# Exhibit B

After Recording Return To:

_____
_____
_____
_____

eRecorded in Philadelphia PA   Doc Id: 53597570
11/27/2019 10:34 AM    Page 1 of 44    Rec Fee: $226.75
Receipt#: 19-120312
Records Department   Doc Code: M

_____ [Space Above This Line For Recording Data] _____

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **November 8, 2019** together with all Riders to this document.

(B) "Borrower" is **DDH Fund, LP, a Delaware Limited Partnership**. Borrower is the mortgagor under this Security Instrument.

(C) "Lender" **Lima One Capital, LLC**. Lender is a Limited Liability Company organized and existing under the laws of Georgia. Lender's address is 201 East McBee Ave, Suite 300, Greenville, SC, 29601. Lender is the mortgagee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated **November 8, 2019**. The Note states that Borrower owes Lender **Five Hundred Ninety Four Thousand Two Hundred Seventy Five and 00/100 Dollars (U.S. $594,275.00)** plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **December 1, 2049**.

(E) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☒ 1-4 Family Rider |
| ☒ Amendment to Security Instruments and Cross Collateralization Agreement | | |

PENNSYLVANIA

Loan #102963

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Escrow Items"** means those items that are described in Section 3.

**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns the

PENNSYLVANIA

Loan #102963

following described property located in the City of Philadelphia, State of Pennsylvania

*See Attached Exhibit A*

which currently has the address of **5332 Lena Street, Philadelphia, PA 19144 and 1835 Harrison Street, Philadelphia, PA 19124 and 4124 Paul Street, Philadelphia, PA 19124 and 5743 North Beechwood Street, Philadelphia, PA 19138 and 335 North Redfield Street, Philadelphia, PA 19139 and 4182 Paul Street, Philadelphia, PA 19124 and 2737 West Eyre Street, Philadelphia, PA 19121**

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not

PENNSYLVANIA

obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items

Loan #102963

PENNSYLVANIA

directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the

PENNSYLVANIA

Loan #102963

date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse

PENNSYLVANIA                                                                          Loan #102963

proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

PENNSYLVANIA

Loan #102963

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to

PENNSYLVANIA

Loan #102963

pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable

PENNSYLVANIA

Loan #102963

Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason

PENNSYLVANIA

Loan #102963

of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given

PENNSYLVANIA

by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument, (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably

PENNSYLVANIA                                                                                          Loan #102963

require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check. bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred.  However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20.  Sale of Note; Change of Loan Servicer; Notice of Grievance.**  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.  A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing.  If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.  If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.  The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

23. **Prepayment.** The prepayment penalty shall be five (5) percent stepping down one (1) percent every year. This applies to any principal payment that would reduce the scheduled principal

PENNSYLVANIA

Loan #102963

balance, per the loan's original amortization table, by more than twenty (20) percent.  This applies only to the portion of any payment that exceeds twenty (20) percent of the scheduled principal balance.

24. **Release.**  Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument.  Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

25. **Waiver of Valuation and Appraisement.**  Borrower waives all right of valuation and appraisement.

[Signatures Commence on Next Page]

PENNSYLVANIA

Loan #102963

In Witness Whereof, the undersigned have executed this Mortgage as of **November 8, 2019**

Borrower: **DDH Fund, L.P., a Delaware Limited Partnership**

By: **Brandon D. Mendenhall, Managing Member of DDH Capital Management, LLC, General Partner**

Signed, sealed, and/or delivered in the presence of:

_____
Unofficial Witness

By: _____

_____
Unofficial Witness

By: _____

State of _Calif_

County of _San Bernardino_

On this **8th** day of **November 2019**, before me, the undersigned official, personally appeared **Brandon D. Mendenhall, Managing Member of DDH Capital Management, LLC, General Partner** of **DDH Fund, L.P., a Delaware Limited Partnership**, known to me or satisfactorily proven to be said person upon presentation of valid photographic identification, who executed this document in my presence for the purposes herein contained.

In witness whereof, I hereunto set my hand and official seal.

[SEAL]

CAROLINE H. GUTIERREZ-JACKSON
Commission # 2136562
Notary Public - California
Los Angeles County
My Comm Expires Dec 12, 2019

_____
Notary Public

_Caroline H Gutierrez Jackson_
Print Name

_12-12-19_
Commission Expiration

_See "Calif ALL Purpose Acknowlegment"_

_(attached)_

PENNSYLVANIA                                                      Loan #102963

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

CIVIL CODE § 1189

State of California

County of *San Bernardino* }

On **11-8-19** before me, *Cardine H Gutierrez-Jackson*
Here Insert Name and Title of the Officer

personally appeared *Brandon D. Mendenhall*
Name(s) of Signer(s)

CAROLINE H GUTIERREZ-JACKSON
Commission # 2136562
Notary Public - California
Los Angeles County
My Comm. Expires Dec 12, 2019

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ *Notary public*
Signature of Notary Public

Place Notary Seal Above

---

## OPTIONAL

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

### Description of Attached Document

Title or Type of Document: **MORTGAGE (Deed)**

Document Date: **11|8|19**          Number of Pages: **16**

Signer(s) Other Than Named Above: **—**

### Capacity(ies) Claimed by Signer(s)

Signer's Name: **Brandon D. Mendenhall**
- Corporate Officer — Title(s): _____
- Individual
- Partner — Limited  General
- Attorney in Fact
- Trustee
- Guardian or Conservator
- ✓ Other: **Managing Member of LP**

Signer Is Representing: **DH FUND LP**

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer's Name: _____
- Corporate Officer — Title(s):
- Individual
- Partner — Limited  General
- Attorney in Fact
- Trustee
- Guardian or Conservator
- Other:

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

© 2010 National Notary Association · NationalNotary.org · 1-800-US NOTARY (1-800-876-6827)     Item #5907

53587570    11/27/2019 10:34 AM

# EXHIBIT "A"

## LEGAL DESCRIPTION

PENNSYLVANIA

Loan #102963

# EXHIBIT A
# LEGAL DESCRIPTION

Issuing Office File No. AM3592

Premises "A"
ALL THAT CERTAIN lot or piece of ground with the two story brick messuage or tenement thereon erected.
SITUATE on the East side of Beechwood Street at the distance of Three hundred fourteen feet Seven and one-eighth inches (314' 7-1/8") Northward from the North side of Chew Street in the Forty-ninth Ward of the City of Philadelphia.

