# EXHIBIT A

ORIGINAL

# ADJUSTABLE RATE NOTE

### (12 Month Term SOFR Reference Rate as administered by CME Group Benchmark Administration Limited)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE BORROWER'S INTEREST RATE AND MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MINIMUM AND MAXIMUM RATES THE BORROWER MUST PAY.

THIS NOTE CONTAINS A CONFESSION OF JUDGMENT PROVISION THAT CONSTITUTES A WAIVER OF IMPORTANT RIGHTS YOU MAY HAVE AS A DEBTOR/BORROWER AND ALLOWS THE CREDITOR/LENDER TO OBTAIN A JUDGMENT AGAINST YOU WITHOUT ANY FURTHER NOTICE.

Loan Number:

Property Addresses:

1508 W Oxford St
Philadelphia, PA 19121
2034 N 17th St
Philadelphia, PA 19121

1926 N Gratz St
Philadelphia, PA 19121

Date of this Adjustable Rate Note: February 13, 2023

## 1.    BORROWER'S PROMISE TO PAY

In return for the Loan that the undersigned RAD Diversified REIT, Inc., a Maryland Corporation (individually and collectively, the "Borrower") has received, the Borrower promises to pay U.S. $1,019,850.00 (this amount is called "Note Amount"), plus interest, to the order of Civic Financial Services, LLC, a California Limited Liability Company (the "Lender"). The Borrower will make all payments under this Adjustable Rate Note (as amended, restated, supplemented or otherwise modified from time to time, this "Note") in readily available funds of United States dollars.

The Borrower understands that the Lender may assign, sell, pledge, securitize or transfer this Note or any interest (including, without limitation, participation interests) in this Note (a "Secondary Market Transaction") at any time and from time to time without notice to, or the consent of, the Borrower. The Lender or anyone who takes this Note or any interest herein in connection with a Secondary Market Transaction and who is entitled to receive payments under

this Note is called the "**Note Holder.**"

## 2.    DEFINED TERMS

The following capitalized terms shall have the following meanings:

"**Administrator**" means the CME Group Benchmark Administration Limited ("CME Group") or any successor administrator of Term SOFR; provided, however, that upon the occurrence of an Index Replacement Event, it shall mean the administrator, or, if applicable, successor administrator, of the Replacement Index to the extent that such Replacement Index has replaced the then existing Index.

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Bankruptcy Event**" means any of the following events: (a) any Loan Party institutes or consents to the institution of any proceeding under any Debtor Relief Law or makes an assignment for the benefit of creditors; (b) any Loan Party applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; (c) any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of any Loan Party and the appointment continues undischarged or unstayed for 30 calendar days; (d) any proceeding under any Debtor Relief Law relating to any Loan Party or to all or any material part of its property is instituted without the consent of any Loan Party and continues undismissed or unstayed for 30 calendar days, or an order for relief is entered in any such proceeding; (e) any Loan Party becomes unable or admits in writing its inability or fails generally to pay its debts as they become due; or (f) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the Property of any Loan Party and is not released, vacated or fully bonded within 30 days after its issue or levy.

"**Business Day**" means any day except for a Saturday, Sunday or a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in US government securities.

"**Conforming Changes**" means, with respect to any Index, any technical, administrative or operational changes (including changes to the definition of "Index", "Current Index", and "Business Day" or any analogous or similar definition, the timing and frequency of determining rates and making payments of interest, the timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, and other technical, administrative or operational matters) Note Holder decides may be appropriate to reflect the adoption and implementation of such Index and to permit the use or administration thereof by Note Holder in a manner substantially consistent with market practice (or, if Note Holder decides adoption of any portion of such market practice is not administratively feasible or if Note Holder

determines no market practice for the administration of such Replacement Index exists, in such other manner of administration as Lender decides is reasonably necessary in connection with the administration of this Note and the other Loan Documents).

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto. Without limiting the generality of the foregoing, a Person shall be deemed to be Controlled by another Person if such other Person possesses, directly or indirectly, power to vote twenty percent (20%) or more of the securities having ordinary voting power for the election of directors, managing general partners or the equivalent.

"Current Index" means the most recent Index value available as of the date forty-five (45) days before each Change Date; provided, that for the avoidance of doubt, if the most recent Index value is not then available as of such date, then such Index value shall be determined as of the immediately preceding date for which it is available.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" means the occurrence of any event that, but for the giving of notice or the passage of time, or both, would be an Event of Default.

"Default Rate" means a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law or (ii) eighteen percent (18%) per annum.

"Disbursement Date" means the date of the disbursement of Loan proceeds hereunder.

"Event of Default" shall have the meaning set forth in Section 8(B).

"First Payment Due Date": 04/01/2023.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantor" means, individually and collectively, any guarantor of the Indebtedness of Borrower under this Note.

"Indebtedness" means the Principal Indebtedness together with all interest and all other obligations and liabilities, of every kind and character, of Borrower under this Note and the Loan

Documents, whether such Principal Indebtedness, interest, obligations, and liabilities are individual, joint and several, contingent or otherwise, now or hereafter existing.

"Index" means Term SOFR; provided, however, that upon the occurrence of an Index Replacement Event with respect to Term SOFR or the then existing Index, it means the applicable Replacement Index to the extent that such Replacement Index has replaced such prior Index pursuant to the terms of this Note. Any reference to "Index" shall include, as applicable, the published component used in the calculation thereof.

"Index Replacement Event" means, with respect to the then existing Index, (i) a public statement or publication of information by or on behalf of the Administrator of such Index (or the published component used in the calculation thereof), the administrator of SOFR, the regulatory supervisor for the Administrator (or such component), the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the Administrator for such Index (or such component), a resolution authority with jurisdiction over the Administrator for such Index (or such component) or a court or an entity with similar insolvency or resolution authority over the Administrator for such Index (or such component), which states that such Administrator has ceased or will cease on a specified date to provide such Index (or such component thereof), permanently or indefinitely, provided at the time of such statement or publication, there is no successor administrator that will continue to provide such Index (or such component thereof); (ii) a public statement or publication of information by or on behalf of the Administrator of such Index (or the published component used in the calculation thereof), the administrator of SOFR or the regulatory supervisor for the Administrator of such Index (or such component thereof) announcing that such Index (or such component thereof) is no longer, or will no longer be, representative of the underlying market and economic reality that such Index is intended to measure or no longer representative or in compliance with or aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks, and that representativeness or compliance or alignment will not be restored; or (iii) Lender determines that it is or will be illegal or impractical for Note Holder to use such Index to calculate the interest rate.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Loan" means the loan evidenced by this Note.

"Loan Document(s)" means this Note, any Security Instrument, any guaranty of the Borrower's Indebtedness under this Note, and all other present and future agreements, documents and instruments executed or to be executed in connection with this Loan or any of the foregoing documents, and all extensions, renewals, substitutions, replacements and

modifications of this Note or any of the foregoing documents.

"**Loan Parties**" means, collectively, the Borrower and each Guarantor, if any, each of which shall individually be a "**Loan Party**".

"**Maturity Date**" shall mean the earlier of (i) **March 01, 2053** and (ii) the date on which the unpaid Principal Indebtedness and all other Indebtedness hereunder become due and payable by acceleration or otherwise pursuant to the Loan Documents or the exercise by Note Holder of any right or remedy under any Loan Document or under applicable Law.

"**Obligations**" means, collectively, each and all of the obligations of the Loan Parties under the Loan Documents, including, but not limited to, Borrower's obligations for payment of the Indebtedness, interest, fees, costs, Prepayment Premium, late fees and other amounts due or to become due to Note Holder pursuant to the Loan Documents, and payment of all operating expenses necessary for the operation of the Property and capital expenditures necessary to maintain the Property in accordance with the Loan Documents.

"**Payment Due Date**" means the First Payment Due Date and any subsequent date on which a Monthly Payment is due and payable pursuant to Section 4 of this Note.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Permitted Transfer**" means, provided that no Default or Event of Default shall then exist: (a) a Transfer of a Property or a portion thereof in accordance with Section 19; or (b) a lease to a residential tenant of the Property in the ordinary course of Borrower's business if, with respect to said lease, (i) it is entered into on an arm's-length basis, (ii) no tenant is an Affiliate, (iii) rental rates and other economic terms, taken as a whole, are at least equivalent to then-existing market rates based on the applicable market or otherwise commercially reasonable, and (iv) it is subject and subordinate to the Security Instrument and contains provisions for the agreement by the tenant(s) thereunder to attorn to Lender and any purchaser at a foreclosure or trustee sale, such attornment to be self-executing and effective upon acquisition of title to the Property by any purchaser at a foreclosure or trustee sale. Borrower shall pay all costs and expenses of Note Holder in connection with a Transfer.

"**Prepayment Premium**" shall mean, in connection with each Prepayment, an amount equal to (a) the amount of the Principal Indebtedness being prepaid in connection with such Prepayment <u>multiplied by</u> (b) the applicable percentage below opposite the period in which such Prepayment is made:

| Prepayment is made: | Prepayment Percentage |
|---|---|
| On or prior to the date the twelfth Monthly Payment is due pursuant to Section 4 of this Note | 3% |
| After the date the twelfth Monthly Payment is due pursuant to Section 4 of this Note but on or prior to the date the twenty-fourth Monthly Payment is due pursuant to Section 4 of this Note | 2% |
| After the date the twenty-fourth Monthly Payment is due pursuant to Section 4 of this Note but on or prior to the date the thirty-sixth Monthly Payment is due pursuant to Section 4 of this Note | 1% |
| At any time after the immediately preceding time period | 0% |

"**Policies**" All insurance required pursuant to Section 3.5 of each Security Instrument.

"**Principal Indebtedness**" means the principal balance of the Loan outstanding from time to time.

"**Property**" means the real property located at

1508 W Oxford St
Philadelphia, PA 19121
2034 N 17th St
Philadelphia, PA 19121

1926 N Gratz St
Philadelphia, PA 19121

together with all buildings and other improvements thereon and all personal property owned by Borrower and encumbered by and further described in the Security Instrument(s), together with all rights pertaining thereto.

"**Relevant Governmental Body**" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York, or any successor thereto.

"**Replacement Index**" means a rate selected by Note Holder in its sole discretion, including any spread adjustment thereto or method for calculating or determining such spread adjustment (which shall be a positive or negative value or zero), giving due consideration to (i) any selection or recommendation of a replacement benchmark rate and applicable spread

adjustment or the mechanism for determining such a rate and adjustment by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining an index as a replacement for the then existing Index.

"Security Instrument" means, with respect to each Property, that certain mortgage, deed of trust or deed to secure debt, as the case may be, assignment of leases and rents, security agreement and fixture filing encumbering such Property, executed by Borrower as of the date hereof, as the same may from time to time be amended, restated, replaced, substituted, supplemented or otherwise modified in accordance herewith.

"Servicer" means the entity or entities appointed by Note Holder from time to time to serve as servicer and/or special servicer of the Loan. If at any time no entity is so appointed, the term "Servicer" shall be deemed to refer to Note Holder.

"SOFR" means a rate equal to the secured overnight financing rate as administrated by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"Taxes" means all real estate and personal property taxes, assessments, fees, taxes on rents or rentals, water rates or sewer rents, facilities and other governmental, municipal and utility district charges or other similar taxes or assessments now or hereafter levied or assessed or imposed against the Property or Borrower with respect to the Property or rents therefrom or that may become liens upon any of the Property, without deduction for any amounts reimbursable to Borrower by third parties and including any interest, additions to tax or penalties applicable thereto.

"Term SOFR" means the forward-looking term rate based on SOFR for a twelve (12) month term as published by the Administrator at approximately 5 a.m. Chicago, Illinois time on each Business Day and displayed on the Bloomberg Professional Service page SR12M Index, or any successor or alternative source identified by Note Holder from time to time, rounded upwards, if necessary, to the nearest 1/100th of one percent (0.01%).

"Transfer" means any transfer of any kind (including any gift, conveyance, lease, sublease, sale, or lien) with respect to all or any part of or any interest (whether direct or indirect, ownership, beneficial or otherwise, and irrespective of the number of tiers of parties having interests) in any Property or Borrower, or any direct or indirect constituent of Borrower, whether voluntarily or involuntarily and whether directly or indirectly, by operation of law or otherwise.

3.    INTEREST

Interest will be charged on unpaid Principal Indebtedness until the full amount of Principal Indebtedness has been paid. Until the First Change Date (as defined below), the Borrower will pay interest at a yearly rate of 7.500%. On and after the First Change Date, the interest rate the Borrower will pay will change in accordance with Section 5 of this Note. Notwithstanding the foregoing, upon the occurrence of an Event of Default the Borrower will pay interest at the

Default Rate to the extent set forth in Section 8(A).

Interest under this Note shall be computed on the basis of a 30-day month and 360-day year and actual days elapsed (which results in more interest being paid than if computed on the basis of a 365 or 366 day year); provided however, for the month in which this Note is made and the month in which the Indebtedness of the Borrower under this Note are paid in full, interest shall be computed on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed.

**4.    PAYMENTS**

**(A)    Time and Place of Payments**

Unless disbursement of principal is made by Note Holder to Borrower on the first day of a calendar month, interest for the period beginning on the Disbursement Date and ending on and including the last day of such calendar month shall be payable by Borrower on or before the Disbursement Date. If the Disbursement Date is on the first day of a calendar month, then no payment will be due from Borrower until the First Payment Due Date. The Payment Due Date for the first monthly installment payment under Section 4(B) will be the First Payment Due Date. Except as provided in this Section 4(A), accrued interest will be payable in arrears.

Except as otherwise specifically provided herein, the Borrower will make all payments required under this Note, without notice and without offset or deduction, at **2015 Manhattan Beach Blvd, Suite 106, Redondo Beach, CA 90278** or at a different place if required by the Note Holder, unless such Monthly Payments are drawn directly from the Borrower Account in accordance with Section 4(E) of this Note. In the event any check given by Borrower to Note Holder as a payment on this Note is dishonored, or in the event there are insufficient funds in the designated Borrower Account to cover any preauthorized monthly debit from the Borrower Account, then, without limiting any other charges or remedies, Borrower shall pay to Note Holder a processing fee of $15.00 (but not more than the maximum amount allowed by law) for each such event.

Any regularly scheduled monthly installment that is received by Note Holder before the date it is due shall be deemed to have been received on the due date solely for the purpose of calculating interest due. Any amount added to Principal Indebtedness pursuant to the Loan Documents shall bear interest at the applicable rate or rates specified in this Note and shall be payable with such interest upon demand by Note Holder and absent such demand, as provided in this Note for the payment of interest or principal and interest. The Borrower will pay the Monthly Payments described in this Note every month until the Borrower has paid all of the principal, interest, and any other Obligations of Borrower due under this Note or the Loan Documents. Each Monthly Payment will be applied as of its scheduled due date and will be applied to interest before principal. Borrower shall pay to Note Holder on the Maturity Date the remaining Principal Indebtedness, all accrued and unpaid interest and all other amounts due under the Loan Documents.

**(B)    Amount of Initial Fixed Monthly Payments**

Beginning on the First Payment Due Date, and continuing until and including the monthly installment due on the Maturity Date, regularly scheduled monthly installments shall be payable by Borrower in the amounts and on the terms and conditions provided for in this Note in consecutive monthly installments due and payable on the first day of each calendar month (each a "Monthly Payment").

Subject to adjustment for the application of the Default Rate set forth in Section 8(A), each of the Borrower's Monthly Payments through the First Change Date (as defined in Section 5) will be for interest only and in the amount of U.S. $6,374.06 (the "Initial Fixed Monthly Payments"). This amount of the Monthly Payments will change on the First Change Date and on each Change Date thereafter in accordance with Section 5 and shall be adjusted by the Note Holder for the application (if any) of the Default Rate as set forth in Section 8(A).

**(C)    Monthly Payment Changes**

On the First Change Date and on each Change Date thereafter, the changes in the Borrower's Monthly Payment will reflect changes in the unpaid Principal Indebtedness evidenced by this Note and in the interest rate that the Borrower must pay. The Note Holder will determine the Borrower's new interest rate, the Principal Indebtedness evidenced by this Note to be amortized in each Monthly Payment and the changed amount of each Monthly Payment in accordance with Section 5 of this Note. In addition, during the existence of an Event of Default, the Monthly Payments shall be adjusted by the Note Holder to reflect the change in the interest rate resulting from the application of the Default Rate as set forth in Section 8(A).

