**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 8:26-01636-CPM** |
| | § | **Chapter 11** |
| **RAD DIVERSIFIED REIT, Inc.** | § | |
| | § | |
| **DEBTOR** | | |

**MOTION FOR RELIEF FROM AUTOMATIC STAY**
(Property: 412 Hohldale Street, Houston, TX 77091)

Comes now, Kiavi Funding, Inc, (the "Secured Creditor") and moves the Court for the entry of an order granting it relief from the automatic stay pursuant to 11 U.S.C. §362(d), and as grounds thereof states as follows:

1. This Court has jurisdiction under 28 U.S.C. §1334 and 11 U.S.C. § 362.

2. On March 1, 2026 (the "Petition Date"), the Debtor, RAD Diversified REIT, Inc. (the "Debtor"), filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code before the United States Bankruptcy Court for the Middle District of Florida, Tampa Division (the "Bankruptcy Court") in the case styled as *In re RAD Diversified REIT, Inc.*, Case No. 9:26-bk-01636-CPM (the "Bankruptcy Case").

3. The Debtor has executed and delivered or is otherwise obligated with respect to that certain promissory note, in the original principal amount of $550,400.00 (the "Note"). Secured Creditor is an entity entitled to enforce the Note.

4. Pursuant to that certain Mortgage (the "Mortgage"), all obligations (collectively, the "Obligations") of the Debtor under and with respect to the Note and the Mortgage are secured by the property located at 412 Hohldale Street, Houston, TX 77091 (the "Property").  A true and correct copy of the Note and Mortgage is attached hereto as Exhibit A.

5. The legal description of the Property is:

The East 110 feet of Lot Two (2) in Block One (1), of Hohldale Addition, a subdivision in Harris County, Texas, according to the map or plat thereof recorded in Volume 13, Page 17 of the Map Records of Harris County, Texas.

AND

A tract of land being 547.00 square feet of land, out of Lot 2, Block 1, of HOHLDALE SUBDIVISION, as recorded in Volume 13, Page 17, of the Harris County Map Records, Texas, and being more particularly described by metes and bounds as follows:

COMMENCING, at the original southeast corner of Lot 1 and the Southwest corner of Lot 2, in Block 1, of said Hohldale Subdivision, same point being in the Northerly right-of-way line of Hohldale Avenue;

THENCE South 89 deg. 45 min. 00 sec. East, along the Northerly right-of-way line of said Hohldale Avenue, a distance of 87.70 feet to the POINT OF BEGINNING;

THENCE North 00 deg. 49 min. 23 sec. West, a distance of 182.32 feet along a fence line to a point for corner; THENCE South 89 deg. 45 min. 00 sec. East, a distance of 3.70 feet to a point for corner;

THENCE South 00 deg. 23 min. 00 sec. East, parallel with the East line of Lot 1 and the West line of Lot 2, a distance of 182.30 feet to a ½ iron pipe found for corner, said point also being in the Northerly right-of-way line of said Hohldale Avenue;

THENCE North 89 deg. 45 min. 00 sec. West along the said Hohldale Avenue, a distance of 2.30 feet to the POINT OF BEGINNING and containing 547 sq. ft. of land.

6. Under the Note, the balance matured and all sum became due and payable on July 1, 2025.

7. To date, the Debtor has failed to pay the balance due and the balance owed is approximately $725,395.53.

8. A Brokers Price Opinion (the "BPO") asserts that the current just value of the property is approximately $750,000.00.  The BPO is attached hereto and incorporated by reference herein as Exhibit B.

9. On Schedule A , the Debtor asserts that its net value interest in the Property is $0.00.

10. The Secured Creditor maintains that after all costs associated with any liquidation of the Property that there would be no equity in the Property.

11. Accordingly, the Secured Creditor seeks relief from the automatic stay pursuant to 11

U.S.C. 362(d) to permit it to continue its foreclosure of the Property in state court.

12. Secured Creditor has incurred court costs and attorney's fees in this proceeding and will incur additional fees, costs and expenses in foreclosing the Mortgage and in preserving and protecting the Property, all of which additional sums are secured by the lien of the Mortgage. Movant seeks an award of its reasonable attorneys' fees and costs, or alternatively, leave to seek recovery of its reasonable attorneys' fees and costs in any pending or subsequent foreclosure proceeding.

WHEREFORE, Secured Creditor prays that this Court issue an Order terminating or modifying the automatic stay and granting the following:

1. Relief from the stay allowing Secured Creditor (and any successors and/or assigns) to finalize the sale of the Property.

2. That the 14-day stay described by Bankruptcy Rule 4001(a)(4) be waived.

3. For such relief further relief as the Court deems proper.

Respectfully submitted,

*/s/April H. Stone*
April Hosford Stone
Fla. Bar No. 91388
astone@tmppllc.com
TROMBERG, MILLER, MORRIS &
PARTNERS PLLC
600 W. Hillsboro Blvd., Suite 600
Deerfield Beach, FL 33071
Phone: 561-338-4101

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was delivered to the addressees on the attached mailing list by First Class U.S. Mail postage pre-paid and/or electronic mail this 17th day of July, 2026.

/s/ April H. Stone
**April H. Stone**

**Via Pre-Paid U.S. Mail:**

Matthew Fornshell
Ice Miller LLP
250 West Street, Suite 700
Columbus, OH 43215-7509

**Via ECF:**

**Jessey James Krehl**
Pack Law
4649 Ponce de Leon Boulevard, Ste 405
Coral Gables, FL 33146
Email: jessey@packlaw.com

**Joseph A Pack**
Pack Law
4649 Ponce de Leon Boulevard, Ste 405
Coral Gables, FL 33146
Email: Joe@packlaw.com

Nicole Peair
United States Trustee
Timberlake Annex
501 E Polk Street, Suite 1200
Tampa, FL 33602
Email: Nicole.W.Peair@USdoj.gov

**John D Elrod**
Greenberg Traurig, LLP
Terminus 200
3333 Piedmont Road, NE
Suite 2500
Atlanta, GA 30305
Email: elrodj@gtlaw.com

**Danielle S Kemp**
Greenberg Traurig, P.A.
Bank of America Plaza
101 E. Kennedy Blvd., Suite 1900
Tampa, FL 33602
Email: kempd@gtlaw.com

# Exhibit A

# PROMISSORY NOTE
# SECURED BY SECURITY INSTRUMENT

*(Term Loan, Interest Only Payments, Balloon Payment due* 07-01-2025 *)*

Amount: $550,400.00

███████████████

Date:    06-13-2023

San Francisco, CA

**FOR   VALUE   RECEIVED,**   at the times   hereinafter stated,

RAD Diversified REIT, Inc., A Maryland Corporation ,
herein called ("**Borrower**") promise(s) to pay to **Kiavi Funding Inc.**, a Delaware corporation ("**Lender**") or order at the address specified below, or at such place or places as Lender may designate in writing from time to time, the sum of:
Five Hundred And Fifty Thousand Four Hundred and 00/100 U.S. Dollars

(   $550,400.00   ) which amount shall include the Initial Advance and, if applicable, the Reserve Advance (the "**Principal Amount**") with interest at the interest rate set forth below from the date hereof until 07-01-2025 (the "**Maturity Date**").

**SECURITY**: This Promissory Note (the "**Note**") is secured by a FIRST priority Deed of Trust, Mortgage, or Security Deed (the "**Security Instrument**") including an Assignment of Rents and Fixture Filing dated of even date herewith on property known as:

412 HOHLDALE ST HOUSTON TX 77091

A P N : 0650780010002 (the "**Property**"). The term "**Loan Documents**" shall have the same meaning as that term in the Security Instrument.

1.    **Advances.** Lender will make Advances for the purposes specified not to exceed the maximum (aggregate) sum of $550,400.00 (the "**Loan**").

1.1    Initial Advance. The initial disbursement of funds ("**Initial Advance**") shall be $413,400.00 to be used in connection with the purchase or refinance of the Property.

1.2    Reserve Advance. The additional advance of funds ("**Reserve Advance**"), if any, made contemporaneously with the Initial Advance shall be into a reserve account for the purpose of funding subsequent Borrower requests for reimbursement of the costs of construction and/or rehabilitation of the Property. The amount and other terms of the Reserve Advance, if any, are provided for in the attached **Schedule A.**

1.3    Authorization. Lender may conclusively presume that all requests, statements, information, certifications, and representations, whether written or oral, submitted or made by Borrower or any of its agents to the Lender in connection with this Note are true and correct, and the Lender shall be entitled to rely thereon, without investigation or inquiry of any kind by the Lender, in disbursing or releasing the Loan proceeds and taking or refraining from taking any other action in connection with the Loan.

2.    **Interest Rate and Payment of Principal and Interest.**

2.1    Interest Rate.

2.1.1    Applicable Rates. Subject to the provisions of this Section 2 below, the Initial Advance will bear interest at an annual rate of 9.650% . The Reserve Advance, if any, will bear interest at the annual rate specified in Schedule A from the date of the Initial Advance.

2.1.2    360-day Year. Interest for each full calendar month during the term of this Note will be calculated on the basis of a three hundred sixty (360) day year consisting of twelve (12) months of thirty (30) days each. Notwithstanding the foregoing,

1

the amount of interest due in the full or partial calendar month at the beginning of the term of this Note will be calculated on the basis of the actual number of days during which the principal balance of this Note is outstanding. Borrower acknowledges and agrees that the calculation of interest on the basis described in the preceding sentences may result in the accrual and payment of interest in amounts greater than those which would be payable if interest were calculated on the basis of a three hundred sixty-five (365) day year.

2.1.3    Default Rate of Interest. From and after the earlier of either (a) the occurrence of an Event of Default; or (b) the maturity of this Note (whether the stated Maturity Date of this Note or the maturity date resulting from Lender's acceleration of unpaid principal and interest) subject to the provisions of Section 2.2.9 below, additional interest on the unpaid principal balance of this Note (under both the Initial Advance and the Reserve Advance) shall immediately accrue at a rate equal to **ten percent (10%)** per annum. Such interest shall be in addition to the interest specified in Sections 2.1.1 and 2.1.2 above.

2.1.4    Usury Protection. Notwithstanding anything contained in this Note to the contrary, if collection from Borrower of interest at the foregoing interest rate would be contrary to applicable laws, then the interest rate in effect on any day shall be the highest interest rate which may be collected from Borrower under applicable laws on such day. If, under any circumstances, Lender shall ever receive as interest an amount that exceeds the highest lawful rate, the amount that would be excessive interest shall be applied to reduce the unpaid principal balance under this Note and not to pay interest, or, if such excessive interest exceeds the unpaid principal balance under this Note, such excess shall be refunded to Borrower.

2.1.5    Interest Commencement. Interest on the Initial Advance shall commence on the date Loan proceeds are initially deposited into an escrow for the benefit of Borrower and regardless of the date they are subsequently disbursed therefrom, provided that the period for which interest accrues prior to release of funds from escrow does not exceed **one (1)** day. Interest on any Reserve Advance shall commence on the date the funds are set aside for the benefit of Borrower notwithstanding the date released to, or for, Borrower.

2.2    Payments.

2.2.1    Periodic Payment Date. Unless sooner accelerated, payments due under the Note until the Maturity Date shall be made on the first (1st) calendar day of each month (each a "**Payment Date**") commencing on 08-01-2023                    .

2.2.2    Maturity Date. Unless sooner accelerated, the entire unpaid principal balance of this Note plus all accrued and unpaid interest thereon plus all other obligations owed under this Note shall be due and payable on the Maturity Date.

2.2.3    Interest Only Payments. From the interest commencement dates set forth in Section 2.1.5 above, payments shall be made on each Payment Date of all accrued interest due and owing as of such Payment Date, which is currently calculated to be in the sum of $ 3,324.43 based on the maximum aggregate amount of the Initial Advance and any Reserve Advance. If Borrower prepays part of the outstanding principal balance of this Note, or if the outstanding principal balance of this Note is reduced by application of any Reserve Advance surplus (as provided in Schedule A of this Note, if applicable) or for any other reason, Borrower's periodic Interest Payments shall be changed accordingly.

**2.2.4    Balloon Payment. BORROWER ACKNOWLEDGES AND AGREES THAT (1) THE LOAN EVIDENCED BY THIS NOTE IS NOT AN AMORTIZING LOAN; AND (2) THE ENTIRE PRINCIPAL AMOUNT OF THIS NOTE SHALL BE DUE AND PAYABLE ON THE MATURITY DATE OF THIS NOTE.**

2.2.5    Prepayment. Borrower may prepay at any time all or part of the outstanding principal balance of this Note without a prepayment fee. If the loan calls for principal payments in installments, all prepayments of principal shall be applied on the most remote principal installment or installments then unpaid.

2.2.6    Payment Application. All payments under this Note shall be credited first to charges, fees, costs, and expenses payable by Borrower ("Borrower Fees") under this Note, or in connection with the obligations evidenced by this Note, second to accrued interest then due, thereafter to unpaid principal. For any particular Payment Date, the Lender retains the option to postpone the crediting of payments to Borrower Fees, if and only if the Borrower's payment on such Payment Date, after deducting Borrower Fees, would otherwise be insufficient to pay the accrued interest and unpaid principal due on such Payment Date. If any payment of interest is not made when due, at the option of Lender, such interest payment shall bear interest at the same rate as principal from and after the due date of the interest payment. All payments due under this Note shall be made as provided in Section 2.2.10 below. The receipt of any check or other physical item of payment (a "**Payment Item**") by Lender, at its option, either (a) shall be rejected and not considered a payment or (b) shall not be considered a payment until such Payment Item is honored when presented for payment at the drawee bank or institution, and Lender, at its option, may delay the credit of such payment until such Payment Item is so honored. Upon

2

the occurrence of any Event of Default, the Lender, at its option, shall have the right to apply all payments made under this Note to principal, interest, and other charges, fees, costs and expenses payable by Borrower under this Note or in connection with the Loan in such order and amounts as the Lender may determine in its sole and absolute discretion.

2.2.7 Initial Loan Fee. Concurrently with or prior to the execution of this Note, Borrower shall pay to the Lender an origination fee ("**Loan Fee**"), as set forth in a final settlement statement or closing disclosure delivered to Borrower. The entire Loan Fee shall be deemed to be fully earned by the Lender as of the interest commencement dates set forth in Section 2.1.5, and no part of the Loan Fee shall be refundable to Borrower, whether or not the principal balance of the Loan is prepaid prior to the Maturity Date subject to the provisions of Exhibit B (if applicable), attached hereto and incorporated herein.

2.2.8 Late Charge. Borrower shall immediately pay a late charge equal to 5.0% of such installment of interest and/or principal to Lender to compensate Lender for administrative costs and expenses incurred in connection with such late payment if any installment of interest and/or principal under this Note is not paid within **fifteen (15)** days from the date on which it is due. Borrower agrees that the actual damages suffered by Lender because of any late installment payment are extremely difficult and impracticable to ascertain, and the late charge described in this Section represents a reasonable attempt to fix such damages under the circumstances existing at the time this Note is executed. Lender's acceptance of any late charge shall not constitute a waiver of any of the terms of this Note and shall not affect Lender's right to enforce any of its rights and remedies against any Person liable for payment of this Note.

2.2.9 Extension Fee. If Borrower should not pay all obligations outstanding on this Note upon the scheduled Maturity Date, Borrower hereby authorizes Lender, at its sole discretion, to grant extensions of the term of this Note beyond such scheduled Maturity Date for up to six (6) months each.

(a) If any such extension is granted, (i) Interest will continue to accrue as specified in this Note; (ii) the payments specified in this Note shall be due and owing; (iii) Borrower shall continue to make the payments of Interest (and Principal if applicable) on the Periodic Payment Date as provided herein until the extended Maturity Date; and (iv) the term "Maturity Date" in this Agreement will be deemed to mean the originally scheduled Maturity Date, plus the cumulative length of any extensions granted pursuant to this section.

(b) As consideration for extending the maturity, Borrower hereby authorizes a charge equal to a maximum of **one percent (1.00%)** of the current principal loan balance for the first extension granted and an amount in the discretion of the Lender for any subsequent extension. This fee, whether for the initial or any subsequent extension, which shall be due and owing at the time of each extension, may be adjusted in amount in the sole and absolute discretion of Lender.

(c) To effect any extension under this section, Lender need only send written notice to Borrower after the original Maturity Date indicating Lender's election to grant an extension and identifying the new Maturity Date.

2.2.10 Method of Payment and Servicing of Loan. Borrower will make all payments under the Note by automatically-debited Automated Clearing House (ACH) from a business-purpose account to be designated by Borrower at closing, and in accordance with the written instructions provided by Lender to Borrower at closing or from time to time thereafter.

## 3. Default and Remedies.

3.1 **Events of Default.** Lender, at its option, may declare Borrower to be in default under this Agreement and the other Loan Documents upon the occurrence of any or all of the following events (the declaration of such a default by the Lender shall constitute an "**Event of Default**"):

3.1.1 Payment or Performance. Borrower fails to pay any payment or perform any obligation due under this Note within **ten (10)** days of the date due, or to pay the entirety of the amount due hereunder within **ten (10)** days of the Maturity Date (whether the due date of any such payment is the date expressly set forth herein or is determined by extension, acceleration, or otherwise).

3.1.2 Event of Default. Any Event of Default as defined in the Loan Documents, including any Guaranty.

3.1.3 Breach of Representations or Warranties. Borrower's breach of the representations and warranties in this Note and the other Loan Documents.

3

3.2     **Remedies.** Upon the Lender's election to declare Borrower to be in default under the Loan Documents pursuant to Section 3.1 above, Borrower shall be deemed to be in default under the Note, and the Lender shall have the right to do any or all of the following without notice or demand (except as required by law):

3.2.1     Discontinue Release of Funds. Discontinue any Advances or withhold the release of any Advances under the Note.

3.2.2     Acceleration. Declare the entire unpaid balance of principal and all accrued and unpaid interest, costs and expenses then due and payable under this Note to be immediately due and payable, even though the time of maturity as expressed herein shall not have arrived. The Lender may withdraw such amount or any portion thereof via automatic payment or ACH, without notice to the Borrower, as provided in the Automatic Payment Authorization Agreement executed by the Borrower.

3.2.3     Declare Default. Declare a default under any or all of Borrower's obligations under this Note or under the Security Instrument and to proceed in accordance with Lender's rights and remedies under those agreements.

3.2.4     Foreclose. Foreclose upon any security pledged under any applicable pledge or security agreement and any other collateral securing Borrower's obligations, pursuant to any right or remedy permitted by law, including as set forth under the Security Instrument.

3.2.5     Exercise Other Rights. Exercise any other right or remedy contained in any of Borrower's obligations, including as set forth under the Security Instrument or Automatic Payment Authorization Agreement.

3.2.6     Assign. Collect or assign to any other person, individual or entity (**"Person"**) the right to collect any and all rents, profits or proceeds from the property, collection and assignment of which shall not be impaired by any act of Borrower.

3.2.7     Application. Immediately apply as against any and all amounts due and owing under this Note the balance of any Reserve Advance funds, cash or other security then on deposit with the Lender, loan servicer or Trustee held as additional collateral.

3.2.8     Guaranty. Make demand on any Guaranty.

3.2.9     Legal Remedies. Exercise any other right or remedy available at law or in equity.

4.     **Borrower's Representations and Warranties.** As a material inducement to the Lender's extension of credit to Borrower in connection with the Loan, Borrower warrants and represents to the Lender as follows:

4.1     Authority to Execute Note. Borrower has the full power and authority to execute, deliver and perform its obligations under this Note, and the execution, delivery and performance of this Note has been duly authorized by all requisite action on the part of Borrower. If Borrower is a corporation, partnership, limited liability company, trust or other entity, the Person or Persons signing the Loan Documents on behalf of Borrower are duly authorized to execute the Note and all other documents necessary to consummate the Loan on behalf of Borrower.

4.2     Valid Obligations. The Note is a legal, valid and binding obligation of Borrower, enforceable in accordance with its terms (except as enforcement may be limited by equitable principles and by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to creditors' rights generally).

4.3     No Consents Required. No consent of any other Person and no consent, approval, authorization or other action by or filing with any governmental authority not previously obtained by Borrower is required in connection with the execution, delivery and performance of this Note by Borrower.

4.4     Borrower's Name. Borrower has set forth above its full and correct name, and Borrower does not use any other names or tradenames, except for the tradenames disclosed to Lender in writing.

4.5     Commercial Loan. Borrower represents and warrants that the proceeds of this loan will be used by Borrower only for business purposes. If Borrower is a natural person, Borrower represents and warrants that Borrower does not intend to, and will not, occupy or reside on the Property so long as the Loan remains outstanding. If Borrower is a legal entity, Borrower represents and warrants that no person affiliated with Borrower intends to or will occupy or reside on the Property so long as the Loan remains outstanding.

4

4.6     Borrower's Warranties. Borrower's warranties and representations set forth in this Section 4 shall be true and correct and deemed made at the time of execution of this Note and as of the date of each Advance, shall survive the closing of the Loan, and shall remain true and correct as of the date on which such warranties and representations are given.

4.7     Truth of Loan Application Documents. Borrower certifies that the information Borrower (or Borrower's agent(s)) provided to Lender in connection with Borrower's loan application was true, correct and complete at the time it was provided and remains true, correct and complete as of the date of execution of this Note.

5.      Waivers. Borrower and all sureties, Guarantors, endorsers and other Persons liable for payment of this Note (a) waive presentment, demand for payment, protest, notice of demand, dishonor, protest and nonpayment, and all other notices and demands in connection with the delivery, acceptance, performance, default under, and enforcement of this Note; (b) waive the right to assert any statute of limitations as a defense to the enforcement of this Note to the fullest extent permitted by law; (c) waive the benefits of any applicable law, regulation, or procedure which provides, in substance, that where cross demands for money exist between parties at any point in time when neither demand is barred by the applicable statute of limitations, and an action is thereafter commenced by one such party, the other party may assert the defense of payment in that the two demands are compensated so far as they equal each other, notwithstanding that an independent action asserting the claim would at the time of filing the response be barred by the applicable statute of limitations; (d) consent to all extensions and renewals of the time of payment of this Note and to all modifications of this Note by the Lender and Borrower without notice to and without in any way affecting the liability of any Person for payment of this Note; and (e) consent to any forbearance by the Lender and to the release, addition, and substitution of any Person liable for payment of this Note and of any or all of the security for this Note without notice to and without in any way affecting the liability of any Person for payment of this Note.

6.      Attorney Fees, Collection Costs and Impositions. Borrower agrees to pay all costs, expenses, charges, consultants' fees, expert witness fees, trustee's fees, foreclosure costs, costs of litigation or alternative dispute resolution proceeding (including, without limitation, those incurred preliminary to the institution of any legal action or judicial or non-judicial proceeding, or in order to quantify or obtain recovery of the amount of such recoverable attorney's fees, costs, or expenses, or in connection with any appeal arising from any such action or proceeding), discovery costs and expenses, and attorney fees ("Collection Costs") paid or incurred by Lender, or adjudged by a court, arbitrator or other tribunal in connection with: (a) the interpretation, collection or enforcement of this Note (including, without limitation, costs incurred in seeking collection of rents owing from any tenant of the Property), whether or not suit is filed; (b) representing Lender in any bankruptcy, reorganization, receivership, or other proceedings affecting creditors' rights and involving a claim under this Note or the Security Instrument; (c) actions taken to protect the lien of the Security Instrument or Lender's interests in the Property as Lender; (d) actions taken to enforce any provision of this Note or the Security Instrument; and (e) in defense of any claims brought by Borrower arising from the rights and obligations of the parties under the Loan Documents. Borrower shall be obligated to pay all such Collection Costs, which shall be additional obligations of Borrower hereunder payable on demand, and shall bear interest at the Default Rate from the date of such demand until paid in full. Borrower shall also be obligated to pay for any and all incurred Imposition (as defined in the Security Instrument) costs and such obligation shall be payable upon demand. The amount of such Impositions shall be included in the Borrower's principal balance and shall bear interest at the same rate as principal from and after the date of payment of the Imposition by the Lender.

7.      Notice. Any notice required to be provided in this Note shall be given in writing and shall be sent (a) for personal delivery by a delivery service that provides a record of the date of delivery, the individual to whom delivery was made, and the address where delivery was made; (b) by first-class certified United States mail, postage prepaid, return receipt requested; (c) by a nationally recognized overnight courier service, marked for next day business delivery; or (d) by electronic transmission. All notices shall be addressed to the party to whom such notice is to be given at the following address:

| |
|---|
| **Lender Address:** Kiavi Funding, Inc., c/o Loan Servicing, <br> 2 Allegheny Center, Nova Tower 2, Suite 200, Pittsburgh, PA 15212 <br> **Lender Email:** servicing@kiavi.com |
| **Borrower Address:**  154 EAGLEVIEW BLVD, EXTON, PA, 19341, USA |
| **Borrower Email:**    processing@raddiversified.com |

or to such other address as a party may designate by written notice to the other. All notices shall be deemed effective on the earliest of (a) actual receipt; (b) rejection of delivery, if delivery is attempted by personal service, mail or messenger; (c) if sent by certified mail, the third day on which regular United States mail delivery service is provided after the day of mailing or, if sent by overnight delivery service, on the next day on which such service makes next-business-day deliveries after the day of sending; (d) if sent via email, upon

electronic delivery unless thereafter there is electronic notice of failed electronic delivery.

8.     **Applicable Law; Jurisdiction; Venue.** The Loan Documents shall be governed by the state law selected in the Security Instrument, and Borrower hereby submits to the exclusive jurisdiction and venue of the Courts specified in the Security Instrument for any and all claims described therein.

