**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 8:26-01636-CPM** |
| | § | **Chapter 11** |
| **RAD DIVERSIFIED REIT, Inc.** | § | |
| | § | |
| **DEBTOR** | | |

### MOTION FOR RELIEF FROM AUTOMATIC STAY
(Property: 795 89th Avenue North, St. Petersburg, FL 33702)

Comes now, TOORAK CAPITAL PARTNERS LLC (the "Secured Creditor") and moves the Court for the entry of an order granting it relief from the automatic stay pursuant to 11 U.S.C. §362(d), and as grounds thereof states as follows:

1. This Court has jurisdiction under 28 U.S.C. §1334 and 11 U.S.C. § 362.

2. On March 1, 2026 (the "Petition Date"), the Debtor, RAD Diversified REIT, Inc. (the "Debtor"), filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code before the United States Bankruptcy Court for the Middle District of Florida, Tampa Division (the "Bankruptcy Court") in the case styled as *In re RAD Diversified REIT, Inc.*, Case No. 9:26-bk-01636-CPM (the "Bankruptcy Case").

3. The Debtor has executed and delivered or is otherwise obligated with respect to that certain promissory note, in the original principal amount of $340,200.00 (the "Note"). Secured Creditor is an entity entitled to enforce the Note.

4. Pursuant to that certain Mortgage (the "Mortgage"), all obligations (collectively, the "Obligations") of the Debtor under and with respect to the Note and the Mortgage are secured by the property located 795 89th Avenue, St. Petersburg, FL 33702 (the "Property"). A true and correct copy of the Note and Mortgage is attached hereto as Exhibit A.

5. The legal description of the Property is:

Lot 120, John Alex Kelly SCARBOUGH SUBDIVISION, according to the map or plat thereof as recorded in Plat Book 8, Page 31, of The Public Records of Pinellas County, Florida.

Being the same property conveyed to U.S. Bank National Association as Legal Title Trustee for Truman 2016 SC6 Title Trust, by Ken Burke, CPA, Clerk of the Circuit Court and Comptroller of Pinellas County Florida, by Certificate of Title dated 06/28/2022, recorded 06/29/2022, in Instrument No. 2022201838, Book 22118 Page 1065, in the County of Pinellas and State of Florida.

6.   Under the Note, the balance matured and all sums became due and payable on November 1, 2023.  This maturity date was extended to May 1, 2024.

7.   To date, the Debtor has failed to pay the balance due and the balance owed is approximately $350,873.16.

8.   The Pinellas County Property Appraiser asserts that the current just value of the property is approximately $267,875.00.   The Hillsborough Property Appraisal is attached hereto and incorporated by reference herein as Exhibit B.

9.   On Schedule A , the Debtor asserts that its net value interest in the Property is $0.00.

10. The Secured Creditor maintains that the Debtor has no equity in the Property.

11.  Accordingly, the Secured Creditor seeks relief from the automatic stay pursuant to 11 U.S.C. 362(d) to permit it to continue its foreclosure of the Property in state court.

12. Secured Creditor has incurred court costs and attorney's fees in this proceeding and will incur additional fees, costs and expenses in foreclosing the Mortgage and in preserving and protecting the Property, all of which additional sums are secured by the lien of the Mortgage. Movant seeks an award of its reasonable attorneys' fees and costs, or alternatively, leave to seek recovery of its reasonable attorneys' fees and costs in any pending or subsequent foreclosure proceeding.

WHEREFORE, Secured Creditor prays that this Court issue an Order terminating or modifying the automatic stay and granting the following:

1.   Relief from the stay allowing Secured Creditor (and any successors and/or assigns)

to finalize the sale of the Property.

2.  That the 14-day stay described by Bankruptcy Rule 4001(a)(4) be waived.

3.  For such relief further relief as the Court deems proper.

Respectfully submitted,

/s/April H. Stone
April Hosford Stone
Fla. Bar No. 91388
astone@tmppllc.com
TROMBERG, MILLER, MORRIS &
PARTNERS PLLC
600 W. Hillsboro Blvd., Suite 600
Deerfield Beach, FL 33071
Phone: 561-338-4101

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was delivered to the addressees on the attached mailing list by First Class U.S. Mail postage pre-paid and/or electronic mail this 17th day of July, 2026.

/s/ April H. Stone
**April H. Stone**

**Via Pre-Paid U.S. Mail:**
Matthew Fornshell
Ice Miller LLP
250 West Street, Suite 700
Columbus, OH 43215-7509

**Via ECF:**
**Jessey James Krehl**
Pack Law
4649 Ponce de Leon Boulevard, Ste 405
Coral Gables, FL 33146
Email: jessey@packlaw.com

**Joseph A Pack**
Pack Law
4649 Ponce de Leon Boulevard, Ste 405
Coral Gables, FL 33146
Email: Joe@packlaw.com

Nicole Peair
United States Trustee
Timberlake Annex
501 E Polk Street, Suite 1200
Tampa, FL 33602
Email: Nicole.W.Peair@USdoj.gov

**John D Elrod**
Greenberg Traurig, LLP
Terminus 200
3333 Piedmont Road, NE
Suite 2500
Atlanta, GA 30305
Email: elrodj@gtlaw.com

**Danielle S Kemp**
Greenberg Traurig, P.A.
Bank of America Plaza
101 E. Kennedy Blvd., Suite 1900
Tampa, FL 33602
Email: kempd@gtlaw.com

# Exhibit A

# COMMERCIAL LOAN AGREEMENT





## COMMERCIAL LOAN AGREEMENT

THIS COMMERCIAL LOAN AGREEMENT (this "Loan Agreement"), is made as of the Closing Date by and between **RAD DIVERSIFIED REIT, INC.** (the "Borrower"), a Maryland corporation with a principal place of business of 7 St. Paul Street, Suite 820, Baltimore, MD 21202; and **RCN Capital, LLC** (the "Lender"), a Connecticut limited liability company with a principal place of business at 75 Gerber Road East, Ste. 102, South Windsor, CT 06074.

## RECITALS

Lender has agreed to make, and Borrower has agreed to accept, a loan (the "Loan") in the original principal amount of Three Hundred Forty Thousand Two Hundred Dollars and No Cents ($340,200.00). Lender is willing to make the Loan to Borrower upon the terms and subject to the conditions set forth in this Loan Agreement.

The Loan is evidenced by that certain Commercial Promissory Note (as same may be amended, restated, or modified from time to time, the "Note"), in the principal amount of **Three Hundred Forty Thousand Two Hundred Dollars and No Cents ($340,200.00)**, executed by Borrower, payable to Lender and its assigns (Lender and any subsequent holder of the Note are hereinafter referred to collectively as "Holder"). The Loan will bear interest and will be paid in accordance with the payment terms set forth in the Note.

The obligations under the Loan are guaranteed by Brandon D. Mendenhall (the "Guarantor").

## **AGREEMENT**

NOW, THEREFORE, in consideration of these promises, the mutual covenants contained in this Loan Agreement and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows:

1. Closing Date. As used herein, the term "Closing Date" shall mean _October  18_, 2022.

2. Loan Proceeds. Subject to the final closing statement (the "Closing Statement") prepared by Elite Commercial Closings LLC, approved by Holder, and executed by Borrower, the Loan proceeds shall be disbursed as follows:

   A sum (the "Short Interest") equal to $60.6253 (the "Per Diem Interest") for each and every day in the period beginning on the Closing Date to the last day of the month in which the Closing Date occurs (such period of time being referred to as the "Short Interest Period"), shall be disbursed by Holder, on behalf of Borrower and simultaneously paid to Holder and applied to cover interest that will accrue during the Short Interest Period.

   A portion of the Loan in the amount of $110,220.00 (the "Construction Holdback") shall be held by Holder, to be disbursed after the date hereof, from time to time in accordance with the terms and conditions of Section 7. **No interest will accrue on the Construction Holdback until such sums are disbursed.**

3. Prepaid Monthly Payments. So long as no Event of Default (as hereinafter defined), and no event which, with the passage of time and/or the giving of notice would constitute an Event of Default (as hereinafter defined) under this Loan Agreement or under any other Loan Documents (as hereinafter defined), shall have occurred, Holder shall credit Borrower from the prepaid monthly payments (the "Prepaid Monthly Payments"), if any, set forth on the Closing Statement to the extent of amounts not so credited for payments due. The Prepaid Monthly Payments will be credited against each payment as such payment becomes due. Any amounts not so credited from the Prepaid Monthly Payments by the time Borrower pays the Loan in full, the remaining Prepaid Monthly Payments shall be credited towards the payment of the Loan, and the excess, if any, shall be disbursed to Borrower.

4. Loan Termination Fee. Should Borrower make any payment of principal, whether partial or full, after August 1, 2023, Borrower shall, at the time of such principal payment, pay Holder a fee (the "Loan Termination Fee") equal to ONE PERCENT (1%) of the principal amount paid.

**Page 1 of 21**

5. Maturity Date. All principal, interest, and other sums due under the Note shall be due and payable in full on November 1, 2023 (the "Maturity Date").

6. Payoff Requests. In order to make a payment of all or a portion of the principal amount due under the Note, Borrower, or an agent authorized by Borrower, must provide Holder with notice (the "Payoff Notice") requesting a payoff statement (the "Payoff Statement") for a specified date (the "Payoff Date"), no fewer than four (4) business days and no greater than thirty (30) business days, on which such principal payment will be made. The Payoff Notice must contain: (a) A statement specifying whether it is Borrower's intention to satisfy the Loan in full or prepay a portion of the principal; (b) The applicable recording information for any instrument for which a satisfaction or partial release will be filed in connection with the payment; (c) A direction as to whether the statement is to be sent to Borrower, Borrower's authorized agent, or another specified party; and (d) Sufficient information to enable the Holder to reasonably identify the Loan. Holder shall be under no obligation to provide a Payoff Statement in response to a notice or request that does not meet the requirements set forth in this Section 6. Holder shall be under no obligation to accept any payment from, or on behalf of, Borrower, other than a payment that satisfies such amounts that are then due and payable under the terms of the Loan Documents (as hereinafter defined) or satisfies the full amount specified in the Payoff Statement.

7. Construction Holdback. All disbursements of the Construction Holdback made under this Section 7 shall be used by Borrower for the construction and renovation of improvements (the "Project") at the Premises in accordance with the renovation budget (the "Budget") provided by Borrower to Lender, a copy of which is attached hereto as SCHEDULE 1. Disbursements of the Construction Holdback for the construction or renovation of the Project, and for the costs incident thereto, shall only be made by Holder upon satisfactory review and confirmation that the construction of the Project is proceeding and is being completed in accordance with the terms and conditions of any construction contracts or agreements by Borrower for the construction on the Project, whether or not in effect as of the effective date of the Loan Agreement. All disbursements of the Construction Holdback made by Holder shall be for completion of each portion of the Project, subject to any and all necessary approvals required thereunder. All disbursements of the Construction Holdback made by Holder shall be for reimbursement of expenses actually incurred.

Contents of Funding Requests, Lien Waivers, Verification of Payment and Title. Each funding request (individually, a "Funding Request"; collectively, the "Funding Requests") shall reference the complete budget, the amounts of any previous disbursements, and the amount requested for the then current Funding Request. It shall be Borrower's responsibility to obtain lien releases, in a standard statutory form, as and when Borrower pays contractors, materialmen, and laborers providing labor, equipment, or materials to the job. If required by Holder, as a condition to any Funding Request, Borrower must provide reasonable written verification (such as copies of cleared or pending checks) that show that all funds previously drawn have been used for their intended purpose and that Borrower has obtained lien releases from all contractors. As a condition to the fulfillment of any Funding Request, Borrower, at its own expense, shall cause the Title Company to deliver to Holder an endorsement to the Title Policy insuring the amount of the requested draw as of the date of disbursement thereof and showing Holder's lien is a first, prior, and paramount lien on the Premises, subject only to the Permitted Encumbrances (as defined in the Security Instrument) confirming that nothing has intervened to affect the validity or priority of Holder's lien, and such other instruments, documents and information as Holder or the Title Company insurer may reasonably request.

Liens and Encumbrances. No disbursement of the Construction Holdback shall be due while there is any lien or encumbrance upon the Premises, other than the Permitted Encumbrances, or while there is any change, question, or claim of any kind whatsoever, whether or not of record, which, in the reasonable opinion of the counsel for Holder, may constitute a cloud on the title to the Premises, render the title of the Premises unmarketable, or otherwise invalidate, or have priority over, the instruments securing the Loan, or any portion thereof, or in any way may render Lender's position insecure. Further, Holder will be under no obligation to make a disbursement hereunder if there shall have been a "discharge" of any "hazardous substances" or "hazardous wastes", as those terms are defined by any applicable federal, state, or local environmental laws, or following the occurrence of an Event of Default or while there is any circumstance which, with the giving of notice, the passage of time, or both, would constitute an Event of Default.

**Page 2 of 21**

Borrower's Funding Requests. Borrower may submit to Holder, in form and substance satisfactory to Holder, in its sole discreton, periodic Funding Requests for the purposes of obtaining funds to pay expenses incurred in connection with the Project. Notwithstanding anything to the contrary herein, if Borrower fails to satisfy the conditions for any disbursement of the Construction Holdback, then, subject to the terms of the Loan Agreement, the amount of any subsequent advance may be increased by an amount not to exceed the amount that could have been advanced, from time to time, if not for the failure to satisfy the funding criteria during any such previous requested advance or scheduled advance; provided that such funding criteria is then satisfied.

Special Representations, Warrants, and Covenants. Borrower represents, warrants, and covenants to Holder the following: (i) The Project will continue with reasonable diligence and will be performed in accordance with the approved design guidelines and approved preliminary plat. Borrower represents, warrants, and covenants to Holder that Holder and its agents, at all times prior to full payment and satisfaction of the Loan, including on the occasion of each disbursement, shall have the right of entry and free access to the Project and the right to inspect all of the work performed or furnished in and about the Project as well as all subcontracts and records of Borrower. Borrower agrees to pay the reasonable costs of such inspections performed by Holder or its agents. **(ii) Borrower has obtained from all appropriate governmental authorities the appropriate permits and approvals for the corresponding work for which the disbursement is requested and Holder has been furnished with a filed copy thereof;** (iii) All material, equipment, and fixtures incorporated in the work at the Premises shall have been purchased so that the absolute ownership thereof shall have vested in Borrower immediately upon installation thereof on the Premises and Borrower shall have produced and furnished, if required by Holder, the contracts, bills of sale, or other agreements under which title thereto has vested; (iv) All material, equipment, and fixtures incorporated in the work at the Premises shall have been purchased so that the absolute ownership thereof shall have vested in Borrower immediately upon installation thereof on the Premises and Borrower shall have produced and furnished, if required by Holder, the contracts, bills of sale, or other agreements under which title thereto has vested; (v) Borrower has obtained all applicable authorizations, consents, licenses, approvals, and permits of governmental authorities for the work for which disbursements are requested and evidence of such has been provided to Holder; (vi) Borrower shall have complied with all laws, ordinances, regulations, and all requirements of governmental authorities, including, without limitation, a retainage of ten percent (10%) under all contractors and subcontractors working on the Premises (it being agreed that Holder shall not unreasonably withhold its consent to any retainage below ten percent (10%) for any particular contract); (vii) Each disbursement shall be used by Borrower solely to pay, or as reimbursement for, the obligations for which such disbursement is sought; (viii) Holder shall not be required to make any advance of the Construction Holdback if at the time of the requested advance: (a) Holder shall have determined that the undisbursed balance of the Loan, plus any of Borrower's funds, to be insufficient to fund completion of the Project and Borrower is unable or unwilling to produce funds to cover the deficiency; or (b) The Premises has been materially damaged or destroyed by fire or any other casualty and Borrower is unwilling or unable to repair the same using funds other than the proceeds of the Loan or insurance proceeds; or (c) Any legal action is pending which may have a material adverse effect upon the ability of Borrower to complete the Project; or (d) Holder has not received all required documentation and information, to enable Holder to confirm that the Premises can be developed in accordance with Borrower's design guidelines and preliminary plat approval.

8. Post-Closing Holdbacks. Intentionally left blank.

9. Security. The obligations under the Loan are secured by, among other things, the following mortgages or deeds of trust (as the same may be amended, restated, or modified from time to time, the "Security Instrument"): a certain Mortgage, Assignment of Rents and Security Agreement granted by RAD DIVERSIFIED REIT, INC., in favor of RCN Capital, LLC, encumbering the real property and improvements at 795 89th Ave N, St. Petersburg, FL 33702 (the foregoing real property and improvements are hereinafter referred to as the "Premises").

10. Guaranty. The obligations under the Loan are guaranteed by Guarantor in that certain Commercial Guaranty, executed by Guarantor and delivered to Holder on the Closing Date. The Note, this Loan Agreement, the Security Instrument, the Guaranty, and any other documents evidencing, securing, or now or hereafter executed in connection with the making of the Loan may sometimes hereinafter be individually referred to as a "Loan Document" and collectively referred to as the "Loan Documents". All of the indebtedness, obligations, and

liabilities of Borrower arising under the Loan and the Loan Documents, and any and all renewals, modifications, rearrangements, amendments, or extensions thereof, are sometimes hereinafter referred to as the "Indebtedness".

11. Release or Reconveyance of the Premises. Upon payment and discharge of the Indebtedness (as hereinafter defined), and the performance of Borrower's obligations under the Loan Documents (as hereinafter defined), Holder will release the lien of the Security Instrument.

12. Collateral Assignment of Contracts, Plans, Permits & Approvals. To further secure the Indebtedness, Borrower hereby assigns, transfers, and sets over unto Holder, all of its right, title, privileges, and interest in and to the Additional Collateral (as hereinafter defined) and all rights and benefits therefrom as security for the full, timely, and faithful repayment of the principal, interest, and any and all other sums due under the Note, this Loan Agreement, the Security Instrument, and any other document delivered in connection with or as security for the Loan and performance by Borrower of all of their obligations under the Loan, to the fullest extent permitted by law and by the terms of the Additional Collateral. (A) The following shall constitute the "Additional Collateral" hereby assigned, transferred, and set over to Holder: (i) All licenses, permits, approvals, certificates and agreements with or from all boards, agencies, departments, governmental or quasi-governmental, relating directly or indirectly to the ownership, use, operation and maintenance of the Premises and the construction, use, development, renovation and installation of improvements to the Premises, whether heretofore or hereafter issued or executed (collectively the "Licenses"; said boards, agencies, departments, governmental or otherwise being hereinafter referred to collectively as "Governmental Authorities"); (ii) All contracts, subcontracts, agreements, service agreements, rights, warranties and purchase orders which have heretofore been or will hereinafter be executed by or on behalf of Borrower, or which have been or will hereafter be assigned to Borrower, as well as all promotional, sales and/or marketing materials, products or documents in connection with or relating to the current or future development, construction, renovation or improvement of the Premises or to the use, access, operation, sale and maintenance of the Premises (All of the contracts, agreements and other items referred to in subparagraphs (i), (iii), (iv), (v), (vi), and (vii) of this Section 12(A) are hereinafter referred to as the "Contracts" and the parties with whom or to whom such Contracts have been or are given are hereinafter referred to collectively as the "Contractors"); (iii) All other contracts now or hereafter entered into, including, but without limitation, those certain architects' agreements, engineers' agreements, development agreements and management agreements, if any; (iv) All and any agreements of purchase and sale between Borrower and a bona fide third party, now existing or hereafter made, for all or any portion or portions of the Premises, as said agreements of purchase and sale may have been, or may from time to time be hereafter, modified or extended; (v) All rights necessary to provide the Premises with utility services including, but not limited to sewer, water, electricity and gas services as approved by those governmental authorities having jurisdiction thereof; (vi) All other agreements now or in the future with respect to the management, maintenance and operation of the Premises and the business conducted thereon; (vii) All plans, specifications, surveys, drawings, and reports between Borrower and any other party, existing as of the date hereof or entered into or created in the future with respect to the Premises. (B) Borrower will (i) fulfill or perform each and every condition and covenant of any Additional Collateral to be fulfilled or performed by Borrower; (ii) give prompt notice to Holder of any notice of default under any Contracts, Licenses, or other Additional Collateral received by Borrower together with a complete copy of any such notice; and, (iii) enforce, short of termination of any Contracts, the performance or observance of each and every covenant and condition of the Contracts by the contracting party to be performed or observed. Borrower shall not alter, modify, or change any Contracts, or terminate the term thereof, or accept a surrender thereof, or cancel any Contracts or waive or release any party from the performance or observance of any obligations or conditions thereof, without the prior written consent of Holder. (C) Holder shall not be obligated to perform or discharge any obligation under any Contracts or under or by reason of, the assignment of the Contracts, and Borrower hereby agrees to indemnify Holder against, and hold it harmless from, any and all liability, loss, or damage which it may incur under any Contracts or under, or by reason of, the assignment of the Contracts and of and from any and all claims and demands whatsoever which may be asserted against it by reason of any alleged obligation or undertaking on its part to perform or discharge under any of the terms of the Contracts. Should Holder incur any such liability, loss, or damage under any Contract or under, or by reason of, this assignment of the Additional Collateral, or in defense against any such claims or demands, the amount thereof, including costs, expenses and reasonable attorneys' fees, together with interest thereon at the default rate set forth in the Note, shall be secured hereby and by the Security Instrument, and Borrower shall reimburse Holder therefor immediately upon demand. (D) So long as there is no Event of Default, Borrower shall have the right to exercise or enforce, or seek to exercise or enforce, all rights, powers, privileges, authorizations and benefits under or pursuant to the Additional Collateral. Upon the payment in full of the Indebtedness, as

evidenced by the recording or filing of a full release of the lien of the Security Instrument by Holder, this assignment shall become null and be void and of no effect.

13. Uniform Commercial Code Security Agreement. This Loan Agreement is also a security agreement under the Uniform Commercial Code (the "UCC") for any portion of the Premises which, under applicable law, may be subjected to a security interest under the UCC, for the purpose of securing Borrower's obligations under the Note, this Loan Agreement, the Security Instrument, and other Loan Documents, whether such Premises are owned now or acquired in the future, and all products and cash and non-cash proceeds thereof (collectively, the "UCC Collateral"), and by this Loan Agreement, Borrower grants to Holder a security interest in the UCC Collateral.

14. Conditions Precedent To Holder's Obligations. Holder shall not be obligated to make the Loan hereunder unless Holder shall have received the following conditions precedent (individually, a "Condition Precedent", collectively, the "Conditions Precedent"), all in form and substance satisfactory to Holder in all respects. The Conditions Precedent exist solely for Holder's benefit, and Holder, in its sole discretion, shall determine whether the Conditions Precedent have been satisfied. Any advance of funds by Holder shall neither (i) constitute a waiver of any Conditions Precedent to further advances; (ii) preclude Holder from declaring as an Event of Default any failure by Borrower to satisfy a Condition Precedent; nor (iii) constitute a waiver of Holder's right to require Borrower to comply with its duties, as stated in any Loan Documents.

A   Organization and Authorization Documents. Holder shall have received copies of: (i) Borrower's articles of organization or incorporation, and any amendments thereto; (ii) Borrower's operating agreement or bylaws, and any amendments thereto; and (iii) certified copies of all action taken by Borrower and its members or shareholders to authorize the execution, delivery, and performance of this Loan Agreement and the other Loan Documents, and the borrowing by Borrower hereunder, and such other papers as Holder shall reasonably require.

B   Loan Documents. Holder shall have received each of the Loan Documents, duly executed by the parties thereto. The Security Instrument shall be in form acceptable for recording in the land records where the Land (as defined in the Security Instrument) is located.

C   Financial and Other Credit Information. Borrower and Guarantor shall have provided to Holder such financial and other credit information and documentation as Holder shall require, and Holder shall be satisfied with the creditworthiness of Borrower and Guarantor.

D   Holder's Fees and Expenses. Borrower shall have paid all of Holder's costs and expenses (including appraisal and reasonable attorneys' fees) incurred in connection with the negotiation, preparation, execution of the Loan Documents, and in the satisfaction of the Conditions Precedent.

E   Short Interest. Borrower shall have paid the Short Interest.

F   Validity of Liens. The Security Instrument shall be effective to create in favor of Holder a legal, valid, enforceable, and perfected first priority security interest in the Premises as set forth in the Security Instrument, in such manner as is satisfactory to Holder in its sole discretion.

G   Title Policy. A paid title insurance policy (the "Title Policy"), without survey exception, in the full amount of the Loan issued by the Title Company and insuring the lien of the Security Instrument as a valid first lien on the Premises, with such endorsements as Holder shall require, and subject to the permitted exceptions identified in the Security Instrument.

H   Insurance. Certificates of insurers, or other evidence satisfactory to Holder, indicating that Borrower have obtained the policies of insurance required under the terms of Section 16(D).

I   Taxes. Holder shall have received evidence of payment of all real estate taxes and municipal charges on the Premises which were due and payable prior to the date hereof, or become due and payable within six (6) months from the Closing Date.

**Page 5 of 21**

J   Appraisal. Holder shall have received a current appraisal, in form and substance satisfactory to Holder.

**K   Permits and Approvals. Holder shall have received copies of all permits or approvals required by any Governmental Authorities to such date with respect to Borrower or the Premises, to the extent the same are necessary and appropriate to operate and develop the Premises.**

L   Additional Requirements. Holder shall have received such other agreements, certificates, or other documents as Holder or Title Company may reasonably request.

15. Representations, Warranties, and General Covenants. On the date hereof, in order to induce Holder to enter into this Loan Agreement, Borrower represents, warrants, and covenants the following:

A   Nature of Entity. RAD DIVERSIFIED REIT, INC. is a corporation, validly existing and in good standing under the laws of the state of Maryland and is, and will continue to be, duly qualified and licensed to do business in any other state in which it is required to be so qualified, organized, and/or licensed.

B   Power and Authority. Borrower has the power to execute, deliver, and carry out this Loan Agreement and to incur the Indebtedness, and Borrower has taken all necessary action to authorize the execution, delivery, and performance by Borrower of this Loan Agreement and the incurring of the Indebtedness.

C   No Change in Facts or Circumstances. (i) All information in the application for the Loan submitted to Holder, including all financial statements for the Premises, Borrower and Guarantor, and all rent schedules, reports, certificates, and any other documents submitted in connection with the application (collectively, the "Loan Application") is complete and accurate in all material respects as of the date such information was submitted to Holder; and (ii) There has been no change in any fact or circumstance since the Loan Application was submitted to Holder that would make any information submitted as part of the Loan Application materially incomplete or inaccurate.

D   No Legal Bar. The execution and delivery of this Loan Agreement and compliance by Borrower with any of the terms and provisions hereof or of any of the other agreements or instruments referred to herein will not, on the date hereof, violate any provision of any existing law or regulation or any writ or decree of any court or governmental instrumentality, or any agreement or instrument to which Borrower is a party or which is binding upon it or its assets, and will not result in the creation or imposition of any lien, security interest, charge, or encumbrance of any nature whatsoever upon or in any of its assets, except as contemplated by this Loan Agreement; and no consent of any other party, license approval or authorization of or registration or declaration with any governmental bureau or agency, is required in connection with the execution, delivery, performance, validity, and enforceability of this Loan Agreement.

E   No Fraudulent Transfer or Preference. No Borrower or Guarantor (i) have made, or are making, in connection with, and as security for, the Loan, a transfer of an interest in the property of Borrower or Guarantor to or for the benefit of Holder or otherwise as security for any of the obligations under the Loan Documents which does or could constitute a voidable preference under Federal bankruptcy, state insolvency or similar applicable creditors' rights laws; or (ii) have made, or is making, in connection with the Loan, a transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of Borrower or Guarantor in property which does or could constitute a voidable preference under Federal bankruptcy, state insolvency or similar applicable creditors' rights laws; or (c) have incurred, or is incurring in connection with the Loan; any obligation (including any obligation to or for the benefit of an insider under an employment contract) which is or could constitute a fraudulent transfer under Federal bankruptcy, state insolvency, or similar applicable creditors' rights laws.

F   No Insolvency or Judgment. (i) Borrower is not (a) the subject of, or a party to (other than as a creditor), any completed or pending bankruptcy, reorganization, or insolvency proceeding; or (b) the subject of any judgment unsatisfied of record or docketed in any court located in the United States. Guarantor is not (a) the subject of or a party to (other than as a creditor) any completed or pending bankruptcy, reorganization or insolvency proceeding, or (b) the subject of any judgment unsatisfied of record or docketed in any court located in the United States. (ii) Borrower is not presently insolvent, and the Loan will not render Borrower

**Page 6 of 21**

insolvent. Guarantor is not presently insolvent, and the Loan will not render Guarantor insolvent. As used in this Section, the term "insolvent" means that the total of all of a person's liabilities (whether secured or unsecured, contingent or fixed, or liquidated or unliquidated) is in excess of the value of all of the assets of the person that are available to satisfy claims of creditors. (iii) There are no judicial, administrative, mediation or arbitration actions, suits or proceedings pending or, to the best of Borrower's or Guarantor's knowledge, threatened, in writing, against or affecting Borrower; or Guarantor; or the Premises; which, if adversely determined, would have a significant detrimental effect on: (a) the business, prospects, profits, operations, or condition (financial or otherwise) of Borrower; or Guarantor; or the Premises; (b) the enforceability, validity, perfection, or priority of the lien of any Loan Document; or (c) the ability of Borrower to perform any obligations under any Loan Document.

G     Compliance with Applicable Laws and Regulations. Except as already disclosed to Holder by Borrower in writing, to the best of Borrower's knowledge after due inquiry and investigation, each of the following is true: (i) All buildings, structures and improvements now constructed or at any time in the future constructed or placed upon the Land or the Improvements (as those terms are defined in the Security Instrument) and the use of the Premises comply with all applicable statutes, rules and regulations, including all applicable statutes, rules and regulations pertaining to requirements for equal opportunity, anti-discrimination, fair housing, environmental protection, zoning and land use ("legal, non-conforming" status with respect to uses or structures will be considered to comply with zoning and land use requirements for the purposes of this representation); and (ii) The Improvements comply with applicable health, fire, and building codes.

H     Commencement of Work; No Labor or Materialmen's Claims. Except as already disclosed to Holder by Borrower in writing, prior to the recordation of the Security Instrument, no work of any kind has been or will be commenced or performed upon the Premises, and no materials or equipment have been or will be delivered to or upon the Premises, for which the contractor, subcontractor, or vendor continues to have any rights including the existence of or right to assert or file a mechanic's or materialmen's lien. If any such work of any kind has been commenced or performed upon the Premises, or if any such materials or equipment have been ordered or delivered to or upon the Premises, then prior to the execution of the Security Instrument, Borrower has satisfied each of the following conditions: (i) Borrower has fully disclosed in writing to the Title Insurance Company issuing the Title Policy insuring the lien of the Security Instrument that work has been commenced or performed on the Premises, or materials or equipment have been ordered or delivered to or upon the Premises; (ii) Borrower has obtained and delivered to Holder and the Title Insurance Company issuing the Title Policy, is the first case with complete opinions, lien waivers from all contractors, subcontractors, suppliers or any other applicable party, pertaining to all work commenced or performed on the Premises, or materials or equipment ordered or delivered to or upon the Premises; and (iii) Borrower represents and warrants that all parties furnishing labor and materials for which a lien or claim of lien may be filed against the Premises have been paid in full and, except for such liens or claims insured against by the policy of title insurance to be issued in connection with the Loan, there are no mechanics', laborers' or materialmen's liens or claims outstanding for work, labor or materials affecting the Premises, whether prior to, equal with or subordinate to the lien of the Security Instrument.

I     Access; Utilities; Tax Parcels. The Premises: (i) has ingress and egress via a publicly dedicated right of way or via an irrevocable easement permitting ingress and egress, (ii) is served by public utilities and services generally available in the surrounding community or otherwise appropriate for the use in which the Premises are currently being utilized, and (iii) constitutes one or more separate tax parcels.

J     Licenses and Permits. Borrower, any commercial tenant of the Premises, and any operator of the Premises are in possession of all material licenses, permits and authorizations required for use of the Premises, which are valid and in full force and effect as of the date of this Loan Agreement.

K     No Other Interests. To the best of Borrower's knowledge, after due inquiry and investigation, no other party has (i) any possessory interest in the Premises or right to occupy the Premises except under and pursuant to the provisions of existing leases by and between tenants and Borrower (a form of residential lease having been previously provided to Holder together with the material terms of any and all non-residential leases at the Premises), or (ii) an option to purchase the Premises or an interest in the Premises, except as has been disclosed to and approved in writing by Holder.

L   Illegal Activity. No portion of the Premises has been or will be purchased with the proceeds of any illegal activity.

M   Taxes Paid. Borrower has filed all required federal, state, county and municipal tax returns, and Borrower has paid all taxes which have become due pursuant to such returns or to any notice of assessment received by Borrower, and Borrower has no knowledge of any basis for additional assessment with respect to such taxes. To the best of Borrower's knowledge, after due inquiry and investigation, there are not presently pending any special assessments against the Premises or any part of the Premises.

N   Title Exceptions. To the best of Borrower's knowledge after due inquiry and investigation, none of the items shown in the schedule of exceptions to coverage in the Title Policy issued to and accepted by Holder contemporaneously with the execution of this Loan Agreement and insuring Holder's interest in the Premises will have a significant detrimental effect on: (i) the ability of Borrower to pay the Loan in full, (ii) the ability of Borrower to use all or any part of the Premises in the manner in which the Premises are being used on the Closing Date, (iii) the operation of the Premises, or (iv) the value of the Premises.

O   Survival. The representations and warranties set forth in this Loan Agreement will survive until the Indebtedness is paid in full.

P   Cross-Default. Notwithstanding anything to the contrary contained in this Loan Agreement, any of the Loan Documents, or any of the documents executed in connection with the breach or default by Borrower or Guarantor of any covenant or other term or condition contained in any other loans, obligations, liabilities, or indebtedness (whether now existing or hereafter arising) by and among Borrower or Guarantor and Holder shall be considered a default under this Loan Agreement, entitling (but in no event requiring) Holder to apply any and all of the rights and remedies Holder has under the terms of this Loan Agreement.

16. Covenants. Borrower covenants and agrees that, so long as any of the Indebtedness to Holder remains outstanding, Borrower will perform and observe each and all of the covenants and agreements herein set forth.

A   Payments Under this Loan Agreement. Borrower will make timely payment of all monies and will faithfully and fully keep and perform all of the terms, conditions, covenants, and agreements contained on Borrower's part to be paid, kept, or performed hereunder, and will be bound in all respects as debtor under this Loan Agreement, the Note, and any other instruments or documents executed and/or delivered in connection herewith or therewith.

B   Payment of Liabilities. Borrower will pay and discharge at or before their maturity all taxes, assessments, rents, claims, debts, and charges, except where the same may be contested in good faith and/or non-payment is advised by Borrower's counsel, and maintain, in accordance with generally accepted accounting principles and practice, appropriate reserves for the accrual of any of the same.

C   Compliance with Laws, Care of Property. Borrower will do, or cause to be done, all things necessary to comply with all laws, and to at all times maintain, preserve, and protect its property used or useful in the conduct of its business and keep the same in good condition and repair (normal wear and tear and obsolescence excepted), and from time to time make, or cause to be made, all needful and proper repairs, renewals, replacements, betterments, and improvements thereto.

