CNH INDUSTRIAL CAPITAL

# RETAIL INSTALLMENT SALE CONTRACT AND SECURITY AGREEMENT
## FIXED RATE

F%000002802844 21004A0105

062380 / 2775449

| "Buyer(s)": Legal Name(s) | Address | City | St | Zip Code |
|---|---|---|---|---|
| RAD DIVERSIFIED REIT, INC. | 211 N LOUIS AVE | TAMPA | FL | 33609-2232 |

| "Seller": Legal Name | Address | City | St | Zip Code |
|---|---|---|---|---|
| TITAN MACHINERY INC. | 913 SOUTH ONEIDA | RUPERT | ID | 83350 |

The undersigned Buyer(s) (collectively called "Buyer") hereby purchases from Seller and Seller hereby sells to Buyer the following goods (the "Equipment") at the Time Sale Price and the terms set forth herein. The Equipment is purchased for commercial business use ✓ agricultural use

| NEW*/USED | EQUIPMENT DESCRIPTION | MODEL | SERIAL NUMBER/PIN | "CASH SALE PRICE" |
|---|---|---|---|---|
| USED | Case IH Combine | 2388 | JJC0270590 | $44,000.00 |
| USED | Case IH Combine Head | 1010 | JJC0300093 | $3,900.00 |
| | | | | |
| | | | | |
| | | | | |

*New Equipment is unused equipment, a rental unit or a demonstrator, not previously sold, for which the manufacturer will supply all or a portion of a new equipment warranty; the Equipment may have been manufactured in a year prior to the year of this purchase.

| TRADE-IN EQUIPMENT | MODEL | SERIAL NUMBER/PIN | ALLOWANCE | AMT. OWED | NET TRADE-IN | OWED TO (Address details Page 4) |
|---|---|---|---|---|---|---|
| | | | N/A | N/A | N/A | |
| | | | | | | |
| | | | | | | |

### STATEMENT OF TRANSACTION

| | | |
|---|---|---|
| 1. Cash Price (Cash Sale Price) | | 1. $ 47,800.00 |
| 2. Cash Down Payment | $ 9,640.00 | |
| Net Trade-in Allowance | $ N/A | |
| Manufacturer's Rebate | $ N/A | |
| Total Down Payment | | 2. $ 9,640.00 |
| 3. Unpaid Balance of Cash Price (1 minus 2) | | 3. $ 38,260.00 |
| 4. Other Charges | | |
| (a) Taxes (Not in Cash Price) | $ N/A | |
| (b) Official Fees (Filing and Termination) | $ 50.00 | |
| (c) UCC Service Fee (Filing and Termination) | $ 22.00 | |
| (d) Administrative Fee | $ 93.50 | |
| (e) Physical Damage Insurance | $ N/A | |
| (f) Credit Life Insurance | $ N/A | |
| (g) Credit Accident & Health Insurance | $ N/A | |
| (h) Purchased Protection Plan | $ N/A | |
| (i) Other | $ N/A | |
| Total Other Charges | | 4. $ 165.50 |
| 5. Unpaid Balance (Amount Financed) (3+4) | | 5. $ 38,425.50 |
| 6. INTEREST CHARGE | | 6. $ 4,610.37 |
| 7. Total of Payments (Time Balance) (5+6) | | 7. $ 43,035.87 |
| 8. Deferred Payment Price (Time Sale Price) (1+4+6) | | 8. $ 52,675.87 |

9. The Unpaid Balance (Amount Financed) shall bear an Interest Charge computed at a per annum rate (the **INTEREST RATE**) equal to 3.90 % (this is a ***FIXED RATE*** contract).

10. Date Interest Rate begins accruing: 11-08-2023

Buyer agrees to pay to the Seller the Time Balance as follows:

| NBR OF PAYMENTS | PERIOD OF PAYMENTS | AMOUNT OF EACH PAYMENT | BEGINNING MM/DD/YYYY |
|---|---|---|---|
| 4 | 12 MONTHS | $ 8,607.18 | 11/08/2024 |
| 1 | 12 MONTHS | $ 8,607.15 | 11/08/2028 |

The payments have been calculated to pay in full principal and interest over the term of this Agreement using the Interest Rate in effect on the date of this Agreement, and assuming that all required payments are made in full on the scheduled due dates. The final payment due hereunder shall be recalculated to pay the Obligations in full.