CONTAINING in front of breadth on the said Beechwood Street Fourteen feet Three inches (14' 3") and extending of that width in length or depth Eastward parallel with the Conlyn Street on the North line thereof Sixty-two (62') and on the South line thereof Sixty two feet and Three eighth inches (62' 3/8") to a certain Three feet (3') wide alley extending Northward into said Conlyn Street and communicating at its Southern end with a certain other Three feet (3') wide alley extending Westward into said Beechwood Street.

TOGETHER with the free and common use, right, liberty and privilege of the aforesaid alleys as and for passageways and watercourses at all times hereafter, forever.

BEING NO 5743 North Beechwood Street
BRT # 17-2-4949-00


Premises "B"
ALL THAT CERTAIN Lot or piece of ground with the buildings and improvements thereon erected.
SITUATE on the Southwest side of Lena Street at the distance of 160 feet 6-38 inches Southeast from the Southeast side of Coulter Street; Thence extending South 41 degrees 50 minutes 10 seconds West 90 feet to the Southwest side of a certain 3 feet wide alley leading Northwest into said Coulter Street; Thence Southeast along said alley 15 feet 11-3/4 inches to a point; Thence North 41 degrees 52 minutes 18 seconds East 90 feet to the Southwest side of said Lena Street; Thence Northwest along the same 16-3/8 inches to the place of beginning.
BEING known as 5332 Lena Street.
BEING BRT No. 12-2-1329-00.

Premises "C"
ALL THAT CERTAIN lot or piece of ground with the buildings and improvements thereon erected,
SITUATE in the 23rd Ward of the City of Philadelphia and described according to a survey and plan thereof made by Arthur G. Singer, Esquire, Surveyor and Regulator of the 10th District on the 21st day of September, A.D. 1925, as follows, to wit:

BEGINNING at a point on the Northeasterly side of Harrison Street at the distance of 108 feet Southeasterly side of Charles Street (both streets 50 feet wide).

CONTAINING in front or breadth on the said Harrison Street 15 feet 8 inches and extending of that width in length or depth Northeastwardly between parallel lines at right angles to the said Harrison Street and passing through the center of party walls, 66 feet to a certain 2 feet 6 inches wide alley which leads Northwestwardly and Southeastwardly.
TOGETHER with the free and common use, right, liberty and privilege of the 2 feet 6 inches wide alley which alley as and for a passageway and watercourse at all times hereafter, forever.
BEING known as 1835 Harrison Street.
BEING BRT No. 23-2-2126-00.


Premises "D"
ALL THAT CERTAIN lot or piece of ground with the messuage or tenement thereon erected. SITUATE on the Northwestwardly side of Paul Street at the distance of one hundred sixty-one feet and seven and one-eighths inches Northeastwardly from the Northerly side of Torresdale Avenue in the Twenty-third Ward of the City of Philadelphia.

CONTAINING in front or breadth on the said Paul Street, sixteen feet three inches and extending Northwestwardly between parallel lines in length or depth North sixty-two degrees five minutes forty-five seconds West on the Northeastwardly line passing through the middle of the partition wall between two brick dwellings one hundred two feet six and three-eighths inches and on the Southwest line passing along the middle of an alley two feet six and one half inches.

BOUNDED Northwestwardly by ground now or late of Richard Garsed et al., Northwestwardly by ground now or late of John H. Webster and Southeastwardly by Paul Street aforesaid.
TOGETHER with the free right, use, liberty and privilege of the above mentioned overhead alley at all times hereafter, forever.
BEING known as 4124 Paul Street.
BEING BRT No. 23-2-5099-00.


Premises "E"
ALL THAT CERTAIN lot or piece of ground with the buildings and improvements thereon erected.

SITUATE on the East side of Redfield Street at the distance 252 feet Northward from the North side of Vine Street in the 4th Ward of the City of Philadelphia.

CONTAINING in front or breadth on the said Redfield Street 15 feet and extending of that width in length or depth Eastwardly between parallel lines at right angles to the said Redfield Street 44 feet to a certain 3 feet wide alley extending Northwardly and Southwardly and communicating at the Southern end thereof with a certain other 3 feet wide alley extending Westwardly and Eastwardly into the said Redfield Street and 59th Street.
BEING Known as 335 North Redfield Street.
BEING BRT No. 04-2-2487-00.

Premises "F"
ALL THAT CERTAIN lot or piece of ground with the three story brick messuage and tenement thereon erected described according to a survey made thereof by J. H. Webster, Jr., Surveyor and Regulator of the Tenth District of, or tenant thereon situate on the Twenty-fifth day of August, A.D. 1892, as follows, to wit:

SITUATE on the Northwesterly side of Paul Street at the distance of Twenty feet Southwestwardly from the Southwesterly side of Womrath (formerly Green) Street in Frankford in the Twenty-third Ward of the City of Philadelphia.

CONTAINING in front or breadth on the said Paul Street, nineteen feet ten and three quarters of an inch and extending of that width in length or depth Northwestwardly between parallel lines at right angles to the said Paul Street, one hundred feet bounded Northwestwardly by ground now or late of James Claghan, Southwestwardly by ground now or late of John H. Webster and Southeastwardly by Paul Street, aforesaid.
BEING known as 4182 Paul Street.
BEING BRT No. 23-2-5125-00.

Premises "G"
ALL THAT CERTAIN lot or piece of ground with the buildings and improvements thereon erected.

SITUATE on the Northerly side of Eyre Street at the distance of 276 feet 8 inches Westwardly from the Westerly side of 27th Street.

CONTAINING in frontage on Eyre Street 15 feet and extending of that width in length or depth Northward 54 feet to a certain 3 feet wide alley.

BEING Known as 2737 W Eyre Street
BEING BRT No. 32-4-0749-00.