**(D)    (Reserved)**

**(E)    Direct Payment Authorization**

To effectuate any payment of any principal, interest or fees due under this Note or any Loan Document, the Borrower shall at all times maintain on deposit in a demand deposit account with the financial institution identified by the Borrower in a separate automatic payment authorization (as such account shall be designated by the Borrower in a separate automatic payment authorization delivered to the Note Holder from time to time, the "Borrower Account") an amount sufficient to pay such principal, interest or fees in full when due. The Borrower hereby authorizes the Note Holder to initiate debits for all principal, interest or fees when due under this Note or any other Loan Document from the Borrower Account, including by means of automated clearing house electronic funds transfer or by any other commercially accepted method ("ACH"). Borrower acknowledges that this authorization shall not affect Borrower's obligation to pay such sums when due if there are insufficient funds in the Borrower Account or if the financial institution does not debit the Borrower Account, and that if a debit is not made because there are insufficient funds in the Borrower Account, or otherwise, the payment may be late or past due. The Note Holder agrees to provide notice to the Borrower of any automatic deduction made pursuant to this provision showing in reasonable detail the amounts of such deduction. Note

Holder reserves the right, in its sole and absolute discretion, to permit or require payment in any other manner.

## 5.    INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A)    Change Dates

The initial interest rate the Borrower will pay may change on **04/01/2028** (the "First Change Date"), and on that day every twelfth (12th) month thereafter. Each date on which the interest rate applicable to this Note could change (including the First Change Date but excluding any change to the interest rate resulting from the application of the Default Rate pursuant to Section 8(A)) is called a "**Change Date.**"

### (B)    The Index

Beginning with the First Change Date, and on each Change Date thereafter, the interest rate applicable to this Note will be based on the Current Index; provided that if the Current Index (inclusive of any spread adjustment thereto) is less than zero, then the Current Index will be deemed to be zero for purposes of calculating the interest rate.

### (C)    Calculation of Changes

Before each Change Date, the Note Holder will calculate the new interest rate applicable to this Note by adding **Six percentage points (6.000%)** (the "**Margin**") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth (1/8) of one percentage point (0.125%). Subject to the limits stated in Section 5(D) below, this rounded amount will be the new interest rate applicable to this Note until the next Change Date.

The Note Holder will then determine the amount of the Monthly Payment that would be sufficient to repay the unpaid Principal Indebtedness that Borrower is expected to owe at the Change Date in full on the Maturity Date at the new interest rate in substantially equal payments. Subject to adjustment for the application of the Default Rate set forth in Section 8(A), the result of this calculation will be the new amount of the Monthly Payment to be made by Borrower until the next Change Date.

### (D)    Limits on Interest Rate Changes

Other than any increase to the interest rate resulting from the application of the Default Rate set forth in Section 8(A), the interest rate Borrower is required to pay at the First Change Date will not be greater than 9.500% or less than the Margin. Thereafter, other than any increase to the interest rate resulting from the application of the Default Rate set forth in Section 8(A), the interest rate applicable to this Note will never be increased or decreased on any single Change Date by more than two (2) percentage points from the rate of interest applicable to this Note for the preceding twelve (12) months. Notwithstanding anything to the contrary, other than any increase to the interest rate resulting from the application of the Default Rate set forth in Section 8(A), the interest rate applicable to this Note will never be greater than 12.500% or less than the

Margin.

### (E)    Effective Date of Changes

The new interest rate applicable to this Note will become effective on each Change Date. The Borrower will pay the amount of the new Monthly Payment beginning on the first Monthly Payment date after the Change Date until the amount of the Monthly Payment changes again in accordance with this Section 5.

### (F)    Notice of Changes

Other than any increase to the interest rate resulting from the application of the Default Rate set forth in Section 8(A), the Note Holder will deliver or mail to the Borrower a notice of any changes in the interest rate applicable to this Note and the amount of the Monthly Payment payable under this Note before the effective date of any change. The notice will include information, if any, required by law. Any increase to the interest rate resulting from the application of the Default Rate set forth in Section 8(A) shall apply as of the date the applicable Default occurred whether or not notice thereof is given to the Borrower.

### (G)    Replacement Index

Notwithstanding anything to the contrary in this Note or in any other Loan Document, upon the occurrence of an Index Replacement Event, Note Holder may replace the then existing Index with the Replacement Index. Note Holder shall provide written notice ("**Replacement Index Notice**") to Borrower of any Replacement Index, which notice shall (i) identify the Replacement Index and (ii) make the Replacement Index effective beginning with the first Change Date more than forty-five (45) days after an Index Replacement Event, or such other effective date stated in the Replacement Index Notice. Any determination, decision, or election that may be made by Note Holder pursuant to this Section 5(G) will be conclusive and binding absent manifest error and may be made in Note Holder's sole discretion and without consent from any other party to this Note or any other Loan Document.

For the avoidance of doubt, the Index may be replaced more than once during the term of the Note.

In connection with the use and administration of any Index or the adoption and implementation of a Replacement Index, Note Holder will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary in this Note or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Note or any other Loan Document. Note Holder will promptly notify the Borrower of the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of an Index.

### (H)    Notification; No Warranty

Note Holder does not warrant or accept responsibility for, and shall not have any liability

with respect to (i) the administration of, submission of, calculation of or any other matter related to Term SOFR, the rates in the definitions thereof or any component definition thereof or rates referenced in the definitions thereof or any alternative, comparable or successor rate thereto (including any then existing Index or any Replacement Index), including whether the composition or characteristics of any such alternative, comparable, successor, or replacement rate (including any Replacement Index) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, Term SOFR or any other Index prior to its discontinuance or unavailability or (ii) the effect, implementation, or composition of any Conforming Changes. Borrower agrees Note Holder shall not be liable in any manner for (i) its selection of Term SOFR or any Replacement Index, (ii) its selection of information sources or services to ascertain Term SOFR or any Replacement Index (or any component thereof), in each case pursuant to the terms of this Agreement or (iii) the reliability, availability and/or economic returns intended when Note Holder chose any Index; provided that Note Holder makes such selection in good faith and any Replacement Index is generally being applied across Note Holder's commercial real estate loan portfolio.

## 6.    BORROWER'S RIGHT TO PREPAY

The Borrower may, upon prior written notice to the Note Holder, at any time or from time to time voluntarily prepay Principal Indebtedness in whole or in part (each such prepayment of Principal Indebtedness is referred to herein as a "**Prepayment**"); provided that (A) such notice must be in a form acceptable to the Note Holder and be received by the Note Holder not later than 11:00 a.m. Chicago, Illinois time three (3) Business Days prior to the date of such Prepayment; (B) such notice shall specify the date and amount of such Prepayment; (C) any such Prepayment shall be in a principal amount of $10,000 or a whole multiple of $10,000 in excess thereof or, in each case, if less, the entire Principal Indebtedness then outstanding; (D) each such Prepayment shall be accompanied by a payment by the Borrower of all accrued interest on the amount prepaid and the Prepayment Premium due with respect to such Prepayment. If such notice is given by the Borrower, the Borrower shall make such Prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. The Borrower may not designate a payment as a Prepayment if the Borrower has not made all the Monthly Payments due under the Note.

The Note Holder may apply any Prepayment made by the Borrower hereunder to the accrued and unpaid interest on the Prepayment amount and the Prepayment Premium, before applying any such Prepayment to reduce the Principal Indebtedness of the Note. If the Borrower makes a partial Prepayment, there will be no changes in the due dates of the Monthly Payments.

(i)    Any such partial Prepayment made prior to the First Change Date may reduce the Initial Fixed Monthly Payment amount after the date of such partial Prepayment. Note Holder shall calculate the amount due for subsequent Initial Fixed Monthly Payments under this Note in accordance with Sections 3 and 4.

(ii)    Any such partial Prepayment made on or after the First Change Date may reduce the amount of the Borrower's Monthly Payments after the first Change Date following such

partial Prepayment (at which time the Note Holder shall recalculate the Monthly Payments due under this Note in accordance with Section 5). However, any reduction due to such Prepayment may be offset by an interest rate increase.

The Borrower waives any right, under California Civil Code Section 2954.10 or otherwise, to prepay, in whole or in part, any portion of the outstanding Principal Indebtedness under this Note without paying the Prepayment Premium described in this Note. The Borrower acknowledges that prepayment of the Principal Indebtedness of this Note in whole or in part may result in the Note Holder incurring additional losses, costs, expenses and liabilities, including lost revenue and lost profits. The Borrower therefore agrees to pay the Prepayment Premium on the terms set forth in this Note if any Principal Indebtedness is prepaid, whether voluntarily or by reason of acceleration, including acceleration upon any sale or other transfer of any interest in the Property securing this Note in violation of the provisions of this Note or the related Security Instrument. The Borrower further agrees that the Note Holder's willingness to offer the interest rate described above to the Borrower is sufficient and independent consideration, given individual weight by the Note Holder, for this waiver. The Borrower understands that the Note Holder would not offer such an interest rate to the Borrower absent this waiver.

## 7.    LOAN CHARGES

If a law, which applies to this Loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this Loan exceed the permitted limits, then: (a) the interest or any such loan charge shall be reduced by the amount necessary to reduce the interest or charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to the Borrower. The Note Holder may choose to make this refund by reducing the Principal Indebtedness that the Borrower owes under this Note or by making a direct payment to the Borrower. If a refund reduces Principal Indebtedness, the reduction will be treated as a partial Prepayment.

## 8.    BORROWER'S FAILURE TO PAY AS REQUIRED

### (A)    Late Charges for Overdue Payments; Default Rate

If the Note Holder has not received the full amount of any Monthly Payment by the end of fifteenth (15) calendar day after the date it is due, the Borrower will pay a late charge to the Note Holder. The amount of the late charge will be the lesser of (i) ten percent (10%) of such overdue payment or (ii) the maximum amount permitted by applicable law. Borrower will pay this late charge promptly but only once on each late payment. The Borrower acknowledges that late payment to the Note Holder of any sums due hereunder will cause the Note Holder to incur costs not contemplated hereunder, the exact amount of which would be impracticable or extremely difficult to ascertain. Such costs include processing and accounting costs, the expenses incurred and time and effort associated with recovering the delinquent payment, and the loss of timely use of the payment amount. The Borrower and the Note Holder agree that the late payment charge described in this Section 8(A) represents a fair and reasonable estimate of the

costs the Note Holder will incur by reason of late payment. The provisions of this Section 8(A) shall not be construed as extending the time for payment of any amount under this Note, and acceptance of a late payment charge by the Note Holder shall in no event constitute a waiver of the Borrower's default with respect to the overdue amount nor prevent the Note Holder from exercising any of its rights and remedies with respect to such default (including, without limitation, charging interest at the Default Rate set forth below).

Upon the occurrence of and during the continuance of an Event of Default, the interest rate applicable to the entire Principal Indebtedness and all other Indebtedness will automatically increase to the Default Rate, and shall be payable upon demand from time to time. Notwithstanding anything to the contrary contained in this Note and the other Loan Documents, with respect to monetary defaults, the Default Rate shall be assessed as follows: if any amount due in respect of the Loan (other than amounts due on the Maturity Date or earlier acceleration) remains past due for thirty (30) days or more, interest on such unpaid amount(s) shall accrue from the date payment is due at the Default Rate and shall be payable on demand by Note Holder. Should an Event of Default occur with respect to two (2) or more consecutive Monthly Payments and the Borrower remains past due for more than sixty (60) days (i.e., two or more consecutive Monthly Payments are not paid when due), the Loan shall bear interest at the applicable Default Rate for the remainder of the term until the Principal Indebtedness is paid in full. From and after the Maturity Date, the unpaid Principal Indebtedness and all accrued interest thereon shall continue to bear interest at the Default Rate until and including the date on which the entire Principal Indebtedness and all other outstanding Obligations due and owing under the Loan Documents are paid in full. During any period that the Default Rate is in effect the additional interest accruing over and above the interest rate provided for in Sections 3 or 5, as applicable, shall be immediately due and payable in addition to the regularly scheduled Monthly Payments.

Borrower acknowledges and agrees that the increase from the interest rate to the Default Rate represents a fair and reasonable estimate of the additional risks, costs and expenses Note Holder will incur by reason of Borrower's Default on account of the delinquent payment and the additional compensation Note Holder is entitled to receive for the increased risks of nonpayment associated with a delinquency on the Loan.

**(B)    Events of Default**

Each of the following shall constitute an event of default hereunder (each an "**Event of Default**"):

(i)    Any failure by Borrower to pay or deposit when due any amount required by this Note or any other Loan Document;

(ii)    Any failure of Borrower to comply with any other covenant contained in this Note that calls for the payment of money;

(iii)    Borrower fails to perform or observe any covenant or agreement contained in Schedule 1 (Financial Reporting and Covenants) attached to this Note and incorporated herein

by this reference and such failure continues for ten (10) days;

(iv)     Borrower fails to perform or observe any other covenant or agreement (not specified in Section 8(B)(i), 8(B)(ii), or 8(B)(iii) above) contained in this Note or any Loan Document on its part to be performed or observed and such failure continues for ten (10) days;

(v)     Any representation, warranty, certification, covenant or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party in this Note, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading when made or deemed made;

(vi)     Any failure of Borrower to maintain in full force and effect all Policies required hereunder;

(vii)     Any exercise by the holder of any debt instrument secured by a mortgage, deed of trust, or deed to secure debt against any Property of a right to declare all amounts due under that debt instrument immediately due and payable;

(viii)     The commencement of a forfeiture action or proceeding, whether civil or criminal, which, in Note Holder's reasonable judgment, could result in a forfeiture of any Property or otherwise materially impair the lien created by any Security Instrument or Note Holder's interest in any Property;

(ix)     A Transfer other than a Permitted Transfer occurs (including without limitation, the creation or existence of any lien as provided in Section 3.20 of any Security Instrument);

(x)     The occurrence of any "Default" as defined in any other Loan Document in which a "Default" is defined, including any breach, "Default," or "Event of Default" under any Loan Document;

(xi)     If a Property is subject to any covenants, conditions, and/or restrictions, land use restriction agreements or similar agreements, Borrower fails to perform any of its obligations under any such agreement as and when required, and such failure continues beyond any applicable cure period;

(xii)     The occurrence of a Bankruptcy Event;

(xiii)     Borrower (if Borrower is a natural person) or any member, shareholder, partner or trustee of Borrower (if such member, shareholder, partner or trustee is a natural person), or any Guarantor who is a natural person, dies or becomes incompetent (unless, in the case of the death or incapacity of any member, shareholder or partner of Borrower, the Transfer of such member's, shareholder's or partner's interest in Borrower would have been a Permitted Transfer);

(xiv)     Any Loan Party or any Affiliate thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in

respect of any indebtedness or guarantee (other than under the Loan Documents) owed or owing to the Lender, or (B) fails to observe or perform any other agreement or condition relating to any such indebtedness or guarantee owed or owing to the Note Holder or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the Note Holder to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due (automatically or otherwise) prior to its stated maturity or such guarantee to become payable; or

(xv)     Any breach or default or other similar condition or event (however described) by Borrower or an Affiliate of Borrower under any other loan, note or agreement to which Note Holder or any Affiliate of Note Holder is also a party.

(C)     Remedies; Acceleration

If any Event of Default has occurred and is continuing, the Indebtedness, at the option of the Note Holder, shall immediately become due and payable, without any prior written notice to the Borrower, unless applicable law requires otherwise (and in such case, after any required notice has been given). The Note Holder may exercise this option to accelerate regardless of any prior forbearance. In addition, the Note Holder shall have all rights and remedies afforded to the Note Holder hereunder and under the other Loan Documents, including, application of the Default Rate in accordance with Section 8(A), foreclosure on and/or the power of sale of each Property covered by any Security Instrument, as provided in such Security Instrument, and any rights and remedies available to the Note Holder at law or in equity. Notwithstanding the foregoing, the occurrence of any Bankruptcy Event shall automatically accelerate this Note and all Obligations under this Note and the other Loan Documents, and this Note and the Obligations under this Note and the other Loan Documents shall be immediately due and payable without written notice or further action by the Note Holder. Each right and remedy provided in this Note is distinct from all other rights or remedies under this Note or any other Loan Document or afforded by applicable Law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order. The Note Holder shall not be required to demonstrate any actual impairment of its security or any increased risk of additional default by the Borrower in order to exercise any of its remedies with respect to any Event of Default.

(D)     No Waiver By Note Holder

Any waiver of a Default, Event of Default, or forbearance by the Note Holder in exercising any right or remedy under this Note or any other Loan Document or otherwise afforded by applicable Law, shall not be a waiver of any other Default or Event of Default or preclude the exercise or failure to exercise of any other right or remedy. Enforcement by the Note Holder of any security for the Indebtedness of the Borrower under this Note shall not constitute an election by the Note Holder of remedies so as to preclude the exercise or failure to exercise of any other right or remedy available to the Note Holder. The acceptance by Note Holder of any payment after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Note Holder's right to require prompt payment when due of all other payments or to exercise any right or remedy with respect to any failure to make prompt payment.