9.     **Time Is of the Essence.** Time is of the essence with respect to all obligations of Borrower under this Note.

10.    **Multiple Interests of Lender.** In the event that multiple parties are named as Lender or Beneficiary, or multiple parties hold beneficial interests in this Note or the Security Instrument, a vote of 51% or greater of the beneficial interests will be considered the majority necessary for any decision or action by Lender or Beneficiary under the terms of this Note and the Security Instrument.

11.    **Entire Agreement.** This Note, the Security Instrument (and any and all riders), the Guaranty and any other Loan Document contain the entire agreement concerning the subject matter of the Loan Documents and supersede all prior and contemporaneous negotiations, agreements, statements, understandings, terms, conditions, representations and warranties, whether oral or written, by and among the Lender, Borrower and Guarantors concerning the Loan which is the subject matter of the Loan Documents.

12.    **No Modifications or Amendments; No Waiver.** Except as specified herein, no modification, amendment, change or waiver of any provision of this Note ("**Change or Waiver**") shall be valid, binding or effective unless it is in writing and signed by the party against whom enforcement of such Change or Waiver is sought. Additionally, a waiver of any provision in one event shall <u>not</u> be construed as a waiver of any other provision at any time, as a continuing waiver, or as a waiver of such provision on a subsequent event.

13.    **Lender's Acceptance of Payment, Extensions of Time or Forbearance Not a Waiver.** The acceptance by Lender, loan servicer or the Trustee of any payment, partial or otherwise, made hereunder, whether paid on or after the time that such payment becomes due as herein set forth, will not establish a custom or constitute a waiver of any of Lender's rights to enforce prompt payment or to enforce any of Lender's rights or any of the obligations of Borrower or any guarantor or endorser set forth in this Note or the Security Instrument, or otherwise provided at law or in equity. Any extension of time granted or tolerated by Lender with respect to any payment due hereunder or other forbearance with respect to the performance of any other term, provision, covenant or agreement of this Note or the Security Instrument, or the taking or releasing of security or collateral for the payment of this Note, or in exercising or failing to exercise any right or power under this Note or the Security Instrument, shall not in any way release or affect the liability of Borrower, or any guarantor or endorser hereof, or any other party obligated to make any payment or render any performance hereunder. If Lender delays in exercising or fails to exercise any of its rights under this Note or the Security Instrument, that delay or failure shall not constitute a waiver of any Lender rights or of any breach, default, or failure of condition hereunder or thereunder. No waiver by Lender of any of its rights or of any such breach, default, or failure of condition shall be effective, unless the waiver is expressly stated in a writing signed by Lender.

14.    **Remedies Cumulative.** All of Lender's rights and remedies under this Note shall be cumulative. Any failure of Lender to exercise any right or remedy under this Note or under any of the loan documents executed by Borrower shall not be construed as a waiver of the right to exercise the same or any other right or remedy at any time and from time to time, thereafter.

15.    **Severability.** If any provision of the Loan Documents shall be held by any court of competent jurisdiction to be unlawful, voidable, void, or unenforceable for any reason, such provision shall be deemed to be severable from and shall in no way affect the validity or enforceability of the remaining provisions of the Loan Documents.

16.    **Interpretation.** Whenever the context of this Note reasonably requires, all words used in the singular shall be deemed to have been used in the plural, and the neuter gender shall be deemed to include the masculine and feminine gender, and vice versa. The headings to sections of this Note are for convenient reference only and shall not be used in interpreting this Note. For purposes of this Note, (a) the term "including" shall be deemed to mean "including without limitation"; (b) the term "document" shall be deemed to include all written contracts, commitments, agreements, and instruments; and (c) the term "discretion," when applied to any determination, consent, or approval right by the Lender, shall be deemed to mean the Lender's sole but good faith business judgment.

17.    **Assignment.** This Note inures to and binds the heirs, legal representatives, successors, and assigns of Borrower and Lender; provided, however, that Borrower may not assign this Note or any proceeds of it, or assign or delegate any of its rights or obligations, without Lender's prior written consent in each instance. Lender in its sole discretion may transfer this Note, and may sell or assign participations or other interests in all or any part of this Note, and/or designate any other Person as the holder hereof, all without notice to or the consent of Borrower.

6

18.   **Successors and Assigns.** Whenever used herein, the terms "Lender" and "Borrower" shall be deemed to include their respective heirs, personal representatives, and permitted successors and assigns.

19.   **Cooperation.** Borrower acknowledges that Lender and its successors and assigns may (a) sell, transfer, pledge or assign the Security Instrument, the Note, and other Loan Documents to one or more investors as a whole loan, in a rated or unrated public offering or private placement; (b) participate the Loan secured by this Mortgage to one or more investors in a rated or unrated public offering or private placement; (c) deposit the Security Instrument, the Note, and other Loan Documents with a trust, which trust may sell certificates to investors evidencing an ownership interest in the trust assets in a rated or unrated public offering or private placement; or (d) otherwise sell or pledge the Loan or interest therein to investors in a rated or unrated public offering or private placement. (The transactions referred to in clauses (a)-(d) are hereinafter referred to as "Secondary Market Transactions.") Borrower shall, at Lender's expense, cooperate in good faith with Lender in effecting any such Secondary Market Transactions and shall cooperate in good faith to implement all requirements reasonably imposed by the participants involved in any Secondary Market Transactions (including, without limitation, a rating agency and/or an institutional purchaser, participant, or investor) including, without limitation, all structural or other changes to the Loan, modifications to any documents evidencing or securing the Loan, delivery of opinions of counsel acceptable to the rating agency or such other purchasers, pledgees, participants or investors, and addressing such matters as the rating agency or such other purchasers, participants, or investors may require; provided, however, that Borrower shall not be required to modify any documents evidencing or securing the Loan that would modify (i) the interest rate payable under the Note, (ii) the stated maturity of the Note, (iii) the amortization of principal of the Note, or (iv) any other material terms or covenants of the Loan. Borrower shall provide such information and documents relating to Borrower, the Property, the Leases, and any lessees as Lender or the rating agency or such other purchasers, pledgees, participants, or investors may reasonably request in connection with a Secondary Market Transactions. Lender shall have the right to provide to the rating agency or prospective purchasers, participants, or investors any information in its possession including, without limitation, financial statements relating to Borrower, the Property, and any lessee. Borrower acknowledges that certain information regarding the Loan and the parties thereto and the Property may be included in a private placement memorandum, prospectus, or other disclosure documents.

20.   **Loss, Theft, Destruction or Mutilation of Note.** In the event of the loss, theft or destruction of this Note, upon Borrower's receipt of a reasonably satisfactory indemnification agreement executed in favor of Borrower by the party who held this Note immediately prior to its loss, theft or destruction, or in the event of the mutilation of this Note upon Lender's surrender to Borrower of the mutilated Note, Borrower shall execute and deliver to such party or Lender, as the case may be, a new promissory note in form and content identical to this Note in lieu of the lost, stolen, destroyed or mutilated Note.

**Joint and Several Liability.**

20.1   Joint and Several. Each Person or party comprising Borrower shall be jointly and severally liable for the obligations of Borrower hereunder. If Borrower consists of more than one Person, the occurrence of any Default or Event of Default with respect to any one or more of such Persons shall constitute a Default or Event of Default, as applicable, and (in the case of an Event of Default) entitle the Lender to exercise its rights and remedies as provided above.

20.2   Married Individuals. Each Borrower who is a married person agrees that the Lender shall have the right to recourse against his or her community property and separate property for any or all obligations to the fullest extent permitted by law.

21.   **Waiver of Right to Jury Trial.** Borrower irrevocably waives all rights to a jury trial in any action, suit, proceeding or counterclaim of any kind directly or indirectly arising out of or in any way relating to this Note or any of the other Loan Documents, any or all of the real and personal property collateral securing this Note. The jury trial waiver contained in this section is intended to apply, to the fullest extent permitted by law, to any and all disputes and controversies that arise out of or in any way related to any or all of the matters described in the immediately preceding sentence, including without limitation contract claims, tort claims, and all other common law and statutory claims of any kind. This Note may be filed with any court of competent jurisdiction as borrower's written consent to borrower's waiver of a jury trial.

22.   **State Specific Provisions.** State specific provisions are outlined on Exhibit A (if applicable), attached hereto and incorporated herein.

IN WITNESS WHEREOF, Borrower has executed this Promissory Note Secured by the Security Instrument effective as of the date first written above.

**Borrower:** RAD Diversified REIT, Inc., A Maryland Corporation

_____

By: Brandon Mendenhall, Chief Executive Officer

_____

# Schedule A
### (Principal Advances)

This schedule is attached to and made a part of the Promissory Note Secured by Security Instrument from RAD Diversified REIT, Inc., A Maryland Corporation ("**Borrower**") to Kiavi Funding, Inc. ("**Lender**") (Loan No. ▮▮▮▮▮▮▮ ) ("**Note**"), and provides for the disbursement and release of the Initial Advance and Additional Advances in accordance with the terms of this schedule and the Construction Loan Rider to the Security Instrument.

## 1. **Advances and Release of Funds**.

1.1 **Loan Amount.** The Loan shall be in an amount not to exceed the principal sum of _____ $550,400.00 _____. The principal balance of the Loan at any time shall be comprised of the Initial Advance and any Additional Advances made by Lender, and shall bear interest on so much of the principal as shall have been advanced pursuant to the terms of the Note, the Security Instrument and all Riders to such documents.

1.2 **Initial Advance**. The advance to be used in connection with the acquisition of the Property (the "**Initial Advance**"). The Initial Advance will be funded by the Lender on the date of disbursement of the Loan, pursuant to and governed by the Note, this schedule and the Construction Loan Rider to the Security Instrument.

1.3 **Advance Termination Date.** Unless Lender agrees otherwise in writing, Lender is not required to disburse any Advance funds for construction or improvements on the Property completed subsequent to the earlier of (i) the Maturity Date or (ii) the date construction is to be completed according to Borrower's Scope of Work (the "**Advance Termination Date**"). After the Advance Termination Date, Lender may, in its sole and absolute discretion, elect not to make any further Additional Advances. If Lender makes that election, Lender will provide written notice to Borrower at the Borrower's physical address provided in the Note or email address provided by the Borrower at application.

## 2. **Interest Rate**.

2.1 The Loan, including the Initial Advance and any Additional Advances will bear interest at the annual rate of 9.65 _____ per cent. Each advance will become a part of the unpaid principal balance of the Loan and begin bearing interest on the date it is disbursed.

## 3. **Note Amendments**.

3.1 The word "***Term***" as it appears in the parenthetical below the title of the Note is hereby replaced with the word "***Construction***".

3.2 Section 1.2 of the Note is hereby deleted and replaced in its entirety with the following:

> 1.2 **Additional Advances**. Subsequent advances of funds after the Initial Advance and prior to or contemporaneous with the Advance Termination Date shall be referred to herein as the "**Additional Advances**". The aggregate total of all Additional Advances shall not exceed the maximum amount of the Loan less the Initial Advance, as set forth in the Note and this Schedule thereto.

3.3 The final sentence of Section 2.2.3 of the Note is hereby deleted.

3.4 The capitalized term "Reserve Advances" is hereby replaced by "Additional Advances" wherever it appears in the Note.

[the remainder of this page intentionally left blank]

1

IN WITNESS WHEREOF, Borrower has caused this instrument to be executed as of the date indicated on the Note.

**BORROWER**: RAD Diversified REIT, Inc., A Maryland Corporation

_____
Signature

By: Brandon Mendenhall, Chief Executive Officer

_____
Signature

2

## PROMISSORY NOTE

### EXHIBIT "A"

### STATE SPECIFIC PROVISIONS - TX

**Section 22.1** **Inconsistencies.** In the event of any inconsistencies between the terms and conditions of this Section 22 and the other provisions of this Note, the terms and conditions of this Section 22 shall control and be binding.

**Section 22.2** **Usury.** If the parties choice of law is overruled or applicable law is ever judicially interpreted so as to render usurious any amount (a) contracted for, charged, taken, reserved or received pursuant to the Note, any of the other Loan Documents or any other communication or writing by or between Borrower and Lender related to the transaction or transactions that are the subject matter of the Loan Documents, (b) contracted for, charged or received by reason of Lender's exercise of the option to accelerate the maturity of the Note and/or the other Indebtedness, or (c) Borrower will have paid or Lender will have received by reason of any voluntary prepayment by Borrower of the Note and/or the other Indebtedness, then it is Borrower's and Lender's express intent that all amounts charged in excess of the judicially-determined maximum rate of interest shall be automatically canceled, ab initio, and all amounts in excess of that rate heretofore collected by Lender shall be credited on the principal balance of the Note and/or the other Indebtedness (or, if the Note and/or the other Indebtedness (or, if the Note and all other Indebtedness have been or would thereby be paid in full, refunded to Borrower), and the provisions of the Note and the other Loan Documents immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount of interest otherwise called for hereunder and thereunder; provided, however, if the Note has been paid in full before the end of the stated term of the Note, then Borrower and Lender agree that Lender shall, with reasonable promptness after Lender is informed by a court that interest was received in an amount in excess of the judicially-determined maximum rate, either refund such excess interest to Borrower and/or credit such excess interest against the Note and/or any other Indebtedness then owing by Borrower to Lender. Borrower hereby agrees that as a condition precedent to any claim seeking usury penalties against Lender, Borrower will provide written notice to Lender, advising Lender in reasonable detail of the nature and amount of the violation, and Lender shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Borrower or crediting such excess interest against the Note and/or the other Indebtedness then owing by Borrower to Lender. In no event shall the provisions of Chapter 346 of the Texas Finance Code (which regulates certain revolving credit loan accounts and revolving triparty accounts) apply to the Note and/or the other Indebtedness. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

**Section 22.3** **The following shall replace Section 2.2.8 of the Note: Late Charge.** Borrower shall immediately pay a late charge equal to **five percent (5%)** of such installment of interest and/or principal to Lender to compensate Lender for administrative costs and expenses incurred in connection with such late payment if any installment of interest and/or principal under this Note is not paid within **ten (10)** days after the date on which it is due. Borrower agrees that the actual damages suffered by Lender because of any late installment payment are extremely difficult and impracticable to ascertain, and the late

1

charge described in this Section represents a reasonable attempt to fix such damages under the circumstances existing at the time this Note is executed. Lender's acceptance of any late charge shall not constitute a waiver of any of the terms of this Note and shall not affect Lender's right to enforce any of its rights and remedies against any Person liable for payment of this Note.

**Section 22.4** **STATUTE OF FRAUDS NOTICE.** **THIS NOTE AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

IN WITNESS WHEREOF, Borrower has caused this instrument to be executed as of date indicated on Promissory Note Secured by Security Instrument.

**Borrower:** RAD Diversified REIT, Inc., A Maryland Corporation

_____

By: Brandon Mendenhall, Chief Executive Officer

_____

2

WHEN RECORDED MAIL TO:

Kiavi Funding, Inc.
2 Allegheny Center, Nova Tower 2, Suite 200
Pittsburgh, PA 15212

INSTRUCTIONS TO RECORDER:
Index this document as

(1) a deed of trust;
(2) an assignment of rents; and
(3) a fixture filing.

(Space above this line for Recorder's use)

NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.[1]

# DEED OF TRUST, ASSIGNMENT OF RENTS AND FIXTURE FILING

---

[1] The notice of confidentiality rights is required to be on the first page of the Deed of Trust in Texas. Attach this page as a cover sheet to the Deed of Trust form before filing.

# Pages 52
06/20/2023 03:09 PM
e-Filed & e-Recorded in the
Official Public Records of
HARRIS COUNTY
TENESHIA HUDSPETH
COUNTY CLERK
Fees   $218.00

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.

COUNTY CLERK
HARRIS COUNTY, TEXAS

**WHEN RECORDED MAIL TO:**

Kiavi Funding, Inc.
2 Allegheny Center, Nova Tower 2, Suite 200
Pittsburgh, PA 15212

**INSTRUCTIONS TO RECORDER:**
Index this document as

(1) a deed of trust;
(2) an assignment of rents; and
(3) a fixture filing.

_____

(Space above this line for Recorder's use)

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.[1]

# DEED OF TRUST, ASSIGNMENT OF RENTS AND FIXTURE FILING

_____

[1] The notice of confidentiality rights is required to be on the first page of the Deed of Trust in Texas. Attach this page as a cover sheet to the Deed of Trust form before filing.

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

Kiavi Funding, Inc.
Attn: Post Closing Department
2 Allegheny Center, Nova Tower 2, Suite 200
Pittsburgh, PA 15212



INSTRUCTIONS TO RECORDER:
Index this document as

(1) a deed of trust;
(2) an assignment of rents; and
(3) a fixture filing.

---

(Space above this line for Recorder's use)

# DEED OF TRUST, ASSIGNMENT OF RENTS AND FIXTURE FILING

THIS DEED OF TRUST, ASSIGNMENT OF RENTS AND FIXTURE FILING (the "**Deed of Trust**") is made on 06-13-2023 _____ by :

RAD Diversified REIT, Inc., A Maryland Corporation

("**Borrower**"), whose address is 154 EAGLEVIEW BLVD, EXTON, PA, 19341, USA

in favor of Rose Swan

("**Trustee**"), whose address is c/o Rose Swan, PLLC 1701 W Northwest Hwy Ste 100, Grapevine, TX 76051 ,

for the benefit of Kiavi Funding, Inc., a Delaware corporation, as beneficiary ("**Lender**"),

whose address is 2 Allegheny Center, Nova Tower 2, Suite 200, Pittsburgh, PA 15212 .

## WITNESSETH

WHEREAS, Lender has agreed to provide Borrower with a Loan (the "**Loan**") as evidenced by that certain Promissory Note dated of even date herewith in the amount of $550,400.00 _____ by and between Lender and Borrower (the "**Note**"); and

WHEREAS, Lender is making the Loan in reliance on this Deed of Trust, and it is a condition precedent to the making of the Loan by Lender that Borrower execute and deliver this Deed of Trust.

NOW, THEREFORE, in consideration of the foregoing and other benefits accruing to Borrower, the receipt and sufficiency of which are hereby acknowledged, Borrower hereby covenants and agrees with Lender, as follows:

## GRANTING CLAUSES

BORROWER IRREVOCABLY GRANTS, CONVEYS, TRANSFERS AND ASSIGNS TO TRUSTEE, IN TRUST, FOR THE USE AND BENEFIT OF LENDER, WITH POWER OF SALE AND RIGHT OF ENTRY AND POSSESSION, all of Borrower's present and future estate, right, title and interest in and to the following described property (collectively, the "**Property**"):

(A)    The real property located in the County of _Harris County_, State of _TX_ commonly known and addressed as:

_412 HOHLDALE ST HOUSTON TX 77091_

and more particularly described in Exhibit A attached to this Deed of Trust and incorporated herein by reference (the "**Land**"); and

(B)    All Buildings, Fixtures, Easements, Rents and Profits, Development Rights, Water Rights, and Mineral Rights, including without limitation all present and future Leases relating to the foregoing real property and all guaranties and security and security deposits supporting such Leases (as those terms are defined in Article 1 of this Deed of Trust); and

(C)    All of the following related to the assets specified in (A) and (B) above, (i) Books and Records, plans, specifications, surveys (ii) Insurance Policies, title insurance policies, sales contracts, construction contracts, architectural agreements, engineering contracts, service and maintenance contracts, management contracts, and marketing contracts; (iii) work product arising from any such contract or agreement; (iv) all warranties, guarantees, and other similar contract rights and (v) all other tangible personal property located on or used in connection with the forgoing (excluding only Consumer Goods as defined in the Uniform Commercial Code).

THIS DEED OF TRUST SECURES THE FOLLOWING INDEBTEDNESS AND OBLIGATIONS (collectively, the "**Obligations**") in such order of priority as Lender may from time to time elect:

(1)    Payment and performance of Borrower's indebtedness and obligations under the Note and this Deed of Trust and all extensions, renewals, modifications, and replacements thereof, including the reserve advance pursuant to the Note and Construction Loan Rider (if applicable) ("**Reserve Advance**"); and

(2)    Payment and performance of any and all other indebtedness which may hereafter be owing by Borrower to Lender under the Note, this Deed of Trust or other Loan Documents, however incurred, including but not limited to the attorneys' fees, court costs, witness fees, expert witness fees, collection costs, and costs and expenses paid by Lender in the preservation and enforcement of its rights and remedies under this Deed of Trust or other Loan Documents.

(3)    To the extent that Lender's rights to recover a deficiency from Borrower are subject to California real property law (including without limitation the provisions of Code of Civil Procedure 580a, 580b, 580d, 580e, 726, 726.5 and 736) Borrower and Lender hereby agree and acknowledge that this Deed of Trust shall not secure the following obligations which are hereby excluded from the definition of "Obligations": (i) the obligations of Borrower under Section 2.3 of this Deed of Trust or (ii) any obligations under any other environmental indemnity agreement or (iii) any obligations under any other guaranty or indemnity agreement.

2

THIS DEED OF TRUST constitutes (i) a personal property security agreement to the extent that it includes personal property assets hereunder that are not real property assets subject to the applicable real property recording statues (and Borrower hereby grants Lender a security interest in all such personal property assets to secure the Obligations) and (ii) a Fixture Filing in accordance with the Article 9 of the Uniform Commercial Code.

## ARTICLE 1

## DEFINITIONS

For purposes of this Deed of Trust, the following terms shall have the following definitions:

**1.1** **Books and Records.** "Books and Records" means all books and records relating to the design, construction, improvement, development, use, ownership, operation, maintenance, repair, lease, taxation or marketing of the Property whether kept in hard copy or electronic form.

**1.2** **Buildings.** "Buildings" means all buildings, structures and other improvements now existing or hereafter located on the Land.

**1.3** **Condemnation Claims.** "Condemnation Claims" means all claims, actions, causes of action, demands, liens, rights, judgments, settlements, awards, compensation, and damages of every kind and nature which Borrower now has or which may hereafter accrue against any Person, whether arising in tort, by contract or statute, or in any other manner, which in any way directly or indirectly relate to or arise out of any condemnation of the Property or other taking of the Property for public or quasi-public use by eminent domain or to the transfer of the Property in lieu of condemnation or any such taking.

**1.4** **Condemnation Proceeds.** "Condemnation Proceeds" means all proceeds, tangible and intangible property resulting from the payment, collection of, recovery on, or other disposition of any or all of the Condemnation Claims.

**1.5** **Covenants and Restrictions.** "Covenants and Restrictions" means all covenants, conditions, restrictions, equitable servitudes, and all other similar matters now or hereafter affecting the Property, including any condominium, planned unit development, or cooperative apartment declaration of covenants, conditions and restrictions, by-laws, articles, rules, and regulations to which Borrower or the Property is subject or bound.

**1.6** **Development Rights.** "Development Rights" means all existing and future development rights, development credits, air rights, and options of any kind relating to the Property.

**1.7** **Easements.** "Easements" means all existing and future easements, rights of way, licenses, and similar rights relating or appurtenant to the Property and all existing and future rights in or to streets, roads, sidewalks, alleys, strips and gores adjoining or used in connection with the Property.

**1.8** **Event of Default.** "Event of Default" means any of the events described in Article 3 of this Deed of Trust.

**1.9** **Fixtures.** "Fixtures" means all fixtures, machinery, equipment, building materials, appliances, landscaping, systems, built-in furniture, plumbing, electrical, coverings and other commonly recognized fixtures now or hereafter located in, on, attached or affixed to, or used in connection with the Land or the Buildings, including, but not limited to, all HVAC and utility systems; security and access control equipment; water heaters, showers, bathtubs, tanks, pumps, toilets, sinks, pipes, and other plumbing fixtures and equipment; stoves, ranges, refrigerators, dishwashers, and disposals; laundry equipment; engines, motors, generators, boilers, furnaces, and incinerators; wall, window, and floor coverings, including screens, shades, drapes, and awnings; partitions, doors, windows, cabinets, bookcases, and hardware; chandeliers and other light fixtures; trees, plants and other landscaping; and all attachments, substitutions, accessories, accessions, replacements, improvements, and additions to any or all of the foregoing, all of

3

which shall conclusively be deemed to be part of the Land and Buildings and conveyed by this Deed of Trust, whether or not affixed or attached to the Land or the Buildings.

1.10   **General Partner.** "General Partner" means any Person who is acting as a general partner of a partnership.

1.11   **Governmental Authorities.** "Governmental Authorities" means all governmental or quasi-governmental authorities, boards, bureaus, agencies, commissions, departments, administrative tribunals, and other instrumentalities, judicial and non-judicial authorities, and public utilities having or exercising jurisdiction over Borrower or the Property.

1.12   **Governmental Permits.** "Governmental Permits" means all permits, approvals, and authorizations now or hereafter issued by all Governmental Authorities for or in connection with the Property, including grading permits, foundation permits, building permits, tentative subdivision map approvals, zone changes, zone variances, conditional use permits, temporary certificates of occupancy, and final certificates of occupancy.

1.13   **Governmental Requirements.** "Governmental Requirements" means all existing and future laws, ordinances, rules, regulations, orders, and requirements of all Governmental Authorities applicable to Borrower or the Property, including those respecting the design, construction, improvement, development, use, ownership, operation, maintenance, repair, or marketing of the Property.

1.14   **Guaranty.** "Guaranty" means the guaranty agreement or agreements executed by any Guarantor.

1.15   **Guarantor.** "Guarantor" means the Person or Persons, if any, now or hereafter guaranteeing payment of the Note or payment or performance of any or all of the other Obligations.