D   Insurance. Borrower shall keep all buildings erected on, or to be erected on, the Land (as defined in the Security Instrument) insured against loss by fire and such other hazards as Holder may require and Borrower shall obtain and maintain insurance with respect to other insurable risks and coverage relating to the Premises, including but not limited to, comprehensive general public liability insurance and loss of income (rent insurance or business interruption), all such insurance in such sums and upon such terms as Holder may reasonably require, with loss proceeds by the terms of such policies made payable to Holder as its interest may appear. All such policies shall provide for a minimum of thirty (30) days prior written cancellation notice to Holder. Holder, upon its request to Borrower, shall have the custody of all such policies and all other policies which may be procured insuring the Premises, the same to be delivered,

**Page 8 of 21**

premiums paid at least five (5) days before the expiration of the old policies; and Borrower agrees that upon failure to maintain the insurance as above stipulated or to deliver said renewal policies as aforesaid, or to pay the premiums therefor, Holder may, without obligation to do so, procure such insurance and pay the premiums therefor and all sums so expended shall immediately be paid by Borrower and unless so paid, shall be deemed part of the Indebtedness and shall bear interest at the rate set forth in the Note, and thereupon the entire principal sum unpaid, including such sums as have been paid for premiums of insurance as aforesaid, and any and all other sums which shall be payable hereunder shall become due and payable forthwith at the option of Holder, anything herein contained to the contrary notwithstanding. In case of loss and payment by any insurance company, the amount of insurance money received shall be applied either to the Indebtedness, or in rebuilding and restoring the damaged property, as the Holder may elect. Borrower shall claim no cancellation or return any policy or premium except from and after full satisfaction of the Loan.

E    Fundamental Changes. So long as any Indebtedness of Borrower to Holder remains outstanding and unpaid, Borrower agrees that it will not merge or consolidate with or into any other entity; dissolve or liquidate; convey, sell, lease, or otherwise dispose of all or substantially all of its property, assets, or business; change the present form, ownership, or control of its business.

17. Default. Borrower hereby acknowledges and agrees that any of the following shall constitute an "Event of Default" hereunder: (a) failure of Borrower to make any payment of any installment of principal or interest when due under the Note; (b) failure of Borrower to pay any other sum when due hereunder or under the Note or any other Loan Document; (c) any representation or warranty of Borrower or any Guarantor made herein or in any other Loan Document or in any other writing given to Holder in connection with the Loan shall have been incorrect in any material respect as of the time when the same shall have been made or is not accurate when a further disbursement is to be made to Borrower; (d) the occurrence of an Event of Default under the Security Instrument or any other Loan Document; (e) the sale, conveyance, assignment, transfer or other disposition or divestiture of Borrower's title to any of the Premises, or the mortgage or other conveyance of a security interest in, or other encumbrance on any of the Premises or any interest therein, whether voluntary or involuntary, except as provided herein; (f) any merger, consolidation, liquidation, or dissolution, or the sale or transfer of all or substantially all of the assets, of Borrower; (g) the transfer (directly or indirectly) of any of the stock or other ownership of Borrower; (h) any default in the performance or observance of any term, covenant, or agreement to be performed by Borrower or any Guarantor in this Loan Agreement or in any Loan Document; (i) the use of proceeds of the Loan for any purpose other than as provided herein; (j) any Loan Documents for any reason shall cease to be in full force and effect, the liens on any Premises purported to be created thereby shall cease to be or are not valid and perfected liens having priority over all other liens except any encumbrances specifically permitted under such Loan Documents, or any Guarantor shall assert that it has no liability under the Guaranty to which it is a party; (k) one or more judgments or decrees shall be entered against Borrower or any Guarantor (not paid or fully covered by insurance) and all such judgments or decrees shall not have been vacated or discharged, stayed, or bonded pending appeal within sixty (60) days from the entry thereof; (l) Borrower or any Guarantor becomes insolvent or deceased; (m) Borrower or any Guarantor generally does not pay its debts as they become due and Borrower fails to make any payment to Holder required by the Loan Documents; (n) Borrower or any Guarantor makes an assignment for the benefit of creditors; (o) Borrower or any Guarantor calls or causes to be called a meeting of creditors for the composition of debts; (p) if there shall be filed by or with the consent or authorization of Borrower or any Guarantor a petition in bankruptcy for liquidation or for reorganization, or a custodian, receiver, or agent is appointed or authorized to take charge of its properties, or Borrower or any Guarantor authorized such action; (q) if there shall be filed against Borrower or any Guarantor a petition in bankruptcy, for liquidation, or for reorganization, or a custodian, receiver, or agent is appointed or authorized to take charge of its properties and Borrower or any Guarantor, as the case may be, has not consented to or authorized such action and such action is not dismissed within sixty (60) days; (r) if any license, permit, registration, vendor account, or other approval required for the normal operation of Borrower's business or any of the Premises shall be suspended or shall cease to be in full force and effect; (s) failure by Borrower to commence work promptly on the Project and to continue the Project diligently and in a commercially reasonable and workmanlike manner in accordance with the Budget. Should any Event of Default occur, HOLDER MAY DECLARE THE ENTIRE UNPAID BALANCE AND ANY OTHER SUMS OWED UNDER THE NOTE AND LOAN DOCUMENTS, IMMEDIATELY DUE AND PAYABLE WITHOUT PRESENTMENT, DEMAND, PROTEST, NOTICE OF PROTEST, OR ANY OTHER KIND OF NOTICE OF DISHONOR, all of which are

**Page 9 of 21**

hereby expressly waived by Borrower. All such rights of Holder are cumulative, not exclusive, and enforceable alternatively, successively, or concurrently. After the occurrence of an Event of Default, interest on the unpaid outstanding balance of the Loan will accrue at the Default Rate, as defined in the Note. If a judgment on the Note is obtained, then after the judgment, interest on the unpaid balance will continue to accrue at the Default Rate until the Note is paid in full.

18. Indemnification of and Reimbursement to Holder. Borrower shall indemnify and hold Holder harmless from and against any and all claims, demands, losses, judgment, liabilities, costs or expenses (including, without limitation, reasonable attorneys' fees and disbursements) arising out of or resulting from the Note, this Loan Agreement, Holder's security interest in the Premises, or enforcement or exercise of any right or remedy granted to Holder under this Loan Agreement. In no event shall Holder incur liability to Borrower for any matter or thing in connection with this Loan Agreement, other than to account for monies actually received by Holder. (A) Cure by Holder. Following an Event of Default, Holder may, but shall not be required to, do any act or thing which Borrower has covenanted hereunder to do or cause to be done, and Holder may remedy any breach, and add to the Indebtedness of Borrower the costs or expenses incurred by Holder in so doing, and any and all amounts expended by Holder in taking such action shall be repayable to it upon its demand to Borrower therefor. All such costs and expenses shall bear interest from the date incurred by Holder until the date Holder is repaid in full at the Default Rate set forth in the Note. (B) Reimbursement of Expenses. Borrower shall pay to Holder all costs and expenses paid or incurred by Holder (including, without limitation, reasonable attorneys' fees and disbursements) in connection with the preparation for or any actual or attempted disposition of any portion of the Premises. All such costs and expenses incurred by Holder shall be repayable to it upon its demand to Borrower and shall bear interest from the date the same were incurred to the date paid in full at the interest rate set forth in the Note.

19. Document Re-Execution. Borrower and Guarantor will re-execute any document or instrument signed in connection with the Loan, or will execute any document or instrument that should have been signed at or before the closing of the Loan, or which was incorrectly drafted and/or signed. In the event of any miscalculation, misapplication or error in payment or collections of monies at closing, Borrower and Guarantor agree to correct the same upon request. Borrower and Guarantor shall execute and deliver, or cause to be executed and delivered, to Holder, all other instruments, certificates, and agreements as Holder or Holder's Counsel may reasonably require, including but not limited to, an estoppel certificate stating that the Loan is in full force and effect and that there are no defenses or offsets thereto, or any document, certificate, instrument or agreement reasonably required by Holder or Holder's Counsel to effect, confirm, or assure the rights, remedies, and liens intended to be granted or conveyed to Holder under the Note, the Loan Agreement, the Security Instrument, or any other Loan Document. Each request by Holder pursuant to this Section 19 shall receive the full cooperation and compliance of Borrower and Guarantor by execution and delivery, or as the case may be, by re-execution and delivery, at Holder's offices, or such other location as Holder may designate, within ten (10) business days or seven (7) calendar days of the date that Holder makes such a request. Failure to strictly comply with the requirements herein shall constitute an Event of Default.

20. Environmental Indemnity.

A    Defined Terms. For purposes of this Section 20, the following words and terms shall have the respective meanings and be construed as hereinafter provided: As used herein, "DEP" means the Florida Department of Environmental Protection. "Enforcement Action" means any action, proceeding or investigation instituted or threatened by the United States Environmental Protection Agency (the "EPA"), the DEP, or any other federal, state or local governmental agency related to any alleged or actual violation of any Environmental Law (as hereinafter defined) with respect to the Premises and/or any business conducted thereon, and/or Borrower. "Enforcement Action" shall also include any similar action brought by any private party pursuant to any Environmental Law (as hereinafter defined). "Environmental Laws" means all laws relating to hazardous waste, chemical substances or mixtures or hazardous, toxic or dangerous substances or conditions or relating to the interaction of the use or ownership of property and the environment, whether such law is: (a) criminal or civil, (b) federal, state or local, (c) statutory, common law or administrative regulation, (d) currently in effect or enacted in the future. "Environmental Authority" means the EPA, the DEP, or any other federal, state or local Governmental Authority having jurisdiction in a matter. "Hazardous Material" means any pollutants, hazardous or toxic substances or contaminated materials, including but not limited to, oil and oil products, asbestos, asbestos containing materials, urea formaldehyde foam insulation,

polychlorinated biphenyls, flammables, explosives, radioactive materials, laboratory wastes, biohazardous wastes, chemicals, compounds or any other materials and substances (including materials, substances or things which are composed of or which have as constituents any of the foregoing substances), which are or may be subject to regulation under, or the Release of which or exposure to which is prohibited or limited by, or regulated under, any Environmental Law. "Release" means any spilling, leaking, migrating, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment of any Hazardous Material. "Remediation" or "Remediate" means any response, remedial removal or corrective action undertaken pursuant to any Environmental Law with respect to any Hazardous Material, any actions to prevent a Release or threatened Release of any Hazardous Material; any action necessary or appropriate to comply with any Environmental Law; any action necessary or appropriate to obtain or comply with permits needed for operations in connection with the Premises; including but not limited to, any investigation, monitoring, assessment, testing, sampling, laboratory or other analysis or evaluation, relating to any such remedial, removal or corrective action or relating to any Release or threatened Release of any Hazardous Material.

B    Guaranty. Borrower hereby absolutely and unconditionally guarantees to Holder that it and all other users, as well as all operations at the Premises, will fully comply with all Environmental Laws and all of the terms, covenants and provisions of the Security Instrument and the other Loan Documents. In the event that Borrower or any other users or operations at the Premises do not fully comply with all Environmental Laws or the terms, covenants and provisions of the Security Instrument and the other Loan Documents, Holder may, but shall be under no obligation to, comply with same. If Borrower does not fully comply with all Environmental Laws and all of the terms, covenants and provisions of the Security Instrument or the other Loan Documents, Borrower shall reimburse Holder, upon demand, for all reasonable costs and expenses incurred by Holder (including, without limitation, counsel and consulting fees and expenses, investigation and laboratory fees and expenses, court costs and litigation expenses) to the extent not otherwise reimbursed to Holder by Borrower in connection with Holder performing the obligations of Borrower as set forth herein or in the Security Instrument or the other Loan Documents.

C    Indemnification. Borrower hereby absolutely and unconditionally agrees to defend, indemnify, and hold harmless Holder, its employees, agents, trustees, attorneys, officers, directors and shareholders from and against any and all claims, demands, penalties, causes of action, fines, liabilities, settlements, damages, costs or expenses of whatever kind or nature, known or unknown, foreseen or unforeseen, contingent or otherwise, incurred by Holder, its employees, agents, trustees, attorneys, officers or directors (including, without limitation, counsel and consultant fees and expenses, investigation and laboratory fees and expenses, court costs, and litigation expenses) arising out of, or in any way related to: (i) any breach of the provisions of this Loan Agreement; (ii) any breach of any of the provisions of the Security Instrument or any of the Loan Documents; (iii) any Hazardous Discharge or threat thereof of any Hazardous Material which is at, in, on, under, around, from or affecting the Premises, including, without limitation, any violation of any Environmental Laws or any damage or injury resulting from any Hazardous Material to or affecting the Premises or the soil, water, air, vegetation, buildings, personal property, persons or animals located on the Premises or on any other property or otherwise, whether occurring during or prior to the ownership of the Premises; (iv) any personal injury (including wrongful death) and property damages (real or personal) arising out of or related to any such Hazardous Material; (v) any lawsuit brought or threatened, settlement reached, or order or directive of or by any Environmental Authority relating to such Hazardous Material; (vi) any remedial action undertaken by Holder in connection with any of the foregoing.

D    Survival. The obligations and liabilities of Borrower under this Section 20 shall survive and continue in full force and effect and shall not be terminated, discharged, or released, in whole or in part, irrespective of whether the Indebtedness has been paid in full and irrespective of any foreclosure of the Security Instrument, release of any collateral, sale of the Premises pursuant to the provisions of the Security Instrument, or acceptance by Holder, its wholly-owned subsidiary, assignee or nominee of a deed or assignment in lieu of foreclosure or sale, and irrespective of any other fact or circumstance of any nature whatsoever.

E    Dealing with Borrower and Others. Without incurring responsibility to Borrower and without impairing or releasing the liabilities and obligations of Borrower hereunder, Holder, may at any time and from time to

**Page 11 of 21**

time, without the consent of, or notice to Borrower, upon any terms or conditions and in whole or in part shall have the right to: (i) Amend, modify or change the manner, place or terms of payment of the Note or any other Loan Document and/or change or extend the time for payment or renew or alter any liabilities and obligations of Borrower or any security therefor, and the indemnity herein made shall apply to the liabilities and obligations of Borrower, as so amended, modified, changed, extended, renewed or altered; (ii) Sell, exchange, release, surrender, realize upon or otherwise deal with in any manner and in any order, any property by whomsoever at any time pledged, assigned, mortgaged or in which a security interest is given to secure, or howsoever securing, the liabilities and obligations of Borrower; (iii) Exercise or refrain from exercising any rights against Borrower or other persons or entities or against any security given by Borrower or other persons or entities, or otherwise act or refrain from acting; (iv) Settle or compromise any liabilities and obligations of Borrower to Holder, dispose of any security therefor, with or without consideration, or any liability incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liabilities and obligations of Borrower (whether due or not) to creditors of Borrower other than Holder; and (v) Apply any sums by whomsoever paid and howsoever realized for the benefit of Borrower to any liabilities and obligations of Borrower, subject to the provisions of the Loan Documents.

F    Obligations Absolute. The liabilities and obligations of Borrower under this Section 20 shall be absolute and unconditional irrespective of (i) any lack of validity or enforceability of the Note or any other Loan Document; (ii) the insolvency of, or the voluntary or involuntary bankruptcy, assignment for the benefit of creditors, reorganization or other similar proceedings affecting Borrower, any other Guarantor, or any of their assets; or (iii) any other circumstance or claim which otherwise might constitute a defense available to, or a discharge of Borrower with respect to the liabilities and obligations under the Loan Documents, or of Borrower with respect to this Loan Agreement.

21. Notices. All notices, consents, approvals, and requests required or permitted under this Loan Agreement or under any other Loan Document shall be given in writing and shall be effective for all purposes if hand delivered or sent by any of the following methods: (i) overnight delivery by a nationally recognized express transportation company; or (ii) certified or registered United States mail, return receipt requested. Addresses for notices are as follows:

|  |  |
|---|---|
| If to Lender: | RCN Capital, LLC<br>75 Gerber Road East, Ste. 102<br>South Windsor, CT 06074 |
| If to Borrower: | RAD DIVERSIFIED REIT, INC.<br>222 Angels Boulevard<br>Big Bear City, CA 92314 |

A notice shall be deemed to have been given: in the case of hand delivery, at the time of delivery; in the case of overnight delivery by a nationally recognized express transportation company, upon the first attempted delivery on a business day; and in the case of registered or certified mail, when delivered or the first attempted delivery on a business day. Any party to this Loan Agreement may change the address to which notices intended for it are to be directed by means of notice given to the other party in accordance with this Section 21. Each party agrees that it will not refuse or reject delivery of any notice given in accordance with this Section 21, that it will acknowledge, in writing, the receipt of any notice upon request by the other party and that any notice rejected or refused by it will be deemed for purposes of this Section 21 to have been received by the rejecting party on the date so refused or rejected, as conclusively established by the records of the U.S. Postal Service or other nationally recognized express transportation company. Borrower acknowledges and agrees that Lender, or any future servicer of the Loan, on behalf of Lender, may contact Borrower by telephone, text message, email, or by U.S. Postal Service or other nationally recognized express transportation company, for all matters pertaining to the Loan including, without limitation, servicing of the Loan.

**22. LOAN FOR BUSINESS PURPOSE.** Borrower hereby represents, warrants, and certifies to Holder the following:

**Page 12 of 21**

A. The Loan being obtained on the Premises is solely for business purposes, for the purchase and sale and/or rehabilitiation of the Premises.

B. Lender has stressed to the Borrower the importance of knowing the primary purpose of the Loan. Borrower knows that the legal responsibilities of Lender vary considerably depending upon whether the Loan is a consumer loan (for personal, household, or family purposes), or a business loan.

C. Borrower's primary business activity is to purchase, rehabilitate, and resell real property at a profit.

D. Borrower has represented to Lender, and Borrower now again represents to Lender, that the sole purpose of the Loan is to finance the purchase, rehabilitation, and resale of the Premises.

E. The Premises is being purchased/held for business purposes only and will not be used as a personal residence by Borrower.

F. No part of the Loan proceeds are intended to be used for personal, household, or family purposes.

G. The undersigned hereby agrees that the Loan is an exempted transaction under the Truth in Lending Act, 15 U.S.C., § 1601, et. seq.

**23. WAIVER OF RIGHT TO PREJUDGMENT REMEDY, NOTICE, AND HEARING. BORROWER (AND EACH AND EVERY ENDORSER, GUARANTOR, AND SURETY OF THE NOTE) ACKNOWLEDGES THAT THE LOAN EVIDENCED BY THIS LOAN AGREEMENT IS A COMMERCIAL TRANSACTION, AND HEREBY VOLUNTARILY AND KNOWINGLY WAIVE THE RIGHT TO NOTICE AND HEARING UNDER CHAPTER 903a OF THE CONNECTICUT GENERAL STATUTES, OR ANY SUCCESSOR STATUTE OF SIMILAR IMPORT, WITH RESPECT TO ANY PREJUDGMENT REMEDY AS DEFINED THEREIN, AND FURTHER WAIVES DILIGENCE, DEMAND, PRESENTMENT FOR PAYMENT, NOTICE OF NONPAYMENT, PROTEST AND NOTICE OF PROTEST AND NOTICE OF ANY RENEWALS OR EXTENSIONS OF THE NOTE, AND ALL RIGHTS UNDER ANY STATUTE OF LIMITATIONS, AND AGREE THAT THE TIME FOR PAYMENT OF THE NOTE MAY BE CHANGED AND EXTENDED AS PROVIDED IN THE NOTE, IN THE SECURITY INSTRUMENT OR THE LOAN DOCUMENTS, WITHOUT IMPAIRING BORROWER'S LIABILITY THEREON, AND FURTHER CONSENT TO THE RELEASE OF ALL OR ANY PART OF THE SECURITY FOR THE PAYMENT HEREOF, OR THE RELEASE OF ANY PARTY LIABLE FOR THIS OBLIGATION WITHOUT AFFECTING THE LIABILITY OF THE OTHER PARTIES HERETO. ANY DELAY IN EXERCISING ANY RIGHT HEREUNDER, ON THE PART OF HOLDER OF THE NOTE, SHALL NOT OPERATE AS A WAIVER OF ANY SUCH RIGHT, AND ANY WAIVER GRANTED ON ONE OR MORE OCCASIONS SHALL NOT OPERATE AS A WAIVER OF SUCH RIGHT IN THE EVENT OF ANY SUBSEQUENT DEFAULT.**

**24. JURY TRIAL WAIVER. BORROWER AND HOLDER EACH HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, COUNTERCLAIM, OR CROSS-CLAIM ARISING IN CONNECTION WITH, OUT OF, OR OTHERWISE RELATING TO THE LOAN DOCUMENTS, THE INDEBTEDNESS, THE PREMISES, ANY TRANSACTION ARISING THEREFROM OR RELATED THERETO, OR ANY DISPUTE INVOLVING BORROWER AND HOLDER. FURTHER, EXCEPT AS PROHIBITED BY LAW, BORROWER WAIVES ANY RIGHT WHICH IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION BETWEEN THE PARTIES ANY SPECIAL, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES, OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. BORROWER ACKNOWLEDGES AND AGREES THAT THIS SECTION 24 IS A SPECIFIC AND MATERIAL ASPECT OF THIS LOAN AGREEMENT AND THAT HOLDER WOULD NOT EXTEND CREDIT TO BORROWER IF THE WAIVERS SET FORTH IN THIS SECTION 24 WERE NOT A PART OF THIS LOAN AGREEMENT.**

25. No Waiver by Holder. No course of dealing between Borrower and Holder and no failure to exercise or delay in exercising on the part of Holder any right, power, or privilege under the terms of this Loan Agreement or under

the terms of any other Loan Documents or other agreements, or instruments between Holder and Borrower shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power, or privilege hereunder or thereunder preclude any other or further privilege. The rights and remedies provided herein or in any other agreement are cumulative and not exclusive or in derogation of any rights or remedies provided in and thereof, by law or otherwise.

26. Survival of Representations. All agreements, representations, and warranties made herein, in any agreement and in any statements, notices, invoices, certificates, schedules, documents, or other instruments delivered to Holder in connection with this Loan Agreement or any other agreement shall survive the making of the loans and advances hereunder.

27. Rights of Assignees and Successors. All rights of Holder in, to, and under this Loan Agreement and any other instrument or document executed and/or delivered in connection herewith shall pass to and may be exercised by any assignee thereof. Borrower agrees that, in the event of an assignment of this Loan and notice of such assignment to Borrower, the liability of Borrower to any holder of this Loan, provided such holder is a holder for value, shall be immediate and absolute and not affected by any actions of Holder and that Borrower will not set up any claim against Holder as a defense, counterclaim, or setoff to any action for the unpaid balance owed under this Loan Agreement or for possession brought by said holder. All rights of Holder hereunder shall inure to the benefit of its successors and assigns and any subsequent holder of the Note, and all Indebtedness of Borrower shall bind the heirs, executors, administrators, successors, and assigns of Borrower.

28. Attorneys' Fees and Expenses. Borrower agrees to pay all reasonable attorneys' fees and expenses, including recording and filing fees, incurred by Holder in connection with the financing being concluded this day as well as any fees and expenses of counsel, whether incurred before or after the Indebtedness is paid and performed in full, which Holder may hereafter incur in reasonably protecting, enforcing, increasing, or releasing any security held by Holder, and in foreclosing any mortgage and/or in sustaining the validity of any mortgage Borrower specifically authorizes Holder to pay all such fees and expenses and charge the same to its account.

29. Headings. The descriptive headings of the several sections of this Loan Agreement are inserted for convenience only and shall not be deemed to affect the meaning or construction of any of the provisions hereof.

30. Severability. If any provision of this Loan Agreement or application thereof to any person or circumstance shall to any extent be invalid, the remainder of this Loan Agreement or the application of such provision to persons, entities, or circumstances other than those as to which it is held invalid, shall not be affected thereby and each provision of this Loan Agreement shall be valid and enforceable to the fullest extent permitted by law.

31. Choice of Law. This Loan Agreement shall be governed by the laws of the state of Connecticut.

32. Amendments; Entire Agreement; Counterparts. This Loan Agreement may not be altered, amended, waived, or modified in any way whatsoever except by a writing duly executed by the party to be charged therewith. This Loan Agreement, together with the other Loan Documents, constitutes the entire agreement between the parties with respect to the subject matter hereof and constitutes a complete and exclusive statement of the terms of the agreement between the parties with respect to the subject matter hereof. This Loan Agreement, together with the other Loan Documents, supersedes all prior communications, contracts, or agreements between the parties with respect to the subject matter addressed in this Loan Agreement, whether oral or written. This Loan Agreement may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page. Any signature page of this Loan Agreement may be detached from any counterpart of this Loan Agreement without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Loan Agreement identical in form hereto but having attached to it one or more additional signature pages.

33. Lender's Right to Assign. Holder shall have the right to sell, assign, participate, transfer, or dispose of all or any part of its interest in the Loan without the consent or approval of Borrower.

34. Leasing Covenant. Intentionally left blank.

**Page 14 of 21**

35. Post-Closing Requirements. Intentionally left blank.

36. Origination Fee Rebate. Intentionally left blank.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the undersigned have executed this Commercial Loan Agreement on _10/18_
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _, 2022.

RAD DIVERSIFIED REIT, INC.

By: _____

Name: Brandon D. Mendenhall

Title: CEO

STATE OF _Florida_ _ _ _ _ _ _ _ _ _ _ )

)ss. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

COUNTY OF _Hillsborough_ _ _ _ _ _ _ _ )

The foregoing instrument was acknowledged by means of __x__ physical presence _____ online notarization before me this _18th_ day of _October_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _, 2022, by Brandon D. Mendenhall, CEO of RAD DIVERSIFIED REIT, INC., a Maryland corporation, on behalf of the corporation. He/she is _x_ personally known to me _ _ _ _ has produced Drivers license _ _ _ _ _ _ _ _, as identification.

_____

Notary Public

Michelle Caroline Tchu, Notary Public

MICHELLE CAROLINE TCHU
Notary Public-State of Florida
Commission # HH 124055
My Commission Expires
April 28, 2025

**Page 16 of 21**

IN WITNESS WHEREOF, the undersigned have executed this Commercial Loan Agreement on the **24** day of _ _
_ _ _ **OCT** _ _ _ _ _ _ _ _ _ _ _ _ _, 2022.

RCN Capital, LLC

By: _____

Angela DiTommaso, Authorized Signer

| | |
|---|---|
| STATE OF CONNECTICUT | ) |
| | )ss. South Windsor |
| COUNTY OF HARTFORD | ) |

I certify that on the _ **24** _ day of _ _ _ **OCT** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _, 20**22**, Angela
DiTommaso came before me in person and stated to my satisfaction that he/she made the attached instrument;
and was authorized to and did execute this instrument on behalf of, and as Authorized Signer of RCN Capital,
LLC (the "Company"), the entity named in this instrument, as the free act and deed of the Company, by virtue of
the authority granted by its operating agreement and its members

_____
Notary Public

CECELIA RITSKOWITZ
Notary Public of Connecticut
My Commission Expires 03/31/2025

SCHEDULE 1
BUDGET

| Item (Do not change the names) | Description (Fill in this section, describe work to be completed in detail) | UNIT 1 - Cost |
|---|---|---|
| Draw Item | DrawDescription | DrawBudget |
| Demo & Trash Out | | |
| Architectural Plans, Permits, Fees, Etc. | roof/window/electric/plumber GC pull builders permit | $2,500.00 |
| Mold Remediation | | |
| Landscaping | | |
| Retaining Wall | | |
| Tree Removal | | |
| Fencing | | |
| Pool -In-ground Swimming Pool | | |
| Driveway / Sidewalk | | |
| Insulation | | |
| Deck / Patio | | |
| Porch | | |
| Garage Doors | n/a | $2,000.00 |
| Garage Door Opener | | |
| Roofing Replace | | |
| Roofing Repair | | |
| Roofing Soffit / Fascia | | |
| Gutters & Downspout | | |
| Siding / Stucco | | |
| Windows | | |
| Stairways | | |
| Foundation Repair | | |
| Chimney / Fireplace Repair | | |
| HVAC-Furnace / Boiler | | |
| HVAC-A/C | | |
| HVAC-Duct, or Baseboard Work | | |
| Hot Water Heater | | |
| Electrical Panel / General Wiring | | |
| Electrical Fan / Light Fixtures | | |
| Electrical Receptacles / Switches | | |
| Electrical | | |
| Carpentry - Trim / Finish | | |
| Carpentry - Rough / Framing | | |
| Doors Exterior | | |
| Doors Interior | | |
| Drywall Remove & Replace | | |

| | | |
|---|---|---|
| Wall Remove & Replace | | |
| Wallpaper / Wall Covering | | |
| Wall Repair | | |
| Flooring Tile | | |
| Flooring Carpeting | | |
| Flooring Hardwood | | |
| Flooring Vinyl / Laminate | | |
| Flooring | | |
| Painting Exterior | | |
| Painting Interior | | |
| Kitchen Cabinetry | | |
| Kitchen Countertops | | |
| Kitchen Electrical | | |
| Kitchen Plumbing | | |
| Kitchen | | |
| **Kitchen Appliances-Refrigerator** | | |
| **Kitchen Appliances-Range / Stove Top / Oven** | | |
| **Kitchen Appliances-Range Hood** | | |
| **Kitchen Appliances-Dishwasher** | | |
| **Laundry-Clothes Washer** | | |
| **Laundry-Clothes Dryer** | | |
| Appliances | wash and dryer stainless steel | $1,200.00 |
| Bathroom Vanity / Sink | | |
| Bathroom Plumbing | | |
| Bathroom Electrical | | |
| Bathroom Toilet | | |
| Bathroom Tub / Shower / Surround | | |
| Bathroom Tile | | |
| Bathroom | | |
| Project Management | | |
| Fences & Gates | | |
| Closets. | | |
| Swimming Pool. | | |
| Kitchen Appliances | | |
| Electrical | | |
| Plumbing (Rough & Final). | | |
| Plumbing Fixtures & Hardware | | |
| Paint | | |

| | | |
|---|---|---|
| **Contingency** | | $10,020.00 |
| **driveway** | pavers or concrete driveway depending on availability/completion time | $10,000.00 |
| **Clean & Trash Removal** | remove any remanding supplies/trash and hired professional to clean/sanitize inside home | $700.00 |
| **Finish electrical** | hang 2-3 celing fans and 6-8 light fixtures along with hanging all covers | $1,500.00 |
| **Finish Plumbing** | connecting 4 sinks properly and verify no leaks | $500.00 |
| **Finsish HVAC** | replace all interior vents 10-12 replace 1 filter | $1,000.00 |
| **Cabinets Kit, Bath & Counter** | three new shaker wood style vanitys kitchen cabinets wont touch unless need be | $5,000.00 |
| **Doors** | 10 interior doors replaced with 6 panel doors with brush nickel hardware finsish | $3,500.00 |
| Flooring | lamiante wood plank style throughout entire home excluding restrooms with cermanic tile in restrooms | $8,000.00 |
| **Paint** | sherman williams super paint or similiar 40 gallons interior/ 20 gallons exterior | $4,000.00 |

| | | |
|---|---|---|
| Drywall | 150 sheets of drywal throughout entire home including ceiling/mud/texture | $5,500.00 |
| Rough Electrical | update fuse box 16-20 breakers and replace outlets 60-70/ light switches 18-20 | $8,000.00 |
| Rough HVAC | Install new 4 ton unit from a hired professional | $6,000.00 |
| Rough Plumbing | update plumbing fixtures in all restrooms and kitchen, install new 1/2 inch piping in shower/tub and new 40 gallon water heater | $4,500.00 |
| Windows & Exterior Doors | 10 double hung vinyl windows and | $15,000.00 |
| stucco/siding exterior | fix any stucco if needed | $2,500.00 |
| Roof | hired licensed professional to replace roof shingles (GAP Timberline HDZ) | $13,500.00 |
| Cleanout & Demo | complete remodel removing all flooring/cabinets/restrooms/doors/baseboards/lights/tubs | $4,500.00 |
| Kitchen-Appliance Package | | |
| | | |
| | | |
| | **Total Cost:** | **$110,220.00** |

BORROWER SIGN TO ACKNOWLEDGE:

RAD DIVERSIFIED REIT, INC.

By: _____
Name: Brandon D. Mendenhall
Title: CEO

**Page 21 of 21**

# GUARANTY





## COMMERCIAL GUARANTY

THIS COMMERCIAL GUARANTY (the "Guaranty") is made by **Brandon D. Mendenhall** ("Guarantor"), an individual, residing at 222 Angels Boulevard, Big Bear City, CA 92314.

FOR VALUE RECEIVED, Guarantor hereby unconditionally and absolutely guarantees the prompt payment and performance of a certain Commercial Promissory Note (the "Note") in the principal amount of Three Hundred Forty Thousand Two Hundred Dollars and No Cents ($340,200.00), plus interest, fees, and any other charges due thereunder (all sums due under the aforesaid Note are hereinafter referred to collectively, as the "Indebtedness") made and delivered simultaneously with this Guaranty by RAD DIVERSIFIED REIT, INC., in favor of RCN Capital, LLC, a Connecticut limited liability company with a principal place of business at 75 Gerber Road East, Ste. 102, South Windsor, CT 06074, and its assigns (collectively, the "Holder"); and all monies coming due under a certain Commercial Loan Agreement (the "Loan Agreement") between Borrower and Lender, any mortgage or any other document granted to secure the Indebtedness, any environmental indemnification agreement, and any other document executed in relation to and simultaneously with the Indebtedness (all of the foregoing document are hereinafter referred to collectively as the "Loan Documents").

1. Consent to Modifications. Guarantor consents to any change in the terms and conditions of the Loan Documents, including but not limited to, any change in the collateral provided in the Loan Documents or any change with respect to the parties who may be liable with respect to the Loan Documents, with notice to, or further assent by, Guarantor. Guarantor is to remain bound upon this Guaranty, notwithstanding any such change or extension or release, substitution, exchange or other indulgence granted any maker of the Indebtedness. Guarantor hereby waives all defenses, counterclaims, or offsets which Guarantor might have by reason of any change in or to the Loan Documents or any release, exchange, surrender, or impairment of security, or any addition or release of any party liable with respect to the Loan Documents.

2. Default. Upon any Event of Default of (as defined in each respective loan document), Borrower in the payment or performance under any of the Loan Documents, Holder may enforce this Guaranty immediately against Guarantor and may exercise remedies under any security instruments given to secure the obligations under this Guaranty, without the necessity of any suit or action against Borrower or any other party and without resorting to and without regard to any collateral or any other guarantee or any other source of payment. In the event of default under any of the Loan Documents, Guarantor further agrees to pay all costs, without limitation, reasonable attorneys' fees, incurred or expended by Holder in the collection or attempted collection under this Guaranty and in realization of any lien or security interest securing amounts due hereunder, including, without limitation, those incurred as a result of Holder's participation in any proceeding involving Guarantor under the Federal Bankruptcy Code.