Buyer hereby conveys to Seller all rights, title and interest in the Trade-In Equipment free and clear of all encumbrances except as noted above.

If checked, Seller represents and warrants that the above Amt. Owed has been paid.

Buyer agrees to the terms of the above titled agreement (herein the "Agreement"). Buyer has received and examined the Equipment, which is in good operating order and condition and is as described above. Buyer acknowledges receipt of a copy of this Agreement. Buyer agrees to purchase the Equipment described above and pay the Time Balance based on the terms of this Agreement.

**NOTICE TO THE BUYER:**

1. DO NOT SIGN THIS BEFORE YOU READ THE TERMS ON THE FOUR AGREEMENT PAGES (PLUS ANY ADDENDUMS) EVEN IF OTHERWISE ADVISED.
2. DO NOT SIGN THIS IF IT CONTAINS ANY BLANK SPACES.
3. YOU ARE ENTITLED TO AN EXACT COPY OF ANY AGREEMENT YOU SIGN. KEEP IT TO PROTECT YOUR LEGAL RIGHTS.
4. BUYER REPRESENTS THAT THE EQUIPMENT IS NOT BEING PURCHASED FOR FAMILY, HOUSEHOLD OR PERSONAL USE.

ADDITIONAL PROVISIONS CONCERNING RIGHTS AND DUTIES OF THE PARTIES ON THE ADDITIONAL PAGES OF THIS AGREEMENT ARE A PART OF THIS AGREEMENT.

X [signature] RAD DIVERSIFIED REIT, INC. DIRECTOR - [illegible] 11-08-2023
Signature of Buyer/Buyer's Representative — Printed Name — Title (not for an individual Buyer) — Date

X ______ ______ ______ ______
Signature of Buyer/Buyer's Representative — Printed Name — Title (not for an individual Buyer) — Date

Dealer (hereinafter "Assignor" or "Seller") hereby assigns all of its rights, title and interest in and to the Agreement and the Equipment to CNH Industrial Capital America LLC (hereinafter "Assignee" or "CNH Capital"), under terms also described in the Retail Finance Agreement, Program Procedures, Dealer Handbook or other related documents (collectively hereinafter the "RFA") executed by the Assignor and Assignee. Seller has obtained a signed credit application for this Agreement. The Equipment has been paid in full or will be paid in full with Agreement proceeds pursuant to the terms of the RFA. Assignor waives notice of acceptance of this Assignment and notice of non-payment and non-performance of the Agreement and any other notices required by law and waives any and all setoffs and counterclaims. This Assignment shall become effective upon delivery of the Agreement to Assignee or upon Assignee's payment of the purchase price thereof, whichever occurs first.

Basis of Acceptance: ✓ Nonrecourse  Repurchase  Full Recourse  Other

Other explanation

X [signature] TITAN MACHINERY INC. 11-08-2023
Signature of Seller's Representative — Printed Seller Name — Date



21004A Rev. 07/23 Previous editions may not be used.

Ex. A

CNH INDUSTRIAL | CAPITAL

F%000002 802 8442 1004A0205

062380 / 2775449

# Agreement Provisions

1. **NO WARRANTY. THE EQUIPMENT IS SOLD AS IS AND WITH ALL FAULTS, SUBJECT TO ANY APPLICABLE MANUFACTURER'S EXPRESS, WRITTEN WARRANTY. NEITHER SELLER NOR MANUFACTURER MAKE ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AND SPECIFICALLY DISCLAIM THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR PARTICULAR PURPOSES.* NEITHER SELLER NOR MANUFACTURER WILL BE LIABLE FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES RESULTING FROM A BREACH OF THE EXPRESS WARRANTY OR ANY IMPLIED WARRANTY IMPOSED BY LAW.***

   ***Some states do not allow these limitations and exclusions, and they shall not apply to the extent such limitations or exclusions are not allowed by applicable state law.***

2. **Prepayments.** Buyer may make a partial prepayment of the unpaid Time Balance at any time, but any partial prepayments will not change or defer Buyer's next scheduled payments.