# ADJUSTABLE RATE RIDER
### (One-Year LIBOR Index – Rate Caps)

THIS ADJUSTABLE RATE RIDER is made the 8th day of **November 2019**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by **DDH Fund, LP, a Delaware Limited Partnership** ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to **Lima One Capital, LLC** ("Lender") of the same date and covering the property described in the Security Instrument and located at:

**5332 Lena Street, Philadelphia, PA 19144**

**1835 Harrison Street, Philadelphia, PA 19124**

**4124 Paul Street, Philadelphia, PA 19124**

**5743 North Beechwood Street, Philadelphia, PA 19138**

**335 North Redfield Street, Philadelphia, PA 19139**

**4182 Paul Street, Philadelphia, PA 19124**

**2737 West Eyre Street, Philadelphia, PA 19121**

[Property Address]

**THE ASSOCIATED NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MINIMUM AND MAXIMUM RATES BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## CHANGES TO INTEREST RATE AND MONTHLY PAYMENT

The Note provides for an initial interest rate of **5.90%**; however, the Note further provides for changes in the interest rate and the monthly payments as follows:

**(1) Change Dates.** The interest rate Borrower will pay may first change on **January 01, 2025**, and on that day every 12th month thereafter. Each date on which the interest rate could change is called a "Change Date."

**(2) The Index.** Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index value available as of the date 45 days before each Change Date is called the "Current Index," provided that if the Current Index is less than zero, then the Current Index will be deemed to be zero for purposes of calculating Borrower's interest rate.

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(3) Calculation of Changes.** Before each Change Date, the Note Holder will calculate my new interest rate by adding **4.00%** (the "Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits set forth in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that, at the Change Date, would be sufficient to repay the unpaid principal that the Borrower is expected to owe in full on the Maturity Date, at Borrower's new interest rate, in substantially equal payments. The result of this calculation will be the new amount of the Borrower's monthly payment.

**(4) Limits on Interest Rate Changes.** The interest rate Borrower is required to pay at the first Change Date will not be greater than **10.90%** or less than **5.90%**. Thereafter, Borrower's interest rate will never increase or decrease on any single Change Date by more than **2.00%** from the rate of interest Borrower paid for the preceding 12 months. Borrower's interest rate will never be greater than **10.90%**, which is called the "Maximum Rate," or less than **5.90%**, which is called the "Minimum Rate."

PENNSYLVANIA                                                                                                Loan #102963

53567570    12/27/2019 10:34 AM

**(5) Effective Date of Changes.** Borrower's new interest rate will become effective on each Change Date. Borrower will pay the amount of the new monthly payment beginning on the first monthly payment date on, or immediately after, the Change Date until the amount of the monthly payment changes again.

**[Signatures Commence on Next Page]**

PENNSYLVANIA

Loan #102963

In Witness Whereof, the undersigned have executed this Adjustable Rate Rider as of **November 8, 2019**.

Borrower: **DDH Fund, LP, a Delaware Limited Partnership**

By: Brandon D. Mendenhall, Managing Member of DDH Capital Management, LLC, General Partner

Signed, sealed, and/or delivered in the presence of:

_____
Unofficial Witness

By: _____

_____
Unofficial Witness

By: _____

State of *Calif*

County of *San Bernardino*

On this **8th** day of November 2019, before me, the undersigned official, personally appeared **Brandon D. Mendenhall, Managing Member of DDH Capital Management, LLC, General Partner** of **DDH Fund, LP, a Delaware Limited Partnership**, known to me or satisfactorily proven to be said person upon presentation of valid photographic identification, who executed this document in my presence for the purposes herein contained.

In witness whereof, I hereunto set my hand and official seal.

[SEAL]

CAROLINE H. GUTIERREZ-JACKSON
Commission # 2136562
Notary Public - California
Los Angeles County
My Comm. Expires Dec 12, 2019

_____ *Notary Public*
Notary Public

*Caroline H Gutierrez Jackson*
Print Name

*12-12-19*
Commission Expiration

*See attached*
*"Calif Acknowledgment"*

PENNSYLVANIA

Loan #102963

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

CIVIL CODE § 1189

State of California

County of San Bernardino }

On 11-8-19 before me, Caroline H Gutierrez Jackson
Date                        Here Insert Name and Title of the Officer

personally appeared Brandon D Mendenhall
                              Name(s) of Signer(s)

CAROLINE H. GUTIERREZ-JACKSON
Commission # 2136562
Notary Public - California
Los Angeles County
My Comm. Expires Dec 12, 2019

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ NOTARY public
                    Signature of Notary Public

Place Notary Seal Above

━━━━━━━━━━ **OPTIONAL** ━━━━━━━━━━

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: Adjustable Note Rider

Document Date: 11/8/19                    Number of Pages: 2

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: SAME

- Corporate Officer — Title(s): _____
- Individual
- Partner — Limited General
- Attorney in Fact
- Trustee
- Guardian or Conservator
- Other: Managing Member of LP

Signer Is Representing: DDH Fund LP

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer's Name: _____

- Corporate Officer — Title(s): _____
- Individual
- Partner — Limited General
- Attorney in Fact
- Trustee
- Guardian or Conservator
- Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

© 2010 National Notary Association • NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)          Item #5907

# 1-4 FAMILY RIDER
## (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this 8th day of November 2019, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned **DDH Fund, LP, a Delaware Limited Partnership** (the "Borrower") to secure Borrower's Note to **Lima One Capital, LLC** (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**5332 Lena Street, Philadelphia, PA 19144**
**1835 Harrison Street, Philadelphia, PA 19124**
**4124 Paul Street, Philadelphia, PA 19124**
**5743 North Beechwood Street, Philadelphia, PA 19138**
**335 North Redfield Street, Philadelphia, PA 19139**
**4182 Paul Street, Philadelphia, PA 19124**
**2737 West Eyre Street, Philadelphia, PA 19121**
[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Section 6 concerning Borrower's occupancy of the Property is deleted and Borrower further warrants that neither Borrower nor Borrower's immediate family shall at any time occupy the Property.

PENNSYLVANIA

Loan #102963

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note, instrument or agreement relating to a loan owned by Lender shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument. If the Security Instrument is on a leasehold, a default on the lease is, at the sole discretion of Lender, a default on the Security Instrument.

**[Signatures Commence on Next Page]**

PENNSYLVANIA

Loan #102963

53557570 11/27/2019 10:34 AM

In Witness Whereof, the undersigned have executed this 1-4 Family Rider (Assignment of Rents) as of **November 8, 2019**.

Borrower: **DDH Fund, LP, a Delaware Limited Partnership**

By: Brandon D. Mendenhall, Managing Member of DDH Capital Management, LLC, General Partner

Signed, sealed, and/or delivered in the presence of:

Unofficial Witness

By: _____

Unofficial Witness

By: _____

State of _Calif_

County of _San Bernardino_

On this **8th day of November 2019**, before me, the undersigned official, personally appeared **Brandon D. Mendenhall, Managing Member of DDH Capital Management, LLC, General Partner of DDH Fund, LP, a Delaware Limited Partnership**, known to me or satisfactorily proven to be said person upon presentation of valid photographic identification, who executed this document in my presence for the purposes herein contained.