Borrower agrees not to send Note Holder any payment marked "paid in full," "without recourse," or similar language. If Borrower sends such a payment, Note Holder may accept it without losing any of Note Holder's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Note Holder.

(E)     Payment of Note Holder's Costs and Expenses

The Borrower shall immediately reimburse the Note Holder for all fees and costs, including reasonable attorneys' fees and experts' fees and costs, incurred by the Note Holder for: (i) enforcement of this Note, any other Loan Document or any terms hereof or thereof, or the exercise of any rights or remedies hereunder or thereunder and/or at Law, in equity or otherwise, whether or not any action or proceeding is filed; (ii) representation of the Note Holder in any bankruptcy, insolvency, reorganization or other debtor-relief or similar proceeding under any Debtor Relief Law of or relating to any Loan Party or the property covered by any Security Instrument; or (iii) representation of the Note Holder in any action or proceeding relating to any Property covered by any Security Instrument, whether commenced by the Note Holder or any other Person, including foreclosure, receivership, lien or stop-notice enforcement, bankruptcy, eminent domain and probate actions or proceedings. All such fees and costs shall bear interest until paid at the rate applicable from time to time under this Note.

(F)     Confession of Judgment

IF THE BORROWER FAILS TO PAY WHEN DUE ANY PRINCIPAL OR INTEREST HEREUNDER, OR THERE OTHERWISE EXISTS AN EVENT OF DEFAULT, THEN, THE BORROWER HEREBY ACKNOWLEDGES THAT HE WILL THEREBY BE JUSTLY INDEBTED TO THE LENDER, AND HEREBY AUTHORIZES ANY ATTORNEY DESIGNATED BY LENDER, OR ITS DESIGNEE, AS HIS ATTORNEY-IN-FACT TO APPEAR FOR THE BORROWER AND ANY GUARANTORS HEREOF, AND IN HIS NAME, TO CONFESS JUDGMENT AGAINST HIM, BEFORE THE CLERK/PROTHONOTARY OF THE COURT OF PHILADELPHIA, PENNSYLVANIA, OR ANY OTHER JURISDICTION THAT PERMITS THE ENTRY OF JUDGMENT BY CONFESSION, IN THE DEFAULT BALANCE OF $1,019,850.00, LESS ANY PAYMENTS MADE BY THE BORROWER HEREUNDER PRIOR THERETO, PLUS INTEREST ACCRUING THEREON AS SET FORTH HEREIN UNTIL PAID, PLUS REASONABLE ATTORNEY'S FEES, TO PROSECUTE AND COLLECT THE BALANCE OWED. THE BORROWER HEREBY EXPRESSLY ACKNOWLEDGES THAT ANY ATTORNEY DESIGNATED BY THE LENDER HAS THE POWER OF ATTORNEY NECESSARY TO CONFESS JUDGMENT AGAINST THE BORROWER AS SET FORTH HEREIN, BY SWORN AFFIDAVIT.

_____
                                                              BORROWER INITIALS

(G)   (Reserved)

9.      GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to the Borrower under this Note will be given by delivering it or by mailing it by first class mail to the Borrower at the property address set forth on page 1 above (or if more than one property address, at any one of them) or at a different address if the Borrower gives the Note Holder written notice of a different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 4(A) above or at a different address if the Borrower is given a notice of that different address.

## 10. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one Person signs this Note, each Person is jointly, severally, fully and personally obligated to keep all of the promises made in this Note, including the promise to pay, the full amount owed. The Note Holder may enforce its rights under this Note against each Person individually or against all of such Persons together. This means that any one such Person may be required to pay all of the amounts owed under this Note.

## 11. WAIVERS

The Borrower hereby waives the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other Persons that amounts due have not been paid. In addition, without limiting the foregoing, Borrower hereby waives diligence, demand, notice of non-payment, protest and notice of protest, and the Borrower (a) agrees that the time for performance of any obligation under this Note may be extended from time to time without notice, (b) consents to the release without notice of any party liable hereon or herefor, (c) consents to the addition without notice of parties liable hereon or herefor, and (d) consents to the acceptance without notice of further security for this Note, including other types of security, all without in any way affecting their liability. Further, Borrower waives the right to plead any and all statutes of limitations as a defense to this Note, or any agreement to pay the obligations hereof, or any other Loan Document, in each case to the full extent permitted by law. No provision of this Note or any other Loan Document may be waived or modified orally, it being expressly agreed that any such waiver or modification must be in a writing signed by the Note Holder.

## 12. UNIFORM SECURED NOTE

The Indebtedness of Borrower hereunder is secured by, among other things, each Security Instrument and reference is made to each Security Instrument for other rights of Note Holder as to collateral for the Indebtedness. This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, each Security Instrument entered into in connection with this Note, protects the Note Holder from possible losses which might result if the Borrower does not keep the promises made

in this Note. Each such Security Instrument describes how and under what conditions the Borrower may be required to make immediate payment in full of all amounts the Borrower owes under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or Transferred, other than a Permitted Transfer, (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or Transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. If Borrower fails to pay these sums, Lender may invoke any remedies permitted by this Security Instrument without notice or demand on Borrower.

## 13.   LIABILITY; FULL PAYMENT

The Borrower is personally liable for all obligations under this Note. All amounts payable under this Note shall be paid in full without setoff, deduction or counterclaim. All amounts payable under this Note shall be free and clear of and without any deduction or withholding for or on account of any taxes, levies, duties, charges, fees, restrictions or conditions of any nature now or hereafter imposed by any Governmental Authority. The Borrower shall indemnify the Note Holder against any such taxes, levies, imposts, duties, charges and fees (other than taxes on the income of the Note Holder imposed by any taxing authority) which may be assessed against the Note Holder or claimed or demanded from the Note Holder in respect of any amount payable by the Borrower hereunder, and against any costs, charges, expenses or liability arising out of or with respect to such assessment, claim or demand, to the full extent permitted by Law.

## 14.   BUSINESS PURPOSE LOAN; NO OCCUPANCY BY ANY LOAN PARTY

BORROWER WILL USE THE PROCEEDS OF THE LOAN THAT BORROWER HAS RECEIVED UNDER THIS NOTE SOLELY FOR THE PURPOSE OF ACQUIRING OR REFINANCING REAL PROPERTY FOR INVESTMENT PURPOSES, AND BORROWER WARRANTS AND REPRESENTS TO THE NOTE HOLDER THAT ALL LOAN PROCEEDS WILL BE SOLELY USED TO ACQUIRE OR REFINANCE REAL PROPERTY FOR INVESTMENT PURPOSES, AND THAT NO LOAN PROCEEDS WILL IN ANY EVENT BE USED FOR A CONSUMER, FAMILY OR HOUSEHOLD PURPOSE. BORROWER FURTHER WARRANTS AND REPRESENTS TO NOTE HOLDER THAT: (A) NEITHER BORROWER NOR ANY OTHER LOAN PARTY WILL AT ANY TIME DURING THE TERM OF THIS NOTE INHABIT THE PROPERTY, AND (B) THE PROPERTY WILL NOT BE ANY LOAN PARTY'S PRINCIPAL RESIDENCE OR SECONDARY RESIDENCE.

## 15.   GOVERNING LAW; SUBMISSION TO JURISDICTION; JURY TRIAL WAIVER AND JUDICIAL REFERENCE

(A)   Governing Law; Submission to Jurisdiction

This Note shall be governed by and construed under the internal laws of the State of

California, without regard to conflict of law provisions. The Borrower irrevocably submits and consents to jurisdiction of any federal or state court of competent jurisdiction within California in connection with any action or proceeding arising out of, or relating to, this Note, and consents to service of process by any means allowed by California or federal law.

(B)    Waiver of Jury Trial

TO THE FULLEST EXTENT PERMITTED BY LAW, THE BORROWER HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (1) ARISING UNDER THIS NOTE OR ANY OTHER LOAN DOCUMENT, OR (2) IN ANY WAY CONNECTED WITH, OR RELATED OR INCIDENTAL TO, THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS NOTE OR ANY OTHER LOAN DOCUMENT, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND THE BORROWER HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY TO THE FULLEST EXTENT PERMITTED BY LAW. THE BORROWER AGREES THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARM'S-LENGTH BASIS, WITH THE BORROWER AGREEING TO THE SAME KNOWINGLY, AND BEING AFFORDED THE OPPORTUNITY TO HAVE THE BORROWER'S LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN. ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THE RIGHT TO TRIAL BY JURY.

(C)    Judicial Reference

IN THE EVENT THAT THE JURY TRIAL WAIVER CONTAINED HEREIN SHALL BE HELD OR DEEMED TO BE UNENFORCEABLE, THE BORROWER HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE. PURSUANT TO SUCH JUDICIAL REFERENCE, THE BORROWER AGREES TO THE APPOINTMENT OF A SINGLE REFEREE AND SHALL USE THE BORROWER'S BEST EFFORTS TO AGREE ON THE SELECTION OF A REFEREE. IF THE PARTIES TO THE DISPUTE ARE UNABLE TO AGREE ON A SINGLE REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT TO HEAR ANY DISPUTES HEREUNDER IN LIEU OF ANY SUCH JURY TRIAL. THE BORROWER ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT OF DECISION THEREON; PROVIDED, HOWEVER, THAT ANY MATTERS WHICH WOULD NOT OTHERWISE BE THE SUBJECT OF A JURY TRIAL WILL BE UNAFFECTED BY THIS WAIVER AND THE AGREEMENTS CONTAINED HEREIN. THE BORROWER AGREES THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARM'S-LENGTH BASIS, WITH THE BORROWER AGREEING TO THE SAME KNOWINGLY, AND BEING AFFORDED THE OPPORTUNITY TO HAVE THE BORROWER'S LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN. ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE AGREEMENTS CONTAINED HEREIN REGARDING THE APPLICATION OF JUDICIAL

REFERENCE IN THE EVENT OF THE INVALIDITY OF SUCH JURY TRIAL WAIVER.

**16.    FINANCIAL REPORTING AND COVENANTS**

The covenants set forth in Schedule 1 to this Note are incorporated herein by this reference as though set forth herein in full. The Borrower hereby covenants and agrees to comply with all of the covenants, terms and provisions set forth in Schedule 1 at all times.

**17.    OFAC; ANTI-MONEY LAUNDERING**

**(A)    USA PATRIOT Act**

The Note Holder hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies the Borrower and each other Loan Party, which information includes the name and address of the Borrower and each other Loan Party and other information that will allow the Note Holder to identify the Borrower and each other Loan Party in accordance with the Act. The Borrower and each other Loan Party shall, promptly following a request by the Note Holder, provide all documentation and other information that the Note Holder requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

**(B)    OFAC Representations**

Neither the Borrower, nor any other Loan Party, nor, to the knowledge of the Borrower, any director, officer, employee, agent, affiliate or representative thereof, is an individual or entity that is, or is owned or controlled by one or more individuals or entities that are (i) currently the subject or target of any sanction administered or enforced by the United States Government (including without limitation, OFAC), the United Nations Security Council, the European Union, Her Majesty's Treasury ("HMT") or other relevant sanctions authority ("Sanctions"), (ii) included on the List of Specially Designated Nationals maintained by the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC") or HMT's Consolidated List of Financial Sanctions Targets, or any similar list enforced by any other relevant sanctions authority or (iii) located, organized or resident in any country or territory to the extent that such country or territory itself is the subject of any Sanction. The Borrower has conducted its businesses in compliance in all material respects with all applicable Sanctions and have instituted and maintained policies and procedures designed to promote and achieve compliance with such Sanctions.

**(C)    Anti-Corruption Laws**

The Borrower has conducted, and shall at all times conduct, its business in compliance in all material respects with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and all other applicable anti-corruption legislation in other jurisdictions and have

instituted and maintained, and shall at all times institute and maintain, policies and procedures designed to promote and achieve compliance with such laws.

## 18.   FINAL DOCUMENTS; NO ORAL AGREEMENTS

THE LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE LOAN PARTIES AND THE LENDER AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO ORAL AGREEMENTS BETWEEN THE LOAN PARTIES AND THE LENDER.

## 19.   PARTIAL RECONVEYANCE, SATISFACTION OR RELEASE OF PROPERTY

At any time prior to the Maturity Date, the Note Holder shall, at the Borrower's written request, issue partial reconveyances, partial satisfactions or partial releases of the Security Instrument(s) ("**Partial Releases**") to release therefrom one or more legal parcels constituting a portion of the Property encumbered by such Security Instrument (each, a "**Released Parcel**"); provided, however, that prior to or simultaneously with each such Partial Release each and every one of the following conditions shall be satisfied (as determined by the Note Holder in its sole discretion):

(a)   No Default or Event of Default shall exist or would exist with notice or passage of time, or both.

(b)   The Note Holder shall have received a release price for the Released Parcel in an amount not less than the sum of (i) the Release Price (as defined in Schedule 2 of this Note) for the Released Parcel as set forth on Schedule 2 of this Note, (ii) the accrued and unpaid interest on the Principal Indebtedness to be prepaid with the funds described in clause (i) of this Section 19(b), plus (iii) the applicable Prepayment Premium resulting from the Prepayment to be made with the funds described in clause (i) of this Section 19(b) (collectively, the "**Release Funds**").

(c)   The Note Holder shall have received any and all sums then due and payable under the Loan Documents, together with all escrow, closing and recording costs, the costs of preparing and delivering such partial reconveyance, satisfaction or release and the cost of any title insurance endorsements required by the Note Holder, including, without limitation, a partial reconveyance or release endorsement.

(d)   The Note Holder shall have received evidence satisfactory to the Note Holder that: (i) the portion of the Property to be reconveyed or released and the portion of the Property which shall remain encumbered by the Security Instrument(s) are each legal parcels lawfully created in compliance with all applicable laws and ordinances pertaining to subdivisions, parcel maps, condominiums or other land divisions and, at Borrower's sole cost, Note Holder shall have received any title insurance endorsements to that effect requested by the Note Holder; and (ii) that the portion of the Property which shall remain encumbered by the Security Instrument(s) has the benefit of all utilities, easements, public and/or private streets, covenants, conditions and restrictions as may be necessary, in the Note Holder's sole opinion, for the anticipated

development and improvement thereof.

(e)    The Note Holder shall have received evidence satisfactory to the Note Holder that any tax, bond or assessment, including without limitation under the Mello-Roos Community Facilities Act of 1982, which constitutes a lien against the Property and improvements thereon has been properly allocated between the portion of the Property subject to the Partial Release and the portion of the Property and improvements which shall remain encumbered by the Security Instrument(s).

(f)    The Note Holder shall have received written notice from the Borrower requesting such Partial Release at least fifteen days prior to the date such Partial Release is to be made, together with copies of the bona fide contract for the sale of the Released Parcel to an unaffiliated third party and such other information regarding such sale as the Note Holder may request.

(g)    The Release Funds shall be applied as a Prepayment to the obligations owing under this Note, and the Note Holder shall apply the Release Funds to the accrued and unpaid interest on the Principal Indebtedness to be prepaid with such Release Funds and the Prepayment Premium resulting from the Prepayment made with such Release Funds, before applying any Release Funds to reduce the Principal Indebtedness of the Note.

(h)    The Debt Service Coverage Ratio for each of the remaining properties (other than the Released Parcel) encumbered by the Security Instrument(s) for the most recent four fiscal quarter period of the Borrower then ended for which financial information has been delivered pursuant to Schedule 1 of this Note (the "Measurement Period"), shall not be less than the "Minimum Debt Service Coverage Ratio" set forth in the table on Schedule 2 of this Note opposite the description of such Property. As used herein, "Debt Service Coverage Ratio" means, a ratio as determined by Note Holder, in accordance with the Debt Service Coverage Table set forth on Schedule 2 to this Note. The Debt Service Coverage Ratio after the release of any property encumbered by the Security Instrument(s) is required to be equal to or greater than the Debt Service Coverage Ratio as of the origination date of this Loan.

(i)    After giving effect to the release of the Released Parcel and the application of the Release Funds in the manner set forth in this Section 19, the Loan to Value Ratio for each of the remaining properties encumbered by the Security Instrument(s) shall not be more than the "Maximum Loan to Value Ratio" set forth in the table on Schedule 2 of this Note opposite the description of such Property. "Loan to Value Ratio" means, for each Property encumbered by the Security Instrument(s), the ratio of (i) the outstanding Principal Indebtedness of the Loan made by the Note Holder with respect to such Property (after giving effect to the prepayment of Principal Indebtedness to be made with the Release Funds) to (ii) either the original appraised value of such Property based on the appraisal used to underwrite the loans made with respect to such Property under this Note or in Note Holder's sole discretion, an updated valuation of such Property based on a commercially reasonable review of such Property.