1.16   **Impositions.** "Impositions" means all (a) Taxes; (b) Insurance Premiums; (c) gas, electricity, water, sewer, and other utility charges which are incurred for the benefit of the Property or which may become a lien against the Property; (d) assessments, charges, and fees imposed pursuant to any Covenants and Restrictions; (e) assessments, charges and fees payable with respect to any Easements, Water Rights or Development Rights; (f) principal, interest, and other amounts payable in connection with any Liens; and (g) such other taxes, charges, premiums, assessments and impositions relating to the Property, the payment of which Lender determines to be necessary to protect Lender's security for the Obligations.

1.17   **Improvements.** "Improvements" means the Buildings and Fixtures, collectively.

1.18   **Insurance Claims.** "Insurance Claims" means all claims, actions, causes of action, demands, liens, rights, judgments, settlements, awards, compensation, and damages of every kind and nature which Borrower now has or which may hereafter accrue against any Person, whether arising in tort, by contract or statute, or in any other manner, which in any way directly or indirectly relate to or arise under any policy of insurance which Borrower maintains with respect to the Property or which Borrower is required to maintain under this Deed of Trust (collectively, the "Insurance Policies").

1.19   **Insurance Proceeds.** "Insurance Proceeds" means all proceeds, tangible and intangible property resulting from the payment, collection of, recovery on, or other disposition of any or all of the Insurance Claims.

1.20   **Insurance Premiums.** "Insurance Premiums" means all premiums and other amounts payable in connection with procuring or maintaining the Insurance Policies.

1.21   **Leases.** "Leases" means all existing and future rental agreements, leases, licenses, concessions, occupancy agreements, and other similar agreements affecting the Property, including all subleases at any level.

4

1.22    **Liens.** "Liens" means all mortgages, deeds of trust, mechanics' liens, and other liens and encumbrances of every kind and nature, other than this Deed of Trust, now or hereafter affecting the Property.

1.23    **Loan Documents.** "Loan Documents" means the Note, this Deed of Trust (together with any riders), the Guaranty, and all other documents executed by Borrower or any of the Guarantors and delivered to Lender at Lender's request in connection with the Loan, and all extensions, renewals, modifications, and replacements of such documents.

1.24    **Manager.** "Manager" means any Person who is acting as a manager of a limited liability company, including any member who is acting in such capacity.

1.25    **Mineral Rights.** "Mineral Rights" means all existing and future right, title, and interest in and to all minerals, oil, gas and other hydrocarbon substances in or on the Property.

1.26    **Person.** "Person" means any natural person or any entity, including any corporation, partnership, joint venture, limited liability company, trust, unincorporated organization, trustee, or Governmental Authority.

1.27    **Property Claims.** "Property Claims" means all claims, actions, causes of action, demands, liens, rights, judgments, settlements, awards, compensation, and damages of every kind and nature (other than the Insurance Claims and Condemnation Claims) which Borrower now has or which may hereafter accrue against any Person, whether arising in tort, by contract or statute, or in any other manner, which in any way directly or indirectly relate to or arise out of any or all of the following: (a) the Property; (b) any existing or future fact, matter, occurrence, or transaction relating to the Property; or (c) the design, construction, improvement, development, use, ownership, operation, maintenance, repair or marketing of the Property.

1.28    **Property Proceeds.** "Property Proceeds" means all proceeds, tangible and intangible property resulting from the payment, collection of, recovery on, or other disposition of any or all of the Property Claims.

1.29    **Rents and Profits.** "Rents and Profits" means all existing and future rents, royalties, issues, profits, proceeds, revenues, income and other benefits of the Property and all Leases, including all security deposits and prepaid rent.

1.30    **Taxes.** "Taxes" means (a) all taxes, bonds, levies and assessments now or hereafter affecting the Property, including all general and special real and personal property taxes, bonds, and assessments affecting the Property; (b) all other taxes, bonds, levies and assessments which now are or hereafter may become a lien on the Property, including all income, profits, franchise, withholding, and gross receipt taxes; (c) all other charges now or hereafter imposed on or assessed against the Property by any Governmental Authority or arising with respect to the design, construction, improvement, development, use, ownership, operation, maintenance, repair or marketing of the Property; and (d) all taxes, bonds, levies, and assessments now or hereafter imposed by any Governmental Authorities on Trustee or Lender by reason of their respective interests in the Loan Documents, excluding any franchise, estate, inheritance, income, or similar tax imposed on Lender or Trustee.

1.31    **Tenants**. "Tenants" means all tenants and occupants of the Property under the Leases.

1.32    **Water rights**. "Water rights" means all existing and future water, water rights (whether riparian, appropriative, or otherwise, and whether or not appurtenant), and all water stock relating to the Property.

## ARTICLE 2

### COVENANTS OF BORROWER

**2.1** **Performance of Secured Obligations.** Borrower shall pay and perform each and all of the Obligations in accordance with their respective terms.

**2.2** **Preservation of the Property.** Borrower (a) shall maintain the Property in good condition and repair; (b) shall promptly repair and restore in a good and workmanlike manner any part of the Property which may be damaged or destroyed, whether or not any Insurance Proceeds are adequate to pay for the cost of such repair and restoration; (c) shall comply and cause the Property to comply with the provisions of all Insurance Policies; (d) shall comply and cause the Property to comply with all Governmental Requirements; (e) shall comply and cause the Property to comply with all Covenants and Restrictions; (f) shall maintain in effect all Governmental Permits; (g) shall not initiate, join in or consent to any change in the zoning, general plan, specific plan, or any other land use classification affecting the Property or any Covenant or Restriction without the prior written consent of Lender; (h) shall not remove, demolish, improve, add to, or alter the Improvements (excluding non-structural alterations which preserve or increase the value of the Property, alterations required by Governmental Requirements and alterations approved by Lender) or change the character or use of the Property without the prior written consent of Lender; (i) shall not commit or permit any waste respecting the Property or impairment of the Property; (j) shall not abandon the Property; (k) shall not commit or permit any act upon the Property in violation of any Governmental Requirements; (l) shall promptly complete in a good and workmanlike manner, and shall pay, when due, all claims for labor performed and for materials furnished in connection with, Improvements which Borrower commences to construct on the Land; and (m) shall paint, cultivate, irrigate, fertilize, fumigate, prune, maintain and do all other acts, in a timely and proper manner, which from the character or use of the Property may be necessary or appropriate to preserve, protect and maintain the value of the Property. Borrower hereby recognizes and acknowledges that the condition and appraisal of the Property and all relevant documents relating to the Property are important and necessary for Lender to protect its position as secured creditor (whether or not Borrower is a debtor in bankruptcy, receivership, liquidation, credit restructuring case or proceeding under state or Federal or bankruptcy law). Therefore, Borrower hereby agrees:
(a) to promptly provide to Lender all documents and filings reasonably requested by Lender which relate to (i) the Property, (ii) its condition, (iii) any operations related thereto, (iv) the maintenance thereof, (v) any taxes or assessments thereon, (vi) any insurance therefor, (vii) any liens, claims or interests thereon asserted by third parties, (viii) any leases thereof, and (ix) any rents or profits arising therefrom; (b) to provide Lender or its agents upon two days notice with reasonable opportunity to conduct an internal and external appraisal of the Property and to cooperate with any reasonable requests in connection with such appraisal; and (c) to coordinate with lender to take the foregoing actions on an expedited basis on not mor than one day in the event the Borrower should become a debtor in any bankruptcy, receivership, liquidation or credit restructure case or proceeding under state or Federal bankruptcy law.

**2.3** **Hazardous Substances.** As used in this Section 2.3, (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be

appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, Hazardous Substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

2.4     **Insurance.** Borrower shall keep the Improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. Each of the Insurance Policies, including the amounts, form, coverage, deductibles, insurer and loss payable and cancellation provisions, shall be acceptable to Lender and the insurance company providing coverage must have rating of at least A-V or better in the latest edition of "Best's Insurance Guide," must be licensed to do business in the state in which the property is located, and must be licensed to transact the lines of insurance required in this transaction. Without limiting any of the terms of this Section, (i) each of the Insurance Policies shall provide that it may be canceled or modified only upon not less than thirty (30) days prior written notice to Lender; and (ii) the fire and extended coverage and other casualty insurance policies which Borrower is required to maintain under this Deed of Trust shall contain a mortgagee's loss payable endorsement acceptable to Lender naming Lender as loss payee and shall be written with liability in an amount equal to the lesser of (x) the original principal amount of the Loan plus any Reserve Advance and (y) the full replacement cost of the Improvements. Borrower shall provide evidence to Lender of all required insurance hereunder on or before the closing of the Loan.

2.5     **Insurance Policies.** Within thirty (30) days after closing of the Loan, Borrower shall deliver to Lender the originals of all Insurance Policies together with receipts for the full payment of all Insurance Premiums, and Lender shall have the right to hold such policies as long as any Obligations are outstanding. Lender shall not be liable or responsible for the suitability, adequacy, enforceability, validity, amount, form, or content of any Insurance Policies, the solvency of any insurer, or the collection of any Insurance Proceeds, and Borrower shall at all times have full responsibility for all of such matters. Not later than thirty (30) days prior to the expiration of each of the Insurance Policies, Borrower shall deliver to Lender a policy or policies renewing or extending the expiring Insurance Policies together with written evidence showing payment of the Insurance Premiums for such policies. If Borrower fails to deliver any of the Insurance Policies to Lender in accordance with this Deed of Trust, or if any of the Insurance Policies is canceled, Lender, without notice to or demand upon Borrower, shall have the right to obtain such insurance in such form, content and amount and with such insurer as Lender determines to be necessary or appropriate to protect its interest. Without limiting any other provision of this Deed of Trust, all premiums and other costs and expenses paid or incurred by Lender in connection with Lender's obtaining any Insurance Policies under this Section shall be payable by Borrower to Lender on Lender's demand. Neither Trustee nor Lender shall be obligated to obtain or maintain any policy of insurance with respect to the Property. All Insurance Policies relating to the Property and all unearned Insurance Premiums shall automatically inure to the benefit of and be deemed to be assigned to the grantee of the Property at any judicial or nonjudicial foreclosure sale under this Deed of Trust or by any deed in lieu of foreclosure under this Deed of Trust.

2.6     **Assignment of Insurance Claims and Proceeds.** To secure the Obligations, Borrower grants, transfers, and assigns to Lender the Insurance Claims and Insurance Proceeds.

2.7     **Assignment of Condemnation Claims and Proceeds and Other Claims.** To secure the Obligations, Borrower grants, transfers, and assigns to Lender the Condemnation Claims, Condemnation Proceeds, Property Claims, and Property Proceeds.

7

**2.8** **Payment of Proceeds.** Borrower shall cause all Insurance Proceeds, Condemnation Proceeds and Property Proceeds (collectively, the "Proceeds") to be paid or delivered directly to Lender. Lender shall at all times have the right but not the obligation (a) to demand, collect, accept, receive and give receipts for any and all of the Proceeds; and (b) to direct any Person to pay or deliver any or all of the Proceeds directly to Lender. Nothing contained in this Deed of Trust shall be deemed to obligate Lender to make any inquiry as to the sufficiency of any Proceeds received by Lender. If for any reason Borrower receives any Proceeds, Borrower shall immediately pay, assign, endorse or deliver such Proceeds to Lender in the original form in which received by Borrower and shall not commingle such Proceeds with any of Borrower's other funds or property.

**2.9** **Prosecution and Settlement of Claims.** Prior to the occurrence of any Event of Default, Borrower shall have a license to prosecute and enforce the Insurance Claims, Condemnation Claims, and Property Claims (collectively, the "Claims"). Lender shall at all times have the right to appear in, defend, and prosecute any action or proceeding arising out of or relating to any or all of the Claims if Lender determines that such action is necessary or appropriate to protect Lender's interest in connection with the Obligations. Upon the occurrence of an Event of Default, Borrower's license to prosecute and enforce the Claims shall be revoked upon, and to the extent provided in, notice by Lender to Borrower. Following such revocation, Lender, at its option, shall have the exclusive right to prosecute and enforce any or all of the Claims to the extent provided in Lender's notice of revocation and to compromise, adjust, settle or dismiss any or all of the Claims, whether or not Lender has taken possession of the Property. Without Lender's prior written consent, Borrower shall not (a) sell, transfer, pledge, hypothecate or otherwise dispose of or abandon any or all of the Claims; or (b) compromise, adjust, settle, or dismiss any or all of the Claims.

**2.10** **Title Policy.** Upon recordation of this Deed of Trust, Borrower shall cause the Lender to be furnished with an lender's policy of title insurance acceptable to Lender (a) written in an amount equal to the principal amount of the Loan; (b) issued by a title insurance company acceptable to the Lender; (c) showing title to the Property to be vested in a manner acceptable to the Lender; (d) containing a legal description of the Property satisfactory to the Lender; (e) insuring this Deed of Trust as a first lien on the Property, subject only to such exceptions as have been approved in writing by the Lender; (f) containing such title insurance endorsements as may be required by the Lender; and (g) otherwise acceptable to the Lender in form and substance, including the policy revision date. Within five (5) business days after the Lender's request from time to time, Borrower, at its expense, shall furnish the Lender with such additional title insurance endorsements as the Lender may require insuring the continuing first priority of this Deed of Trust. Borrower shall at all times cooperate with the Lender and its title insurer and provide the Lender's title insurer with such information as such title insurer may request or require in order to provide the Lender with the policies and endorsements described in this Section.

**2.11** **Subordinate Mortgages.** Borrower shall not grant or permit any other Lien on the Property ("**Subordinate Mortgage**") without Lender's prior written consent. To obtain Lender's written consent, which Lender may withhold for any reason in its discretion, Borrower must first deliver to Lender a written agreement, acceptable to Lender, executed by the holder of the Subordinate Mortgage which provides that (a) the Subordinate Mortgage is and shall at all times remain unconditionally subject and subordinate to this Deed of Trust; (b) if any action or proceeding is commenced to foreclose the Subordinate Mortgage, no Tenant under any Lease shall be named as a defendant in such action or proceeding, nor shall such action or proceeding terminate any Lease, without Lender's prior written consent; (c) all Rents and Profits, whether collected directly by the holder of the Subordinate Mortgage or through a receiver, shall be applied first to the Obligations, second to the payment of the Impositions, and thereafter to payment of maintenance and operating costs relating to the Property; and (d) the holder of the Subordinate Mortgage shall give written notice to Lender not later than ten (10) days prior to commencing any judicial or nonjudicial action or proceeding to foreclose the Subordinate Mortgage.

**2.12** **Permitted Leasing; Assignment of and Compliance with Leases.** Notwithstanding Section 3.12 below, Borrower shall have the right to enter into Leases in the ordinary course of Borrower's business without Lender's prior written consent, provided that all of the following conditions are satisfied with respect to any such Lease or modification thereto: (a) the term of such Lease, including any extension or renewal options, does not exceed

8

a total of five (5) years; (b) the form used for such Lease represents a commercially reasonable lease form or has been approved in writing by Lender prior to Borrower's execution of the Lease; (c) such Lease is unconditionally subordinate to this Deed of Trust and contains an attornment provision consistent with Section 2.13 below; (d) no Event of Default has occurred and is continuing at the time of Borrower's execution of such Lease; (e) Borrower provides Lender with an accurate and complete copy of such Lease within ten (10) business days after such Lease is executed by Borrower; (f) Borrower does not collect rent for more than one (1) month in advance; and (g) Borrower does not in any other manner impair Lender's rights with respect to or interest in the Rents and Profits. Upon Lender's request, Borrower shall execute, acknowledge and deliver to Lender an absolute and unconditional assignment acceptable to Lender of all of Borrower's interest in all Leases and all guaranties of and security for the Tenants' respective obligations under the Leases. Borrower shall perform and discharge all obligations of the lessor under the Leases in accordance with the terms thereof and shall diligently enforce all remedies available to Borrower in a commercially reasonable manner in the event of a default by the Tenant under any Lease.

2.13    **Attornment at Lender's Option.** Each Tenant who enters into a Lease for the Property after the date of recordation of this Deed of Trust (each such Lease is referred to as a "Subordinate Lease") and who has not entered into a written non-disturbance and attornment agreement with Lender shall be deemed to have agreed to attorn to Lender and accept Lender as the landlord under its Lease on the terms of this Section. If Lender acquires title to the Property by judicial or nonjudicial foreclosure under this Deed of Trust or by deed in lieu of foreclosure under this Deed of Trust, Lender, at its option, shall have the right to require any or all Tenants under Subordinate Leases to attorn to and accept Lender as the landlord under such Tenant's Subordinate Lease (the "Attornment Option") by giving written notice to such Tenant within thirty (30) days after the date on which Lender acquires title to the Property (the "Acquisition Date"). If Lender exercises the Attornment Option with respect to any Subordinate Lease, such attornment shall be effective and self-operative as of the Acquisition Date without the execution of any further documents on the part of the Tenant, Lender, or any other party, and the Tenant under the Subordinate Lease shall be bound to Lender under all of the terms, covenants, and conditions of the Subordinate Lease for the remaining balance of the term thereof, with the same force and effect as if Lender were the landlord under such Lease. Whether or not Lender exercises its Attornment Option with respect to any Subordinate Lease, Lender (a) shall not be liable for any act or omission of any prior landlord under any Subordinate Lease, including Borrower; (b) shall not be subject to any offset, defense, or claim which any Tenant may have against any prior landlord under any Subordinate Lease, including Borrower; (c) shall not be obligated (i) to return any security deposit now or hereafter paid by any Tenant;
(ii) to return any prepaid rent or other amounts prepaid by any Tenant; or (iii) to grant any Tenant a credit for any such security deposit, prepaid rent or other prepaid amounts (excluding monthly rent and other charges which have not been prepaid for more than one month in advance), except to the extent, if any, that Lender has actually and unconditionally received such security deposit, prepaid rent or other prepaid amounts; and (d) shall not be obligated to complete the construction of any or all Improvements. Without limiting the terms of this Section, upon Lender's request, each Tenant under a Subordinate Lease shall execute and deliver to Lender any document which Lender determines to be necessary or appropriate to evidence such Tenant's attornment to Lender on the terms of this Section, including a new lease with Lender on the same terms and conditions as the Subordinate Lease for a term equal to the unexpired term of the Subordinate Lease. Nothing contained in this Section shall be deemed to obligate Lender to recognize any Subordinate Lease or accept an attornment by any Tenant upon Lender's acquisition of title to the Property. If Lender elects not to exercise the Attornment Option within the time period specified in this Section with respect to any Subordinate Lease, such Subordinate Lease and all of the rights, privileges and powers of the Tenant thereunder shall automatically terminate and shall be of no further force or effect from and after the Acquisition Date.

2.14    **No Liability by Lender.** Nothing contained in this Deed of Trust shall be deemed to obligate Lender to prosecute or enforce any or all of the Claims nor shall Lender have any liability or responsibility for any failure or delay by Lender in prosecuting or enforcing any or all of the Claims or to collect any or all of the Proceeds. Borrower shall at all times have the right to determine and follow its own policies and practices in the conduct of its business, subject to the terms and conditions of the Loan Documents.

2.15    **Application of Proceeds.** Lender, at its option, shall have the right (a) to apply any or all Proceeds received by Lender to any or all of the Obligations in such order and manner as Lender shall determine, whether or

9

not such Obligations are then due and payable and without regard to the adequacy or impairment of the security for the Obligations; (b) to release any or all of the Proceeds received by Lender for payment of the costs of repair or reconstruction of the Property on such terms and conditions as may be acceptable to Lender; or (c) to release any or all of the Proceeds received by Lender to Borrower on such terms and conditions as may be acceptable to Lender. To the extent it is determined that Lender has applied payments in any order prohibited by any Governmental Authority, Lender shall refund to Borrower any fees and/or interest associated with the misapplication of payments. Acceptance of such refund by Borrower shall be deemed sufficient remedy and Borrower will have no right to seek further claims or damages from Lender.

2.16    **Release of Proceeds for Reconstruction.** Without limiting the generality of Section 2.15 above, if Lender elects to release any Proceeds for repair or reconstruction of the Property, at Lender's option, such release shall be conditioned on Borrower's satisfaction of the following conditions within one hundred and twenty (120) days after the occurrence of the damage requiring the repair or reconstruction: (a) Borrower's deposit with Lender of such funds in addition to the Proceeds as Lender determines to be necessary to pay all direct and indirect costs relating to the repair or reconstruction of the Property; (b) the establishment of a procedure acceptable to Lender for Lender's disbursement of the Proceeds; (c) Lender's receipt and approval of final plans and specifications and a cost breakdown for the repair or reconstruction of the Property; (d) Lender's receipt and approval of (i) a general construction contract for the repair or reconstruction of the Property executed by Borrower and a contractor acceptable to Lender; and (ii) payment and performance bonds written on such general contractor issued by a surety acceptable to Lender; (e) evidence acceptable to Lender that (i) the repair and reconstruction of the Property can be completed and a final and unconditional certificate of occupancy for the Property can be issued not later than thirty (30) days before the maturity date of the Note; (ii) upon completion of the repair or reconstruction of the Property, the income from the Property will be sufficient to pay all Impositions, operating expenses of the Property and installment payments due in connection with the Loan; (iii) leases acceptable to Lender will be in effect or remain in effect upon completion of the repair or reconstruction of the Property; (iv) upon completion of the repair or reconstruction of the Property, the fair market value of the Property will be at least as great as it was prior to the date on which the damage or condemnation occurred as shown in an appraisal acceptable to Lender; (v) there has been no adverse change in the financial condition of Borrower or any Guarantors since the date of this Deed of Trust; and (vi) no Event of Default exists; and (f) such additional conditions as Lender may establish.

2.17    **Taxes and Impositions.** Borrower (a) shall pay all Taxes at least ten (10) days before delinquency; and (b) shall pay all other Impositions when due. Upon Lender's request, Borrower shall deliver to Lender receipts and such other substantiating documentation as may be required by Lender to evidence payment of all Impositions by Borrower in accordance with this Section.

2.18    **Absolute Assignment of Rents and Profits.**

(a)    **Absolute Assignment.** Borrower absolutely, irrevocably and unconditionally grants, transfers and assigns to Lender all Rents and Profits. Prior to the occurrence of an Event of Default, Borrower shall have a license to collect and retain on the terms of this Section 2.18 all Rents and Profits as they become due and payable. Upon the occurrence of an Event of Default, Borrower's license to collect the Rents and Profits shall automatically be revoked without notice to Borrower. Following such revocation, Lender shall be entitled to collect and retain all Rents and Profits, whether or not Lender has taken possession of the Property, and Borrower shall immediately pay, deliver or cause to be delivered to Lender any Rents and Profits then held or thereafter collected by Borrower. All Rents and Profits collected by or on behalf of Lender may be applied by Lender to the Obligations in such order and amounts as Lender may determine. If Lender elects to seek the appointment of a receiver following the occurrence of an Event of Default, Borrower irrevocably and unconditionally consents to the appointment of a receiver without regard to the adequacy of the security for any of the Obligations. Notwithstanding anything to the contrary contained in this Deed of Trust, the assignment of Rents and Profits contained in this Section is an absolute assignment and not an assignment as security. Neither the assignment of Rents and Profits contained in this Section nor any action taken by Lender to collect the Rents and Profits shall be deemed to make Lender a mortgagee-in-possession of the Property or shall be deemed to render Lender directly or indirectly liable or responsible for (i) the

10

use, control, condition, care, operation, occupancy, management, repair, or leasing of the Property; (ii) the production of Rents and Profits from the Property; or (iii) to the extent permitted under applicable law, the performance or observance of any or all of Borrower's duties, obligations, representations, or warranties under any Leases or other agreements relating to the Rents and Profits. Lender shall have no responsibility or liability of any kind for any failure or delay by Lender in enforcing any of the terms or conditions of this Section 2.18.

**(b)** **Applications of Rents and Profits Prior to Revocation of License.** Borrower shall apply the Rents and Profits to the payment of all reasonable and necessary operating costs and expenses of the Property, installment payments due in connection with the Loan, payment of Impositions, and a reasonable reserve for future reasonable and necessary expenses, repairs and replacements relating to the Property before using the Rents and Profits for any other purpose which does not directly benefit the Property.

**(c)** **Notices to Tenants.** Upon revocation of the license described in Section 2.18(a) above, Borrower irrevocably authorizes and directs all Tenants under the Leases to comply with any notice or demand by Lender for payment to Lender of any Rents and Profits or for the performance of any of the Tenant's other respective obligations under the Leases, regardless of any conflicting demand by Borrower or notice by Borrower to any Tenant that Lender's demand is invalid or wrongful. No Tenant shall have any duty to inquire as to whether any default by Borrower has occurred under the Loan Documents in connection with any notice or demand by Lender under this Section.

**2.19** **Request for Lender's Consent to Transfers.** All requests by Borrower for Lender's consent to transfers under Section 3.12 below (a) shall specifically describe the transaction with respect to which Lender's consent is requested; (b) shall be delivered to Lender not less than fifteen (15) days before Borrower proposes to take the action with respect to which Lender's consent is requested; and (c) shall be accompanied by complete and accurate copies of all documents relating to the transaction with respect to which Lender's consent is requested, including financial statements and other information regarding the proposed transferee. Borrower acknowledges and agrees that Lender's right to withhold its consent, in its sole and absolute discretion, to any or all of the events described in Section 3.12 below is based, in part, on the fact that Borrower's particular financial condition, credit history, character, experience, ability and expertise, as represented by Borrower to Lender, were material and important factors in Lender's decision to make the Loan, and that Lender will continue to rely on such matters to insure satisfactory compliance with the Loan Documents during the entire term of the Loan. If Lender, in its sole and absolute discretion, consents to any of the transfers described in Section 3.12 below, such consent shall not be deemed to release Borrower or any other Person liable for payment or performance of the Obligations, and Borrower and such Persons shall continue to remain liable for payment and performance of the Obligations in accordance with the terms of the Loan Documents, unless expressly released pursuant to a further written agreement signed by Lender.