3. Delay or Omission No Waiver; Continuing Guaranty. No delay or omission in exercising any right hereunder shall operate as a waiver of such right or any other right; and a waiver on one occasion shall not be a bar to or waiver of any right on any other occasion. This Guaranty is a continuing guaranty which shall take effect on its delivery to Holder and shall remain in full force and effect and be binding upon Guarantor until the complete satisfaction of all of the obligations set forth in the Loan Documents.

4. Waiver. Guarantor hereby waives demand, presentment, protest, and notice of acceptance of this Guaranty by Holder, and of any loans made, extensions granted or other action taken in reliance hereon and all other demands and notices of any description in connection with this Guaranty, or under the Loan Documents.

5. Representations and Warranties. Guarantor represents and warrants that: (a) Guarantor is deriving direct financial benefit from the Indebtedness; (b) Guarantor is not now insolvent and will not be rendered insolvent by the execution hereof or the performance hereunder; (c) there are no actions, suits or proceedings pending, and Guarantor has not received notice of any actions, suits, proceedings, against or affecting Guarantor, or the properties of Guarantor before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which, if determined adversely to Guarantor, would have a material adverse effect on the financial condition, properties or operations of Guarantor; (d) the most recent financial statements of Guarantor, copies of which statements have been furnished to Holder, fairly present the financial condition of Guarantor as of such dates in accordance with generally accepted accounting principles applied on a consistent

basis, and since the date of each of such financial statements, there has been no material adverse change in such condition or operations; (e) Guarantor is not a party to any indenture, loan or credit agreement or any lease or other agreement or instrument or subject to any charter or other restriction which would have a material adverse effect on the ability of Guarantor to carry out its obligations hereunder; (f) no information, exhibit or report furnished by Guarantor to Holder in connection with the negotiation of this Guaranty contained as of the date thereof, or, if there be no such date, the date of furnishing thereof, any untrue statements of a material fact and do not omit to state any material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading; (g) this Guaranty constitutes the valid and legally binding obligation of Guarantor, enforceable in accordance with its terms, except as the enforcement may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditor's rights generally; and (h) all authorizations, consents and approvals of governmental bodies or agencies required in connection with the execution and delivery of this Guaranty, or in connection with the performance of Guarantor's obligations hereunder, if any, have been obtained as required hereunder or by law

6. Dealing with Borrower and Others. Without incurring responsibility to Guarantor and without impairing or releasing the liabilities and obligations of Guarantor hereunder, Holder may, at any time and from time to time, without the consent of or notice to Guarantor, upon any terms or conditions and in whole or in part shall have the right to: (a) sell, exchange, release, surrender, realize upon or otherwise deal with in any manner and in any order, any property by whomsoever at any time pledged, assigned, mortgaged or in which a security interest is given to secure, or howsoever securing, the liabilities and obligations of Borrower; (b) exercise or refrain from exercising any rights against Borrower or other persons or entities (including Guarantor) or against any security given by Borrower or other persons or entities (including Guarantor), or otherwise act or refrain from acting; (c) Settle or compromise any liabilities and obligations of Borrower to Holder, dispose of any security therefor, with or without consideration, or any liability incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liabilities and obligations of Borrower (whether due or not) to creditors of Borrower other than Holder and Guarantor; and (d) apply any sums by whomsoever paid and howsoever realized for the benefit of Borrower to any liabilities and obligations of Borrower, subject to the provisions of the Loan Documents.

7. Subrogation. So long as: (i) the Indebtedness remains unpaid; (ii) any liabilities and obligations of Borrower exist under the Loan Documents; or (iii) any liabilities and obligations of Guarantor exist under this Guaranty; Guarantor waives any and all rights of indemnification, reimbursement, subrogation or contribution which Guarantor may otherwise have now or hereafter as a matter of law against Borrower.

8. Obligations Absolute; No Impairment; Rights Cumulative. The liabilities and obligations of Guarantor hereunder shall be absolute and unconditional irrespective of: (i) any lack of validity or enforceability of the Indebtedness or any other Loan Document; (ii) the insolvency of, or the voluntary or involuntary bankruptcy, assignment for the benefit of creditors, reorganization, or other similar proceedings affecting Borrower, Guarantor, any other guarantor of the Indebtedness, or any assets owned by the aforementioned persons or entities; or (iii) any other circumstance or claim which otherwise might constitute a defense available to, or a discharge of, Borrower with respect to its liabilities and obligations under the Loan Documents, or of Guarantor with respect to this Guaranty. No invalidity, irregularity or unenforceability of all or any part of any liabilities and obligations of Borrower or the impairment or loss of any security therefor, whether caused by any actions or inactions of Holder, or otherwise, shall affect, impair or be a defense to this Guaranty. All rights, powers and remedies afforded to Holder by reason of this Guaranty are separate and cumulative remedies, and no one of such remedies whether or not exercised by Holder shall be deemed to exclude any of the other remedies available to Holder nor prejudice the availability of any other legal or equitable remedy which Holder may have with respect to the Indebtedness.

**9. COMMERCIAL TRANSACTION. GUARANTOR ACKNOWLEDGES THAT THIS GUARANTY AND EACH TRANSACTION RELATED TO IT IS A "COMMERCIAL TRANSACTION" WITHIN THE MEANING OF CHAPTER 903A OF THE CONNECTICUT GENERAL STATUTES, AS AMENDED. GUARANTOR WAIVES ANY RIGHT WHICH THEY MIGHT HAVE TO A NOTICE AND A HEARING OR A PRIOR COURT ORDER, UNDER SAID CHAPTER 903A OR AS OTHERWISE PROVIDED UNDER ANY APPLICABLE FEDERAL OR STATE LAW, IN THE EVENT HOLDER SEEKS ANY PREJUDGMENT REMEDY IN CONNECTION WITH THIS GUARANTY.**

10. Joint and Several Liability; Successors and Assigns; Counterparts. The liability of Guarantor under this Guaranty shall be joint and several with that of each and every other guarantor under any other Commercial Guaranty executed in connection with the Loan. This Guaranty shall inure to the benefit of Holder, and its successors and assigns, and it shall be binding upon Guarantor and the executors, administrators, heirs, successors, and assigns, of Guarantor. This Guaranty may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page. Any signature page of this Guaranty may be detached from any counterpart of this Guaranty without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Guaranty identical in form hereto but having attached to it one or more additional signature pages.

11. Choice of Remedy; Lawsuit or Arbitration. Any claim or controversy arising out of or relating to this Guaranty may, at the sole option and election and discretion of the Holder and without prior notice to the Guarantor of such election, be either be adjudicated by i) a civil lawsuit in any court of competent jurisdiction, including the state courts of Connecticut, or ii) arbitration administered by the American Dispute Resolution Center, Inc. (the "ADR Center") in accordance with its Rules of Commercial Arbitration (the "Rules") as in effect at the time of such arbitration's commencement as amended as herein stated below, and subject to Chapter 909 of the Connecticut General Statutes, and judgment on an award rendered by the arbitrator may be entered in any court of competent jurisdiction. Notwithstanding the existing Rules of the ADR Center, the Guarantor and the Holder specifically agree to amend said Rules for any claim or controversy to be arbitrated between the Guarantor and the Holder to the extent of the following:

a. The arbitrator shall be Keith K. Fuller, Esq. of Enfield, Connecticut (the "Arbitrator"), and if such Arbitrator is unable or unwilling to act as Arbitrator, then the selection of the Arbitrator shall be made by the Holder from a list provided by the ADR Center, and any objections made to the selection of a particular Arbitrator by the Holder shall be made in writing to the ADR Center within five (5) calendar days of the selection, and no extensions of time shall be granted.

b. There shall be one (1) Arbitrator selected only.

c. The Guarantor and Holder agree to waive oral, in-person or virtual hearings, and agree to make only written submissions to the Arbitrator.

d. The Guarantor and the Holder agree to waive administrative conferences.

e. The Guarantor and the Holder agree to waive any conflicts of interest with respect to the Arbitrator and any party to the arbitration.

f. The Guarantor and the Holder additionally agree to waive the effectiveness of Connecticut General Statutes Sections 52-407kk(b) and 52-407ll(c). It is a known and agreed fact that Keith K. Fuller, Esq. has previously or currently represents the Holder as counsel, but in unrelated matters not affecting the Guarantor, and Guarantor and Holder agree that Keith K. Fuller, Esq. as Arbitrator shall be presumed to be acting without partiality toward any party

12. Governing Law. This Guaranty is, and shall be deemed to be, a contract entered into under and pursuant to the laws of the State of Connecticut and shall be in all respects governed, construed, applied and enforced in accordance with the laws of said state without regard to conflicts of laws considerations; and this Guaranty shall be construed without regard to any presumption or rule requiring construction against the party causing such instrument or any portion thereof to be drafted; and no defense given or allowed by the laws of any other state or country shall be interposed in any action or proceeding hereon unless such defense is also given or allowed by the laws of the State of Connecticut. The undersigned agrees to submit to personal jurisdiction in the State of Connecticut in any action or proceeding arising out of this Guaranty and, in furtherance of such agreement, the undersigned hereby agrees and consents that without limiting other methods of obtaining jurisdiction, personal jurisdiction over the undersigned in any such action or proceeding may be obtained within or without the jurisdiction of any court located in Connecticut and that any process or notice of motion or other application to any such court in connection with any such action or proceeding may be served upon the undersigned by registered mail to or by personal service at the last known address of the undersigned, whether such address be within or without the jurisdiction of any such court.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the undersigned have executed this Commercial Guaranty on *10/18* _____ _____, 2022.

Brandon D. Mendenhall

_____
Brandon D. Mendenhall

STATE OF _Florida_____ )
                                )ss. _____
COUNTY OF _Hillsborough_____ )

The foregoing instrument was acknowledged by means of __x___ physical presence _____ online notarization before me this _18th_ day of _October_____, 2022, by Brandon D. Mendenhall, who ___ is personally known to me or _x_ has produced a _*Drivers License*__ _____ (type of identification), as identification.

_____
Notary Public
Michelle Caroline Tchu, Notary Public

MICHELLE CAROLINE TCHU
Notary Public-State of Florida
Commission # HH 124055
My Commission Expires
April 28, 2025

# COMMERCIAL PROMISSORY NOTE





## COMMERCIAL PROMISSORY NOTE

1. Promise to Pay. FOR VALUE RECEIVED, **RAD DIVERSIFIED REIT, INC.** (the "Borrower"), a Maryland corporation with a principal place of business of 7 St. Paul Street, Suite 820, Baltimore, MD 21202 promises to pay to the order of **RCN Capital, LLC**, a Connecticut limited liability company with a principal place of business at 75 Gerber Road East, Ste. 102, South Windsor, CT 06074, or its assigns (collectively, the "Holder"), the principal sum of **Three Hundred Forty Thousand Two Hundred Dollars and No Cents ($340,200.00)** (the "Loan"), or so much of the Loan as may be advanced hereunder from time to time (the "Current Balance"), together with interest on the Current Balance computed from the date advanced (the "Commencement Date"), all as hereinafter provided, subject to the terms and conditions of a certain Commercial Loan Agreement (the "Loan Agreement"), executed by Borrower and Holder, and upon the following terms, agreements, and conditions:

2. Interest. Interest shall accrue on the unpaid Current Balance at the rate of 9.49% per annum. Interest is calculated on the basis of a 360-day year and the actual number of days elapsed. No interest will accrue on undisbursed portions of the Loan.

3. Maturity Date. The unpaid Current Balance, all accrued interest thereon, and all other fees or charges shall be due and payable on November 1, 2023 (the "Maturity Date"), provided, however, that from and after (i) the Maturity Date, whether upon stated maturity, acceleration, or otherwise, or (ii) the date on which the interest rate hereunder is increased to the Default Rate (as hereinafter defined) as provided herein, interest shall be computed at the Default Rate.

4. Payments. Beginning on December 1, 2022 and continuing on the first (1st) day of each month thereafter, through and including the Maturity Date, Borrower shall make monthly payments of interest, in arrears. All unpaid principal, interest, and other sums due hereunder shall be due and payable in full on the Maturity Date. All payments shall be payable in lawful money of the United States of America and shall be made by wire transfer to an account designated by Holder to Borrower from time to time, or at Holder's election, shall be made through automated clearing house (ACH) transfers from an account designated by Borrower. All payments will be applied first to any unpaid collection costs and late charges, then to accrued and unpaid interest, and any remaining amount to principal. Whenever any payment to be made hereunder shall be due on a day other than a business day, such payment shall be made on the next succeeding business day. The term "business day" as used herein shall mean any day other than a Saturday, Sunday, or public holiday.

A   Loan Termination Fee. Should Borrower make any payment of principal, whether partial or full, after August 1, 2023, Borrower shall, at the time of such principal payment, pay Holder a fee (the "Loan Termination Fee") equal to ONE PERCENT (1%) of the principal amount paid.

5. Prepayment. Subject to Section 4(A), Borrower may prepay the unpaid principal balance hereof, together with accrued interest thereon, in whole or in part, without penalty or premium, it being understood and agreed that, except as expressly provided herein, Borrower shall not be entitled to, whether claimed by virtue of prepayment or any other grounds, a refund any fees, expenses, interest, points, charges and the like paid by Borrower to Holder, all of which payments will be retained by Holder from and after the date each such payment is made hereunder.

6. Default. At the election of Holder, the Maturity Date may be accelerated, and all sums due hereunder shall become immediately due and payable without notice or demand, upon the occurrence of any of the following events (each an "Event of Default"): (a) Any failure by Borrower to pay in full any sum due hereunder on or before the date such sum is due; (b) Any failure by Borrower to perform or observe any other term or provision herein; (c) Any default under the Security Instrument (as hereinafter defined), a default under the Guaranty (as hereinafter defined) or a default under or misrepresentation contained in any other agreement, document, or certificate of Borrower or any Guarantor (as hereinafter defined) in connection with the Loan, which default is not cured within any grace period expressly provided therefor in such document; (d) Any failure by Borrower to satisfy a Condition Precedent set forth in the Loan Agreement; (e) Borrower shall: (i) apply for or consent to the appointment of a receiver,

Page 1 of 4

trustee, liquidator or custodian of itself or of all or substantially all of its property and assets; (ii) make a general assignment for the benefit of its creditors; (iii) be dissolved or liquidated; (iv) become insolvent (as such term may be defined or interpreted under any applicable statute); (v) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect, or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it; or (vi) take any action for the purpose of effecting any of the foregoing. In addition to the rights and remedies provided herein, Holder may exercise any other right or remedy available under applicable law or under any other document, instrument, or agreement evidencing, securing, or otherwise relating to the indebtedness evidenced hereby, in accordance with the terms thereof, all of which rights and remedies shall be cumulative. The payment and acceptance of any sum shall not be considered a waiver of such right of election. Borrower hereby agrees to indemnify, defend, and hold Holder harmless from and against any and all claims, loss, cost, damage or expense (including, without limitation, reasonable attorneys' fees) which may be incurred by Holder in connection with, or as a result of, any Event of Default.

7. Default Rate. Beginning on the earlier of (i) the Maturity Date; (ii) the date on which an Event of Default occurs; or (iii) the date on which Holder accelerates the entire amount of the indebtedness due hereunder, without notice or any required action by Holder; the Current Balance will accrue interest at a rate (the "Default Rate") equal to the lesser of (i) Sixteen Percent (16%) per annum; or (ii) the Maximum Rate (as hereinafter defined)). Following an Event of Default, interest will continue to accrue at the Default Rate until such Event of Default, and any other Events of Default are cured. In the event Holder, obtains a judgment on this promissory note the interest will continue to accrue at the Default Rate after judgment until all sums are paid in full. Notwithstanding anything to the contrary contained herein, under no circumstances shall the aggregate amount paid, or agreed to be paid, hereunder exceed the highest lawful rate permitted under any applicable usury law (the "Maximum Rate") and the payment obligations of Borrower under this Note are hereby limited accordingly. If under any circumstances, whether by reason of advancement or acceleration of the aggregate amounts paid on this promissory note (as may be amended, restated, or modified from time to time, the "Note"'), should cause the effective interest rate of the Note to exceed the Maximum Rate, Borrower stipulates that payment and collection of such excess amounts shall have been and will be deemed to be the result of a mistake on the part of both Borrower and Holder. The party that receives such excess payments shall promptly credit such excess (to the extent such payments in excess of the Maximum Rate) against the unpaid principal balance hereof. Any portion of such excess payments not capable of being so credited will be refunded to Borrower.

8. Late Charges. If any payment of interest is not paid within ten (10) days of the date such payment is due, a late charge equal to the lesser of (i) ten percent (10%) of such overdue payment; or (ii) the maximum amount permitted by applicable law shall automatically become due to the Holder of this Note. If any payment of principal is not paid within ten (10) days of the date such payment is due, a late charge equal to the lesser of: (i) three percent (3%) of such overdue payment; or (ii) the maximum amount permitted by applicable law; shall automatically become due to the Holder of this Note. Said late charges do not constitute interest and shall constitute compensation to Holder of this Note for collection administration costs incurred hereunder. In addition, if any payment of principal or interest is not paid when due, the rate of interest per annum on the outstanding Current Balance shall increase to the Default Rate and such rate increase shall remain in force and effect for so long as such default shall continue. This paragraph shall not be construed as an agreement or privilege to extend the due date of any payment, nor as a waiver of any other right or remedy accruing to Holder by reason of any default or Event of Default.

9. Security and Guaranty. The obligations hereunder, including the obligation to make full and timely payments of principal and interest, are secured by, among other things, the following: the Loan Agreement; a certain Commercial Guaranty (the "Guaranty") executed by Brandon D. Mendenhall (the "Guarantor"); a certain Mortgage, Assignment of Rents and Security Agreement (the "Security Instrument") granted by RAD DIVERSIFIED REIT, INC., in favor of RCN Capital, LLC, encumbering the real property and improvements at 795 89th Ave N, St. Petersburg, FL 33702.

10. Reservation of Holder's Rights. Notwithstanding any course of dealing or course of performance: (i) neither failure nor delay on the part of Holder to exercise any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power, or privilege; (ii) no notice to or demand upon

**Page 2 of 4**

Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Holder to take further action without notice or demand; and (iii) no amendment, modification, rescission, waiver, or release of any provision of this Note shall be effective unless the same shall be in writing and signed by Holder.

11. Costs and Expenses. Borrower will pay to Holder all costs and expenses of collection hereof (including reasonable attorneys' fees).

12. Completion of Instrument; Reproduction Admissible; Counterparts. Borrower authorizes Holder to complete this Note if delivered incomplete in any respect. A photographic or other reproduction of this Note shall be admissible in evidence with the same effect as the original Note in any judicial or other proceeding, whether or not the original is in existence. This Note may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page. Any signature page of this Note may be detached from any counterpart of this Note without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Note identical in form hereto but having attached to it one or more additional signature pages.

**13. WAIVER OF RIGHTS/DELAY; WAIVER OF JURY TRIAL. BORROWER AND EACH SURETY, ENDORSER, AND GURANTOR HEREOF ACKNOWLEDGE THAT THE LOAN EVIDENCED BY THIS NOTE IS A COMMERCIAL TRANSACTION AND HEREBY VOLUNTARILY AND KNOWINGLY WAIVE THE RIGHT TO NOTICE AND HEARING UNDER CHAPTER 903a OF THE CONNECTICUT GENERAL STATUTES, OR ANY SUCCESSOR STATUTE OF SIMILAR IMPORT, WITH RESPECT TO ANY PREJUDGMENT REMEDY AS DEFINED THEREIN, and further waive diligence, demand, presentment for payment, notice of nonpayment, protest and notice of protest, notice of any renewals or extensions of this Note, and all rights under any statute of limitations, and agree that the time for payment in this Note may be changed and extended as provided in the Loan Agreement, without impairing their liability thereon, and further consent to the release of all or any part of the security for the payment hereof, or the release of any party liable for this obligation without affecting the liability of the other parties hereto. Any delay on the part of Holder in exercising any right hereunder shall not operate as a waiver of any such right, and any waiver granted for one occasion shall not operate as a waiver in the event of any subsequent default. In the interest of a speedy resolution of a lawsuit which may arise hereunder, Borrower and each accommodation maker and endorser under this Note waive a trial by jury in any action with respect to this Note and as to any issues arising relating to this Note. Any funds received by Holder after maturity, whether by acceleration or otherwise, shall be applied to amounts then due and Holder's acceptance of any such funds shall not be construed as a waiver of Borrower's default.**

14. Governing Law. This Note shall be governed by, and shall be construed and interpreted in accordance with, the laws of the state of Connecticut.

15. Binding Effect. The terms and provisions of this Note shall be binding upon Borrower and its successors and assigns, and shall inure to the benefit of Holder and its successors and assigns.

[Remainder of page intentionally left blank]

**Page 3 of 4**

IN WITNESS WHEREOF, the undersigned have executed this Commercial Promissory Note on _10/18/_ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _, 2022.

**RAD DIVERSIFIED REIT, INC.**

By: _____

Name: Brandon D. Mendenhall

Title: CEO


STATE OF Florida_ _ _ _ _ _ _ _ _ _          )
                                              )ss. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
COUNTY OF Hillsborough_ _ _ _ _ _ _ _          )

The foregoing instrument was acknowledged by means of ___x___ physical presence _____ online
notarization before me this _18th_ day of _October_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _, 2022, by Brandon D.
Mendenhall, CEO of RAD DIVERSIFIED REIT, INC., a Maryland corporation, on behalf of the corporation.
He/she is _ _ _ _ personally known to me _x_ _ has produced Drivers License _ _ _ _ _ _ _ _,
as identification.

_____

Notary Public

Michelle Caroline Tchu, Notary Public

MICHELLE CAROLINE TCHU
Notary Public-State of Florida
Commission # HH 124055
My Commission Expires
April 28, 2025

**Page 4 of 4**

████████████████

…….............................. Space Above Line for Recorder's Use …….....................................

## MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

██████████████████████████████

| THIS DOCUMENT PREPARED BY: | AFTER RECORDING, RETURN TO: |
|---|---|
| Angela DiTommaso<br>ADiTommaso@EliteCommercialClosings.com<br>RCN Capital, LLC<br>75 Gerber Road East, Ste. 102<br>South Windsor, CT 06074 | RCN Capital, LLC<br>75 Gerber Road East, Ste. 102<br>South Windsor, CT 06074 |

████████████████

## MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

THIS MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT (the "Instrument") is made by **RAD DIVERSIFIED REIT, INC.** (the "Mortgagor"), a Maryland corporation with a principal place of business at 7 St. Paul Street, Suite 820, Baltimore, MD 21202; in favor of **RCN Capital, LLC** (the "Mortgagee"), a Connecticut limited liability company with a principal place of business at 75 Gerber Road East, Ste. 102, South Windsor, CT 06074, its successors and assigns.

### RECITAL

Mortgagor is indebted to Mortgagee in the principal amount of **Three Hundred Forty Thousand Two Hundred Dollars and No Cents ($340,200.00)**, as evidenced by Mortgagor's Commercial Promissory Note (as the same may be amended, restated, or modified from time to time, the "Note"), payable to Mortgagee, executed and delivered contemporaneously with this Instrument, and maturing on November 1, 2023 (the "Maturity Date"), subject to the terms and conditions of that certain Commercial Loan Agreement (as the same may be amended from time to time, the "Loan Agreement"), between Mortgagor and Mortgagee executed and delivered contemporaneously herewith.

### AGREEMENT

TO SECURE TO Mortgagee the full and prompt payment and performance of each and all of Mortgagor's obligations under the Note, and the performance of the covenants and agreements of Mortgagor contained in this Instrument, and in any other documents evidencing, securing, or now or hereafter executed in connection with the Note (each, a "Loan Document"; collectively, the "Loan Documents"; and all of the indebtedness, obligations, and liabilities of Mortgagor arising under the Note, the Loan Documents, or both, and any and all renewals, modifications, rearrangements, amendments, or extensions thereof, are sometimes hereinafter referred to as the "Indebtedness"), Mortgagor hereby MORTGAGES, WARRANTS, HYPOTHECATES, AND ASSIGNS to Mortgagee, the following described property (collectively, the "Premises"):

A   The real property located in Pinellas County, Florida, at **795 89th Ave N, St. Petersburg, FL 33702**, as such real property is more particularly described in SCHEDULE 1, attached hereto and made a part hereof for all purposes the same as if set forth herein verbatim; together with all right, title, and interest of Mortgagor in and to (i) all streets, roads, alleys, easements, rights-of-way, licenses, rights of ingress and egress, vehicle parking rights and public places, existing or proposed, abutting, adjacent, used in connection with or pertaining to the real property or the Improvements (as hereinafter defined), (ii) any strips or gores between the real property and abutting or adjacent properties, and (iii) all water and water rights, timber, crops and mineral interests pertaining to the real property (such real property and other rights, titles, and interests being hereinafter sometimes called the "Land");

B   All buildings, structures, improvements now constructed or at any time in the future constructed or placed upon the Land, including any future alterations, replacements and additions (the "Improvements");

**Page 2 of 14**

C   All fixtures and systems and articles of personal property, of every kind and character, now owned or hereafter acquired by Mortgagor which are now or hereafter is attached to the Land or the Improvements so as to constitute a fixture under the laws of the state of Florida, and used in or necessary to complete the proper planning, development, use, occupancy or operation thereof, or acquired (whether delivered to the Land or stored elsewhere) for use or installation in or on the Land or the Improvements, and all renewals and replacements of, substitutions for and additions to the foregoing (all of which are herein sometimes referred to together as "Accessories");

D   All (i) plans and specifications for the Improvements; (ii) approvals, entitlements and contracts relating to the Land or the Improvements or the Accessories or any part thereof; (iii) deposits including, but not limited to, Mortgagor's rights in tenants' security deposits (if any), deposits with respect to utility services to the Land or the Improvements or the Accessories or any part thereof, and any deposits or reserves hereunder or under any other Loan Documents (as hereinafter defined) for taxes, insurance or otherwise, funds, accounts, contract rights, instruments, documents, commitments, general intangibles, notes and chattel paper used in connection with or arising from or by virtue of any transactions related to the Land or the Improvements or the Accessories or any part thereof; (iv) permits, licenses, franchises, bonds, certificates and other rights and privileges obtained in connection with the Land or the Improvements or the Accessories or any part thereof; (v) leases, rents, royalties, bonuses, issues, profits, revenues and other benefits of the Land, the Improvements and the Accessories; and (vi) other properties, rights, titles and interests, if any, specified in any Section of this Instrument as being part of the Premises;

E   All rents (whether from residential or non-residential space), revenues, and other income of the Land or the Improvements, parking fees, laundry and vending machine income and fees and charges for food, health care and other services provided at the Premises, whether now due, past due or to become due, and deposits forfeited by tenants, and, if Mortgagor is a cooperative housing corporation or association, maintenance fees, charges or assessments payable by shareholders or residents under proprietary leases or occupancy agreements, whether now due, past due, or to become due (all of which are herein sometimes referred to together as the "Rents");

F   All present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Premises, or any portion of the Premises (including proprietary leases or occupancy agreements if Mortgagor is a cooperative housing corporation), and all modifications, extensions or renewals (all of which are herein sometimes referred to together as the "Leases");

G   All proceeds, products, consideration, compensation and recoveries, direct or consequential, cash and noncash, of or arising from, as the case may be, (i) the properties, rights, titles and interests referred to above in paragraphs (A), (B), (C), (D), (E), and (F); (ii) any sale, lease or other disposition thereof; (iii) each policy of insurance relating

**Page 3 of 14**

thereto (including premium refunds); (iv) the taking thereof or of any rights appurtenant thereto by eminent domain or sale in lieu thereof for public or quasi-public use under any law; and (v) any damage thereto whether caused by such a taking (including change of grade of streets, curb cuts or other rights of access) or otherwise caused; and

H   All other interests of every kind and character, and proceeds thereof, which Mortgagor now has or hereafter acquires in, to or for the benefit of the properties, rights, titles and interests referred to above in paragraphs (A), (B), (C), (D), (E), (F), (G), and all property used or useful in connection therewith, including, but not limited to, remainders, reversions and reversionary rights or interests.

Mortgagor does hereby represent and warrant that Mortgagor is lawfully seized of the Premises and has the right, power and authority to MORTGAGE, PLEDGE, HYPOTHECATE, GRANT, WARRANT, CONVEY AND ASSIGN the Premises, and that the Premises are unencumbered except for those encumbrances (the "Permitted Encumbrances") shown on the schedule of exceptions to coverage in the Title Policy (as defined in the Loan Agreement), issued to and accepted by Mortgagee contemporaneously with the execution and recordation of this Instrument and insuring Mortgagee's interest in the Premises. Mortgagor does hereby covenant and agree that Mortgagor will warrant and defend generally the title to the Premises against all claims and demands, subject to the Permitted Encumbrances.

In consideration of the aforesaid, and in order to more fully protect the security of this Instrument, Mortgagor hereby represents, warrants, covenants, and agrees as follows:

1. Inspection. Mortgagee and any other Person authorized by Mortgagee shall have the right to enter and inspect the Premises at all reasonable times.

2. Security Agreement. This Instrument is also a security agreement between Mortgagor, as debtors, and Mortgagee, as secured party, for any of the Premises which, under applicable law, may be subjected to a security interest under the Uniform Commercial Code in the state of Florida (the "UCC"), for the purpose of securing Mortgagor's obligations under this Instrument and to further secure Mortgagor's obligations under the Note, and other Loan Documents, whether such Premises are owned now or acquired in the future, and all products and cash and non-cash proceeds thereof (collectively, the "UCC Collateral"), and by this Instrument, Mortgagor hereby grants to Mortgagee a security interest in the Collateral. To the extent necessary under applicable law, Mortgagor hereby authorizes Mortgagee to prepare and file financing statements, continuation statements and financing statement amendments in such form as Mortgagee may require to perfect or continue the perfection of this security interest. If an Event of Default (as hereinafter defined) has occurred and is continuing, Mortgagee will have the remedies of a secured party under the UCC, in addition to all remedies provided by this Instrument or existing under applicable law. In exercising any remedies, Mortgagee may exercise its remedies against the Collateral separately or together, and in any order, without in any way affecting the availability of Mortgagee's other remedies. This Instrument also constitutes a financing statement with respect to any part of the Premises that is or may become a fixture, if permitted by applicable law.

3. Taxes and Other Charges. Mortgagor is responsible for the payment of all taxes ("Taxes"), assessments for local improvements ("Assessment"), rates and charges, license fees, all charges which may be imposed for the use of vaults, chutes, areas and other space beyond the lot line and abutting the public sidewalks in front of or adjoining the Premises, and all other governmental levies and charges (collectively, the "Impositions"), of every kind and nature whatsoever. Upon Mortgagee's request, Mortgagor shall deliver to Mortgagee within five (5) days of any such request, proof of payment of any and all Impositions, in form satisfactory to Mortgagee.

4. Insurance. Mortgagor shall keep the Premises insured in accordance with the provisions of the Loan Agreement.

5. Liens. Mortgagor shall not, directly or indirectly, create or suffer or permit to be created, or to stand, against the Premises or any portion thereof, or against the rents, issues and profits therefrom, any lien, charge, mortgage, deed of trust, adverse claim or other encumbrance, whether senior or junior to the lien of this Instrument, other than the lien of this Instrument and the Permitted Encumbrances.

6. Due on Sale or Encumbrance. Should the title to the Premises, or any part thereof or any interest therein, be transferred to any Person, firm or entity other than the Borrower, or should the ownership of the Premises, or any part thereof, become vested in any owner other than the Borrower, or should any lien, mortgage or any other encumbrance, voluntary or involuntary, be placed against the Premises, or in any of the foregoing events, the entire principal balance due under the Note, together with all accrued interest thereunder, shall at the election of Mortgagee, be and become immediately due and payable in full, subject to applicable law, and Mortgagee shall be entitled to pursue all remedies provided for in this Instrument or at law, including without limitation, foreclosure of the lien of this Instrument.

7. Assignment of Rents; Appointment of Receiver; Mortgagee in Possession. (A) As part of the consideration for the Indebtedness, Mortgagor absolutely and unconditionally assigns and transfers to Mortgagee all Rents. It is the intention of Mortgagor to establish a present, absolute and irrevocable transfer and assignment to Mortgagee of all Rents and to authorizes and empower Mortgagee to collect and receive all Rents without the necessity of further action on the part of the Borrower. Promptly upon request by Mortgagee, Mortgagor agrees to execute and deliver such further assignments as Mortgagee may from time to time require. Mortgagor and Mortgagee intend this assignment of Rents to be immediately effective and to constitute an absolute, present, and unconditional assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of Rents, and for no other purpose, the Rents will not be deemed to be a part of the Premises. However, if this present, absolute, and unconditional assignment of the Rents is not enforceable by its terms under the laws of the state of Florida, then the Rents will be included as a part of the Premises and it is the intention of Mortgagor that in this circumstance this Instrument create and perfect a lien on the Rents in favor of Mortgagee, which lien will be effective as of the date of this Instrument. (B) Until the occurrence of an Event of Default, Mortgagee hereby grants to Mortgagor a revocable license to collect and receive all the Rents, to hold all the Rents in trust for the benefit of Mortgagee and to apply all the Rents to pay the installments of interest and principal then due and payable under the Note and the other amounts then due and

payable under the other Loan Documents, including the Taxes, Impositions, Assessments, and Insurance, and to pay the current costs and expenses of managing, operating and maintaining the Premises, tenant improvements and other capital expenditures. So long as no Event of Default has occurred and is continuing, the Rents remaining after application pursuant to the preceding sentence may be retained by Mortgagor free and clear of, and released from, Mortgagee's rights with respect to the Rents under this Instrument. After the occurrence of an Event of Default, and during the continuance of such Event of Default, Mortgagor authorizes Mortgagee to collect, sue for, and compromise the Rents and directs each tenant of the Premises to pay all the Rents to, or as directed by, Mortgagee. From and after the occurrence of an Event of Default, and during the continuance of such Event of Default, and without the necessity of Mortgagee entering upon and taking and maintaining control of the Premises directly, or by a receiver, Mortgagor's license to collect the Rents will automatically terminate and Mortgagee will, without notice, be entitled to all the Rents as they become due and payable, including the Rents then due and unpaid. Mortgagor will pay to Mortgagee upon demand all the Rents to which Mortgagee is entitled. At any time on or after the date of Mortgagee's demand for the Rents, Mortgagee may give, and Mortgagor hereby irrevocably authorizes Mortgagee to give, notice to all tenants of the Premises instructing them to pay all Rents to Mortgagee. *No tenant will be obligated to inquire further as to the occurrence or continuance of an Event of Default. No tenant will be obligated to pay to* Mortgagor *any amounts which are actually paid to* Mortgagee *in response to such a notice.* Any such notice by Mortgagee will be delivered to each tenant personally, by mail or by delivering such demand to each rental unit. Mortgagor will not interfere with and will cooperate with Mortgagee's collection of such Rents. (C) If an Event of Default has occurred and is continuing, then Mortgagee will have each of the following rights and may take any of the following actions: (i) Mortgagee may, regardless of the adequacy of Mortgagee's security or the solvency of Mortgagor and even in the absence of waste, enter upon and take and maintain full control of the Premises in order to perform all acts that Mortgagee in its discretion determines to be necessary or desirable for the operation and maintenance of the Premises, including the execution, cancellation, or modification of the Leases, the collection of all the Rents, the making of repairs to the Premises and the execution or termination of contracts providing for the management, operation or maintenance of the Premises, for the purposes of enforcing the assignment of the Rents pursuant to Section 7(A) of this Instrument, protecting the Premises or the security of this Instrument, or for such other purposes as Mortgagee, in its discretion, may deem necessary or desirable. (ii) Alternatively, if an Event of Default has occurred and is continuing, regardless of the adequacy of Mortgagee's security, without regard to Mortgagor's solvency and without the necessity of giving prior notice (oral or written) to Mortgagor, Mortgagee may apply to any court having jurisdiction for the appointment of a receiver for the Premises to take any or all of the actions set forth in the preceding sentence. If Mortgagee elects to seek the appointment of a receiver for the Premises at any time after an Event of Default has occurred and is continuing, Mortgagor's, by its execution of this Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte* if permitted by applicable law. (iii) If Mortgagor is a housing cooperative corporation or association, Mortgagor hereby agrees that if a receiver is appointed, the order appointing the receiver may contain a provision requiring the receiver to pay the installments of interest and principal then due and payable under the Note and the other amounts then due and payable under the other Loan Documents, including the Taxes,

**Page 6 of 14**

Impositions, Assessments, and Insurance, it being acknowledged and agreed that the Indebtedness is an obligation of Mortgagor and must be paid out of maintenance charges payable by Mortgagor's tenant shareholders under their proprietary leases or occupancy agreements. (iv) Mortgagee or the receiver, as the case may be, will be entitled to receive a reasonable fee for managing the Premises. (v) Immediately upon appointment of a receiver or immediately upon Mortgagee's entering upon and taking possession and control of the Premises, Mortgagor will surrender possession of the Premises to Mortgagee or the receiver, as the case may be, and will deliver to Mortgagee or the receiver, as the case may be, all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Premises and all security deposits and prepaid Rents. (vi) If Mortgagee takes possession and control of the Premises, then Mortgagee may exclude Mortgagor and its representatives from the Premises. Mortgagor acknowledges and agrees that the exercise by Mortgagee of any of the rights conferred under this Section 7 will not be construed to make Mortgagee a Mortgagee-in-possession of the Premises so long as Mortgagee has not itself entered into actual possession of the Land and Improvements. (D) If Mortgagee enters the Premises, Mortgagee will be liable to account only to Mortgagor and only for those Rents actually received. Except to the extent of Mortgagee's gross negligence or willful misconduct, Mortgagee will not be liable to the Borrower, anyone claiming under or through Mortgagor or anyone having an interest in the Premises, by reason of any act or omission of Mortgagee under Section 7(C) of this Instrument, and Mortgagor hereby releases and discharges Mortgagee from any such liability to the fullest extent permitted by law. If the Rents are not sufficient to meet the costs of taking control of and managing the Premises and collecting the Rents, any funds expended by Mortgagee for such purposes will become an additional part of the Indebtedness. (E) If the Rents are not sufficient to meet the costs of taking control of and managing the Premises and collecting the Rents, any funds expended by Mortgagee for such purposes will become an additional part of the Indebtedness as provided in Section 9 of this Instrument. (F) Any entering upon and taking of control of the Premises by Mortgagee or the receiver, as the case may be, and any application of Rents as provided in this Instrument will not cure or waive any Event of Default or invalidate any other right or remedy of Mortgagee under applicable law or provided for in this Instrument.