3. **Late Charges/Default Rate/Returned Checks.** Buyer shall pay a late charge on each payment not paid within 10 days after the due date at the highest amount, both as permitted by applicable law. Buyer shall pay interest on the unpaid balance after maturity (as scheduled, by acceleration or otherwise) at the highest rate, as permitted by applicable law. If a check is returned for any reason, Assignee may charge Buyer a returned check processing fee as established by Assignee from time to time not to exceed the maximum permitted under applicable law. Assignee may apply any payment or proceed received toward the Obligations, in its sole discretion regardless of how requested or directed.

4. **Fees.** All parties to this Agreement acknowledge and agree that some fees and charges scheduled under section 4 in the Statement of Transaction may be shared between the Seller and CNH Capital as permitted by law and may result in profit for the Seller and CNH Capital. The parties further agree that Administrative or Other Fees are reasonable consideration for credit determination, handling, review, and approval of the transaction, and are not a document preparation fee nor an official fee. CNH Capital may make UCC related filings and/or termination statements pursuant to this Agreement. CNH Capital reserves its right to assess additional fees and other charges to the Obligations including but not limited to, if fees and other charges increase or other actions are needed to protect its lien upon the Equipment. If any fees and/or other charges scheduled and/or assessed under any part of this Agreement exceed the maximum permitted by applicable law, any excess shall be applied toward a reduction of the principal balance and that shall be the sole and satisfactory remedy under this Agreement.

5. **Extensions and Refinancing.** If Assignee extends, defers or refinances any payments due under this Agreement, Assignee may, at its option, increase the Interest Rate or Interest Charge (herein collectively referred to as the Interest Rate).

6. **Security Interests/Cross Collateralization.** Buyer hereby grants to Seller and its successors and assigns (including Assignee) a first priority purchase money security interest in the Equipment, and in all improvements, parts and accessories belonging to the Equipment, and all substitutions, replacements, products, proceeds (including any insurance proceeds) thereof and premium refunds, refunds of any other charges hereunder and all accessions related to the Equipment (the Equipment and such items are collectively referred to herein as the "Collateral"), to secure payment and performance of all existing and future obligations of Buyer under this Agreement or any other agreement between Buyer and Seller, between Buyer and Assignee or any affiliate of Assignee, or where Buyer, under another agreement in favor of Seller or Assignee, is a guarantor or obligor (the "Obligations"). Loss of or damage to the Equipment shall not release Buyer from any of the Obligations. Upon request, Buyer shall take any action reasonably deemed necessary by Assignee to protect and enforce Assignee's interest in the Collateral or rights under this Agreement. Assignee or Seller is authorized to examine the Collateral wherever located at any reasonable time or times. Buyer authorizes Assignee to insert in this Agreement, or amend any financing statement or title registration documentation to reflect the serial/PIN and/or model numbers of the Equipment if unknown at the time this Agreement is executed and to correct any errors in such numbers or any other errors in the description of the Equipment.

7. **Assignment.** Seller hereby assigns this Agreement, and any guarantee(s) ("Guarantee") hereof (together, "Assignment") to Assignee. Buyer acknowledges that Seller has the right to assign this Agreement and such Guarantee, that all rights and benefits but no obligations (if any) of Seller under this Agreement may be exercised by Assignee and that no obligations (if any) of Seller pass to Assignee. Buyer shall make all payments due under this Agreement directly to Assignee. This Agreement shall be binding on and inure to the benefit of Buyer, Seller and Assignee and their respective heirs, personal representatives, successors and assigns, provided however, that Buyer may not assign its interest in the Collateral, rights, nor its obligations under this Agreement to any person without Assignee's prior written consent. CNH Capital may pay a fee to the Assignor as consideration for the Assignor's assignment of this Agreement to CNH Capital.

8. **Notification of Change in Residence, Principal Office, or Organizational Form.** If Buyer changes (as applicable): (a) its state of principal residence; or (b) the state in which its chief executive office is located; or (c) the state in which it is organized; or (d) its form of organization (such as from an individual to a corporation); or (e) its name, as printed on a State filed registration document or individual name, as printed on a valid driver's license, then Buyer will notify Assignee in writing promptly, but in no event more than 30 days after such change.