In witness whereof, I hereunto set my hand and official seal.

[SEAL]

CAROLINE H. GUTIERREZ-JACKSON
Commission # 2136562
Notary Public - California
Los Angeles County
My Comm Expires Dec 12, 2019

Notary Public

_Caroline H Gutierrez-Jackson_
Print Name

_12-12-19_
Commission Expiration

_See Attached_
_"Caluf All-Purpose Acknowledgment_

## AMENDMENT TO SECURITY INSTRUMENTS

PENNSYLVANIA

Loan #102963

Doc #: 535875700 07/26 28 of 44 Page 129 of 245 11/27/2019 10:34 AM

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

CIVIL CODE § 1189

State of California

County of San Bernardino }

On 11-8-19 before me, Caroline H Gutierrez-Jackson
Date                        Here Insert Name and Title of the Officer

personally appeared Brandon D. Mendenhall
Name(s) of Signer(s)

CAROLINE H GUTIERREZ-JACKSON
Commission # 2136562
Notary Public - California
Los Angeles County
My Comm Expires Dec 12, 2019

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _____
Place Notary Seal Above        Signature of Notary Public

―――――――――――――― OPTIONAL ――――――――――――――

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

## Description of Attached Document

Title or Type of Document: 1-4 Family Rider

Document Date: 11/8/15                    Number of Pages: 3

Signer(s) Other Than Named Above: —

## Capacity(ies) Claimed by Signer(s)

| Signer's Name: | Signer's Name: |
|---|---|
| Corporate Officer — Title(s): | Corporate Officer — Title(s): |
| ☐ Individual | ☐ Individual |
| ☐ Partner — ☐ Limited ☐ General | ☐ Partner — ☐ Limited ☐ General |
| ☐ Attorney in Fact | ☐ Attorney in Fact |
| ☐ Trustee | ☐ Trustee |
| ☐ Guardian or Conservator | ☐ Guardian or Conservator |
| ☑ Other: Managing Member | ☐ Other: |
| Signer Is Representing: DDH Fund LP | Signer Is Representing: |

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

© 2010 National Notary Association • NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)     Item #5907

## AND CROSS-COLLATERALIZATION AGREEMENT

THIS AMENDMENT TO SECURITY INSTRUMENTS AND CROSS-COLLATERALIZATION AGREEMENT (this "**Agreement**") is made as of this **8ᵗʰ day of November, 2019** by **Lima One Capital, LLC**, a Georgia limited liability company ("**Lender**"), and **DDH Fund, LP, a Delaware Limited Partnership** ("**Borrower**").

## RECITALS

A.     Lender, as of the date set forth above, has made certain mortgage loans to Borrower in the total original principal amount of **$594,275.00** (collectively, "**Existing Loans**") secured by various residential real properties (collectively, "**Mortgaged Properties**") by way of various security deeds (collectively, "**Instruments**"), all as more fully set forth in Exhibit A.

B.     In addition to any Existing Loans, Lender is making other mortgage loans (collectively, "**Related Loans**") to Borrower and/or affiliates of Borrower secured by other residential real properties (collectively, "**Related Properties**") by way of various security deeds (collectively, "**Related Instruments**"), the schedule of total Properties being fully set forth in Exhibit B.

C.     Borrower acknowledges that a condition of Lender making Exiting Loans and the Related Loans is that each of the Mortgaged Properties serves as collateral for each of the Exiting and Related Loans and that each of the Related Properties serves as collateral for each of the Exiting and Related Loans. Borrower is executing this Agreement to satisfy such condition. Borrower further acknowledges that the benefits derived by Borrower from this Agreement and from those certain Cross-Collateralization Agreements entered into or to be entered into in connection with the Related Loans are equivalent to the burdens imposed upon borrower and the Mortgaged Properties by this Agreement, notwithstanding that the Existing Loans and Related Loans may be of differing amounts.

## Section 1
## Definitions

For purposes of this Agreement, the following terms shall have the meanings indicated:

"**Events of Default**" shall have the meaning set forth in Section 5.

"**Foreclosure**" means a judicial or non-judicial foreclosure of or trustee's sale under the Instrument or a related Instrument, a deed in lieu of such foreclosure or sale, a sale of any of the Total Property pursuant to lawful order of a court of competent jurisdiction in a bankruptcy case filed under Title 11 of the United States Code, or any other similar disposition of any of the Total Property.

"**Indebtedness**" means the aggregate of the indebtedness as defined in the Instruments, inclusive of any and all associated accrued interests.

PENNSYLVANIA                                                                                                          Loan #102963

"**Loan Documents**" means the documentation utilized to effectuate each of the Existing Loans, also defined in and related to each of the Instruments.

"**Loans**" means the Exiting Loans and the Related Loans.

"**Related Borrowers**" means the original borrower under each of the Loans (which original borrower may be the Borrower named in this Agreement), any personal guarantor under each of the Loans, and any successor to the interest of each such borrower and/or guarantor in any of the Total Properties who acquires such property subject to, or who assumes the obligations under an Instrument or Related Instrument.

"**Related Indebtedness**" means the aggregate of the indebtedness as defined in the Related Instruments, inclusive of any and all associated accrued interest.

"**Related Loans Documents**" means the documentation utilized to effectuate each of the Related Loans, also defined in and related to each of the Related Instruments.

"**Total Indebtedness**" means the aggregate of the Indebtedness plus the Related Indebtedness, inclusive of any and all associated accrued interest.

"**Total Loans Documents**" means the documentation utilized to effectuate each of the Existing Loans and Related Loans, also defined in and related to the Instruments and the Related Instruments, respectively. This Agreement is among the Total Loan Documents.

"**Total Property**" means the aggregate of the Mortgaged Properties and the mortgaged property secured under each of the Related Loans (i.e. the Related Properties).

Capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in the Instrument.

### Section 2
### Assumption and Integration of Related Indebtedness; Obligations Absolute

Borrower hereby acknowledges that:

(a)     Borrower shall pay not only the Indebtedness; but all of the Related Indebtedness in accordance with the Loans Documents and Related Loan Documents. Borrower, the personal guarantors, and the Related Borrowers are jointly and severally liable for the payments of the Total Indebtedness. Lender, at its option may, treat the Existing Loans and each of the Related Loans as separate and independent obligations of Borrower, or may treat some or all of the Loans, and all or any part of the Total Indebtedness, as a single, integrated indebtedness of Borrower.