Neither the acceptance of any payment nor the issuance of any Partial Release by the

Note Holder shall affect the Borrower's obligation to repay all amounts owing under the Loan Documents or under the lien of the Security Instrument(s) on the remainder of the Property and improvements which are not reconveyed, satisfied or released.

## 20. SERVICER

Note Holder may delegate any and all rights and obligations of Note Holder under the Note and the other Loan Documents to the Servicer upon notice by Note Holder to Borrower, whereupon any notice or consent from the Servicer to Borrower, and any action by Servicer on Note Holder's behalf, shall have the same force and effect as if Servicer were Note Holder.

## 21. CONSTRUCTION

Any reference in this Note to an "Exhibit" or "Schedule" or a "Section" or an "Article" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an exhibit or schedule attached to this Note or to a Section or Article of this Note. Any reference in this Note to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time. Use of the singular in this Note includes the plural and use of the plural includes the singular. As used in this Note, the term "including" means "including, but not limited to" or "including, without limitation," and is for example only, and not a limitation. Whenever Borrower's knowledge is implicated in this Note or the phrase "to Borrower's knowledge" or a similar phrase is used in this Note, Borrower's knowledge or such phrase(s) shall be interpreted to mean to the best of Borrower's knowledge after reasonable and diligent inquiry and investigation. Unless otherwise provided in this Note, if Lender's or the Note Holder's approval, designation, determination, selection, estimate, action or decision is required, permitted or contemplated hereunder, such approval, designation, determination, selection, estimate, action or decision shall be made in Lender's or the Note Holder's sole and absolute discretion. All references in this Note to a separate instrument or agreement shall include such instrument or agreement as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time pursuant to the applicable provisions thereof. "Lender may" or "Note Holder may" shall mean at Lender's or Note Holder's sole discretion, but shall not be an obligation. If there are multiple Borrowers, "Borrower" means all and any one or more of them.

## 22. (Reserved)

## 23. SUCCESSORS AND ASSIGNS

The Borrower may not assign or transfer its rights or obligations under this Note without the prior written consent of the Note Holder, which the Note Holder may give or refuse in its sole and absolute discretion. The terms of this Note bind the Borrower and its successors, assigns, heirs, administrators and executors, and inures to the benefit of the Note Holder and its successors, assigns, participants, heirs, administrators and executors. The Borrower shall (A) do anything necessary to comply with the reasonable requirements of the Note Holder or provide, or cause to be provided, to the Note Holder within ten (10) days of the request, at Borrower's cost and expense, such further documentation or information as the Note Holder may reasonably

require, in order to enable the Note Holder to consummate a Secondary Market Transaction; (B) confirm that the Borrower is not in default under this Note or any other Loan Document or in observing any of the covenants or agreements contained in this Note or any other Loan Document (or, if the Borrower is in default, describing such default in reasonable detail); and (C) execute and deliver to the Note Holder such other documentation, including any amendments, corrections, deletions or additions to this Note as is reasonably required by the Note Holder.

## 24.    TIME IS OF THE ESSENCE

The Borrower agrees that, with respect to each and every obligation and covenant contained in this Note, time is of the essence.

[Remainder of Page Intentionally Left Blank; Signature Page Follows]

**BY SIGNING BELOW, BORROWER ACKNOWLEDGES THIS DOCUMENT INCLUDES, AND AGREES TO THE TERMS OF, A CONFESSION OF JUDGMENT.**

IN WITNESS WHEREOF, this Note has been duly executed by the Borrower as of the day and year first above written.

**BORROWER:**

RAD Diversified REIT, Inc., a Maryland Corporation

By: _____

Name: Taylor Green
Title: Secretary

Address:

7 St Paul Street Suite 820
Baltimore, MD 21202
Attention: Brandon Mendenhall

Organizational ID:

## SCHEDULE 1

### FINANCIAL REPORTING AND COVENANTS

**Section 1.1**    Annual Financial Statements. As soon as available, and in any event within 90 days after the close of each fiscal year of Borrower, Borrower shall furnish to Note Holder, in an Excel spreadsheet file in electronic format (at Borrower's sole cost and expense), or, in the case of predominantly text documents, in Adobe pdf format, annual financial statements of Borrower, including a balance sheet of Borrower as of the end of such fiscal year, together with related statements of operations and equityholders' capital and cash flow for such fiscal year, which statements shall be accompanied by a certificate executed by the Borrower (if a natural person) or a responsible officer of the Borrower (if an entity) certifying that the same are true, correct and complete and were prepared in accordance with GAAP applied on a consistent basis, subject to changes resulting from audit and normal year-end audit adjustments. Together with Borrower's annual financial statements, Borrower shall furnish to Note Holder, in an Excel spreadsheet file in electronic format, or, in the case of predominantly text documents, in Adobe pdf format:

(i)      a statement of cash flows of Borrower;
(ii)     then current rent roll for the real property securing this Note; and
(iii)    such other information as Note Holder shall reasonably request.

**Section 1.2**    Quarterly Financial Statements. As soon as available, and in any event within 45 days after the end of each fiscal quarter (including year-end) of Borrower, Borrower shall furnish to Note Holder, in an Excel spreadsheet file in electronic format, or, in the case of predominantly text documents, in Adobe pdf format, quarterly and year-to-date unaudited financial statements prepared for such fiscal quarter with respect to Borrower, including a balance sheet of Borrower as of the end of such fiscal quarter, together with related statements of operations, equityholders' capital and cash flows for such fiscal quarter and for the portion of the fiscal year of Borrower ending with such fiscal quarter, which statements shall be accompanied by a certificate executed by the Borrower (if a natural person) or a responsible officer of the Borrower (if an entity) certifying that the same are true, correct and complete and were prepared in accordance with GAAP applied on a consistent basis, subject to changes resulting from audit and normal year-end audit adjustments. Each such quarterly financial statements shall be accompanied by the following, in an Excel spreadsheet file in electronic format, or, in the case of predominantly text documents, in Adobe pdf format:

(i)      a statement in reasonable detail that calculates net operating income of Borrower as of the end of each of the four fiscal quarters in the four fiscal quarter period ending on the last day of the most recently completed fiscal quarter of Borrower;
(ii)     copies of each of the leases with respect to the real property securing this Note signed during such quarter;
(iii)    then current rent roll for the real property securing this Note; and
(iv)     such other information as Note Holder shall reasonably request.

As used herein, "**GAAP**" generally accepted accounting principles in the United States set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession) including, without limitation, the FASB Accounting Standards Codification, that are applicable to the circumstances as of the date of determination, consistently applied.

## SCHEDULE 2

### PARTIAL RECONVEYANCES

1.  The "Release Price" for each Released Parcel shall be an amount equal to 120% of the then outstanding principal amount of the loan described below opposite such Released Parcel:

| Description of Released Parcel | Original Principal Amount of Loan Made with Respect to Such Released Parcel |
|---|---|
| 1508 W Oxford St<br>Philadelphia, PA 19121 | $595,350.00 |
| 1926 N Gratz St<br>Philadelphia, PA 19121 | $192,500.00 |
| 2034 N 17th St<br>Philadelphia, PA 19121 | $232,000.00 |

## 2. Minimum Debt Service Coverage Ratio and Maximum Loan to Value Ratio

| Description of Properties Encumbered by the Security Instrument | Original Value of Property | Original Principal Amount of Loan Made with Respect to such Property | Minimum Debt Service Coverage Ratio | Maximum Loan to Value Ratio |
|---|---|---|---|---|
| 1508 W Oxford St Philadelphia, PA 19121 | $800,000.00 | $595,350.00 | 1.085:1.00 | 74.42% |
| 1926 N Gratz St Philadelphia, PA 19121 | $290,000.00 | $192,500.00 | 0.936:1.00 | 66.38% |
| 2034 N 17th St Philadelphia, PA 19121 | $290,000.00 | $232,000.00 | 1.227:1.00 | 80.00% |

Debt Service Coverage Ratio: 1.085:1.00

### 3. Debt Service Coverage Table:

| Loan Type | Debt Service Coverage Ratio |
|---|---|
| Small Portfolio (1-4 Properties) | Effective Gross Income (verified rents or market rents) – (10% of EGI Expense Factor) divided by the Monthly Debt Service + Taxes + Insurance + HOA dues (if applicable) |
| Large Portfolio (5 or more Properties) | Effective Gross Income (verified rents or market rents) - [25% of EGI Expense Factor (Vacancy + PM + OPEX + CAPEX) – TIA)] divided by the Monthly Debt Service + Taxes + Insurance + HOA dues (if applicable)<br><br>Floor Expense Factor of 15% based on actual expenses and supporting documentation |

# NOTE ALLONGE

This Note Allonge is attached to and made a part of the Note, for the purpose of Noteholder Endorsement to evidence transfer of interest.

Servicer Loan Number:

Original Note Date:         2/13/2023

Original Loan Amount:       $1,019,850.00

Original Lender:            Civic Financial Services, LLC a California Limited Liability
Company

Borrower:                   RAD DIVERSIFIED REIT, INC., a Maryland Corporation

Property Addresses:         1508 W OXFORD ST
                            PHILADELPHIA, PA 19121

PAY TO THE ORDER OF:

Without recourse: Civic Financial Services, LLC a
California Limited Liability Company
By: Fay Servicing, LLC as its Attorney-in-Fact

By: _Maria Ross_____
Name:  Maria Ross
Title:    Assistant Secretary

Case 8:26-bk-01636-CPM Doc 80-1 Filed 07/11/26 Page 34 of 81

PREPARED BY, RECORDING
REQUESTED BY AND
WHEN RECORDED, RETURN TO:

Civic Financial Services, LLC
2015 Manhattan Beach Blvd, Suite 106
Redondo Beach, CA 90278

TO BE RECORDED IN THE
MORTGAGE RECORDS OF
Philadelphia COUNTY, PENNSYLVANIA
Loan Number

## MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

**THIS INSTRUMENT CONTAINS A CONFESSION OF JUDGMENT PROVISION THAT CONSTITUTES A WAIVER OF IMPORTANT RIGHTS YOU MAY HAVE AS A DEBTOR/BORROWER AND ALLOWS THE CREDITOR/LENDER TO OBTAIN A JUDGMENT AGAINST YOU WITHOUT ANY FURTHER NOTICE.**

PA05.2 PENNSYLVANIA MORTGAGE, ASSIGNMENT OF LEASES AND
RENTS, SECURITY AGREEMENT AND FIXTURE FILING – HYBRID ARM
COVER PAGE

Page 1 of 38

## MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

This Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing (as amended from time to time, this "**Security Instrument**") is made and executed as of **February 13, 2023** by **RAD Diversified REIT, Inc., a Maryland Corporation organized and existing under the laws of Maryland, ("Borrower"),** whose address for all purposes hereunder is **7 St Paul Street Suite 820, Baltimore, MD 21202,** to and for the benefit of **Civic Financial Services, LLC, a California Limited Liability Company** (together with all of its successors and assigns, "**Lender**"), whose address for all purposes hereunder is **2015 Manhattan Beach Blvd, Suite 106, Redondo Beach, CA 90278.** For all state law, statutory and other purposes hereunder, (i) the term "Borrower" as used herein shall be deemed to mean a mortgagor of the Property as described herein the same as if the term "mortgagor" were used in lieu of the term "Borrower" throughout this Security Instrument, and (ii) the term "Lender" as used herein shall be deemed to mean a mortgagee of this Security Instrument with respect to the Property with all of the rights conferred hereby the same as if the term "mortgagee" were used in lieu of the term "Lender" throughout this Security Instrument.

### 1.    Definitions

Capitalized terms used and not specifically defined herein have the meanings given to such terms in the Note. All terms used and not specifically defined herein, but which are otherwise defined by the UCC, shall have the meanings assigned to them by the UCC. The following terms, when used in this Security Instrument, shall have the following meanings:

"**Applicable Law**" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners' association or similar organization.

"**Condemnation Action**" means any action or proceeding, however characterized or named, relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Property, whether direct or indirect.

"**Default**" has the meaning set forth in the Note.

"**Electronic Funds Transfer**" means any transfer of funds, other than a transaction

originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

"**Escrow Items**" has the meaning set forth in Section 3.3 of this Security Instrument.

"**Goods**" means all of Borrower's present and hereafter acquired right, title and interest in all goods which are used now or in the future in connection with the ownership, management, or operation of the Land or the Improvements or are located on the Land or in the Improvements, including inventory; furniture; furnishings; machinery, equipment, engines, boilers, incinerators, and installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring, and conduits used in connection with radio, television, security, fire prevention, or fire detection, or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers, and other appliances; light fixtures, awnings, storm windows, and storm doors; pictures, screens, blinds, shades, curtains, and curtain rods; mirrors, cabinets, paneling, rugs, and floor and wall coverings; fences, trees, and plants; swimming pools; exercise equipment; supplies; tools; books and records (whether in written or electronic form); websites, URLs, blogs, and social network pages; computer equipment (hardware and software); and other tangible personal property which is used now or in the future in connection with the ownership, management, or operation of the Land or the Improvements or are located on the Land or in the Improvements.

"**Improvements**" has the meaning set forth in Section 2 of this Security Instrument.

"**Land**" has the meaning set forth in Section 2 of this Security Instrument.

"**Leases**" means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Property, or any portion of the Property, and all modifications, extensions or renewals thereof.

"**Lien**" means any claim or charge against property for payment of a debt or an amount owed for services rendered, including any mortgage, deed of trust, deed to secure debt, security interest, tax lien, any materialman's or mechanic's lien, or any lien of a governmental authority, including any lien in connection with the payment of utilities, or any other encumbrance.

"**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges (including, without limitation, any Prepayment Premium (as defined in the Note)) and late charges due under the Note, any costs, fees and expenses payable by the Borrower under the Note and all sums due under this Security Instrument, plus interest.

"**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverage described in Section 3.5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

"**Note**" means the promissory note signed by Borrower in favor of Lender and dated **February 13, 2023**, as amended, restated, supplemented or otherwise modified from time to time. The Note states that Borrower owes Lender **One Million Nineteen Thousand Eight Hundred Fifty Dollars and Zero Cents (US $1,019,850.00)** plus interest; Borrower has promised to pay interest on this debt in regular Periodic Payments and to pay the debt in full not later than **March 01, 2053**.

"**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts payable under Section 3.3 of this Security Instrument.

"**Permitted Encumbrance**" means only (i) the easements, restrictions and other matters listed in a schedule of exceptions to coverage in the title policy received and accepted by Lender on or about the date of this Security Instrument with respect to the Property, (ii) taxes for the current tax year that are not yet due and payable, (iii) statutory Liens such as carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than thirty (30) days or which are being contested in good faith and by appropriate proceedings diligently conducted, but only so long as (A) Lender determines that adequate reserves with respect thereto are maintained on the books of the Borrower and (B) in Lender's opinion, such proceedings operate to prevent the enforcement of the Lien while those proceedings are pending, and (iv) such other encumbrances as Lender may permit (in a separate writing) in its sole and absolute discretion.

"**Personalty**" has the meaning set forth in Section 2 of this Security Instrument.

"**Property**" has the meaning set forth in Section 2 of this Security Instrument.

"**Property Jurisdiction**" means the jurisdiction in which the Land is located.

"**Rents**" means all rents (whether from residential or non-residential space), revenues and other income from the Land or the Improvements, including subsidy payments received from any sources, including payments under any "Housing Assistance Payments Contract" or other rental subsidy agreement (if any), parking fees, laundry and vending machine income and fees and charges for food, health care and other services provided at the Property, whether now due, past due, or to become due, and tenant security deposits.

"**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower:

[] Condominium Rider                              [] Planned Unit Development Rider

[] Revocable Trust Rider                          [] Other: Non-Recourse Rider

[] Other:                                         [] Other:

**"Secured Obligations"** has the meaning set forth in Section 2 of this Security Instrument.

**"Security Instrument"** means this document, which is dated **February 13, 2023**, together with all Riders to this document, as amended, restated, supplemented or otherwise modified from time to time.

**"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**"UCC"** means the Uniform Commercial Code in effect in the Property Jurisdiction, as amended from time to time.

**"UCC Collateral"** means any or all of that portion of the Property in which a security interest may be granted under the UCC and in which Borrower has any present or hereafter acquired right, title or interest.

2.      **Transfer of Rights in the Property**

This Security Instrument secures to Lender:

(a)      the repayment of the Loan, and all amendments, restatements, renewals, extensions and modifications of the Note; and

(b)      the performance of Borrower's covenants and agreements under this Security Instrument and the Note (all of the foregoing obligations described in clauses (a) and (b) above are referred to in this Security Instrument as the **"Secured Obligations"**).