**2.20** **Fixtures.** Notwithstanding Section 3.12 below, Borrower may from time to time replace any Fixtures constituting a part of the Property in the ordinary course of Borrower's business, provided that (a) the replacement property for such Fixtures is at least equivalent in value, character, and quality to the Fixtures being replaced; (b) Borrower has good and marketable title to such replacement property free and clear of all liens, claims, and interests other than the lien of this Deed of Trust; and (c) this Deed of Trust shall constitute a first lien on such replacement Property.

**2.21** **Notice of Certain Matters.** Borrower shall promptly notify Lender in writing of (i) any claim, demand, right, or Lien relating to the Property which may be adverse to the lien of this Deed of Trust; (ii) any material loss, depreciation, or adverse change in the value of the Property and any other occurrence which may materially and adversely affect Lender's lien on the Property; (iii) any material adverse change in Borrower's ability to perform any or all of the Obligations; (iv) any event or condition which constitutes an Event of Default; and (v) any dispute between Borrower and any Governmental Authority relating to the Property which may have a material adverse effect on the Property.

11

**2.22**     **Inspection.** Lender shall have the right at all reasonable times (a) upon reasonable prior written or telephonic notice (except that no such notice shall be required in the case of an emergency or any inspection limited to the public areas or common areas of the Property) to enter upon and inspect the Property, including any entry which Lender determines is necessary or appropriate in connection with enforcing or exercising any right, remedy or power available to or conferred on Lender under the Loan Documents; (b) to contact any Person to verify any information provided or disclosed by Borrower to Lender; and (c) to release such information regarding the Property, Borrower, or the Obligations as Lender may determine to be necessary or appropriate in connection with enforcing or exercising any right, remedy or power available to or conferred on Lender under the Loan Documents. Lender shall have no obligation or duty to inspect the Property, and all such inspections by Lender shall be for Lender's sole benefit and not for the benefit of Borrower or any other Person.

**2.23**     **Defense of Actions and Protection of Security by Borrower.** Borrower shall appear in and defend any action or proceeding commenced by any Person other than Lender which affects or which Lender determines may affect any or all of the following: (a) the Property; (b) the Insurance Claims, Condemnation Claims, or Property Claims; (c) Lender's, Trustee's or Borrower's respective rights and obligations under the Loan Documents; (d) the Obligations; or (e) any other transaction or matter which affects Lender by reason of its interest in the Property. Borrower shall promptly commence and diligently prosecute all actions and proceedings which are necessary or appropriate or which Lender determines may be necessary or appropriate to do any or all of the following:
(i) prevent any damage, destruction, or injury to the Property; (ii) enforce or recover upon the Insurance Claims, Condemnation Claims or Property Claims or collect the Insurance Proceeds, Condemnation Proceeds, or Property Proceeds; or (iii) to preserve, protect, maintain, and defend the Property and Lender's lien thereon.

**2.24**     **Enforcement of Covenants and Restrictions.** If any of the Covenants and Restrictions apply to Persons owning or occupying real property which is adjacent to or in the vicinity of the Property, Borrower shall diligently enforce the Covenants and Restrictions against such Persons if (a) such Persons have breached their obligations under the Covenants and Restrictions; and (b) such breach has not been cured by such Persons within ninety (90) days after a request by Lender to Borrower to enforce the Covenants and Restrictions.

**2.25**     **Further Assurances.** Upon Lender's request, Borrower shall execute, acknowledge and deliver to Lender such further documents and agreements and take such further actions as Lender may reasonably require from time to time to effectuate or carry out the purposes of the Loan Documents or to evidence, perfect, maintain, preserve or protect Lender's lien on the Property, including Borrower's execution of security agreements, assignments, financing statements, and continuation financing statements. Upon Lender's request, Borrower shall execute, acknowledge and deliver to Lender an assignment acceptable to Lender of such additional rights, privileges, Governmental Permits, and documents relating to the Property as Lender may reasonably determine to be necessary or appropriate in connection with the design, construction, improvement, development, use, ownership, operation, maintenance, repair or marketing of the Property.

## ARTICLE 3

## EVENTS OF DEFAULT

Lender, at its option, shall have the right to declare Borrower to be in default under this Deed of Trust and the other Loan Documents upon the occurrence of any or all of the following events:

**3.1**     **Payment of Note and Other Monetary Obligations Under Loan Documents.** If (a) an Event of Default occurs under the terms of the Note; or (b) Borrower fails perform any of its other obligations under the Loan Documents or under any other document with Lender requiring the payment of money to Lender or any third Person within ten (10) days after the date on which such indebtedness or monetary obligation is due.

**3.2**      **Performance of Non-Monetary Obligations Under Loan Documents.** If Borrower breaches or otherwise fails to perform any of its non-monetary obligations to Lender or any third Person under any of the Loan Documents or under any other document with Lender when due.

**3.3**      **Misrepresentation.** If any request, statement, information, certification, or representation, whether written or oral, submitted or made by Borrower to Lender in connection with the Loan is false or misleading in any material respect.

**3.4**      **Insolvency of Borrower.** If (a) a petition is filed by or against Borrower under the federal bankruptcy laws or any other applicable federal or state bankruptcy, insolvency or similar law; (b) a receiver, liquidator, trustee, custodian, sequestrator, or other similar official is appointed to take possession of Borrower or the Property, or Borrower consents to such appointment; (c) Borrower makes an assignment for the benefit of creditors; provided, however, that Borrower shall have thirty (30) days within which to cause any involuntary bankruptcy proceeding to be dismissed or the involuntary appointment of any receiver, liquidator, trustee, custodian, or sequestrator to be discharged. The cure provision contained in this Section shall be in lieu of, and not in addition to, any and all other cure provisions contained in the Loan Documents.

**3.5**      **Performance of Obligations to Senior Lien Holders or Third Persons.** If (i) Borrower fails to pay any of its indebtedness or to perform any of its obligations under any agreement between Borrower and any other Person who holds a Lien senior to this Deed of Trust when due; or (ii) Borrower fails to pay any of its indebtedness or to perform any of its obligations when due under any other material document between Borrower and any other Person.

**3.6**      **Attachment.** If all or any material part of the assets of Borrower or Guarantor are attached, seized, subjected to a writ or levied upon by any court process and Borrower fails to cause such attachment, seizure, writ or levy to be fully released or removed within sixty (60) days after the occurrence of such event. The cure provision contained in this Section shall be in lieu of, and not in addition to, any and all other cure periods contained in the Loan Documents.

**3.7**      **Injunctions.** If a court order is entered against Borrower enjoining the conduct of all or part of its business and Borrower fails to cause such injunction to be fully stayed, dissolved or removed within sixty (60) days after such order is entered. The cure provision contained in this Section shall be in lieu of, and not in addition to, any and all other cure periods contained in the Loan Documents.

**3.8**      **Dissolution.** The dissolution, liquidation, or termination of existence of Borrower or any of Borrower's General Partners or Managers.

**3.9**      **Impairment of Priority.** If (i) the priority of this Deed of Trust or Lender's security interest under any of the other agreements securing any or all of the Obligations is impaired for any reason; or (ii) the value of the Property has deteriorated, declined or depreciated as a result of any intentional tortious act or omission by Borrower.

**3.10**      **Condemnation.** If all or any material part of the Property is transferred to any Governmental Authority as a result of any condemnation proceeding or action with respect to all or any material part of the Property.

**3.11**      **Failure to Repair Casualty.** If there is an uninsured casualty with respect to the Property and Borrower (a) fails to commence repairs and reconstruction of the Property within ninety (90) days after such damage; or (b) thereafter fails to diligently prosecute such repairs and reconstruction to completion.

**3.12**      **Sales, Transfers and Further Encumbrances.** If any one of the following events occurs without Lender's prior written consent, which may be withheld in Lender's sole and absolute discretion:

13

(a)    the sale, conveyance, transfer, mortgage, encumbrance, lease (except for (i) the leasing of space in the Improvements which is permitted under Section 2.12 of this Deed of Trust and (ii) the conveyance or transfer of any part or any interest in the Property to a revocable family trust affiliated with Borrower, provided that such conveyance or transfer is solely for estate planning purposes), or alienation of all or any part of the Property or any interest in the Property, whether voluntary or involuntary, or Borrower's grant of any option or agreement to effect any such transaction.

(b)    if Borrower or any General Partner or Manager of Borrower is a partnership, the admission, withdrawal, retirement or removal of any General Partner of Borrower or any of Borrower's General Partners or Managers, or the sale or transfer of more than forty-nine percent (49%) of the beneficial interests in Borrower or any of Borrower's General Partners or Managers.

(c)    if Borrower or any General Partner or Manager of Borrower is a corporation, the sale or transfer of an aggregate of more than forty-nine percent (49%) of any class of stock in such corporation or the issuance by such corporation of additional stock to any Person who is not a shareholder in such corporation as of the date of this Deed of Trust.

(d)    if Borrower or any General Partner or Manager of Borrower is a limited liability company, the appointment, withdrawal, retirement or removal of any Manager of Borrower or any of Borrower's General Partners or Managers or the sale or transfer of more than forty-nine percent (49%) of the beneficial interests in Borrower or any of Borrower's General Partners or Managers.

(e)    if Borrower or any General Partner or Manager of Borrower is an individual, the death or incompetency of such Person, except where applicable law limits or prohibits Lender's declaration of a default based on such occurrences; provided, however, that Lender shall not declare an Event of Default to exist based solely on the death or mental incompetence of any individual Borrower, General Partner, or Manager if, within ninety (90) days after the occurrence of such event, a substitute is appointed, and Lender determines that the financial condition, credit history, character, experience, ability and expertise of such substitute is otherwise acceptable.

3.13    **Default by Guarantor.** If Guarantor fails to pay any of its indebtedness or perform any of its obligations under the Guaranty when due or the revocation, limitation or termination or attempted revocation, limitation or termination of any of the obligations of Guarantor under the Guaranty, except in accordance with the express written terms of the Guaranty.

3.14    **Misrepresentation by Guarantor.** If any request, statement, information, certification, or representation, whether written or oral, submitted or made by Guarantor to Lender in connection with the Loan or any other extension of credit by Lender to Borrower or such Guarantor is false or misleading in any material respect.

3.15    **Cross-Default.** If Borrower, or any Affiliated Borrower (as hereinafter defined), fails to pay any of its indebtedness or to perform any of its obligations as to any other loan or loans or any other obligation owed to Lender when due. As used in this Section, "Affiliated Borrower" means, any borrower (individual or entity) directly or indirectly controlling, controlled by, or under common control with, Borrower, and "control" means an ownership interest equal to or greater than 10% of the entity or the ability to direct the management or affairs of that entity, whether through ownership, by contract or otherwise.

14

## ARTICLE 4

## REMEDIES

Upon Lender's election to declare Borrower to be in default under this Deed of Trust and the other Loan Documents pursuant to Article 3 above, Borrower shall be deemed to be in default under this Deed of Trust and the other Loan Documents, and Lender shall have the following rights and remedies:

**4.1      Entry by Lender.** Lender shall have the right (a) to enter, take possession of, and manage, operate and lease the Property; (b) to take possession of any or all Books and Records; (c) to collect any or all Rents and Profits, whether or not Lender has taken possession of the Property; and (d) to take any or all actions which Lender determines to be necessary or appropriate in connection therewith or to preserve, protect, maintain and defend the Property and Lender's lien thereon, including (i) the exercise and enforcement of all of Borrower's rights under any or all of the Leases; (ii) the termination, acceptance of a surrender, modification or amendment of any or all of the Leases; (iii) the execution of new Leases on such terms and conditions as Lender determines to be appropriate; and (iv) the repair, alteration, improvement or completion of the Property in such manner and to such extent as Lender determines to be necessary or appropriate. If Lender elects to take possession of the Property or to take any or all of the other actions described in this Section by court process, Borrower irrevocably and unconditionally agrees that a receiver may be appointed by a court for such purpose pursuant to Section 4.5 below.

**4.2      Judicial Action.** Lender shall have the right to commence an action or proceeding to foreclose this Deed of Trust and to enforce any or all of the terms of the Loan Documents, including specific performance of the covenants of Borrower under this Deed of Trust.

**4.3      Foreclosure by Power of Sale.**

**(a)      Declaration and Notice of Default.** Lender shall have the right (i) to cause the Property to be sold under the power of sale contained in this Deed of Trust in any manner permitted by applicable law; and (ii) to deliver to Trustee a written declaration of default and demand for sale and a written notice of default and election to cause the Property to be sold, which notice the Trustee or Lender shall cause to be recorded as required by law. Upon the expiration of such period of time after the recordation of such notice of default and election to sell and the giving of such notice of sale as may then be required by law, and without the necessity of any demand on Borrower, Trustee, at the time and place specified in the notice of sale, shall sell the Property at public auction to the highest bidder for cash in U.S. Dollars payable at the time of sale. Lender or any obligee, creditor, or the holder or holders of the Note or Loan Documents may bid and purchase at such sale.

**(b)      Postponements; Multiple Parcels.** To the extent permitted by law, Trustee may, and upon request of Lender shall, from time to time, postpone any sale hereunder by public announcement at the time and place noticed for such sale or may, in its discretion, give a new notice of sale. If the Property consists of several lots, parcels or items of property, Lender shall have the exclusive right (i) to designate the order in which such lots, parcels or items shall be offered for sale or sold; and (ii) to elect to sell such lots, parcels or items through a single sale, through two or more successive sales, or in any other manner Lender determines to be in its best interest. Any Person, including Borrower, Trustee and Lender, may purchase at any sale under this Deed of Trust, and Lender shall have the right to purchase at any such sale by crediting upon the bid price the amount of all or any part of the Obligations. If Lender determines to sell the Property in more than one sale, Lender may, at its option, cause such sales of the Property to be conducted simultaneously or successively, on the same day or on such different days or times and in such order as Lender may determine, and no such sale shall terminate or otherwise affect the lien of this Deed of Trust on any part of the Property that has not been sold until all Obligations have been paid in full.

**(c)      Costs of Sale; Deed to Purchaser.** Borrower shall pay all costs, fees, and expenses of all sales of the Property under this Deed of Trust, including the costs, fees, and expenses (including attorneys' fees) of Trustee and Lender, together with interest thereon at the interest rate applicable to principal under the Note or, with

15

respect to Trustee, the maximum rate permitted by law to be charged by Trustee. Upon any sale under the power of sale contained in this Deed of Trust, Trustee shall execute and deliver to the purchaser or purchasers a deed or deeds conveying the property so sold, but without any covenant or warranty whatsoever, express or implied. The recitals in any such deed or deeds of any matter or facts, including the existence of any default by Borrower, the giving of notice of default and notice of sale, and other facts affecting the regularity or validity of such sale or sales, shall be conclusive proof of the truth of such facts and matters, and any such deed or deeds shall be conclusive against all Persons as to such facts and matters recited therein. A sale of less than all of the Property or any defective or irregular sale under this Deed of Trust shall not exhaust, impair or otherwise affect the power of sale contained in this Deed of Trust, and subsequent sales of the Property may be made under this Deed of Trust until all Obligations have been satisfied or until the entire Property has been sold without defect or irregularity. If Lender elects to cause the Property to be sold under the power of sale contained in this Deed of Trust, Lender shall deposit with the Trustee this Deed of Trust, the Note, and such receipts and evidence of such other Obligations as Trustee may reasonably require.

4.4     **Application of Sale Proceeds.** Trustee shall apply the proceeds of the sale or sales conducted by Trustee in the following order of priority: (a) first, to payment of all expenses of such sale or sales and all costs, expenses, fees, and liabilities of Trustee and this trust, including attorneys' fees, costs of a trustee's sale guaranty, costs of other evidence of title, and Trustee's fees in connection with such sale or sales; (b) second, to all amounts advanced or disbursed by Trustee or Lender under any of the terms of this Deed of Trust which have not then been repaid, together with interest thereon at the rate applicable to principal under the Note or, with respect to Trustee, the maximum rate permitted by law to be charged by Trustee; (c) third, to the payment of all other Obligations in such order and amounts as Lender determines; and (d) the remainder, if any, to the Person or Persons legally entitled thereto.

4.5     **Appointment of a Receiver.** Lender shall have the absolute and unconditional right to apply to any court having jurisdiction and obtain the appointment of a receiver or receivers of the Property, and Borrower irrevocably and unconditionally consents to such appointment and agrees that Lender shall have the right to obtain such appointment (a) without notice to Borrower or any other Person; (b) without regard to the value of the Property or any other collateral securing the Obligations; and (c) without acceleration of the Obligations or commencement of foreclosure proceedings under this Deed of Trust. Any such receiver or receivers shall have the usual powers and duties of receivers in similar cases and all powers and duties necessary or appropriate to exercise the rights of Lender as provided in this Deed of Trust.

4.6     **Protection of Lender's Security.** Lender or Trustee, without obligation to do so and without notice to or demand on Borrower, and without releasing Borrower from any of its Obligations or waiving Lender's rights under the Loan Documents, shall have the right to perform any Obligation which Borrower has breached in such manner, at such time, and to such extent as Lender or Trustee determines to be necessary or appropriate to preserve, protect, maintain and defend the Property and Lender's lien thereon.

4.7     **Assembly of Property.** Upon Lender's request, Borrower shall assemble and make available to Lender at the location of the Land all Property which has been removed from or which is not located on the Land.

4.8     **Rescission of Notice of Default.** Prior to the conduct of any sale under the power of sale contained in this Deed of Trust, Lender, at its option, shall have the right to rescind any notice of default and election to sell the Property by delivering to Trustee a written notice of rescission executed by Lender which, when recorded, shall cancel the foreclosure proceedings which have been commenced by the recordation of such notice of default and election to sell. Lender's rescission of any notice of default and election to sell pursuant to this Section or under applicable law shall not constitute or be construed as a waiver of any Event of Default or impair, prejudice or otherwise affect (a) Lender's right to record a new notice of default and election to sell the Property based on the same or any other Event of Default; or (b) Lender's rights and remedies in connection with the Obligations.

4.9     **Exercise of Rights Under Other Loan Documents and Laws.** Lender shall have the right to exercise any or all rights and remedies which Lender may have under any or all of the other Loan Documents and all

other applicable law, including without limitation the applicable Uniform Commercial Code as it relates to such personal property assets as are encumbered under this Agreement.

**4.10** **Continuing Recourse Liability.** Notwithstanding any contractual or statutory defense to, or prohibition of, (x) continuing liability on the Loan or the Note or the other Loan Documents or (y) liability for any deficiency remaining on the Loan, the Note and or any other Loan Document after foreclosure upon any item of Property (collectively "Deficiency Defense"), Borrower hereby agrees, to the extent not prohibited by applicable law, that:

**(a)** Borrower shall be continue to be liable for, and shall be subject to full recourse liability for, all amounts owed under the Loan, the Note or any other Loan Documents if any of the following conditions occur:

(i) in the event of (1) the commencement of a case by Borrower or against Borrower by any person or entity other than Lender or any person or entity affiliated with Lender under Title 11 of the United States Code (11 U.S.C. §§101, et seq.) or any successor statute (the "**Bankruptcy Code**") or under any other law governing any federal or state bankruptcy, insolvency, reorganization, or other similar proceeding (collectively, a "**Bankruptcy Proceeding**"), or (2) the consent of the Borrower to any Bankruptcy Proceeding; or (3) the failure of Borrower to oppose in good faith and to the maximum extent permitted by law of such involuntary Bankruptcy Proceeding; or (4) if any involuntary Proceeding is filed, the failure of Borrower to promptly stipulate to entry of an order granting Lender relief from the "automatic stay" under 11 U.S.C, 342 to proceed with a foreclosure of the Property, or (5) any collusion by Borrower with other creditors to cause, assist, or support such involuntary Bankruptcy Proceeding.

(ii) in the event that Guarantor joins or consents to any Bankruptcy Proceeding for Borrower or opposes any stipulation or motion seeking to grant Lender relief from the "automatic stay" under 11 U.S.C 342 to proceed with a foreclosure of the Property.

(iii) in the event that Borrower makes a transfer of any interest in the Borrower or in the Property or makes or allows to exist an encumbrance on the Property or on an interest in the Borrower, (1) that is not expressly permitted pursuant to the terms, conditions, and provisions of the Loan Documents and (2) without the prior express written approval of the Lender and (3) that is not cured within thirty (30) days after written notice from the Lender.

**(b)** Borrower shall be continue to be liable for, and shall be subject to full recourse liability for, all amounts owed under the Loan, the Note and the other Loan Documents minus any recovery the Lender is successful in collecting on any title insurance policy it holds in connection with the Property in the event that the Lender is prevented from acquiring title to the Property after the occurrence of an Event of Default) because of the failure of the Borrower's title to the Property under applicable federal, state, or local laws due to the commission of a criminal act by the Borrower or an affiliate of the Borrower as a result of which the applicable governmental entity is entitled to (under such applicable law) and does, take title to the Property.

**(c)** Borrower shall be continue to be liable for, and shall be subject to full recourse liability for, all damages and losses incurred by Lender directly or indirectly arising out of or relating to any of the following: (1) fraud or misrepresentation by Borrower in connection with or relating to the Loan; (2) waste or willful mismanagement by Borrower with respect to any or all of the Property; (3) the application by Borrower of the Loan proceeds in any manner or for any

17

purpose other than as specified in or required by the Loan Documents; (4) the removal or disposition by Borrower of any or all of the Property in violation of any of the terms of any of the Loan Documents; (5) any failure by Borrower to pay any Impositions in accordance with the Loan Documents, (6) the misapplication or misappropriation by Borrower of Insurance Proceeds (7) failure to deliver to Lender condemnation proceeds, insurance proceeds, or other proceeds of the Property or other similar proceeds, funds or payments, or other benefits of all or part of any collateral; (8) the misapplication or misappropriation of any Rents and Profits, prepaid rents, security deposits and similar sums paid to Borrower or any other Person in connection with any or all Leases of any part of the Property in violation of the terms of the Loan Documents; (9) recovery of amounts, damages, costs and expenses, including without limitation attorneys' fees, owing or payable to the Lender by Borrower relating to certain environmental matters or under any secured or unsecured indemnity agreement relating to Hazardous Substances executed by Borrower in connection with the Loan, including without limitation under (A) any Environmental Indemnity Agreement executed by Borrower in connection with the Loan; and (B) all terms of the Loan Documents which constitute "environmental provisions" under applicable law (including without limitation California Code of Civil Procedure Section 726.5 and 736, as such Section may be amended from time to time); respectively; and (10) all amounts owing to the Lender by Borrower under any other indemnification provision contained in the Loan Documents or with respect to claims asserted by any third Person against the Lender or liabilities incurred by the Lender with respect to any third Person, which claims or liabilities directly or indirectly result from or arise out of any act or omission of Borrower or from the occupancy or use of all or part of the Property by Borrower prior to Lender's acquisition of title to such Property.

     **(d)**     To the extent not prohibited by applicable law, Borrower hereby waives any and all rights and protections of the Deficiency Defenses.

## ARTICLE 5

## WARRANTIES AND REPRESENTATIONS

     **5.1**     **Warranties and Representations.** As a material inducement to Lender's extension of credit to Borrower in connection with the Loan, Borrower warrants and represents to Lender as follows:

     **(a)**     **Qualifications.** Borrower is qualified to do business in the jurisdiction in which the Property is located.

     **(b)**     **Litigation.** To the best of Borrower's knowledge, there are no actions, suits, proceedings or investigations pending or threatened against or affecting Borrower or the Property in any court or before any other Governmental Authorities that could reasonably be expected to have a material adverse effect on Borrower's ability to repay the Loan or on the value of the Property, nor does Borrower know of any basis for any such action, suit, proceeding or investigation.

     **(c)**     **Ownership.** Upon recordation of this Deed of Trust, Borrower will be the sole legal and beneficial owner of, and will have good and marketable title to, the Property and all other collateral which is the subject of the Loan Documents.

     **(d)**     **Liens.** To the best of Borrower's knowledge, there are no Liens, claims, encroachments, Covenants and Restrictions, Leases, Easements, or other rights affecting the Property which would not be disclosed by a customary search of the records relating to the Land of the county recorder for the county in which the Property

18

is located, except for such matters as have been specifically disclosed by Borrower to and approved in writing by Lender prior to the date of recordation of this Deed of Trust.

        (e)    **Condition**. Upon completion of the Project (as defined on the Construction Loan Rider attached hereto), the Property will be in good condition and repair without any material defects known to Borrower.

        (f)    **Property Compliance**. Upon completion of the Project, the Property will be in compliance with all Governmental Requirements in all material respects.

        (g)    **Borrower Compliance**. Borrower shall comply with all Governmental Requirements, except to the extent that failure to comply therewith would not have a material adverse effect on its ability to fulfill its Obligations or otherwise fully comply with the Loan Documents.

        (h)    **Damage**. Except for any damage to be repaired by the Project, the Property is free from material casualty or termite damage.

        (i)    **Condemnation**. To the best of Borrower's knowledge, there is no condemnation, zoning change, or other proceeding or action pending, threatened or contemplated by any Governmental Authority which would in any way affect the Property.

        (j)    **Commercial Loan**. Borrower represents and warrants that the proceeds of this loan will be used by Borrower only for business purposes. If Borrower is a natural person, Borrower represents and warrants that Borrower does not intend to, and will not, occupy or reside on the Property so long as the Loan remains outstanding. If Borrower is a legal entity, Borrower represents and warrants that no person affiliated with Borrower intends to or will occupy or reside on the Property so long as the Loan remains outstanding.