8. Application of Payments. If at any time Mortgagee receives, from Mortgagor or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, then Mortgagee may apply that payment to amounts then due and payable in any manner and in any order determined by Mortgagee, in Mortgagee's discretion. Neither Mortgagee's acceptance of an amount that is less than all amounts then due and payable nor Mortgagee's application of such payment in the manner authorized will constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Notwithstanding the application of any such amount to the Indebtedness, Mortgagor's obligations under this Instrument, the Note and all other Loan Documents will remain unchanged.

9. Protection of Mortgagee's Security; Instrument Secures Future Advances. If Mortgagor should fail to perform any of its obligations under this Instrument or any other Loan Document, or if any action or proceeding is commenced which purports to affect the Premises, Mortgagee's security, or Mortgagee's rights under this Instrument, including eminent domain, insolvency, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials

Laws (as hereinafter defined), fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Mortgagee, at Mortgagee's option may make such appearances, file such documents, disburse such sums and take such actions as Mortgagee reasonably deems necessary to perform such obligations of Mortgagor and to protect Mortgagee's interest, including all of the following: (i) payment of attorney's fees and costs; (ii) enter upon the Premises to make repairs or secure the Premises; procure insurance as required by the Loan Agreement; (iii) pay any amounts which Mortgagor has failed to pay under this Instrument, the Loan Agreement, or any of the Loan Documents; (iv) perform any of the Mortgagor's obligations under the Loan Agreement; (v) make advances to pay, satisfy or discharge any obligation of the Mortgagor for the payment of money that is secured by a lien on the Premises. Any amounts disbursed by Mortgagee under this Section 9 or under any other provision of this Instrument that treats such disbursement as being made under this Section 9, will be secured by this Instrument, will be added to, and become part of, the principal component of the Indebtedness, will be immediately due and payable and will bear interest from the date of disbursement until paid at the Default Rate (as defined in the Note). Nothing in this Section 9 will require Mortgagee to incur any expense or take any action. The provisions of this Section 9, including the obligation to indemnify Mortgagee, shall survive the payment of the indebtedness and the satisfaction and reconveyance of the lien of this Instrument and shall not be affected by Mortgagee's acquisition of any interest in the Premises, whether by foreclosure or otherwise. As used herein, the term "Hazardous Materials Law" and "Hazardous Materials Laws" means any and all federal, state and local laws, ordinances, regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future, including all amendments, that relate to Hazardous Materials (as hereinafter defined) or the protection of human health or the environment and apply to Mortgagor or to the Premises. Hazardous Materials Laws include the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, et seq., the Resource Conservation and Recovery Act of 1976, 42 U.S.C. Section 6901, et seq., the Toxic Substance Control Act, 15 U.S.C. Section 2601, et seq., the Clean Water Act, 33 U.S.C. Section 1251, et seq., and the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101 et seq., and their state analogs. As used herein, the term "Hazardous Materials" means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls (PCBs) and compounds containing them; lead and lead-based paint; asbestos or asbestos containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Premises are prohibited by any governmental authority; any substance that requires special handling and any other material or substance now or in the future that (i) is defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" by or within the meaning of any Hazardous Materials Law, or (ii) is regulated in any way by or within the meaning of any Hazardous Materials Law.

10. Events of Default. An Event of Default under the Note, the Loan Agreement, or any other Loan Documents will constitute an Event of Default under this Instrument. Upon the occurrence of an Event of Default, the Indebtedness shall become due and payable forthwith at the option of Mortgagee.

11. Remedies Cumulative. Each right and remedy provided in this Instrument is distinct from all other rights or remedies under this Instrument, the Loan Agreement or any other Loan Document or afforded by applicable law or equity, and each will be cumulative and may be exercised concurrently, independently or successively, in any order. Mortgagee's exercise of any particular right or remedy will not in any way prevent Mortgagee from exercising any other right or remedy available to Mortgagee. Mortgagee may exercise any such remedies from time to time and as often as Mortgagee chooses.

12. Waiver of Statute of Limitations, Offsets, and Counterclaims. Mortgagor waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Instrument or to any action brought to enforce any Loan Document. Mortgagor hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Mortgagee or otherwise to offset any obligations to make the payments required by the Loan Documents. No failure by Mortgagee to perform any of its obligations under this Instrument will be a valid defense to, or result in any offset against, any payments that Mortgagor is obligated to make under any of the Loan Documents.

13. Waiver of Marshalling. Notwithstanding the existence of any other security interests in the Premises held by Mortgagee or by any other party, Mortgagee will have the right to determine the order in which any or all of the Premises will be subjected to the remedies provided in this Instrument, the Note, the Loan Agreement, or any other Loan Document, or applicable law. Mortgagee will have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Mortgagor and any party who now or in the future acquires a security interest in the Premises and who has actual or constructive notice of this Instrument waives any and all right to require the marshalling of assets or to require that any of the Premises be sold in the inverse order of alienation or that any of the Premises be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Instrument.

14. Further Assurances. Mortgagor will deliver, at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements or amendments, transfers and assurances as Mortgagee may require from time to time in order to better assure, grant, and convey to Mortgagee the rights intended to be granted, now or in the future, to Mortgagee under this Instrument and the Loan Documents.

15. Governing Law; Consent to Jurisdiction and Venue. This Instrument, and the provisions for the creation, perfection, priority, enforcement, and foreclosure of the liens and security interests created in the Premises will be governed by, and construed in accordance with, the laws of the state of Florida. Notwithstanding the foregoing, the law of the state of Connecticut shall govern the validity and enforceability of all Loan Documents, and the Indebtedness arising hereunder (but the foregoing shall not be construed to limit Mortgagee's rights with respect to such security interest created in the state of Florida). Nothing in this Section 15 is intended to limit Mortgagee's right to bring any suit, action or proceeding relating to matters under this Instrument, the Note, the Loan Agreement, or any of the Loan Documents in any court of any other jurisdiction.

**Page 9 of 14**

16. Notices. All notices, consents, approvals, and requests required or permitted under this Instrument or under any other Loan Document shall be given in accordance with the requirements set forth under the Loan Agreement.

17. Successors and Assigns. This Instrument will bind the respective successors and assigns of Mortgagor and Mortgagee, and the rights granted by this Instrument will inure to Mortgagee's successors and assigns.

19. Joint and Several Liability. If more than one party signs this Instrument as Mortgagor, the obligations of such Persons will be joint and several.

19. Relationship of Parties; No Third-Party Beneficiary. The relationship between Mortgagee and Mortgagor will be solely that of creditor and debtor, respectively, and nothing contained in this Instrument will create any other relationship between Mortgagee and Mortgagor. Nothing contained in this Instrument will constitute Mortgagee as a joint venturer, partner or agent of Mortgagor, or render Mortgagee liable for any debts, obligations, acts, omissions, representations or contracts of Mortgagor. No creditor of any party to this Instrument and no other Person will be a third-party beneficiary of this Instrument or any other Loan Document.

20. Severability; Amendments; Construction The invalidity or unenforceability of any provision of this Instrument will not affect the validity or enforceability of any other provision, and all other provisions will remain in full force and effect. This Instrument contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Instrument. This Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought. The captions and headings of the sections of this Instrument are for convenience only and will be disregarded in construing this Instrument. Any reference in this Instrument to a "Section" will, unless otherwise explicitly provided, be construed as referring to a section of this Instrument. Any reference in this Instrument to a statute or regulation will be construed as referring to that statute or regulation as amended from time to time. Use of the singular in this Instrument includes the plural and use of the plural includes the singular. As used in this Instrument, the term "including" means "including, but not limited to" and the term "includes" means "includes without limitation." Unless the context requires otherwise, any definition of or reference to any agreement, instrument, or other document in this Instrument will be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in this Instrument). Any reference in this Instrument to any Person will be construed to include such Person's successors and assigns. Any capitalized term not specifically defined in this Instrument will have the meaning ascribed to that term in the Loan Agreement. The term "Person" as used herein, shall mean any natural person, sole proprietorship, corporation, general partnership, limited partnership, limited liability company, limited liability partnership, limited liability limited partnership, joint venture, association, joint stock company, bank, trust, estate, unincorporated organization, any federal, state, county or municipal government (or any agency or political subdivision thereof), endowment fund or any other form of entity.

21. Subrogation. If, and to the extent that, the proceeds of the loan evidenced by the Note, or subsequent advances under Section 9 of this Instrument, are used to pay, satisfy or discharge a

prior lien, such loan proceeds or advances will be deemed to have been disbursed by Mortgagee at Mortgagor's request, and Mortgagee will automatically, and without further action on its part, be subrogated to the rights, including lien priority, of the owner or holder of the obligation secured by the prior lien, whether or not the prior lien is released.

22. Confession of Judgment in Ejectment. To the extent permissible under the laws of the state of Florida, at any time after an Event of Default, regardless of whether Mortgagee has asserted any other right or exercised any other remedy under this Instrument or any of the other Loan Documents, it shall be lawful for any attorney of any court to confess judgment in ejectment against Mortgagor and all Persons claiming under Mortgagor for the recovery by Mortgagee of possession of all or any part of the Premises, for which this Instrument shall be sufficient warrant. If for any reason after such action shall have commenced the same shall be discontinued and the possession of the Premises shall remain in or be restored to Mortgagor, Mortgagee shall have the right upon subsequent default or defaults to bring one or more action or actions as hereinabove set forth to recover possession of all or any part of the Premises.

23. Acceleration; Remedies; Waiver of Permissive Counterclaims. At any time during the existence of an Event of Default, Mortgagee, at Mortgagee's option, may declare the Indebtedness to be immediately due and payable without further demand, and may foreclose this Instrument by judicial proceeding and may invoke any other remedies permitted by Florida law or provided in this Instrument, the Loan Agreement or in any other Loan Document. Mortgagee will be entitled to collect all costs and expenses incurred in pursuing such remedies, including attorneys' fees and costs and costs of documentary evidence, abstracts and title reports. Mortgagor hereby waives any and all rights to file or pursue permissive counterclaims in connection with any legal action brought by Mortgagee under this Instrument, the Note or any other Loan Document. In the event Mortgagee forecloses this Instrument against the Premises, Mortgagee may, at its option and in its sole and absolute discretion (but not the obligation, unless consented to it by Mortgagee), as owner of the Premises, and to assume all rights and privileges of Mortgagor thereunder.

24. Release. Upon payment of the Indebtedness, Mortgagee will release this Instrument. Mortgagor will pay Mortgagee's reasonable costs incurred in releasing this Instrument.

25. Future Advances. Mortgagee may from time to time, in Mortgagee's discretion, make optional future or additional advances (collectively, "Future Advances") to Mortgagor, except that at no time will the unpaid principal balance of all indebtedness secured by the lien of this Instrument, including Future Advances, be greater than an amount equal to two hundred percent (200%) of the original principal amount of the Note as set forth on the first page of this Instrument plus accrued interest and amounts disbursed by Mortgagee under Section 9 of this Instrument or any other provision of this Instrument or the other Loan Documents that treats a disbursement by Mortgagee as being made under Section 9 of this Instrument. All Future Advances will be made, if at all, within twenty (20) years after the date of this Instrument, or within such lesser period that may in the future be provided by law as a prerequisite for the sufficiency of actual or record notice of Future Advances as against the rights of creditors or subsequent purchasers for value. Mortgagor will, immediately upon request by Mortgagee, execute and deliver to Mortgagee a promissory note evidencing each Future Advance together with a notice of such Future Advance in recordable form. All promissory notes evidencing

Future Advances will be secured, _pari passu_, by the lien of this Instrument, and each reference in this Instrument to the Note will be deemed to be a reference to all promissory notes evidencing Future Advances. Nothing contained herein shall be deemed an obligation on the part of Mortgagee to make any Future Advances.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the undersigned has signed and delivered this Mortgage, Assignment of Rents and Security Agreement or has caused said instrument to be signed and delivered by its duly authorized representative on _____ Octl 18 _____, 2022.

**RAD DIVERSIFIED REIT, INC.**

Witness: Michelle Caroline Tchu

By: _____
Name: Brandon D. Mendenhall
Title: CEO

Witness: Erin R Hyde

STATE OF _Florida_____ )
                                    )ss. _____
COUNTY OF _Hillsborough_____ )

The foregoing instrument was acknowledged by means of _x_____ physical presence _____ online notarization before me this _18th_ day of _October_____, 2022, by Brandon D. Mendenhall, CEO of RAD DIVERSIFIED REIT, INC., a Maryland corporation, on behalf of the corporation. He/she is _____ personally known to me x____ has produced _Drivers License_____, as identification.

Notary Public
Michelle Caroline Tchu, Notary Public

MICHELLE CAROLINE TCHU
Notary Public-State of Florida
Commission # HH 124055
My Commission Expires
April 28, 2025

## SCHEDULE 1
## PROPERTY DESCRIPTION

The following property in Pinellas County, Florida:

Lot 120, John Alex Kelly SCARBOUGH SUBDIVISION, according to the map or plat thereof as recorded in Plat Book 8, Page 31, of The Public Records of Pinellas County, Florida.

Being the same property conveyed to U.S. Bank National Association as Legal Tittle Trustee for Truman 2016 SC6 Title Trust, by Ken Burke, CPA, Clerk of the Circuit Court and Comptroller of Pinellas County Florida, by Certificate of Title dated 06/28/2022, recorded 06/29/2022, in Instrument No. 2022201838, Book 22118 Page 1065, in the County of Pinellsa and State of Florida.

More commonly known as 795 89th Ave. N. Saint Petersburg FL 33702.

Parcel/Tax ID:  19/30/17/45612/000/1200



## ALLONGE TO COMMERCIAL PROMISSORY NOTE

This Allonge to Commercial Promissory Note is to be affixed to and made a part of that certain Commercial Promissory Note in the stated principal amount of **Three Hundred Forty Thousand Two Hundred Dollars and No Cents ($340,200.00)**, executed by **RAD DIVERSIFIED REIT, INC.**, a Maryland corporation with a principal place of business of 7 St. Paul Street, Suite 820, Baltimore, MD 21202 and made to the order of **RCN Capital, LLC**, a Connecticut limited liability company, having a principal place of business at 75 Gerber Road East, Ste. 102, South Windsor, CT 06074.

Pay to the order of **Toorak Capital Partners, LLC** (the "Assignee"), a Delaware limited liability company, having a principal place of business of 15 Maple St., Second Floor West, Summit, NJ 07901, WITHOUT RECOURSE OR WARRANTY.

Dated as of Ocotber 24, 2022.

**RCN Capital, LLC**

By: _____
Angela DiTommaso, Authorized Signer

STATE OF CONNECTICUT       )
                                       )ss. South Windsor

COUNTY OF HARTFORD       )

The foregoing instrument was acknowledged before me this **24** day of Ocotber, 2022, by **Angela DiTommaso**, Authorized Signer of RCN Capital, LLC, a Connecticut limited liability company, on behalf of the limited liability company. He/she is personally known to me.

_____
Notary Public



CECELIA RITSKOWITZ
Notary Public of Connecticut
My Commission Expires 03/31/2025

Prepared By & Return to:
Erin Schanzer
RCN Capital, LLC
75 Gerber Road East, Ste. 102
South Windsor, CT 06074



..............................Space Above Line for Recorder's Use.............................

## ASSIGNMENT OF MORTGAGE

FOR VALUE RECEIVED, the undersigned **RCN Capital, LLC** (the "Assignor"), a Connecticut limited liability company, having a principal place of business at 75 Gerber Road East, Ste. 102, South Windsor, CT 06074, does hereby GRANT, SELL, ASSIGN, TRANSFER, AND CONVEY unto **Toorak Capital Partners, LLC** (the "Assignee"), a Delaware limited liability company, having a principal place of business of 15 Maple St., Second Floor West, Summit, NJ 07901, all of its right, title, and interest in and to a certain **Mortgage, Assignment of Rents and Security Agreement**, dated _____, executed by RAD DIVERSIFIED REIT, INC., a Maryland corporation, as mortgagor, in favor of RCN Capital, LLC, as mortgagee, which was recorded as _____ _____ _____ in the Public Records of Pinellas County, Florida, securing payment of **$340,200.00**, and encumbering the real property and improvements commonly known as **795 89th Ave N, St. Petersburg, FL 33702**, as more particularly described in SCHEDULE 1, attached.

Together with the obligations therein described and the money due and to become due thereon with interest, and all rights accrued or to accrue under the said security instrument.

Page **1** of **4**

TO HAVE AND TO HOLD the same unto the Assignee, and its successor and assigns, forever, subject only to the terms and conditions of the above-described security instrument.

The security instrument assigned hereby has not been further assigned except as set forth herein.

[Remainder of this page intentionally left blank]

Page 2 of 4

IN WITNESS WHEREOF, the undersigned Assignor has executed this Assignment on _ October 24, 2022.

Witness:

Witness: Rosana Alvarado

**RCN Capital, LLC**

By: _____
Angela DiTommaso, Authorized Signer

STATE OF CONNECTICUT                    )
                                        )ss. South Windsor
COUNTY OF HARTFORD                      )

The foregoing instrument was acknowledged before me this **24** day of Ocotber, 2022, by **Angela DiTommaso**, Authorized Signer of RCN Capital, LLC, a Connecticut limited liability company, on behalf of the limited liability company. He/she is personally known to me.

_____
Notary Public

**CECELIA RITSKOWITZ**
**Notary Public of Connecticut**
**My Commission Expires 03/31/2025**

Page **3** of **4**

## SCHEDULE 1
### PROPERTY DESCRIPTION

**LOT 120, JOHN ALEX KELLY SCARBOUGH SUBDIVISION, ACCORDING TO THE MAP OR PLAT THEREOF AS RECORDED IN PLAT BOOK 8, PAGE 31, OF THE PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA.**



## EXTENSION AND MODIFICATION AGREEMENT

**THIS EXTENSION AND MODIFICATION AGREEMENT** ("**Agreement**"), is made as of
_____5/16/2024_____, by and between **RAD DIVERSIFIED REIT, INC.**, as
borrower ("**Borrower**"), a Maryland corporation with a principal place of business at 7 St. Paul Street,
Suite 820, Baltimore, MD 21202; and **Toorak Capital Partners, LLC**, as lender ("**Lender**"), a Delaware
limited liability company, having a principal place of business of 15 Maple St., Second Floor West,
Summit, NJ 07901.

### RECITALS

**WHEREAS,** RCN Capital, LLC made a commercial loan (the "**Loan**") in the original principal amount
of **Three Hundred Forty Thousand Two Hundred Dollars and No Cents ($340,200.00)**, upon the
terms and subject to the conditions set forth in a certain **Commercial Loan and Security Agreement**
dated October 18, 2022 (the "**Loan Agreement**"), and evidenced by a certain **Commercial Promissory
Note** of even date therewith (the "**Note**"), in the principal amount of **Three Hundred Forty Thousand
Two Hundred Dollars and No Cents ($340,200.00)**, made by **Borrower**, payable to RCN Capital, LLC
and its assigns;

**WHEREAS**, the obligations under the **Loan** are secured by, among other things, the following security
instruments (each, a "**Security Instrument**"), encumbering certain real property and improvements
(the "**Secured Property**") set forth below, and more particularly described therein:

A certain **Mortgage, Assignment of Rents and Security Agreement** granted by RAD DIVERSIFIED
REIT, INC. in favor of RCN Capital, LLC, encumbering the real property and improvements located at
**795 89th Ave N, St. Petersburg, FL 33702**; and

**WHEREAS**, the **Note**, the **Security Instrument**, the **Loan Agreement**, and all other documents
evidencing, securing, or executed in connection with, the **Loan** are hereinafter referred to collectively as
the "**Loan Documents**"); and

**WHEREAS**, under the terms of the **Loan**, the date upon which all unpaid principal, accrued interest
thereon, and other fees or charges (collectively, the "**Indebtedness**") became (or will become) due and
payable is **May 1, 2024**; and

**WHEREAS**, RCN Capital, LLC granted, conveyed, assigned, and transferred to **Lender** all of its right,
title, and interest under the **Loan** and the **Loan Documents**; and

**WHEREAS**, **Borrower** has requested, and **Lender** has agreed, to modify the terms of the **Loan**.

**NOW**, **Borrower** and **Lender** therefore agree as follows:

### ARTICLE I: MODIFICATION OF TERMS

**1.01 Extension Fee**. **Borrower** will pay to **Lender** a fee (the "**Extension Fee**") in the amount of
**$3,449.70**, in consideration for **Lender's** agreements contained herein, including without limitation,
**Lender's** agreement to modify the date on which the **Indebtedness** becomes due and payable in full. This
**Agreement** is expressly conditioned on payment and receipt of the **Extension Fee**.

Page **1** of **5**

**1.02 Legal Fee**. **Borrower** will pay to **Lender** a fee (the "**Legal Fee**") in the amount of **$600.00**, in consideration for **Lender's** work in preparing this **Agreement**. This **Agreement** is expressly conditioned on payment and receipt of the **Legal Fee**.

**1.03 Administration Fee**. **Borrower** will pay to **Lender** a fee (the "**Administration Fee**") in the amount of **$350.00**, in consideration for **Lender's** servicer's work in preparing this **Agreement**. This **Agreement** is expressly conditioned on payment and receipt of the **Administration Fee**.

**1.04 Extension of Maturity Date**. Upon the **Lender's** receipt of the **Extension Fee**, provided no **Event of Default** (as defined in the **Loan Agreement**), or any event that, with notice or passage of time, or both, would constitute an **Event of Default**, has occurred and is continuing, or is not cured by this **Agreement**, the date on which all principal, interest, and other sums due under the **Note** shall be due and payable on **November 1, 2024** (hereinafter, the "**Maturity Date**").

**1.05 Interest Rate Change**. Intentionally left blank.

**1.06 BPO Fee**. **Borrower** will pay to **Lender** a fee (the "**BPO Fee**") in the amount of **$95.00**, in consideration for **Lender's** work in preparing, ordering, and reviewing a broker price opinion of the **Secured Property** in order to determine eligibility for this **Agreement**. This **Agreement** is expressly conditioned on payment and receipt of the **BPO Fee**.

## ARTICLE II: STANDARD TERMS

**2.01** The **Loan Documents** are hereby modified in such a manner to be consistent with all modifications and agreements contained herein. Except as specifically modified by the terms of this **Agreement**, the **Loan Documents** shall not be affected by this **Agreement**, and each shall remain in full force and effect. Nothing herein contained shall be construed to impair the **Lender's** security under the **Loan Documents** nor to limit or impair any rights or powers that the **Lender** now enjoys or may hereafter enjoy under the **Loan Documents** for recovery of the indebtedness secured thereby.

**2.02** The **Loan Documents** are hereby ratified and confirmed by **Borrower** and **Lender** and every provision, covenant, warranty, representation, condition, obligation, right, and power contained in and under the **Loan Documents** as amended and modified, shall continue in full force and effect, affected by this **Agreement** only to the extent of the amendments and modifications set forth above. Without limiting the generality of the foregoing, the **Borrower** and the **Lender** hereby ratify and confirm that as of the date hereof, or as a consequence of this **Agreement**, there exists no **Event of Default** and no circumstances exist which could constitute an **Event of Default** after the giving of notice or the passage of time, or both.

**2.03** This **Agreement** is expressly conditioned upon **Borrower** being current with all outstanding interest, payments, or other charges due **Lender**. This **Agreement** shall be of no effect until **Lender** has received all outstanding interest, payments, or other charges that may be due as of the date of this **Agreement**.

**2.04 Borrower** hereby acknowledges and agrees that the execution of this **Agreement** shall in no way be construed as imposing on the **Lender** any obligation to offer the **Borrower** any further extensions of the date on which the **Indebtedness** becomes due and payable in full, or the modification of any other terms of the **Loan**.

**2.05** All capitalized terms used and not otherwise defined herein shall have the meaning ascribed to them in the loan documents. In the event of any inconsistency between capitalized terms used herein and otherwise defined in loan documents, the terms of this **Agreement** shall govern.

**2.06** The covenants and agreements herein set forth shall bind and inure to the benefit of the parties hereto, their heirs, successors and assigns.

**2.07** The consummation of the transactions hereby contemplated and the performance of the obligations of the **Borrower** under and by virtue of the loan documents will not result in any breach of, or constitute a default under, any mortgage, security deed, deed of trust, lease, bank loan or credit agreement, trust agreement or other instrument to which the **Borrower** is a party or by which it may be bound or affected.

**2.08** There are no actions, suits or proceedings pending, or to the knowledge of the **Borrower**, threatened, against, or affecting the **Borrower**, or the **Secured Property**, or involving the validity or enforceability of any of the loan documents or the priority of the lien thereof.

**2.09** There has been no material adverse change in the financial condition of the **Borrower** since the date of the last financial statements delivered to the **Lender**. No bankruptcy or insolvency case or proceedings of any kind have been filed, threatened or are outstanding by or against the **Borrower**, and the **Borrower** is current with regard to payment and performance of all loans, contracts and other agreements or obligations affecting the **Borrower**.

**2.10** This **Agreement** may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.

**2.11** The **Borrower** hereby acknowledges and agrees that the **Borrower** has no claim, offset, or defense against the **Lender** or with respect to any collateral securing the **Loan**.

**2.12 THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF CONNECTICUT, WAS EXECUTED AND DELIVERED BY THE BORROWER AND ACCEPTED BY THE LENDER IN THE STATE OF CONNECTICUT, WHICH STATE THE BORROWER AND THE LENDER AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE. THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER AND UNDER THE LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF CONNECTICUT, WITHOUT REGARD TO CHOICE OF LAW CONSIDERATIONS, APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, PRIORITY, ENFORCEMENT, AND FORECLOSURE OF THE LIENS AND SECURITY INTERESTS CREATED IN THE MORTGAGED PROPERTY UNDER THE LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE JURISDICTION IN WHICH THE MORTGAGED PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH JURISDICTION, THE LAW OF THE STATE OF CONNECTICUT SHALL GOVERN THE VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS, AND THE DEBT OR OBLIGATIONS ARISING HEREUNDER.**

**2.13 THE LENDER AND THE BORROWER HEREBY AGREE THAT THE EXECUTION AND DELIVERY OF THIS AGREEMENT, AS WELL AS PERFORMANCE OF THE OBLIGATIONS REQUIRED HEREUNDER, CONSTITUTE THE TRANSACTION OF BUSINESS WITHIN THE STATE OF CONNECTICUT. IF THE BORROWER DOES NOT HAVE A REGISTERED AGENT IN THE STATE OF CONNECTICUT, THEN THE BORROWER HEREBY APPOINTS THE CONNECTICUT SECRETARY OF STATE AS ITS ATTORNEY AND AGREES THAT ANY PROCESS IN ANY CASE OF CONTROVERSY ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT MAY BE SERVED UPON THE CONNECTICUT SECRETARY OF STATE AND SHALL HAVE THE SAME VALIDITY AS IF SERVED UPON THE UNDERSIGNED PERSONALLY. THE LENDER AND THE BORROWER HEREBY AGREE THAT ANY APPROPRIATE STATE OR FEDERAL DISTRICT COURT LOCATED IN THE STATE OF CONNECTICUT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY CASE OR CONTROVERSY ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT AND SHALL BE A PROPER FORUM IN WHICH TO ADJUDICATE SUCH CASE OR CONTROVERSY. THE LENDER AND THE BORROWER AGREE TO SUBMIT TO PERSONAL JURISDICTION IN THE STATE OF CONNECTICUT IN ANY ACTION OR PROCEEDING ARISING OUT OF THIS AGREEMENT AND THE LOAN DOCUMENTS.**

**[Remainder of this page intentionally left blank]**

**IN WITNESS WHEREOF**, the undersigned have executed this Extension and Modification Agreement on the date first set forth above.

**RAD DIVERSIFIED REIT, INC.**, as Borrower

5/16/2024

**Date**

DocuSigned by:

**By:** *Brandon D. Mendenhall*

552599F650F249D...

**Name:** Brandon D. Mendenhall
**Title:** CEO

**ACKNOWLEDGED AND ASSENTED TO:**
**Brandon D. Mendenhall**, as Guarantor

5/16/2024

**Date**

DocuSigned by:

*Brandon D. Mendenhall*

552599F650F249D...

**Toorak Capital Partners, LLC**, as Lender

5/16/2024

**Date**

DocuSigned by:

**By:** *Mary Tessitore*

4753197B41E94CA...

**Name:** Mary Tessitore
**Title:** Authorized Signer

Page **5** of **5**



## EXTENSION AND MODIFICATION AGREEMENT

**THIS EXTENSION AND MODIFICATION AGREEMENT** ("**Agreement**"), is made as of
_____11/15/2023_____, by and between **RAD DIVERSIFIED REIT, INC.**, as
borrower ("**Borrower**"), a Maryland corporation with a principal place of business at 7 St. Paul Street,
Suite 820, Baltimore, MD 21202; and **Toorak Capital Partners, LLC**, as lender ("**Lender**"), a Delaware
limited liability company, having a principal place of business of 15 Maple St., Second Floor West,
Summit, NJ 07901.

### RECITALS

**WHEREAS,** RCN Capital, LLC made a commercial loan (the "**Loan**") in the original principal amount
of **Three Hundred Forty Thousand Two Hundred Dollars and No Cents ($340,200.00)**, upon the
terms and subject to the conditions set forth in a certain **Commercial Loan and Security Agreement**
dated October 18, 2022 (the "**Loan Agreement**"), and evidenced by a certain **Commercial Promissory
Note** of even date therewith (the "**Note**"), in the principal amount of **Three Hundred Forty Thousand
Two Hundred Dollars and No Cents ($340,200.00)**, made by **Borrower**, payable to RCN Capital, LLC
and its assigns;

**WHEREAS**, the obligations under the **Loan** are secured by, among other things, the following security
instruments (each, a "**Security Instrument**"), encumbering certain real property and improvements
(the "**Secured Property**") set forth below, and more particularly described therein:

A certain **Mortgage, Assignment of Rents and Security Agreement** granted by RAD DIVERSIFIED
REIT, INC. in favor of RCN Capital, LLC, encumbering the real property and improvements located at
**795 89th Ave N, St. Petersburg, FL 33702**; and

**WHEREAS**, the **Note**, the **Security Instrument**, the **Loan Agreement**, and all other documents
evidencing, securing, or executed in connection with, the **Loan** are hereinafter referred to collectively as
the "**Loan Documents**"); and

**WHEREAS**, under the terms of the **Loan**, the date upon which all unpaid principal, accrued interest
thereon, and other fees or charges (collectively, the "**Indebtedness**") became (or will become) due and
payable is **November 1, 2023**; and

**WHEREAS**, RCN Capital, LLC granted, conveyed, assigned, and transferred to **Lender** all of its right,
title, and interest under the **Loan** and the **Loan Documents**; and

**WHEREAS**, **Borrower** has requested, and **Lender** has agreed, to modify the terms of the **Loan**.

**NOW**, **Borrower** and **Lender** therefore agree as follows:

### ARTICLE I: MODIFICATION OF TERMS

**1.01 Extension Fee**. **Borrower** will pay to **Lender** a fee (the "**Extension Fee**") in the amount of
**$3,449.70**, in consideration for **Lender's** agreements contained herein, including without limitation,
**Lender's** agreement to modify the date on which the **Indebtedness** becomes due and payable in full.
**Extension Fee** is to be paid as of the earlier of (i) the **Maturity Date**, or (ii) the time the **Loan** is
paid in full.

**1.02 Legal Fee**. **Borrower** will pay to **Lender** a fee (the "**Legal Fee**") in the amount of **$600.00**, in consideration for **Lender's** work in preparing this **Agreement**. This **Agreement** is expressly conditioned on payment and receipt of the **Legal Fee**.

**1.03 Administration Fee**. **Borrower** will pay to **Lender** a fee (the "**Administration Fee**") in the amount of **$350.00**, in consideration for **Lender's** servicer's work in preparing this **Agreement**. **Administration Fee** is to be paid as of the earlier of (i) the **Maturity Date**, or (ii) the time the **Loan** is paid in full.