9. **Waiver of Defenses Against Assignee; Indemnification.** Buyer will not assert against Assignee any claim or defense which Buyer may have against Seller, the manufacturer of the Equipment, or any other person. Buyer agrees that its obligation to remit payments will not be subject to, and it will not make any claim against Assignee for breach of any representation, warranty or condition with respect to the Equipment and that its obligation to pay Assignee all amounts under this Agreement is absolute and unconditional without abatement, reduction, set-off, counterclaim or interruption for any reason whatsoever, including any dispute which now or hereafter arises between Buyer and Seller or any other person. Time is of the essence. Buyer shall indemnify and hold harmless Seller, Assignee and their respective officers, directors, employees and agents from and against any damage, loss, theft or destruction of the Equipment or any part thereof, and from and against any and all loss, damages, injuries, claims, demands, costs and expenses (including without limitation reasonable attorneys' fees and expenses) of any kind and nature, arising out of or connected with this Agreement or the use, condition (including without limitation, all defects whether or not discoverable by Buyer, Seller or Assignee) or operation of the Equipment or any part thereof. Buyer shall promptly notify Seller and Assignee in writing of any loss, damage, theft, destruction, injury, claim, demand, cost or expense related to this Agreement or the Equipment of which Buyer has knowledge.

10. **Buyer's Covenants.** Buyer shall: (a) keep the Equipment in the state listed on page 1 of this Agreement and not remove the Equipment from such location, except temporarily in connection with its ordinary use or repair, unless Assignee consents in writing; (b) maintain the Equipment in good condition and repair and not permit its intended function or value to be impaired; (c) keep the Collateral free of all liens, encumbrances and security interests of all persons other than Seller and Assignee, (d) defend the Collateral against all claims and legal proceedings by persons other than Assignee; (e) pay and discharge when due all taxes, fees, levies and other charges upon the Collateral (including all personal property and ad valorem taxes); (f) pay when due all taxes arising from the purchase of the Equipment under this Agreement, excluding any taxes based upon Seller's net income; (g) use the Equipment solely in the conduct of Buyer's business; (h) ensure the Equipment will be used solely within the intended uses of the manufacturer and that manufacturer warranty remains valid; (i) not sell, lease or otherwise dispose of the Equipment nor permit the Equipment to become an accession to other goods or a fixture; and (j) not permit the Equipment to be used in violation of any law, regulation or policy of insurance; and (k) strictly follow the terms on page 1 of this Agreement; (l) perform (at Buyer's expense) all maintenance and repairs necessary to keep the Equipment in as good a condition as when delivered to Buyer, reasonable wear excepted; (m) not permit the Equipment to be used by, or to be in the possession of, anyone other than Buyer or Buyer's employees. Buyer represents and warrants that: (i) each individual executing this Agreement authorized by or on behalf of Buyer has the requisite power and authority to execute this Agreement and all related documents; (ii) Buyer is fully authorized to perform its obligations and consummate the transactions contemplated under this Agreement and related documents; (iii) the execution and delivery of this Agreement and all related documents and the consummation of the transactions under this Agreement have been duly authorized by Buyer; and (iv) this Agreement and all related documents constitute valid and legally binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms.