(b)     No invalidity, irregularity or unenforceability of all or any part of the Related Indebtedness shall affect, impair or be a defense to the recovery by Lender of the Indebtedness or *vice versa*.

PENNSYLVANIA                                                                                    Loan #102963

(c)    It is the intention of Lender and Borrower that Borrower's obligations to pay the Related Indebtedness shall be independent, primary, and absolute, and shall be performed without demand by Lender and shall be unconditional irrespective of the genuineness, validity, regularity or enforceability of any of the Related Loan Documents, and without regard to any circumstance, other than payment in full of the Related Indebtedness, which might otherwise constitute a legal or equitable discharge of a borrower, a mortgagor, a surety or a personal guarantor.  Borrower waives, to the fullest extent permitted by law, all rights to require Lender to proceed against any Related Borrower or against any personal guarantor of any of the Total Indebtedness or to pursue ant other rights or remedy Lender may now or hereafter have against an Related Borrower or any collateral for any of the Total Indebtedness.

(d)    In the event Borrower is past due on one or more mortgage payments on any of the Mortgaged or Related Properties, Lender is entitled to increase the payoff value on any of the other Mortgaged or Related Properties to the same extent of the past due mortgage payments, including any applicable penalties and interest. This increase in payoff value will be cumulative and reflect any past due mortgage payments for any and all of the properties that comprise the Total Properties.

## Section 3
## Amendment of Instrument to Grant Additional Security

The Instruments are hereby amended that the Instruments secure the obligation of Borrower and the Related Borrowers to pay the Related Indebtedness as well as the obligation of Borrower and the Related Borrower to pay the Indebtedness. Borrower hereby irrevocably grants, conveys and assigns to Lender a security interest in the Total Property, to secure to Lender payment of the Related Indebtedness and performance of the covenants and agreements contained in the Related Loan Documents, as well as to secure to Lender payment of the Indebtedness and performance of the covenants and agreements contained in the Loan Documents.

Borrower may finance multiple residential real properties under one loan.  Under this scenario, a lien against an individual residential real property will be released when one hundred and twenty percent (120%) of the Indebtedness or Related Indebtedness allocated to that collateral is paid in full.   A prepayment penalty, if applicable, would be calculated based on a prepayment of one hundred (100%) percent of the original loan amount allocated to that collateral.

## Section 4
## Amendment of Instruments to Provide for Cross-Default

The Instruments are hereby amended to provide that any Event of Default under this Agreement or the Related Instruments shall constitute an Event of Default under the Instruments.

## Section 5
## Events of Default

Each of the following events shall constitute an "**Event of Default**" under this agreement:

(a)   a default or breach by Borrower of any provision of this Agreement; and

(b)   any event or condition constituting an Event of Default under any of the Total Loan Documents.

## Section 6
## Remedies

(a)   Upon the occurrence of an Event of Default, Lender in its sole and absolute discretion may exercise any, some or all of the following remedies, in such order and at such time or times as Lender shall elect:

(i)   declared immediately due and payable the entire Total Indebtedness or any portion thereof;

(ii)   increased the payoff value necessary for release of Lender's security interest in any property included in the Total Property, as set forth in Section 2(d); and

(iii)   exercise any, some or all of Lender's rights and remedies under this Agreement, any of the Total Loan Documents or applicable law.

(b)   Lender may exercise such remedies in one or more proceedings, whether contemporaneous or consecutive or a combination of both, to be determined by Lender in its sole and absolute discretion. Lender any enforce its rights against any of the Mortgaged Properties, any of the Related Properties or the Total Property, or any portions of the Mortgaged Property, Related Property or the Total Property, in such order and manner as Lender may elect in Lender's sole and absolute discretion. The enforcement of any of the Instruments or any of the Related Instruments or any other of the Total Loan Documents shall not constitute an election of remedies, and shall not limit or preclude the enforcement of any of the Instruments or any of the Related Instruments or any other of the Total Loan Documents, through one or more additional proceedings. Lender may bring any action or proceeding, including but not limited to foreclosure proceedings, without regard to the fact that one or more other proceedings may have been commenced elsewhere with respect to other of the Total Property or any portion thereof. Borrower, for itself and for any and all persons or entities now or in the future holding or claiming any lien on, security interest in, or other interest or right of any nature in or to any of the Total Property, hereby unconditionally and irrevocably waives any rights Borrower may have, now or in the future, whether at law or in equity, to require Lender to enforce or exercise any of Lender's rights or remedies under this Agreement, under the Instruments, under the Related Instruments or under any other of the Total Loans Documents in any particular manner or order or in any particular state or county, or to apply the proceeds of any foreclosure in any particular manner or order.

(c)   No judgment obtained by Lender in any proceeding enforcing any of the Total Loan Documents shall merge any of the Total Indebtedness into that judgment, and all Total

PENNSYLVANIA                                                                                    Loan #102963

Indebtedness that remains unpaid shall remain a continuing obligation of Borrower. Notwithstanding any foreclosure of any of the Instruments or any of the Related Instruments, borrower shall remain bound under this Agreement.

(d)    The prepayment penalty shall be five (5) percent stepping down one (1) percent every year. This applies to any principal payment that would reduce the scheduled principal balance, per the loan's original amortization table, by more than twenty (20) percent. This applies only to the portion of any payment that exceeds twenty (20) percent of the scheduled principal balance.

[For example, if a borrower made a $25,000 payment in Year 1, on a loan with a scheduled principal balance of $100,000, the prepayment penalty would be assessed on the $5,000 portion of the payment that would be above 20% of the scheduled principal balance [$25,000 - $20,000 ($100,000 x 20%)]. The resulting prepayment penalty would be $250 [$5,000 x 5%].]

## Section 7
## Application of Proceeds

Proceeds of the enforcement or foreclosure of any of the instruments or any of the Related Instruments shall be applied to the payment of the Total Indebtedness (including prepayment premiums, if applicable) in such order a Lender may determine in Lender's sole and absolute discretion.