For this purpose, Borrower irrevocably and unconditionally mortgages, grants, warrants and conveys to Lender, with the right of entry and possession, all of the Borrower's present and hereafter acquired right, title and interest in and to all of the following:

(i)      the property(ies) located in the State of Pennsylvania, County of Philadelphia described in **Exhibit A** attached hereto (which is incorporated herein by this reference) (the **"Land"**), which currently has/have the address(es) of:

1508 W Oxford St
Philadelphia, PA 19121

1926 N Gratz St
Philadelphia, PA 19121

2034 N 17th St
Philadelphia, PA 19121

      (ii)     all of the buildings, structures, improvements, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements, facilities, and additions and other construction on the Land (the **"Improvements"**);

      (iii)    all Goods, accounts, choses of action, chattel paper, documents, general intangibles (including software), payment intangibles, instruments, investment property, letter of credit rights, supporting obligations, computer information, source codes, object codes, records and data, all telephone numbers or listings, claims (including claims for indemnity or breach of warranty), deposit accounts and other property or assets of any kind or nature related to the Land or the Improvements now or in the future, including operating agreements, surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements, and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land (the **"Personalty"**);

      (iv)    all current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights of way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefitting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

      (v)    all insurance policies relating to the Property (and any unearned premiums) and all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Personalty, or any other part of the Property, whether or not Borrower obtained the insurance pursuant to Lender's requirements;

      (vi)    all awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Personalty, or any other part of the Property, including any awards or settlements resulting from (1) any Condemnation Actions, (2) any damage to the Property caused by governmental action that does not result in a Condemnation Action, or (3) the total or partial taking of the Land, the Improvements, the Personalty, or any other part of the Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

      (vii)    all contracts, options and other agreements for the sale of the Land, the Improvements, the Personalty, or any other part of the Property entered into by Borrower now

or in the future, including cash or securities deposited to secure performance by parties of their obligations;

(viii)    all Leases and Lease guaranties, letters of credit and any other supporting obligation for any of the Leases given in connection with any of the Leases, and all Rents;

(ix)    all earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Property;

(x)    deposits in an amount sufficient to accumulate with Lender the entire sum required to pay the Escrow Items when due;

(xi)    all refunds or rebates of Escrow Items by any municipal, state or federal authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Security Instrument is dated);

(xii)    all tenant security deposits related to the Property;

(xiii)    all products and replacements of any of the foregoing, and all cash and non-cash proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds; and

(xiv)    all of Borrower's right, title and interest in the oil, gas, minerals, mineral interests, royalties, overriding royalties, production payments, net profit interests and other interests and estates in, under and on the Property and other oil, gas and mineral interests with which any of the foregoing interests or estates are pooled or unitized.

All of the foregoing property described in clauses (i) through (xiv) above is referred to in this Security Instrument as the **"Property"**.

BORROWER REPRESENTS, WARRANTS AND COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant, warrant and convey the Property and that the Property is unencumbered, except for encumbrances of record as of the date hereof. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record as of the date hereof. Borrower hereby releases, relinquishes, and waives, to the fullest extent allowed by Applicable Law, all rights and benefits, if any, under and by virtue of the homestead exemption laws of the Property Jurisdiction, if applicable.

WITHOUT LIMITING THE FOREGOING, to secure to Lender the payment and performance of the Secured Obligations, Borrower hereby pledges, assigns, and grants to Lender a continuing security interest in the UCC Collateral. This Security Instrument constitutes a security agreement and a financing statement under the UCC. This Security Instrument also constitutes a financing statement pursuant to the terms of the UCC with respect to any part of the Property that is or may become a fixture under Applicable Law, and will be recorded as a "fixture filing" in accordance with the UCC. Borrower hereby authorizes Lender to file financing statements,

continuation statements and financing statement amendments in such form as Lender may require to perfect or continue the perfection of this security interest without the signature of Borrower. If a Default (as defined in the Note) has occurred and is continuing, Lender shall have the remedies of a secured party under the UCC or otherwise provided at law or in equity, in addition to all remedies provided by this Security Instrument and in any Loan Document (as defined in the Note). Lender may exercise any or all of its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability or validity of Lender's other remedies. For purposes of the UCC, the debtor is Borrower and the secured party is Lender. As of the date hereof, the name, address and organizational ID of the debtor is set forth after Borrower's signature below (for the Borrower) and on the first page of this Security Instrument (for the Lender) which are the addresses from which information on the security interest may be obtained.

Borrower represents and warrants that: (1) Borrower maintains its chief executive office at the location set forth after Borrower's signature below, and Borrower will notify Lender in writing of any change in its chief executive office not less than ten (10) days prior to such change; (2) Borrower is the record owner of the Property; (3) Borrower's state of incorporation, organization, or formation, if applicable, is as set forth on Page 1 of this Security Instrument, and Borrower will notify Lender in writing of any change in its state of incorporation, organization, or formation not less than ten (10) days prior to such change; (4) Borrower's exact legal name is as set forth on Page 1 of this Security Instrument, and Borrower will notify Lender in writing of any change in its name not less than ten (10) days prior to such change; (5) Borrower is the owner of the UCC Collateral subject to no Liens, charges or encumbrances other than the Lien hereof and the Permitted Encumbrances; (6) the UCC Collateral will not be removed from the Property without the consent of Lender; and (7) no financing statement covering any of the UCC Collateral or any proceeds thereof is on file in any public office except pursuant hereto.

All property of every kind acquired by Borrower after the date of this Security Instrument which by the terms of this Security Instrument shall be subject to the Lien and the security interest created hereby, shall immediately upon the acquisition thereof by Borrower and without further conveyance or assignment become subject to the Lien and security interest created by this Security Instrument. Nevertheless, Borrower shall execute, acknowledge, deliver and record or file, as appropriate, all and every such further deeds of trust, mortgages, deeds to secure debt, security agreements, financing statements, assignments and assurances as Lender shall require for accomplishing the purposes of this Security Instrument and to comply with the rerecording requirements of the UCC.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

3.    **Uniform Covenants**

Borrower and Lender covenant and agree as follows:

### 3.1    Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges

Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges (including, without limitation, any Prepayment Premium (as defined in the Note)) and late charges due under the Note, and any costs, fees and expenses payable by the Borrower under the Note or this Security Instrument. Borrower shall also pay funds for Escrow Items pursuant to Section 3.3 of this Security Instrument. Payments due under the Note and this Security Instrument shall be made in U.S. currency in the manner provided under the Note. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 3.13 of this Security Instrument. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future. In Lender's sole and absolute discretion, Lender may apply such payments at the time such payments are accepted or hold such payments until Borrower makes another payment sufficient to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such payments or return them to Borrower, in Lender's sole and absolute discretion. In any event, (a) Lender shall not be obligated to pay the Borrower any interest on unapplied payments or funds, and (b) if not earlier applied or returned, such payments or funds will be applied to the outstanding obligations under the Note immediately prior to foreclosure in any manner or order determined by Lender in its sole and absolute discretion. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

### 3.2    Application of Payments or Proceeds

Except as otherwise described in this Section 3.2, voluntary prepayments shall be applied as described in the Note. If at any time Lender receives, from Borrower or otherwise, any payment in respect of the Loan that is less than all amounts due and payable at such time, then Lender may apply such payment to amounts then due and payable in any manner and in any order determined by Lender or hold in suspense and not apply such payment at Lender's election in its sole and absolute discretion. Neither Lender's acceptance of a payment that is less than all amounts then due and payable, nor Lender's application of, or suspension of the application of, such payment, shall constitute or be deemed to constitute either a waiver of the unpaid amounts

or an accord and satisfaction. Notwithstanding the application of any such payment to the Loan, Borrower's obligations under the Note and the other Loan Documents shall remain unchanged.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

### 3.3    Funds for Escrow Items

Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a Lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; and (c) premiums for any and all insurance required by Lender under Section 3.5. These items described in the immediately preceding sentence are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and if so required, such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section 3.3. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 3.8. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 3.8 and pay such amount, and Borrower shall then be obligated under Section 3.8 to repay to Lender any such amount so paid by Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 3.13 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.3. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds. Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds then held by Lender.

### 3.4    Charges; Liens

Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property, all leasehold payments or ground rents on the Property, if any, and all Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.3. Borrower shall promptly discharge any Lien on the Property other than Permitted Encumbrances. If Lender determines that any part of the Property is subject to a Lien other than Permitted Encumbrances, Lender may give Borrower a notice identifying the Lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the Lien. Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

### 3.5    Property Insurance

Borrower shall keep the Improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained by Lender might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 3.5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and

renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied to the Secured Obligations, whether or not then due, in any manner and order determined by Lender in its sole and absolute discretion.

If Borrower fails to give notice to the Lender or the insurance carrier of an event of loss in a timely manner, abandons the Property or fails to file, negotiate or settle any available insurance claim or related matter in a timely manner, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 10 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 10-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 4.1 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in respect of the Property, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

### 3.6 Preservation, Maintenance and Protection of the Property; Inspections

Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or permit waste to be committed on the Property. Notwithstanding the fact that Borrower is not residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance

or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration. Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

### 3.7    Borrower's Loan Application

Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning the ABSENCE OF ANY OCCUPANCY OR USE OF THE PROPERTY AS A PRINCIPAL RESIDENCE OR SECOND HOME OF ANY OF BORROWER OR ANY OWNER, EMPLOYEE OR OTHER AFFILIATE OF BORROWER.

### 3.8    Protection of Lender's Interest in the Property and Rights Under this Security Instrument

If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy (or under other Debtor Relief Laws), probate, for condemnation or forfeiture, for enforcement of a Lien on the Property or to enforce laws or regulations), or (c) Borrower has permitted the Property to remain vacant, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (i) paying any sums secured by a Lien on the Property; (ii) appearing in court; and (iii) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding (or any other proceeding under any other Debtor Relief Law). Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 3.8, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 3.8.

Any amounts disbursed by Lender under this Section 3.8 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement, and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground or master lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

### 3.9    Assignment of Miscellaneous Proceeds; Forfeiture

(a)    To the fullest extent permitted by Applicable Law, all Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

(b)    If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied to the Secured Obligations, whether or not then due, in any manner or order determined by the Lender in its sole and absolute discretion.

(c)    In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

(d)    In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

(e)    In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

(f)    If Borrower fails to pursue recovery of Miscellaneous Proceeds in a diligent manner, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 10 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. **"Opposing Party"** means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

(g)    Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default if acceleration has not occurred by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

(h)    All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied to the Secured Obligations, whether or not then due, in any manner or order determined by the Lender in its sole and absolute discretion.

### 3.10    Borrower Not Released; Forbearance By Lender Not a Waiver

Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

### 3.11    Joint and Several Liability; Co-signers; Successors and Assigns Bound

Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 3.16, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by

Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 3.17) and benefit the successors and assigns of Lender.

### 3.12    Loan Charges

Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, Property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits (and for purposes of making any such determination as to whether any interest exceeds the lawful maximum, it is understood and agreed that all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal indebtedness of Borrower to Lender), then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

### 3.13    Notices

All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the address designated in the Note unless Borrower has designated a substitute notice address by no less than ten (10) days prior notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have

been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

### 3.14    Governing Law; Severability; Rules of Construction

EXCEPT AS EXPRESSLY SET FORTH IN THIS PARAGRAPH AND TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF CALIFORNIA (WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES) SHALL GOVERN ALL MATTERS RELATING TO THIS SECURITY INSTRUMENT, THE NOTE PROVISIONS INCORPORATED HEREIN BY REFERENCE, AND ALL OF THE INDEBTEDNESS AND OBLIGATIONS ARISING HEREUNDER OR THEREUNDER; PROVIDED, HOWEVER, THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED PURSUANT TO THIS SECURITY INSTRUMENT SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE LAND IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF CALIFORNIA SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF THIS SECURITY INSTRUMENT AND ALL OF THE OBLIGATIONS ARISING HEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS SECURITY INSTRUMENT, AS THIS SECURITY INSTRUMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA TO THE EXTENT SET FORTH IN THIS PARAGRAPH.

All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

### 3.15    Borrower's Copy

Borrower shall be given one copy of the Note and of this Security Instrument.

### 3.16    Transfer of the Property or a Beneficial Interest in Borrower

As used in this Section 3.16, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred)

without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. If Borrower fails to pay these sums, Lender may invoke any remedies permitted by this Security Instrument without notice or demand on Borrower.

### 3.17    Sale of Note; Change of Loan Servicer; Notice of Grievance

The Note or a partial interest in the Note (together with this Security Instrument) can be sold by the Lender one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the **"Loan Servicer"**) that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information required by Applicable Law in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

The Borrower may not commence or join any judicial action (as either an individual litigant or the member of a class) that arises from the Lender's actions pursuant to this Security Instrument or that alleges that the Lender has breached any provision of, or any duty owed by reason of, this Security Instrument, until the Borrower has notified the Lender (with such notice given in compliance with the requirements of Section 3.13) of such alleged breach and afforded the Lender hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.

### 3.18    Hazardous Substances

As used in this Section 3.18: (a) **"Hazardous Substances"** are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) **"Environmental Law"** means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) **"Environmental Cleanup"** includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an **"Environmental Condition"** means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which,

due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

### 3.19    Use of Property; Compliance with Law

Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body or Governmental Authority applicable to the Property.

### 3.20    Liens

Other than Permitted Encumbrances, Borrower shall not allow any Lien, whether inferior or superior to the Security Instrument, to exist, attach or be perfected against the Property.

### 3.21    Rent Loss Insurance

Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 3.5.

### 3.22    Assignment of Leases and Rents; Appointment of Receiver; Lender in Possession

Borrower absolutely and unconditionally assigns and transfers to Lender all of the Leases and Rents, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, until a Default has occurred and is continuing, Borrower shall have a revocable license to collect and receive all Rents, to hold all Rents in trust for the benefit of Lender, and to apply all Rents to pay amounts then due and payable under the other Loan Documents and to pay the current costs and expenses of managing, operating and maintaining the Property, including utilities, tenant improvements and other capital expenditures. So long as no Default has occurred and is continuing, the Rents remaining after application pursuant to the preceding sentence may be retained and distributed by Borrower. This assignment of Leases and Rents constitutes a present, outright, immediate,

continuing and absolute assignment and not an assignment for additional security only. This assignment to Lender shall not be construed to bind Lender to the performance of any of the covenants, conditions or provisions contained in any Lease or otherwise impose any obligation upon Lender. Lender shall have no responsibility on account of this assignment for the control, care, maintenance, management or repair of the Property, for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property. Borrower agrees to execute and deliver to Lender such additional instruments, in form and substance satisfactory to Lender, as may hereafter be reasonably requested by Lender to further evidence and confirm such assignment.

If a Default has occurred and is continuing: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless Applicable Law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument in the manner and order determined by the Lender in its sole and absolute discretion; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security, and if Lender elects to seek the appointment of a receiver for the Property at any time after a Default has occurred and is continuing, Borrower, by its execution of this Security Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte*, if permitted by Applicable Law; (vii) Lender shall have the right to enforce all of the rights and remedies of an assignee under California Civil Code Section 2938 (viii) Lender shall have the immediate and continuing right, power and authority, either in person or by agent, without bringing any action or proceeding, or by a receiver appointed by a court, without the necessity of taking possession of the Property in its own name, and without the need for any other authorization or action by Borrower or Lender, in addition to and without limiting any of Lender's rights and remedies hereunder, under the Note and any other Loan Documents and as otherwise available at law or in equity, (1) to notify any tenant or other person that the Leases have been assigned to Lender and that all Rents are to be paid directly to Lender, whether or not Lender has commenced or completed foreclosure or taken possession of the Property; (2) to settle, compromise, release, extend the time of payment of, and make allowances, adjustments and discounts of any Rents or other obligations in, to and under the Leases; (3) to demand, sue for, collect, receive, and enforce payment of Rents, including those past-due and unpaid and other rights under the Leases, prosecute any action or proceeding, and defend against any claim with respect to the Leases and Rents; (4) to enter upon, take possession of and operate the Property whether or not foreclosure under this Security Instrument has been instituted and without applying for a receiver; (5) to lease all or any part of the Property; and/or

(6) to perform any and all obligations of Borrower under the Leases and exercise any and all rights of Borrower therein contained to the full extent of Borrower's rights and obligations thereunder.