        (k)    **Arms-Length Transaction**. Borrower represents and warrants that Borrower is operating at arms-length with, and has no material interest in, all parties to the Loan transaction, including the seller(s), any assignor(s) of the purchase and sale agreement for the Property, any loan broker or real estate agent(s), settling agent(s), escrow and title companies, insurance agent(s) or companies, or others, except for any relationship Borrower has disclosed to Lender and which Lender has approved in writing.

    5.2    **Continuing Warranties and Representations**. The warranties and representations contained in this Article 5 shall be true and correct as of the date of recordation of this Deed of Trust, shall survive the closing of the Loan, and shall remain true and correct as of the date on which such warranties and representations are given.

## ARTICLE 6

### MISCELLANEOUS

    6.1    **Lender Statement; Certain Charges**. With respect to (a) any statement, accounting, or similar information requested by Borrower or any other Person; or (b) any other document furnished to Borrower or any other Person by Lender at Borrower's request, Lender shall have the right to charge the maximum amount then permitted by law or, if there is no such maximum, Lender's customary charge for providing such statement, accounting, or other information. Borrower shall pay Lender its customary charge for any other service rendered by Lender in connection with the Loan or the Property, including the issuance of a request for full or partial reconveyance of this Deed of Trust, transmitting Loan proceeds to an escrow holder and changing Lender's records relating to the Obligations.

    6.2    **Reconveyance**. Upon (a) Lender's written request stating that all Obligations secured by this Deed of Trust have been paid or performed in full; (b) surrender to Trustee of this Deed of Trust, the Note and all other documents evidencing the indebtedness secured by this Deed of Trust; and (c) payment of Trustee's fees and expenses of this trust, Trustee shall reconvey the Property then held under this Deed of Trust without warranty of any kind. The

19

recitals in the reconveyance of any matters or facts shall be conclusive proof of their truthfulness. The grantee in such reconveyance may be described as the "person or persons legally entitled thereto". Such reconveyance shall operate as a reassignment of the Rents and Profits assigned to Lender under this Deed of Trust. Unless Trustee is directed by Lender to retain such documents for a longer period of time, Trustee may destroy this Deed of Trust and the Note five (5) years after issuance of the full reconveyance; provided, however, that Trustee, in its sole discretion, may deliver this Deed of Trust and the Note after full reconveyance to the Person or Persons legally entitled thereto.

6.3 **Substitution of Trustee.** Lender, at its option, shall have the right from time to time to appoint a successor trustee to any trustee appointed under this Deed of Trust by Lender's execution and acknowledgment of a written instrument which is recorded in the office of the recorder of each county in which the Property is located. The recordation of such an instrument in accordance with this Section shall constitute conclusive proof of the proper substitution of a successor trustee under this Deed of Trust. Upon recordation of such an instrument, the successor trustee shall succeed to all the title, power and duties granted to the Trustee under this Deed of Trust and by applicable law without conveyance of the Property. Such instrument shall contain the name of the original Lender, Trustee and Borrower named in this Deed of Trust, the book and page or other recording information for this Deed of Trust, and the name and address of the successor trustee. If a notice of default has been recorded prior to the recordation of a substitution of trustee, the power of substitution shall not be exercised by Lender until the costs, fees and expenses of the acting trustee have been paid in full and the acting trustee has endorsed acknowledgment of receipt of such amounts on the instrument substituting the successor trustee. Without limiting the terms of this Section, Lender shall have the right from time to time to substitute a successor to any trustee appointed under this Deed of Trust in accordance with any statutory or other procedure allowed by law for such substitution.

6.4 **Execution of Instruments by Lender and Trustee.** Without notice to or affecting the liability of Borrower or any other Person for the payment or performance of the Obligations, without affecting the lien or priority of this Deed of Trust or Lender's rights and remedies under the Loan Documents, and without liability to Borrower or any other Person, Lender and Trustee (if Trustee is so requested in writing by Lender) shall have the right, at any time and from time to time, to do any one or more of the following: (a) reconvey any part of the Property; (b) consent in writing to the making of any map or plat relating to the Property; (c) join in or consent to the granting of any Easement affecting the Property; and (d) execute any extension agreement relating to any or all of the Obligations, any document subordinating the lien of this Deed of Trust to any other Lien or document, or any other document relating to the Property, Obligations, or Loan Documents.

6.5 **Trust Irrevocable; Acceptance by Trustee.** The trust created by this Deed of Trust is irrevocable by Borrower. Trustee accepts this trust when this Deed of Trust, duly executed and acknowledged, is recorded in the county in which the Property is located as provided by law. Trustee is not obligated to notify any party of a pending sale under any other deed of trust or of any action or proceeding in which Borrower, Lender or the Trustee shall be a party unless brought by the Trustee.

6.6 **Late Charges.** If any installment payment under the Note is not paid when due, Borrower shall pay any late charge provided for in the Note.

6.7 **Requests by Borrower for Approvals by Lender.** All requests by Borrower for Lender's consent to or approval of any transaction or matter requiring Lender's consent or approval under the Loan Documents (a) shall be made by Borrower in writing (inclusive of electronic delivery); (b) shall specifically describe the transaction or matter with respect to which Lender's consent or approval is requested; (c) shall be accompanied by such information and documentation as Lender may require in connection with such request; and (d) shall be delivered to Lender not less than fifteen (15) days before Borrower proposes to take the action or effect the transaction with respect to which Lender's consent or approval is requested, unless a different period of time is expressly provided for in the Loan Documents.

6.8 **Approvals by Lender.** Whenever (a) the terms of the Loan Documents grant Lender the right to consent to or approve any transaction or matter; (b) Lender is authorized or empowered under the Loan Documents to

make a determination with respect to any transaction or matter; or (c) the Loan Documents provide that any document or other item must be approved by or acceptable to Lender, then except as otherwise expressly provided in the Loan Documents, (i) Lender shall have the right to grant or withhold such approval or consent and make such determination in its sole and absolute discretion; and (ii) the form and substance of such document or other item must be satisfactory to Lender in its sole and absolute discretion. Whenever the terms of the Loan Documents require Lender's consent to or approval of any transaction, matter, or document, such consent or approval shall not be deemed to be effective unless it is set forth in a written instrument executed by Lender.

**6.9    Transfers by Borrower Without Lender's Consent; No Release of Borrower.** The following provisions shall apply if Borrower sells the Property to a third Person either (i) without Lender's consent; or (ii) with Lender's consent in a transaction in which Borrower is <u>not</u> released from liability under the Loan Documents:

**(a)    No Release of Borrower.** No such action by Borrower nor any assumption of any or all of the Obligations by any transferee of the Property ("Transferee") shall be deemed to release Borrower or any other Person, including Guarantor, from any liability under the terms of the Loan Documents, and Borrower and such Persons shall remain liable to Lender for the payment and performance of all of their respective obligations under the Loan Documents.

**(b)    Actions Without Borrower's Consent.** Borrower agrees that Lender may do any one or all of the following without notice to or the consent of Borrower and without affecting Lender's rights or remedies against Borrower: (i) accelerate, accept partial payment of, compromise, settle, renew, extend the time for payment or performance of, or refuse to enforce any of Borrower's Obligations to Lender under or in connection with this Deed of Trust or any of the other Loan Documents; (ii) grant any indulgence or forbearance to the Transferee or any other Person under or in connection with any or all of the Loan Documents; (iii) release, waive, substitute or add any or all collateral securing payment of any or all of the Obligations; (iv) release, substitute or add any one or more endorsers or guarantors of any or all of the Obligations; (v) amend, supplement, alter or change in any respect whatsoever any term or provision of the Loan Documents or any other agreement relating to the Obligations; and (vi) exercise any right or remedy with respect to the Obligations or any collateral securing the Obligations, notwithstanding any effect on or impairment of Borrower's subrogation, reimbursement or other rights against the Transferee.

**(c)    Waivers.** Borrower waives all rights which it may have (i) to require Lender to exhaust its rights and remedies against the Transferee, any other Person, or any collateral securing any or all of the Obligations before pursuing its rights and remedies against Borrower; (ii) to require Lender to exercise any right or power or to pursue any remedy which Lender may have under the Loan Documents or applicable law before pursuing its rights and remedies against Borrower; and (iii) to assert any defense to Lender's enforcement of its rights and remedies against Borrower based on an election of remedies by Lender or the manner in which Lender exercises any remedy which destroys, diminishes or interferes with any or all of Borrower's subrogation, reimbursement or other rights against the Transferee.

**6.10    Defense of Actions and Protection of Security by Lender.** Whether or not an Event of Default has occurred, Lender and Trustee shall each have the right, but not the obligation, to appear in and defend any action or proceeding, whether commenced by or against Borrower, any of the Guarantors, or any other Person, which affects or which Lender or Trustee determines may affect any or all of the following: (a) the Property; (b) the Insurance Claims, Condemnation Claims, or Property Claims; (c) Lender's, Trustee's, or Borrower's respective rights and obligations under the Loan Documents; (d) the Obligations; or (e) any other transaction or matter which affects Lender by reason of its interest in the Property. Lender and Trustee shall each have the right, but not the obligation, to commence and prosecute any action or proceeding which Lender or Trustee determines to be necessary or appropriate to do any or all of the following: (i) prevent any damage, destruction, or injury to the Property; (ii) enforce or recover upon the Insurance Claims, Condemnation Claims, or Property Claims or collect the Insurance Proceeds, Condemnation Proceeds, or Property Proceeds pursuant to this Deed of Trust; (iii) preserve, protect, maintain, and defend the Property and Lender's lien thereon; or (iv) enforce or exercise any right, remedy or power available to or conferred on Lender or Trustee under the Loan Documents or applicable law. Lender and Trustee shall each have the

21

right to discontinue, suspend or dismiss any such action or proceeding which has been commenced by Lender or Trustee at any time.

6.11 **Expenses.** Lender shall have the right to incur and pay all costs, fees, expenses, and liabilities that Lender determines to be necessary or appropriate in connection with any or all of the following matters (the "Reimbursable Costs"): (a) the exercise of any or all of Lender's rights and remedies under the Loan Documents, (b) the enforcement of any or all of the Obligations or any other obligation of any Person liable to Lender in connection with the Loan, whether or not any legal action or proceeding is commenced by Lender; (c) the preservation, protection, maintenance, or defense of the Property or Lender's lien thereon; (d) the sale or disposition of the Property or any other collateral securing any or all of the Obligations; (e) the defense of any action or proceeding commenced by Borrower or Guarantor; or (f) the commencement and prosecution of any action or proceeding by Lender or Trustee with respect to any or all of the matters described in this Section or in Section 6.10 above, including an action for relief from any stay, injunction, or similar order or enactment arising under any federal or state bankruptcy, insolvency or similar law. Without limiting the terms of this Section, Lender shall have the right to do any or all of the following in connection with any of the matters described in this Section, and all costs, fees, expenses, and liabilities incurred or paid in connection therewith shall constitute Reimbursable Costs: (1) select, retain, and consult with attorneys, accountants, appraisers, contractors, brokers, architects, engineers and such other experts, consultants, advisors and third Persons as Lender determines to be necessary or appropriate; (2) settle, purchase, compromise or pay any or all claims, demands, and Liens; and (3) obtain any trustee's sale guaranty or other title insurance coverage relating to the Property which Lender determines to be necessary or appropriate.

6.12 **Taxes Imposed on Lender**. If, after the date of this Deed of Trust, any Governmental Requirements are enacted for the purpose of taxing any lien on the Property or changing in any way the laws for the taxation of deeds of trust or debts secured by deeds of trust, so as to impose on Lender payment of all or part of any Taxes assessed against the Property, then prior to the due date of such Taxes, Borrower shall pay all such Taxes and agree to pay such Taxes when levied or assessed against the Property or Lender.

6.13 **Payment of Advances by Borrower**. All Reimbursable Costs and all other costs, fees, expenses and liabilities incurred or paid by Lender under any other provision of the Loan Documents or under applicable law in connection with the Obligations or the Property (a) shall be payable by Borrower to Lender on Lender's demand; (b) shall constitute additional indebtedness of Borrower to Lender; (c) shall be secured by this Deed of Trust; and (d) shall bear interest from the date of expenditure at the rate of interest applicable to principal under the Note. Nothing contained in this Deed of Trust shall be deemed to obligate Lender (i) to incur any costs, fees, expenses, or liabilities; (ii) to make any appearances in or defend any action or proceeding; or (iii) to commence or prosecute any action or proceeding relating to any matter.

6.14 **No Third Party Beneficiaries**. The Loan Documents are entered into for the sole protection and benefit of Lender, Borrower and Trustee and their respective permitted successors and assigns. No other Person shall have any rights or causes of action under the Loan Documents.

6.15 **Notices**. All notices and demands by Lender to Borrower under this Deed of Trust and the other Loan Documents shall be in writing and shall be effective on the earliest of (a) personal delivery to Borrower; (b) electronic delivery to Borrower addressed to Borrower at the e-mail address set forth in this Deed of Trust (c) two (2) days after deposit in first-class or certified United States mail, postage prepaid, addressed to Borrower at the address set forth in this Deed of Trust; and (d) one (1) business day after deposit with a reputable nationally recognized overnight delivery service, delivery charges prepaid, addressed to Borrower at the address set forth in this Deed of Trust; provided, however, that notwithstanding anything to the contrary contained in this Section, service of any notice of default or notice of sale provided or required by law shall, if mailed, be deemed effective on the date of mailing. All notices and demands by Borrower to Lender under this Deed of Trust shall be in writing and shall be effective on actual receipt by Lender at Lender's address set forth in this Deed of Trust; provided, however, that nonreceipt of any such notice or demand by Lender as a result of Lender's refusal to accept delivery or Lender's failure to notify Borrower of Lender's change of address shall be deemed receipt by Lender. Borrower's and Lender's respective

22

addresses set forth in this Deed of Trust may be changed by written notice given to the other party in accordance with this Section. If Borrower consists of more than one Person, service of any notice or demand on any one of such Persons by Lender shall be effective service on Borrower for all purposes.

**6.16    Performance of Covenants.** Borrower shall perform and comply with all of its obligations under this Deed of Trust at Borrower's sole cost and expense.

**6.17    Severability; Savings Clause.** If any provision of the Loan Documents shall be held by any court of competent jurisdiction to be unlawful, voidable, void, or unenforceable for any reason, such provision shall be deemed to be severable from and shall in no way affect the validity or enforceability of the remaining provisions of the Loan Documents. Notwithstanding anything to the contrary contained in the Note or any of the other Loan Documents, the interest and other amounts paid or agreed to be paid to the Lender in consideration of the Loan evidenced by the Note (such interest and other amounts are referred to collectively as "Interest") shall not exceed the maximum rate permitted under applicable usury laws. If, for any reason, the Interest exceeds the maximum rate permitted under applicable usury laws, then (a) all excess Interest amounts previously collected by the Lender shall be credited against the principal balance of the Note or, at the Lender's option, to any other principal indebtedness of Borrower to Lender arising out of the Loan evidenced by the Note; (b) if the Note and all such other indebtedness have been paid in full, such excess amounts shall be refunded by the Lender to Borrower; and (c) the provisions of the Note shall automatically be deemed to be reformed and the amount of Interest payable hereunder shall automatically be deemed to be reduced, without the execution of any further documents by Borrower or Lender, so as to provide for the payment of Interest in an amount equal to, but not exceeding, the maximum rate permitted under applicable usury laws. All consideration paid to Lender which constitutes Interest under applicable usury laws shall be amortized, prorated, allocated, or otherwise apportioned throughout the term of the Note so that, to the extent possible, the rate of interest on the principal amount of the Note does not exceed the maximum rate permitted under applicable usury laws.

**6.18    Interpretation.** Whenever the context of the Loan Documents reasonably requires, all words used in the singular shall be deemed to have been used in the plural, and the neuter gender shall be deemed to include the masculine and feminine gender, and vice versa. For purposes of this Deed of Trust, all references to the Property or Improvements shall be deemed to refer to all or any part of the Property or Improvements, respectively. The headings to sections of this Deed of Trust are for convenient reference only, and they do not in any way define or limit any of the terms of this Deed of Trust and shall not be used in interpreting this Deed of Trust.

**6.19    Time of the Essence.** Time is of the essence in the performance of each provision of the Loan Documents by Borrower.

**6.20    Amendments.** The Loan Documents (excluding the Guaranty) may be modified only by written agreement signed by Lender and Borrower.

**6.21    Entire Agreement.** The Loan Documents contain the entire agreement concerning the subject matter of the Loan Documents and supersede all prior and contemporaneous negotiations, agreements, statements, understandings, terms, conditions, representations and warranties, whether oral or written, between Lender and Borrower concerning the Loan which are the subject matter of the Loan Documents.

**6.22    No Waiver by Lender.** No waiver by Lender of any of its rights or remedies in connection with the Obligations or of any of the terms or conditions of the Loan Documents shall be effective unless such waiver is in writing and signed by Lender. Without limiting the generality of this Section, (a) no delay or omission by Lender in exercising any of its rights or remedies in connection with the Obligations shall constitute or be construed as a waiver of such rights or remedies; (b) no waiver by Lender of any default by Borrower under the Loan Documents or consent by Lender to any act or omission by Borrower shall constitute or be construed as a waiver of or consent to any other or subsequent default, act or omission by Borrower; (c) no acceptance by Lender of any late payment or late or defective performance of any of the Obligations by Borrower shall constitute a waiver by Lender of the right to require

23

prompt payment and performance strictly in accordance with the Loan Documents with respect to any other payment or performance of any of the Obligations; (d) no acceptance by Lender of any payment or performance following any notice of default which has been given or recorded by Lender shall constitute a waiver of Lender's right to proceed with the exercise of its remedies with respect to any Obligations which have not been paid or performed in full; (e) no acceptance by Lender of any partial payment or performance shall constitute a waiver by Lender of any of its rights or remedies relating to any Obligations which have not been paid or performed in full; and (f) no application of Rents and Profits, Insurance Proceeds, Condemnation Proceeds or Property Proceeds to any of the Obligations shall constitute or be construed as a waiver by Lender or cure of any Event of Default or impair, prejudice, invalidate or otherwise affect any action by Lender or Trustee in response to such default.

6.23    **Waivers by Borrower.** Borrower waives presentment, demand for payment, protest, notice of demand, dishonor, protest and non-payment, and all other notices and demands in connection with the delivery, acceptance, performance, default under, and enforcement of the Loan Documents. Borrower waives the right to assert any statute of limitations as a defense to the enforcement of any or all of the Loan Documents to the fullest extent permitted by law. Without limiting the generality of the immediately preceding sentence, in the event of Borrower's payment in partial satisfaction of any or all of the Obligations, Lender shall have the sole and exclusive right and authority to designate the portion of the Obligations that is to be satisfied.

6.24    **Waiver of Marshalling.** Borrower and all Persons holding a Lien affecting the Property who have actual or constructive notice of this Deed of Trust waive (a) all rights to require marshalling of assets or liens in the event of Lender's exercise of any of its rights and remedies under this Deed of Trust, including any judicial or nonjudicial foreclosure sale of the Property; (b) all rights to require Lender to exhaust its rights and remedies against any other collateral securing any or all of the Obligations before pursuing its rights and remedies under this Deed of Trust; and (c) all rights to require Lender to exercise any other right or power or to pursue any other remedy which Lender may have under any document or applicable law before pursuing its rights and remedies under this Deed of Trust.

6.25    **Waiver of Subrogation.** Borrower waives all rights to recover against Lender for any loss or damage incurred by Borrower from any cause which is insured under any of the Insurance Policies, except that the foregoing waiver of subrogation shall not be effective with respect to any Insurance Policy if the coverage under such policy would be materially reduced or impaired as a result of such waiver. Borrower shall use its best efforts to obtain Insurance Policies which permit the waiver of subrogation contained in this Section.

6.26    **Cumulative Remedies.** No right or remedy of Lender or Trustee under this Deed of Trust or the other Loan Documents shall be exclusive of any other right or remedy under the Loan Documents or to which Lender or Trustee may be entitled. Lender's rights and remedies under the Loan Documents are cumulative and in addition to all other rights and remedies which Lender may have under any other document with Borrower and under applicable law. Lender shall have the right to exercise any one or more of its rights and remedies in connection with the Obligations at Lender's option and in its sole and absolute discretion, without notice to Borrower or any other Person (except as otherwise expressly required by law or under the Loan Documents), and in such order as Lender may determine in its sole and absolute discretion. If Lender holds any collateral in addition to the Property for any of the Obligations, Lender, at its option, shall have the right to pursue its rights or remedies with respect to such other collateral either before, contemporaneously with, or after Lender's exercise of its rights or remedies with respect to the Property. Upon the occurrence of an Event of Default, Lender, at its option, shall have the right to offset against any debt or monies due from Lender to Borrower against all or part of the Obligations.

6.27    **Subrogation to Lien Rights.** If any or all of the proceeds of the Note are directly or indirectly used to pay any outstanding Lien against the Property, or if Lender pays or discharges any Lien pursuant to any of the terms of the Loan Documents or under applicable law, Lender shall be subrogated to all rights and liens held by the holder of such Lien, regardless of whether such Lien is reconveyed.

**6.28**    **Joint and Several Liability.** Each Person signing this Deed of Trust as Borrower shall be jointly and severally liable to Lender for the performance of Borrower's obligations under the Loan Documents. If Borrower consists of more than one Person, the occurrence of any Event of Default with respect to any one or more of such Persons shall constitute an Event of Default and entitle Lender to exercise its rights and remedies under Article 4 of this Deed of Trust.

**6.29**    **Sale of Loan Documents.** Lender shall have the right to do any or all of the following at any time without prior notice to or the consent of Borrower or any other Person: (a) to sell, transfer, pledge or assign any or all of Loan Documents, or any or all servicing rights with respect thereto; (b) to sell, transfer, pledge or assign participations in the Loan Documents ("**Participations**"); and (c) to issue mortgage pass-through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (the "**Securities**"). Lender is authorized to forward or disclose to each purchaser, transferee, pledgee, assignee, servicer, participant, or investor in such Participations or Securities (collectively, the "**Investor**") or any Rating Agency rating such Securities, each prospective Investor, and any organization maintaining databases on the underwriting and performance of commercial mortgage loans, all documents and information which Lender now has or may hereafter acquire relating to the Loan and to Borrower or any Guarantor as Lender determines to be necessary or desirable. Upon Lender's request, Borrower shall reasonably cooperate with Lender in connection with any of the transactions contemplated by this Section. Notwithstanding anything to the contrary contained in this Deed of Trust or any of the other Loan Documents, from and after the date of any sale, transfer or assignment of the Note and other Loan Documents by Lender or upon any realization of a pledge by a pledgee, the cross-default provision contained in Section 3.15 of this Deed of Trust shall terminate and shall be of no further force or effect.

**6.30**    **Applicable Law; Jurisdiction; Venue.** The Loan Documents shall be governed by and construed under the laws of the state of California (without giving effect to any state's conflict of law principles), except that the exercise of remedies against the Property shall be governed by the laws of the state in which the Property is located. All payments made pursuant to the Loan Documents are to be made to the Lender in California in which state the last act occurred to make the Note effective between the parties. Borrower agrees that the courts of the State of California and Federal District Courts located in San Francisco County, California, shall have exclusive jurisdiction and venue of any action or proceeding directly or indirectly arising out of or related to the negotiation, execution, delivery, performance, breach, enforcement or interpretation of the Loan Documents (except for foreclosure proceedings, which shall proceed in the state in which the Property is located and according to the laws of that state), regardless of how any claim, counterclaim or defense in any such action or proceeding is characterized. Borrower irrevocably consents to the personal jurisdiction and venue of such courts, and to the service of process in the manner provided for the giving of notices in this Deed of Trust. Borrower waives all objections to such jurisdiction and venue, including all objections that are based upon inconvenience or the nature of the forum.

**6.31**    **Successors.** Subject to the restrictions contained in the Loan Documents, the Loan Documents shall be binding upon and inure to the benefit of Lender and Borrower and their respective permitted successors and assigns.

**6.32**    **Power of Attorney.** Borrower irrevocably appoints Lender, with full power of substitution, as Borrower's attorney-in-fact, coupled with an interest, with full power, in Lender's own name or in the name of Borrower to take any or all of the actions specified in Article 4 above with respect to the Property. Lender shall have the right to exercise the power of attorney granted in this Section directly or to delegate all or part of such power to one or more agents of Lender. Nothing contained in this Deed of Trust shall be construed to obligate Lender to act on behalf of Borrower as attorney-in-fact.

**6.33**    **Indemnification.** Borrower shall indemnify and hold Lender and its officers, directors, agents, employees, representatives, shareholders, affiliates, successors and assigns (collectively, the "Indemnified Parties") harmless from and against any and all claims, demands, damages, liabilities, actions, causes of action, suits, costs, and expenses, including attorneys' fees and costs, arising directly or indirectly out of or relating to any or all of the following: (a) Borrower's breach of any of its Obligations or warranties under the Loan Documents; (b) any act or

omission by Borrower; (c) any act or omission by a contractor, architect or any other Person providing labor, services, materials or equipment in connection with the design, construction, improvement, development, use, ownership, operation, maintenance, repair or marketing of the Property; (d) Borrower's use and occupancy of the Property or any other activity or thing allowed or suffered by Borrower to be done on or about the Property; (e) any claims for commissions, finder's fees or brokerage fees arising out of the Loan or the transactions contemplated by the Loan Documents; and (f) Lender's exercise of any or all of Lender's rights or remedies under the Loan Documents in accordance with the terms thereof, except in the case of negligence or intentional tortious conduct of such Indemnified Party which such Indemnified Party is determined by the final judgment of a court of competent jurisdiction to have committed.