**1.04 Extension of Maturity Date**. Upon the **Lender's** receipt of the **Extension Fee**, provided no **Event of Default** (as defined in the **Loan Agreement**), or any event that, with notice or passage of time, or both, would constitute an **Event of Default**, has occurred and is continuing, or is not cured by this **Agreement**, the date on which all principal, interest, and other sums due under the **Note** shall be due and payable on **May 1, 2024** (hereinafter, the "**Maturity Date**").

**1.05 Interest Rate Change.** Beginning as of **November 1, 2023**, interest on the **Loan** shall begin to accrue at **11.2400%** per annum, provided no **Event of Default**, or any event that, with notice or passage of time, or both, would constitute an **Event of Default**, has occurred and is continuing, in which case interest shall accrue at the **Default Rate**, as defined in the **Note**. All interest payments payable to the **Lender** shall be paid monthly, in arrears, and shall be payable as of the **first (1st)** day of each month.

**1.06 BPO Fee**. **Borrower** will pay to **Lender** a fee (the "**BPO Fee**") in the amount of **$95.00**, in consideration for **Lender's** work in preparing, ordering, and reviewing a broker price opinion of the **Secured Property** in order to determine eligibility for this **Agreement**. **BPO Fee** is to be paid as of the earlier of (i) the **Maturity Date**, or (ii) the time the **Loan** is paid in full.

**ARTICLE II: STANDARD TERMS**

**2.01** The **Loan Documents** are hereby modified in such a manner to be consistent with all modifications and agreements contained herein. Except as specifically modified by the terms of this **Agreement**, the **Loan Documents** shall not be affected by this **Agreement** and each shall remain in full force and effect. Nothing herein contained shall be construed to impair the **Lender's** security under the **Loan Documents** nor to limit or impair any rights or powers that the **Lender** now enjoys or may hereafter enjoy under the **Loan Documents** for recovery of the indebtedness secured thereby.

**2.02** The **Loan Documents** are hereby ratified and confirmed by **Borrower** and **Lender** and every provision, covenant, warranty, representation, condition, obligation, right, and power contained in and under the **Loan Documents** as amended and modified, shall continue in full force and effect, affected by this **Agreement** only to the extent of the amendments and modifications set forth above. Without limiting the generality of the foregoing, the **Borrower** and the **Lender** hereby ratify and confirm that as of the date hereof, or as a consequence of this **Agreement**, there exists no **Event of Default** and no circumstances exist which could constitute an **Event of Default** after the giving of notice or the passage of time, or both.

**2.03** This **Agreement** is expressly conditioned upon **Borrower** being current with all outstanding interest, payments, or other charges due **Lender**. This **Agreement** shall be of no effect until **Lender** has received all outstanding interest, payments, or other charges that may be due as of the date of this **Agreement**.

**2.04 Borrower** hereby acknowledges and agrees that the execution of this **Agreement** shall in no way be construed as imposing on the **Lender** any obligation to offer the **Borrower** any further extensions of the date on which the **Indebtedness** becomes due and payable in full, or the modification of any other terms of the **Loan**.

**2.05** All capitalized terms used and not otherwise defined herein shall have the meaning ascribed to them in the loan documents. In the event of any inconsistency between capitalized terms used herein and otherwise defined in loan documents, the terms of this **Agreement** shall govern.

**2.06** The covenants and agreements herein set forth shall bind and inure to the benefit of the parties hereto, their heirs, successors and assigns.

**2.07** The consummation of the transactions hereby contemplated and the performance of the obligations of the **Borrower** under and by virtue of the loan documents will not result in any breach of, or constitute a default under, any mortgage, security deed, deed of trust, lease, bank loan or credit agreement, trust agreement or other instrument to which the **Borrower** is a party or by which it may be bound or affected.

**2.08** There are no actions, suits or proceedings pending, or to the knowledge of the **Borrower**, threatened, against, or affecting the **Borrower**, or the **Secured Property**, or involving the validity or enforceability of any of the loan documents or the priority of the lien thereof.

**2.09** There has been no material adverse change in the financial condition of the **Borrower** since the date of the last financial statements delivered to the **Lender**. No bankruptcy or insolvency case or proceedings of any kind have been filed, threatened or are outstanding by or against the **Borrower**, and the **Borrower** is current with regard to payment and performance of all loans, contracts and other agreements or obligations affecting the **Borrower**.

**2.10** This **Agreement** may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.

**2.11** The **Borrower** hereby acknowledges and agrees that the **Borrower** has no claim, offset, or defense against the **Lender** or with respect to any collateral securing the **Loan**.

**2.12 THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF CONNECTICUT, WAS EXECUTED AND DELIVERED BY THE BORROWER AND ACCEPTED BY THE LENDER IN THE STATE OF CONNECTICUT, WHICH STATE THE BORROWER AND THE LENDER AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE. THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER AND UNDER THE LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF CONNECTICUT, WITHOUT REGARD TO CHOICE OF LAW CONSIDERATIONS, APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, PRIORITY, ENFORCEMENT, AND FORECLOSURE OF THE LIENS AND SECURITY INTERESTS CREATED IN THE MORTGAGED PROPERTY UNDER THE LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE JURISDICTION IN WHICH THE MORTGAGED PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH**

**JURISDICTION, THE LAW OF THE STATE OF CONNECTICUT SHALL GOVERN THE VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS, AND THE DEBT OR OBLIGATIONS ARISING HEREUNDER.**

**2.13 THE LENDER AND THE BORROWER HEREBY AGREE THAT THE EXECUTION AND DELIVERY OF THIS AGREEMENT, AS WELL AS PERFORMANCE OF THE OBLIGATIONS REQUIRED HEREUNDER, CONSTITUTE THE TRANSACTION OF BUSINESS WITHIN THE STATE OF CONNECTICUT. IF THE BORROWER DOES NOT HAVE A REGISTERED AGENT IN THE STATE OF CONNECTICUT, THEN THE BORROWER HEREBY APPOINTS THE CONNECTICUT SECRETARY OF STATE AS ITS ATTORNEY AND AGREES THAT ANY PROCESS IN ANY CASE OF CONTROVERSY ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT MAY BE SERVED UPON THE CONNECTICUT SECRETARY OF STATE AND SHALL HAVE THE SAME VALIDITY AS IF SERVED UPON THE UNDERSIGNED PERSONALLY. THE LENDER AND THE BORROWER HEREBY AGREE THAT ANY APPROPRIATE STATE OR FEDERAL DISTRICT COURT LOCATED IN THE STATE OF CONNECTICUT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY CASE OR CONTROVERSY ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT AND SHALL BE A PROPER FORUM IN WHICH TO ADJUDICATE SUCH CASE OR CONTROVERSY. THE LENDER AND THE BORROWER AGREE TO SUBMIT TO PERSONAL JURISDICTION IN THE STATE OF CONNECTICUT IN ANY ACTION OR PROCEEDING ARISING OUT OF THIS AGREEMENT AND THE LOAN DOCUMENTS.**

**[Remainder of this page intentionally left blank]**

Page **4** of **5**

**IN WITNESS WHEREOF**, the undersigned have executed this Extension and Modification Agreement on the date first set forth above.

**RAD DIVERSIFIED REIT, INC.**, as Borrower

11/14/2023
_____
**Date**

By: _____

*Brandon D. Mendenhall*
—552599F650F249D...

**Name:** Brandon D. Mendenhall
**Title:** CEO

**ACKNOWLEDGED AND ASSENTED TO:**
**Brandon D. Mendenhall**, as Guarantor

11/14/2023
_____
**Date**

_____

*Brandon D. Mendenhall*
—552599F650F249D...

**Toorak Capital Partners, LLC**, as Lender

11/15/2023
_____
**Date**

By: _____

*Angela DiTommaso*
—CD94FF1E4E3A445...

**Name:** Angela DiTommaso
**Title:** Authorized Signer

Page **5** of **5**

# COMMERCIAL LOAN AGREEMENT



## COMMERCIAL LOAN AGREEMENT

THIS COMMERCIAL LOAN AGREEMENT (this "Loan Agreement"), is made as of the Closing Date by and between **RAD DIVERSIFIED REIT, INC.** (the "Borrower"), a Maryland corporation with a principal place of business of 7 St. Paul Street, Suite 820, Baltimore, MD 21202; and **RCN Capital, LLC** (the "Lender"), a Connecticut limited liability company with a principal place of business at 75 Gerber Road East, Ste. 102, South Windsor, CT 06074.

## RECITALS

Lender has agreed to make, and Borrower has agreed to accept, a loan (the "Loan") in the original principal amount of Twenty-Four Thousand Three Hundred Dollars and No Cents ($24,300.00). Lender is willing to make the Loan to Borrower upon the terms and subject to the conditions set forth in this Loan Agreement.

The Loan is evidenced by that certain Commercial Promissory Note (as same may be amended, restated, or modified from time to time, the "Note"), in the principal amount of **Twenty-Four Thousand Three Hundred Dollars and No Cents ($24,300.00)**, executed by Borrower, payable to Lender and its assigns (Lender and any subsequent holder of the Note are hereinafter referred to collectively as "Holder"). The Loan will bear interest and will be paid in accordance with the payment terms set forth in the Note.

The obligations under the Loan are guaranteed by Brandon D. Mendenhall (the "Guarantor").

## AGREEMENT

NOW, THEREFORE, in consideration of these promises, the mutual covenants contained in this Loan Agreement and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows:

1. Closing Date. As used herein, the term "Closing Date" shall mean _10/ 18/_ , 2022.

2. Loan Proceeds. Subject to the final closing statement (the "Closing Statement") prepared by Elite Commercial Closings LLC, approved by Holder, and executed by Borrower, the Loan proceeds shall be disbursed as follows:

    A sum (the "Short Interest") equal to $6.4058 (the "Per Diem Interest") for each and every day in the period beginning on the Closing Date to the last day of the month in which the Closing Date occurs (such period of time being referred to as the "Short Interest Period"), shall be disbursed by Holder, on behalf of Borrower and simultaneously paid to Holder and applied to cover interest that will accrue during the Short Interest Period.

3. Prepaid Monthly Payments. So long as no Event of Default (as hereinafter defined), and no event which, with the passage of time and/or the giving of notice would constitute an Event of Default (as hereinafter defined) under this Loan Agreement or under any other Loan Documents (as hereinafter defined), shall have occurred, Holder shall credit Borrower from the prepaid monthly payments (the "Prepaid Monthly Payments"), if any, set forth on the Closing Statement to the extent of amounts not so credited for payments due. The Prepaid Monthly Payments will be credited against each payment as such payment becomes due. Any amounts not so credited from the Prepaid Monthly Payments by the time Borrower pays the Loan in full, the remaining Prepaid Monthly Payments shall be credited towards the payment of the Loan, and the excess, if any, shall be disbursed to Borrower.

4. Loan Termination Fee. Should Borrower make any payment of principal, whether partial or full, after August 1, 2023, Borrower shall, at the time of such principal payment, pay Holder a fee (the "Loan Termination Fee") equal to ONE PERCENT (1%) of the principal amount paid.

5. Maturity Date. All principal, interest, and other sums due under the Note shall be due and payable in full on November 1, 2023 (the "Maturity Date").

6. Payoff Requests. In order to make a payment of all or a portion of the principal amount due under the Note, Borrower, or an agent authorized by Borrower, must provide Holder with notice (the "Payoff Notice") requesting

**Page 1 of 15**

a payoff statement (the "Payoff Statement") for a specified date (the "Payoff Date"), no fewer than four (4) business days and no greater than thirty (30) business days, on which such principal payment will be made. The Payoff Notice must contain: (a) A statement specifying whether it is Borrower's intention to satisfy the Loan in full or prepay a portion of the principal; (b) The applicable recording information for any instrument for which a satisfaction or partial release will be filed in connection with the payment; (c) A direction as to whether the statement is to be sent to Borrower, Borrower's authorized agent, or another specified party; and (d) Sufficient information to enable the Holder to reasonably identify the Loan. Holder shall be under no obligation to provide a Payoff Statement in response to a notice or request that does not meet the requirements set forth in this Section 6. Holder shall be under no obligation to accept any payment from, or on behalf of, Borrower, other than a payment that satisfies such amounts that are then due and payable under the terms of the Loan Documents (as hereinafter defined) or satisfies the full amount specified in the Payoff Statement.

7. Construction Holdback. Intentionally left blank.

8. Post-Closing Holdbacks. Intentionally left blank.

9. Security. The obligations under the Loan are secured by, among other things, the following mortgages or deeds of trust (as the same may be amended, restated, or modified from time to time, the "Security Instrument"): a certain Mortgage, Assignment of Rents and Security Agreement granted by RAD DIVERSIFIED REIT, INC., in favor of RCN Capital, LLC, encumbering the real property and improvements at 795 89th Ave N, St. Petersburg, FL 33702 (the foregoing real property and improvements are hereinafter referred to as the "Premises").

10. Guaranty. The obligations under the Loan are guaranteed by Guarantor in that certain Commercial Guaranty, executed by Guarantor and delivered to Holder on the Closing Date. The Note, this Loan Agreement, the Security Instrument, the Guaranty, and any other documents evidencing, securing, or now or hereafter executed in connection with the making of the Loan may sometimes hereinafter be individually referred to as a "Loan Document" and collectively referred to as the "Loan Documents". All of the indebtedness, obligations, and liabilities of Borrower arising under the Loan and the Loan Documents, and any and all renewals, modifications, rearrangements, amendments, or extensions thereof, are sometimes hereinafter referred to as the "Indebtedness".

11. Release or Reconveyance of the Premises. Upon payment and discharge of the Indebtedness (as hereinafter defined), and the performance of Borrower's obligations under the Loan Documents (as hereinafter defined), Holder will release the lien of the Security Instrument.

12. Collateral Assignment of Contracts, Plans, Permits & Approvals. To further secure the Indebtedness, Borrower hereby assigns, transfers, and sets over unto Holder, all of its right, title, privileges, and interest in and to the Additional Collateral (as hereinafter defined) and all rights and benefits therefrom as security for the full, timely, and faithful repayment of the principal, interest, and any and all other sums due under the Note, this Loan Agreement, the Security Instrument, and any other document delivered in connection with or as security for the Loan and performance by Borrower of all of their obligations under the Loan, to the fullest extent permitted by law and by the terms of the Additional Collateral. (A) The following shall constitute the "Additional Collateral" hereby assigned, transferred, and set over to Holder: (i) All licenses, permits, approvals, certificates and agreements with or from all boards, agencies, departments, governmental or quasi-governmental, relating directly or indirectly to the ownership, use, operation and maintenance of the Premises and the construction, use, development, renovation and installation of improvements to the Premises, whether heretofore or hereafter issued or executed (collectively the "Licenses"; said boards, agencies, departments, governmental or otherwise being hereinafter referred to collectively as "Governmental Authorities"); (ii) All contracts, subcontracts, agreements, service agreements, rights, warranties and purchase orders which have heretofore been or will hereinafter be executed by or on behalf of Borrower, or which have been or will hereafter be assigned to Borrower, as well as all promotional, sales and/or marketing materials, products or documents in connection with or relating to the current or future development, construction, renovation or improvement of the Premises or to the use, access, operation, sale and maintenance of the Premises (All of the contracts, agreements and other items referred to in subparagraphs (i), (iii), (iv), (v), (vi), and (vii) of this Section 12(A) are hereinafter referred to as the "Contracts" and the parties with whom or to whom such Contracts have been or are given are hereinafter referred to collectively as the "Contractors"); (iii) All other contracts now or hereafter entered into, including, but without limitation, those certain architects' agreements, engineers' agreements, development agreements and management agreements, if any; (iv) All and any agreements

of purchase and sale between Borrower and a bona fide third party, now existing or hereafter made, for all or any portion or portions of the Premises, as said agreements of purchase and sale may have been, or may from time to time be hereafter, modified or extended; (v) All rights necessary to provide the Premises with utility services including, but not limited to sewer, water, electricity and gas services as approved by those governmental authorities having jurisdiction thereof; (vi) All other agreements now or in the future with respect to the management, maintenance and operation of the Premises and the business conducted thereon; (vii) All plans, specifications, surveys, drawings, and reports between Borrower and any other party, existing as of the date hereof or entered into or created in the future with respect to the Premises. (B) Borrower will (i) fulfill or perform each and every condition and covenant of any Additional Collateral to be fulfilled or performed by Borrower; (ii) give prompt notice to Holder of any notice of default under any Contracts, Licenses, or other Additional Collateral received by Borrower together with a complete copy of any such notice; and, (iii) enforce, short of termination of any Contracts, the performance or observance of each and every covenant and condition of the Contracts by the contracting party to be performed or observed. Borrower shall not alter, modify, or change any Contracts, or terminate the term thereof, or accept a surrender thereof, or cancel any Contracts or waive or release any party from the performance or observance of any obligations or conditions thereof, without the prior written consent of Holder. (C) Holder shall not be obligated to perform or discharge any obligation under any Contracts or under or by reason of, the assignment of the Contracts, and Borrower hereby agrees to indemnify Holder against, and hold it harmless from, any and all liability, loss, or damage which it may incur under any Contracts or under, or by reason of, the assignment of the Contracts and of and from any and all claims and demands whatsoever which may be asserted against it by reason of any alleged obligation or undertaking on its part to perform or discharge under any of the terms of the Contracts. Should Holder incur any such liability, loss, or damage under any Contract or under, or by reason of, this assignment of the Additional Collateral, or in defense against any such claims or demands, the amount thereof, including costs, expenses and reasonable attorneys' fees, together with interest thereon at the default rate set forth in the Note, shall be secured hereby and by the Security Instrument, and Borrower shall reimburse Holder therefor immediately upon demand. (D) So long as there is no Event of Default, Borrower shall have the right to exercise or enforce, or seek to exercise or enforce, all rights, powers, privileges, authorizations and benefits under or pursuant to the Additional Collateral. Upon the payment in full of the Indebtedness, as evidenced by the recording or filing of a full release of the lien of the Security Instrument by Holder, this assignment shall become null and be void and of no effect.

13. Uniform Commercial Code Security Agreement. This Loan Agreement is also a security agreement under the Uniform Commercial Code (the "UCC") for any portion of the Premises which, under applicable law, may be subjected to a security interest under the UCC, for the purpose of securing Borrower's obligations under the Note, this Loan Agreement, the Security Instrument, and other Loan Documents, whether such Premises are owned now or acquired in the future, and all products and cash and non-cash proceeds thereof (collectively, the "UCC Collateral"), and by this Loan Agreement, Borrower grants to Holder a security interest in the UCC Collateral.

14. Conditions Precedent To Holder's Obligations. Holder shall not be obligated to make the Loan hereunder unless Holder shall have received the following conditions precedent (individually, a "Condition Precedent", collectively, the "Conditions Precedent"), all in form and substance satisfactory to Holder in all respects. The Conditions Precedent exist solely for Holder's benefit, and Holder, in its sole discretion, shall determine whether the Conditions Precedent have been satisfied. Any advance of funds by Holder shall neither (i) constitute a waiver of any Conditions Precedent to further advances; (ii) preclude Holder from declaring as an Event of Default any failure by Borrower to satisfy a Condition Precedent; nor (iii) constitute a waiver of Holder's right to require Borrower to comply with its duties, as stated in any Loan Documents.

A   Organization and Authorization Documents. Holder shall have received copies of: (i) Borrower's articles of organization or incorporation, and any amendments thereto; (ii) Borrower's operating agreement or bylaws, and any amendments thereto; and (iii) certified copies of all action taken by Borrower and its members or shareholders to authorize the execution, delivery, and performance of this Loan Agreement and the other Loan Documents, and the borrowing by Borrower hereunder, and such other papers as Holder shall reasonably require.

B   Loan Documents. Holder shall have received each of the Loan Documents, duly executed by the parties thereto. The Security Instrument shall be in form acceptable for recording in the land records where the Land (as defined in the Security Instrument) is located.

**Page 3 of 15**

C    Financial and Other Credit Information. Borrower and Guarantor shall have provided to Holder such financial and other credit information and documentation as Holder shall require, and Holder shall be satisfied with the creditworthiness of Borrower and Guarantor.

D    Holder's Fees and Expenses. Borrower shall have paid all of Holder's costs and expenses (including appraisal and reasonable attorneys' fees) incurred in connection with the negotiation, preparation, execution of the Loan Documents, and in the satisfaction of the Conditions Precedent.

E    Short Interest. Borrower shall have paid the Short Interest.

F    Validity of Liens. The Security Instrument shall be effective to create in favor of Holder a legal, valid, enforceable, and perfected first priority security interest in the Premises as set forth in the Security Instrument, in such manner as is satisfactory to Holder in its sole discretion.

G    Title Policy. A paid title insurance policy (the "Title Policy"), without survey exception, in the full amount of the Loan issued by the Title Company and insuring the lien of the Security Instrument as a valid first lien on the Premises, with such endorsements as Holder shall require, and subject to the permitted exceptions identified in the Security Instrument.

H    Insurance. Certificates of insurers, or other evidence satisfactory to Holder, indicating that Borrower have obtained the policies of insurance required under the terms of Section 16(D).

I    Taxes. Holder shall have received evidence of payment of all real estate taxes and municipal charges on the Premises which were due and payable prior to the date hereof, or become due and payable within six (6) months from the Closing Date.

J    Appraisal. Holder shall have received a current appraisal, in form and substance satisfactory to Holder.

**K    Permits and Approvals. Holder shall have received copies of all permits or approvals required by any Governmental Authorities to such date with respect to Borrower or the Premises, to the extent the same are necessary and appropriate to operate and develop the Premises.**

L    Additional Requirements. Holder shall have received such other agreements, certificates, or other documents as Holder or Title Company may reasonably request.

15. Representations, Warranties, and General Covenants. On the date hereof, in order to induce Holder to enter into this Loan Agreement, Borrower represents, warrants, and covenants the following:

A    Nature of Entity. RAD DIVERSIFIED REIT, INC. is a corporation, validly existing and in good standing under the laws of the state of Maryland and is, and will continue to be, duly qualified and licensed to do business in any other state in which it is required to be so qualified, organized, and/or licensed.

B    Power and Authority. Borrower has the power to execute, deliver, and carry out this Loan Agreement and to incur the Indebtedness, and Borrower has taken all necessary action to authorize the execution, delivery, and performance by Borrower of this Loan Agreement and the incurring of the Indebtedness.

C    No Change in Facts or Circumstances. (i) All information in the application for the Loan submitted to Holder, including all financial statements for the Premises, Borrower and Guarantor, and all rent schedules, reports, certificates, and any other documents submitted in connection with the application (collectively, the "Loan Application") is complete and accurate in all material respects as of the date such information was submitted to Holder; and (ii) There has been no change in any fact or circumstance since the Loan Application was submitted to Holder that would make any information submitted as part of the Loan Application materially incomplete or inaccurate.

**Page 4 of 15**

D    No Legal Bar. The execution and delivery of this Loan Agreement and compliance by Borrower with any of the terms and provisions hereof or of any of the other agreements or instruments referred to herein will not, on the date hereof, violate any provision of any existing law or regulation or any writ or decree of any court or governmental instrumentality, or any agreement or instrument to which Borrower is a party or which is binding upon it or its assets, and will not result in the creation or imposition of any lien, security interest, charge, or encumbrance of any nature whatsoever upon or in any of its assets, except as contemplated by this Loan Agreement; and no consent of any other party, license approval or authorization of or registration or declaration with any governmental bureau or agency, is required in connection with the execution, delivery, performance, validity, and enforceability of this Loan Agreement.

E    No Fraudulent Transfer or Preference. No Borrower or Guarantor (i) have made, or are making, in connection with, and as security for, the Loan, a transfer of an interest in the property of Borrower or Guarantor to or for the benefit of Holder or otherwise as security for any of the obligations under the Loan Documents which does or could constitute a voidable preference under Federal bankruptcy, state insolvency or similar applicable creditors' rights laws; or (ii) have made, or is making, in connection with the Loan, a transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of Borrower or Guarantor in property which does or could constitute a voidable preference under Federal bankruptcy, state insolvency or similar applicable creditors' rights laws; or (c) have incurred, or is incurring in connection with the Loan; any obligation (including any obligation to or for the benefit of an insider under an employment contract) which is or could constitute a fraudulent transfer under Federal bankruptcy, state insolvency, or similar applicable creditors' rights laws.

F    No Insolvency or Judgment. (i) Borrower is not (a) the subject of, or a party to (other than as a creditor), any completed or pending bankruptcy, reorganization, or insolvency proceeding; or (b) the subject of any judgment unsatisfied of record or docketed in any court located in the United States. Guarantor is not (a) the subject of or a party to (other than as a creditor) any completed or pending bankruptcy, reorganization or insolvency proceeding, or (b) the subject of any judgment unsatisfied of record or docketed in any court located in the United States. (ii) Borrower is not presently insolvent, and the Loan will not render Borrower insolvent. Guarantor is not presently insolvent, and the Loan will not render Guarantor insolvent. As used in this Section, the term "insolvent" means that the total of all of a person's liabilities (whether secured or unsecured, contingent or fixed, or liquidated or unliquidated) is in excess of the value of all of the assets of the person that are available to satisfy claims of creditors. (iii) There are no judicial, administrative, mediation or arbitration actions, suits or proceedings pending or, to the best of Borrower's or Guarantor's knowledge, threatened, in writing, against or affecting Borrower; or Guarantor; or the Premises; which, if adversely determined, would have a significant detrimental effect on: (a) the business, prospects, profits, operations, or condition (financial or otherwise) of Borrower; or Guarantor; or the Premises; (b) the enforceability, validity, perfection, or priority of the lien of any Loan Document; or (c) the ability of Borrower to perform any obligations under any Loan Document.

G    Compliance with Applicable Laws and Regulations. Except as already disclosed to Holder by Borrower in writing, to the best of Borrower's knowledge after due inquiry and investigation, each of the following is true: (i) All buildings, structures and improvements now constructed or at any time in the future constructed or placed upon the Land or the Improvements (as those terms are defined in the Security Instrument) and the use of the Premises comply with all applicable statutes, rules and regulations, including all applicable statutes, rules and regulations pertaining to requirements for equal opportunity, anti-discrimination, fair housing, environmental protection, zoning and land use ("legal, non-conforming" status with respect to uses or structures will be considered to comply with zoning and land use requirements for the purposes of this representation); and (ii) The Improvements comply with applicable health, fire, and building codes.

H    Commencement of Work; No Labor or Materialmen's Claims. Except as already disclosed to Holder by Borrower in writing, prior to the recordation of the Security Instrument, no work of any kind has been or will be commenced or performed upon the Premises, and no materials or equipment have been or will be delivered to or upon the Premises, for which the contractor, subcontractor, or vendor continues to have any rights including the existence of or right to assert or file a mechanic's or materialmen's lien. If any such work of any kind has been commenced or performed upon the Premises, or if any such materials or equipment have been ordered or delivered to or upon the Premises, then prior to the execution of the

**Page 5 of 15**

Security Instrument, Borrower has satisfied each of the following conditions: (i) Borrower has fully disclosed in writing to the Title Insurance Company issuing the Title Policy insuring the lien of the Security Instrument that work has been commenced or performed on the Premises, or materials or equipment have been ordered or delivered to or upon the Premises; (ii) Borrower has obtained and delivered to Holder and the Title Insurance Company issuing the Title Policy, is the first case with complete opinions, lien waivers from all contractors, subcontractors, suppliers or any other applicable party, pertaining to all work commenced or performed on the Premises, or materials or equipment ordered or delivered to or upon the Premises; and (iii) Borrower represents and warrants that all parties furnishing labor and materials for which a lien or claim of lien may be filed against the Premises have been paid in full and, except for such liens or claims insured against by the policy of title insurance to be issued in connection with the Loan, there are no mechanics', laborers' or materialmen's liens or claims outstanding for work, labor or materials affecting the Premises, whether prior to, equal with or subordinate to the lien of the Security Instrument.

I    Access; Utilities; Tax Parcels. The Premises: (i) has ingress and egress via a publicly dedicated right of way or via an irrevocable easement permitting ingress and egress, (ii) is served by public utilities and services generally available in the surrounding community or otherwise appropriate for the use in which the Premises are currently being utilized, and (iii) constitutes one or more separate tax parcels.

J    Licenses and Permits. Borrower, any commercial tenant of the Premises, and any operator of the Premises are in possession of all material licenses, permits and authorizations required for use of the Premises, which are valid and in full force and effect as of the date of this Loan Agreement.

K    No Other Interests. To the best of Borrower's knowledge, after due inquiry and investigation, no other party has (i) any possessory interest in the Premises or right to occupy the Premises except under and pursuant to the provisions of existing leases by and between tenants and Borrower (a form of residential lease having been previously provided to Holder together with the material terms of any and all non-residential leases at the Premises), or (ii) an option to purchase the Premises or an interest in the Premises, except as has been disclosed to and approved in writing by Holder.

L    Illegal Activity. No portion of the Premises has been or will be purchased with the proceeds of any illegal activity.

M    Taxes Paid. Borrower has filed all required federal, state, county and municipal tax returns, and Borrower has paid all taxes which have become due pursuant to such returns or to any notice of assessment received by Borrower, and Borrower has no knowledge of any basis for additional assessment with respect to such taxes. To the best of Borrower's knowledge, after due inquiry and investigation, there are not presently pending any special assessments against the Premises or any part of the Premises.

N    Title Exceptions. To the best of Borrower's knowledge after due inquiry and investigation, none of the items shown in the schedule of exceptions to coverage in the Title Policy issued to and accepted by Holder contemporaneously with the execution of this Loan Agreement and insuring Holder's interest in the Premises will have a significant detrimental effect on: (i) the ability of Borrower to pay the Loan in full, (ii) the ability of Borrower to use all or any part of the Premises in the manner in which the Premises are being used on the Closing Date, (iii) the operation of the Premises, or (iv) the value of the Premises.

O    Survival. The representations and warranties set forth in this Loan Agreement will survive until the Indebtedness is paid in full.

P    Cross-Default. Notwithstanding anything to the contrary contained in this Loan Agreement, any of the Loan Documents, or any of the documents executed in connection with the breach or default by Borrower or Guarantor of any covenant or other term or condition contained in any other loans, obligations, liabilities, or indebtedness (whether now existing or hereafter arising) by and among Borrower or Guarantor and Holder shall be considered a default under this Loan Agreement, entitling (but in no event requiring) Holder to apply any and all of the rights and remedies Holder has under the terms of this Loan Agreement.

**Page 6 of 15**

16. Covenants. Borrower covenants and agrees that, so long as any of the Indebtedness to Holder remains outstanding, Borrower will perform and observe each and all of the covenants and agreements herein set forth.

A    Payments Under this Loan Agreement. Borrower will make timely payment of all monies and will faithfully and fully keep and perform all of the terms, conditions, covenants, and agreements contained on Borrower's part to be paid, kept, or performed hereunder, and will be bound in all respects as debtor under this Loan Agreement, the Note, and any other instruments or documents executed and/or delivered in connection herewith or therewith.

B    Payment of Liabilities. Borrower will pay and discharge at or before their maturity all taxes, assessments, rents, claims, debts, and charges, except where the same may be contested in good faith and/or non-payment is advised by Borrower's counsel, and maintain, in accordance with generally accepted accounting principles and practice, appropriate reserves for the accrual of any of the same.

C    Compliance with Laws, Care of Property. Borrower will do, or cause to be done, all things necessary to comply with all laws, and to at all times maintain, preserve, and protect its property used or useful in the conduct of its business and keep the same in good condition and repair (normal wear and tear and obsolescence excepted), and from time to time make, or cause to be made, all needful and proper repairs, renewals, replacements, betterments, and improvements thereto.

D    Insurance. Borrower shall keep all buildings erected on, or to be erected on, the Land (as defined in the Security Instrument) insured against loss by fire and such other hazards as Holder may require and Borrower shall obtain and maintain insurance with respect to other insurable risks and coverage relating to the Premises, including but not limited to, comprehensive general public liability insurance and loss of income (rent insurance or business interruption), all such insurance in such sums and upon such terms as Holder may reasonably require, with loss proceeds by the terms of such policies made payable to Holder as its interest may appear. All such policies shall provide for a minimum of thirty (30) days prior written cancellation notice to Holder. Holder, upon its request to Borrower, shall have the custody of all such policies and all other policies which may be procured insuring the Premises, the same to be delivered, premiums paid at least five (5) days before the expiration of the old policies; and Borrower agrees that upon failure to maintain the insurance as above stipulated or to deliver said renewal policies as aforesaid, or to pay the premiums therefor, Holder may, without obligation to do so, procure such insurance and pay the premiums therefor and all sums so expended shall immediately be paid by Borrower and unless so paid, shall be deemed part of the Indebtedness and shall bear interest at the rate set forth in the Note, and thereupon the entire principal sum unpaid, including such sums as have been paid for premiums of insurance as aforesaid, and any and all other sums which shall be payable hereunder shall become due and payable forthwith at the option of Holder, anything herein contained to the contrary notwithstanding. In case of loss and payment by any insurance company, the amount of insurance money received shall be applied either to the Indebtedness, or in rebuilding and restoring the damaged property, as the Holder may elect. Borrower shall claim no cancellation or return any policy or premium except from and after full satisfaction of the Loan.

E    Fundamental Changes. So long as any Indebtedness of Borrower to Holder remains outstanding and unpaid, Borrower agrees that it will not merge or consolidate with or into any other entity; dissolve or liquidate; convey, sell, lease, or otherwise dispose of all or substantially all of its property, assets, or business; change the present form, ownership, or control of its business.