CNH INDUSTRIAL | CAPITAL

062380 / 2775449

## Agreement Provisions

F%000002802844210004A0305

11. **Insurance.** Buyer shall keep Assignee's interests in the Equipment insured against fire, theft, physical damage and other hazards under policies listing Assignee as Lender's loss payee or as an additional insured, with such provisions, for such amounts (but not less than the unpaid balance outstanding under this Agreement) and by such insurers and terms as shall be satisfactory to Assignee from time to time, and shall furnish to Assignee evidence of such insurance satisfactory to Assignee. Such insurance shall provide at least 30 days' written notice of cancellation, lapse or expiration to Assignee. Buyer assigns (and directs any insurer to pay) to Assignee Buyer's interest in the proceeds of any and all insurance related to the Equipment and any premium refund, and Assignee may, at its option, apply such proceeds and refunds to any unpaid balance of the Obligations, whether or not due, and/or to repair or restore the Equipment. Buyer must make all payments due under this Agreement whether or not the Equipment is insured or underinsured. Assignee is authorized, in the name of Buyer or otherwise, to make, adjust and/or settle claims under any insurance on the Equipment, or cancel the same after the occurrence of an event of default, or set off amounts owed Assignee against any rebates, credits or refunds due Buyer and/or any guarantor. If Buyer purchased physical damage insurance that is financed under this Agreement, Buyer hereby requests and authorizes Seller (provided Seller is properly licensed to do so) or its designee: (a) to arrange physical damage insurance for the benefit of Seller or Assignee and Buyer that covers physical damage to the Equipment, (b) to replace or otherwise modify such insurance as Seller deems appropriate; and (c) to be Buyer's attorney-in-fact to make claim for, receive payment of and execute, endorse and negotiate all documents, checks or drafts received in payment of loss, damage or premium refunds under any insurance. This Agreement includes and hereby incorporates by reference any Insurance Addendum signed in connection with this Agreement.

    STATEMENT TO BUYER: THE PHYSICAL DAMAGE INSURANCE PURCHASED UNDER THE TERMS OF THIS AGREEMENT COVERS ONLY LOSS OF OR DAMAGE TO THE EQUIPMENT. LIABILITY INSURANCE COVERAGE FOR BODILY INJURY AND PROPERTY DAMAGE CAUSED TO OTHERS IS NOT INCLUDED AS PART OF THE PHYSICAL DAMAGE INSURANCE. BUYER UNDERSTANDS THAT IF INSURANCE IS FINANCED UNDER THIS AGREEMENT, PREPAYMENT OF BUYER'S OBLIGATIONS OR TERMINATION OF THIS AGREEMENT WILL RESULT IN CANCELLATION OF INSURANCE COVERAGE, UNLESS OTHERWISE EXPLICITLY AGREED TO IN WRITING BY ASSIGNEE.

12. **Modifications and Waivers.** This Agreement sets forth the entire understanding among Seller, Assignee and Buyer. No modification, amendment or extension of this Agreement and no waiver of any provision of this Agreement shall be valid unless in writing and signed by the parties and a waiver of any default hereunder by Assignee shall not constitute a waiver of any other prior or subsequent default, except that Buyer authorizes Assignee to insert in this Agreement the serial number/PIN and/or model number of any Equipment if this information is unknown when this Agreement is executed or to correct any errors in such numbers or any other patent errors in the description of the Equipment.

13. **Authority of Assignee to Perform for Buyer.** If Buyer fails to perform any of Buyer's duties set forth in this Agreement (including, without limitation, the purchase of insurance), Assignee may at its option, in Buyer's name or otherwise, take any such action, including, without limitation, signing Buyer's name or paying any amount so required, and all costs and expenses incurred by Assignee in connection therewith shall form part of the Obligations and shall be payable by Buyer upon demand with interest from the date of payment by Assignee at the highest rate permitted by applicable law.

14. **Default/Cross Default.** Buyer shall be in default under this Agreement, and any other agreement with or assigned to Assignee, if any of the following occurs (each, an "event of default"): (a) Buyer fails to pay when due any of the Obligations, or to perform any covenant or other obligation of Buyer under this Agreement or any other agreement with or assigned to Assignee; (b) Buyer or any guarantor dies, ceases to exist, becomes insolvent or the subject of bankruptcy, insolvency or liquidation proceedings, attempts to or does assign this Agreement or attempts to or does remove, sell, transfer, further encumber, part with possession of or sublet any Equipment; (c) any warranty or representation made by Buyer or any guarantor to induce Seller or Assignee to extend credit to Buyer, under this Agreement or otherwise, is false in any material respect when made; (d) Buyer fails to maintain insurance required hereunder or fails to comply with the requirements of any such insurance; (e) any other event occurs that causes Assignee, in good faith, to consider that payment or performance of the Obligations is impaired or that the Equipment is at risk; (f) the Equipment is impounded or confiscated by any federal, state or local governmental authority; (g) Buyer fails to produce Collateral for inspection within 10 days, upon demand; or (h) Buyer breaches any of the other terms of this Agreement or any other agreement with or assigned to Assignee.