## Section 8
## Borrower's Rights to Subrogation

Until the Total Indebtedness has been paid in full and there has expired the maximum possible period thereafter during which any payment to Lender with respect to the Total Indebtedness could be deemed a preference under the United States Bankruptcy Code, borrower shall have no right of, and hereby waives any claim for, subrogation, contribution, reimbursement or indemnity (whether contractual, statutory, equitable, under common law or otherwise) which Borrower has now or may have in the future against any of the Related borrowers or any of the Related Properties or against any personal guarantor or security for any of the Total Indebtedness. Borrower understands that the exercise by Lender f certain rights and remedies contained in the Instruments or Related Instruments may affect or eliminate Borrower's rights of subrogation against a Related Borrower and that Borrower may therefore incur a partially or totally non-reimbursement liability under this Agreement. Nevertheless, Borrower hereby authorizes and empowers Lender in its sole and absolute discretion to exercise any right or remedy, or any combination thereof, which may then be available.

## Section 9
## Subordination of Obligations to Borrower

Any indebtedness or other obligation of a Related Borrower held by Borrower shall be subordinate to the rights of Lender against that Related Borrower. If Lender so requests at a time when an Event

PENNSYLVANIA                                                                    Loan #102963

Unofficial Copy

of Default has occurred, Borrower shall enforce and collect any such indebtedness or other obligation as trustee for Lender and shall pay over to lender any amount collected, on account of the Total Indebtedness.

## Section 10
## Lender's Rights

At any time and from time to time and without the consent of Borrower, without incurring liability to Borrower, and without impairing or releasing Borrower's liability for the Total Indebtedness, Lender may:

(a)     change the manner, place or terms of payment, or change or extend the time of payment of, or renew, increase, accelerate or alter, any of the Total Indebtedness, any security for the Total Indebtedness, or any liability incurred directly or indirectly with respect to the Total Indebtedness;

(b)     take and hold security for the payment of any of the Related Indebtedness, and sell, exchange, release, surrender, realize upon or otherwise deal with in any manner and in any order any property pledged or mortgaged to secure any of the Total Indebtedness, including, but not limited to, increasing the payoff value necessary for release of Lender's security interest in any property that compromises the Total Properties;

(c)     exercise or refrain from exercising any rights against Borrower, any Related Borrower or personal guarantor, any Mortgaged properties or any Related Properties;

(d)     release or substitute any one or more borrowers or personal guarantors with respect to any of the Total Indebtedness;

(e)     settle or compromise any of the Total Indebtedness, or subordinate the payment of all or any part of the Total Indebtedness to the payment of any liability (whether due or not) of Borrower or any Related Borrower under, this Agreement or any of the Total Loan Documents.

## Section 11
## Waivers of Presentment, Marshalling, Defenses, *etc.*

(a)     With respect to its obligations under this Agreement and the total Loan Documents, Borrower waives presentment, demand, notice of dishonor, protest, notice of acceleration, notice of intent to demand or accelerate payment or maturity, presentment for payment, notice of nonpayment, grace, and diligence in collecting such obligations.

(b)     Lender shall have the right to determine in Lender's sole and absolute discretion whether and the order in which any or all of the Total Property, or portions thereof, shall be subjected to the remedies provided in the Total Loan Documents or applicable law. Lender shall have the

PENNSYLVANIA                                                                                              Loan #102963

right to determine in Lender's sole and absolute discretion the order in which any or all portions of the Total Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Borrower and any party who now or in the future acquires a lien on or security interest or other interest in any of the Mortgaged Properties or Related Properties hereby unconditionally and irrevocably waives any and all right to require the marshalling of assets or to require that any of the Total Property, or portions thereof, be sold in the inverse order of alienation, in parcels, as an entirety or in any other order or manner in connection with the exercise of such remedies.

## Section 12
### Release Provisions

In the event of a transfer of a particular property included in the Total Property to an unaffiliated third party, Lender will release its security interest on said particular property from this Agreement and the relevant Instruments or Related Instruments upon the satisfaction of all of the following conditions:

(a)     Lender has received from Borrower at least thirty (30) days prior written notice of the proposed date and details for such release ("**Release Date**");

(b)     no Event of Default has occurred on any property included in the Total Property and no event or circumstances exists on the Release Date that, with the giving of notice or the passage of time or both, could constitute such an Event of Default or in the existence of an Event of Default, Lender is able to cure such Event of Default pursuant to the remedies set forth in Section 6; and

(c)     Lender determines in its sole and absolute discretion the Total Property that would remain as security for the remaining Total Indebtedness is sufficient to secure the remaining Total Indebtedness or, in the event Lender determines the Total Property that would remain would not be sufficient to secure the remaining Total Indebtedness, Borrower either pledges additional security or reduces the Total Indebtedness through additional payments of principal sufficient to satisfy this condition in Lender's sole and absolute judgment.

## Section 13
### Notices

All notices to Borrower by Lender under this Agreement shall be in writing and shall be given in the manner provided in the Instruments and Related Instruments for notices to Borrower. All notices to Lender by Borrower under this Agreement shall be in writing and shall be given in the manner provided in the Instruments and Related Instruments for notices to Lender.

## Section 14
### Governing Law; Jurisdiction and Venue

This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia. Borrower irrevocably submits to the jurisdiction of any federal or state court sitting in the

PENNSYLVANIA                                                                                    Loan #102963

State of Georgia. Borrower hereby submits to the *in personam* jurisdiction of each such court in any matter involving this Agreement. Borrower irrevocably waived, to the fullest extent permitted under applicable law, any objections it may now or hereafter have to the venue of any suit, action or proceeding forum. Borrower acknowledges that it has received material and substantial consideration for the cross-collateralization of the Mortgaged Properties and the Related Properties and that the foregoing venue provision is integral to the Lender's realization of its rights hereunder. Borrower further acknowledges that it is not in disparate bargaining position, that it is a commercial enterprise, with sophisticated financial, legal and economic experience, that the venue selections contained herein are not unreasonable, unjust, inconvenient or overreaching.

## Section 15
### Captions, Cross references and Exhibits

The captions assigned to provisions of this Agreement are for convenience only and shall be disregarded in construing the Agreement. Any reference in this Agreement to a "Section", a "Subsection" or an "Exhibit" shall, unless otherwise explicitly provided, be construed as referring to a section of this Agreement, to a subsection of the section of this Agreement in which the reference appears or to an Exhibit attached to this Agreement. All Exhibits referred to in this Agreement are hereby incorporated by reference.