At Lender's request, Borrower shall deliver a copy of this Security Instrument to each tenant under a Lease and to each manager and managing agent or operator of the Property, and Lender shall have the continuing right to do so. Borrower irrevocably directs any tenant, manager, managing agent, or operator of the Property, without any requirement for notice to or consent by Borrower, to comply with all demands of Lender under this Section 3.22 and to turn over to Lender on demand all Rents that it receives. Borrower hereby acknowledges and agrees that payment of any Rents by a person to Lender as hereinabove provided shall constitute payment by such person, as fully and with the same effect as if such Rents had been paid to Borrower. Neither the enforcement of any of the remedies under this Section 3.22 nor any other remedies or security interests afforded to Lender under the Loan Documents, at law or in equity shall cause Lender to be deemed or construed to be a mortgagee in possession of the Property, to obligate Lender to lease the Property or attempt to do so, or to take any action, incur any expense, or perform or discharge any obligation, duty or liability whatsoever under any of the Leases or otherwise. Borrower shall, and hereby agrees to indemnify Lender for, and to hold Lender harmless from and against, any and all claims, liability, expenses, losses or damages that may or might be asserted against or incurred by Lender solely by reason of Lender's status as an assignee pursuant to the assignment of Leases and Rents contained herein, but excluding any claim to the extent caused by Lender's gross negligence or willful misconduct. Should Lender incur any such claim, liability, expense, loss or damage, the amount thereof, including all actual expenses and reasonable fees of attorneys, shall constitute Secured Obligations secured hereby, and Borrower shall reimburse Lender therefor within ten (10) days after demand.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents, any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 3.8.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this Section 3.22.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Leases and Rents shall terminate when all the sums secured by the Security Instrument are paid in full.

### 3.23    Pledge of Monies Held

Borrower hereby pledges to Lender any and all monies now or hereafter held by Lender, including, without limitation, any sums deposited in the escrow as provided in Section 3.3 above, insurance proceeds as provided in Section 3.5 above and Miscellaneous Proceeds as provided in Section 3.9 above, as additional security for Borrower's performance of its obligations under the

Note, this Security Instrument and all of the other Loan Documents, until expended or applied as provided in this Security Instrument. At any time a Default has occurred and is continuing, all such monies may be applied by the Lender to the Secured Obligations, whether or not then due, in any manner or order determined by the Lender in its sole and absolute discretion.

### 3.24 Other Loan Documents

Any breach or default by Borrower or any Affiliate of Borrower under the Note and the other obligations stated in the other loan documents specifically relating to the loan evidenced by the Note shall be a breach under this Security Instrument, and Lender may invoke any of the remedies permitted by this Security Instrument.

### 4. Non-Uniform Covenants

Borrower and Lender further covenant and agree as follows:

### 4.1 Default; Acceleration; Remedies

(a) <u>Remedies</u>. If a Default has occurred and is continuing, Lender may, at Lender's election, take such action permitted at law or in equity, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower and to the Property, including but not limited to, any or all of the following rights, remedies and recourses each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

(i) <u>Acceleration</u>. Declare the Secured Obligations to be immediately due and payable, without further notice, presentment, protest, notice of intent to accelerate, notice of acceleration, demand or action of any nature whatsoever (each of which hereby is expressly waived by Borrower), whereupon the same shall become immediately due and payable.

(ii) <u>Entry on Property</u>. Enter the Property and take exclusive possession thereof and of all books, records and accounts relating thereto. If Borrower remains in possession of the Property after the occurrence and during the continuance of a Default and without Lender's prior written consent, Lender may invoke any legal remedies to dispossess Borrower.

(iii) <u>Operation of Property</u>. Whether or not a receiver has been appointed pursuant to this Security Instrument, hold, lease, develop, manage, operate, control and otherwise use the Property upon such terms and conditions as Lender may deem reasonable under the circumstances (making such repairs, alterations, additions and improvements and taking other actions, from time to time, as Lender deems reasonably necessary or desirable), exercise all rights and powers of Borrower with respect to the Property, whether in the name of Borrower or otherwise, including the right to make, cancel, enforce or modify leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents, and apply all Rents and other amounts collected by Lender in connection therewith in accordance with the provisions of Section 4.1(g).

(iv)     Foreclosure and Sale. Institute proceedings for the complete foreclosure of this Security Instrument, either by judicial action or otherwise, in which case the Property may be sold for cash or credit in one or more parcels or in several interests or portions and in any order or manner in accordance with applicable law governing foreclosures. At any such sale by virtue of any judicial proceedings or any other legal right, remedy or recourse, the title to and right of possession of any such property shall pass to the purchaser thereof, and to the fullest extent permitted by law, Borrower shall be completely and irrevocably divested of all of its right, title, interest, claim and demand whatsoever, either at law or in equity, in and to the property sold and such sale shall be a perpetual bar both at law and in equity against Borrower, and against all other persons claiming or to claim the property sold or any part thereof, by, through or under Borrower. Lender may be a purchaser at such sale and if Lender is the highest bidder, may credit the portion of the purchase price that would be distributed to Lender against the Secured Obligations in lieu of paying cash. At any such sale (A) whether made under the power herein contained, the UCC, any other legal requirement or by virtue of any judicial proceedings or any other legal right, remedy or recourse, it shall not be necessary for Lender or Lender's agent to be physically present at or to have constructive possession of the Property (Borrower shall deliver to Lender or Lender's agent any portion of the Property not actually or constructively possessed by Lender immediately upon demand by Lender), and the title to and right of possession of any such property shall pass to the purchaser thereof, as completely as if Lender or Lender's agent had been actually present and delivered to purchaser at such sale, (B) each instrument of conveyance shall contain a general warranty of title, binding upon Borrower, (C) each recital contained in any instrument of conveyance shall conclusively establish the truth and accuracy of the matters recited therein, including, without limitation, nonpayment of the Secured Obligations, advertisement and conduct of such sale in the manner provided herein and otherwise by law, (D) any prerequisites to the validity of such sale shall be conclusively presumed to have been performed, and (E) the receipt of sale shall be a sufficient discharge to the purchaser or purchasers for his/her/their purchase money and no such purchaser or purchasers, or his/her/their assigns or personal representatives, shall thereafter be obligated to see to the application of such purchase money or be in any way answerable for any loss, misapplication or nonapplication thereof. With respect to any notices required or permitted under the UCC, Borrower agrees that ten (10) business days' prior written notice shall be deemed commercially reasonable.

(v)     Receiver. Prior to, concurrently with, or subsequent to the institution of foreclosure proceedings, make application to a court of competent jurisdiction for, and (to the extent permitted by applicable law) obtain from such court as a matter of strict right and without notice to Borrower or anyone claiming under Borrower or regard to the value of the Property or the solvency or insolvency of Borrower or the adequacy of any collateral for the repayment of the Secured Obligations or the interest of Borrower therein, the appointment of a receiver or receivers of the Property, and Borrower irrevocably consents to such appointment. Any such receiver or receivers shall have all the usual powers and duties of receivers in similar cases, including the full power to rent, maintain and otherwise operate the Property upon such terms as may be approved by the court, and shall apply such Rents in accordance with the provisions

of Section 4.1(g).

(vi)    Other. Exercise all other rights, remedies and recourses granted under the Loan Documents or otherwise available at law or in equity (including an action for specific performance of any covenant contained in the Loan Documents, or a judgment on the Note either before, during or after any proceeding to enforce this Security Instrument).

(b)    Separate Sales. In connection with the exercise by Lender of its rights and remedies hereunder, the Property may be sold in one or more parcels and in such manner and order as Lender in its sole discretion, may elect, subject to applicable law; the right of sale arising out of any Default shall not be exhausted by any one or more sales.

(c)    Remedies Cumulative, Concurrent and Nonexclusive. Lender shall have all rights, remedies and recourses granted in the Loan Documents and available at law or equity (including the UCC), which rights (a) shall be cumulative and concurrent and shall be in addition to every other remedy so provided or permitted, (b) may be pursued separately, successively or concurrently against Borrower, or against the Property, or against any one or more of them, at the sole discretion of Lender, (c) may be exercised as often as occasion therefor shall arise, and the exercise or failure to exercise any of them shall not be construed as a waiver or release thereof or of any other right, remedy or recourse, and (d) are intended to be, and shall be, nonexclusive. No action by Lender in the enforcement of any rights, remedies or recourses under the Loan Documents or otherwise at law or equity shall be deemed to cure any Default.

(d)    Release of and Resort to Collateral. Lender may release, regardless of consideration and without the necessity for any notice to or consent by the holder of any subordinate Lien on the Property, any part of the Property without, as to the remainder, in any way impairing, affecting, subordinating or releasing the Lien or security interests created in or evidenced by the Loan Documents or their stature as a first and prior Lien and security interest in and to the Property. For payment of the Secured Obligations, Lender may resort to any other security in such order and manner as Lender may elect.

(e)    Waiver of Redemption, Notice and Marshaling of Assets. To the fullest extent permitted by law, Borrower hereby irrevocably and unconditionally waives and releases (a) all benefit that might accrue to Borrower by virtue of any present or future statute of limitations or "moratorium law" or other law or judicial decision exempting the Property or any part thereof, or any part of the proceeds arising from any sale of any such property, from attachment, levy or sale on execution or providing for any appraisement, valuation, stay of execution, exemption from civil process, redemption reinstatement (to the extent permitted by law) or extension of time for payment, (b) any right to a marshaling of assets or a sale in inverse order of alienation, and (c) any and all rights it may have to require that the Property be sold as separate tracts or units in the event of foreclosure.

(f)    Discontinuance of Proceedings. If Lender shall have proceeded to invoke any right, remedy or recourse permitted under the Loan Documents and shall thereafter elect to

discontinue or abandon it for any reason, Lender shall have the unqualified right to do so and, in such an event, Borrower and Lender shall be restored to their former positions with respect to the Secured Obligations, the Loan Documents, the Property and otherwise, and the rights, remedies, recourses and powers of Lender shall continue as if the right, remedy or recourse had never been invoked, but no such discontinuance or abandonment shall waive any Default that may then exist or the right of Lender thereafter to exercise any right, remedy or recourse under the Loan Documents for such Default.

(g)    Application of Proceeds. Except as otherwise provided in the Loan Documents and unless otherwise required by applicable law, the proceeds of any sale of, and the Rents and other amounts generated by the holding, leasing, management, operation or other use of the Property, shall be applied by Lender (or the receiver, if one is appointed) in the following order or in such other order as Lender shall determine in its sole discretion: (i) to all fees, costs and expenses incurred by the Lender in enforcing the Loan Documents, including, but not limited to, reasonable attorneys' fees; (b) to the Secured Obligations, whether or not then due, in any order or manner determined by the Lender; and (c) any excess to the Person or Persons legally entitled to it.

(h)    Occupancy After Foreclosure. The purchaser at any foreclosure sale pursuant to Section 4.1(a)(iv) shall become the legal owner of the Property. All occupants of the Property shall, at the option of such purchaser, become tenants of the purchaser at the foreclosure sale and shall deliver possession thereof immediately to the purchaser upon demand. It shall not be necessary for the purchaser at said sale to bring any action for possession of the Property other than the statutory action of forcible detainer in any court having jurisdiction over the Property.

(i)    Additional Advances and Disbursements; Costs of Enforcement. If a Default is continuing, Lender shall have the right, but not the obligation, to cure such Default in the name and on behalf of Borrower. All sums advanced and expenses incurred at any time by Lender under this Section, or otherwise under this Security Instrument or any of the other Loan Documents or applicable law, shall bear interest from the date that such sum is advanced or expense incurred, to and including the date of reimbursement, computed at the Default Rate, and all such sums, together with interest thereon, shall constitute additions to the Secured Obligations and shall be secured by this Security Instrument and Borrower covenants and agrees to pay them to the order of Lender promptly upon demand.

(j)    No Lender in Possession. Neither the enforcement of any of the remedies under this Section 4, the assignment of the Leases and Rents under Section 3.22, nor any other remedies afforded to Lender under the Loan Documents, at law or in equity shall cause Lender to be deemed or construed to be a mortgagee in possession of the Property, to obligate Lender to lease the Property or attempt to do so, or to take any action, incur any expense, or perform or discharge any obligation, duty or liability whatsoever under any of the Leases or otherwise.

This Section 4.1 shall be subject to (and shall be deemed modified by) any state specific provisions set forth in Exhibit B attached hereto.

### 4.2    Reconveyance

Upon payment of all sums secured by this Security Instrument, Lender shall reconvey the Property, without warranty, to the person legally entitled to it and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable. This Section 4.2 shall be subject to (and shall be deemed modified by) any state specific provisions set forth in Section Exhibit B attached hereto.

### 4.3     Statement of Obligation Fee

Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

### 4.4     Use of Property

BORROWER WILL AT NO TIME DURING THE TERM OF THE LOAN INHABIT THE PROPERTY. THE PROPERTY IS OWNED AND HELD BY BORROWER AS AN INVESTMENT PROPERTY. NONE OF BORROWER OR ANY OWNER, EMPLOYEE OR OTHER AFFILIATE OF BORROWER NOW OCCUPIES OR USES THE PROPERTY, AND NONE OF THEM HAS ANY PRESENT INTENTION TO OCCUPY OR USE THE PROPERTY IN THE FUTURE AS A PRINCIPAL RESIDENCE OR SECOND HOME OF ANY OF BORROWER OR ANY OWNER, EMPLOYEE OR OTHER AFFILIATE OF BORROWER. EACH OF BORROWER AND ITS OWNERS, EMPLOYEES AND OTHER AFFILIATES NOW OCCUPIES AND USES OTHER PROPERTY OR PROPERTIES AS SUCH PERSON'S PRINCIPAL OFFICE, RESIDENCE AND/OR SECOND HOME.

## 5.     State Specific Provisions.

The provisions of **Exhibit B** attached hereto are hereby incorporated by reference as though set forth in full herein.

## 6.     Obligations and Reliance; Further Assurances

### 6.1     Obligations and Reliance

(a)     **Relationship of Borrower and Lender.** The relationship between Borrower and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Borrower, and no term or condition of any of the Note, this Security Instrument and the other Loan Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of debtor and creditor.

(b)     **No Reliance on Lender.** The members, general partners, principals and (if Borrower is a trust) beneficial owners of Borrower are experienced in the ownership and operation of properties similar to the Property, and Borrower and Lender are relying solely upon such expertise and business plan in connection with the ownership and operation of the Property. Borrower is not relying on Lender's expertise, business acumen or advice in connection with the Property.

(c)    **No Lender Obligations.** By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Security Instrument, the Note or the other Loan Documents, including without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

(d)    **Reliance.** Borrower recognizes and acknowledges that in accepting the Note, this Security Instrument and the other Loan Documents, Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations made by Borrower herein and therein without any obligation to investigate the Property and notwithstanding any investigation of the Property by Lender; that such reliance existed on the part of Lender prior to the date hereof; that the warranties and representations are a material inducement to Lender in accepting the Note, this Security Instrument and the other Loan Documents; and that Lender would not be willing to make the Loan and accept this Security Instrument in the absence of the warranties and representations as set forth herein and therein.

### 6.2    Further Assurances

(a)    **Recording of Security Instrument, etc.** Borrower forthwith upon the execution and delivery of this Security Instrument and thereafter, from time to time, will cause this Security Instrument and any of the other Loan Documents creating a Lien or security interest or evidencing the Lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the Lien or security interest hereof upon, and the interest of Lender in, the Property. Borrower will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Note, this Security Instrument, the other Loan Documents, any note or deed of trust or mortgage supplemental hereto, any security instrument with respect to the Property and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Security Instrument, any deed of trust or mortgage supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by law so to do.

(b)    **Further Acts, etc.** Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the Property and rights hereby deeded, mortgaged, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the

performance of the terms of this Security Instrument or for filing, registering or recording this Security Instrument, or for complying with all Applicable Law. Borrower, on demand, will execute and deliver and hereby authorizes Lender, following 10 days' notice to Borrower, to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, one or more financing statements (including, without limitation, initial financing statements, amendments thereto and continuation statements) with or without the signature of Borrower as authorized by Applicable Law, chattel mortgages or other instruments, to evidence more effectively the security interest of Lender in the Property. Borrower also ratifies its authorization for Lender to have filed any like initial financing statements, amendments thereto and continuation statements, if filed prior to the date of this Security Instrument. Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender pursuant to this Section 6.2(b). To the extent not prohibited by Applicable Law, Borrower hereby ratifies all acts Lender has lawfully done in the past or shall lawfully do or cause to be done in the future by virtue of such power of attorney.

(c) **Changes in Tax, Debt Credit and Documentary Stamp Laws**

(1) If any Law is enacted or adopted or amended after the date of this Security Instrument which deducts the Secured Obligations from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Secured Obligations or Lender's interest in the Property, Borrower will pay the tax, with interest and penalties thereon, if any. If Lender is advised by counsel chosen by it that the payment of tax by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury, then Lender shall have the option, exercisable by written notice of not less than ninety (90) days, to declare the Secured Obligations immediately due and payable.