      6.34     **State Specific Provisions.** State specific provisions are outlined on <u>Exhibit B</u> (if applicable), attached hereto and incorporated herein.

IN WITNESS WHEREOF, Borrower has caused this Deed of Trust to be executed as of the day and year first written above.

<u>BORROWER</u>:  RAD Diversified REIT, Inc., A Maryland Corporation

_____

By: Brandon Mendenhall, Chief Executive Officer

_____

NOTE: ALL FOREGOING SIGNATURES ON THIS INSTRUMENT MUST BE NOTARIZED

26

**CONSTRUCTION LOAN RIDER
TO SECURITY INSTRUMENT
(Principal Advances)**

This Construction Loan Rider B to Security Instrument (the "**Rider**") is attached to and made a part of the Deed of Trust, Mortgage, or Security Deed (the "**Security Instrument**", and together with the Rider, the "**Agreement**") including an Assignment of Rents, and Fixture Filing dated 06-13-2023 _____ executed by:

RAD Diversified REIT, Inc., A Maryland Corporation _____ ("**Borrower**"), for the benefit of **Kiavi Funding, Inc.**, a Delaware corporation ("**Lender**"), and encumbering the property described in the Security Instrument. Capitalized terms used in this Rider without definition have the meanings ascribed to them in the Security Instrument and/or Note.

WHEREAS, Borrower desires to finance the construction of certain improvements to the Property and Borrower and Lender desire to establish certain terms and conditions relating to the advance of proceeds of the Construction Loan for such construction.

WHEREAS, all references to the word "Loan" in the Security Instrument should include this Construction Loan.

NOW, THEREFORE, for valuable consideration, the Security Instrument is hereby amended and supplemented as follows:

## I.    CHANGE IN DEFINED TERMS:

1.    The words "the reserve advance" in paragraph (1) of the definition of "Obligations" on page two of the Security Instrument are hereby replaced by the words "any advance," and the word "Reserve" is hereby deleted from the parenthetical at the end of said paragraph.

2.    The defined term "Reserve Advance" in clause (ii) of the penultimate sentence of Section 2.4 of the Security Instrument is hereby replaced by the defined term "Advance".

## II.    CONSTRUCTION PROVISIONS:

The following Article 7 is hereby added to the Security Instrument:

## ARTICLE 7

## CONSTRUCTION PROVISIONS

**7.1 Additional Definitions**. For purposes of this Security Instrument, the following terms shall have the following definitions:

(a) **Account**. "Account" means a construction loan account used to deposit additional funds provided by Borrower, if applicable.

1

(b) **Additional Advance(s)**. "Additional Advance(s) means all advances made as provided hereunder following the Initial Advance.

(c) **Approved Sale Costs**. "Approved Sale Costs" means:

(1) Any actual brokerage fees payable to an unaffiliated third party in an amount not to exceed three percent (3%) of the Gross Retail Sales Proceeds of the Property which has been pre-approved by Lender in writing unless otherwise agreed by Lender in writing; plus

(2) Reasonable escrow, closing, recording, loan payoff; plus

(3) Appraisal fees.

(d) **Architect**. "Architect" means any architect who provides or provided materials to Contractor and/or the Borrower relative to the Project.

(e) **Budget**. "Budget" means the amounts set forth in Exhibit B-1 to be disbursed according to the timetable and dates set forth therein.

(f) **Business Day**. "Business Day" shall mean a day other than a Saturday, Sunday or a day on which commercial banks are traditionally authorized or required by Law to close.

(g) **Completion Date**. "Completion Date" means either: (i) three hundred sixty (360) days after the Initial Advance if the Loan has an original twelve (12) month term and seven hundred twenty (720) days after the Initial Advance if the Loan has an original twenty-four (24) month term, subject to extension as may be agreed to by Lender in its discretion in writing or (ii) at Lender's option, the dates set forth in the Work Schedule.

(h) **Contract Price**. "Contract Price" means total cost of construction project.

(i) **Contractor**. "Contractor" means the general contractor or contractors who have been retained by Borrower to construct the Project and approved by Lender. As used herein, and if so approved by Lender in its sole discretion, "Contractor" may be (or include) Borrower.

(j) **Construction Account.** "Construction Account" means the bank account maintained by Borrower from which Loan payments shall be debited and to which Advances may be deposited by Lender.

(k) **Construction Contract**. "Construction Contract" means the general construction contract or contracts between Borrower and the Contractor, which have been submitted to and approved by Lender including without limitation, any Infrastructure Contract.

(l) **Construction Loan**. "Construction Loan" means the total amount of the Additional Advances made under this Agreement, including the principal sum identified in Schedule A to the Note plus all other sums due under the Note and under this Agreement.

(m) **Construction Project.** "Construction Project" means the work of improvement to be undertaken by the Borrower with respect to the Property, as described in the Scope of Work, and, unless otherwise agreed by Lender in writing, with respect to which all necessary zoning, mapping, sub-division, utilities, site clearing, street, sidewalk and drainage installations and other horizontal site improvements required by Lender have been completed prior to the date of the Loan.

(n) **Determined Value**. "Determined Value" means the value of the remaining

2

Property as determined by Lender in its reasonable discretion.

(o) **Gross Appraised Value**. "Gross Appraised Value" means the gross fair market value of the Property remaining subject to the liens of the Security Instrument as of a particular date as determined by Lender based upon an appraisal conducted by a licensed MAI appraiser not older than sixty (60) days.

(p) **Gross Retail Sale Proceeds**. "Gross Retail Sale Proceeds" means the gross cash proceeds plus the fair market value in cash of any non-cash consideration, resulting from the sale of a Property (including any personal property therewith) to a bona fide, unaffiliated third party, in immediately available funds. Cash equal to the fair market value of any non-cash consideration shall be paid by Borrower to lender concurrently with the closing of the sale of any applicable Property.

(q) **Improvements**. "Improvements" are the improvements made to a residence or new construction of a residence.

(r) **Infrastructure Contract**. "Infrastructure Contract" means any contract for Infrastructure Improvements for the Property.

(s) **Infrastructure Improvements**. "Infrastructure Improvements" means any and all streets, storm drains, sewers and other improvements required by any governmental agency to be constructed as a condition to construction, sale and occupancy of any residence on the Property as more particularly described in the Plans and Specifications, together with any rough grading of home sites.

(t) **Infrastructure Plans**. "Infrastructure Plans" means any and all Plans and Specifications relating to Infrastructure Improvements.

(u) **Law**. "Law" shall mean any applicable Federal, state, or local law or laws (including common law), constitution, statute, treaty, convention, regulation, rule, ordinance, order, injunction, writ, decree or award of any Governmental Authority.

(v) **Loan to Value**. "Loan to Value" shall be determined by Lender by taking (i) the sum of: the outstanding principal balance of the Loan plus (ii) the remaining costs to complete the Improvements; and dividing the total by the Determined Value.

(w) **Net Sale Proceeds**. "Net Sales Proceeds" means the Gross Retail Sale Proceeds for the Property less applicable Approved Sale Costs for such Property.

(x) **Plans and Specifications**. "Plans and Specifications" are any and all plans and, maps, surveys, drawings, specifications, or lists of materials approved by Lender including without limitation any Infrastructure Plans, as any of them may be from time to time hereafter changed, amended, modified, and/or otherwise supplemented.

(y) **Project**. "Project" means the improvements that Borrower proposes to construct on the Land as described in the Scope of Work.

(z) **Property**. "Property" means the particular single family residence which is encumbered by this Security Instrument.

(aa) **Scope of Work**. "Scope of Work" means the documents (including without

3

limitation the final Plans and Specifications for the Project, describing in reasonable detail the improvements to be performed and/or construction on the Land that have been submitted to Lender on or around the date of the loan application, and subsequently approved by Lender.

(bb) **Utility Services**. "Utility Services" means all utility services commonly provided for residential property in the area where the Property is located, including without limitation, gas, sewer, water, electrical, and telephone.

(cc) **Work**. "Work" means labor performed and materials furnished by Contractor.

(dd) **Work Schedule**. "Work Schedule" means the work schedule and any line item Budget approved by Lender.

**7.2 Advances of Construction Loan Proceeds**. Subject to the terms, conditions, and provisions of the Note, Security Instrument, Contract, and this Agreement, and provided no Event of Default (or potential Event of Default which with notice and/or passage of time would become an Event of Default) has occurred and is continuing under the same, Lender agrees to advance the Construction Loan proceeds to Borrower's Construction Account at any time during the period from the date of recordation of this Security Instrument up to but not including the Advance Termination Date (as defined in Schedule A of the Note) in the aggregate principal amount not to exceed at any time the amount of the Construction Loan under the terms and conditions set forth below; provided, however, that, except as otherwise set forth in Section 7.9, such disbursement of the Construction Loan shall not occur until (1) Borrower successfully submits to Lender a Request for Advance (as defined below); (2) Borrower submits to Lender any other documents Lender may require; and (3) Borrower complies with all requirements set forth in this Section 7.2 (the "**Advance**"). All Advances made by the Lender for financing construction of the Improvements shall be charged against the Note, shall bear interest on said amount as provided in the Note from the date of advance, and shall become a part of the indebtedness as additional unpaid principal balance of the Construction Loan from the date of Advance. If the funds to be advanced under the Loan, together with the funds in the Account, appear to Lender at any time to be insufficient to complete the Improvements in accordance with the Plans and Specifications, Borrower agrees to promptly deposit in an Account with Lender (the "**Account**") funds to cover the insufficiency. Any excess funds will, at Borrower's option, be refunded to Borrower or credited against any completion costs.

(a) **Use of Construction Loan Proceeds**. All Construction Loan proceeds received by Borrower shall be held in trust and shall be applied solely for the purposes for which such proceeds have been advanced under the Loan Documents. Lender shall have no obligation to monitor or verify the use or application of any Construction Loan proceeds advanced by Lender. Borrower understands that if amounts properly owing are not actually paid, subcontractors, artisans, laborers, or materialmen may file liens against the Property. Borrower understands that Borrower has selected Contractor, and thereby agrees to assume all risks in the event Contractor fails to pay for all labor and material furnished, or otherwise fails to perform under the Contract. Notwithstanding the foregoing, Borrower shall not use any portion of the Construction Loan proceeds to make any payment on the Loan or on any other outstanding loan(s) from or serviced by Lender.

(b) **Request for Advance**. The proceeds of the Construction Loan and any funds held in the Account shall be advanced at such times as Borrower has successfully submitted, on any Business Day, a request that the Lender make such Advance, by delivery to the Lender of an executed request for advance ("**Request for Advance**"), which shall be satisfactory to Lender in form and substance, not later than 12:00 PM NOON (Eastern Standard Time) at least five (5)

4

Business Days prior to the proposed Business Day of said Advance. The amount of each such Advance shall be for reimbursement for the items identified in the draw request as previously paid by Borrower, as approved by Lender. At any time, Lender shall have the right to request any other documentation as it may deem necessary to accompany the Request for Advance. The Request for Advance shall be fully completed and executed, and shall specify (i) the borrowing date (which shall be a Business Day) in respect to the Advance and (ii) the amount of the proposed borrowing. From time to time during the course of construction of the Project and upon Lender's request, Borrower shall, or shall cause its Contractor (if any) to, submit to Lender an itemized statement (the "**Itemized Statement**") showing the cost of those items of labor, services, materials, and equipment that have been performed on or incorporated in, or delivered to the Project together with, if applicable, the pro rata portion of any contractor's fee, overhead, or general conditions attributable to such labor, services, materials, and equipment. Each Itemized Statement (i) shall be satisfactory to Lender in form and substance; (ii) shall be stated on a standard AIA payment request form or other form approved by Lender and shall be only with respect to work actually done and materials actually incorporated into the Improvements; (iii) shall be signed and certified as being true and correct by Borrower; (iv) shall be signed and certified as being true and correct by the contractor who was responsible for completing the work identified in the Itemized Statement; (v) shall be accompanied by a true and correct copy of the bills and itemized receipts and invoices setting forth in reasonable detail the labor, services, materials, and equipment used or performed which are the subject of the Itemized Statement (collectively, the "**Invoices**"); (vi) shall be accompanied by the names of all parties who have been paid by Borrower, the payment of which will be reimbursed to Borrower in whole or in part with the proceeds of such Itemized Statement (the "**Claimants**"); (vii) shall be accompanied by photographic evidence substantiating the work performed; (viii) at Lender's request, shall be accompanied by recorded video evidence substantiating the work performed; (ix) shall be accompanied by a lien waiver and release in form and substance satisfactory to Lender upon progress payment in the form required by the laws of the state in which the Property is located executed by each Claimant; and (x) shall be accompanied by such title insurance endorsements or other information as may be required by Lender to insure the first priority of this Security Instrument insofar as it secures such advance as provided in Sections 7.2(d)(2) and (e)(3) below. All of the items and documentation required to accompany each Advance Request shall be considered a part of such Advance Request. For each Advance Request submitted to Lender, Borrower shall pay to Lender an administrative fee; provided that Lender shall have no obligation to approve any Advance Request or Itemized Statement that does not comply with this Section.

(c) **Advances**. Upon Borrower's successful submission of an Advance Request, Lender shall advance funds directly to Borrower's Account, at Lender's option, on such borrowing date for reimbursement of the amount(s) shown in the Advance Request, which amounts were paid by the Borrower for the purposes of completing the Project. Notwithstanding anything in the foregoing, Lender shall not have any obligation to advance any funds if the work performed is outside the scope of the Scope of Work. If, at the time any such draw request is made, Lender determines in its sole discretion that there are insufficient funds remaining to be advanced to complete the Improvements in accordance with the Contract, Lender shall have no obligation to advance funds hereunder until such time as Borrower has deposited sufficient funds into the Account which, when added to the remaining funds to be advanced, are sufficient in the opinion of Lender to complete said Improvements in accordance with the Contract.

(d) **Initial Advance**. As a condition precedent to the initial advance of funds for the construction of the Improvements, and in addition to the requirements for all additional advances, all of the following conditions shall have been satisfied, which satisfaction shall be determined solely by Lender:

5

(1) **Documentation**. Borrower shall have delivered the following documents to Lender:

[A] This Agreement fully executed and acknowledged;

[B] A copy of the recordable Warranty Deed (if applicable) conveying the Property to Borrower;

[C] The original executed Note and any applicable Allonge;

[D] A fully executed and acknowledged Security Instrument and applicable Riders covering the Property and all Improvements thereon, whether now existing or hereafter constructed;

[E] Satisfactory evidence that a notice of commencement (if required by applicable law), has been properly executed, recorded and posted at the Property or will be recorded and posted promptly following acquisition of the Property by Borrower; and

[F] Any other documentation required by Lender.

(2) **Mortgagee Title Policy**. Borrower shall furnish to Lender, at Borrower's expense, an acceptable ALTA Lender's Policy of Title Insurance ("**Mortgagee Title Policy**") insuring that the lien created by the Security Instrument constitutes a valid first lien on the Property. Such policy shall, in form and substance, be acceptable to Lender, and contain only the Lender-approved exceptions. Such policy must evidence that all due and payable real estate taxes, including subsequent assessments for prior years due to change in land usage or ownership, have been paid in full. At the completion of construction, Borrower shall be responsible for the cost of any endorsements or additional title coverage necessary to satisfy Lender.

(3) **Contract and Work Schedule**. Borrower shall have furnished to Lender, in form and content acceptable to Lender, (i) the Contract executed between Contractor and Borrower; (ii) any contract or other agreement between any Architect and the Contractor and/or the Borrower relative to the Project; (iii) the Work Schedule and budget prepared for the project; and (iv) the names, addresses and telephone numbers of all subcontractors, artisans, laborers and materialmen with whom Borrower or Contractor has contracted or intends to contract for the construction of the Improvements.

(4) **Plans and Specifications**. Borrower shall have furnished to Lender two final sets of the Plans and Specifications for the Improvements and any modifications thereof with, if required, the appropriate governmental approval, which shall be reviewed and approved by Lender. Furthermore, Borrower shall provide such additional sets of the Plans and Specifications as may be required by any Governmental Authorities.

(5) **Soil Test**. If requested to do so by Lender, Borrower shall furnish to Lender a copy of all fault line maps and soil and subsoil test reports for the Property prepared by a registered engineer qualified to do soil testing and acceptable to Lender.

(6) **Building Permit**. Borrower shall have furnished to Lender building permits and all other necessary approvals, with respect to the Improvements, including approval from any appropriate environmental agency, issued by the appropriate Governmental Authority. Borrower shall provide Lender with satisfactory evidence that all Plans and Specifications for

6

construction of the Improvements have been approved by all governmental units having jurisdiction and, if applicable, by the appropriate homeowners association or architectural review committee, and that construction shall comply with applicable zoning, building, use and occupancy codes, and restrictions. Borrower represents and warrants to Lender that all utility services and facilities necessary for the construction and use of the Improvements are unconditionally available to the Property and any costs associated therewith are included in the Contract Price.

(7) **Survey**. Where applicable, Borrower agrees to furnish Lender a survey, prepared by a registered surveyor or engineer acceptable to Lender, which survey shall show that the foundation will comply with the minimum slab level regulations promulgated by the Federal Housing Administration and the regulations of the municipality in which the Property is located. If the Property contains existing improvements, a current survey made and certified by a registered public surveyor or professional engineer in a form acceptable to Lender, which survey will include a flood stamp, shall be furnished to Lender. Additionally, Borrower agrees to furnish a final survey upon completion of the Improvements.

(8) **Contractor's Warranties**. If required by Lender, Borrower must furnish evidence to Lender that Contractor is approved by an association acceptable to Lender for the issuance of a homeowner's warranty.

(9) **Insurance**. Borrower or Contractor shall have obtained or cause to have been obtained from an insurance company acceptable to Lender, builder's all risk extended coverage insurance against loss or damage, which coverage in no event shall be less than the expected value of the structures upon completion of the Improvements. Such insurance policy shall name the Lender as a "loss-payee" as its interest may appear, and shall contain a non-contributory mortgagee clause. Borrower or Contractor shall furnish Lender with a certificate that such insurance is in full force and effect, Borrower or Contractor shall also furnish a general or public liability insurance policy and evidence of Contractor's workers compensation insurance in accordance with applicable state law requirements. Each such policy shall be in an amount and form and issued by an insurer acceptable to Lender. Each such policy shall provide that Lender receive written notice thirty (30) days prior to cancellation of said policy, and shall be otherwise satisfactory in content to Lender. The originals of such policies shall be deposited with Lender, or in lieu thereof, certified copies of the original policies along with original certificates of insurance coverage. In case of loss, Lender, at its option, shall be entitled to receive and retain the proceeds of the insurance policies, applying the proceeds to the balance of the Note, and the balance of such proceeds, if any, shall be paid to Borrower.

(10) **Flood Insurance**. Lender shall have been provided with evidence, satisfactory to Lender that the Property is not situated in an area designated by the Federal Emergency Management Agency as being located in a special flood hazard area or Borrower shall provide flood insurance from an insurer acceptable to Lender and in form and amount satisfactory to Lender.

(11) **Infrastructure Arrangements**. To the extent that any governmental agency shall require posting of security to permit construction of any Infrastructure Improvements, Borrower shall provide evidence to Lender prior to commencement of construction that sufficient security has been posted.

(12) **Entitlements**. The Property shall have all necessary approvals, consents and entitlements from all appropriate agencies to complete all Improvements as provided in the Plans and Specifications and to obtain a certificate of occupancy for each Property.

(e) **Additional Advances**. Each advance is subject to the satisfaction, at the option

7

of and as determined solely by Lender, of each of the following conditions listed in this Section 7.2(e) at the time of such advance. Lender reserves the right to make advances which are allocated to any of the designated items in the approved Work Schedule for such other purposes or in such different proportions as Lender may, in its sole discretion, deem necessary or advisable. Borrower or Contractor may not reallocate items of cost or change the approved Work Schedule without the prior written consent of Lender. In the absence of a Work Schedule, Lender shall make advances in its sole discretion. Borrower agrees to fulfill each of these conditions, and to furnish to Lender such evidence of compliance therewith as Lender may require:

(1) **Foundation Survey**. A foundation survey, if required by Lender, showing no encroachments of the Improvements on any boundary line, or easement, setback line or other restricted area shall have been furnished to Lender within ten (10) days after laying of the foundation of the Improvements. If applicable, the foundation survey will refer to the basement.

(2) **No Casualty**. No fire or other casualty has occurred which could reasonably be expected to make it impossible for the Improvements to be completed by the Completion Date. There have been no notifications from any municipal authority of any potential fire or environmental hazard.

(3) **Title Insurance Endorsement**. If requested by Lender, Borrower will furnish to Lender, at the expense of Borrower, a title insurance policy endorsement insuring the lien of the Security Instrument to be a valid first lien, containing only such exclusions and exceptions as Lender may approve, issued by a title insurance company satisfactory to Lender, current to the date of the advance and covering that advance and all prior advances.

(4) **Contract in Force**. The Contract shall be in full force and free from default; all amounts then payable for labor and materials with respect to construction of Improvements have been or will be paid with the requested advance; that Lender has been informed in writing as to whether or not Borrower and Contractor have been served with any written notice or otherwise informed that a lien will be claimed for any amounts unpaid for materials furnished or labor performed by any person, firm, or corporation furnishing materials or performing labor of any kind entering into the construction of any of the Improvements, and that a copy of any such notice is thereto attached to the written notice.

(5) **Sworn Statements**. Lender has been furnished with sworn statements by Contractor, any Architect, and Borrower as specially requested to do so by Lender, specifying as follows:

[A] The Contract between Contractor and Borrower is in full force and free from default, and the names, and the amounts due as well as the amounts already paid or to be paid contemporaneously with the requested advance to each contractor, subcontractor, artisans, laborers and materialmen or other person or entity furnishing materials or performing work entering into the construction of any improvements are accurate.

[B] The stage of completion of construction and overall cost of construction theretofore incurred, and that no material changes from the Plans and Specifications have been made.

[C] The estimated overall cost of completing the Improvements, to be in such form and with such supporting details as Lender shall

8

require, including (without limitation) certification by Contractor of the estimated cost of completing construction, demonstrating to the satisfaction of Lender that the amount to be subsequently advanced will be sufficient to pay the remaining overall cost of completing construction.

[D] That all Work performed to the date of the advance in question has been performed in a good and workmanlike manner pursuant to the provisions of the Contract and in conformance with the Plans and Specifications and any manufacturer requirements. That all construction has been performed in strict compliance with all applicable ordinances, statutes, regulations, and subdivision requirements or restrictions.

[E] That no default exists under the Note, the Security Instrument, the Contract, or this Agreement, and that no event has occurred which, with the giving of notice, or otherwise, would constitute an event of default under said Note, Security Instrument, Contract, or this Agreement. Any advance made by Lender prior to the fulfillment by Borrower of any requirements made by Lender, or of any condition precedent set forth in this Agreement, shall not be deemed a waiver of Lender's right to have such requirement or condition precedent fulfilled prior to advancing future Loan proceeds. Lender may, but shall not be obligated to, advance an amount that exceeds the face amount of the Note.

[F] That there are no liens or encumbrances against said Property other than the liens created by the Security Instrument or those otherwise approved by Lender.

(f) **Final Draw**. Notwithstanding anything herein to the contrary and unless Lender agrees otherwise, (i) for a Construction Project, the final Request for Advance (the "**Final Request for Advance**") shall be for an advance in an amount equal to or greater than 10% of the original principal amount of the Construction Loan and (ii) for all other Projects, the Final Request for Advance amount shall be at least 25% of the original principal amount of the Construction Loan.

(g) **Borrower Certification**. With respect to each Request for Advance that Borrower submits, Borrower shall be deemed conclusively to have certified to Lender that (i) the items of labor, services, materials, and equipment shown in the Request for Advance have been performed on, supplied to, or installed in the Project in conformance with the Scope of Work and all Governmental Permits; (ii) the costs of labor, services, materials, and equipment shown in the Request for Advance are commercially reasonable, and (iii) all funds advanced to or for the benefit of Borrower by Lender in connection with the Request for Advance shall be in reimbursement of the cost of those items of labor, services, materials, and equipment shown in the Request for Advance. Borrower shall be deemed to have made the certification described in this Section 7.2(g) with respect to each Request for Advance received by Lender, notwithstanding Borrower's failure to sign such Request for Advance. Each Request for Advance shall be deemed a reaffirmation of each representation and warranty provided in this Agreement and as representation and warranty by Borrower that no event of default exists under this Agreement.

(h) **Reliance by Lender**. Lender may conclusively presume that all Itemized Statements, Request for Advance, statements, information, certifications, and representations,

9

whether written, oral or electronic, submitted or made by Borrower, Contractor, or any of the other parties involved in the Project, or any of their respective agents, to Lender in connection with the Construction Loan are true and correct, and Lender shall be entitled to rely thereon, without investigation or inquiry of any kind by Lender, in advancing the Construction Loan proceeds and taking or refraining from taking any other action in connection with the Construction Loan.

(i) **[Reserved]**.

(j) **No Default**. To receive disbursement of any Construction Loan proceeds, Borrower must not be in default under the Loan Documents or under any monthly payment grace period for this Loan or any other loan made or serviced by Lender. If an Event of Default has occurred, all obligations on the part of Lender to make any further advances hereunder or under the Security Instrument shall, at Lender's election, cease and all amounts previously advanced shall, at the option of Lender, become due and payable under the terms of the Note.