17. Default. Borrower hereby acknowledges and agrees that any of the following shall constitute an "Event of Default" hereunder: (a) failure of Borrower to make any payment of any installment of principal or interest when due under the Note; (b) failure of Borrower to pay any other sum when due hereunder or under the Note or any other Loan Document; (c) any representation or warranty of Borrower or any Guarantor made herein or in any other Loan Document or in any other writing given to Holder in connection with the Loan shall have been incorrect in any material respect as of the time when the same shall have been made or is not accurate when a further disbursement is to be made to Borrower; (d) the occurrence of an Event of Default under the Security Instrument or any other Loan Document; (e) the sale, conveyance, assignment, transfer or other disposition or divestiture of Borrower's title to any of the Premises, or the mortgage or other conveyance of a security interest

**Page 7 of 15**

in, or other encumbrance on any of the Premises or any interest therein, whether voluntary or involuntary, except as provided herein; (f) any merger, consolidation, liquidation, or dissolution, or the sale or transfer of all or substantially all of the assets, of Borrower; (g) the transfer (directly or indirectly) of any of the stock or other ownership of Borrower; (h) any default in the performance or observance of any term, covenant, or agreement to be performed by Borrower or any Guarantor in this Loan Agreement or in any Loan Document; (i) the use of proceeds of the Loan for any purpose other than as provided herein; (j) any Loan Documents for any reason shall cease to be in full force and effect, the liens on any Premises purported to be created thereby shall cease to be or are not valid and perfected liens having priority over all other liens except any encumbrances specifically permitted under such Loan Documents, or any Guarantor shall assert that it has no liability under the Guaranty to which it is a party; (k) one or more judgments or decrees shall be entered against Borrower or any Guarantor (not paid or fully covered by insurance) and all such judgments or decrees shall not have been vacated or discharged, stayed, or bonded pending appeal within sixty (60) days from the entry thereof; (l) Borrower or any Guarantor becomes insolvent or deceased; (m) Borrower or any Guarantor generally does not pay its debts as they become due and Borrower fails to make any payment to Holder required by the Loan Documents; (n) Borrower or any Guarantor makes an assignment for the benefit of creditors; (o) Borrower or any Guarantor calls or causes to be called a meeting of creditors for the composition of debts; (p) if there shall be filed by or with the consent or authorization of Borrower or any Guarantor a petition in bankruptcy for liquidation or for reorganization, or a custodian, receiver, or agent is appointed or authorized to take charge of its properties, or Borrower or any Guarantor authorized such action; (q) if there shall be filed against Borrower or any Guarantor a petition in bankruptcy, for liquidation, or for reorganization, or a custodian, receiver, or agent is appointed or authorized to take charge of its properties and Borrower or any Guarantor, as the case may be, has not consented to or authorized such action and such action is not dismissed within sixty (60) days; (r) if any license, permit, registration, vendor account, or other approval required for the normal operation of Borrower's business or any of the Premises shall be suspended or shall cease to be in full force and effect. Should any Event of Default occur, HOLDER MAY DECLARE THE ENTIRE UNPAID BALANCE AND ANY OTHER SUMS OWED UNDER THE NOTE AND LOAN DOCUMENTS, IMMEDIATELY DUE AND PAYABLE WITHOUT PRESENTMENT, DEMAND, PROTEST, NOTICE OF PROTEST, OR ANY OTHER KIND OF NOTICE OF DISHONOR, all of which are hereby expressly waived by Borrower. All such rights of Holder are cumulative, not exclusive, and enforceable alternatively, successively, or concurrently. After the occurrence of an Event of Default, interest on the unpaid outstanding balance of the Loan will accrue at the Default Rate, as defined in the Note. If a judgment on the Note is obtained, then after the judgment, interest on the unpaid balance will continue to accrue at the Default Rate until the Note is paid in full.

18. Indemnification of and Reimbursement to Holder. Borrower shall indemnify and hold Holder harmless from and against any and all claims, demands, losses, judgment, liabilities, costs or expenses (including, without limitation, reasonable attorneys' fees and disbursements) arising out of or resulting from the Note, this Loan Agreement, Holder's security interest in the Premises, or enforcement or exercise of any right or remedy granted to Holder under this Loan Agreement. In no event shall Holder incur liability to Borrower for any matter or thing in connection with this Loan Agreement, other than to account for monies actually received by Holder. (A) Cure by Holder. Following an Event of Default, Holder may, but shall not be required to, do any act or thing which Borrower has covenanted hereunder to do or cause to be done, and Holder may remedy any breach, and add to the Indebtedness of Borrower the costs or expenses incurred by Holder in so doing, and any and all amounts expended by Holder in taking such action shall be repayable to it upon its demand to Borrower therefor. All such costs and expenses shall bear interest from the date incurred by Holder until the date Holder is repaid in full at the Default Rate set forth in the Note. (B) Reimbursement of Expenses. Borrower shall pay to Holder all costs and expenses paid or incurred by Holder (including, without limitation, reasonable attorneys' fees and disbursements) in connection with the preparation for or any actual or attempted disposition of any portion of the Premises. All such costs and expenses incurred by Holder shall be repayable to it upon its demand to Borrower and shall bear interest from the date the same were incurred to the date paid in full at the interest rate set forth in the Note.

19. Document Re-Execution. Borrower and Guarantor will re-execute any document or instrument signed in connection with the Loan, or will execute any document or instrument that should have been signed at or before the closing of the Loan, or which was incorrectly drafted and/or signed. In the event of any miscalculation, misapplication or error in payment or collections of monies at closing, Borrower and Guarantor agree to correct the same upon request. Borrower and Guarantor shall execute and deliver, or cause to be executed and delivered, to Holder, all other instruments, certificates, and agreements as Holder or Holder's Counsel may reasonably

**Page 8 of 15**

require, including but not limited to, an estoppel certificate stating that the Loan is in full force and effect and that there are no defenses or offsets thereto, or any document, certificate, instrument or agreement reasonably required by Holder or Holder's Counsel to effect, confirm, or assure the rights, remedies, and liens intended to be granted or conveyed to Holder under the Note, the Loan Agreement, the Security Instrument, or any other Loan Document. Each request by Holder pursuant to this Section 19 shall receive the full cooperation and compliance of Borrower and Guarantor by execution and delivery, or as the case may be, by re-execution and delivery, at Holder's offices, or such other location as Holder may designate, within ten (10) business days or seven (7) calendar days of the date that Holder makes such a request. Failure to strictly comply with the requirements herein shall constitute an Event of Default.

20. Environmental Indemnity.

A   Defined Terms. For purposes of this Section 20, the following words and terms shall have the respective meanings and be construed as hereinafter provided: As used herein, "DEP" means the Florida Department of Environmental Protection. "Enforcement Action" means any action, proceeding or investigation instituted or threatened by the United States Environmental Protection Agency (the "EPA"), the DEP, or any other federal, state or local governmental agency related to any alleged or actual violation of any Environmental Law (as hereinafter defined) with respect to the Premises and/or any business conducted thereon, and/or Borrower. "Enforcement Action" shall also include any similar action brought by any private party pursuant to any Environmental Law (as hereinafter defined). "Environmental Laws" means all laws relating to hazardous waste, chemical substances or mixtures or hazardous, toxic or dangerous substances or conditions or relating to the interaction of the use or ownership of property and the environment, whether such law is: (a) criminal or civil, (b) federal, state or local, (c) statutory, common law or administrative regulation, (d) currently in effect or enacted in the future. "Environmental Authority" means the EPA, the DEP, or any other federal, state or local Governmental Authority having jurisdiction in a matter. "Hazardous Material" means any pollutants, hazardous or toxic substances or contaminated materials, including but not limited to, oil and oil products, asbestos, asbestos containing materials, urea formaldehyde foam insulation, polychlorinated biphenyls, flammables, explosives, radioactive materials, laboratory wastes, biohazardous wastes, chemicals, compounds or any other materials and substances (including materials, substances or things which are composed of or which have as constituents any of the foregoing substances), which are or may be subject to regulation under, or the Release of which or exposure to which is prohibited or limited by, or regulated under, any Environmental Law. "Release" means any spilling, leaking, migrating, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment of any Hazardous Material. "Remediation" or "Remediate" means any response, remedial removal or corrective action undertaken pursuant to any Environmental Law with respect to any Hazardous Material, any actions to prevent a Release or threatened Release of any Hazardous Material; any action necessary or appropriate to comply with any Environmental Law; any action necessary or appropriate to obtain or comply with permits needed for operations in connection with the Premises; including but not limited to, any investigation, monitoring, assessment, testing, sampling, laboratory or other analysis or evaluation, relating to any such remedial, removal or corrective action or relating to any Release or threatened Release of any Hazardous Material.

B   Guaranty. Borrower hereby absolutely and unconditionally guarantees to Holder that it and all other users, as well as all operations at the Premises, will fully comply with all Environmental Laws and all of the terms, covenants and provisions of the Security Instrument and the other Loan Documents. In the event that Borrower or any other users or operations at the Premises do not fully comply with all Environmental Laws or the terms, covenants and provisions of the Security Instrument and the other Loan Documents, Holder may, but shall be under no obligation to, comply with same. If Borrower does not fully comply with all Environmental Laws and all of the terms, covenants and provisions of the Security Instrument or the other Loan Documents, Borrower shall reimburse Holder, upon demand, for all reasonable costs and expenses incurred by Holder (including, without limitation, counsel and consulting fees and expenses, investigation and laboratory fees and expenses, court costs and litigation expenses) to the extent not otherwise reimbursed to Holder by Borrower in connection with Holder performing the obligations of Borrower as set forth herein or in the Security Instrument or the other Loan Documents.

C    Indemnification. Borrower hereby absolutely and unconditionally agrees to defend, indemnify, and hold harmless Holder, its employees, agents, trustees, attorneys, officers, directors and shareholders from and against any and all claims, demands, penalties, causes of action, fines, liabilities, settlements, damages, costs or expenses of whatever kind or nature, known or unknown, foreseen or unforeseen, contingent or otherwise, incurred by Holder, its employees, agents, trustees, attorneys, officers or directors (including, without limitation, counsel and consultant fees and expenses, investigation and laboratory fees and expenses, court costs, and litigation expenses) arising out of, or in any way related to: (i) any breach of the provisions of this Loan Agreement; (ii) any breach of any of the provisions of the Security Instrument or any of the Loan Documents; (iii) any Hazardous Discharge or threat thereof of any Hazardous Material which is at, in, on, under, around, from or affecting the Premises, including, without limitation, any violation of any Environmental Laws or any damage or injury resulting from any Hazardous Material to or affecting the Premises or the soil, water, air, vegetation, buildings, personal property, persons or animals located on the Premises or on any other property or otherwise, whether occurring during or prior to the ownership of the Premises; (iv) any personal injury (including wrongful death) and property damages (real or personal) arising out of or related to any such Hazardous Material; (v) any lawsuit brought or threatened, settlement reached, or order or directive of or by any Environmental Authority relating to such Hazardous Material; (vi) any remedial action undertaken by Holder in connection with any of the foregoing.

D    Survival. The obligations and liabilities of Borrower under this Section 20 shall survive and continue in full force and effect and shall not be terminated, discharged, or released, in whole or in part, irrespective of whether the Indebtedness has been paid in full and irrespective of any foreclosure of the Security Instrument, release of any collateral, sale of the Premises pursuant to the provisions of the Security Instrument, or acceptance by Holder, its wholly-owned subsidiary, assignee or nominee of a deed or assignment in lieu of foreclosure or sale, and irrespective of any other fact or circumstance of any nature whatsoever.

E    Dealing with Borrower and Others. Without incurring responsibility to Borrower and without impairing or releasing the liabilities and obligations of Borrower hereunder, Holder, may at any time and from time to time, without the consent of, or notice to Borrower, upon any terms or conditions and in whole or in part shall have the right to: (i) Amend, modify or change the manner, place or terms of payment of the Note or any other Loan Document and/or change or extend the time for payment or renew or alter any liabilities and obligations of Borrower or any security therefor, and the indemnity herein made shall apply to the liabilities and obligations of Borrower, as so amended, modified, changed, extended, renewed or altered; (ii) Sell, exchange, release, surrender, realize upon or otherwise deal with in any manner and in any order, any property by whomsoever at any time pledged, assigned, mortgaged or in which a security interest is given to secure, or howsoever securing, the liabilities and obligations of Borrower; (iii) Exercise or refrain from exercising any rights against Borrower or other persons or entities or against any security given by Borrower or other persons or entities, or otherwise act or refrain from acting; (iv) Settle or compromise any liabilities and obligations of Borrower to Holder, dispose of any security therefor, with or without consideration, or any liability incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liabilities and obligations of Borrower (whether due or not) to creditors of Borrower other than Holder; and (v) Apply any sums by whomsoever paid and howsoever realized for the benefit of Borrower to any liabilities and obligations of Borrower, subject to the provisions of the Loan Documents.

F    Obligations Absolute. The liabilities and obligations of Borrower under this Section 20 shall be absolute and unconditional irrespective of (i) any lack of validity or enforceability of the Note or any other Loan Document; (ii) the insolvency of, or the voluntary or involuntary bankruptcy, assignment for the benefit of creditors, reorganization or other similar proceedings affecting Borrower, any other Guarantor, or any of their assets; or (iii) any other circumstance or claim which otherwise might constitute a defense available to, or a discharge of Borrower with respect to the liabilities and obligations under the Loan Documents, or of Borrower with respect to this Loan Agreement.

21. Notices. All notices, consents, approvals, and requests required or permitted under this Loan Agreement or under any other Loan Document shall be given in writing and shall be effective for all purposes if hand delivered or sent by any of the following methods: (i) overnight delivery by a nationally recognized express transportation company; or (ii) certified or registered United States mail, return receipt requested. Addresses for notices are as follows:

If to Lender:

RCN Capital, LLC
75 Gerber Road East, Ste. 102
South Windsor, CT 06074

If to Borrower:

RAD DIVERSIFIED REIT, INC.
222 Angels Boulevard
Big Bear City, CA 92314

A notice shall be deemed to have been given: in the case of hand delivery, at the time of delivery; in the case of overnight delivery by a nationally recognized express transportation company, upon the first attempted delivery on a business day; and in the case of registered or certified mail, when delivered or the first attempted delivery on a business day. Any party to this Loan Agreement may change the address to which notices intended for it are to be directed by means of notice given to the other party in accordance with this Section 21. Each party agrees that it will not refuse or reject delivery of any notice given in accordance with this Section 21, that it will acknowledge, in writing, the receipt of any notice upon request by the other party and that any notice rejected or refused by it will be deemed for purposes of this Section 21 to have been received by the rejecting party on the date so refused or rejected, as conclusively established by the records of the U.S. Postal Service or other nationally recognized express transportation company. Borrower acknowledges and agrees that Lender, or any future servicer of the Loan, on behalf of Lender, may contact Borrower by telephone, text message, email, or by U.S. Postal Service or other nationally recognized express transportation company, for all matters pertaining to the Loan including, without limitation, servicing of the Loan.

**22. LOAN FOR BUSINESS PURPOSE.** Borrower hereby represents, warrants, and certifies to Holder the following:

A.    The Loan being obtained on the Premises is solely for business purposes, for the purchase and sale and/or rehabilitiation of the Premises.

B.    Lender has stressed to the Borrower the importance of knowing the primary purpose of the Loan. Borrower knows that the legal responsibilities of Lender vary considerably depending upon whether the Loan is a consumer loan (for personal, household, or family purposes), or a business loan.

C.    Borrower's primary business activity is to purchase, rehabilitate, and resell real property at a profit.

D.    Borrower has represented to Lender, and Borrower now again represents to Lender, that the sole purpose of the Loan is to finance the purchase, rehabilitation, and resale of the Premises.

E.    The Premises is being purchased/held for business purposes only and will not be used as a personal residence by Borrower.

F.    No part of the Loan proceeds are intended to be used for personal, household, or family purposes.

G.    The undersigned hereby agrees that the Loan is an exempted transaction under the Truth in Lending Act, 15 U.S.C., § 1601, et. seq.

**23. WAIVER OF RIGHT TO PREJUDGMENT REMEDY, NOTICE, AND HEARING. BORROWER (AND EACH AND EVERY ENDORSER, GUARANTOR, AND SURETY OF THE NOTE) ACKNOWLEDGES THAT THE LOAN EVIDENCED BY THIS LOAN AGREEMENT IS A COMMERCIAL TRANSACTION, AND HEREBY VOLUNTARILY AND KNOWINGLY WAIVE THE RIGHT TO NOTICE AND HEARING UNDER CHAPTER 903a OF THE CONNECTICUT GENERAL**

**Page 11 of 15**

**STATUTES**, OR ANY SUCCESSOR STATUTE OF SIMILAR IMPORT, WITH RESPECT TO ANY PREJUDGMENT REMEDY AS DEFINED THEREIN, AND FURTHER WAIVES DILIGENCE, DEMAND, PRESENTMENT FOR PAYMENT, NOTICE OF NONPAYMENT, PROTEST AND NOTICE OF PROTEST AND NOTICE OF ANY RENEWALS OR EXTENSIONS OF THE NOTE, AND ALL RIGHTS UNDER ANY STATUTE OF LIMITATIONS, AND AGREE THAT THE TIME FOR PAYMENT OF THE NOTE MAY BE CHANGED AND EXTENDED AS PROVIDED IN THE NOTE, IN THE SECURITY INSTRUMENT OR THE LOAN DOCUMENTS, WITHOUT IMPAIRING BORROWER'S LIABILITY THEREON, AND FURTHER CONSENT TO THE RELEASE OF ALL OR ANY PART OF THE SECURITY FOR THE PAYMENT HEREOF, OR THE RELEASE OF ANY PARTY LIABLE FOR THIS OBLIGATION WITHOUT AFFECTING THE LIABILITY OF THE OTHER PARTIES HERETO. ANY DELAY IN EXERCISING ANY RIGHT HEREUNDER, ON THE PART OF HOLDER OF THE NOTE, SHALL NOT OPERATE AS A WAIVER OF ANY SUCH RIGHT, AND ANY WAIVER GRANTED ON ONE OR MORE OCCASIONS SHALL NOT OPERATE AS A WAIVER OF SUCH RIGHT IN THE EVENT OF ANY SUBSEQUENT DEFAULT.

**24. JURY TRIAL WAIVER. BORROWER AND HOLDER EACH HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, COUNTERCLAIM, OR CROSS-CLAIM ARISING IN CONNECTION WITH, OUT OF, OR OTHERWISE RELATING TO THE LOAN DOCUMENTS, THE INDEBTEDNESS, THE PREMISES, ANY TRANSACTION ARISING THEREFROM OR RELATED THERETO, OR ANY DISPUTE INVOLVING BORROWER AND HOLDER. FURTHER, EXCEPT AS PROHIBITED BY LAW, BORROWER WAIVES ANY RIGHT WHICH IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION BETWEEN THE PARTIES ANY SPECIAL, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES, OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. BORROWER ACKNOWLEDGES AND AGREES THAT THIS SECTION 24 IS A SPECIFIC AND MATERIAL ASPECT OF THIS LOAN AGREEMENT AND THAT HOLDER WOULD NOT EXTEND CREDIT TO BORROWER IF THE WAIVERS SET FORTH IN THIS SECTION 24 WERE NOT A PART OF THIS LOAN AGREEMENT.**

25. No Waiver by Holder. No course of dealing between Borrower and Holder and no failure to exercise or delay in exercising on the part of Holder any right, power, or privilege under the terms of this Loan Agreement or under the terms of any other Loan Documents or other agreements, or instruments between Holder and Borrower shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power, or privilege hereunder or thereunder preclude any other or further privilege. The rights and remedies provided herein or in any other agreement are cumulative and not exclusive or in derogation of any rights or remedies provided in and thereof, by law or otherwise.

26. Survival of Representations. All agreements, representations, and warranties made herein, in any agreement and in any statements, notices, invoices, certificates, schedules, documents, or other instruments delivered to Holder in connection with this Loan Agreement or any other agreement shall survive the making of the loans and advances hereunder.

27. Rights of Assignees and Successors. All rights of Holder in, to, and under this Loan Agreement and any other instrument or document executed and/or delivered in connection herewith shall pass to and may be exercised by any assignee thereof. Borrower agrees that, in the event of an assignment of this Loan and notice of such assignment to Borrower, the liability of Borrower to any holder of this Loan, provided such holder is a holder for value, shall be immediate and absolute and not affected by any actions of Holder and that Borrower will not set up any claim against Holder as a defense, counterclaim, or setoff to any action for the unpaid balance owed under this Loan Agreement or for possession brought by said holder. All rights of Holder hereunder shall inure to the benefit of its successors and assigns and any subsequent holder of the Note, and all Indebtedness of Borrower shall bind the heirs, executors, administrators, successors, and assigns of Borrower.

28. Attorneys' Fees and Expenses. Borrower agrees to pay all reasonable attorneys' fees and expenses, including recording and filing fees, incurred by Holder in connection with the financing being concluded this day as well as any fees and expenses of counsel, whether incurred before or after the Indebtedness is paid and performed in full, which Holder may hereafter incur in reasonably protecting, enforcing, increasing, or releasing any security held

**Page 12 of 15**

by Holder, and in foreclosing any mortgage and/or in sustaining the validity of any mortgage Borrower specifically authorizes Holder to pay all such fees and expenses and charge the same to its account.

29. Headings. The descriptive headings of the several sections of this Loan Agreement are inserted for convenience only and shall not be deemed to affect the meaning or construction of any of the provisions hereof.

30. Severability. If any provision of this Loan Agreement or application thereof to any person or circumstance shall to any extent be invalid, the remainder of this Loan Agreement or the application of such provision to persons, entities, or circumstances other than those as to which it is held invalid, shall not be affected thereby and each provision of this Loan Agreement shall be valid and enforceable to the fullest extent permitted by law.

31. Choice of Law. This Loan Agreement shall be governed by the laws of the state of Connecticut.

32. Amendments; Entire Agreement; Counterparts. This Loan Agreement may not be altered, amended, waived, or modified in any way whatsoever except by a writing duly executed by the party to be charged therewith. This Loan Agreement, together with the other Loan Documents, constitutes the entire agreement between the parties with respect to the subject matter hereof and constitutes a complete and exclusive statement of the terms of the agreement between the parties with respect to the subject matter hereof. This Loan Agreement, together with the other Loan Documents, supersedes all prior communications, contracts, or agreements between the parties with respect to the subject matter addressed in this Loan Agreement, whether oral or written. This Loan Agreement may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page. Any signature page of this Loan Agreement may be detached from any counterpart of this Loan Agreement without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Loan Agreement identical in form hereto but having attached to it one or more additional signature pages.

33. Lender's Right to Assign. Holder shall have the right to sell, assign, participate, transfer, or dispose of all or any part of its interest in the Loan without the consent or approval of Borrower.

34. Leasing Covenant. Intentionally left blank.

35. Post-Closing Requirements. Intentionally left blank.

36. Origination Fee Rebate. Intentionally left blank.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the undersigned have executed this Commercial Loan Agreement on _ _*10/18*_ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _, 2022.

RAD DIVERSIFIED REIT, INC.

By: _____

Name: Brandon D. Mendenhall

Title: CEO


STATE OF _ Florida _ _ _ _ _ _ _ _ _ _          )
                                                  )ss. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
COUNTY OF _Hillsborough_ _ _ _ _ _ _ _         )

The foregoing instrument was acknowledged by means of __x____ physical presence _____ online
notarization before me this _ 18th _ day of _ _October _ _ _ _ _ _ _ _ _ _ _ _ _, 2022, by Brandon D.
Mendenhall, CEO of RAD DIVERSIFIED REIT, INC., a Maryland corporation, on behalf of the corporation.
He/she is _ _ _ _ personally known to me _ x _ _ has produced _Drivers License_ _ _ _ _ _ _,
as identification.

_____
Notary Public

Michelle Caroline Tchu, Notary Public

MICHELLE CAROLINE TCHU
Notary Public-State of Florida
Commission # HH 124055
My Commission Expires
April 28, 2025

IN WITNESS WHEREOF, the undersigned have executed this Commercial Loan Agreement on the 24 day of __ ____ OCT _____, 2022.

RCN Capital, LLC

By: _____

Angela DiTommaso, Authorized Signer

STATE OF CONNECTICUT                                    )
                                                        )ss. South Windsor
COUNTY OF HARTFORD                                      )

I certify that on the __24__ day of ___OCT_____, 20_24_, Angela DiTommaso came before me in person and stated to my satisfaction that he/she made the attached instrument; and was authorized to and did execute this instrument on behalf of, and as Authorized Signer of RCN Capital, LLC (the "Company"), the entity named in this instrument, as the free act and deed of the Company, by virtue of the authority granted by its operating agreement and its members

_____
Notary Public

CECELIA RITSKOWITZ
Notary Public of Connecticut
My Commission Expires 03/31/2025

**Page 15 of 15**

# GUARANTY



ORIGINAL

**COMMERCIAL GUARANTY**

THIS COMMERCIAL GUARANTY (the "Guaranty") is made by **Brandon D. Mendenhall** ("Guarantor"), an individual, residing at 222 Angels Boulevard, Big Bear City, CA 92314.

FOR VALUE RECEIVED, Guarantor hereby unconditionally and absolutely guarantees the prompt payment and performance of a certain Commercial Promissory Note (the "Note") in the principal amount of Twenty-Four Thousand Three Hundred Dollars and No Cents ($24,300.00), plus interest, fees, and any other charges due thereunder (all sums due under the aforesaid Note are hereinafter referred to collectively, as the "Indebtedness") made and delivered simultaneously with this Guaranty by RAD DIVERSIFIED REIT, INC., in favor of RCN Capital, LLC, a Connecticut limited liability company with a principal place of business at 75 Gerber Road East, Ste. 102, South Windsor, CT 06074, and its assigns (collectively, the "Holder"); and all monies coming due under a certain Commercial Loan Agreement (the "Loan Agreement") between Borrower and Lender, any mortgage or any other document granted to secure the Indebtedness, any environmental indemnification agreement, and any other document executed in relation to and simultaneously with the Indebtedness (all of the foregoing document are hereinafter referred to collectively as the "Loan Documents").

1. Consent to Modifications. Guarantor consents to any change in the terms and conditions of the Loan Documents, including but not limited to, any change in the collateral provided in the Loan Documents or any change with respect to the parties who may be liable with respect to the Loan Documents, with notice to, or further assent by, Guarantor. Guarantor is to remain bound upon this Guaranty, notwithstanding any such change or extension or release, substitution, exchange or other indulgence granted any maker of the Indebtedness. Guarantor hereby waives all defenses, counterclaims, or offsets which Guarantor might have by reason of any change in or to the Loan Documents or any release, exchange, surrender, or impairment of security, or any addition or release of any party liable with respect to the Loan Documents.

2. Default. Upon any Event of Default of (as defined in each respective loan document), Borrower in the payment or performance under any of the Loan Documents, Holder may enforce this Guaranty immediately against Guarantor and may exercise remedies under any security instruments given to secure the obligations under this Guaranty, without the necessity of any suit or action against Borrower or any other party and without resorting to and without regard to any collateral or any other guarantee or any other source of payment. In the event of default under any of the Loan Documents, Guarantor further agrees to pay all costs, without limitation, reasonable attorneys' fees, incurred or expended by Holder in the collection or attempted collection under this Guaranty and in realization of any lien or security interest securing amounts due hereunder, including, without limitation, those incurred as a result of Holder's participation in any proceeding involving Guarantor under the Federal Bankruptcy Code.

3. Delay or Omission No Waiver; Continuing Guaranty. No delay or omission in exercising any right hereunder shall operate as a waiver of such right or any other right; and a waiver on one occasion shall not be a bar to or waiver of any right on any other occasion. This Guaranty is a continuing guaranty which shall take effect on its delivery to Holder and shall remain in full force and effect and be binding upon Guarantor until the complete satisfaction of all of the obligations set forth in the Loan Documents.

4. Waiver. Guarantor hereby waives demand, presentment, protest, and notice of acceptance of this Guaranty by Holder, and of any loans made, extensions granted or other action taken in reliance hereon and all other demands and notices of any description in connection with this Guaranty, or under the Loan Documents.

5. Representations and Warranties. Guarantor represents and warrants that: (a) Guarantor is deriving direct financial benefit from the Indebtedness; (b) Guarantor is not now insolvent and will not be rendered insolvent by the execution hereof or the performance hereunder; (c) there are no actions, suits or proceedings pending, and Guarantor has not received notice of any actions, suits, proceedings, against or affecting Guarantor, or the properties of Guarantor before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which, if determined adversely to Guarantor, would have a material adverse effect on the financial condition, properties or operations of Guarantor; (d) the most recent financial statements of Guarantor, copies of which statements have been furnished to Holder, fairly present the financial condition of Guarantor as of such dates in accordance with generally accepted accounting principles applied on a consistent

basis, and since the date of each of such financial statements, there has been no material adverse change in such condition or operations; (e) Guarantor is not a party to any indenture, loan or credit agreement or any lease or other agreement or instrument or subject to any charter or other restriction which would have a material adverse effect on the ability of Guarantor to carry out its obligations hereunder; (f) no information, exhibit or report furnished by Guarantor to Holder in connection with the negotiation of this Guaranty contained as of the date thereof, or, if there be no such date, the date of furnishing thereof, any untrue statements of a material fact and do not omit to state any material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading; (g) this Guaranty constitutes the valid and legally binding obligation of Guarantor, enforceable in accordance with its terms, except as the enforcement may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditor's rights generally; and (h) all authorizations, consents and approvals of governmental bodies or agencies required in connection with the execution and delivery of this Guaranty, or in connection with the performance of Guarantor's obligations hereunder, if any, have been obtained as required hereunder or by law

6. Dealing with Borrower and Others. Without incurring responsibility to Guarantor and without impairing or releasing the liabilities and obligations of Guarantor hereunder, Holder may, at any time and from time to time, without the consent of or notice to Guarantor, upon any terms or conditions and in whole or in part shall have the right to: (a) sell, exchange, release, surrender, realize upon or otherwise deal with in any manner and in any order, any property by whomsoever at any time pledged, assigned, mortgaged or in which a security interest is given to secure, or howsoever securing, the liabilities and obligations of Borrower; (b) exercise or refrain from exercising any rights against Borrower or other persons or entities (including Guarantor) or against any security given by Borrower or other persons or entities (including Guarantor), or otherwise act or refrain from acting; (c) Settle or compromise any liabilities and obligations of Borrower to Holder, dispose of any security therefor, with or without consideration, or any liability incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liabilities and obligations of Borrower (whether due or not) to creditors of Borrower other than Holder and Guarantor; and (d) apply any sums by whomsoever paid and howsoever realized for the benefit of Borrower to any liabilities and obligations of Borrower, subject to the provisions of the Loan Documents.

7. Subrogation. So long as: (i) the Indebtedness remains unpaid; (ii) any liabilities and obligations of Borrower exist under the Loan Documents; or (iii) any liabilities and obligations of Guarantor exist under this Guaranty; Guarantor waives any and all rights of indemnification, reimbursement, subrogation or contribution which Guarantor may otherwise have now or hereafter as a matter of law against Borrower.

8. Obligations Absolute; No Impairment; Rights Cumulative. The liabilities and obligations of Guarantor hereunder shall be absolute and unconditional irrespective of: (i) any lack of validity or enforceability of the Indebtedness or any other Loan Document; (ii) the insolvency of, or the voluntary or involuntary bankruptcy, assignment for the benefit of creditors, reorganization, or other similar proceedings affecting Borrower, Guarantor, any other guarantor of the Indebtedness, or any assets owned by the aforementioned persons or entities; or (iii) any other circumstance or claim which otherwise might constitute a defense available to, or a discharge of, Borrower with respect to its liabilities and obligations under the Loan Documents, or of Guarantor with respect to this Guaranty. No invalidity, irregularity or unenforceability of all or any part of any liabilities and obligations of Borrower or the impairment or loss of any security therefor, whether caused by any actions or inactions of Holder, or otherwise, shall affect, impair or be a defense to this Guaranty. All rights, powers and remedies afforded to Holder by reason of this Guaranty are separate and cumulative remedies, and no one of such remedies whether or not exercised by Holder shall be deemed to exclude any of the other remedies available to Holder nor prejudice the availability of any other legal or equitable remedy which Holder may have with respect to the Indebtedness.

**9. COMMERCIAL TRANSACTION. GUARANTOR ACKNOWLEDGES THAT THIS GUARANTY AND EACH TRANSACTION RELATED TO IT IS A "COMMERCIAL TRANSACTION" WITHIN THE MEANING OF CHAPTER 903A OF THE CONNECTICUT GENERAL STATUTES, AS AMENDED. GUARANTOR WAIVES ANY RIGHT WHICH THEY MIGHT HAVE TO A NOTICE AND A HEARING OR A PRIOR COURT ORDER, UNDER SAID CHAPTER 903A OR AS OTHERWISE PROVIDED UNDER ANY APPLICABLE FEDERAL OR STATE LAW, IN THE EVENT HOLDER SEEKS ANY PREJUDGMENT REMEDY IN CONNECTION WITH THIS GUARANTY.**

10. Joint and Several Liability; Successors and Assigns; Counterparts. The liability of Guarantor under this Guaranty shall be joint and several with that of each and every other guarantor under any other Commercial Guaranty executed in connection with the Loan. This Guaranty shall inure to the benefit of Holder, and its successors and assigns, and it shall be binding upon Guarantor and the executors, administrators, heirs, successors, and assigns, of Guarantor. This Guaranty may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page. Any signature page of this Guaranty may be detached from any counterpart of this Guaranty without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Guaranty identical in form hereto but having attached to it one or more additional signature pages.

11. Choice of Remedy; Lawsuit or Arbitration. Any claim or controversy arising out of or relating to this Guaranty may, at the sole option and election and discretion of the Holder and without prior notice to the Guarantor of such election, be either be adjudicated by i) a civil lawsuit in any court of competent jurisdiction, including the state courts of Connecticut, or ii) arbitration administered by the American Dispute Resolution Center, Inc. (the "ADR Center") in accordance with its Rules of Commercial Arbitration (the "Rules") as in effect at the time of such arbitration's commencement as amended as herein stated below, and subject to Chapter 909 of the Connecticut General Statutes, and judgment on an award rendered by the arbitrator may be entered in any court of competent jurisdiction. Notwithstanding the existing Rules of the ADR Center, the Guarantor and the Holder specifically agree to amend said Rules for any claim or controversy to be arbitrated between the Guarantor and the Holder to the extent of the following:

   a. The arbitrator shall be Keith K. Fuller, Esq. of Enfield, Connecticut (the "Arbitrator"), and if such Arbitrator is unable or unwilling to act as Arbitrator, then the selection of the Arbitrator shall be made by the Holder from a list provided by the ADR Center, and any objections made to the selection of a particular Arbitrator by the Holder shall be made in writing to the ADR Center within five (5) calendar days of the selection, and no extensions of time shall be granted.

   b. There shall be one (1) Arbitrator selected only.

   c. The Guarantor and Holder agree to waive oral, in-person or virtual hearings, and agree to make only written submissions to the Arbitrator.

   d. The Guarantor and the Holder agree to waive administrative conferences.

   e. The Guarantor and the Holder agree to waive any conflicts of interest with respect to the Arbitrator and any party to the arbitration.

   f. The Guarantor and the Holder additionally agree to waive the effectiveness of Connecticut General Statutes Sections 52-407kk(b) and 52-407ll(c). It is a known and agreed fact that Keith K. Fuller, Esq. has previously or currently represents the Holder as counsel, but in unrelated matters not affecting the Guarantor, and Guarantor and Holder agree that Keith K. Fuller, Esq. as Arbitrator shall be presumed to be acting without partiality toward any party

12. Governing Law. This Guaranty is, and shall be deemed to be, a contract entered into under and pursuant to the laws of the State of Connecticut and shall be in all respects governed, construed, applied and enforced in accordance with the laws of said state without regard to conflicts of laws considerations; and this Guaranty shall be construed without regard to any presumption or rule requiring construction against the party causing such instrument or any portion thereof to be drafted; and no defense given or allowed by the laws of any other state or country shall be interposed in any action or proceeding hereon unless such defense is also given or allowed by the laws of the State of Connecticut. The undersigned agrees to submit to personal jurisdiction in the State of Connecticut in any action or proceeding arising out of this Guaranty and, in furtherance of such agreement, the undersigned hereby agrees and consents that without limiting other methods of obtaining jurisdiction, personal jurisdiction over the undersigned in any such action or proceeding may be obtained within or without the jurisdiction of any court located in Connecticut and that any process or notice of motion or other application to any such court in connection with any such action or proceeding may be served upon the undersigned by registered mail to or by personal service at the last known address of the undersigned, whether such address be within or without the jurisdiction of any such court.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the undersigned have executed this Commercial Guaranty on _ _ _10/18/22_ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _, 2022.