15. **Expenses.** To the extent not prohibited by law, Buyer shall reimburse Seller or Assignee for any expense incurred by Seller or Assignee in protecting, defending or enforcing their rights under this Agreement, including, without limitation, reasonable attorneys' fees and legal expenses and all expenses of taking possession, transporting, holding, repairing, refurbishing, preparing for disposition and disposing of the Collateral, and all expenses and costs incurred in collecting the Obligations, including collection agency fees based on a maximum of 25% of the Obligations, and all shall be part of the Obligations.

16. **Conflict with Law.** Any provision of this Agreement prohibited by applicable law shall be ineffective to the extent of the prohibition without invalidating the remaining portions of this Agreement. The validity, construction and enforcement of this Agreement shall be governed by the laws of the State of the Seller (without regard to conflict of law principles of such State). All terms not otherwise defined have the meanings assigned to them by the applicable Uniform Commercial Code.

17. **Authorization to Execute and File Financing Statements and Lien Documents.** Buyer hereby authorizes Assignee or its designee to execute and file financing statements, and any motor vehicle title, registration and lien notification documentation, and any amendments thereto, on behalf and in the name of Buyer to evidence the security interest in the Collateral granted pursuant to this Agreement. Buyer hereby irrevocably appoints Assignee or its designee as Buyer's agent and attorney-in-fact to sign such instruments on Buyer's behalf and to file them.

18. **Time Price Calculations.** If this is a variable rate contract, the Prime Rate for a given calendar month shall be the rate designated as the "Prime Rate" published in The Wall Street Journal on the twentieth day of the prior calendar month (or on the next day published if not published on the twentieth day). If The Wall Street Journal ceases publication permanently or no longer publishes a "Prime Rate", the Prime Rate shall mean the prime loan rate of any federally chartered bank selected by Assignee. For all contracts the Interest Rate shall never be less than 0%. Interest Rate shall be calculated using a daily rate determined by dividing the annual rate by 365. Buyer shall make all payments in lawful money of the United States of America.

19. **Remedies.** Upon the occurrence of any event of default, Seller or Assignee shall have all rights and remedies provided by the Uniform Commercial Code or any other applicable law and Seller or Assignee may, except where prohibited by law, at its option: (i) declare all Obligations immediately due and payable without notice or demand; (ii) enter onto any premises where the Collateral may be located, take possession of all Collateral, without notice or hearing, and, Buyer or any guarantor, also expressly waives any right to notice or a prior hearing or to require Assignee to post any bond; (iii) render the Equipment unusable; (iv) require Buyer to assemble all Collateral and make it available to Assignee at any convenient place designated by Assignee within 10 days after notice from Assignee; (v) sell (including at wholesale) or otherwise dispose of all Collateral at public or private sale for cash or on credit terms, without notice; and if notice is required by law, ten (10) days' notice to Buyer shall be deemed reasonable notice; and/or (vi) obtain a consumer credit bureau upon any Buyer or any guarantor. All rights and remedies may be exercised by Seller or Assignee either separately or in combination and any action taken by Assignee to recover payment from Buyer of the Obligations shall not limit Assignee's rights with respect to all Collateral. Assignee may apply all proceeds of realization of the Collateral to such part or parts of the Obligations as Assignee may decide. If there is a deficiency, Buyer will pay the amount of the deficiency upon demand. Buyer waives notice of dishonor, presentment and demand as to this Agreement.