## Section 16
### Number and Gender

Use if the singular in this Agreement includes plural, use of the plural includes the singular, and use of one gender includes all other genders, as the context may require.

## Section 17
### Statutes and Regulations

Any reference in this Agreement to a statute or regulation shall include all amendments to and successors to such statute or regulation, whether adopted before or after the date of this Agreement.

## Section 18
### No Partnership or Joint Venture

This Agreements is not intended to, and shall not, create a partnership or joint venture among the parties, and no party to this Agreement shall have the power or authority to bind any other party except as explicitly provided in this Agreement.

## Section 19
### Successors and Assigns

This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, successor, and assigns.

## Section 20

PENNSYLVANIA                                                                    Loan #102963

## Severability

The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision and all other provisions shall remain in full force and effect.

## Section 21
## Waiver; No Remedy Exclusive

Any forbearance by a party to this Agreement in exercising any right or remedy given under this Agreement or existing at law or in equity shall not constitute a waiver of or preclude the exercise of that or any other right or remedy. Unless otherwise explicitly provided, no remedy under this Agreement is intended to be exclusive of any other available remedy, but each remedy shall be cumulative and shall be in addition to other remedies given under this Agreement or existing at law or equity.

## Section 22
## Third Party Beneficiaries

Neither any creditor of any party to this Agreement, nor any other person, is intended to be a third party beneficiary of this Agreement.

## Section 23
## Course of Dealing

No course of dealing among the parties to this Agreement shall operate as a waiver of any rights of any party under this Agreement.

## Section 24
## Further Assurances and Corrective Instruments

To the extent permitted by law, the parties shall, from time to time, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such supplements to this Agreement and such further instruments as may reasonably be required for carrying out the intention of or facilitating the performance of this Agreement; particularly but not exclusively amendments to Exhibit C per each Related Loan granted to Borrower by Lender.

## Section 25
## No Party Deemed Drafter

No party shall be deemed the drafter of this Agreement, and this Agreement shall not be construed against either party as the drafter of the Agreement.

## Section 26
## Waiver of Trial by Jury

BORROWER AND LENDER EACH (A) COVENANTS AND AGREES NOT TO ELECT A

PENNSYLVANIA                                                                                            Loan #102963

TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS AGREEMENT THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

## Section 27
## Attached Exhibits

The following Exhibits are attached to this Agreement:

[ X ]   Exhibit A – Legal Descriptions of Mortgaged Properties

[ X ]   Exhibit B – Schedule of Total Properties

**[Signatures Commence on Next Page]**

PENNSYLVANIA                                                            Loan #102963

53587570  11/27/2019 10:34 AM

**In Witness Whereof**, the undersigned have executed this Amendment to Security Instruments and Cross-Collateralization Agreement as of **November 8, 2019**.

Borrower: **DDH Fund, LP, a Delaware Limited Partnership**

**By:** Brandon D. Mendenhall, Managing Member of DDH Capital Management. LLC, General Partner

Signed, sealed, and/or delivered in the presence of:

_____
Unofficial Witness

By: _____

_____
Unofficial Witness

By: _____

State of _Calif_

County of _SAN BERNARDINO_

On this **8th day of November 2019**, before me, the undersigned official, personally appeared **Brandon D. Mendenhall, Managing Member of DDH Capital Management, LLC, General Partner of DDH Fund, LP, a Delaware Limited Partnership**, known to me or satisfactorily proven to be said person upon presentation of valid photographic identification, who executed this document in my presence for the purposes herein contained.

In witness whereof, I hereunto set my hand and official seal.

[SEAL]

CAROLINE H. GUTIERREZ-JACKSON
Commission # 2136562
Notary Public - California
Los Angeles County
My Comm. Expires Dec 12, 2019

Notary Public

_Caroline H Gutierrez-Jackson_
Print Name

_12-12-19_
Commission Expiration

" See Attached "
^ Calif All Purpose Acknowledgment "

PENNSYLVANIA

Loan #102963

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

CIVIL CODE § 1189

State of California

County of _San Bernardino_ }

On _11-8-19_ before me _Caroline H Gutierrez-Jackson_
<sub>Date</sub>                    Here Insert Name and Title of the Officer

personally appeared _Brandon D. Mendenhall_
                                Name(s) of Signer(s)

_____

<div style="border:1px solid black;">CAROLINE H GUTIERREZ-JACKSON
Commission # 2136562
Notary Public - California
Los Angeles County
My Comm. Expires Dec 12, 2019</div>

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _Caroline_        _Notary public_
<sub>Place Notary Seal Above</sub>                Signature of Notary Public

——————— OPTIONAL ———————

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**
Title or Type of Document: _And Cross-Collateralization Agreement_

Document Date: _____     Number of Pages: _(11)_

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____          Signer's Name: _____
☐ Corporate Officer — Title(s): _____   ☐ Corporate Officer — Title(s): _____
☐ Individual                              ☐ Individual
☐ Partner — ☐ Limited ☐ General          ☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact                        ☐ Attorney in Fact
☐ Trustee                                 ☐ Trustee
☐ Guardian or Conservator                 ☐ Guardian or Conservator
☒ Other: _Managing Member of RP_          ☐ Other: _____

Signer Is Representing:                    Signer Is Representing:
_DDH Fund LP_                             _____

RIGHT THUMBPRINT OF SIGNER
RIGHT THUMBPRINT OF SIGNER

© 2010 National Notary Association (NationalNotary.org) • 1-800-US NOTARY (1-800-876-6827)        Item #5907

**EXHIBIT A**
**LEGAL DESCRIPTION OF MORTGAGED PROPERTIES**

PENNSYLVANIA

Loan #102963

# EXHIBIT A
# LEGAL DESCRIPTION

Issuing Office File No. AM3592

**Premises "A"**
ALL THAT CERTAIN lot or piece of ground with the two story brick messuage or tenement thereon erected.
SITUATE on the East side of Beechwood Street at the distance of Three hundred fourteen feet Seven and one-eighth inches (314' 7-1/8") Northward from the North side of Chew Street in the Forty-ninth Ward of the City of Philadelphia.

CONTAINING in front of breadth on the said Beechwood Street Fourteen feet Three inches (14' 3") and extending of that width in length or depth Eastward parallel with the Conlyn Street on the North line thereof Sixty-two (62') and on the South line thereof Sixty two feet and Three eighth inches (62' 3/8") to a certain Three feet (3') wide alley extending Northward into said Conlyn Street and communicating at its Southern end with a certain other Three feet (3') wide alley extending Westward into said Beechwood Street.