(2) Borrower will not claim or demand or be entitled to any credit or credits on account of the Secured Obligations for any part of the taxes or other charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of this Security Instrument or the Secured Obligations. If such claim, credit or deduction shall be required by Law, Lender shall have the option, exercisable by written notice of not less than ninety (90) days, to declare the Secured Obligations immediately due and payable.

(3) If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, this Security Instrument, or any of the other Loan Documents or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

(d) **Replacement Documents.** Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note or any other Loan Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or other Loan Document, Borrower will issue (or cause to be issued), in lieu thereof, a

replacement Note or other Loan Document, dated the date of such lost, stolen, destroyed or mutilated Note or other Loan Document in the same principal amount thereof and otherwise of like tenor.

## 7.    Indemnification; Waivers

### 7.1    Indemnification

(a)    **General Indemnification.** Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties (defined below) from and against any and all Losses (defined below) imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (b) any use, nonuse or condition in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (d) any failure of the Property to be in compliance with any Applicable Law; (e) any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any Lease; or (f) the payment of any commission, charge or brokerage fee to anyone which may be payable in connection with the funding of the Loan evidenced by the Note. Any amounts payable to Lender by reason of the application of this Section 7.1(a) shall become immediately due and payable and shall bear interest at the rate of interest set forth in the Note from the date loss or damage is sustained by Lender until paid in full.

(b)    The term **"Losses"** shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, expenses, judgments, awards, and amounts paid in settlement of whatever kind or nature (including but not limited to attorneys' fees and other costs of defense). The term **"Indemnified Parties"** shall mean (i) Lender, (ii) any prior owner or holder of the Note, (iii) any servicer or prior servicer of the Loan, (iv) the officers, directors, shareholders, partners, members, employees and trustees of any of the foregoing, and (iv) the heirs, legal representatives, successors and assigns of each of the foregoing.

(c)    **Mortgage and/or Intangible Tax.** Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of this Security Instrument, the Note or any of the other Loan Documents.

(d)    **Duty to Defend; Attorneys' Fees and Other Fees and Expenses.** Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other

professionals approved by the Indemnified Parties. Notwithstanding the foregoing, any Indemnified Parties may, in their sole discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of any claim or proceeding. Upon demand, Borrower shall pay or, in the sole discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

### 7.2    Waivers

(a)    **Waiver of Counterclaim.** Borrower hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with this Security Instrument, the Note, any of the Loan Documents, or any of Borrower's obligations thereunder.

(b)    **Marshalling and Other Matters.** To the extent permitted by law, Borrower hereby expressly waives:

(1)    the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein; and

(2)    any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Borrower, and on behalf of each and every Person acquiring any interest in or title to the Property subsequent to the date of this Security Instrument and on behalf of all Persons to the extent permitted by Applicable Law.

(c)    **Waiver of Notice.** Borrower shall not be entitled to any notices of any nature whatsoever from Lender except (a) with respect to matters for which this Security Instrument specifically and expressly provides for the giving of notice by Lender to Borrower and (b) with respect to matters for which Lender is required by Applicable Law to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Security Instrument does not specifically and expressly provide for the giving of notice by Lender to Borrower.

(d)    **Waiver of Statute of Limitations.** Borrower hereby expressly waives and releases to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Secured Obligations or performance of its other obligations under this Security Instrument, the Note and the other Loan Documents.

(e)    **Sole Discretion of Lender.** Wherever pursuant to this Security Instrument, the Note or any other Loan Document, (a) Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Lender, or (c) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Lender, shall be in the sole discretion of Lender, except as may be otherwise expressly and specifically provided herein.

(f)    **WAIVER OF RIGHT TO TRIAL BY JURY.** BORROWER HEREBY EXPRESSLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN EVIDENCED BY THE NOTE, THE APPLICATION FOR THE LOAN EVIDENCED BY THE NOTE, THE NOTE, THIS SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER, ITS OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION THEREWITH. BORROWER AGREES THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARM'S-LENGTH BASIS, WITH BORROWER AGREEING TO THE SAME KNOWINGLY, AND BEING AFFORDED THE OPPORTUNITY TO HAVE BORROWER'S LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN. ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THE RIGHT TO TRIAL BY JURY.

(g)    **JUDICIAL REFERENCE.** JUDICIAL REFERENCE IN THE EVENT OF JURY TRIAL WAIVER UNENFORCEABILITY.

NOTWITHSTANDING SECTION 7.2(f) OF THE SECURITY INSTRUMENT, IN THE EVENT THAT THE JURY TRIAL WAIVER CONTAINED HEREIN SHALL BE HELD OR DEEMED TO BE UNENFORCEABLE, BORROWER HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE. PURSUANT TO SUCH JUDICIAL REFERENCE, BORROWER AGREES TO THE APPOINTMENT OF A SINGLE REFEREE AND SHALL USE ITS, HIS OR HER BEST EFFORTS TO AGREE ON THE SELECTION OF A REFEREE. IF THE PARTIES TO THE DISPUTE ARE UNABLE TO AGREE ON A SINGLE REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT TO HEAR ANY DISPUTES HEREUNDER IN LIEU OF ANY SUCH JURY TRIAL. BORROWER ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT OF DECISION THEREON; PROVIDED, HOWEVER, THAT ANY MATTERS WHICH WOULD NOT OTHERWISE BE THE SUBJECT OF A JURY TRIAL WILL BE UNAFFECTED BY THIS WAIVER AND THE AGREEMENTS CONTAINED HEREIN. BORROWER AGREES THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARM'S-LENGTH BASIS, WITH BORROWER AGREEING TO THE SAME KNOWINGLY, AND BEING AFFORDED THE OPPORTUNITY TO HAVE BORROWER'S LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN. ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE AGREEMENTS CONTAINED HEREIN REGARDING THE APPLICATION OF JUDICIAL REFERENCE IN THE EVENT OF THE INVALIDITY OF SUCH JURY TRIAL WAIVER.

PROVIDED, HOWEVER, THAT NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, NO JUDICIAL REFERENCE SHALL BE APPLICABLE WITH RESPECT TO ANY ACTION IN RESPECT OF THE FORECLOSURE OF THIS SECURITY INSTRUMENT.

8.    **Miscellaneous Provisions**

### 8.1   No Oral Change

This Security Instrument, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the Borrower and Lender.

### 8.2   Liability

If Borrower consists of more than one Person, the obligations and liabilities of each such Person hereunder shall be joint and several. This Security Instrument shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

### 8.3   Inapplicable Provisions

If any term, covenant or condition of the Note or this Security Instrument is held to be invalid, illegal or unenforceable in any respect, the Note and this Security Instrument shall be construed without such provision.

### 8.4   Duplicate Originals; Counterparts

This Security Instrument may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Security Instrument may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Security Instrument. The failure of any party hereto to execute this Security Instrument, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

### 8.5   Time is of the Essence

Borrower agrees that, with respect to each and every obligation and covenant contained in this Security Instrument, time is of the essence.

[Remainder of Page Intentionally Left Blank; Signature Page Follows]

**BY SIGNING BELOW, BORROWER ACKNOWLEDGES THIS DOCUMENT INCLUDES, AND AGREES TO THE TERMS OF, A CONFESSION OF JUDGMENT.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

**BORROWER:**

RAD Diversified REIT, Inc., a Maryland Corporation

By: _____

Name: Taylor Green
Title: Secretary
Date: 2/14/2023

Address:

7 St Paul Street Suite 820
Baltimore, MD 21202
Attention: Brandon Mendenhall

PA05.2 PENNSYLVANIA MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING – HYBRID ARM SIGNATURE PAGE

State of __CALIFORNIA__

County of __SAN BERNARDINO__

This record was acknowledged before me on __2-14-2023__, (date) by

__Taylor Green__ (name(s)

of individual(s)) as __Corporate Secretary__ (type of

authority, such as officer or trustee) who represent that he/she/they are authorized to act on

behalf of __Rad Diversified Reit INC__ (name of

party on whose behalf record was executed).

☐ personally known to me – OR –

☒ proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same for the purposes therein stated.

WITNESS my hand and official seal.

_____
**Signature of Notary Public**

__YASMIN BHOLAT__
*Printed Name of Notary*

My commission expires: __Sept 29, 2026__

YASMIN BHOLAT
Notary Public - California
San Bernardino County
Commission # 2416153
My Comm. Expires Sep 29, 2026

*Stamp/Seal*

MORTGAGE
PENNSYLVANIA NOTARY ACKNOWLEDGEMENT

**Exhibit A**
**Legal Description**

SEE LEGAL DESCRIPTION ATTACHED

| APN(S) | ADDRESS(ES) |
|---|---|
| | 1508 W Oxford St<br>Philadelphia, PA 19121 |
| | 1926 N Gratz St<br>Philadelphia, PA 19121 |
| | 2034 N 17th St<br>Philadelphia, PA 19121 |

# EXHIBIT A

**Premises A:**

ALL THAT CERTAIN lot or piece of ground with the three story brick messuage or tenement thereon erected.

SITUATE on the West side of 17th Street at the distance of 120 feet Southward from the South side of Diamond Street, in the 32nd Ward of the City of Philadelphia.

CONTAINING in front or breadth on the said 17th Street, 15 feet and extending of that width in length or depth Westward between parallel lines at right angles to the said 17th Street, 74 feet 6 inches to a 3 feet wide alley leading Northward and communicating with a 15 feet wide alley and extending from said 17th Street to 18th Street.

TOGETHER with the free and common use, right, liberty and privilege of above mentioned alleys as and for passageways and watercourses at all times hereafter, forever.

BEING known as No. 2034 North 17th Street.


**Premises B:**

ALL THAT CERTAIN lot or piece of ground with the three-story brick messuage or tenement thereon erected.

SITUATE on the West side of Gratz Street at the distance of two hundred ten feet Northward from the North side of Berks Street, in the Thirty-second Ward of the City of Philadelphia;

CONTAINING in front or breadth on the said Gratz Street sixteen feet and extending of that width in length or depth Westward between parallel lines at right angles to said Gratz Street eighty-one feet to a certain four feet four inches wide alley running Northward from said Berks Street to Norris Street.

TOGETHER with the free and common use, right, liberty and privilege of the aforesaid alley as and for a passageway and watercourse at all times hereafter, forever.

BEING known as No. 1926 North Gratz Street.


**Premises C:**

ALL THAT CERTAIN lot or piece of ground with the buildings and improvements thereon erected, SITUATE on the Southwesterly corner of Oxford Street and Sydenham Street in the Forty-seventh Ward of the City of Philadelphia.

CONTAINING in front or breadth on the said Oxford Street eighteen feet two and one-half inches and extending in length or depth Southwardly of that width along the Westerly side of the said Sydenham Street seventy-eight feet three inches.

BEING Number 1508 West Oxford Street.
Being as to Premises "A" the same premises which Vincene Morris by Deed dated 12/03/2015 and recorded 01/05/2016 in Philadelphia County as Document No. 53007713 conveyed unto Goodherb Enterprises, LP, in fee.
Being as to Premises "B" the same premises which Margaret L. Edwards and Gwendolyn B. McPherson, Administrator of the Estate of Charles Saunders, deceased by Deed dated 07/17/2008 and recorded 08/08/2008 in Philadelphia County as Document No. 51949970 conveyed unto Goodherb Enterprises, LP, in fee.


Being as to Premises "C" the same premises which Wayne Staton and Ruby Staton, his wife and Wendy Staton by Deed dated 12/30/2011 and recorded 01/05/2012 in Philadelphia County as Document No. 52431333 conveyed unto Goodherb Enterprises, LP, in fee.

**Exhibit B**

**State Specific Provisions - Pennsylvania**

THIS EXHIBIT B is attached to and made a part of that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of **February 13, 2023** (as amended, restated, replaced, supplemented, or otherwise modified from time to time, the **"Security Instrument"**), executed and delivered by **RAD Diversified REIT, Inc., a Maryland Corporation organized and existing under the laws of Maryland**, mortgagor for all purposes hereunder (individually or collectively as the context requires, together with their permitted successors and permitted assigns, **"Borrower"**), for the benefit of **Civic Financial Services, LLC, a California Limited Liability Company**, beneficiary for all purposes hereunder (together with all its successors and assigns, **"Lender"**). This Exhibit B is hereby incorporated by reference into and made a part of the Security Instrument as if fully set forth therein. All provisions and terms of the Security Instrument not otherwise amended or modified herein shall remain in full force and effect, and all definitions contained in the Security Instrument shall have the same meanings for purposes of this Exhibit B, except as otherwise specifically defined or modified hereby. In the event of any inconsistencies between the terms and provisions of this Exhibit B and the terms and provision of the other Sections and Articles of the Security Instrument, the terms and provisions of this Exhibit B shall govern and control.

The representations, warranties and covenants in this Exhibit B shall be continuing representations, warranties and covenants that shall be deemed to be made by Borrower throughout the term of the Loan, until paid in full.

(a)    **Remedies Not Exclusive; Waiver.** Lender shall have all powers, rights and remedies under Applicable Law whether or not specifically or generally granted or described in this Security Instrument. Nothing contained herein shall be construed to impair or to restrict such powers, rights and remedies or to preclude any procedures or process otherwise available to beneficiaries under security instruments in the State of California. Lender shall be entitled to enforce the payment and performance of any indebtedness or obligations secured hereby and to exercise all rights and powers under this Security Instrument or other agreement or any laws now or hereafter in force, notwithstanding the fact that some or all of the indebtedness and obligations secured hereby may now or hereafter be otherwise secured, whether by mortgage, deed of trust, pledge, Lien, assignment or otherwise. Neither the acceptance of this Security Instrument nor its enforcement, whether by court action or other powers contained herein, shall prejudice or in any manner affect Lender's right to realize upon or enforce any other rights or security now or hereafter held by Lender. Lender shall be entitled to enforce this Security Instrument and any other rights or security now or hereafter held by Lender in such order and manner as they or either of them may in their absolute discretion determine. No remedy herein conferred upon or reserved to Lender is intended to be exclusive of any other remedy contained herein or by law provided or permitted, but each shall be cumulative and in addition to every other remedy given hereunder or now or hereafter existing at law or in equity. Every power or

remedy given by any of this Security Instrument to Lender, or to which either of them may be otherwise entitled, may be exercised, concurrently or independently, from time to time and as often as may be deemed expedient by Lender, and either of them may pursue inconsistent remedies. By exercising or by failing to exercise any right, option or election hereunder, Lender shall not be deemed to have waived any provision hereof or to have released Borrower from any of the obligations secured hereby unless such waiver or release is in writing and signed by Lender. The waiver by Lender of Borrower's failure to perform or observe any term, covenant or condition referred to or contained herein to be performed or observed by Borrower shall not be deemed to be a waiver of such term, covenant or condition or of any subsequent failure of Borrower to perform or observe the same or any other such term, covenant or condition referred to or contained herein, and no custom or practice which may develop between Borrower and Lender during the term hereof shall be deemed a waiver of or in any way affect the right of Lender to insist upon the performance by Borrower of the obligations secured hereby in strict accordance with the terms hereof.

(b)     **Usury.** It is the intention of the parties hereto to comply with the usury laws of applicable governmental authorities; accordingly, it is agreed that, notwithstanding any provision to the contrary in the Note, this Security Instrument, or any of the other Loan Documents, no such provision shall require the payment or permit the collection of interest in excess of the maximum permitted by law. In determining the maximum rate allowed, Lender may take advantage of any state or federal law, rule, or regulation in effect from time to time which may govern the maximum rate of interest which may be charged. If any excess of interest in such respect is provided for, or shall be adjudicated to be so provided for, in the Note, this Security Instrument, or in any of the other Loan Documents, then in such event: (i) the provisions of this Section 2 of Exhibit B shall govern and control; (ii) neither Borrower nor its heirs, personal representatives, successors, or assigns or any other party liable for the payment thereof, shall be obligated to pay the amount of such interest to the extent that it is in excess of the maximum amount permitted by law; (iii) any such excess which may have been collected shall be either applied as a credit against the then unpaid principal amount of the Note or refunded to Borrower; and (iv) the Interest Rate shall be automatically reduced to the maximum lawful contract rate allowed under the applicable usury laws.

(c)     **Assignment of Leases and Rents.** The assignments of Leases and Rents contained in this Security Instrument are intended to be absolute. However, in no event shall this reference diminish, alter, impair, or affect any other rights and remedies of Lender, including but not limited to, the appointment of a receiver, nor shall any provision in this Section diminish, alter, impair or affect any rights or powers of the receiver in law or equity or as set forth herein. In addition, this assignment shall be fully operative without regard to value of the Property or without regard to the adequacy of the Property to serve as security for the obligations owed by Borrower to Lender. Further, Borrower waives any notice of default or demand for turnover of rents by Lender to apply to a court to deposit the Rents into the registry of the court or such other depository as the court may designate.