(k) **Records**. All financial records of Borrower and of Contractor shall be prepared and maintained in accordance with Generally Accepted Accounting Principles (GAAP).

(l) **Set Aside Letters**. Borrower may request that Lender issue letters ("**Set Aside Letters**") to any governmental agency or any bonding company whereby Lender agrees with such third party to allocate Loan proceeds for the construction of off-site, common area or other improvements for which bonds may be required in connection with the development of the Property. Lender may agree to issue such Set Aside Letters on such terms and conditions as it may impose. Lender's consent to issue one Set Aside Letter shall not obligate it to issue any other Set Aside Letter.

(m) **Pledge and Assignment**. As additional security for Borrower's performance under the Loan Documents, Borrower hereby irrevocably grants Lender a security interest and assigns to Lender all present and future Account which contains any proceeds of the Loan or Net Sale Proceeds from the sale of any Property.

**7.3 Construction Covenants**. Borrower covenants and agrees to comply with each of the following terms and conditions:

(a) **Approval of Scope of Work, Permits and Notices**. Borrower shall deliver to Lender for Lender's approval complete and accurate copies of the following documents upon Borrower's receipt thereof: (i) Scope of Work and any material modifications thereto; (ii) the Construction Contracts and any material modifications thereto; (iii) Governmental Permits related to the Project; (iv) and all material notices, requests, and demands received by Borrower from any Governmental Authority, architect, contractor, subcontractor or engineer related to the Project.

(b) **Commencement of Construction**. After recordation of this Security Instrument and Lender's approval of the Scope of Work and other documents described in Section 7.3(a) herein, Borrower shall commence any site preparation work or construction of the Project and shall thereafter diligently prosecute construction in a good and workmanlike manner in accordance with the Scope of Work. For the avoidance of doubt, Borrower shall not commence any construction activity prior to the date of recordation of this Security Instrument which may result in any mechanic's lien or similar lien gaining priority over the lien of this Security Instrument, unless arrangements acceptable to Lender have been made by Borrower for the issuance of a title insurance policy to Lender which satisfies the requirements of this Security Instrument.

(c) **Completion of Construction**. Borrower shall complete construction of the

Project on or before the Completion Date. For purposes of this Agreement, the Work shall be deemed completed on the day the Property is ready for occupancy, subject only to the completion of the usual punch list items. Prior to the advance of funds upon completion of the Improvements, Borrower agrees, where deemed applicable by Lender:

(1) To deliver an acceptable final survey which would allow the title insurer to remove the survey exceptions from the Mortgagee Title Policy;

(2) To deliver an appraiser's final inspection;

(3) To deliver a hazard insurance policy, acceptable to Lender and, if applicable, flood insurance application reflecting the correct property address;

(4) To pay any funds due under the Note, Construction Loan, Security Instrument and/or this Agreement;

(5) To file a completion affidavit, or the statutory equivalent, in a form acceptable to Lender, of record in the county where the Property is located;

(6) To pay any escrow impounds required by Lender for appropriate taxes, insurance, mortgage insurance and homeowners association dues;

(7) To obtain an affidavit from Contractor which affirmatively states that all subcontractors, artisans, laborers, or materialmen have been paid in full;

(8) To obtain any further documentation required by Lender; and

(9) To execute, acknowledge and deliver to Lender any documentation deemed necessary by Lender.

The Improvements shall not be considered complete unless and until: (i) all the work requiring inspection by any homeowners association or similar entity, municipal or other governmental authorities having jurisdiction has been duly inspected and approved by such entities or authorities and all requisite certificates of occupancy and other approvals have been duly issued; and provided, further, that satisfactory evidence shall have been presented to Lender showing payment in full of all obligations incurred in connection with construction of the Improvements, and waiver of all liens in conjunction with such obligations and (ii) all Utility Services for the Project have been completed and are in full operation.

(d) **Notice of Completion**. Lender may from time to time request Borrower to sign and record a notice of completion for the Project in the office of the county recorder for the county in which the Property is located as soon as permitted under applicable law. Upon Lender's request, Borrower (i) shall sign and record a notice of cessation of labor and such other similar notices or documents as Lender may reasonably require to protect its interest in connection with the Construction Loan; and (ii) shall provide Lender with a copy of all notices recorded pursuant to this Section 7.3(d).

(e) **Substitution of Contractor**. In the event that Borrower and Contractor agree to release Contractor from its obligation under the Contract and substitute a different Contractor, Borrower agrees to execute and acknowledge, and to obtain Contractor's execution and acknowledgment, if required by Lender, of a recordable document evidencing the substitution and the continuing validity of all liens arising from the Work and benefiting Lender. Lender's consent is a condition precedent for any substitution of contractor.

11

(f) **Approval of Changes to the Construction**. Borrower agrees and understands that, with respect to the construction of the Improvements, no modification, deletion, addition, and/or amendment to the Contract or Plans and Specifications subsequent to the execution of this Agreement, may be made without the prior written approval of Lender. If any change order is proposed by the parties, the Plans and Specifications shall be amended, and a modified set shall be submitted to Lender. Any such proposed change order shall be subject to Lender's approval, which approval may be withheld in its sole discretion. Borrower agrees to be responsible to Lender for Lender's fees and costs in connection with such review.

**7.4 Inspection.** Lender shall have the right at all times to enter upon and inspect the Property, or designate an agent to do the same, and to contact any Person supplying labor, materials, services, or equipment to the Property to verify information disclosed by Borrower or the Contractor to Lender, to obtain information relating to the Property, or for any other purpose relating to the Construction Loan, and Borrower authorizes each such Person to provide such information to Lender. NOTHING, INCLUDING, WITHOUT LIMITATION, APPROVAL OF ANY PLANS AND SPECIFICATIONS OR WORK, ANY DISBURSEMENT HEREUNDER OR THE DEPOSIT OR ACCEPTANCE OF ANY DOCUMENT OR INSTRUMENT, SHALL BE CONSTRUED AS A REPRESENTATION, WARRANTY, OR WAIVER, EXPRESS OR IMPLIED, AS TO KIND, QUALITY, VALUE, MARKETABILITY OR FITNESS FOR ANY PURPOSE OF THE IMPROVEMENTS, ON LENDER'S PART.

**7.5 Right to Stop Work, Complete or Secure.**

(a) **Right to Stop Work**. If Lender determines that any portion of the Project does not conform in any material respect to the Scope of Work or the requirements of the Loan Documents, Lender shall have the right (a) to require Borrower and the Contractor to stop work on such portion of the Project and to correct the non-conforming matter as soon as reasonably practicable; and (b) to withhold any or all further advances relating to such portion of the Project until the matter has been corrected. No such action by Lender shall affect Borrower's obligation to complete the Project on or before the Completion Date. Borrower, at its expense, shall take all actions which may be reasonably necessary to correct any non-conforming matter within the time period reasonably specified by Lender or, if no time period is specified, as soon as reasonably practicable.

(b) **Right to Complete**. Borrower agrees that, if construction of the Improvements is delayed or suspended for a period in excess of fifteen (15) days, or if Contractor fails to supply workmen and materials which are satisfactory to Lender at any time during the progress of the construction, or if Contractor or any other persons engaged in such construction or any part thereof refuses, omits or neglects to supply a quantity of material or workmen necessary to complete the Work within the required time period, or if Borrower shall be in default with respect to any provision hereof, or any provision of the instruments referenced in this Agreement, Lender may (but is not obligated) and is hereby authorized, in its sole discretion, upon five (5) days written notice to Borrower, to proceed with the Improvements..

(c) **Right to Secure**. If construction is delayed or suspended, Lender, in Lender's sole discretion, and without notice to Borrower or Contractor, may take such steps as Lender deems reasonable to secure the Property and Improvements from the elements, intruders or other hazards. Any costs so incurred shall be at Borrower's expense, Lender may act hereunder by itself, or through any agent, representative or contractor. All disbursements by Lender shall be considered advances made by Lender to Borrower under the provisions of this Agreement and the Note.

(d) **Right of Access**. For the purposes specified above, Lender, and any persons authorized or employed by it, are expressly authorized to enter into and upon said Property and

12

Improvements and take charge thereof, together with all materials, equipment and other personal property thereon and: (i) to proceed with the construction of said Improvements, or to require Borrower and Contractor to complete construction, with any such changes, alterations, additions or modifications as may be deemed necessary or expedient by Lender, and to do whatever Lender may, in its sole discretion, deem necessary to insure furtherance or completion of the construction and (ii) to proceed to secure the Property and Improvements..

7.6 **Lien Claims; Stop Notices**. Borrower shall promptly pay and discharge all claims and liens for labor, services, materials and equipment furnished in connection with the development of the Property, including without limitation mechanics liens. Lender shall have the right to withhold Construction Loan proceeds pursuant to any stop notice or bonded stop notice that is served on Lender in connection with the Construction Loan. Within ten (10) days after service of any such stop notice on Lender or the recordation of any mechanic's lien or other similar lien against the Property, Borrower (a) shall cause the claim evidenced by the stop notice or lien to be paid in full out of Borrower's own funds and not out of the Construction Loan proceeds and thereby cause such stop notice or lien to be released and discharged; (b) shall deliver to Lender or record, as appropriate, a surety bond complying with all applicable Governmental Requirements which is sufficient to release such stop notice or lien; or (c) shall make such other arrangements as may be acceptable to Lender for the payment of the claim evidenced by the stop notice or lien and the protection of Lender and the Property from the effect of the stop notice or lien.

7.7 **Additional Events of Default**. In addition to the Events of Default specified in Article 3 of the Security Instrument, the following also constitute additional Events of Default: (i) if the Contractor does not proceed diligently and continuously with an adequate supply of labor and materials to construct and complete the Improvements, except for a period of not more than fifteen (15) days (or of such greater length of time as the Lender may agree to in writing in any given case); (ii) if any statement, representation, or warranty contained herein or in any certificate or other instrument at any time delivered to Lender pursuant to this Agreement shall be untrue in any material respect at the time such statement, representation, or warranty was made or (iii) for any Construction Project if, by the date which is one hundred and eighty (180) days from the date hereof, Borrower fails to obtain any permits or other governmental approvals necessary to allow improvement of the Property consistent the Scope of Work, or the governmental authority responsible for the issuance of any such permit or approval has formally declined to issue any necessary permit or approval.

7.8 **Additional Remedies of Lender**.

(a) In addition to the remedies provided in Article 4, upon the occurrence of an Event of Default, Lender, at its option (and whether or not it exercises any other rights hereunder), may thereupon or at any time thereafter (i) take possession of the Property, together with all materials, equipment, and Improvements thereon, whether or not affixed to the Property; (ii) perform any and all Work and labor and purchase any and all materials necessary to complete the Improvements substantially according to the Plans and Specifications and to equip the same; and (iii) incur and pay such other costs and expenses as are reasonably connected with any of the foregoing. The authorization granted hereby shall be deemed irrevocably vested in Lender for the purpose of protecting Lender's security interest in the Property and shall constitute a power coupled with an interest, and may not be revoked by Borrower or interfered with by Contractor, In no event shall such remedies taken by Lender generate any right or claim to compensation by Contractor, Lender has any rights and/or remedies given to Lender in the Note, Security Instrument, or any other document executed in connection with the Loan, and any remedy at law or in equity under the laws of the state where the Property is located.

13

(b) All costs and expenses paid or incurred by the Lender pursuant to the foregoing Section 7.8(a) shall be deemed to be advanced to Borrower and shall be a part of the indebtedness evidenced by the Note and secured by the Security Instrument. At the option of Lender, such sums may be deducted from any advance thereafter becoming due.

(c) Nothing herein contained shall be deemed to waive any right given to Lender pursuant to the applicable law relating to Contractor's, subcontractors, artisan's and materialman's liens.

**7.9 Use of Funds by Lender.** Lender or its escrow agent may at any time without the consent of Borrower or Contractor, pay bills and continue the construction pursuant to this Agreement in accordance with the Plans and Specifications on file with Lender, using for such purposes such sums as may be available in the Account or such additional funds as may be otherwise advanced by Lender (but not in excess of the maximum principal amount secured by this Security Instrument under applicable Law); provided, however, that nothing herein shall in any way be construed to obligate Lender to pay bills or to complete the Work. No use of such funds by the Lender shall generate any right or claim to compensation by Contractor. Any use of funds by Lender pursuant to this Section 7.9 shall be deemed an Advance for all purposes under this Agreement and the Note.

**7.10 Costs to be Paid by Borrower.** Borrower will pay Lender for all expenses contemplated in this Agreement of any kind which may be incurred by Lender in connection with this transaction, and Lender may deduct from any advance to be made hereunder any amount necessary for the payment of any unpaid interest owing to Lender hereunder or any fees and expenses of or relating to the examination of the title to the Property, surveys, appraisals, re-appraisals, inspection fees, recording fees, wire transfer fees, architect's fees, attorney fees and legal expenses incurred in the enforcement by Lender of any of the provisions contained in this Agreement, and any other amounts necessary for the payment of the costs of said Improvements, whether incurred by an escrow agent or by Lender, and all sums so deducted or applied shall be deemed advances under this Agreement. In addition, Lender has the option, but not the obligation, to pay or discharge any lien or claim upon the Property and to pay any delinquent tax or assessment thereon, and upon such payment, Lender shall be subrogated to the rights of the holder of such lien or claim or the rights of the taxing authority. Lender may also advance any unpaid insurance premiums and obtain and maintain insurance not provided by Borrower or Contractor. Borrower hereby expressly agrees to pay Lender, upon demand, any and all disbursements made under this Agreement, together with interest thereon at the rate stated in the Note, from the date each disbursement is made, and Borrower agrees that all such disbursements shall become a part of the indebtedness represented by the Note.

**7.11 Indemnification.** In addition to the indemnification provisions in Section 6.30 of the Security Instrument, Borrower herein indemnifies and agrees to hold Lender harmless from any and all liability or claims or causes of action arising from any applicable statute or regulation, which Lender may at any time be subject to arising from any interest of Lender in the Property related to the Loan. Borrower and Contractor or any other interested parties indemnify and shall hold Lender, its agents and attorneys harmless from any and all actions, claims, demands, damages, costs, expenses, and other liabilities, including without limitation attorney's fees, that any such parties may incur or that in any way relate to or arise out of the construction of the Improvements, including without limitation those arising out of the negligence of Lender. Borrower indemnifies and shall hold Lender harmless for any losses or damages incurred as a result of any delay in construction including without limitation the estimated reasonable rental value of the completed Improvements during the period of delay in completion which Lender would have recovered following any foreclosure.

14

**7.12 Compliance with Applicable Laws**. Borrower shall at all times comply with and keep in effect all Governmental Permits. Borrower shall at all times cause the Property to comply with (a) all Governmental Requirements; (b) all requirements and orders of all judicial authorities which have jurisdiction over the Property; and (c) all covenants, conditions, restrictions and other matters of record affecting the Property.

**7.13 Additional Insurance**. In addition to the insurance requirements set forth in Section 2.3 of this Security Instrument, Borrower at its expense shall at all times maintain in full force builder's all-risk insurance covering the Project and all materials stored on the Property, together with such endorsements as Lender may require, including vandalism, malicious mischief, earthquake, and flood coverage, and such other types of insurance as may from time to time be required by Lender.

**7.14 Cooperation**. Borrower shall at all times cooperate with Lender in order to ensure that the Property is developed in accordance with the requirements of the Loan Documents. Upon Lender's request, Borrower (a) shall execute such further documents and instruments and perform such further acts as may be required by Lender to carry out the terms and conditions of the Loan Documents; and (b) shall assign to Lender as additional collateral for the Construction Loan such further rights, privileges, permits, licenses, approvals, contracts, agreements, reports, and other documents relating to the Property as Lender may require.

**7.15 No Duty to Inspect**. Lender shall have no obligation to supervise or inspect the Project or to examine any of Borrower's or Contractor's books and records relating to the Property. All such inspections and examinations by Lender, including Lender's review and approval of the Scope of Work or Construction Contract shall be for Lender's sole benefit and not for the benefit of Borrower. No inspection of the Project by Lender shall constitute or be construed as a representation or determination by Lender that the Project complies with the Scope of Work or that the Project is or will be free from defective work or materials.

**7.16 No Liability of Lender**. Borrower shall have the sole responsibility for all aspects of Borrower's business and the development of the Property, including (a) the quality, suitability and adequacy of the Scope of Work; (b) the inspection and supervision of construction of the Project; (c) the qualifications, financial condition and performance of all architects, engineers, contractors, subcontractors, material suppliers, consultants, sureties, bonding companies, property managers and other Persons supplying labor, materials, services, or equipment to the Property; (d) the accuracy of all applications for advances of the Construction Loan proceeds; (e) the proper application of all Construction Loan advances; (f) the suitability, adequacy, enforceability, and validity of the Construction Contracts; (g) the conformance of the Project with the Scope of Work and the existence or non-existence of any defective work or materials in the Project; and (h) the legitimacy of any party making a Request for Advance on Borrower or Contractor's behalf. Borrower agrees that Lender shall not be directly or indirectly liable or responsible in any way or under any circumstances to Borrower or any other Person for any or all of the matters described in parts (a) through (h) of this Section 7.16, and Lender owes no duty of care to protect Borrower against negligent, faulty, inadequate or defective workmanship or materials in connection with the construction of the Project.

**7.17 Third Parties**. This Agreement is made for the sole protection and benefit of Borrower and Lender, and no other person shall be deemed to have any privity of contract hereunder nor any right of action of any kind hereon. Borrower agrees that, without the written consent of Lender, Borrower will not assign this Agreement or any interest herein, or assign or issue an order on Lender for any advances or any part thereof, and that any such purported assignment or order shall be hull and void, and Lender shall not be obligated to recognize, accept, or fulfill any such assignment or order.

15

**7.18 Environmental**. Borrower or Contractor have made such inspections of the Property as each deems reasonable and necessary, regarding the presence of hazardous waste or other toxic substances in or on the Property. Borrower warrants and represents to Lender that it is not aware of any presence of any hazardous waste or toxic substance in or on the Property, whether in containers or otherwise, any storage medium or facilities for hazardous waste or other toxic substances in or on the Property, or the use of any part of the Property for processing or storage of any hazardous waste or other toxic substance. There is excepted from this provision such matters as may pertain to normal residential utility service to the Property.

**7.19 Relationship of Parties.** Nothing contained in the Loan Documents or the transactions contemplated by the Loan Documents shall (a) constitute or be construed as the formation of a partnership or joint venture between Lender and Borrower or any Person; or (b) constitute or be construed as the creation of any confidential or fiduciary relationship of any kind between Lender and Borrower or any other Person; or (c) result in Lender being deemed to be a manager, controlling person, or other business associate or participant of any kind in the conduct of Borrower's business or affairs, including the design, construction, improvement, development, use, ownership, operation, maintenance, repair or marketing of the Property.

**7.20 Power-of-Attorney**. In addition to the Power of Attorney provided in Section 6.32, Borrower does hereby irrevocably constitute and appoint Lender to be Borrower's true and lawful attorney-in-fact, and in Borrower's name to sign any and all releases, waivers, substitution of contractor documentation, and all draw requests for the advances to be made hereunder as Lender may, in its sole discretion, deem necessary and proper to secure the continuance and completion of said Improvements according to the terms hereof, and to pay all sums necessary for expenses in connection therewith, all of which disbursements and sums shall be considered advances made by Lender to Borrower under the provisions of this Agreement and the Note. Lender may make such payments without regard to any requirements otherwise in this Agreement or the Contract for draw requests or other instruments to be signed by any party. Borrower does hereby also irrevocably authorize and empower Lender to do and perform for Borrower and in Borrower's name, place and stead all actions which Lender may in its judgment deem necessary and proper to be done to effect the construction of said Improvements, including but not limited to the execution and recording of any notice or other instrument which Lender may in its sole discretion deem necessary to protect its interest or security. Further, Lender has the option but not the obligation to commence, appear in or defend any action or proceeding which may affect the Property. The Powers-of-Attorney contained herein shall be a power coupled with an interest.

[the remainder of this page intentionally left blank]

16

IN WITNESS WHEREOF, Borrower has caused this instrument to be executed as of the date indicated on the Security Instrument.

__BORROWER:__ RAD Diversified REIT, Inc., A Maryland Corporation

_____
Signature

By: Brandon Mendenhall, Chief Executive Officer

_____
Signature

17

## DEED OF TRUST

## EXHIBIT "B"

## STATE SPECIFIC PROVISIONS - TX

**NOTICE: THIS INSTRUMENT SECURES, INTER ALIA, OBLIGATORY FUTURE ADVANCES. ALL SUCH OBLIGATORY FUTURE ADVANCES SHALL HAVE THE SAME LIEN PRIORITY AS IF MADE ON THE DATE HEREOF (SEE THE DEED OF TRUST FOR PARTICULARS).**

**Section 6.34.1    Inconsistencies.** In the event of any inconsistencies between the terms and conditions of this Section 6.34 and the other provisions of this Deed of Trust, the terms and conditions of this Section 6.34 shall control and be binding.

**Section 6.34.2    Obligations.** "Obligations" shall also mean payment and performance of Borrower's indebtedness and obligations under the Note and this Deed of Trust and all restatements, rearrangements, substitutions, and enlargements thereof, it being contemplated by Borrower and Lender that Borrower may hereafter become indebted to Lender in further sum or sums, including Future or Additional Advances if any and as defined in the Construction Loan Rider B to Security Instrument if such rider is present.

**Section 6.34.3    Mineral Rights.** Mineral Rights means all existing and future right, title, and interest in and to all substances in, on, under or above the Land which are now, or may become in the future, intrinsically valuable (that is, valuable in themselves) and which now or may be in the future enjoyed through extraction or removal from the property, including without limitation, oil, gas, and all other hydrocarbons, coal, lignite, carbon dioxide and all other nonhydrocarbon gases, uranium and all other radioactive substances, and gold, silver, copper, iron and all other metallic substances or ores in or on the Property.

**Section 6.34.4    Hazardous Substances.** "Hazardous Substances" shall also include any regulated substance under Environmental Law, underground storage tanks, whether empty, filled or partially filled with any substance, and any other chemical, material or substance, the exposure to which is prohibited, limited or regulated by any Governmental Authority on the basis that such chemical, material or substance is toxic, hazardous or harmful to human health or the environment.

**Section 6.34.5    Environmental Laws.** "Environmental Laws" shall also include any federal, state, or local law, statute, ordinance, or regulation, whether now or hereafter in effect, pertaining to health, industrial hygiene, or the environmental conditions on, under, or about the Property, including, without limitation, the following as now or hereafter amended: the Texas Water Code **("TWC")** § 26.001 et seq.; Texas Health & Safety Code **("THSC")** § 361.001 et seq.; and regulations, rules, guidelines, or standards promulgated pursuant to such laws, statutes and regulations, as such statutes, regulations, rules, guidelines, and standards are amended from time to time.

**Section 6.34.6    Foreclosure-Power of Sale.** If an Event of Default occurs, Trustee will, at the request of Lender, under the power of sale which is hereby conferred, sell all or any part of the Property, all as Trustee in Trustee's discretion elects. The sale will be made in accordance with Texas Property Code **("Property Code")** Section 51.002 or any successor statute. If the Land is situated in more than one county, then required notices will be given in both or all of such counties, the Property may be sold in either or any such county, and such notices shall designate the county where the Property will be sold. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service. Any sale made by Trustee hereunder may be as an entirety or in such parcels as Lender may request, and any sale may be adjourned by announcement at the time and place appointed for such sale without further notice except as may be required by law. The sale by Trustee of less than the whole of the Property shall not exhaust the power of sale herein granted, and Trustee is specifically empowered to make successive sale or sales under such power until the whole of the Property shall be sold; and, if the proceeds of such sale of less than the whole of the Property shall be less than the aggregate of the Obligations and the expense of executing this trust as provided herein, this Deed of Trust and the lien hereof shall remain in full force and effect as to the unsold portion of the Property just as though no sale had been made;

provided, however, that Borrower shall never have any right to require the sale of less than the whole of the Property

1

but Lender shall have the right, at its sole election, to request Trustee to sell less than the whole of the Property. After each sale, Trustee shall make to the purchaser or purchasers at such sale good and sufficient conveyances in the name of Borrower, conveying the property so sold to the purchaser or purchasers in fee simple with general warranty of title, and shall receive the proceeds of said sale or sales and apply the same as herein of the purchase price to Trustee shall satisfy the obligation of purchaser at such sale therefor, and such purchaser shall not be responsible for the application thereof. The power of sale granted herein shall not be exhausted by any sale held hereunder by Trustee or his substitute or successor, and such power of sale may be exercise from time to time and as many times as Lender may deem necessary until all of the Property has been duly sold and all Obligations have been fully paid. In the event any sale hereunder is not completed or is defective in the opinion of Lender, such sale shall not exhaust the power of sale hereunder and Lender shall have the right to cause a subsequent sale or sales to be made hereunder. Any and all statements of fact or other recitals made in any deed or deeds given by Trustee or any successor or substitute appointed hereunder as to nonpayment of the Obligations, or as to the occurrence of any Event of Default, or as to Lender having declared all of such Obligations to be due and payable, or as to the request to sell, or as to notice of time, place and terms of sale and of the properties to be sold having been duly given, or as to the refusal, failure or inability to act of Trustee or any substitute or successor, or as to the appointment of any substitute or successor Trustee, or as to any other act or ting having been duly done by Lender or by Trustee or any substitute or successor, shall be taken as prima facie evidence of the truth of the facts so stated and recited. Trustee, his successor or substitute, may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Trustee, including, without limitation, the posting of notices and the conducting of sales, but in the name and on behalf of Trustee, his successor or substitute, Lender may at any time before the sale direct Trustee to abandon the sale, and may at any time thereafter direct Trustee to again commence foreclosure. Whether or not foreclosure is commenced by Trustee, Lender may at any time after an Event of Default occurs institute suit for collection of all or any part of the Obligations or foreclosure of the lien of this Deed of Trust or both. If Lender institutes suit for collection of the Obligations and foreclosure of the lien of this Deed of Trust, Lender may at any time before the entry of final judgment dismiss the same, require Trustee to sell the Property in accordance with the provision of this Deed of Trust. No single sale or series of sales under this Deed of Trust or by judicial foreclosure will extinguish the lien or exhaust the power of sale under this Deed of Trust except with respect to the items of property sold. Trustee (including any successor trustee) will not be liable for any error of judgment or act done by such party in good faith, or be otherwise responsible or accountable to Borrower under any circumstances.