**Brandon D. Mendenhall**

_____

Brandon D. Mendenhall

STATE OF _Florida _ _ _ _ _ _ _ _ _ _ )
                                      )ss. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
COUNTY OF _Hillsborough _ _ _ _ _ _ _ )

The foregoing instrument was acknowledged by means of __x_____ physical presence _____ online
notarization before me this _ _18th_ day of _ October _ _ _ _ _ _ _ _ _ _ _ _ _ _ , 2022, by Brandon D.
Mendenhall, who ___ is personally known to me or ___ has produced a Drivers License _ _ _ _
_ _ _ _ _ _ _ _ (type of identification), as identification.

Notary Public

Michelle Caroline Tchu, Notary Public

MICHELLE CAROLINE TCHU
Notary Public-State of Florida
Commission # HH 124055
My Commission Expires
April 28, 2025

# COMMERCIAL PROMISSORY NOTE





Lender Loan Number: ██████

## COMMERCIAL PROMISSORY NOTE

1. Promise to Pay. FOR VALUE RECEIVED, **RAD DIVERSIFIED REIT, INC.** (the "Borrower"), a Maryland corporation with a principal place of business of 7 St. Paul Street, Suite 820, Baltimore, MD 21202 promises to pay to the order of **RCN Capital, LLC**, a Connecticut limited liability company with a principal place of business at 75 Gerber Road East, Ste. 102, South Windsor, CT 06074, or its assigns (collectively, the "Holder"), the principal sum of **Twenty-Four Thousand Three Hundred Dollars and No Cents ($24,300.00)** (the "Loan"), or so much of the Loan as may be advanced hereunder from time to time (the "Current Balance"), together with interest on the Current Balance computed from the date advanced (the "Commencement Date"), all as hereinafter provided, subject to the terms and conditions of a certain Commercial Loan Agreement (the "Loan Agreement"), executed by Borrower and Holder, and upon the following terms, agreements, and conditions:

2. Interest. Interest shall accrue on the unpaid Current Balance at the rate of 9.49% per annum. Interest is calculated on the basis of a 360-day year and a 30-day month. No interest will accrue on undisbursed portions of the Loan.

3. Maturity Date. The unpaid Current Balance, all accrued interest thereon, and all other fees or charges shall be due and payable on November 1, 2023 (the "Maturity Date"), provided, however, that from and after (i) the Maturity Date, whether upon stated maturity, acceleration, or otherwise, or (ii) the date on which the interest rate hereunder is increased to the Default Rate (as hereinafter defined) as provided herein, interest shall be computed at the Default Rate.

4. Payments. Beginning on December 1, 2022 and continuing on the first (1st) day of each month thereafter, through and including the Maturity Date, Borrower shall make monthly payments of interest, in arrears. All unpaid principal, interest, and other sums due hereunder shall be due and payable in full on the Maturity Date. All payments shall be payable in lawful money of the United States of America and shall be made by wire transfer to an account designated by Holder to Borrower from time to time, or at Holder's election, shall be made through automated clearing house (ACH) transfers from an account designated by Borrower. All payments will be applied first to any unpaid collection costs and late charges, then to accrued and unpaid interest, and any remaining amount to principal. Whenever any payment to be made hereunder shall be due on a day other than a business day, such payment shall be made on the next succeeding business day. The term "business day" as used herein shall mean any day other than a Saturday, Sunday, or public holiday.

A    Loan Termination Fee. Should Borrower make any payment of principal, whether partial or full, after August 1, 2023, Borrower shall, at the time of such principal payment, pay Holder a fee (the "Loan Termination Fee") equal to ONE PERCENT (1%) of the principal amount paid.

5. Prepayment. Subject to Section 4(A), Borrower may prepay the unpaid principal balance hereof, together with accrued interest thereon, in whole or in part, without penalty or premium, it being understood and agreed that, except as expressly provided herein, Borrower shall not be entitled to, whether claimed by virtue of prepayment or any other grounds, a refund any fees, expenses, interest, points, charges and the like paid by Borrower to Holder, all of which payments will be retained by Holder from and after the date each such payment is made hereunder.

6. Default. At the election of Holder, the Maturity Date may be accelerated, and all sums due hereunder shall become immediately due and payable without notice or demand, upon the occurrence of any of the following events (each an "Event of Default"): (a) Any failure by Borrower to pay in full any sum due hereunder on or before the date such sum is due; (b) Any failure by Borrower to perform or observe any other term or provision herein; (c) Any default under the Security Instrument (as hereinafter defined), a default under the Guaranty (as hereinafter defined) or a default under or misrepresentation contained in any other agreement, document, or certificate of Borrower or any Guarantor (as hereinafter defined) in connection with the Loan, which default is not cured within any grace period expressly provided therefor in such document; (d) Any failure by Borrower to satisfy a Condition Precedent set forth in the Loan Agreement; (e) Borrower shall: (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or substantially all of its property and assets; (ii) make a general

**Page 1 of 4**

assignment for the benefit of its creditors; (iii) be dissolved or liquidated; (iv) become insolvent (as such term may be defined or interpreted under any applicable statute); (v) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect, or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it; or (vi) take any action for the purpose of effecting any of the foregoing. In addition to the rights and remedies provided herein, Holder may exercise any other right or remedy available under applicable law or under any other document, instrument, or agreement evidencing, securing, or otherwise relating to the indebtedness evidenced hereby, in accordance with the terms thereof, all of which rights and remedies shall be cumulative. The payment and acceptance of any sum shall not be considered a waiver of such right of election. Borrower hereby agrees to indemnify, defend, and hold Holder harmless from and against any and all claims, loss, cost, damage or expense (including, without limitation, reasonable attorneys' fees) which may be incurred by Holder in connection with, or as a result of, any Event of Default.

7. Default Rate. Beginning on the earlier of (i) the Maturity Date; (ii) the date on which an Event of Default occurs; or (iii) the date on which Holder accelerates the entire amount of the indebtedness due hereunder, without notice or any required action by Holder; the Current Balance will accrue interest at a rate (the "Default Rate") equal to the lesser of (i) Sixteen Percent (16%) per annum; or (ii) the Maximum Rate (as hereinafter defined)). Following an Event of Default, interest will continue to accrue at the Default Rate until such Event of Default, and any other Events of Default are cured. In the event Holder, obtains a judgment on this promissory note the interest will continue to accrue at the Default Rate after judgment until all sums are paid in full. Notwithstanding anything to the contrary contained herein, under no circumstances shall the aggregate amount paid, or agreed to be paid, hereunder exceed the highest lawful rate permitted under any applicable usury law (the "Maximum Rate") and the payment obligations of Borrower under this Note are hereby limited accordingly. If under any circumstances, whether by reason of advancement or acceleration of the aggregate amounts paid on this promissory note (as may be amended, restated, or modified from time to time, the "Note"'), should cause the effective interest rate of the Note to exceed the Maximum Rate, Borrower stipulates that payment and collection of such excess amounts shall have been and will be deemed to be the result of a mistake on the part of both Borrower and Holder. The party that receives such excess payments shall promptly credit such excess (to the extent such payments in excess of the Maximum Rate) against the unpaid principal balance hereof. Any portion of such excess payments not capable of being so credited will be refunded to Borrower.

8. Late Charges. If any payment of interest is not paid within ten (10) days of the date such payment is due, a late charge equal to the lesser of (i) ten percent (10%) of such overdue payment; or (ii) the maximum amount permitted by applicable law shall automatically become due to the Holder of this Note. If any payment of principal is not paid within ten (10) days of the date such payment is due, a late charge equal to the lesser of: (i) three percent (3%) of such overdue payment; or (ii) the maximum amount permitted by applicable law; shall automatically become due to the Holder of this Note. Said late charges do not constitute interest and shall constitute compensation to Holder of this Note for collection administration costs incurred hereunder. In addition, if any payment of principal or interest is not paid when due, the rate of interest per annum on the outstanding Current Balance shall increase to the Default Rate and such rate increase shall remain in force and effect for so long as such default shall continue. This paragraph shall not be construed as an agreement or privilege to extend the due date of any payment, nor as a waiver of any other right or remedy accruing to Holder by reason of any default or Event of Default.

9. Security and Guaranty. The obligations hereunder, including the obligation to make full and timely payments of principal and interest, are secured by, among other things, the following: the Loan Agreement; a certain Commercial Guaranty (the "Guaranty") executed by Brandon D. Mendenhall (the "Guarantor"); a certain Mortgage, Assignment of Rents and Security Agreement (the "Security Instrument") granted by RAD DIVERSIFIED REIT, INC., in favor of RCN Capital, LLC, encumbering the real property and improvements at 795 89th Ave N, St. Petersburg, FL 33702.

10. Reservation of Holder's Rights. Notwithstanding any course of dealing or course of performance: (i) neither failure nor delay on the part of Holder to exercise any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power, or privilege; (ii) no notice to or demand upon Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Holder to take further

**Page 2 of 4**

action without notice or demand; and (iii) no amendment, modification, rescission, waiver, or release of any provision of this Note shall be effective unless the same shall be in writing and signed by Holder.

11. Costs and Expenses. Borrower will pay to Holder all costs and expenses of collection hereof (including reasonable attorneys' fees).

12. Completion of Instrument; Reproduction Admissible; Counterparts. Borrower authorizes Holder to complete this Note if delivered incomplete in any respect. A photographic or other reproduction of this Note shall be admissible in evidence with the same effect as the original Note in any judicial or other proceeding, whether or not the original is in existence. This Note may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page. Any signature page of this Note may be detached from any counterpart of this Note without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Note identical in form hereto but having attached to it one or more additional signature pages.

**13. WAIVER OF RIGHTS/DELAY; WAIVER OF JURY TRIAL. BORROWER AND EACH SURETY, ENDORSER, AND GURANTOR HEREOF ACKNOWLEDGE THAT THE LOAN EVIDENCED BY THIS NOTE IS A COMMERCIAL TRANSACTION AND HEREBY VOLUNTARILY AND KNOWINGLY WAIVE THE RIGHT TO NOTICE AND HEARING UNDER CHAPTER 903a OF THE CONNECTICUT GENERAL STATUTES, OR ANY SUCCESSOR STATUTE OF SIMILAR IMPORT, WITH RESPECT TO ANY PREJUDGMENT REMEDY AS DEFINED THEREIN, and further waive diligence, demand, presentment for payment, notice of nonpayment, protest and notice of protest, notice of any renewals or extensions of this Note, and all rights under any statute of limitations, and agree that the time for payment in this Note may be changed and extended as provided in the Loan Agreement, without impairing their liability thereon, and further consent to the release of all or any part of the security for the payment hereof, or the release of any party liable for this obligation without affecting the liability of the other parties hereto. Any delay on the part of Holder in exercising any right hereunder shall not operate as a waiver of any such right, and any waiver granted for one occasion shall not operate as a waiver in the event of any subsequent default. In the interest of a speedy resolution of a lawsuit which may arise hereunder, Borrower and each accommodation maker and endorser under this Note waive a trial by jury in any action with respect to this Note and as to any issues arising relating to this Note. Any funds received by Holder after maturity, whether by acceleration or otherwise, shall be applied to amounts then due and Holder's acceptance of any such funds shall not be construed as a waiver of Borrower's default.**

14. Governing Law. This Note shall be governed by, and shall be construed and interpreted in accordance with, the laws of the state of Connecticut.

15. Binding Effect. The terms and provisions of this Note shall be binding upon Borrower and its successors and assigns, and shall inure to the benefit of Holder and its successors and assigns.

[Remainder of page intentionally left blank]

**Page 3 of 4**

IN WITNESS WHEREOF, the undersigned have executed this Commercial Promissory Note on _10/18/22_

_____, 2022.

RAD DIVERSIFIED REIT, INC.

By: _____

Name: Brandon D. Mendenhall

Title: CEO

STATE OF _Florida_____        )

                                     )ss. _____

COUNTY OF _Hillsborough_____        )

The foregoing instrument was acknowledged by means of __x___ physical presence _____ online notarization before me this __18th__ day of __October_____, 2022, by Brandon D. Mendenhall, CEO of RAD DIVERSIFIED REIT, INC., a Maryland corporation, on behalf of the corporation. He/she is _____ personally known to me _x___ has produced Drivers license_____, as identification.

Notary Public

Michelle Caroline Tchu, Notary Public

MICHELLE CAROLINE TCHU
Notary Public-State of Florida
Commission # HH 124055
My Commission Expires
April 28, 2025

**Page 4 of 4**

█████████████████████

...…......................... Space Above Line for Recorder's Use ...…...............................

## MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

███████████████████████

| THIS DOCUMENT PREPARED BY: | AFTER RECORDING, RETURN TO: |
|---|---|
| Angela DiTommaso<br>ADiTommaso@EliteCommercialClosings.com<br>RCN Capital, LLC<br>75 Gerber Road East, Ste. 102<br>South Windsor, CT 06074 | RCN Capital, LLC<br>75 Gerber Road East, Ste. 102<br>South Windsor, CT 06074 |

███████████████

## MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

THIS MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT (the "Instrument") is made by **RAD DIVERSIFIED REIT, INC.** (the "Mortgagor"), a Maryland corporation with a principal place of business at 7 St. Paul Street, Suite 820, Baltimore, MD 21202; in favor of **RCN Capital, LLC** (the "Mortgagee"), a Connecticut limited liability company with a principal place of business at 75 Gerber Road East, Ste. 102, South Windsor, CT 06074, its successors and assigns.

### RECITAL

Mortgagor is indebted to Mortgagee in the principal amount of **Twenty-Four Thousand Three Hundred Dollars and No Cents ($24,300.00)**, as evidenced by Mortgagor's Commercial Promissory Note (as the same may be amended, restated, or modified from time to time, the "Note"), payable to Mortgagee, executed and delivered contemporaneously with this Instrument, and maturing on November 1, 2023 (the "Maturity Date"), subject to the terms and conditions of that certain Commercial Loan Agreement (as the same may be amended from time to time, the "Loan Agreement"), between Mortgagor and Mortgagee executed and delivered contemporaneously herewith.

### AGREEMENT

TO SECURE TO Mortgagee the full and prompt payment and performance of each and all of Mortgagor's obligations under the Note, and the performance of the covenants and agreements of Mortgagor contained in this Instrument, and in any other documents evidencing, securing, or now or hereafter executed in connection with the Note (each, a "Loan Document"; collectively, the "Loan Documents"; and all of the indebtedness, obligations, and liabilities of Mortgagor arising under the Note, the Loan Documents, or both, and any and all renewals, modifications, rearrangements, amendments, or extensions thereof, are sometimes hereinafter referred to as the "Indebtedness"), Mortgagor hereby MORTGAGES, WARRANTS, HYPOTHECATES, AND ASSIGNS to Mortgagee, the following described property (collectively, the "Premises"):

A    The real property located in Pinellas County, Florida, at **795 89th Ave N, St. Petersburg, FL 33702**, as such real property is more particularly described in SCHEDULE 1, attached hereto and made a part hereof for all purposes the same as if set forth herein verbatim; together with all right, title, and interest of Mortgagor in and to (i) all streets, roads, alleys, easements, rights-of-way, licenses, rights of ingress and egress, vehicle parking rights and public places, existing or proposed, abutting, adjacent, used in connection with or pertaining to the real property or the Improvements (as hereinafter defined), (ii) any strips or gores between the real property and abutting or adjacent properties, and (iii) all water and water rights, timber, crops and mineral interests pertaining to the real property (such real property and other rights, titles, and interests being hereinafter sometimes called the "Land");

B    All buildings, structures, improvements now constructed or at any time in the future constructed or placed upon the Land, including any future alterations, replacements and additions (the "Improvements");

**Page 2 of 14**

C     All fixtures and systems and articles of personal property, of every kind and character, now owned or hereafter acquired by Mortgagor which are now or hereafter is attached to the Land or the Improvements so as to constitute a fixture under the laws of the state of Florida, and used in or necessary to complete the proper planning, development, use, occupancy or operation thereof, or acquired (whether delivered to the Land or stored elsewhere) for use or installation in or on the Land or the Improvements, and all renewals and replacements of, substitutions for and additions to the foregoing (all of which are herein sometimes referred to together as "Accessories");

D     All (i) plans and specifications for the Improvements; (ii) approvals, entitlements and contracts relating to the Land or the Improvements or the Accessories or any part thereof; (iii) deposits including, but not limited to, Mortgagor's rights in tenants' security deposits (if any), deposits with respect to utility services to the Land or the Improvements or the Accessories or any part thereof, and any deposits or reserves hereunder or under any other Loan Documents (as hereinafter defined) for taxes, insurance or otherwise, funds, accounts, contract rights, instruments, documents, commitments, general intangibles, notes and chattel paper used in connection with or arising from or by virtue of any transactions related to the Land or the Improvements or the Accessories or any part thereof; (iv) permits, licenses, franchises, bonds, certificates and other rights and privileges obtained in connection with the Land or the Improvements or the Accessories or any part thereof; (v) leases, rents, royalties, bonuses, issues, profits, revenues and other benefits of the Land, the Improvements and the Accessories; and (vi) other properties, rights, titles and interests, if any, specified in any Section of this Instrument as being part of the Premises;

E     All rents (whether from residential or non-residential space), revenues, and other income of the Land or the Improvements, parking fees, laundry and vending machine income and fees and charges for food, health care and other services provided at the Premises, whether now due, past due or to become due, and deposits forfeited by tenants, and, if Mortgagor is a cooperative housing corporation or association, maintenance fees, charges or assessments payable by shareholders or residents under proprietary leases or occupancy agreements, whether now due, past due, or to become due (all of which are herein sometimes referred to together as the "Rents");

F     All present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Premises, or any portion of the Premises (including proprietary leases or occupancy agreements if Mortgagor is a cooperative housing corporation), and all modifications, extensions or renewals (all of which are herein sometimes referred to together as the "Leases");

G     All proceeds, products, consideration, compensation and recoveries, direct or consequential, cash and noncash, of or arising from, as the case may be, (i) the properties, rights, titles and interests referred to above in paragraphs (A), (B), (C), (D), (E), and (F); (ii) any sale, lease or other disposition thereof; (iii) each policy of insurance relating

**Page 3 of 14**

thereto (including premium refunds); (iv) the taking thereof or of any rights appurtenant thereto by eminent domain or sale in lieu thereof for public or quasi-public use under any law; and (v) any damage thereto whether caused by such a taking (including change of grade of streets, curb cuts or other rights of access) or otherwise caused; and

H    All other interests of every kind and character, and proceeds thereof, which Mortgagor now has or hereafter acquires in, to or for the benefit of the properties, rights, titles and interests referred to above in paragraphs (A), (B), (C), (D), (E), (F), (G), and all property used or useful in connection therewith, including, but not limited to, remainders, reversions and reversionary rights or interests.

Mortgagor does hereby represent and warrant that Mortgagor is lawfully seized of the Premises and has the right, power and authority to MORTGAGE, PLEDGE, HYPOTHECATE, GRANT, WARRANT, CONVEY AND ASSIGN the Premises, and that the Premises are unencumbered except for those encumbrances (the "Permitted Encumbrances") shown on the schedule of exceptions to coverage in the Title Policy (as defined in the Loan Agreement), issued to and accepted by Mortgagee contemporaneously with the execution and recordation of this Instrument and insuring Mortgagee's interest in the Premises. Mortgagor does hereby covenant and agree that Mortgagor will warrant and defend generally the title to the Premises against all claims and demands, subject to the Permitted Encumbrances.

In consideration of the aforesaid, and in order to more fully protect the security of this Instrument, Mortgagor hereby represents, warrants, covenants, and agrees as follows:

1. Inspection. Mortgagee and any other Person authorized by Mortgagee shall have the right to enter and inspect the Premises at all reasonable times.

2. Security Agreement. This Instrument is also a security agreement between Mortgagor, as debtors, and Mortgagee, as secured party, for any of the Premises which, under applicable law, may be subjected to a security interest under the Uniform Commercial Code in the state of Florida (the "UCC"), for the purpose of securing Mortgagor's obligations under this Instrument and to further secure Mortgagor's obligations under the Note, and other Loan Documents, whether such Premises are owned now or acquired in the future, and all products and cash and non-cash proceeds thereof (collectively, the "UCC Collateral"), and by this Instrument, Mortgagor hereby grants to Mortgagee a security interest in the Collateral. To the extent necessary under applicable law, Mortgagor hereby authorizes Mortgagee to prepare and file financing statements, continuation statements and financing statement amendments in such form as Mortgagee may require to perfect or continue the perfection of this security interest. If an Event of Default (as hereinafter defined) has occurred and is continuing, Mortgagee will have the remedies of a secured party under the UCC, in addition to all remedies provided by this Instrument or existing under applicable law. In exercising any remedies, Mortgagee may exercise its remedies against the Collateral separately or together, and in any order, without in any way affecting the availability of Mortgagee's other remedies. This Instrument also constitutes a financing statement with respect to any part of the Premises that is or may become a fixture, if permitted by applicable law.

3. Taxes and Other Charges. Mortgagor is responsible for the payment of all taxes ("Taxes"), assessments for local improvements ("Assessment"), rates and charges, license fees, all charges which may be imposed for the use of vaults, chutes, areas and other space beyond the lot line and abutting the public sidewalks in front of or adjoining the Premises, and all other governmental levies and charges (collectively, the "Impositions"), of every kind and nature whatsoever. Upon Mortgagee's request, Mortgagor shall deliver to Mortgagee within five (5) days of any such request, proof of payment of any and all Impositions, in form satisfactory to Mortgagee.

4. Insurance. Mortgagor shall keep the Premises insured in accordance with the provisions of the Loan Agreement.

5. Liens. Mortgagor shall not, directly or indirectly, create or suffer or permit to be created, or to stand, against the Premises or any portion thereof, or against the rents, issues and profits therefrom, any lien, charge, mortgage, deed of trust, adverse claim or other encumbrance, whether senior or junior to the lien of this Instrument, other than the lien of this Instrument and the Permitted Encumbrances.

6. Due on Sale or Encumbrance. Should the title to the Premises, or any part thereof or any interest therein, be transferred to any Person, firm or entity other than the Borrower, or should the ownership of the Premises, or any part thereof, become vested in any owner other than the Borrower, or should any lien, mortgage or any other encumbrance, voluntary or involuntary, be placed against the Premises, or in any of the foregoing events, the entire principal balance due under the Note, together with all accrued interest thereunder, shall at the election of Mortgagee, be and become immediately due and payable in full, subject to applicable law, and Mortgagee shall be entitled to pursue all remedies provided for in this Instrument or at law, including without limitation, foreclosure of the lien of this Instrument.

7. Assignment of Rents; Appointment of Receiver; Mortgagee in Possession. (A) As part of the consideration for the Indebtedness, Mortgagor absolutely and unconditionally assigns and transfers to Mortgagee all Rents. It is the intention of Mortgagor to establish a present, absolute and irrevocable transfer and assignment to Mortgagee of all Rents and to authorizes and empower Mortgagee to collect and receive all Rents without the necessity of further action on the part of the Borrower. Promptly upon request by Mortgagee, Mortgagor agrees to execute and deliver such further assignments as Mortgagee may from time to time require. Mortgagor and Mortgagee intend this assignment of Rents to be immediately effective and to constitute an absolute, present, and unconditional assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of Rents, and for no other purpose, the Rents will not be deemed to be a part of the Premises. However, if this present, absolute, and unconditional assignment of the Rents is not enforceable by its terms under the laws of the state of Florida, then the Rents will be included as a part of the Premises and it is the intention of Mortgagor that in this circumstance this Instrument create and perfect a lien on the Rents in favor of Mortgagee, which lien will be effective as of the date of this Instrument. (B) Until the occurrence of an Event of Default, Mortgagee hereby grants to Mortgagor a revocable license to collect and receive all the Rents, to hold all the Rents in trust for the benefit of Mortgagee and to apply all the Rents to pay the installments of interest and principal then due and payable under the Note and the other amounts then due and

payable under the other Loan Documents, including the Taxes, Impositions, Assessments, and Insurance, and to pay the current costs and expenses of managing, operating and maintaining the Premises, tenant improvements and other capital expenditures. So long as no Event of Default has occurred and is continuing, the Rents remaining after application pursuant to the preceding sentence may be retained by Mortgagor free and clear of, and released from, Mortgagee's rights with respect to the Rents under this Instrument. After the occurrence of an Event of Default, and during the continuance of such Event of Default, Mortgagor authorizes Mortgagee to collect, sue for, and compromise the Rents and directs each tenant of the Premises to pay all the Rents to, or as directed by, Mortgagee. From and after the occurrence of an Event of Default, and during the continuance of such Event of Default, and without the necessity of Mortgagee entering upon and taking and maintaining control of the Premises directly, or by a receiver, Mortgagor's license to collect the Rents will automatically terminate and Mortgagee will, without notice, be entitled to all the Rents as they become due and payable, including the Rents then due and unpaid. Mortgagor will pay to Mortgagee upon demand all the Rents to which Mortgagee is entitled. At any time on or after the date of Mortgagee's demand for the Rents, Mortgagee may give, and Mortgagor hereby irrevocably authorizes Mortgagee to give, notice to all tenants of the Premises instructing them to pay all Rents to Mortgagee. *No tenant will be obligated to inquire further as to the occurrence or continuance of an Event of Default. No tenant will be obligated to pay to* Mortgagor *any amounts which are actually paid to* Mortgagee *in response to such a notice.* Any such notice by Mortgagee will be delivered to each tenant personally, by mail or by delivering such demand to each rental unit. Mortgagor will not interfere with and will cooperate with Mortgagee's collection of such Rents. (C) If an Event of Default has occurred and is continuing, then Mortgagee will have each of the following rights and may take any of the following actions: (i) Mortgagee may, regardless of the adequacy of Mortgagee's security or the solvency of Mortgagor and even in the absence of waste, enter upon and take and maintain full control of the Premises in order to perform all acts that Mortgagee in its discretion determines to be necessary or desirable for the operation and maintenance of the Premises, including the execution, cancellation, or modification of the Leases, the collection of all the Rents, the making of repairs to the Premises and the execution or termination of contracts providing for the management, operation or maintenance of the Premises, for the purposes of enforcing the assignment of the Rents pursuant to Section 7(A) of this Instrument, protecting the Premises or the security of this Instrument, or for such other purposes as Mortgagee, in its discretion, may deem necessary or desirable. (ii) Alternatively, if an Event of Default has occurred and is continuing, regardless of the adequacy of Mortgagee's security, without regard to Mortgagor's solvency and without the necessity of giving prior notice (oral or written) to Mortgagor, Mortgagee may apply to any court having jurisdiction for the appointment of a receiver for the Premises to take any or all of the actions set forth in the preceding sentence. If Mortgagee elects to seek the appointment of a receiver for the Premises at any time after an Event of Default has occurred and is continuing, Mortgagor's, by its execution of this Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte* if permitted by applicable law. (iii) If Mortgagor is a housing cooperative corporation or association, Mortgagor hereby agrees that if a receiver is appointed, the order appointing the receiver may contain a provision requiring the receiver to pay the installments of interest and principal then due and payable under the Note and the other amounts then due and payable under the other Loan Documents, including the Taxes,

**Page 6 of 14**

Impositions, Assessments, and Insurance, it being acknowledged and agreed that the Indebtedness is an obligation of Mortgagor and must be paid out of maintenance charges payable by Mortgagor's tenant shareholders under their proprietary leases or occupancy agreements. (iv) Mortgagee or the receiver, as the case may be, will be entitled to receive a reasonable fee for managing the Premises. (v) Immediately upon appointment of a receiver or immediately upon Mortgagee's entering upon and taking possession and control of the Premises, Mortgagor will surrender possession of the Premises to Mortgagee or the receiver, as the case may be, and will deliver to Mortgagee or the receiver, as the case may be, all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Premises and all security deposits and prepaid Rents. (vi) If Mortgagee takes possession and control of the Premises, then Mortgagee may exclude Mortgagor and its representatives from the Premises. Mortgagor acknowledges and agrees that the exercise by Mortgagee of any of the rights conferred under this Section 7 will not be construed to make Mortgagee a Mortgagee-in-possession of the Premises so long as Mortgagee has not itself entered into actual possession of the Land and Improvements. (D) If Mortgagee enters the Premises, Mortgagee will be liable to account only to Mortgagor and only for those Rents actually received. Except to the extent of Mortgagee's gross negligence or willful misconduct, Mortgagee will not be liable to the Borrower, anyone claiming under or through Mortgagor or anyone having an interest in the Premises, by reason of any act or omission of Mortgagee under Section 7(C) of this Instrument, and Mortgagor hereby releases and discharges Mortgagee from any such liability to the fullest extent permitted by law. If the Rents are not sufficient to meet the costs of taking control of and managing the Premises and collecting the Rents, any funds expended by Mortgagee for such purposes will become an additional part of the Indebtedness. (E) If the Rents are not sufficient to meet the costs of taking control of and managing the Premises and collecting the Rents, any funds expended by Mortgagee for such purposes will become an additional part of the Indebtedness as provided in Section 9 of this Instrument. (F) Any entering upon and taking of control of the Premises by Mortgagee or the receiver, as the case may be, and any application of Rents as provided in this Instrument will not cure or waive any Event of Default or invalidate any other right or remedy of Mortgagee under applicable law or provided for in this Instrument.

8. Application of Payments. If at any time Mortgagee receives, from Mortgagor or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, then Mortgagee may apply that payment to amounts then due and payable in any manner and in any order determined by Mortgagee, in Mortgagee's discretion. Neither Mortgagee's acceptance of an amount that is less than all amounts then due and payable nor Mortgagee's application of such payment in the manner authorized will constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Notwithstanding the application of any such amount to the Indebtedness, Mortgagor's obligations under this Instrument, the Note and all other Loan Documents will remain unchanged.

9. Protection of Mortgagee's Security; Instrument Secures Future Advances. If Mortgagor should fail to perform any of its obligations under this Instrument or any other Loan Document, or if any action or proceeding is commenced which purports to affect the Premises, Mortgagee's security, or Mortgagee's rights under this Instrument, including eminent domain, insolvency, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials

Laws (as hereinafter defined), fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Mortgagee, at Mortgagee's option may make such appearances, file such documents, disburse such sums and take such actions as Mortgagee reasonably deems necessary to perform such obligations of Mortgagor and to protect Mortgagee's interest, including all of the following: (i) payment of attorney's fees and costs; (ii) enter upon the Premises to make repairs or secure the Premises; procure insurance as required by the Loan Agreement; (iii) pay any amounts which Mortgagor has failed to pay under this Instrument, the Loan Agreement, or any of the Loan Documents; (iv) perform any of the Mortgagor's obligations under the Loan Agreement; (v) make advances to pay, satisfy or discharge any obligation of the Mortgagor for the payment of money that is secured by a lien on the Premises. Any amounts disbursed by Mortgagee under this Section 9 or under any other provision of this Instrument that treats such disbursement as being made under this Section 9, will be secured by this Instrument, will be added to, and become part of, the principal component of the Indebtedness, will be immediately due and payable and will bear interest from the date of disbursement until paid at the Default Rate (as defined in the Note). Nothing in this Section 9 will require Mortgagee to incur any expense or take any action. The provisions of this Section 9, including the obligation to indemnify Mortgagee, shall survive the payment of the indebtedness and the satisfaction and reconveyance of the lien of this Instrument and shall not be affected by Mortgagee's acquisition of any interest in the Premises, whether by foreclosure or otherwise. As used herein, the term "Hazardous Materials Law" and "Hazardous Materials Laws" means any and all federal, state and local laws, ordinances, regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future, including all amendments, that relate to Hazardous Materials (as hereinafter defined) or the protection of human health or the environment and apply to Mortgagor or to the Premises. Hazardous Materials Laws include the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, et seq., the Resource Conservation and Recovery Act of 1976, 42 U.S.C. Section 6901. et seq., the Toxic Substance Control Act, 15 U.S.C. Section 2601. et seq., the Clean Water Act, 33 U.S.C. Section 1251, et seq., and the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101 et seq., and their state analogs. As used herein, the term "Hazardous Materials" means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls (PCBs) and compounds containing them; lead and lead-based paint; asbestos or asbestos containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Premises are prohibited by any governmental authority; any substance that requires special handling and any other material or substance now or in the future that (i) is defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" by or within the meaning of any Hazardous Materials Law, or (ii) is regulated in any way by or within the meaning of any Hazardous Materials Law.

10. Events of Default. An Event of Default under the Note, the Loan Agreement, or any other Loan Documents will constitute an Event of Default under this Instrument. Upon the occurrence of an Event of Default, the Indebtedness shall become due and payable forthwith at the option of Mortgagee.

11. Remedies Cumulative. Each right and remedy provided in this Instrument is distinct from all other rights or remedies under this Instrument, the Loan Agreement or any other Loan Document or afforded by applicable law or equity, and each will be cumulative and may be exercised concurrently, independently or successively, in any order. Mortgagee's exercise of any particular right or remedy will not in any way prevent Mortgagee from exercising any other right or remedy available to Mortgagee. Mortgagee may exercise any such remedies from time to time and as often as Mortgagee chooses.

12. Waiver of Statute of Limitations, Offsets, and Counterclaims. Mortgagor waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Instrument or to any action brought to enforce any Loan Document. Mortgagor hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Mortgagee or otherwise to offset any obligations to make the payments required by the Loan Documents. No failure by Mortgagee to perform any of its obligations under this Instrument will be a valid defense to, or result in any offset against, any payments that Mortgagor is obligated to make under any of the Loan Documents.

13. Waiver of Marshalling. Notwithstanding the existence of any other security interests in the Premises held by Mortgagee or by any other party, Mortgagee will have the right to determine the order in which any or all of the Premises will be subjected to the remedies provided in this Instrument, the Note, the Loan Agreement, or any other Loan Document, or applicable law. Mortgagee will have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Mortgagor and any party who now or in the future acquires a security interest in the Premises and who has actual or constructive notice of this Instrument waives any and all right to require the marshalling of assets or to require that any of the Premises be sold in the inverse order of alienation or that any of the Premises be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Instrument.

14. Further Assurances. Mortgagor will deliver, at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements or amendments, transfers and assurances as Mortgagee may require from time to time in order to better assure, grant, and convey to Mortgagee the rights intended to be granted, now or in the future, to Mortgagee under this Instrument and the Loan Documents.

15. Governing Law; Consent to Jurisdiction and Venue. This Instrument, and the provisions for the creation, perfection, priority, enforcement, and foreclosure of the liens and security interests created in the Premises will be governed by, and construed in accordance with, the laws of the state of Florida. Notwithstanding the foregoing, the law of the state of Connecticut shall govern the validity and enforceability of all Loan Documents, and the Indebtedness arising hereunder (but the foregoing shall not be construed to limit Mortgagee's rights with respect to such security interest created in the state of Florida). Nothing in this Section 15 is intended to limit Mortgagee's right to bring any suit, action or proceeding relating to matters under this Instrument, the Note, the Loan Agreement, or any of the Loan Documents in any court of any other jurisdiction.

16. Notices. All notices, consents, approvals, and requests required or permitted under this Instrument or under any other Loan Document shall be given in accordance with the requirements set forth under the Loan Agreement.