CNH INDUSTRIAL CAPITAL

F%000002802844 21004A0405

062380 / 2775449

## Agreement Provisions

20. **Miscellaneous.** In the event that this contract is determined by a court of competent jurisdiction to be characterized as a loan or forbearance agreement, and not a sale, despite the terms and conditions found in this contract, then all parties agree that any interest charges computed and assessed in this contract that are in excess of the maximum allowed interest charges allowed by law shall be applied as a reduction to the principal balance owed on this contract only, and this shall be the agreed upon and satisfactory remedy to all parties. By providing any address, email address or telephone number, including a mobile phone number, either now or in the future to Seller, Assignee, any of Assignee's affiliates or any debt collectors retained by Assignee, Buyer agrees that any of the above may contact Buyer using that address or number, including contact through calls or texts using an automatic dialing and announcing device and prerecorded calls, and that such calls are not "unsolicited" under state or federal law. Any attempted revocation of this consent to contact, if allowable by law, must be made in writing. Buyer acknowledges and agrees that CNH Capital and its third party service providers can access and use telematics data and other information regarding location, maintenance and operation of the Equipment for any lawful purpose, including without limitation, to locate and repossess the Equipment. See https://www.cnhindustrialcapital.com/en_us/Pages/Privacy.aspx for additional details. If a court finds that any part of this Agreement to be invalid or unenforceable, the remainder of this Agreement will remain in effect. All of Assignee's rights shall remain in effect after the expiration or termination of this Agreement. If more than one Buyer is named in the Agreement, the liability of each shall be joint and several. All notices required or permitted hereunder shall be in writing and shall be deemed adequate if sent to the first Buyer on page 1 of the Agreement. The captions and headings of the sections of this Agreement are for convenience only and are not to be used to interpret or define the provisions hereof. Restrictive endorsements on checks or other forms of payment that Buyer sends to Assignee will not change or reduce Buyer's obligations to Assignee. Assignee will not lose any rights if Assignee accepts late or partial payments or delays enforcing its rights under this Agreement. South Dakota Residents: If there are any improprieties in making the loan or in loan practices, you may contact the South Dakota Division of Banking: South Dakota Division of Banking, 1714 Lincoln Ave, Suite 2, Pierre, SD 57501, phone number: (605) 773-3421.

21. **WAIVER OF JURY TRIAL.** EXCEPT IN GEORGIA OR CALIFORNIA OR WHERE OTHERWISE PROHIBITED BY LAW, EACH BUYER, SELLER AND CNH CAPITAL WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING RELATING TO THE OBLIGATIONS, THIS AGREEMENT, OR ANY OTHER DOCUMENT CONNECTED HEREWITH, OR ANY TRANSACTION ARISING FROM OR CONNECTED TO ANY OF THE FOREGOING. EACH BUYER, SELLER AND CNH CAPITAL REPRESENTS THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY GIVEN.

22. **Electronic Contracting, Signature Acknowledgment, Future Notices.** Buyer agrees that (i) this Agreement is an electronic agreement executed by Buyer using Buyer's electronic signature or that Assignee may convert this Agreement into an electronic agreement; (ii) Buyer's electronic signature signifies Buyer's intent to enter into this Agreement and that this Agreement shall be a legally valid and enforceable Agreement in accordance with its terms to the same extent as if Buyer had executed this Agreement using Buyer's written signature and (iii) the authoritative copy of this Agreement ("Authoritative Copy") shall be that electronic copy that resides in a document management system designated by Assignee for the storage and authoritative copies of electronic records, which shall be deemed held by us in the ordinary course of business. Notwithstanding the forgoing, if the Authoritative Copy is converted by printing a paper copy which is marked by Assignee as the original (the "Paper Contract"), then Buyer acknowledges and agrees that (1) your signing of this Agreement with your electronic signature also constitutes issuance and delivery of such Paper Contract, (2) your electronic signature associated with this Agreement, when affixed to the Paper Contract, constitutes your legally valid and binding signature on the Paper Contract and (3) subsequent to such conversion, Buyer's duties and Obligations will be evidenced by the Paper Contract alone. By providing your e-mail address and electing to execute this Agreement electronically, Buyer agrees that all future notices, statements and communications relating to this Agreement shall be delivered to the Buyer via e-mail transmission to the e-mail address provided to Assignee by the Buyer. It is the Buyer's duty to provide any changes to Buyer's e-mail address to Assignee so that future communications can reach Buyer in a timely manner.

CNH INDUSTRIAL | CAPITAL

F%0000028028442103OA0505

062380 / 2776449

# GUARANTEE

In consideration of the extension of credit as referenced by the application number above, and to induce the Secured Party, as hereinafter defined, to extend credit on the agreement dated November 08, 2023, (herein "Agreement") to:

RAD DIVERSIFIED REIT, INC.

of 211 N LOUIS AVE, TAMPA, FL 33609-2232

(collectively the "Buyer"), and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the executing parties below (collectively the "Guarantor", whether one or more) makes this guarantee ("Guarantee") in favor of the Secured Party.