TOGETHER with the free and common use, right, liberty and privilege of the aforesaid alleys as and for passageways and watercourses at all times hereafter, forever.

BEING NO 5743 North Beechwood Street
BRT # 17-2-4949-00

**Premises "B"**
ALL THAT CERTAIN Lot or piece of ground with the buildings and improvements thereon erected.
SITUATE on the Southwest side of Lena Street at the distance of 160 feet 6-38 inches Southeast from the Southeast side of Coulter Street; Thence extending South 41 degrees 50 minutes 10 seconds West 90 feet to the Southwest side of a certain 3 feet wide alley leading Northwest into said Coulter Street; Thence Southeast along said alley 15 feet 11-3/4 inches to a point; Thence North 41 degrees 52 minutes 18 seconds East 90 feet to the Southwest side of said Lena Street; Thence Northwest along the same 16-3/8 inches to the place of beginning.
BEING known as 5332 Lena Street.
BEING BRT No. 12-2-1329-00.

**Premises "C"**
ALL THAT CERTAIN lot or piece of ground with the buildings and improvements thereon erected,
SITUATE in the 23rd Ward of the City of Philadelphia and described according to a survey and plan thereof made by Arthur G. Singer, Esquire, Surveyor and Regulator of the 10th District on the 21st day of September, A.D. 1925, as follows, to wit:

BEGINNING at a point on the Northeasterly side of Harrison Street at the distance of 108 feet Southeasterly side of Charles Street (both streets 50 feet wide).

CONTAINING in front or breadth on the said Harrison Street 15 feet 8 inches and extending of that width in length or depth Northeastwardly between parallel lines at right angles to the said Harrison Street and passing through the center of party walls, 66 feet to a certain 2 feet 6 inches wide alley which leads Northwestwardly and Southeastwardly.
TOGETHER with the free and common use, right, liberty and privilege of the 2 feet 6 inches wide alley which alley as and for a passageway and watercourse at all times hereafter, forever.
BEING known as 1835 Harrison Street.
BEING BRT No. 23-2-2126-00.

**Premises "D"**
ALL THAT CERTAIN lot or piece of ground with the messuage or tenement thereon erected. SITUATE on the Northwestwardly side of Paul Street at the distance of one hundred sixty-one feet and seven and one-eighths inches Northeastwardly from the Northerly side of Torresdale Avenue in the Twenty-third Ward of the City of Philadelphia.

CONTAINING in front or breadth on the said Paul Street, sixteen feet three inches and extending Northwestwardly between parallel lines in length or depth North sixty-two degrees five minutes forty-five seconds West on the Northeastwardly line passing through the middle of the partition wall between two brick dwellings one hundred two feet six and three-eighths inches and on the Southwest line passing along the middle of an alley two feet six and one half inches.

BOUNDED Northwestwardly by ground now or late of Richard Garsed et al., Northwestwardly by ground now or late of John H. Webster and Southeastwardly by Paul Street aforesaid.
TOGETHER with the free right, use, liberty and privilege of the above mentioned overhead alley at all times hereafter, forever.
BEING known as 4124 Paul Street.
BEING BRT No. 23-2-5099-00.


Premises "E"
ALL THAT CERTAIN lot or piece of ground with the buildings and improvements thereon erected.

SITUATE on the East side of Redfield Street at the distance 252 feet Northward from the North side of Vine Street in the 4th Ward of the City of Philadelphia.

CONTAINING in front or breadth on the said Redfield Street 15 feet and extending of that width in length or depth Eastwardly between parallel lines at right angles to the said Redfield Street 44 feet to a certain 3 feet wide alley extending Northwardly and Southwardly and communicating at the Southern end thereof with a certain other 3 feet wide alley extending Westwardly and Eastwardly into the said Redfield Street and 59th Street.
BEING Known as 335 North Redfield Street.
BEING BRT No. 04-2-2487-00.

Premises "F"
ALL THAT CERTAIN lot or piece of ground with the three story brick messuage and tenement thereon erected described according to a survey made thereof by J. H. Webster, Jr., Surveyor and Regulator of the Tenth District of, or tenant thereon situate on the Twenty-fifth day of August, A.D. 1892, as follows, to wit:

SITUATE on the Northwesterly side of Paul Street at the distance of Twenty feet Southwestwardly from the Southwesterly side of Womrath (formerly Green) Street in Frankford in the Twenty-third Ward of the City of Philadelphia.

CONTAINING in front or breadth on the said Paul Street, nineteen feet ten and three quarters of an inch and extending of that width in length or depth Northwestwardly between parallel lines at right angles to the said Paul Street, one hundred feet bounded Northwestwardly by ground now or late of James Claghan, Southwestwardly by ground now or late of John H. Webster and Southeastwardly by Paul Street, aforesaid.
BEING known as 4182 Paul Street.
BEING BRT No. 23-2-5125-00.

Premises "G"
ALL THAT CERTAIN lot or piece of ground with the buildings and improvements thereon erected.

SITUATE on the Northerly side of Eyre Street at the distance of 276 feet 8 inches Westwardly from the Westerly side of 27th Street.

CONTAINING in frontage on Eyre Street 15 feet and extending of that width in length or depth Northward 54 feet to a certain 3 feet wide alley.

BEING Known as 2737 W Eyre Street
BEING BRT No. 32-4-0749-00.

Unofficial Copy

## EXHIBIT B
## SCHEDULE OF TOTAL PROPERTIES

| Property Address | Allocated Loan Amount | Lender Valuation |
|---|---|---|
| 5332 Lena Street, Philadelphia, PA 19144 | $123,750.00 | $165,000.00 |
| 1835 Harrison Street, Philadelphia, PA 19124 | $82,500.00 | $110,000.00 |
| 4124 Paul Street, Philadelphia, PA 19124 | $91,875.00 | $122,500.00 |
| 5743 North Beechwood Street, Philadelphia, PA 19138 | $95,250.00 | $127,000.00 |
| 335 North Redfield Street, Philadelphia, PA 19139 | $70,000.00 | $100,000.00 |
| 4182 Paul Street, Philadelphia, PA 19124 | $64,400.00 | $92,000.00 |
| 2737 West Eyre Street, Philadelphia, PA 19121 | $66,500.00 | $95,000.00 |

PENNSYLVANIA

Loan #102963