(d)     **Future Advances.** Lender may from time to time, in Lender's discretion, make optional future or additional advances ("Future Advances") to Borrower. All Future Advances shall be made, if at all, within twenty (20) years after the date of this Security Instrument, or

within such lesser period that may in the future be provided by law as a prerequisite for the sufficiency of actual or record notice of Future Advances as against the rights of creditors or subsequent purchasers for value. Borrower shall, immediately upon request by Lender, execute and deliver to Lender a promissory note evidencing each Future Advance together with a notice of such Future Advance in recordable form. All promissory notes evidencing Future Advances shall be secured, pari passu, by the Lien of this Security Instrument, and each reference in this Security Instrument or the Loan Agreement to the Note shall be deemed to be a reference to all promissory notes evidencing Future Advances.

(e)     **Indemnity; Expenses.** Borrower will pay or reimburse the Lender for all reasonable attorneys' fees, costs and expenses incurred by Lender in any suit, legal proceeding or dispute of any kind in which Lender is made a party or appears as party plaintiff or defendant, affecting the secured indebtedness, this Security Instrument or the interest created herein, or the Property or any appeal thereof, including, but not limited to, activities related to enforcement of the remedies of Lender, activities related to protection of Lender's collateral, any foreclosure action or exercise of the power of sale, any condemnation action involving the Property or any action to protect the security hereof, any bankruptcy or other insolvency proceeding commenced by or against Borrower, and any such amounts paid or incurred by the Lender shall be added to the secured indebtedness and shall be secured by this Security Instrument. The agreements of this subsection shall expressly survive in perpetuity satisfaction of this Security Instrument and repayment of the secured indebtedness, any release, reconveyance, discharge of foreclosure of this Security Instrument, conveyance by deed in lieu of foreclosure, sale, and any subsequent transfer of the Property.

(f)     **Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

(g)     **Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

(h)     **Confession of Judgment for Possession of Property.** In addition to those remedies available to Lender pursuant to Section 4.1 upon the occurrence of an Event of Default:

(1)     THE LENDER MAY HAVE JUDGMENT ENTERED BY CONFESSION PURSUANT TO APPLICABLE LAW AND ANY POWER TO CONFESS JUDGMENT CONTAINED IN THIS SECURITY INSTRUMENT OR IN ANY LOAN DOCUMENT.

(2)     THE BORROWER HEREBY AUTHORIZES AND EMPOWERS ANY ATTORNEY OR ATTORNEYS OF ANY COURT OF PENNSYLVANIA, OR ANY OTHER JURISDICTION THAT PERMITS THE ENTRY OF JUDGMENT BY CONFESSION, APPEAR FOR THE BORROWER AND, AS ATTORNEY FOR THE BORROWER, TO CONFESS JUDGMENT AGAINST THE BORROWER. THE FOREGOING AUTHORITY TO CONFESS JUDGMENT IS GRANTED INDEPENDENTLY BY THE BORROWER, AND SHALL BE EXERCISABLE AGAINST THE BORROWER, AND THE EXERCISE AGAINST THE BORROWER SHALL NOT EXHAUST THE EXERCISE THEREOF AGAINST THE BORROWER, BUT SHALL CONTINUE UNTIL THE

**BORROWER'S DEBT IS PAID IN FULL, TO LENDER, INCLUDING THE LENDER EXERCISING ALL RIGHTS HEREUNDER OR UNDER ANY LOAN DOCUMENTS, INCLUDING FORECLOSURE ON THE COLLATERAL. THE BORROWER EXPRESSLY AGREES THAT ANY JUDGMENT ENTERED AGAINST HIM PURSUANT TO THE FOREGOING AUTHORITY SHALL BE FINAL WITH RESPECT TO THE BORROWER AND RELEASES TO THE LENDER, AND TO ANY ATTORNEY APPEARING FOR THE LENDER, ALL PROCEDURAL ERRORS IN SAID PROCEEDINGS AND ALL LIABILITY THEREFOR.**

(i)    **Foreclosure.**

(1)    Judicial Sale. In the event of a judicial sale pursuant to a foreclosure decree, it is understood and agreed that Lender or its assigns may become the purchaser of the Property or any part thereof.

(2)    Foreclose on Portion of the Property. Lender may, by following the procedures and satisfying the requirements prescribed by applicable law, foreclosure on only a portion of the Property and, in such event, said foreclosure shall not affect the Lien of this Security Instrument on the remaining portion of the Property.

When Recorded Return To:
Assignments and Lien Release
Title Clearing and Escrow
1601 LBJ Freeway Suite 150
Farmers Branch, TX  75234

**APN: 471129400, 321205300, 321247700**

## CORPORATE ASSIGNMENT OF MORTGAGE

**Philadelphia, Pennsylvania**
**Title Clearing and Escrow#: ****      Escrow/Title**

Date of Assignment: December 18th, 2024

Assignor: Civic Financial Services, LLC, a California limited liability company, By: Fay Servicing, LLC, as attorney-in-fact
Assignee: Goldman Sachs Mortgage Company

I hereby certify the precise address of the within named Assignee is 2001 Ross Ave, Suite 2800, 21968, TX  75201.

Executed By: RAD Diversified REIT  Inc.  a Maryland Corporation  To: Civic Financial Services, LLC
Dated: 02-13-2023 Recorded: 02-13-2023 as Instrument/Document 54156647, Book/Reel/Liber N/A
Page/Folio N/A  In the County of Philadelphia, State of Pennsylvania.

Property Addresses: 1508 W Oxford St, Philadelphia, PA  19121,2034 N 17th St, Philadelphia, PA  19121.1926 N Gratz St, Philadelphia, PA  19121 in the City of PHILADELPHIA

Legal:See Exhibit "A" Attached Hereto And By This Reference Made A Part Hereof

I do certify that the precise address of Goldman Sachs Mortgage Company  is 2001 Ross Ave, Suite 2800, 21968, TX  75201
Attested By:

KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Mortgage having an original principal sum of $1,019,850.00 with interest, secured thereby, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's interest under the Mortgage.

TO HAVE AND TO HOLD the said Mortgage, and the said property unto the said Assignee forever, subject to the terms contained in said Mortgage.

CORPORATE ASSIGNMENT OF MORTGAGE Page 2 of 4

Civic Financial Services, LLC, a California limited liability company, By: Fay Servicing, LLC, as attorney-in-fact
On **December 18th, 2024**

By:
Crystal Malone, Assistant Secretary                    (This area for corporate seal)

**STATE OF Texas**
COUNTY OF Dallas

On December 18th, 2024, before me, John Rodriguez, a Notary Public in and for Dallas in the State of Texas, personally appeared Crystal Malone, Assistant Secretary of Civic Financial Services, LLC, a California limited liability company, By: Fay Servicing, LLC, as attorney-in-fact, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

John Rodriguez
Notary Expires: 6/24/2026   #133827910

John Rodriguez
My Commission Expires
6/24/2026
Notary ID 133827910

CORPORATE ASSIGNMENT OF MORTGAGE Page 3 of 4

## Exhibit A

54156647    Page 35 of 40    03/08/2023 12:55 PM

**Exhibit A**
**Legal Description**

SEE LEGAL DESCRIPTION ATTACHED

| APN(S) | ADDRESS(ES) |
| --- | --- |
| 47-1129400 | 1508 W Oxford St<br>Philadelphia, PA 19121 |
| 32-1247700 | 1926 N Gratz St<br>Philadelphia, PA 19121 |
| 32-1205300 | 2034 N 17th St<br>Philadelphia, PA 19121 |

CORPORATE ASSIGNMENT OF MORTGAGE Page 4 of 4

## EXHIBIT A

**Premises A:**

ALL THAT CERTAIN lot or piece of ground with the three story brick messuage or tenement thereon erected.

SITUATE on the West side of 17th Street at the distance of 120 feet Southward from the South side of Diamond Street, in the 32nd Ward of the City of Philadelphia.

CONTAINING in front or breadth on the said 17th Street, 15 feet and extending of that width in length or depth Westward between parallel lines at right angles to the said 17th Street, 74 feet 6 inches to a 3 feet wide alley leading Northward and communicating with a 15 feet wide alley and extending from said 17th Street to 18th Street.

TOGETHER with the free and common use, right, liberty and privilege of above mentioned alleys as and for passageways and watercourses at all times hereafter, forever.

BEING known as No. 2034 North 17th Street.


**Premises B:**

ALL THAT CERTAIN lot or piece of ground with the three-story brick messuage or tenement thereon erected.

SITUATE on the West side of Gratz Street at the distance of two hundred ten feet Northward from the North side of Berks Street, in the Thirty-second Ward of the City of Philadelphia;

CONTAINING in front or breadth on the said Gratz Street sixteen feet and extending of that width in length or depth Westward between parallel lines at right angles to said Gratz Street eighty-one feet to a certain four feet four inches wide alley running Northward from said Berks Street to Norris Street.

TOGETHER with the free and common use, right, liberty and privilege of the aforesaid alley as and for a passageway and watercourse at all times hereafter, forever.

BEING known as No. 1926 North Gratz Street.


**Premises C:**

ALL THAT CERTAIN lot or piece of ground with the buildings and improvements thereon erected, SITUATE on the Southwesterly corner of Oxford Street and Sydenham Street in the Forty-seventh Ward of the City of Philadelphia.

CONTAINING in front or breadth on the said Oxford Street eighteen feet two and one-half inches and extending in length or depth Southwardly of that width along the Westerly side of the said Sydenham Street seventy-eight feet three inches.

BEING Number 1508 West Oxford Street.
Being as to Premises "A" the same premises which Vincene Morris by Deed dated 12/03/2015 and recorded 01/05/2016 in Philadelphia County as Document No. 53007713 conveyed unto Goodherb Enterprises, LP, in fee.
Being as to Premises "B" the same premises which Margaret L Edwards and Gwendolyn B. McPherson, Administrator of the Estate of Charles Saunders, deceased by Deed dated 07/17/2008 and recorded 08/08/2008 in Philadelphia County as Document No. 51949970 conveyed unto Goodherb Enterprises, LP, in fee.


Being as to Premises "C" the same premises which Wayne Staton and Ruby Staton, his wife and Wendy Staton by Deed dated 12/30/2011 and recorded 01/05/2012 in Philadelphia County as Document No. 52431333 conveyed unto Goodherb Enterprises, LP, in fee.

eRecorded in Philadelphia PA Doc ID 54374868
12/19/2024 02:58 PM    Page 1 of 4    Rec Fee: $242.75
Receipt#:
Records Department    Doc Code: A

When Recorded Return To:
Assignments and Lien Release
Title Clearing and Escrow
1601 LBJ Freeway Suite 150
Farmers Branch, TX  75234


**APN: 471129400, 321205300, 321247700**

## CORPORATE ASSIGNMENT OF MORTGAGE

**Philadelphia, Pennsylvania**
**Title Clearing and Escrow#: ****    Escrow/Title:**

Date of Assignment: December 18th, 2024

Assignor: Goldman Sachs Mortgage Company, By Fay Servicing, LLC as Attorney in Fact
Assignee: U.S. Bank Trust National Association, not in its individual capacity but solely as owner trustee for Legacy Mortgage Asset Trust 2024-INV1


I hereby certify the precise address of the within named Assignee is 60 Livingston Ave EP-MN-WS3D, St. Paul, MN  55107.

Executed By: RAD Diversified REIT  Inc.  a Maryland Corporation  To: Civic Financial Services, LLC  Dated: 02-13-2023 Recorded: 02-13-2023 as Instrument/Document 54156647, Book/Reel/Liber N/A Page/Folio N/A  In the County of Philadelphia, State of Pennsylvania.


Property Addresses: 1508 W Oxford St, Philadelphia, PA  19121,2034 N 17th St, Philadelphia, PA 19121,1926 N Gratz St, Philadelphia, PA  19121 in the City of PHILADELPHIA


Legal:See Exhibit "A" Attached Hereto And By This Reference Made A Part Hereof


I do certify that the precise address of U.S. Bank Trust National Association, not in its individual capacity but solely as owner trustee for Legacy Mortgage Asset Trust 2024-INV1
is 60 Livingston Ave EP-MN-WS3D, St. Paul, MN  55107
Attested By:


KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Mortgage having an original principal sum of $1,019,850.00 with interest, secured thereby, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's interest under the Mortgage.

TO HAVE AND TO HOLD the said Mortgage, and the said property unto the said Assignee forever, subject to the terms contained in said Mortgage.

CORPORATE ASSIGNMENT OF MORTGAGE Page 2 of 4

Goldman Sachs Mortgage Company, By Fay Servicing, LLC as Attorney in Fact POA: 1/15/2022 in Instrument/Document: 53945891
On December 18th, 2024

By:

**Crystal Malone, Assistant Secretary**                    (This area for corporate seal)

STATE OF Texas
COUNTY OF Dallas

On December 18th, 2024, before me, John Rodriguez, a Notary Public in and for Dallas in the State of Texas, personally appeared Crystal Malone, Assistant Secretary of Goldman Sachs Mortgage Company, By Fay Servicing, LLC as Attorney in Fact, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

John Rodriguez
Notary Expires: 6/24/2026   #133827910

John Rodriguez
My Commission Expires
6/24/2026
Notary ID 133827910

CORPORATE ASSIGNMENT OF MORTGAGE Page 3 of 4

## Exhibit A

54156647    Page 35 of 40   03/08/2023 12:55 PM

**Exhibit A**
**Legal Description**

SEE LEGAL DESCRIPTION ATTACHED

| APN(S) | ADDRESS(ES) |
|---|---|
| 47-1129400 | 1508 W Oxford St<br>Philadelphia, PA 19121 |
| 32-1247700 | 1926 N Gratz St<br>Philadelphia, PA 19121 |
| 32-1205300 | 2034 N 17th St<br>Philadelphia, PA 19121 |

CORPORATE ASSIGNMENT OF MORTGAGE Page 4 of 4

54156647    Page 36 of 40    03/08/2023 12:55 PM

## EXHIBIT A

Premises A:

ALL THAT CERTAIN lot or piece of ground with the three story brick messuage or tenement thereon erected.

SITUATE on the West side of 17th Street at the distance of 120 feet Southward from the South side of Diamond Street, in the 32nd Ward of the City of Philadelphia.

CONTAINING in front or breadth on the said 17th Street, 15 feet and extending of that width in length or depth Westward between parallel lines at right angles to the said 17th Street, 74 feet 6 inches to a 3 feet wide alley leading Northward and communicating with a 15 feet wide alley and extending from said 17th Street to 18th Street.

TOGETHER with the free and common use, right, liberty and privilege of above mentioned alleys as and for passageways and watercourses at all times hereafter, forever.

BEING known as No. 2034 North 17th Street.


Premises B:

ALL THAT CERTAIN lot or piece of ground with the three-story brick messuage or tenement thereon erected.

SITUATE on the West side of Gratz Street at the distance of two hundred ten feet Northward from the North side of Berks Street, in the Thirty-second Ward of the City of Philadelphia;

CONTAINING in front or breadth on the said Gratz Street sixteen feet and extending of that width in length or depth Westward between parallel lines at right angles to said Gratz Street eighty-one feet to a certain four feet four inches wide alley running Northward from said Berks Street to Norris Street.

TOGETHER with the free and common use, right, liberty and privilege of the aforesaid alley as and for a passageway and watercourse at all times hereafter, forever.

BEING known as No. 1926 North Gratz Street.


Premises C:

ALL THAT CERTAIN lot or piece of ground with the buildings and improvements thereon erected, SITUATE on the Southwesterly corner of Oxford Street and Sydenham Street in the Forty-seventh Ward of the City of Philadelphia.

CONTAINING in front or breadth on the said Oxford Street eighteen feet two and one-half inches and extending in length or depth Southwardly of that width along the Westerly side of the said Sydenham Street seventy-eight feet three inches.

BEING Number 1508 West Oxford Street.
Being as to Premises "A" the same premises which Vincene Morris by Deed dated 12/03/2015 and recorded 01/05/2016 in Philadelphia County as Document No. 53007713 conveyed unto Goodherb Enterprises, LP, in fee.
Being as to Premises "B" the same premises which Margaret L. Edwards and Gwendolyn B. McPherson, Administrator of the Estate of Charles Saunders, deceased by Deed dated 07/17/2008 and recorded 08/08/2008 in Philadelphia County as Document No. 51949970 conveyed unto Goodherb Enterprises, LP, in fee.


Being as to Premises "C" the same premises which Wayne Staton and Ruby Staton, his wife and Wendy Staton by Deed dated 12/30/2011 and recorded 01/05/2012 in Philadelphia County as Document No. 52431333 conveyed unto Goodherb Enterprises, LP, in fee.