**Section 6.34.7**   **Right to Require Proof of Financial Ability and/or Cash Bid.** At any time during the bidding during a sale as described in Section 6.34.6, the Trustee may require a bidding party (a) to disclose its full name, state and city of residence, occupation, and specific business office location, and the name and address of the principal the bidding party is representing (if applicable), and (b) to demonstrate reasonable evidence of the bidding party's financial ability (or, if applicable, the financial ability of the principal of such bidding party), as a condition to the bidding party submitting bids at the foreclosure sale. If any such bidding party (the **"Questioned Bidder"**) declines to comply with Trustee's requirement in this regard, or if such Questioned Bidder does respond but the Trustee, in Trustee's sole and absolute discretion, deems the information or the evidence of the financial ability of the Questioned Bidder (or, if applicable, the principal of such bidding party) to be inadequate, then the Trustee may continue the bidding with reservation; and in such event (i) the Trustee shall be authorized to caution the Questioned Bidder concerning the legal obligations to be incurred in submitting bids, and (ii) if the Questioned Bidder is not the highest bidder at the sale, or if having been the highest bidder the Questioned Bidder fails to deliver the cash purchase price payment promptly to the Trustee, all bids by the Questioned Bidder shall be null and void. The Trustee may, in Trustee's sole and absolute discretion, determine that a credit bid may be in the best interest of Borrower and Lender, and elect to sell the Property for credit or for a combination of cash and credit; provided, however, that the Trustee shall have no obligation to accept any bid except an all cash bid. In the event the Trustee requires a cash bid and cash is not delivered within a reasonable time after conclusion of the bidding process, as specified by the Trustee, but in no event later than 3:45 p.m. local time on the day of sale, then said contingent sale shall be null and void, the bidding process may be recommenced, and any subsequent bids or sale shall be made as if no prior bids were made or accepted.

**Section 6.34.8**   **Trustee Fee.** Trustee's fees pursuant to Section 4.4 shall not exceed five percent (5%) of the proceeds of each sale pursuant to Section 6.34.6.

**Section 6.34.9**   **Waiver of Deficiency Statute.**

(a)   In the event an interest in any of the Property is foreclosed upon pursuant to a judicial or

2

nonjudicial foreclosure sale, Borrower agrees as follows: notwithstanding the provisions of Section 51.003, 51.004, 51.005 of the Property Code (as the same may be amended from time to time), and to the extent permitted by law, Borrower agrees that Lender shall be entitled to seek deficiency judgment from Borrower and any/or other party obligated on the Obligations equal to the difference between the amount owing on the Obligations and the amount for which the Property was sold pursuant to judicial or nonjudicial foreclosure sale. Borrower expressly recognizes that this Section 6.34.9(a) constitutes a waiver of the above-cited provisions of the Property Code which would otherwise permit Borrower and other persons against whom recovery of deficiencies is sought or Guarantor independently (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Property as of the date of the foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value. Borrower further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Property for purposes of calculating deficiencies owed by Borrower and/or others against whom recovery of a deficiency is sought.

(b)    Alternatively, in the event the waiver provided for in Subsection (a) above is determined by a court of competent jurisdiction to be unenforceable, the following shall be the basis for the finder of fact's determination of the fair market value of the Property as of the date of the foreclosure sale in proceedings governed by Sections 51.003, 51.004 and 51.005 of the Property Code (as amended from time to time): (i) the Property shall be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or expectation that the Property will be repaired or improved in any manner before a resale of the Property after foreclosure; (ii) the valuation shall be based upon an assumption that the foreclosure purchaser desires a resale of the Property for cash promptly (but no later than twelve (12) months) following the foreclosure sale; (iii) all reasonable closing costs customarily borne by the seller in commercial real estate transactions should be deducted from the gross fair market value of the Property, including, without limitation, brokerage commissions, title insurance, a survey of the Property, tax prorations, attorneys' fees, and marketing costs; (iv) the gross fair market value of the Property shall be further discounted to account for any estimated holding costs associated with maintaining the Property pending sale, including, without limitation, utilities expenses, property management fees, taxes and assessments (to the extent not account for in (iii) above), and other maintenance, operational and ownership expenses; and (v) any expert opinion testimony given or considered in connection with a determination of the fair market value of the Property must be given by persons having at least five (5) years of experience in appraising property similar to the Property and who have conducted and prepared a complete written appraisal of the Property taking into consideration the factors set forth above.

**Section 6.34.10  Lender as Purchaser.** Lender shall have the right to become the purchaser at any sale held by any Trustee or substitute or successor or by any receiver or public officer, and if Lender purchases at any such sale Lender shall have the right to credit upon the amount of the bid made therefor, to the extent necessary to satisfy such bid, the Obligations owing to Lender.

**Section 6.34.11  Payment after Acceleration.** If, following the occurrence of an Event of Default, and an acceleration of the Obligations or any part thereof but prior to a foreclosure sale of the Property, Borrower shall tender to Lender the payment of an amount sufficient to satisfy the entire indebtedness or the part thereof which has been accelerated, such tender shall be deemed a voluntary prepayment pursuant to the Obligations and, accordingly, Borrower, to the extent permitted by applicable law, shall also pay to Lender the premium, if any, then required under the Loan Documents in order to exercise the prepayment privilege contained therein.

**Section 6.34.12  Construction Mortgage.** The following provision shall be added to the Construction Rider (if applicable): This Deed of Trust is a **"Construction Mortgage"** under the Texas Business and Commerce Code to the extent that it secures an obligation incurred for the construction of certain improvements to the Land.

**Section 6.34.13  Usury.** **"Maximum Rate"** means the maximum non-usurious rate of interest (or, if the context so requires, an amount calculated at such rate) which Lender is allowed to contract for, charge, take, reserve, or receive under the Loan Documents pursuant to applicable federal or state (whichever is higher) law from time to time in effect after taking into account, to the extent required by applicable federal or state (whichever is higher) law from time to time in effect, any and all relevant payments or charges under the Loan Documents. It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply strictly with applicable law

3

governing the maximum rate or amount of interest payable on the Note or the other. If the parties choice of law is ever overruled or applicable law is ever judicially interpreted so as to render usurious any amount (a) contracted for, charged, taken, reserved or received pursuant to the Note, any of the other Loan Documents or any other communication or writing by or between Borrower and Lender related to the transaction or transactions that are the subject matter of the Loan Documents, (b) contracted for, charged or received by reason of Lender's exercise of the option to accelerate the maturity of the Note and/or the other Obligations, or (c) Borrower will have paid or Lender will have received by reason of any voluntary prepayment by Borrower of the Note and/or the other Obligations, then it is Borrower's and Lender's express intent that all amounts charged in excess of the judicially-determined maximum rate shall be automatically canceled, ab initio, and all amounts in excess of that rate heretofore collected by Lender shall be credited on the principal balance of the Note and/or the other Obligations (or, if the Note and/or the other Obligations (or, if the Note and all other Obligations have been or would thereby be paid in full, refunded to Borrower), and the provisions of the Note and the other Loan Documents immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount of interest otherwise called for hereunder and thereunder; provided, however, if the Note has been paid in full before the end of the stated term of the Note, then Borrower and Lender agree that Lender shall, with reasonable promptness after Lender is informed by a court that interest was received in an amount in excess of the judicially-determined maximum rate, either refund such excess interest to Borrower and/or credit such excess interest against the Note and/or any other Obligations then owing by Borrower to Lender. Borrower hereby agrees that as a condition precedent to any claim seeking usury penalties against Lender, Borrower will provide written notice to Lender, advising Lender in reasonable detail of the nature and amount of the violation, and Lender shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Borrower or crediting such excess interest against the Note and/or the other Obligations then owing by Borrower to Lender. In no event shall the provisions of Chapter 346 of the Texas Finance Code (which regulates certain revolving credit loan accounts and revolving triparty accounts) apply to the Note and/or the other Obligations. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

**Section 6.34.14 Texas Assignment of Rents Act.** Notwithstanding anything to the contrary contained herein, Lender is entitled to all the rights and remedies of an assignee set forth in Chapter 64 of the Texas Property Code, the Texas Assignment of Rents Act (**"TARA"**). This Deed of Trust shall constitute and serve as a security instrument under TARA. Lender shall have the ability to exercise its rights related to the Leases and Rents, in Lender sole discretion and without prejudice to any other remedy available, as provided in this Deed of Trust or as otherwise allowed by applicable law, including, without limitation, TARA. Notwithstanding anything to the contrary contained in this Deed of Trust or the other Loan Documents, to the extent this Deed of Trust or any of the other Loan Documents contain any notice or cure period, the date enforcement of Lender's right under TARA begins shall not be affected, extended or otherwise modified by reason of such periods.

**Section 6.34.15 Texas Business Organizations Code.** If Borrower is subject to Chapter 152 of the Texas Business Organizations Code, it agrees that Lender is not required to comply with Subsection 152.306(b) of the Texas Business Organizations Code and agrees that Lender may proceed directly against one or more partners or their property without first seeking satisfaction from partnership property. Borrower represents and warrants that if it conducts business under an assumed name or professional name it has properly filed Assumed Name Certificates in the offices required by Chapter 36 of the Texas Business and Commerce Code.

**Section 6.34.16 TEXAS FINANCE CODE SECTION 307.052 COLLATERAL PROTECTION INSURANCE NOTICE. (A) BORROWER IS REQUIRED TO (i) KEEP THE COLLATERAL INSURED AGAINST DAMAGE IN THE AMOUNT LENDER SPECIFIES; (ii) PURCHASE THE INSURANCE FROM AN INSURER THAT IS AUTHORIZED TO DO BUSINESS IN THE STATE OF TEXAS OR AN ELIGIBLE SURPLUS LINES INSURER; AND (iii) NAME LENDER AS THE PERSON TO BE PAID UNDER THE POLICY IN THE EVENT OF A LOSS; (B) BORROWER MUST, IF REQUIRED BY LENDER, DELIVER TO LENDER A COPY OF THE POLICY AND PROOF OF THE PAYMENT OF PREMIUMS; AND (C) IF BORROWER FAILS TO MEET ANY REQUIREMENT LISTED IN THE FOREGOING SUBPARTS (A) OR (B), LENDER MAY OBTAIN COLLATERAL PROTECTION INSURANCE ON BEHALF OF BORROWER AT BORROWER'S EXPENSE.**

4

Section 6.34.17 **STATUTE OF FRAUDS NOTICE. THIS DEED OF TRUST AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

IN WITNESS WHEREOF, Borrower has caused this instrument to be executed as of date indicated on the Deed of Trust.

Borrower: RAD Diversified REIT, Inc., A Maryland Corporation

By: Brandon Mendenhall, Chief Executive Officer

5

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of _Florida_ )

County of _Hillsborough_ )

On _June 13 2023_ before me, _Veronica M Peterson Notary_
(insert name and title of the officer)

personally appeared _Brandon Mendenhall_,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _Florida_ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Notary Public State of Florida
Veronica M Peterson
My Commission HH 138847
Expires 07/18/2025

Signature _Veronica M Peterson_   (Seal)

# SECURITY INSTRUMENT

# END PAGE

## CLOSING AGENT TO INSERT

## >>>> LEGAL DESCRIPTION <<<<

## AND RECORD WITH THIS

## SECURITY INSTRUMENT

## CLOSING AGENT TO INSERT

## >>>> LEGAL DESCRIPTION <<<<

## EXHIBIT "A"

All that certain real property situated thereon, lying and being situated in Harris County, Texas, and further described as follows, to-wit:

A tract of land being 547.00 square feet of land, out of Lot 2, Block 1, of HOHLDALE SUBDIVISION, as recorded in Volume 13, Page 17, of the Harris County Map Records, Texas, and being more particularly described by metes and bounds as follows:

COMMENCING at the original Southeast corner of Lot 1 and the Southwest corner of Lot 2, in Block 1, of said Hohldale Subdivision, same point being in the Northerly right-of way line of Hohldale Avenue;

THENCE South 89 deg. 45 min. 00 sec. East, along the Northerly right-of-way line of said Hohldale Avenue, a distance of 87.70 feet to the POINT OF BEGINNING;

THENCE North 00 deg. 49 min. 23 sec. West, a distance of 182.32 feet along a fence line to a point for corner;

THENCE South 89 deg. 45 min. 00 sec. East, a distance of 3.70 feet to a point for corner;

THENCE South 00 deg. 23 min. 00 sec. East, parallel with the East line of Lot 1 and the West line of Lot 2, a distance of 182.30 feet to a 1/2 iron pipe found for corner, said point also being in the Northerly right-of-way line of said Hohldale Avenue;

THENCE North 89 deg. 45 min. 00 sec. West along the said Hohldale Avenue, a distance of 2.30 feet to the POINT OF BEGINNING and containing 547.00 sq.ft. of land.

PARCEL NUMBER(S): 0650780010002

# Exhibit B

# RESIDENTIAL BROKER PRICE OPINION

Loan #  July 2025 One-Off (6

REO # ▮▮▮▮▮▮▮▮▮

This BPO is an [X] Interior  [ ] Exterior Only

DATE  07-15-25

PROPERTY ADDRESS: 412 HOHLDALE STREET

HOUSTON          TX      77091

FIRM NAME:  Luxely Real Estate

PHONE NO:  (832) 434-4509

SALES REPRESENTATIVE:

CLIENT NAME:  Keylink Real Estate

COMPLETED BY:  Broker Derek Montes

EMAIL ADDRESS:  derek@luxelyre.com

## I. GENERAL MARKET CONDITIONS

Current market condition:  [ ] Depressed  [ ] Slow  [X] Stable  [ ] Improving  [ ] Excellent

Employment conditions:  [ ] Declining  [X] Stable  [ ] Increasing

Market price of this type property has:  [ ] Decreased _____ % in past _____ months

[ ] Increased _____ % in past _____ months

[X] Remained Stable

Estimated percentages of owners vs. tenants in neighborhood:  31.25 % owner occupant  58.04 % tenant

There is a [ ] Normal Supply  [ ] oversupply  [X] shortage of comparable listings in the neighborhood

Approximate number of compararable units for sale in neighborhood  140

No. of competeing listings in neighborhood that are REO or Corporate owned  0

No. of boarded or blocked-up homes  0

## II. SUBJECT MARKETABILITY

Range of values in the neighborhood is $  145,000  to  $  1,300,000

The subject is an [X] over improvement  [ ] under improvement  [ ] Approropriate improvement for the neighborhood

Normal marketing time in the area is:  127  days

Is there any evidence of environmental concerns for the property? [ ] Yes  [X] No  If yes, explain _____

Has the property been on the market for the past 12 months?  [X] Yes  [ ] No  If yes, $ _____ list price (current or most recent)

To the best of your knowledge, why did it not sell? _____

Unit type: [X] single family  [ ] condo  [ ] co-op  [ ] mobile home  [in] other

[ ] multi-family  [ ] townhouse  [ ] modular  [ ] land

If condo or other association exists Fee: $ _____ [ ] monthly [ ] annually  Current? [ ] Yes [ ] No  Fee Delinquent $ _____

The fee includes: [ ] Insurance  [ ] Landscape  [ ] Pool  [ ] Tennis  Other _____

Association contact:  Name: _____  Phone No: _____

## III. COMPETITIVE CLOSED SALES

| ITEM | SUBJECT | COMPARABLE NUMBER 1 | | COMPARABLE NUMBER 2 | | COMPARABLE NUMBER 3 | |
|---|---|---|---|---|---|---|---|
| Address: 412 HOHLDALE STREET | | 4903 Candlemist Drive, Houston, | | 5427 Sue Marie Ln, Houston, Te | | 612 Del Norte Street, Houston, T | |
| Proximity to Subject | | 7Blk | REO/Corp [ ] | 6Blk | REO/Corp [ ] | 1Blk | REO/Corp [ ] |
| Sale Price | $ | $ 644,000 | | $ 508,000 | | $ 800,000 | |
| Price/Gross Living Area | | $ 279 | | $ 188 | | $ 263 | |
| Sale Date/Days on Mkt | | 5/23/2025 | 59 | 6/25/2025 | 185 | 5/22/2025 | 37 |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) Adj | DESCRIPTION | +(-) Adj | DESCRIPTION | +(-) Adj |
| Sales or Financing Concessions | | 25000 | | 0 | | 0 | |
| Location | Equal | Equal | | Equal | | Equal | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 20020 | 10535 | | 19308 | | 43500 | |
| View | Residential | Residential | | Residential | | Residential | |
| Design and Appeal | 2 story | Traditional | | Traditional | | Traditional | |
| Quality of Construction | Q4 | Q4 | | Q4 | | Q4 | |
| Age | 84 | 59 | | 47 | | 95 | |
| Condition | Avg | Avg | | Avg | | Avg | |
| Above Grade Room Count (Total/Bdms/Baths) | 10 / 6 / 4.5 | 7 / 3 / 2 | | 8 / 4 / 2.1 | | 8 / 4 / 3.1 | |
| Gross Living Area | 4307 Sq Ft. | 2306 Sq Ft. | | 2688 Sq Ft. | | 3033 Sq Ft. | |
| Basement & Finished Rooms Below Grade | None | None | | None | | None | |
| Functional Utility | Y | Y | | Y | | Y | |
| Heating/Cooling | Central | Central | | Central | | Central | |
| Energy Efficient Items | None | None | | None | | None | |
| Garage/Carport | 2CA | 2CD | | 2CD | | 2CD | |
| Porches, Patio, Deck Fireplace(s), etc. | Porch | Porch | | Porch | | Porch | |
| Fence, Pool, etc. | Fence | Fence | | Fence | | Fence | |
| Other. | n/a | n/a | | n/a | | n/a | |
| NET Adj (total) | | [ ]+ [ ]- | $ | [ ]+ [ ]- | $ | [ ]+ [ ]- | $ |
| Adjusted Sales Price of Comparable | | | $ 644,000 | | $ 508,000 | | $ 800,000 |

REO # ████

## IV.  MARKETING STRATEGY

Occupancy Status:  [X] Occupied   [ ] Vacant   [in] Unknown

[X] As-Is   [ ] Minimal Lender Required Repairs   [ ] Repaired   Most Likely Buyer: [X] Owner Occupant   [ ] Investor

## V.  REPAIRS

Itemize ALL repairs needed to bring jproperty from the present "as is" condition to average marketable condition for the neighborhood.
Check those repairs you recommend that we perform for most successful marketing of the property.

| [ ] _____ | $ _____ | [ ] _____ | $ _____ |
| [ ] _____ | $ _____ | [ ] _____ | $ _____ |
| [ ] _____ | $ _____ | [ ] _____ | $ _____ |
| [ ] _____ | $ _____ | [ ] _____ | $ _____ |
| [ ] _____ | $ _____ | [ ] _____ | $ _____ |

### GRAND TOTAL FOR ALL REPAIRS $ _____

## VI.  COMPETITIVE LISTINGS

| ITEM | SUBJECT | | COMPARABLE NUMBER 1 | | | COMPARABLE NUMBER 2 | | | COMPARABLE NUMBER 3 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Address: | 412 HOHLDALE STREET | | 982 W Donovan Street, Houston, | | | 963 Thornton Road, Houston, Te | | | 405 Hohldale Street, Houston, T | | |
| Proximity to Subject | | | 7Blk | REO/Corp [ ] | | 1Mile | REO/Corp [ ] | | 1Blk | REO/Corp [ ] | |
| List Price | $ | | | $699,786 | | | $ 789,000 | | | $ 900,000 | |
| Price/Gross Living Area | | | $ 202 | | | $ 381 | | | $ 279 | | |
| Data and/or Verification Sources | MLS | | MLS | | | MLS | | | MLS | | |
| VALUE ADJUSTMENTS | DESCRIPTION | | DESCRIPTION | +(-) Adj | | DESCRIPTION | +(-) Adj | | DESCRIPTION | +(-) Adj | |
| Sales or Financing Concessions | | | 0 | | | 0 | | | 0 | | |
| Days On Market | | | 3 | | | 47 | | | 427 | | |
| Location | Equal | | Equal | | | Equal | | | Equal | | |
| Leasehold/Fee Simple | Fee Simple | | Fee Simple | | | Fee Simple | | | Fee Simple | | |
| Site | 20020 | | 16,920 | | | 9,200 | | | 78,500 | | |
| View | Residential | | Residential | | | Residential | | | Residential | | |
| Design and Appeal | 2 story | | 2 story | | | Traditional | | | Traditional | | |
| Quality of Construction | Q4 | | Q4 | | | Q3 | | | Q4 | | |
| Age | 84 | | 50 | | | 56 | | | 65 | | |
| Condition | Avg | | Avg | | | Avg | | | Avg | | |
| Above Grade Room Count | Total 10 | Bdms 6 | Baths 4.5 | Total 9 | Bdms 5 | Baths 3.1 | Total 7 | Bdms 3 | Baths 2 | Total 7 | Bdms 3 | Baths 3 |
| Gross Living Area | 4307 Sq Ft. | | 3,452 Sq Ft. | | | 2,067 Sq Ft. | | | 3,224 Sq Ft. | | |
| Basement & Finished Rooms Below Grade | None | | None | | | None | | | None | | |
| Functional Utility | Y | | Y | | | Y | | | Y | | |
| Heating/Cooling | Central | | Central | | | Central | | | Central | | |
| Energy Efficient Items | None | | None | | | None | | | None | | |
| Garage/Carport | 2CA | | 2CD | | | 3CD | | | N | | |
| Porches, Patio, Deck Fireplace(s), etc. | Porch | | Porch | | | Porch | | | Porch | | |
| Fence, Pool, etc. | Fence | | Fence | | | Fence, Pool | | | Fence | | |
| Other. | n/a | | n/a | | | n/a | | | n/a | | |
| NET Adj (total) | | | [ ]+ [ ]- | $ | | [ ]+ [ ]- | $ | | [ ]+ [ ]- | $ | |
| Adjusted Sales Price of Comparable | | | | $699,786 | | | $ 789,000 | | | $ 900,000 | |

## VII.  THE MARKET VALUE (90-120 Values - List to Close)

| | Market Value | Suggested List Price | 30-Dav Value |
|---|---|---|---|
| AS IS | $ 750,000 | $ 755,000 | $ 730,000 |
| REPAIRED | $ 750,000 | $ 755,000 | $ 730,000 |

Last Sale of Subject   Price $ 0   Date

COMMENTS: (Include specific positives/negatives, speacial concerns, encroachments, easements, water rights, enviromental concerns, flood zones, etc. Attach addendum if additional space is needed.)

The property was listed for sale 98 DOM for $799.9k and expired 6/1/2024. It was listed for rent and eventually rented 5/28/2025 for $3750. No interior access, but previous photos show the subject as having been updated. The subject is overbuilt for the area with most of the surrounding homes being valued much less.

Signature: _____   Date: _____



11956 Bernardo Plaza Drive #516
San Diego,CA 92128
Corporate
Fax

# Subject Photos

### Subject Property Address:

412 HOHLDALE STREET, HOUSTON, TX 77091

**Loan No:**



**Owner:**    Kiavi Lendinghome 2023-2

Subject (Frontal) 412 HOHLDALE STREET9-Jul 15 2025 05_12pm-DrWS.jpg

Subject (Right Side)5-Jul 15 2025 05_11pm-47bW.jpg





Subject (Left Side)8-Jul 15 2025 05_12pm-4nAy.jpg

Subject (Rear)7-Jul 15 2025 05_11pm-wPSa.jpg





Subject (Street Scene)2-Jul 15 2025 05_11pm-dj2b.jpg

Subject (Misc.)1-Jul 15 2025 05_10pm-a2Xy.jpg







11956 Bernardo Plaza Drive #516
San Diego,CA 92128
Corporate
Fax

## Subject Photos

**Subject Property Address:**

412 HOHLDALE STREET, HOUSTON, TX 77091

**Loan No:**

**Owner:**      Kiavi Lendinghome 2023-2

982 W Donovan Street, Houston, Texas, 77Hohldale Active 1.jpg



963 Thornton Road, Houston, Texas, 770Hohldale Active 2.jpg



405 Hohldale Street, Houston, Texas, 770Hohldale Active 3.jpg



4903 Candlemist Drive, Houston, Texas, 7Hohldale Sold 1.jpg



5427 Sue Marie Ln, Houston, Texas, 77091Hohldale Sold 2.jpg



612 Del Norte Street, Houston, Texas, 77Hohldale Sold 3.jpg





11956 Bernardo Plaza Drive #516
San Diego,CA 92128
Corporate
Fax

# Subject Photos

## Subject Property Address:

412 HOHLDALE STREET, HOUSTON, TX 77091

**Loan No:**

**Owner:**    Kiavi Lendinghome 2023-2

Interior #1

Interior #2





Interior #3

Interior #4





Interior #5



rpPhotosSubj_36