17. Successors and Assigns. This Instrument will bind the respective successors and assigns of Mortgagor and Mortgagee, and the rights granted by this Instrument will inure to Mortgagee's successors and assigns.

19. Joint and Several Liability. If more than one party signs this Instrument as Mortgagor, the obligations of such Persons will be joint and several.

19. Relationship of Parties; No Third-Party Beneficiary. The relationship between Mortgagee and Mortgagor will be solely that of creditor and debtor, respectively, and nothing contained in this Instrument will create any other relationship between Mortgagee and Mortgagor. Nothing contained in this Instrument will constitute Mortgagee as a joint venturer, partner or agent of Mortgagor, or render Mortgagee liable for any debts, obligations, acts, omissions, representations or contracts of Mortgagor. No creditor of any party to this Instrument and no other Person will be a third-party beneficiary of this Instrument or any other Loan Document.

20. Severability; Amendments; Construction The invalidity or unenforceability of any provision of this Instrument will not affect the validity or enforceability of any other provision, and all other provisions will remain in full force and effect. This Instrument contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Instrument. This Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought. The captions and headings of the sections of this Instrument are for convenience only and will be disregarded in construing this Instrument. Any reference in this Instrument to a "Section" will, unless otherwise explicitly provided, be construed as referring to a section of this Instrument. Any reference in this Instrument to a statute or regulation will be construed as referring to that statute or regulation as amended from time to time. Use of the singular in this Instrument includes the plural and use of the plural includes the singular. As used in this Instrument, the term "including" means "including, but not limited to" and the term "includes" means "includes without limitation." Unless the context requires otherwise, any definition of or reference to any agreement, instrument, or other document in this Instrument will be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in this Instrument). Any reference in this Instrument to any Person will be construed to include such Person's successors and assigns. Any capitalized term not specifically defined in this Instrument will have the meaning ascribed to that term in the Loan Agreement. The term "Person" as used herein, shall mean any natural person, sole proprietorship, corporation, general partnership, limited partnership, limited liability company, limited liability partnership, limited liability limited partnership, joint venture, association, joint stock company, bank, trust, estate, unincorporated organization, any federal, state, county or municipal government (or any agency or political subdivision thereof), endowment fund or any other form of entity.

21. Subrogation. If, and to the extent that, the proceeds of the loan evidenced by the Note, or subsequent advances under Section 9 of this Instrument, are used to pay, satisfy or discharge a

prior lien, such loan proceeds or advances will be deemed to have been disbursed by Mortgagee at Mortgagor's request, and Mortgagee will automatically, and without further action on its part, be subrogated to the rights, including lien priority, of the owner or holder of the obligation secured by the prior lien, whether or not the prior lien is released.

22. Confession of Judgment in Ejectment. To the extent permissible under the laws of the state of Florida, at any time after an Event of Default, regardless of whether Mortgagee has asserted any other right or exercised any other remedy under this Instrument or any of the other Loan Documents, it shall be lawful for any attorney of any court to confess judgment in ejectment against Mortgagor and all Persons claiming under Mortgagor for the recovery by Mortgagee of possession of all or any part of the Premises, for which this Instrument shall be sufficient warrant. If for any reason after such action shall have commenced the same shall be discontinued and the possession of the Premises shall remain in or be restored to Mortgagor, Mortgagee shall have the right upon subsequent default or defaults to bring one or more action or actions as hereinabove set forth to recover possession of all or any part of the Premises.

23. Acceleration; Remedies; Waiver of Permissive Counterclaims. At any time during the existence of an Event of Default, Mortgagee, at Mortgagee's option, may declare the Indebtedness to be immediately due and payable without further demand, and may foreclose this Instrument by judicial proceeding and may invoke any other remedies permitted by Florida law or provided in this Instrument, the Loan Agreement or in any other Loan Document. Mortgagee will be entitled to collect all costs and expenses incurred in pursuing such remedies, including attorneys' fees and costs and costs of documentary evidence, abstracts and title reports. Mortgagor hereby waives any and all rights to file or pursue permissive counterclaims in connection with any legal action brought by Mortgagee under this Instrument, the Note or any other Loan Document. In the event Mortgagee forecloses this Instrument against the Premises, Mortgagee may, at its option and in its sole and absolute discretion (but not the obligation, unless consented to it by Mortgagee), as owner of the Premises, and to assume all rights and privileges of Mortgagor thereunder.

24. Release. Upon payment of the Indebtedness, Mortgagee will release this Instrument. Mortgagor will pay Mortgagee's reasonable costs incurred in releasing this Instrument.

25. Future Advances. Mortgagee may from time to time, in Mortgagee's discretion, make optional future or additional advances (collectively, "Future Advances") to Mortgagor, except that at no time will the unpaid principal balance of all indebtedness secured by the lien of this Instrument, including Future Advances, be greater than an amount equal to two hundred percent (200%) of the original principal amount of the Note as set forth on the first page of this Instrument plus accrued interest and amounts disbursed by Mortgagee under Section 9 of this Instrument or any other provision of this Instrument or the other Loan Documents that treats a disbursement by Mortgagee as being made under Section 9 of this Instrument. All Future Advances will be made, if at all, within twenty (20) years after the date of this Instrument, or within such lesser period that may in the future be provided by law as a prerequisite for the sufficiency of actual or record notice of Future Advances as against the rights of creditors or subsequent purchasers for value. Mortgagor will, immediately upon request by Mortgagee, execute and deliver to Mortgagee a promissory note evidencing each Future Advance together with a notice of such Future Advance in recordable form. All promissory notes evidencing

Future Advances will be secured, *pari passu*, by the lien of this Instrument, and each reference in this Instrument to the Note will be deemed to be a reference to all promissory notes evidencing Future Advances. Nothing contained herein shall be deemed an obligation on the part of Mortgagee to make any Future Advances.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the undersigned has signed and delivered this Mortgage, Assignment of Rents and Security Agreement or has caused said instrument to be signed and delivered by its duly authorized representative on ___*10/18*_____, 2022.

**RAD DIVERSIFIED REIT, INC.**

Witness: *Michelle Caroline Tchu*

By: _____
Name: Brandon D. Mendenhall
Title: CEO

Witness: *Erin R. Hyde*

STATE OF _Florida_____ )
)ss. _____
COUNTY OF _Hillsborough_____ )

The foregoing instrument was acknowledged by means of ___x___ physical presence _____ online notarization before me this _18th_ day of _October_____, 2022, by Brandon D. Mendenhall, CEO of RAD DIVERSIFIED REIT, INC., a Maryland corporation, on behalf of the corporation. He/she is _____ personally known to me _x___ has produced _Drivers License_____, as identification.

_____
Notary Public

Michelle Caroline Tchu, Notary Public

MICHELLE CAROLINE TCHU
Notary Public-State of Florida
Commission # HH 124055
My Commission Expires
April 28, 2025

**Page 13 of 14**

## SCHEDULE I
## PROPERTY DESCRIPTION

The following property in Pinellas County, Florida:

Lot 120, John Alex Kelly SCARBOUGH SUBDIVISION, according to the map or plat thereof as recorded in Plat Book 8, Page 31, of The Public Records of Pinellas County, Florida.

Being the same property conveyed to U.S. Bank National Association as Legal Tittle Trustee for Truman 2016 SC6 Title Trust, by Ken Burke, CPA, Clerk of the Circuit Court and Comptroller of Pinellas County Florida, by Certificate of Title dated 06/28/2022, recorded 06/29/2022, in Instrument No. 2022201838, Book 22118 Page 1065, in the County of Pinellsa and State of Florida.

More commonly known as 795 89th Ave. N. Saint Petersburg FL 33702.

Parcel/Tax ID:  19/30/17/45612/000/1200



## EXTENSION AND MODIFICATION AGREEMENT

**THIS EXTENSION AND MODIFICATION AGREEMENT** ("**Agreement**"), is made as of
_____11/15/2023_____, by and between **RAD DIVERSIFIED REIT, INC.**, as
borrower ("**Borrower**"), a Maryland corporation with a principal place of business at 7 St. Paul Street,
Suite 820, Baltimore, MD 21202; and **RCN Capital, LLC**, as lender ("**Lender**"), a Connecticut limited
liability company with a principal place of business at 75 Gerber Road East, Ste. 102, South Windsor, CT
06074.

### RECITALS

**WHEREAS,** RCN Capital, LLC made a commercial loan (the "**Loan**") in the original principal amount
of **Twenty-Four Thousand Three Hundred Dollars and No Cents ($24,300.00)**, upon the terms and
subject to the conditions set forth in a certain **Commercial Loan and Security Agreement** dated October
18, 2022 (the "**Loan Agreement**"), and evidenced by a certain **Commercial Promissory Note** of even
date therewith (the "**Note**"), in the principal amount of **Twenty-Four Thousand Three Hundred Dollars
and No Cents ($24,300.00)**, made by **Borrower**, payable to RCN Capital, LLC and its assigns;

**WHEREAS**, the obligations under the **Loan** are secured by, among other things, the following security
instruments (each, a "**Security Instrument**"), encumbering certain real property and improvements
(the "**Secured Property**") set forth below, and more particularly described therein:

A certain **Mortgage, Assignment of Rents and Security Agreement** granted by RAD DIVERSIFIED
REIT, INC. in favor of RCN Capital, LLC, encumbering the real property and improvements located at
**795 89th Ave N, St. Petersburg, FL 33702**; and

**WHEREAS**, the **Note**, the **Security Instrument**, the **Loan Agreement**, and all other documents
evidencing, securing, or executed in connection with, the **Loan** are hereinafter referred to collectively as
the "**Loan Documents**"); and

**WHEREAS**, under the terms of the **Loan**, the date upon which all unpaid principal, accrued interest
thereon, and other fees or charges (collectively, the "**Indebtedness**") became (or will become) due and
payable is **November 1, 2023**; and

**WHEREAS**, **Borrower** has requested, and **Lender** has agreed, to modify the terms of the **Loan**.

**NOW**, **Borrower** and **Lender** therefore agree as follows:

### ARTICLE I: MODIFICATION OF TERMS

**1.01 Extension Fee**. **Borrower** will pay to **Lender** a fee (the "**Extension Fee**") in the amount of **$364.50**,
in consideration for **Lender's** agreements contained herein, including without limitation, **Lender's**
agreement to modify the date on which the **Indebtedness** becomes due and payable in full. This
**Agreement** is expressly conditioned on payment and receipt of the **Extension Fee**.

**1.02 Legal Fee**. **Borrower** will pay to **Lender** a fee (the "**Legal Fee**") in the amount of **$600.00**, in
consideration for **Lender's** work in preparing this **Agreement**. This **Agreement** is expressly conditioned
on payment and receipt of the **Legal Fee**.

Page **1** of **5**

**1.03 Administration Fee. Borrower** will pay to **Lender** a fee (the "**Administration Fee**") in the amount of **$350.00**, in consideration for **Lender's** servicer's work in preparing this **Agreement**. This **Agreement** is expressly conditioned on payment and receipt of the **Administration Fee**.

**1.04 Extension of Maturity Date.** Upon the **Lender's** receipt of the **Extension Fee**, provided no **Event of Default** (as defined in the **Loan Agreement**), or any event that, with notice or passage of time, or both, would constitute an **Event of Default**, has occurred and is continuing, or is not cured by this **Agreement**, the date on which all principal, interest, and other sums due under the **Note** shall be due and payable on **May 1, 2024** (hereinafter, the "**Maturity Date**").

**1.05 Interest Rate Change.** Beginning as of **November 1, 2023**, interest on the **Loan** shall begin to accrue at **11.2400%** per annum, provided no **Event of Default**, or any event that, with notice or passage of time, or both, would constitute an **Event of Default**, has occurred and is continuing, in which case interest shall accrue at the **Default Rate**, as defined in the **Note**. All interest payments payable to the **Lender** shall be paid monthly, in arrears, and shall be payable as of the **first (1st)** day of each month.

**1.06 BPO Fee. Borrower** will pay to **Lender** a fee (the "**BPO Fee**") in the amount of **$95.00**, in consideration for **Lender's** work in preparing, ordering, and reviewing a broker price opinion of the **Secured Property** in order to determine eligibility for this **Agreement**. This **Agreement** is expressly conditioned on payment and receipt of the **BPO Fee**.

## ARTICLE II: STANDARD TERMS

**2.01** The **Loan Documents** are hereby modified in such a manner to be consistent with all modifications and agreements contained herein. Except as specifically modified by the terms of this **Agreement**, the **Loan Documents** shall not be affected by this **Agreement** and each shall remain in full force and effect. Nothing herein contained shall be construed to impair the **Lender's** security under the **Loan Documents** nor to limit or impair any rights or powers that the **Lender** now enjoys or may hereafter enjoy under the **Loan Documents** for recovery of the indebtedness secured thereby.

**2.02** The **Loan Documents** are hereby ratified and confirmed by **Borrower** and **Lender** and every provision, covenant, warranty, representation, condition, obligation, right, and power contained in and under the **Loan Documents** as amended and modified, shall continue in full force and effect, affected by this **Agreement** only to the extent of the amendments and modifications set forth above. Without limiting the generality of the foregoing, the **Borrower** and the **Lender** hereby ratify and confirm that as of the date hereof, or as a consequence of this **Agreement**, there exists no **Event of Default** and no circumstances exist which could constitute an **Event of Default** after the giving of notice or the passage of time, or both.

**2.03** This **Agreement** is expressly conditioned upon **Borrower** being current with all outstanding interest, payments, or other charges due **Lender**. This **Agreement** shall be of no effect until **Lender** has received all outstanding interest, payments, or other charges that may be due as of the date of this **Agreement**.

**2.04 Borrower** hereby acknowledges and agrees that the execution of this **Agreement** shall in no way be construed as imposing on the **Lender** any obligation to offer the **Borrower** any further extensions of the date on which the **Indebtedness** becomes due and payable in full, or the modification of any other terms of the **Loan**.

**2.05** All capitalized terms used and not otherwise defined herein shall have the meaning ascribed to them in the loan documents. In the event of any inconsistency between capitalized terms used herein and otherwise defined in loan documents, the terms of this **Agreement** shall govern.

**2.06** The covenants and agreements herein set forth shall bind and inure to the benefit of the parties hereto, their heirs, successors and assigns.

**2.07** The consummation of the transactions hereby contemplated and the performance of the obligations of the **Borrower** under and by virtue of the loan documents will not result in any breach of, or constitute a default under, any mortgage, security deed, deed of trust, lease, bank loan or credit agreement, trust agreement or other instrument to which the **Borrower** is a party or by which it may be bound or affected.

**2.08** There are no actions, suits or proceedings pending, or to the knowledge of the **Borrower**, threatened, against, or affecting the **Borrower**, or the **Secured Property**, or involving the validity or enforceability of any of the loan documents or the priority of the lien thereof.

**2.09** There has been no material adverse change in the financial condition of the **Borrower** since the date of the last financial statements delivered to the **Lender**. No bankruptcy or insolvency case or proceedings of any kind have been filed, threatened or are outstanding by or against the **Borrower**, and the **Borrower** is current with regard to payment and performance of all loans, contracts and other agreements or obligations affecting the **Borrower**.

**2.10** This **Agreement** may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.

**2.11** The **Borrower** hereby acknowledges and agrees that the **Borrower** has no claim, offset, or defense against the **Lender** or with respect to any collateral securing the **Loan**.

**2.12 THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF CONNECTICUT, WAS EXECUTED AND DELIVERED BY THE BORROWER AND ACCEPTED BY THE LENDER IN THE STATE OF CONNECTICUT, WHICH STATE THE BORROWER AND THE LENDER AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE. THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER AND UNDER THE LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF CONNECTICUT, WITHOUT REGARD TO CHOICE OF LAW CONSIDERATIONS, APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, PRIORITY, ENFORCEMENT, AND FORECLOSURE OF THE LIENS AND SECURITY INTERESTS CREATED IN THE MORTGAGED PROPERTY UNDER THE LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE JURISDICTION IN WHICH THE MORTGAGED PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH JURISDICTION, THE LAW OF THE STATE OF CONNECTICUT SHALL GOVERN THE VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS, AND THE DEBT OR OBLIGATIONS ARISING HEREUNDER.**

**2.13 THE LENDER AND THE BORROWER HEREBY AGREE THAT THE EXECUTION AND DELIVERY OF THIS AGREEMENT, AS WELL AS PERFORMANCE OF THE OBLIGATIONS REQUIRED HEREUNDER, CONSTITUTE THE TRANSACTION OF BUSINESS WITHIN THE STATE OF CONNECTICUT. IF THE BORROWER DOES NOT HAVE A REGISTERED AGENT IN THE STATE OF CONNECTICUT, THEN THE BORROWER HEREBY APPOINTS THE CONNECTICUT SECRETARY OF STATE AS ITS ATTORNEY AND AGREES THAT ANY PROCESS IN ANY CASE OF CONTROVERSY ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT MAY BE SERVED UPON THE CONNECTICUT SECRETARY OF STATE AND SHALL HAVE THE SAME VALIDITY AS IF SERVED UPON THE UNDERSIGNED PERSONALLY. THE LENDER AND THE BORROWER HEREBY AGREE THAT ANY APPROPRIATE STATE OR FEDERAL DISTRICT COURT LOCATED IN THE STATE OF CONNECTICUT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY CASE OR CONTROVERSY ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT AND SHALL BE A PROPER FORUM IN WHICH TO ADJUDICATE SUCH CASE OR CONTROVERSY. THE LENDER AND THE BORROWER AGREE TO SUBMIT TO PERSONAL JURISDICTION IN THE STATE OF CONNECTICUT IN ANY ACTION OR PROCEEDING ARISING OUT OF THIS AGREEMENT AND THE LOAN DOCUMENTS.**

**[Remainder of this page intentionally left blank]**

Page **4** of **5**

**IN WITNESS WHEREOF**, the undersigned have executed this Extension and Modification Agreement on the date first set forth above.

**RAD DIVERSIFIED REIT, INC.**, as Borrower

11/14/2023
_____
**Date**

DocuSigned by:

*Brandon D. Mendenhall*

552599F650F249D...

**By:** _____
**Name:** Brandon D. Mendenhall
**Title:** CEO

**ACKNOWLEDGED AND ASSENTED TO:**
**Brandon D. Mendenhall**, as Guarantor

11/14/2023
_____
**Date**

DocuSigned by:

*Brandon D. Mendenhall*

552599F650F249D...

_____

**RCN Capital, LLC**, as Lender

11/15/2023
_____
**Date**

DocuSigned by:

*Angela DiTommaso*

CD94FF1E4E3A445...

**By:** _____
**Name:** Angela DiTommaso
**Title:** Authorized Signer

Page **5** of **5**



## EXTENSION AND MODIFICATION AGREEMENT

**THIS EXTENSION AND MODIFICATION AGREEMENT** ("**Agreement**"), is made as of
_____5/16/2024_____, by and between **RAD DIVERSIFIED REIT, INC.**, as
borrower ("**Borrower**"), a Maryland corporation with a principal place of business at 7 St. Paul Street,
Suite 820, Baltimore, MD 21202; and **RCN Capital, LLC**, as lender ("**Lender**"), a Connecticut limited
liability company with a principal place of business at 75 Gerber Road East, Ste. 102, South Windsor, CT
06074.

### RECITALS

**WHEREAS,** RCN Capital, LLC made a commercial loan (the "**Loan**") in the original principal amount
of **Twenty-Four Thousand Three Hundred Dollars and No Cents ($24,300.00)**, upon the terms and
subject to the conditions set forth in a certain **Commercial Loan and Security Agreement** dated October
18, 2022 (the "**Loan Agreement**"), and evidenced by a certain **Commercial Promissory Note** of even
date therewith (the "**Note**"), in the principal amount of **Twenty-Four Thousand Three Hundred Dollars
and No Cents ($24,300.00)**, made by **Borrower**, payable to RCN Capital, LLC and its assigns;

**WHEREAS**, the obligations under the **Loan** are secured by, among other things, the following security
instruments (each, a "**Security Instrument**"), encumbering certain real property and improvements
(the "**Secured Property**") set forth below, and more particularly described therein:

A certain **Mortgage, Assignment of Rents and Security Agreement** granted by RAD DIVERSIFIED
REIT, INC. in favor of RCN Capital, LLC, encumbering the real property and improvements located at
**795 89th Ave N, St. Petersburg, FL 33702**; and

**WHEREAS**, the **Note**, the **Security Instrument**, the **Loan Agreement**, and all other documents
evidencing, securing, or executed in connection with, the **Loan** are hereinafter referred to collectively as
the "**Loan Documents**"); and

**WHEREAS**, under the terms of the **Loan**, the date upon which all unpaid principal, accrued interest
thereon, and other fees or charges (collectively, the "**Indebtedness**") became (or will become) due and
payable is **May 1, 2024**; and

**WHEREAS**, **Borrower** has requested, and **Lender** has agreed, to modify the terms of the **Loan**.

**NOW**, **Borrower** and **Lender** therefore agree as follows:

### ARTICLE I: MODIFICATION OF TERMS

**1.01 Extension Fee**. **Borrower** will pay to **Lender** a fee (the "**Extension Fee**") in the amount of **$364.50**,
in consideration for **Lender's** agreements contained herein, including without limitation, **Lender's**
agreement to modify the date on which the **Indebtedness** becomes due and payable in full. This
**Agreement** is expressly conditioned on payment and receipt of the **Extension Fee**.

**1.02 Legal Fee**. **Borrower** will pay to **Lender** a fee (the "**Legal Fee**") in the amount of **$600.00**, in
consideration for **Lender's** work in preparing this **Agreement**. This **Agreement** is expressly conditioned
on payment and receipt of the **Legal Fee**.

**1.03 Administration Fee**. **Borrower** will pay to **Lender** a fee (the "**Administration Fee**") in the amount of **$50.00**, in consideration for **Lender's** servicer's work in preparing this **Agreement**. This **Agreement** is expressly conditioned on payment and receipt of the **Administration Fee**.

**1.04 Extension of Maturity Date**. Upon the **Lender's** receipt of the **Extension Fee**, provided no **Event of Default** (as defined in the **Loan Agreement**), or any event that, with notice or passage of time, or both, would constitute an **Event of Default**, has occurred and is continuing, or is not cured by this **Agreement**, the date on which all principal, interest, and other sums due under the **Note** shall be due and payable on **November 1, 2024** (hereinafter, the "**Maturity Date**").

**1.05 Interest Rate Change**. Intentionally left blank.

**1.06 BPO Fee**. **Borrower** will pay to **Lender** a fee (the "**BPO Fee**") in the amount of **$95.00**, in consideration for **Lender's** work in preparing, ordering, and reviewing a broker price opinion of the **Secured Property** in order to determine eligibility for this **Agreement**. This **Agreement** is expressly conditioned on payment and receipt of the **BPO Fee**.

## ARTICLE II: STANDARD TERMS

**2.01** The **Loan Documents** are hereby modified in such a manner to be consistent with all modifications and agreements contained herein. Except as specifically modified by the terms of this **Agreement**, the **Loan Documents** shall not be affected by this **Agreement,** and each shall remain in full force and effect. Nothing herein contained shall be construed to impair the **Lender's** security under the **Loan Documents** nor to limit or impair any rights or powers that the **Lender** now enjoys or may hereafter enjoy under the **Loan Documents** for recovery of the indebtedness secured thereby.

**2.02** The **Loan Documents** are hereby ratified and confirmed by **Borrower** and **Lender** and every provision, covenant, warranty, representation, condition, obligation, right, and power contained in and under the **Loan Documents** as amended and modified, shall continue in full force and effect, affected by this **Agreement** only to the extent of the amendments and modifications set forth above. Without limiting the generality of the foregoing, the **Borrower** and the **Lender** hereby ratify and confirm that as of the date hereof, or as a consequence of this **Agreement**, there exists no **Event of Default** and no circumstances exist which could constitute an **Event of Default** after the giving of notice or the passage of time, or both.

**2.03** This **Agreement** is expressly conditioned upon **Borrower** being current with all outstanding interest, payments, or other charges due **Lender**. This **Agreement** shall be of no effect until **Lender** has received all outstanding interest, payments, or other charges that may be due as of the date of this **Agreement**.

**2.04 Borrower** hereby acknowledges and agrees that the execution of this **Agreement** shall in no way be construed as imposing on the **Lender** any obligation to offer the **Borrower** any further extensions of the date on which the **Indebtedness** becomes due and payable in full, or the modification of any other terms of the **Loan**.

**2.05** All capitalized terms used and not otherwise defined herein shall have the meaning ascribed to them in the loan documents. In the event of any inconsistency between capitalized terms used herein and otherwise defined in loan documents, the terms of this **Agreement** shall govern.

**2.06** The covenants and agreements herein set forth shall bind and inure to the benefit of the parties hereto, their heirs, successors and assigns.

**2.07** The consummation of the transactions hereby contemplated and the performance of the obligations of the **Borrower** under and by virtue of the loan documents will not result in any breach of, or constitute a default under, any mortgage, security deed, deed of trust, lease, bank loan or credit agreement, trust agreement or other instrument to which the **Borrower** is a party or by which it may be bound or affected.

**2.08** There are no actions, suits or proceedings pending, or to the knowledge of the **Borrower**, threatened, against, or affecting the **Borrower**, or the **Secured Property**, or involving the validity or enforceability of any of the loan documents or the priority of the lien thereof.

**2.09** There has been no material adverse change in the financial condition of the **Borrower** since the date of the last financial statements delivered to the **Lender**. No bankruptcy or insolvency case or proceedings of any kind have been filed, threatened or are outstanding by or against the **Borrower**, and the **Borrower** is current with regard to payment and performance of all loans, contracts and other agreements or obligations affecting the **Borrower**.

**2.10** This **Agreement** may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.

**2.11** The **Borrower** hereby acknowledges and agrees that the **Borrower** has no claim, offset, or defense against the **Lender** or with respect to any collateral securing the **Loan**.

**2.12 THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF CONNECTICUT, WAS EXECUTED AND DELIVERED BY THE BORROWER AND ACCEPTED BY THE LENDER IN THE STATE OF CONNECTICUT, WHICH STATE THE BORROWER AND THE LENDER AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE. THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER AND UNDER THE LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF CONNECTICUT, WITHOUT REGARD TO CHOICE OF LAW CONSIDERATIONS, APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, PRIORITY, ENFORCEMENT, AND FORECLOSURE OF THE LIENS AND SECURITY INTERESTS CREATED IN THE MORTGAGED PROPERTY UNDER THE LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE JURISDICTION IN WHICH THE MORTGAGED PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH JURISDICTION, THE LAW OF THE STATE OF CONNECTICUT SHALL GOVERN THE VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS, AND THE DEBT OR OBLIGATIONS ARISING HEREUNDER.**

**2.13 THE LENDER AND THE BORROWER HEREBY AGREE THAT THE EXECUTION AND DELIVERY OF THIS AGREEMENT, AS WELL AS PERFORMANCE OF THE OBLIGATIONS REQUIRED HEREUNDER, CONSTITUTE THE TRANSACTION OF BUSINESS WITHIN THE STATE OF CONNECTICUT. IF THE BORROWER DOES NOT HAVE A REGISTERED AGENT IN THE STATE OF CONNECTICUT, THEN THE BORROWER HEREBY APPOINTS THE CONNECTICUT SECRETARY OF STATE AS ITS ATTORNEY AND AGREES THAT ANY PROCESS IN ANY CASE OF CONTROVERSY ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT MAY BE SERVED UPON THE CONNECTICUT SECRETARY OF STATE AND SHALL HAVE THE SAME VALIDITY AS IF SERVED UPON THE UNDERSIGNED PERSONALLY. THE LENDER AND THE BORROWER HEREBY AGREE THAT ANY APPROPRIATE STATE OR FEDERAL DISTRICT COURT LOCATED IN THE STATE OF CONNECTICUT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY CASE OR CONTROVERSY ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT AND SHALL BE A PROPER FORUM IN WHICH TO ADJUDICATE SUCH CASE OR CONTROVERSY. THE LENDER AND THE BORROWER AGREE TO SUBMIT TO PERSONAL JURISDICTION IN THE STATE OF CONNECTICUT IN ANY ACTION OR PROCEEDING ARISING OUT OF THIS AGREEMENT AND THE LOAN DOCUMENTS.**

**[Remainder of this page intentionally left blank]**

**IN WITNESS WHEREOF**, the undersigned have executed this Extension and Modification Agreement on the date first set forth above.

**RAD DIVERSIFIED REIT, INC.**, as Borrower

5/16/2024
_____
**Date**

DocuSigned by:

By: ___*Brandon D. Mendenhall*___
552599F650F249D...
**Name:** Brandon D. Mendenhall
**Title:** CEO


**ACKNOWLEDGED AND ASSENTED TO:**
**Brandon D. Mendenhall**, as Guarantor

5/16/2024
_____
**Date**

DocuSigned by:

___*Brandon D. Mendenhall*___
552599F650F249D...


**RCN Capital, LLC**, as Lender

5/16/2024
_____
**Date**

DocuSigned by:

By: ___*Mary Tessitore*___
4753197B41E94CA...
**Name:** Mary Tessitore
**Title:** Authorized Signer

Page **5** of **5**

# Exhibit B

**Pinellas County Property Appraiser - www.pcpao.gov**

## Parcel Summary (as of 16-Jun-2026)

Parcel Number
**19-30-17-45612-000-1200**

Owner Name
RAD DIVERSIFIED REIT INC

Property Use
0110 Single Family Home

Site Address
795 89TH AVE N
ST PETERSBURG, FL 33702

Mailing Address
256 EAGLEVIEW BLVD # 154
EXTON, PA 19341-1157

Legal Description
JOHN ALEX KELLY SCARBROUGH SUB LOT 120

Current Tax District
ST PETERSBURG (SP)

Year Built
1973

| Living SF | Gross SF | Living Units | Buildings |
|-----------|----------|--------------|-----------|
| **1,950** | **2,070** | **1** | **1** |

## Parcel Map



## Exemptions

| Year | Homestead | Use % | Status |
|------|-----------|-------|--------|
| 2027 | No | 0% | |
| 2026 | No | 0% | |
| 2025 | No | 0% | |

**Property Exemptions & Classifications**

No Property Exemptions or Classifications found. Please note that Ownership Exemptions (Homestead, Senior, Widow/Widower, Veterans, First Responder, etc... will not display here).

## Miscellaneous Parcel Info

| Last Recorded Deed | Sales Comparison | Census Tract | Evacuation Zone | Flood Zone | Elevation Certificate | Zoning | Plat Bk/Pg |
|--------------------|------------------|--------------|-----------------|------------|----------------------|--------|------------|
| 22243/1929 | $315,100 | 244.10 | A | Current FEMA Maps | Check for EC | Zoning Map | 8/31 |

## 2025 Final Values

| Year | Just/Market Value | Assessed Value/SOH Cap | County Taxable Value | School Taxable Value | Municipal Taxable Value |
|------|-------------------|------------------------|----------------------|----------------------|-------------------------|
| 2025 | $267,865 | $267,865 | $267,865 | $267,865 | $267,865 |

## Value History (yellow indicates corrected value)

| Year | Homestead Exemption | Just/Market Value | Assessed Value/SOH Cap | County Taxable Value | School Taxable Value | Municipal Taxable Value |
|------|---------------------|-------------------|------------------------|----------------------|----------------------|-------------------------|
| 2024 | N | $312,648 | $312,648 | $312,648 | $312,648 | $312,648 |
| 2023 | N | $286,737 | $286,737 | $286,737 | $286,737 | $286,737 |
| 2022 | Y | $262,128 | $144,012 | $94,012 | $119,012 | $94,012 |
| 2021 | Y | $222,308 | $139,817 | $89,817 | $114,817 | $89,817 |
| 2020 | Y | $205,355 | $137,887 | $87,887 | $112,887 | $87,887 |

## 2025 Tax Information

 Do not rely on current taxes as an estimate following a change in ownership. A significant change in taxable value may occur after a transfer due to a loss of exemptions, reset of the Save Our Homes or 10% Cap, and/or market conditions. Please use our **Tax Estimator** to estimate taxes under new ownership.

| Tax Bill | 2025 Millage Rate | Tax District |
|---|---|---|
| View 2025 Tax Bill | 19.9197 | (SP) |

## Sales History

| Sale Date | Price | Qualified / Unqualified | Vacant / Improved | Grantor | Grantee | Book / Page |
|---|---|---|---|---|---|---|
| 28-Sep-2022 | $355,000 | Q | I | US BANK NATIONAL ASSOCIATION TRUSTEE | RAD DIVERSIFIED REIT INC | 22243/1929 |
| 28-Jun-2022 | $277,100 | U | I | COTTON CHRISTOPHER | US BANK NA TRUSTEE | 22118/1065 |
| 26-Jul-2007 | $50,000 | U | I | VALDEZ FRANCISCO | TICKLE, JAMES | 15907/1783 |
| 22-Dec-2006 | $100 | U | I | VALDEZ FRANSICO | VALDEZ, FRANCISCO | 15563/2641 |
| 19-Sep-2006 | $284,900 | Q | I | BAY HARBOR FINANCIAL INC | VALDEZ, FRANCISCO | 15372/0947 |

## 2025 Land Information

| Land Area: ≅ 6,181 sf \| ≅ 0.14 acres | Frontage and/or View: None | Seawall: No |
|---|---|---|

| Property Use | Land Dimensions | Unit Value | Units | Method | Total Adjustments | Adjusted Value |
|---|---|---|---|---|---|---|
| Single Family | 50x127 | $2,650 | 50.00 | FF | 1.1663 | $154,535 |

## 2025 Building 1 Structural Elements and Sub Area Information

| Structural Elements | |
| --- | --- |
| Foundation | Continuous Footing Poured |
| Floor System | Slab On Grade |
| Exterior Walls | Cb Stucco/Cb Reclad |
| Unit Stories | 1 |
| Living Units | 1 |
| Roof Frame | Gable Or Hip |
| Roof Cover | Shingle Composition |
| Year Built | 1973 |
| Building Type | Single Family |
| Quality | Average |
| Floor Finish | Carpet/Hardtile/Hardwood |
| Interior Finish | Drywall/Plaster |
| Heating | Central Duct |
| Cooling | Cooling (Central) |
| Fixtures | 9 |
| Effective Age | 38 |

| Sub Area | Living Area SF | Gross Area SF |
| --- | --- | --- |
| Base (BAS) | 1,950 | 1,950 |
| Open Porch Unfinished (OPU) | 0 | 120 |
| **Total Area SF** | **1,950** | **2,070** |



| 2025 Extra Features | | | | | |
| --- | --- | --- | --- | --- | --- |
| Description | Value/Unit | Units | Total Value as New | Depreciated Value | Year |
| PATIO/DECK | $15.00 | 150.0 | $2,250 | $900 | 1993 |

### Permit Data

Permit information is received from the County and Cities. This data may be incomplete and may exclude permits that do not result in field reviews (for example for water heater replacement permits). We are required to list all improvements, which may include unpermitted construction. Any questions regarding permits, or the status of non-permitted improvements, should be directed to the permitting jurisdiction in which the structure is located.

| Permit Number | Description | Issue Date | Estimated Value |
| --- | --- | --- | --- |
| 16-08000726 | ROOF | 08/12/2016 | $5,300 |