1. The Guarantor, pursuant to the terms of this Guarantee, unconditionally and irrevocably guarantees the payment, performance and complete fulfillment of all Obligations, as defined in the Agreement described above, of the Buyer to Secured Party, and any amendments or supplements thereto, whether heretofore or hereafter incurred, including any revisions, renewals, consolidations and extensions thereof, any of which may be made without notice to the Guarantor. Guarantor has received and reviewed a copy of the Agreement prior to executing this Guarantee.
2. This Guarantee does not limit, modify or cancel any unlimited guarantee that may have been previously given by the Guarantor, if any.
3. Notice of acceptance is waived (and, in Louisiana, all pleas of division and discussion are waived). Presentment, protest, demand, and notice of protest, demand and dishonor of any of the Obligations, and the exercise of possessory, collection or other remedies for the Obligations, are also hereby waived.
4. Without further authorization from or notice to Guarantor, Secured Party, in its sole discretion, may renew, refinance, revise, settle, alter, compromise, accelerate, extend, consolidate or otherwise change the time or manner of payments of any of the Obligations or increase or reduce the rate of interest thereon; or add or release any one or more other Guarantors. No exercise or nonexercise by Secured Party of any right hereby given to it, no dealing by Secured Party with Buyer or any other Guarantor, and no change, impairment, or extension of any right or remedy of Secured Party shall in any way affect the Guarantor's liability hereunder or give Guarantor any recourse against Secured Party. Notice of default in any of the Obligations is expressly waived by Guarantor.
5. With or without notice to Guarantor, and without affecting the liability of Guarantor hereunder, Secured Party may from time to time before, at, or after any default by Buyer, together or separately, (1) accept additional collateral for the Obligations, (2) accept other collateral in exchange or substitution for the collateral then securing the Obligations, (3) obtain a credit bureau report for any Guarantor, and/or (4) surrender or release any collateral securing the Obligations.
6. This is a Guarantee of prompt payment and performance, and not of collection. Secured Party does not have to exercise or exhaust its rights against the Buyer (or any other person or entity obligated with respect to the Obligations) or enforce its rights against any collateral before a claim is made against Guarantor.
7. It is the mutual intention of the parties hereto that the Guarantor shall be bound notwithstanding any claim or defense Buyer may have or raise, and Guarantor waives any defense Buyer may have. Guarantor agrees to pay reasonable attorneys' fees and all costs and other expenses incurred by Secured Party in collecting or compromising any of the Obligations or in enforcing this Guarantee against Guarantor.
8. In the event that any payment by Buyer to Secured Party is held to constitute a preference under the bankruptcy laws, or if for any other reason the Secured Party is required to refund such payment or pay the amount thereof to any other person or party, such payment by Buyer to Secured Party shall not constitute a release of Guarantor from any liability hereunder, but Guarantor agrees to pay such amount to Secured Party on demand.
9. "Secured Party" shall mean CNH Industrial Capital America LLC and CNH Industrial America LLC and all parent, subsidiary and affiliated corporations and all successors and assigns of any of the foregoing. This Guarantee shall bind the respective heirs, executors, administrators, successors, legal representatives and assigns of each Guarantor and shall inure to the benefit of any Secured Party.
10. Each Guarantor shall be jointly and severally (and, in Louisiana, "in solido" with the Buyer) liable to Secured Party.
11. EXCEPT IN GEORGIA OR CALIFORNIA OR WHERE OTHERWISE PROHIBITED BY LAW, EACH GUARANTOR WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING RELATING TO THE OBLIGATIONS, THIS GUARANTEE, OR ANY OTHER DOCUMENT CONNECTED HEREWITH, OR ANY TRANSACTION ARISING FROM OR CONNECTED TO ANY OF THE FOREGOING. EACH GUARANTOR REPRESENTS THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY GIVEN.

Executed this 08 day of November, 2023.

| Signature of Guarantor/Guarantor Representative | Printed Name | Title (not for individual Guarantor) |
|---|---|---|
| [signature] | BRANDON DUTCH MENDENHALL | Not Applicable |