# COMPOSITE EXHIBIT "B"

**DECLARATIONS**

**STARSTONE SPECIALTY INSURANCE COMPANY**
Harborside 5
185 Hudson Street, Suite 2600
Jersey City, New Jersey 07311
855-275-6041

StarStone
Part of the Core Specialty Group

# PUBLIC COMPANY MANAGEMENT LIABILITY INSURANCE

**NOTICE: THIS POLICY PROVIDES COVERAGE ON A CLAIMS-MADE AND REPORTED BASIS SUBJECT TO ITS TERMS. THE COVERAGE PROVIDED BY THIS POLICY IS LIMITED TO ONLY THOSE CLAIMS FIRST MADE AGAINST THE INSURED AND REPORTED IN WRITING TO THE INSURER DURING THE POLICY PERIOD OR AN EXTENDED REPORTING PERIOD, IF APPLICABLE. THE LIMIT OF INSURANCE WILL BE REDUCED BY PAYMENT OF DEFENSE COSTS AND DAMAGES. PLEASE READ THE ENTIRE POLICY CAREFULLY.**

**NOTICE: THIS INSURANCE CONTRACT IS WITH AN INSURER NOT LICENSED TO TRANSACT INSURANCE IN THE NAMED INSURED'S STATE OF DOMICILE AND IS ISSUED AND DELIVERED AS A SURPLUS LINES COVERAGE PURSUANT TO THE INSURANCE STATUTES.**

POLICY NO: DNO00012050P-00

ITEM 1. NAMED INSURED: RAD Diversified REIT Inc

ADDRESS: 5404 Cypress Center Dr Ste 320
Tampa, FL 33609-1023

MAILING ADDRESS: 5404 Cypress Center Dr Ste 320
Tampa, FL 33609-1023

ITEM 2. POLICY PERIOD: From: 10/24/2022 To: 10/24/2023
(12:01 A.M. local time at the address stated in Item 1.a.)

ITEM 3. POLICY PREMIUM: $50,000.00

ITEM 4. TOTAL AGGREGATE LIMIT OF LIABILITY: $1,000,000

ITEM 5. COVERAGE PART LIMITS OF LIABILITY, RETENTIONS, PENDING & PRIOR LITIGATION DATES:

**Only those Coverage Parts designated with an "X" are included under this Policy. If there is no "X" inserted next to any specified Coverage Part, such Coverage Part and any other reference to it in the Policy shall be deemed to be deleted.**

PUBLIC COMPANY MANAGEMENT LIABILITY COVERAGE PARTS

| Coverage Parts Noted With An "X" | Limit of Liability | Share "X" | Retro Date | Retention | Pending & Prior Litigation Date |
|---|---|---|---|---|---|
| X **Directors & Officers** | $1,000,000 | | | | |
| A. Insuring Agreement A-Insured Person Liability | | | | $0 each **Claim** | 10/24/2022 |
| B. Insuring Agreement B-Company Indemnification | | | | | 10/24/2022 |
| 1. **Claims** except **Securities Claims** | | | | $500,000 each **Claim** | |
| 2. **Securities Claims** | | | | $500,000 each **Claim** | |
| C. Insuring Agreement C-Company Securities | | | | $500,000 each **Claim** | 10/24/2022 |
| D. Extension A-Derivative Demand Investigation Costs | | | | $0 | |
| E. Extension B-Investigative Inquiry | | | | $0 | |
| | | | | | |
| ☐ **Employment Practices** | | | | | |
| A. Insuring Agreement A-Employment Practices Liability | | | | each **Claim** | |
| B. Insuring Agreement B-Third Party Liability | | | | each **Claim** | |
| | | | | | |
| ☐ **Fiduciary** | | | | each **Claim** | |
| A. Extension A-HIPAA and PPACA | | | | | |
| B. Extension B-Settlement Program | | | | | |

Whenever printed in this Declarations, the boldface type terms shall have the same meanings as indicated in the Policy Form.

StarStone

Part of the Core Specialty Group

ITEM 6. SUPPLEMENTAL EXTENDED REPORTING PERIOD PREMIUM:

150% of the Annual Policy Premium for a one (1) year Supplemental Extended Reporting Period;

ITEM 7. FORMS & ENDORSEMENTS:

These Declarations, together with the attached Policy Form and Endorsements as stated in the SSS-MPL-DO-END-CW-001 (10-16) Policy Form Schedule and the **Application** (including all information furnished by the **Insured's** in the underwriting of this Policy), shall constitute the contract between the **Insureds** and the **Insurer** ("Policy").

ITEM 8. NOTICE TO THE INSURER:

| A. Address for Notice of Claim or Potential Claim: | B. Address for all other Notices: |
|---|---|
| Attn: StarStone US Services Claims Office<br>Harborside 5<br>185 Hudson Street, Suite 2600<br>Jersey City, New Jersey 07311<br>Facsimile: (201) 743-7701<br>Tel: (855) 275-6041<br>Email: claims@starstone.com | Attn: StarStone US Services<br>Specialty Underwriting Department<br>Harborside 5<br>185 Hudson Street, Suite 2600<br>Jersey City, New Jersey 07311<br>Facsimile: (201) 743-7701<br>Tel: (855) 275-6041 |

The **Insurer** hereby causes this Policy to be signed by a duly authorized representative of the **Insurer**.

Authorized Representative

11/09/2022

DATE

Whenever printed in this Declarations, the boldface type terms shall have the same meanings as indicated in the Policy Form.

StarStone
Part of the Core Specialty Group

**Company:** StarStone Specialty Insurance Company **Policy No:** DNO00012050P-00
**Insured:** RAD Diversified REIT Inc **End Effective Date:** 10/24/2022

## PUBLIC COMPANY MANAGEMENT LIABILITY INSURANCE
## Policy Form Schedule

It is agreed that:

1. Item 7. Forms and Endorsements of the Declarations of this Policy is amended by the addition of the following:

   Item 7. Forms and Endorsements:

| Form | Form Title |
|---|---|
| SSS-MPL-DO-DEC (03-21) | Public Company Management Liability Insurance Declarations |
| SSS-MPL-DO-GTC (03-21) | Public Company Management Liability Insurance |
| SSS-MPL-DO-END-CW-121 (10-16) | Derivative Demand Investigation Costs Limit |
| SSS-MPL-DO-END-CW-145 (10-16) | Absolute Product Liability Exclusion |
| SSS-MPL-DO-END-CW-524 (10-16) | Professional Services Exclusion |
| SSS-MPL-DO-END-CW-567 (10-16) | Privacy Collection and Disclosure Exclusion - Insuring Agreement C |
| SSS-MPL-STATE AMENDATORY-FL (04-16) | Florida State Amendatory Endorsement |
| SSS-NOT-CW-01 (10-16) | Policyholder Disclosure Notice Of Terrorism Insurance Coverage |

Whenever printed in this Endorsement, the boldface type terms shall have the same meanings as indicated in the Policy Form.
ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

StarStone
Part of the Core Specialty Group

Harborside 5
185 Hudson Street, Suite 2600
Jersey City, NJ 07311
Tel: (201) 743-7700
Fax: (201) 743-7701
www.corespecialty.com

# STARSTONE SPECIALTY INSURANCE COMPANY
## PUBLIC COMPANY LIABILITY INSURANCE

**NOTICE: THIS POLICY PROVIDES COVERAGE ON A CLAIMS-MADE AND REPORTED BASIS SUBJECT TO ITS TERMS. THE COVERAGE PROVIDED BY THIS POLICY IS LIMITED TO ONLY THOSE CLAIMS FIRST MADE AGAINST THE INSURED AND REPORTED IN WRITING TO THE INSURER DURING THE POLICY PERIOD OR AN EXTENDED REPORTING PERIOD, IF APPLICABLE. THE LIMIT OF INSURANCE WILL BE REDUCED BY PAYMENT OF DEFENSE COSTS AND DAMAGES. PLEASE READ THE ENTIRE POLICY CAREFULLY.**

In consideration of the payment of the premium and in reliance upon the statements in the **Application** and subject to all terms and conditions of this Policy, the **Insureds** agree with the **Insurer** as follows:

This Policy is comprised of the Declarations, one or more **Coverage Parts**, Common Definitions, Common Exclusions, Common Conditions, any and all attached endorsements and the **Application**. Although various **Coverage Parts** may be referenced in this Policy, the only **Coverage Parts** that provide coverage under this Policy are the **Coverage Parts** designated as being purchased in Item 5 of the Declarations.

The Common Definitions, Common Exclusions and Common Conditions apply to all **Coverage Parts**. Unless stated to the contrary in any **Coverage Part** or endorsement, the terms and conditions of each **Coverage Part** of this Policy apply only to that **Coverage Part** and shall not apply to any other **Coverage Part**. Any defined term referenced in the Common Definitions but defined in a **Coverage Part** shall, for the purpose of coverage under that **Coverage Part**, have the meaning set forth in that **Coverage Part**. If any provision in the Common Definitions, Common Exclusions or Common Conditions is inconsistent with, or in conflict with, any term, definition, exclusion or condition of an applicable **Coverage Part**, the respective term, definition, exclusion or condition of such **Coverage Part** shall control for the purpose of that **Coverage Part**.

## PUBLIC COMPANY LIABILITY - PART 1
## DIRECTORS & OFFICERS COVERAGE

### I. INSURING AGREEMENTS

Subject to the terms, conditions and exclusions of this Policy:

A. INSURED PERSON LIABILITY INSURANCE

The **Insurer** shall pay on behalf of the **Insured Person**, **Loss** arising from any **Claim** first made against the **Insured Person** during the **Policy Period** and reported to the **Insurer** in the time and manner required by this Policy, except to the extent that such **Loss** has been paid or indemnified.

B. COMPANY INDEMNIFICATION INSURANCE

The **Insurer** shall pay on behalf of the **Company**, **Loss** arising from any **Claim** first made against an **Insured Person** during the **Policy Period** and reported to the **Insurer** in the time and manner required by this Policy, but only to the extent the **Company** has paid or indemnified such **Loss**.

C. COMPANY SECURITIES INSURANCE

The **Insurer** shall pay on behalf of the **Company**, **Loss** arising from a **Securities Claim** first made against the **Company** during the **Policy Period** and reported to the **Insurer** in the time and manner required by this Policy.

### II. EXTENSIONS

A. DERIVATIVE DEMAND INVESTIGATION COSTS COVERAGE

The **Insurer** shall pay on behalf of the **Company**, **Derivative Demand Investigation Costs** resulting from a **Derivative Demand** first made during the **Policy Period** and reported to the **Insurer** during the Policy Period or within 60 days thereafter.

Any payment by the **Insurer** pursuant to this section II. A. shall be considered part of **Loss**, shall be excess of the applicable Retention under the Directors & Officers Coverage Part as specified in Item 5 of the Declarations, and shall be part of, and not in addition to the **Applicable Limit of Liability**. The amount payable by the **Insurer** pursuant to this section II. A. shall not exceed a maximum aggregate limit of $500,000.

B. INVESTIGATIVE INQUIRY COVERAGE

1. The **Insurer** shall pay on behalf of an **Insured Person**, **Defense Costs** incurred by such **Insured Person**, resulting from an **Investigative Inquiry** first made during the **Policy Period** and reported to the **Insurer** during the **Policy Period** or within 60 days thereafter, except to the extent such **Defense Costs** have been paid or indemnified.
2. The **Insurer** shall pay on behalf of the **Company**, **Defense Costs**, in excess of the applicable Retention under the Directors & Officers Coverage Part as specified in Item 5 of the Declarations, incurred solely by an **Insured Person** resulting from an **Investigative Inquiry** first made during the **Policy Period** and reported to the **Insurer** during the **Policy Period** or within 60 days thereafter, but only to the extent the **Company** has paid or indemnified such **Defense Costs**.

Any payment by the **Insurer** pursuant to this section II. B. shall not exceed a maximum aggregate limit of $500,000 and shall be part of, and not in addition to the **Applicable Limit of Liability**.

C. SUBPOENA COVERAGE

In the event the **Insureds** fully comply with the reporting requirements of Common Conditions (Part 6), D. Reporting and Notice Requirements, subsection 2., and to the extent that coverage is not otherwise available under this Policy, the **Insurer** shall pay on behalf of an **Insured Person** reasonable fees and expenses, incurred with the **Insurer's** prior written consent, resulting from a **Subpoena** first received by the **Insured Person** during the **Policy Period** and reported to the **Insurer** during the **Policy Period** or within 60 days thereafter.

Any payment by the **Insurer** pursuant to this section II. C. shall be considered part of **Loss**, shall be part of, and not in addition to the **Applicable Limit of Liability** and no Retention shall apply. The amount payable by the **Insurer** pursuant to this section II. C. shall not exceed a maximum aggregate limit of $100,000 per **Policy Period**, regardless of the number of **Subpoenas** received during the **Policy Period**.

D. INDEPENDENT DIRECTOR LIABILITY COVERAGE

If the **Applicable Limit of Liability** and any other insurance and indemnification available to an **Insured Person** who is a "Non-Employee Director" of the **Company** are completely exhausted, the **Insurer** shall pay on behalf of such **Insured Person**, **Loss**, in excess of the **Applicable Limit of Liability**, arising from a **Claim** covered under Insuring Agreement A. of this **Coverage Part**.

The amount payable by the **Insurer** pursuant to this section II. D. shall not exceed a maximum aggregate limit of $1,000,000 and no Retention shall apply. Notwithstanding Common Conditions (Part 6), H. Other Insurance, coverage pursuant to this section II. D. shall be specifically excess over, and shall not contribute with, any other valid and collectible insurance, including insurance specifically excess of this Policy.

"Non-Employee Director" shall have the meaning ascribed to that term in Rule 16b-3 promulgated under the Securities Exchange Act of 1934; provided however, that the term "issuer" as referenced in such rule shall be deemed to refer to the **Company**.

E. RETIREE COVERAGE

If, after the inception date of this Policy or the first policy issued by the **Insurer** in an uninterrupted series of policies of which this Policy is a renewal or replacement, and before the end of the **Policy Period**, an **Insured Person** retires and no longer serves in his or her capacity as an **Insured Person** and:

1. this Policy is cancelled or non-renewed for reasons other than nonpayment of premium; and
2. this Policy is not replaced by any other directors and officers liability coverage;

then coverage provided under Insuring Agreement A. of this **Coverage Part** for such **Insured Person** shall be extended for a period of six years from such **Insured Person's** official date of retirement, but only with respect to **Claims** for **Wrongful Acts** fully occurring prior to such official date of retirement.

Any matter reported pursuant to section II. A. or B. above shall be deemed to be a notice of fact, circumstance, or situation, which may reasonably be expected to give rise to a **Claim**, as provided for in Common Conditions (Part 6), D. Reporting and Notice Requirements, subsection 2, of this Policy.

## III. DEFINITIONS

Whenever printed in boldface type, and whether in singular or plural form, the following terms shall have the meanings indicated below for purposes of this **Coverage Part**.

A. **Claim** means:

1. a written demand for monetary, non-monetary or injunctive relief against an **Insured**, by reason of a **Wrongful Act**;
2. a civil, administrative, regulatory, arbitration or mediation proceeding or any other alternative dispute resolution proceeding against an **Insured**, by reason of a **Wrongful Act**, which is commenced by service of a complaint or similar document or the filing of a notice of charges;

3. an official request for **Extradition** of an **Insured Person** or a criminal proceeding which is commenced by an arrest of, or return of an indictment against an **Insured Person**, by reason of a **Wrongful Act**;
4. a civil, criminal, administrative, or regulatory investigation of an **Insured Person**, by reason of a **Wrongful Act**, commenced by the service upon, or other receipt by, an **Insured Person**, of a written notice, including a Wells Notice or target letter, from an **Investigating Authority** identifying the **Insured Person** as an individual against whom a formal proceeding may be commenced; or
5. a written request that an **Insured** sign an agreement to toll or waive any statute of limitations, by reason of a **Wrongful Act**.

**Claim** shall not include a **Derivative Demand**, **Investigative Inquiry**, **Subpoena** or any labor or grievance proceeding or investigation which is subject to a collective bargaining agreement. A **Claim** shall be deemed to have been first made at the time written notice of the **Claim** is first received by any **Insured**. All **Claims** arising out of the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to be a single **Claim** first made on the date on which the earliest such **Claim** was first made.

B. **Derivative Demand** means any written demand by a security holder of the **Company**, upon the **Company** or an **Insured Person** of such **Company**, to bring a civil proceeding in a court of law against an **Insured Person** for a **Wrongful Act**, provided such **Derivative Demand** is brought and maintained without the solicitation, assistance or participation of any **Insured Person**, other than assistance that is protected pursuant to any federal or state whistleblower statute or any regulation promulgated thereunder.

C. **Derivative Demand Investigation Costs** means reasonable costs, fees and expenses incurred by a **Company**, with the **Insurer's** prior written consent, solely with respect to an investigation or evaluation required to determine whether it is in the best interest of the **Company** to commence a civil proceeding as demanded by a **Derivative Demand**. **Derivative Demand Investigation Costs** shall not include salaries, wages, fees, costs or expenses of any **Insured Person** or **Employee**.

D. **D&O Wrongful Act** means:

1. with respect to any **Insured Person**, any actual or alleged act, error or omission, misstatement, misleading statement, neglect, or breach of duty by such **Insured Person** in his or her capacity as such or in an **Outside Capacity**, or any matter claimed against them by reason of their status as an **Insured Person**;
2. with respect to a **Securities Claim**, a **D&O Wrongful Act** shall include any actual or alleged act, error or omission, misstatement, misleading statement, neglect, or breach of duty by the **Company** arising from the purchase or sale or offer to purchase or sell securities issued by the **Company** in the open market or in a direct transaction with the **Company**.

E. **Extradition** means a process by which one country surrenders a person to another country to face prosecution, incarceration or to answer any criminal accusation.

F. **Financially Impaired** means the status of an entity resulting from such entity becoming a debtor in possession under United States bankruptcy law, or its foreign equivalent, or from the appointment by a state or federal official, agency or court of a bankruptcy or insolvency examiner, receiver, trustee, or similar official to take control of, supervise, manage or liquidate such entity.

G. **Investigating Authority** means any federal, state, or local law enforcement or governmental regulatory authority worldwide (including any attorney general, the U.S. Department of Justice, and the U.S. Securities and Exchange Commission) or the enforcement unit of any securities exchange or similar self-regulatory organization.

H. **Investigative Inquiry** means a request for the production of documents or sworn statement from, or an interview with, an **Insured Person** by an **Investigating Authority** in connection with such **Insured Person** acting in his or her capacity as such or in connection with the **Company's** business activities. In no event shall an **Investigative Inquiry** include any routine or regularly scheduled oversight, compliance, audit, examination, or inspection.

I. **Outside Capacity** means service by an **Insured Person** as a director, trustee, or equivalent executive position with an **Outside Entity**, but only if such service is or was at the specific request or direction of the **Company**.

J. **Outside Entity** means any not-for-profit entity.

K. **Securities Claim** means a **Claim**:

1. against an **Insured** for violation of any United States securities law or foreign securities law arising from the purchase or sale of, or offer or solicitation of an offer to purchase or sell, any securities of a **Company**;
2. brought by a security holder of a **Company** in his or her capacity as such, whether individually or by class action, against an **Insured** for a common law cause of action pled in connection with any

securities law violation described in K.1. above; or

3. brought by a security holder as a derivative action on behalf of a **Company** solely against an **Insured Person**;

Provided, however, **Securities Claim** shall not include any **Claim** based upon, arising out of, directly or indirectly resulting from, or in any way involving an **Insured Person's** failure to receive or obtain any stock, stock options, stock warrants, or other securities of the **Company**.

L. **Subpoena** means a subpoena or written request compelling witness testimony or document production from an **Insured Person**.

M. **Wrongful Act** means a **D&O Wrongful Act**.

## IV. EXCLUSIONS

The **Insurer** shall not be liable under this Directors & Officers Coverage (Part 1) to pay any **Loss** arising from any **Claim** made against any **Insured**:

A. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Wrongful Act** as defined in any other **Coverage Part**;

B. which is brought or maintained by, on behalf of, or in the right of any **Insured** or any **Outside Entity** on behalf of which an **Insured Person** is or was serving in an **Outside Capacity** or which is brought or maintained by any security holder of the **Company**, whether directly or derivatively; provided, however, this exclusion shall not apply to any **Claim**:

1. that is a derivative action brought and maintained on behalf of the **Company** by one or more persons who are not **Insured Persons**, but only if such **Claim** is instigated and maintained without the solicitation, assistance or participation of any **Insured**, other than assistance that is protected pursuant to any federal or state whistleblower statute or any regulation promulgated thereunder;
2. brought and maintained by any security holder of the **Company**, including any **Employee** in his or her capacity as a security holder of the **Company**, but only if such security holder's **Claim** is instigated and continued independent of, and without the solicitation, assistance, participation or intervention of any **Executive Officer** or the **Company**;
3. by any former **Insured Person** who has not served with, been employed by, or provided consultation to the **Company** in any capacity for at least 2 years prior to such **Claim** being first made, but only if such **Claim** is instigated and maintained without the solicitation, assistance or participation of the **Company** or any **Insured Person** who is or has served with, been employed by, or provided consultation to the **Company** in any capacity in the last 2 years;
4. by any **Insured Person** for contribution or indemnity, where such contribution or indemnity **Claim** results solely from another **Claim** covered by this **Coverage Part**;
5. brought and maintained by or on behalf of a court-appointed bankruptcy or insolvency examiner, receiver, trustee, similar official or creditors committee for such:
   a. **Company** while such **Company** is **Financially Impaired**; or
   b. **Outside Entity** while such **Outside Entity** is **Financially Impaired**; or
6. brought and maintained outside the United States of America and Canada, by or on behalf of the **Company** or any **Outside Entity** against an **Insured Person**, but only if the laws where such **Claim** is brought and maintained require that such **Claim** be brought by or on behalf of such entity;

C. for any actual or alleged violation of any of the responsibilities, obligations or duties imposed by **ERISA**;

D. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of any of the duties, obligations or responsibilities imposed by the Fair Labor Standards Act, including amendments thereto or any similar provision of any federal, state, local or foreign regulation, statute, rule or law governing the classification of employees to determine their eligibility for compensation or the payment of wages, overtime, on-call time, rest periods, expense reimbursement, or minimum wages;

E. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of any of the duties, obligations or responsibilities imposed by the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, or the Occupational Safety and Health Act, including amendments thereto or any similar provision of any federal, state, local or foreign regulation, statute, rule or law;

F. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged act, error, or omission, misstatement, misleading statement, neglect, or breach of duty of an **Insured Person** serving in a capacity, or by reason of his or her status, as a director, officer,

trustee, regent, governor, manager or member of the board of managers of any entity other than the **Company**; provided, however, this exclusion shall not apply to any **Outside Capacity**.

## V. PRESUMPTION OF INDEMNIFICATION

If the **Company** is permitted or required by common or statutory law to indemnify an **Insured Person** for **Loss**, but fails or refuses to do so for reasons other than financial insolvency, then any payment by the **Insurer** of such **Loss** shall be subject to the applicable Retention that correlates with Insuring Agreement B. of this Directors & Officers Coverage Part as specified in Item 5 of the Declarations. To determine if the **Insured Person** is entitled to indemnification from the **Company**, the articles of association, bylaws, charter, resolutions and other organizational documents of the **Company** shall be deemed to have been adopted or amended to provide indemnification to such **Insured Person** to the fullest extent permitted by law.

## VI. PRIORITY OF PAYMENTS

If **Loss** covered under Insuring Agreement A. or section II. Extensions, B.1. and any other **Loss** are concurrently due under this Policy, the **Insurer** shall first pay **Loss** covered under Insuring Agreement A. or section II. Extensions, B.1.

# PUBLIC COMPANY LIABILITY - PART 2
# EMPLOYMENT PRACTICES COVERAGE

## I. INSURING AGREEMENTS

Subject to the terms, conditions and exclusions of this Policy:

A. EMPLOYMENT PRACTICES LIABILITY INSURANCE

The **Insurer** shall pay on behalf of the **Insured**, **Loss** arising from any **Claim** first made against the **Insured** during the **Policy Period** and reported to the **Insurer** in the time and manner required by this Policy.

B. THIRD PARTY LIABILITY INSURANCE

The **Insurer** shall pay on behalf of the **Insured**, **Loss** arising from any **Third Party Claim** first made against the **Insured** during the **Policy Period** and reported to the **Insurer** in the time and manner required by this Policy.

## II. DEFINITIONS

Whenever printed in boldface type, and whether in singular or plural form, the following terms shall have the meanings indicated below for purposes of this **Coverage Part**.

A. **Claim** means:

1. a written demand for monetary, non-monetary or injunctive relief against an **Insured**, by reason of a **Wrongful Act**;
2. a civil, administrative, regulatory, arbitration or mediation proceeding or any other alternative dispute resolution proceeding against an **Insured**, by reason of a **Wrongful Act**, which is commenced by service of a complaint or similar document or the filing of a notice of charges;
3. a formal administrative or regulatory investigation of an **Insured**, by reason of a **Wrongful Act**, which is commenced by written notice or subpoena from the Equal Employment Opportunity Commission or any similar federal, state, local or foreign government agency; or
4. a written request that an **Insured** sign an agreement to toll or waive any statute of limitations, by reason of a **Wrongful Act**.

**Claim** shall not include a criminal proceeding, labor or grievance proceeding or investigation which is subject to a collective bargaining agreement, or an audit by the Office of Federal Contract Compliance Programs. A **Claim** shall be deemed to have been first made at the time written notice of the **Claim** is first received by any **Insured**. All **Claims** arising out of the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to be a single **Claim** first made on the date on which the earliest such **Claim** was first made.

B. **Employment Wrongful Act** means any actual or alleged employment-related:

1. discrimination based upon race, color, religion, age, gender, national origin, sexual orientation, pregnancy, disability, military status, or any other basis prohibited by federal, state, or local statute, rule or common law;
2. wrongful dismissal, discharge, or termination of employment, whether actual or constructive;

3. sexual or workplace harassment, including workplace bullying;
4. violation of employment discrimination laws including any actual or alleged wrongful: deprivation of career opportunity, failure to promote, discipline, evaluation, demotion, denial of tenure, modification of any term or condition of employment; or limitation, segregation or classification of any employee;
5. violation of the Family and Medical Leave Act;
6. retaliation in response to any **Employee** exercising his or her rights under any law;
7. failure to enforce existing employment-related corporate policies and procedures relating to retention, supervision, hiring or training;
8. misrepresentation, defamation, humiliation, or invasion of privacy;
9. breach of any verbal, written or implied contract of employment including any contractual obligation arising out of any employee handbook, personnel manual, or policy statement;

by any **Insured** against an **Employee**; provided, however, **Employment Wrongful Act** shall not include breach of an express contract or agreement between an independent contractor or any entity on behalf of such independent contractor and the **Company**.

C. **Third Party** means any natural person who is not an **Insured** and who is or was a customer, vendor, supplier, applicant or business invitee of the **Company**.

D. **Third Party Claim** means any **Claim** brought by, on behalf of, or in the right of a **Third Party**.

E. **Third Party Wrongful Act** means any actual or alleged:
1. discrimination based upon race, color, religion, age, gender, national origin, sexual orientation, pregnancy, disability, military status or any other basis prohibited by federal, state, or local statute, rule or common law; or
2. harassment, including sexual harassment, any unwelcome sexual advance, or other conduct of a sexual nature;

by an **Insured** against a **Third Party**.

F. **Wrongful Act** means:
1. with respect to I. Insuring Agreement A. of this **Coverage Part**, any **Employment Wrongful Act**.
2. with respect to I. Insuring Agreement B. of this **Coverage Part**, any **Third Party Wrongful Act**.

**III. EXCLUSIONS**

The **Insurer** shall not be liable under this Employment Practices Coverage (Part 2) to pay any **Loss** arising from any **Claim** made against any **Insured**:

A. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Wrongful Act** as defined in any other **Coverage Part**;

B. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of any of the duties, obligations or responsibilities imposed by the Fair Labor Standards Act, including amendments thereto or any similar provision of any federal, state, local or foreign regulation, statute, rule or law governing the classification of employees to determine their eligibility for compensation or the payment of wages, overtime, on-call time, rest periods, expense reimbursement, or minimum wages; provided, however, this exclusion shall not apply to the extent a **Claim** is for amounts owed under the Equal Pay Act of 1963 or for retaliation in response to any **Employee** exercising his or her rights under any such law;

C. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of any of the duties, obligations or responsibilities imposed by the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, or the Occupational Safety and Health Act, including amendments thereto or any similar provision of any federal, state, local or foreign regulation, statute, rule or law; provided, however, this exclusion shall not apply to any **Claim** for retaliation in response to any **Employee** exercising his or her rights under any such law;

D. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged failure to comply with any law concerning disability benefits, unemployment insurance, social security or workers compensation, including amendments thereto or any similar provision of any federal, state, local or foreign regulation, statute, rule or law; provided, however, this exclusion shall not apply to any **Claim** for retaliation in response to any **Employee** exercising his or her rights under any such law;

E. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of any of the responsibilities, obligations or duties imposed by **ERISA**; provided, however, this exclusion shall not apply to any **Claim** for retaliation in response to any **Employee** exercising his or her rights under any such law;

F. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any lockout, strike, picket line, hiring of any replacement workers or other similar action in connection with any labor dispute, labor negotiation or collective bargaining agreement; provided, however, this exclusion shall not apply to any **Claim** for retaliation in response to any **Employee** exercising his or her rights under any such law;

G. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving liability under any written or verbal contract of employment; provided, however, this exclusion shall not apply to **Defense Costs** or liability that would have attached in the absence of such contract or agreement;

H. to the extent such **Loss**, other than **Defense Costs**, constitutes employment related benefits, bonuses, commissions, profit sharing, perquisites, deferred compensation, stock options, or any other type of compensation earned by the claimant in the course of employment; provided, however, this exclusion shall not apply to front pay or back pay.

## PUBLIC COMPANY LIABILITY - PART 3
## FIDUCIARY COVERAGE

### I. INSURING AGREEMENT

Subject to the terms, conditions and exclusions of this Policy, the **Insurer** shall pay on behalf of the **Insured**, **Loss** arising from any **Claim** first made against the **Insured** during the **Policy Period** and reported to the **Insurer** in the time and manner required by this Policy.

### II. EXTENSIONS

A. HIPAA AND PPACA COVERAGE

The **Insurer** shall pay on behalf of the **Insured**, any **Health Act Penalty** arising from a **Health Act Notice** first received by the **Insured** during the **Policy Period** and reported to the **Insurer** during the **Policy Period** or within 60 days thereafter; provided, however, the **Insured** shall not make any payment, admit liability or stipulate to any **Health Act Penalty** without the **Insurer's** prior written consent.

Any payment by the **Insurer** pursuant to this section II. A. shall be considered part of **Damages**, shall be excess of the applicable Retention under the Fiduciary Coverage Part as specified in Item 5 of the Declarations, and shall be part of, and not in addition to the **Applicable Limit of Liability**. The amount payable by the **Insurer** pursuant to this section II. A. shall not exceed a maximum aggregate limit of $250,000.

B. SETTLEMENT PROGRAM COVERAGE

The **Insurer** shall pay on behalf of the **Insured**, **Settlement Fees** arising from a **Settlement Program Notice** first received by the **Insured** during the **Policy Period** and reported to the **Insurer** during the **Policy Period** or within 60 days thereafter; provided, however, the **Insured** shall not make any payment, admit liability or stipulate to any **Settlement Fees** without the **Insurer's** prior written consent.

Any payment by the **Insurer** pursuant to this section II. B. shall be considered part of **Damages**, shall be excess of the applicable Retention under the Fiduciary Coverage Part as specified in Item 5 of the Declarations, and shall be part of, and not in addition to the **Applicable Limit of Liability**. The amount payable by the **Insurer** pursuant to this section II. B. shall not exceed a maximum aggregate limit of $250,000.

Any matter reported pursuant to this section II. shall be deemed to be a notice of fact, circumstance, or situation, which may reasonably be expected to give rise to a **Claim**, as provided for in Part 6, Common Conditions, D. 2. of this Policy.

### III. DEFINITIONS

Whenever printed in boldface type, and whether in singular or plural form, the following terms shall have the meanings indicated below for purposes of this **Coverage Part**.

A. **Administration** means the rendering of advice to any **Employee** with regard to any **Plan**, providing any explanation to any **Employee** with regard to any **Plan**, or handling any record or effecting any enrollment, termination or cancellation of any **Employee** under any **Plan**.

B. **Claim** means:

1. a written demand for monetary or non-monetary relief against an **Insured**, by reason of a **Wrongful Act**;

2. a civil, criminal, administrative, regulatory, arbitration or mediation proceeding or any other alternative dispute resolution proceeding against an **Insured**, by reason of a **Wrongful Act**, which is commenced by service of a complaint or similar document or the filing of a notice of charges;
3. a formal investigation of an **Insured**, by reason of a **Wrongful Act**, which is commenced by written notice from the Department of Labor or the Pension Benefit Guaranty Corporation; or
4. a written request that an **Insured** sign an agreement to toll or waive the statute of limitations, by reason of a **Wrongful Act**.

**Claim** shall not include a **Health Act Notice**, **Settlement Program Notice** or any labor or grievance proceeding or investigation which is subject to a collective bargaining agreement. A **Claim** shall be deemed to have been first made at the time written notice of the **Claim** is first received by any **Insured**. All **Claims** arising out of the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to be a single **Claim** first made on the date on which the earliest such **Claim** was first made.

C. **Fiduciary Wrongful Act** means any actual or alleged breach of any of the duties, responsibilities, or obligations imposed upon **Plan** fiduciaries by **ERISA**; any actual or alleged negligent act, error or omission in the **Administration** of any **Plan** committed or attempted by any **Insured**; or any other matter alleged against such **Insured** solely by reason of such **Insured's** service as a **Plan** fiduciary.

D. **Health Act Notice** means written notice from a governmental agency in connection with an actual or alleged violation, by an **Insured**, of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) or the Patient Protection and Affordable Care Act (PPACA).

E. **Health Act Penalty** means a fine or penalty assessed against the **Company** or any **Insured Person**, in his or her capacity as such, pursuant a violation of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) or the Patient Protection and Affordable Care Act (PPACA).

F. **Plan** means:

1. any Welfare Benefit Plan as defined in **ERISA**, which was, is now, or becomes sponsored by the **Company** exclusively for the benefit of the **Employees** of the **Company**;
2. any Pension Benefit Plan as defined in **ERISA**, which is sponsored by the **Company** exclusively for the benefit of the **Employees** of the **Company**, provided, such plan existed on or before the inception date of this Policy as specified in Item 2 of the Declarations and has been reported in writing to the **Insurer** as part of the **Application**;
3. any employee benefit plan, including an excess benefit plan, not subject to Title 1 of **ERISA**, which is sponsored by the **Company** exclusively for the benefit of the **Employees** of the **Company**, provided, such plan existed on or before the inception date of this Policy as specified in Item 2 of the Declarations; and
4. any government mandated benefit program for disability benefits, unemployment insurance, social security, or workers compensation for **Employees** of the **Company**.

**Plan** does not include any employee stock ownership plan or any multi-employer plan unless such plan is specifically included as a **Plan** in a written endorsement applied to this Policy by the **Insurer**.

G. **Settlement Fees** mean fees, fines or penalties assessed against an **Insured** by a governmental authority, pursuant to a **Settlement Program**, for the actual or alleged inadvertent failure of any **Plan** to comply with any statute, rule or regulation; provided, however, that **Settlement Fees** shall not include:

1. any benefits, costs to correct the non-compliance or any other charges, expenses, or taxes; or
2. any fees, fines or penalties relating to a **Plan** that any **Insured Person** knew to be actually or allegedly non-compliant prior to the earlier of:
   a. this Policy's inception date as specified in Item 2 of the Declarations; or
   b. the inception date of the first policy, in an uninterrupted series of policies of which this Policy is a direct or indirect renewal or replacement, which the **Insurer** issued to the **Company**.

H. **Settlement Program** means any voluntary compliance resolution program or similar settlement program administered by the United States Internal Revenue Service, United States Department of Labor, or any other domestic or foreign authority, including, but not limited to, the Employee Plans Compliance Resolution System, Audit Closing Agreement Program, Voluntary Compliance Resolution Program, Walk-in Closing Agreement Program, Administrative Policy Regarding Self-Correction, Tax Sheltered Annuity Voluntary Correction Program, Delinquent Filer Voluntary Compliance Program, and Voluntary Fiduciary Correction Program, or any similar program administered by a governmental authority located outside of the United States.

I. **Settlement Program Notice** means written notice in connection with a **Settlement Program**.

J. **Wrongful Act** means any **Fiduciary Wrongful Act**.

## IV. EXCLUSIONS

The **Insurer** shall not be liable under this Fiduciary Coverage (Part 3) to pay any **Loss** arising from any **Claim** made against any **Insured**:

A. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Wrongful Act** as defined in any other **Coverage Part**;

B. to the extent such **Loss**, other than **Defense Costs**, constitutes:

1. the return or reversion to an employer of any contribution or asset of a **Plan**, or
2. benefits due or to become due under the terms of any **Plan**, or benefits which would be due under the terms of any **Plan** if such terms complied with all applicable law;

C. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged failure to collect or fund contributions owed to any **Plan**;

D. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged liability under any contract or agreement; provided, however, this exclusion shall not apply to any contract or agreement to which the **Plan** was established;

E. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged employment-related practices including but not limited to any workplace discrimination or harassment, abusive or hostile work environment, wrongful discharge or termination, wrongful demotion or discipline, retaliation, employment-related misrepresentation, negligent hiring, supervision, evaluation, retention or performance evaluation, wrongful reference or any violation of the Family and Medical Leave Act or any similar provision of any federal, state, local or foreign regulation, statute, rule or law; provided, however this exclusion shall not apply to **Claims** asserted under **ERISA**;

F. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of any of the duties, obligations or responsibilities imposed by the Fair Labor Standards Act, including amendments thereto or any similar provision of any federal, state, local or foreign regulation, statute, rule or law governing the classification of employees to determine their eligibility for compensation or the payment of wages, overtime, on-call time, rest periods, expense reimbursement or minimum wages;

G. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any failure to comply with any law concerning disability benefits, unemployment insurance, social security or workers compensation, including amendments thereto or any similar provision of any federal, state, local or foreign regulation, statute, rule or law; except the Consolidated Omnibus Budget Reconciliation Act of 1985 and the Health Insurance Portability and Accountability Act of 1996, or any amendments thereto or any rules or regulations promulgated thereunder;

H. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of any of the duties, obligations or responsibilities imposed by the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act or the Occupational Safety and Health Act, including amendments thereto or any similar provision of any federal, state, local or foreign regulation, statute, rule or law;

I. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any lockout, strike, picket line, hiring of any replacement workers or other similar action in connection with any labor dispute, labor negotiation or collective bargaining agreement.

# PUBLIC COMPANY LIABILITY - PART 4
## COMMON DEFINITIONS

Whenever printed in boldface type, and whether in singular or plural form, the following terms shall have the meanings indicated below.

A. **Applicable Limit of Liability** means:

1. the Total Aggregate Limit of Liability as specified in Item 4 of the Declarations, unless one or more of the Coverage Part Limits of Liability as specified in Item 5 of the Declarations is purchased;
2. if one or more Coverage Part Limits of Liability as specified in Item 5 of the Declarations is purchased, then, **Applicable Limit of Liability** means:
   a. with respect to the Directors & Officers Coverage (Part 1), the Directors & Officers Coverage Part Limit of Liability as specified in Item 5 of the Declarations, if purchased;

b. with respect to the Employment Practices Coverage (Part 2), the Employment Practices Coverage Part Limit of Liability as specified in Item 5 of the Declarations, if purchased;

c. with respect to the Fiduciary Coverage (Part 3), the Fiduciary Coverage Part Limit of Liability as specified in Item 5 of the Declarations, if purchased.

B. **Application** means:

1. the application for insurance and any material submitted therewith or incorporated therein, and any other documents submitted in connection with the underwriting of this Policy; and
2. all publicly available documents filed by a **Company** with the Securities and Exchange Commission or similar federal, state, local or foreign authority during the 12 month period preceding the inception date of this Policy as specified in Item 2 of the Declarations.

C. **Change In Control** means:

1. the acquisition by another entity or person, or group of entities or persons acting in concert, resulting in the ownership or control of more than fifty percent (50%) of:
   a. the **Named Insured's** voting stock or voting rights; or
   b. the **Named Insured's** total consolidated assets as of the date of the **Named Insured's** most recent audited consolidated financial statement prior to such acquisition;
2. the merger of the **Named Insured** into another entity such that the **Named Insured** is not the surviving entity; or
3. the consolidation of the **Named Insured** with another entity.

D. **Claim** shall have the meaning set forth in the applicable **Coverage Part**.

E. **Company** means the **Named Insured** and any **Subsidiary**. In the event of a bankruptcy proceeding by or against a **Company**, **Company** shall also mean the resulting entity named as a debtor in possession within the United States Bankruptcy Code, or an equivalent legal status under foreign law.

F. **Coverage Part** means, individually or collectively, the following coverage parts, if purchased, as specified in Item 5 of the Declarations:

1. Directors & Officers Coverage (Part 1)
2. Employment Practices Coverage (Part 2)
3. Fiduciary Coverage (Part 3)

G. **Damages** means the monetary portion of any award, settlement or judgment, including pre-judgment and post-judgment interest, provided always that **Damages** shall not include:

1. taxes, civil fines, criminal fines, sanctions, fees, restitution or penalties imposed by law, statute, regulation or court rule, except;
   a. a tax, if insurable under the law pursuant to which this Policy is construed, imposed upon an **Insured Person** in connection with any bankruptcy, receivership, or liquidation of a **Company**;
   b. civil fines or penalties, if insurable under the law pursuant to which this Policy is construed, assessed against an **Insured Person** for an unintentional and non-willful violation of the Foreign Corrupt Practices Act of 1977 § 15 U.S.C. §78dd-2(g)(2)(B), the United Kingdom Bribery Act of 2010 (Eng.) § 11(1)(a), or fines or penalties described in Section 308 of the Sarbanes-Oxley Act of 2002;
   c. the 5% or less, or the 20% or less, civil penalties imposed upon an **Insured** as a fiduciary under Section 502 (i) or (l) of **ERISA**; or
   d. costs or attorney fees awarded pursuant to a covered judgment in favor of the claimant;
2. punitive, exemplary or multiplied damages, except to the extent such damage is insurable under the law of any jurisdiction which has a substantial relationship to the **Insured** or the **Claim** seeking such damage, and which is most favorable to the insurability of such damage;
3. any amount that represents an increase in the consideration paid or proposed to be paid by a **Company** in connection with its purchase of any securities or assets as a result of any allegation that the consideration for such securities or assets was inadequate; provided however, this subsection 3 shall only apply with respect to Insuring Agreement C of the Directors & Officers Coverage (Part 1);
4. any amount not insurable under the law pursuant to which this Policy is construed; provided, however, the **Insurer** shall not contend that any amount attributable to violation of Sections 11, 12 or 15 of the Securities Act of 1933, or any amendments thereto, is uninsurable as a matter of law;
5. amounts that represent the return of any fee, charge, commission, gain or other compensation paid to an **Insured**;
6. costs associated with any accommodation, including the cost to make any building or property more accessible or accommodating to any person;

7. any amounts awarded for actual or alleged violations of the Fair Labor Standards Act including amendments thereto or any similar provision of any federal, state, local or foreign regulation, statute, rule or law relating to the classification of employees to determine the payment of wages, overtime, on-call time, rest periods, expense reimbursement or minimum wages;
8. severance pay or amounts owed under an express written contract of employment, leased worker agreement or independent contractor services agreement, or a written agreement to make payment in the event of termination of employment;
9. liquidated damages, except liquidated damages awarded pursuant to the Age Discrimination in Employment Act, Equal Pay Act, or Family and Medical Leave Act; or
10. cost of compliance with any form of injunctive or other non-monetary or declaratory relief.

H. **Defense Costs** means reasonable and necessary fees and expenses incurred with the **Insurer's** prior written consent to defend the **Insured**, and if authorized by the **Insurer**, all other fees and expenses resulting from: (1) the investigation, adjustment, defense or appeal of any **Claim** including the cost of appeal bonds; however, the **Insurer** shall have no obligation to apply for or furnish appeal bonds on behalf of any **Insured**; or (2) an **Investigative Inquiry**. **Defense Costs** shall also include **Sox 304/Dodd-Frank 954(b) Costs**.

**Defense Costs** shall not include salaries and expenses of regular employees or officers of the **Insurer** or any salaries, wages, fees, costs or expenses of any **Insured**. **Defense Costs** shall be part of, and not in addition to, the **Applicable Limit of Liability**.

I. **Employee** means any natural person whose labor or service is engaged by and directed by the **Company** and is on the payroll of the **Company**, including any full-time, part-time, and seasonal worker. **Employee** shall also mean a temporary worker, leased worker, intern, independent contractor or volunteer for the **Company** solely with respect to conduct within the scope of his or her duties on behalf of the **Company**.

J. **ERISA** means the Employee Retirement Income Security Act of 1974, including amendments thereto or any similar federal, state, local or foreign law, whether statutory or common law.

K. **Executive Officer** means any natural person who was, or now is, a duly elected or appointed director, officer, trustee, governor, risk manager, in-house general counsel or **Manager** of any **Company**, or any member of any **Company** advisory or scientific board or internal committee, including the audit committee. **Executive Officer** shall include a shadow director of the **Company** as defined under the United Kingdom's Companies Act 2006, including amendments thereto. **Executive Officer** also means the equivalent status of any of the foregoing under the law of any other country.

L. **Insured** means the **Company** and any **Insured Person**.

M. **Insured Person** means:
1. Solely with respect to the Directors & Officers Coverage (Part 1); any past or present **Executive Officer**. Solely with respect to a **Securities Claim**, an **Insured Person** also means an **Employee**;
2. Solely with respect to the Employment Practices Coverage (Part 2); any past or present **Executive Officer**, in his or her capacity as such, or **Employee** but solely while acting within the scope of employment with the **Named Insured** or a **Subsidiary**;
3. Solely with respect to the Fiduciary Coverage (Part 3); any past or present **Executive Officer** or director, officer, governor, or trustee of any **Plan**.

N. **Insurer** means the Insurance Company shown in the Declarations.

O. **Interrelated Wrongful Acts** means **Wrongful Acts** that have in common any fact, circumstance, situation, event, transaction, cause, or series of causally or logically connected facts, circumstances, situations, events, transactions or causes.

P. **Loss** means **Damages** and **Defense Costs**.

Q. **Manager** means any natural person who was or now is a manager or member of the board of managers of a company that is a limited liability company.

R. **Named Insured** means the entity as specified in Item 1 of the Declarations.

S. **Pending & Prior Litigation Date** means the applicable date, if any, specified in Item 5 of the Declarations under the heading "Pending & Prior Litigation Date".

T. **Policy Period** means the period of time from the inception date of this Policy as set forth in Item 2 of the Declarations to the earlier of the expiration date shown in Item 2 of the Declarations or the effective date of cancellation of this Policy.

U. **Pollutant** means any substance, located anywhere in the world, exhibiting any hazardous characteristic as defined by, or identified on a list of hazardous substances issued by, the U.S. Environmental Protection Agency or a state, county, municipality or locality counterpart thereof. **Pollutant** also means any air emission, odor,

waste water, oil, oil product, infectious waste, medical waste, asbestos, asbestos product, silica, noise, fungus, bacteria, mold, mildew, mycotoxin, spore, scent or byproduct produced or released by fungi, (other than any fungi intended by the **Insured**) and any electric or magnetic or electromagnetic field. **Pollutant** also includes, but is not limited to, any solid, liquid, gaseous, thermal, biological, nuclear irritant, radiological, contaminant, smoke, soot, fume, acid, alkali, chemical or waste material.

V. **Side A Excess DIC Policy** means an insurance policy, written specifically as excess over this Policy, that provides "Side A" (non-indemnifiable or non-indemnified loss) coverage with difference-in-conditions features.

W. **Sox 304/Dodd-Frank 954(b) Costs** means the reasonable and necessary fees, costs and expenses (including the premium or origination fee for a loan or bond), incurred by an **Insured Person** with the **Insurer's** prior written consent, to facilitate the return of amounts required to be repaid by such **Insured Person** pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002 or Section 954(b) of the Dodd-Frank Act of 2010 or any rules, regulations or policies pursuant to such sections; provided, however, **SOX 304/Dodd-Frank 954(b) Costs** do not include the payment, return, reimbursement, disgorgement or restitution of any such amounts.

X. **Subsidiary** means any corporation or limited liability company of which the **Named Insured** owns more than fifty percent (50%) of the outstanding stock or other interest representing the present right to vote, designate or select a majority of the **Managers** or board of directors (or foreign equivalent thereof) of a corporation; but only during such time as the **Named Insured** owns such stock or other interest representing the right to vote, designate or select a majority of the **Managers** or board of directors (or foreign equivalent thereof) of such corporation.

Y. **Wrongful Act** shall have the meaning set forth in the applicable **Coverage Part**.

## PUBLIC COMPANY LIABILITY - PART 5
## COMMON EXCLUSIONS

In addition to the Exclusions listed in the **Coverage Parts**, the **Insurer** shall not be liable under this Policy to pay any **Loss** arising from any **Claim** made against any **Insured**:

A. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

   1. Solely with respect to Directors & Officers Coverage (Part 1) and Fiduciary Coverage (Part 3), any criminal, dishonest, fraudulent, deliberate, intentional or willful act or omission or any deliberate, intentional or willful violation of any statute or regulation committed by any **Insured**; however, this exclusion shall only apply if a final and non-appealable judgment in any underlying action establishes the **Insured** committed such act, omission or violation;

   2. Solely with respect to Employment Practices Coverage (Part 2), any criminal or fraudulent act or omission committed by any **Insured**; however, this exclusion shall only apply if a final and non-appealable judgment in any underlying action establishes the **Insured** committed such act or omission;

B. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any **Insured** gaining any personal profit, remuneration or other financial advantage to which such **Insured** was not legally entitled; however, this exclusion shall only apply if a final and non-appealable judgment in any underlying action establishes the **Insured** gained such personal profit, remuneration or other financial advantage;

Provided however Exclusions A. and B. shall not apply to any actual or alleged violation of Sections 11, 12 or 15 of the Securities Act of 1933, or any amendments thereto.

Severability of Exclusions: For purposes of determining the applicability of Exclusions A. and B. above, the **Wrongful Act** or knowledge of any **Insured Person** shall not be imputed to any other **Insured Person**; provided, however, that the **Wrongful Act** or knowledge of the Chief Executive Officer, Chief Financial Officer or Chief Operating Officer (or the foreign or domestic equivalent of such positions) shall be imputed to the **Company**.

C. for any actual or alleged bodily injury, or emotional distress or mental anguish arising from such bodily injury, or any actual or alleged damage to, or destruction of any tangible property, including loss of use thereof; provided, however, this exclusion shall not apply to:

   1. **Defense Costs** incurred by an **Insured Person** that result solely from the investigation, adjustment, defense or appeal of a **Claim** against the **Company** for violation of the United Kingdom's Corporate Manslaughter and Corporate Homicide Act 2007; or

   2. any **Claim** for emotional distress or mental anguish under the Employment Practices Coverage (Part 2);

D. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any industrial, non-industrial or environmental actual, alleged or threatened discharge, release, escape, seepage, migration or disposal of any **Pollutant** into or on real or personal property, water or the atmosphere or any regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize

any **Pollutant**, or any voluntary decision to do so, including but not limited to any **Claim** alleging damage to the **Company**, its security holders or its creditors; provided, however, this exclusion shall not apply to **Loss** arising from a **Claim** under Insuring Agreement A. of the Directors & Officers Coverage (Part 1);

E. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:
   1. any fact, circumstance, situation, transaction, event or **Wrongful Act** that was the subject of any written notice given under any policy of insurance prior to inception of this Policy; or any other **Wrongful Act** whenever occurring, that, together with a **Wrongful Act** described previously in this paragraph would constitute **Interrelated Wrongful Acts**; or
   2. any prior or pending written demand, suit, complaint, proceeding, investigation, order, judgment, or notice of violation, that is against any **Insured**, and received by any **Insured**, prior to the applicable **Pending & Prior Litigation Date**;

F. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, any actual or alleged **Wrongful Act**, by a **Subsidiary** or any **Insured Person** of such **Subsidiary**, occurring prior to the date such entity became a **Subsidiary** or subsequent to the date such entity ceased to be a **Subsidiary**; or while such entity was a **Subsidiary** and that, together with a **Wrongful Act** occurring prior to the date such entity became a **Subsidiary**, would constitute **Interrelated Wrongful Acts**.

## PUBLIC COMPANY LIABILITY - PART 6
## COMMON CONDITIONS

A. LIMITS OF LIABILITY

Regardless of the number of **Insureds** involved or **Claims** made, the **Insurer's** liability under this Policy is limited as follows:

1. TOTAL AGGREGATE LIMIT OF LIABILITY

   The amount as specified in Item 4 of the Declarations shall be the **Insurer's** maximum aggregate liability for all **Loss**, covered under all **Coverage Parts** combined.

2. COVERAGE PART LIMIT OF LIABILITY
   a. The respective Limit of Liability for each **Coverage Part** as specified in Item 5 of the Declarations, shall be the **Insurer's** maximum aggregate liability for all **Loss** covered under such **Coverage Part**.
   b. In the event coverage is available for a **Claim** under the Employment Practices Coverage (Part 2) and any other **Coverage Part**, then any **Loss** for such **Claim** shall first be paid under the Employment Practices Coverage (Part 2). Any remaining **Loss** for such **Claim** that is not paid under the Employment Practices Coverage (Part 2) shall be paid under such other applicable **Coverage Part**; provided however, the remaining Limit of Liability of such other applicable **Coverage Part** shall be reduced by the amount of **Loss** paid under the Employment Practices Coverage (Part 2).

      In the event coverage is available for a **Claim** under more than one **Coverage Part** and the Employment Practices Liability Coverage (Part 2) does not apply, then the largest applicable remaining Limit of Liability under only one of the applicable **Coverage Parts**, at the time the **Claim** is first made, shall apply.
   c. The Limit of Liability for each **Coverage Part** shall be part of, and not in addition to, the Total Aggregate Limit of Liability as specified in Item 4 of the Declarations.

3. DEFENSE COSTS WITHIN LIMIT OF LIABILITY

   **Defense Costs** are part of, and not in addition to, the **Applicable Limit of Liability** and the payment by the **Insurer** of **Defense Costs** reduces the **Applicable Limit of Liability**.

If the Total Aggregate Limit of Liability set forth in Item 4 of the Declarations or the applicable Coverage Part Limit of Liability set forth in Item 5 of the Declarations is exhausted by payment of **Loss**, the **Insurer's** obligation to pay **Loss** will be completely fulfilled and extinguished. Except as provided for in section VI. Priority of Payments of the Directors & Officers Coverage (Part 1), the **Insurer** is entitled to pay **Loss** as it becomes due and payable, without consideration of other future payment obligations.

B. DEFENSE AND SETTLEMENT
   1. The **Insureds** and not the **Insurer** have the duty to defend any **Claim** made against the **Insureds**. At the written request of the **Insured**, the **Insurer** shall advance covered **Defense Costs** in excess of the applicable Retention within 90 days after receipt by the **Insurer** of detailed invoices and any other

information requested by the **Insurer**. Such advance payments by the **Insurer** shall be repaid by the **Insureds**, severally according to their respective interests, to the extent it is determined that the **Insureds** are not entitled to payment of such **Defense Costs** under the terms of this Policy. The **Insurer** shall have no obligation to pay **Defense Costs** for any **Claim** for damages not covered by this Policy.

2. The **Insurer** shall have the right and opportunity to associate with the **Insured** regarding the investigation, defense and settlement of any **Claim** to which this Policy applies, including selecting appropriate defense counsel. The **Insured** agrees not to offer to settle, incur any expense or **Defense Costs**, or otherwise assume any contractual obligation, admit any liability or stipulate to any judgment with regard to any **Claim** without the **Insurer's** prior written consent, which will not be unreasonably withheld. The **Insurer** shall not be liable for any offer to settle, settlement, expense, **Defense Costs**, assumed obligation, admission, judgment or stipulated judgment to which it has not given its prior consent. However, the **Insured** may settle a **Claim** without the **Insurer's** consent if the **Claim** is reported in the time and manner required by this Policy, settled in its entirety, and the amount of such settlement, including **Defense Costs**, does not exceed the applicable Retention as specified in Item 5 of the Declarations.
3. Each **Insured** agrees to cooperate with the **Insurer** in the defense, investigation and settlement of any **Claim**. Upon the **Insurer's** request, the **Insured** shall submit to examination or questioning, attend hearings, depositions, and trials and assist in effecting settlement, securing and giving evidence and obtaining the attendance of witnesses in the conduct of suits, mediations or similar proceedings. Each **Insured** shall assist the **Insurer** in effecting any rights of indemnity, contribution or apportionment available to any **Insured** or the **Insurer**. The **Insured** shall do nothing to prejudice the **Insurer's** position or its potential or actual rights of recovery.
4. The **Insurer** may, with the consent of the **Insured** which will not be unreasonably withheld, make any settlement of any **Claim** covered under this Policy that the **Insurer** deems expedient. Solely with respect to **Claims** made under the Employment Practices Coverage (Part 2) and Fiduciary Coverage (Part 3), if any **Insureds** refuse to consent to the settlement of a **Claim** recommended by the **Insurer** and acceptable to the claimant, then the **Insurer** shall not pay **Loss** for such claim in excess of the sum of:
   a. The amount of the proposed settlement plus **Defense Costs** incurred prior to such refusal; and
   b. Seventy percent (70%) of the **Loss** incurred for such **Claim** in excess of the amount specified in 4 a. above.

C. RETENTION

1. The **Insurer** shall only be liable for those amounts payable as **Loss** which are in excess of the applicable Retention as specified in Item 5 of the Declarations. The Retention shall apply separately to each **Claim** and shall be paid by the **Insured**.
2. The **Insured** shall promptly make direct payments within the Retention to the appropriate parties as designated by the **Insurer**. The **Insurer** shall have no obligation to make payments within the Retention. If the **Insured** fails to pay the Retention and the **Insurer** brings suit to collect such amounts, then the **Insureds** responsible to pay such amounts shall pay the legal fees, costs, and expenses incurred by the **Insurer** to collect such amounts.
3. If a single **Claim** is covered in whole or in part under more than one **Coverage Part**, the applicable Retention under each such **Coverage Part** shall be applied with regard to coverage for such **Claim**; provided, however, that the sum of all applicable Retentions under all such applicable **Coverage Parts** shall not exceed the largest applicable Retention.
4. Any payment of a Retention by the **Company** as a result of an **Investigative Inquiry** shall reduce any Retention due from the **Company** on account of a **Claim** subsequently afforded coverage under Insuring Agreement B. of the Directors & Officers Coverage (Part 1) that is based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact or circumstance that was the subject of such **Investigative Inquiry**.
5. If the **Company** fails or refuses to pay covered indemnifiable **Loss** of an **Insured Person** within the applicable Retention specified in Item 5 of the Declarations, then:
   a. to the extent such **Loss** is paid pursuant to the terms and conditions of a **Side A Excess DIC Policy**, the **Insurer** agrees such **Side A Excess DIC Policy** payments contribute to and reduce the applicable Retention specified in Item 5 of the Declarations; provided however, as a condition to recognition of the reduction of the applicable Retention amount, the **Insured** shall provide the **Insurer** with written evidence of the payment of such **Loss** under the **Side A Excess DIC Policy**. Such written evidence shall be in a form satisfactory to the **Insurer**;
   b. to the extent such **Loss** is not paid pursuant to the terms and conditions of a **Side A Excess DIC Policy**, the **Insurer** shall advance such amounts on behalf of the **Insured Person** until the **Company** agrees to make such payments or the Retention has been satisfied. Such advancement of **Loss** is

subject to the following:

1. Advancement of **Loss** shall be part of and not in addition to the **Applicable Limit of Liability**; and
2. In no event shall any such advancement of **Loss** by the **Insurer** relieve the **Company** of any duty it may have to provide advancement, payment or indemnification to any **Insured Person**, and the **Company** agrees to provide such advancement, payment or indemnification to the fullest extent permitted by law.

Indemnification shall be deemed "failed" if it has been requested by an **Insured Person** in writing and the **Company** has not provided, agreed to provide or acknowledged such indemnification as an obligation of the **Company** within 60 days of the **Insured Person's** request. Indemnification shall be deemed "refused" if the **Company** gives a written notice of the refusal to the **Insured Person**. In all events, indemnification shall only be deemed "failed" or "refused" to the extent such indemnification is not provided by, or agreed to be provided by, or acknowledged by and collectible from the **Company** or other source.

D. REPORTING AND NOTICE REQUIREMENTS

As a condition precedent to coverage under this Policy, the **Insured's** duties in the event of a **Claim** are as follows:

1. If a **Claim** is made against an **Insured**, the **Insured** must give written notice to the **Insurer** as soon as practicable after the Chief Executive Officer, Chief Financial Officer or Risk Manager (or the foreign or domestic equivalent of such positions) becomes aware of such **Claim**, but in no event later than:
   a. 180 days after this Policy expires, with the stipulation that this Policy is renewed with the **Insurer**;
   b. 60 days after this Policy expires or terminates if this Policy is not renewed with the **Insurer**; or
   c. the expiration date of the Supplemental Extended Reporting Period, if applicable.

   The **Insured** shall immediately forward to the **Insurer** every demand, notice, summons, or other process received by any **Insured**.
2. If, during the **Policy Period**, or an Extended Reporting Period if applicable, an **Insured** becomes aware of any fact, circumstance, or situation, which may reasonably be expected to give rise to a **Claim** against any **Insured**, and gives written notice to the **Insurer** during the **Policy Period,** or an Extended Reporting Period if applicable, then any **Claim** subsequently made against an **Insured** arising out of such fact, circumstance or situation shall be deemed to have been made when written notice was first received by the **Insurer**. Written notice under this paragraph shall include the specific fact, circumstance or situation with full particulars as to dates, injury or damage that may result, and persons and entities involved.

E. CANCELLATION

This Policy may be canceled by the **Named Insured** by providing advance written notice to the **Insurer** stating when thereafter such cancellation shall be effective. If this Policy is canceled by the **Named Insured**, earned premium shall be computed pro rata.

This Policy may be canceled by the **Insurer** only for non-payment of any premium when due. The **Insurer** shall provide written notice to the **Named Insured** at least 10 days prior to the effective date of cancellation. The notice as aforementioned shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the **Policy Period**. If the **Insurer** cancels, earned premium shall be computed pro rata.

F. NON-RENEWAL

The **Insurer** shall not be required to renew this Policy; however, the **Insurer** shall send notice of the **Insurer's** intent not to renew this Policy, to the **Named Insured**, at least 60 days prior to expiration of the **Policy Period**.

G. EXTENDED REPORTING PERIOD COVERAGE

In the event of cancellation or non-renewal of this Policy by either the **Named Insured** or the **Insurer** for reasons other than nonpayment of premium, the **Named Insured** shall have the right to purchase an optional Supplemental Extended Reporting Period upon payment of the additional premium as specified in Item 6 of the Declarations.

If the **Named Insured** purchases the Supplemental Extended Reporting Period, the coverage shall apply only to **Claims** for **Wrongful Acts** fully occurring prior to the date of cancellation or non-renewal and otherwise covered by this Policy and which are first made against any **Insured** and reported to the **Insurer** during the Supplemental Extended Reporting Period.

1. The right to purchase the Supplemental Extended Reporting Period is subject to the following conditions:
   a. any Retention or other amounts owed the **Insurer** have been paid;
   b. the **Insureds** have complied with all terms and conditions of the Policy;
   c. the **Named Insured** must send written notice to the **Insurer** of the intention to purchase the Supplemental Extended Reporting Period accompanied by the additional premium. Written notice and

premium payment must be received by the **Insurer** within 60 days of cancellation or nonrenewal or the right to purchase the Supplemental Extended Reporting Period shall terminate; and

d. the Supplemental Extended Reporting Period does not increase or reinstate the limits of liability or extend the **Policy Period**.

2. Any **Claim** made during the Supplemental Extended Reporting Period shall be deemed to have been made during the **Policy Period**. The entire premium for the Supplemental Extended Reporting Period shall be deemed to be fully earned at the inception of the Supplemental Extended Reporting Period.

H. OTHER INSURANCE

This Policy shall be specifically excess over any applicable Retention. This Policy shall also be specifically excess over, and shall not contribute with, any other valid and collectible insurance, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is a personal umbrella policy, personal directors and officers liability policy purchased by an **Insured Person**, or insurance specifically excess of this Policy.

If two or more policies of insurance issued by the **Insurer** or any of its affiliated companies apply to the same claim, the **Insurer** shall not be liable for any amount greater than the Limit of Liability of the policy which has the highest applicable Limit of Liability. If the Limit of Liability on each policy is the same, only one limit will apply.

With specific respect to any **Employee** that is a temporary or leased worker, or independent contractor, this Policy shall be specifically excess of any indemnification or insurance, otherwise available to such temporary or leased worker or independent contractor, from any source.

If any **Loss** arising out of any covered **Claim** made against any **Insured Person** in an **Outside Capacity** is indemnified by an **Outside Entity** or any other entity other than the **Company**, then, subject to this Policy's terms, conditions and exclusions, this Policy shall cover such **Loss**, but only to the extent that the amount of such **Loss** is in excess of the amount of any insurance from such **Outside Entity** or any entity other than the **Company**.

The **Insured** agrees that it will use its best effort to promptly enforce any and all rights any **Insured Person** has to indemnification by any entity other than the **Company**.

I. SUBROGATION

In the event of any payment under this Policy, the **Insurer** shall be subrogated to the extent of such payment to all of the **Insured's** rights of recovery, including without limitation, any right of recovery from the **Company** for **Loss** incurred by an **Insured Person** that is indemnifiable by the **Company**. The **Insured** shall execute all papers required and do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable the **Insurer** effectively to bring suit in the name of the **Insured**.

In any subrogation claim against the **Company** to enforce an **Insured Person's** right of indemnification, the articles of association, bylaws, charter, resolutions and other organizational documents of the **Company** shall be deemed to provide indemnification to the fullest extent permitted by law and the **Insurer's** recovery from the **Company** for such **Loss** shall not exceed the Retention applicable to the **Company** for such **Loss**.

The **Insurer** shall have no right of recourse against any **Insured Person** with respect to any amounts paid under the Fiduciary Coverage (Part 3), if the premium for this Policy, or any portion thereof, was purchased by or on behalf of any **Insured Person** who is serving as a past, present, or future trustee of a **Plan**.

The **Insurer** shall not exercise its right of subrogation against any **Insured Person** unless it has been established by a final and non-appealable judgment in any underlying action that such **Insured Person** committed conduct that is uninsured pursuant to Common Exclusions (Part 5), A. or B.

Any amounts recovered by the **Insurer** pursuant to the exercise of such rights of subrogation shall be applied to reinstate the **Applicable Limit of Liability** to the extent of such recovery, less the **Insurer's** costs incurred in obtaining such recovery, except as otherwise required by law. It is understood and agreed that the **Insurer** shall have no duty to seek such a recovery.

J. ALLOCATION

If both **Loss** covered by this Policy and loss not covered by this Policy are incurred as a result of a **Claim**, the **Insured** and the **Insurer** shall use their best efforts to allocate such amount between covered **Loss** and uncovered loss based upon the relative legal and financial exposures of the parties to covered and uncovered matters. If the **Insured** and the **Insurer** are unable to agree on the amount of the allocation, then the **Insurer** shall pay only those amounts (excess of the Retention amount) which the **Insurer** deems to be fair and equitable until a different amount shall be agreed upon or determined pursuant to the terms of this Policy and the above stated standards.

K. ASSIGNMENT

Assignment of interest under this Policy shall not bind the **Insurer** unless its consent is endorsed hereon.

L. AUTHORIZATION

It is agreed the **Named Insured** shall act on behalf of all **Insureds** with respect to giving or receiving notice of cancellation or non-renewal, payment of premiums, receiving of any return premiums, exercising or declining the right to purchase Supplemental Extended Reporting Period Coverage and agreeing to any changes in this Policy.

M. ACTION AGAINST THE INSURER

1. No action shall lie against the **Insurer** unless, as a condition precedent thereto, the **Insureds** have fully complied with all terms of this Policy and until the amount of the **Insureds'** obligations to pay shall have been finally determined either by judgment against the **Insured** after actual trial or by written agreement of the **Named Insured**, all claimants and the **Insurer**.
2. Nothing contained in this Policy shall give any person or organization any right to join the **Insurer** as a party in any action against any **Insured** to determine any **Insured's** liability.

N. BANKRUPTCY

Bankruptcy or insolvency of any **Insured** shall not relieve the **Insurer** of any of its obligations hereunder. In the event that a bankruptcy proceeding is commenced by or against the **Company**, the **Company** and the **Insured Persons** shall not oppose efforts by the **Insureds** or the **Insurer** to obtain relief from any stay or injunction.

O. CHANGES IN STATUS OF ENTITY

1. CHANGE IN CONTROL

   If there is a **Change In Control**, coverage will continue until the end of the **Policy Period**, but only with regard to **Claims** first made against the **Insured** during the **Policy Period**, and reported to the **Insurer** in the time and manner required by this Policy, for **Wrongful Acts** occurring prior to the effective date of the **Change In Control**. If and when there has been a **Change In Control**, the premium shall be deemed to be fully earned and the **Policy Period** shall remain unaltered.

2. NEW ENTITY

   a. If during the **Policy Period** the **Company** acquires an entity such that it owns, directly or indirectly, more than fifty percent (50%) of the voting stock or voting rights thereof, coverage under this Policy shall automatically apply to: (i) such new entity; (ii) such new entity's subsidiaries; and (iii) such new entity's subsidiaries' directors, officers, trustees and employees; but only with regard to **Claims** that allege **Wrongful Acts** committed after such acquisition.

   b. However, if the total assets of such newly acquired entity exceed thirty five percent (35%) of the total assets of the **Named Insured** as reflected in the **Named Insured's** most recent audited consolidated financial statements; or the combined total number of all **Company** employees increases by more than thirty five percent (35%) as an immediate result of such acquisition; then coverage under this Policy shall apply only if the **Insurer** agrees to afford such coverage pursuant to paragraph 2.c. below.

   c. The **Insurer** may agree to extend the coverage described in paragraph 2.b. above to the new entities and persons described in paragraph 2.a. above if, within 60 days after the acquisition, the **Named Insured** provides any additional information, pays any additional premium and agrees to any additional terms, conditions and/or exclusions reasonably required by the **Insurer** for such extension of coverage. If the **Named Insured** fails to provide such notice or information, or otherwise fails to comply as required by this paragraph, then coverage as described in paragraph 2.a. above shall terminate with respect to **Claims** first made more than 60 days after such acquisition.

   d. There will be no coverage under this Policy for any **Wrongful Act** by any **Insured** considered to be a covered **Insured** pursuant to paragraph 2.a. above where such **Wrongful Act** occurred, in whole or in part before the effective date of such acquisition, or for any **Wrongful Act** occurring on or after such date which, together with any **Wrongful Act** occurring before such date, would constitute **Interrelated Wrongful Acts**.

P. ECONOMIC OR TRADE SANCTION

If coverage for a **Claim** under this Policy is in violation of any economic or trade sanction, including, but not limited to, any sanction administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control (OFAC), then coverage for such **Claim** shall be deemed null and void.

Q. HEADINGS

The titles and headings to the **Coverage Parts**, Common Definitions, Common Exclusions, Common Conditions, Clauses, Sub-Clauses, endorsements of this Policy, and the schedule of endorsements attached to this Policy, are included solely for ease of reference and do not in any way limit, expand or otherwise affect coverage available under this Policy.

R. APPLICATION REPRESENTATIONS

The **Application** is the basis of this Policy and is incorporated in and constitutes a part of this Policy. The **Application** shall be deemed to be attached to this Policy as if physically attached. The **Insureds** agree that the statements and representations within the **Application** are true and accurate and that this Policy is issued in reliance upon the truth and accuracy of such statements and representations.

With respect to such statements and representations, no knowledge possessed by any **Insured Person** shall be imputed to any other **Insured Person** for purposes of determining the availability of coverage under this Policy; provided however, the **Insureds** agree that in the event of any material misstatement, misrepresentation or omission in the **Application**, no coverage will be afforded under this Policy for any **Claim** based upon or arising out of the information that was not truthfully or accurately disclosed with respect to:

1. any **Insured Person** who knew, as of the inception date of this Policy, the information that was not truthfully or accurately disclosed;
2. the **Company** under Insuring Agreement B. of the Directors & Officers Coverage (Part 1) for the indemnification of any **Insured Person** who knew, as of the inception date of this Policy, the information that was not truthfully or accurately disclosed;
3. the **Company** if any **Insured Person** who is or was Chief Executive Officer or Chief Financial Officer (or the foreign or domestic equivalent of such positions) of the **Company** knew, as of the inception date of this Policy, the information that was not truthfully or accurately disclosed.

S. NON-RESCISSION

This Policy shall not be rescinded by the **Insurer**; provided that nothing herein shall limit or waive any other rights or remedies available under the Policy or applicable law.

T. GLOBAL LIBERALIZATION

If a **Claim**, or a portion of a **Claim**, is subject to a jurisdiction other than the jurisdiction of the United States of America its territories or possessions, and the application of such jurisdictional law would result in a coverage determination under this Policy that is less favorable to the **Insured** than the **Insured** would receive had the issue been subject to the U.S. Jurisdiction, to the greatest extent legally permissible, the **Insurer** shall apply the U.S. Jurisdictional law that would otherwise apply to such coverage determination.

U. REPRESENTATIVES

Coverage under each **Coverage Part**, subject to its terms, shall be extended to apply to **Loss** resulting from a **Claim** for a **Wrongful Act** of an **Insured Person** made against:

1. a natural person who, at the time the **Claim** is made, is the lawful spouse or domestic partner of such **Insured Person**, provided that such **Claim** arises solely out of such person's status as the spouse or domestic partner of such **Insured Person**; or seeks recovery from marital community property, other property jointly held by the spouse or domestic partner and such **Insured Person**, or property transferred from such **Insured Person** to the spouse or domestic partner; or
2. the estate, heir, legal representative or assigns of an **Insured Person**, in the event of such **Insured Person's** death, incompetency, insolvency or bankruptcy; but solely with respect to a **Wrongful Act** fully occurring prior to such **Insured Person's** death, incapacity or bankruptcy and only to the extent that such **Insured Person** would otherwise be covered by this Policy.

There shall be no coverage extended under this Policy for **Loss** resulting from any **Claim** arising from any act, error, or omission of any spouse, domestic partner, estate, heir, legal representative or assigns of any **Insured Person**.

V. VALUATION

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the U.S. If a judgment is rendered, a settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than U.S. dollars, payment under this Policy will be made in U.S. dollars

at the rate of exchange as published in *The Wall Street Journal* on the date the final judgment is reached, the amount of the settlement is agreed upon, or the other element of **Loss** is due, respectively.

W. TERRITORY

Coverage under this Policy shall, to the extent legally permitted, extend to **Wrongful Acts** taking place, **Loss** incurred, or **Claims** made anywhere in the world.

X. SERVICE OF SUIT CLAUSE

The **Insurer** appoints the highest state official in charge of insurance affairs (Commissioner of Insurance, Director of Insurance, Insurance Commissioner, Executive Secretary, Superintendent of Insurance, or such other official title as designated by the state) of the **Insured's** domiciliary state and his/her successor or successors in office as his/her and their duly authorized deputies, as the **Insurer's** true and lawful attorney in and for the aforesaid state, upon whom all lawful process may be served in any action, suit or proceeding instituted in the **Insured's** domiciliary state by or on behalf of any **Insured** or beneficiary against the **Insurer** arising out of this Policy, provided a copy of any process, suit, complaint or summons is sent by certified or registered mail to:

Robert Kuzloski<br>
Secretary<br>
Legal Department<br>
StarStone US Companies<br>
412 Mt. Kemble Avenue, Suite G-60,<br>
Morristown, New Jersey 07960<br>
Tel: (917) 704-6008<br>
Email: Robert.Kuzloski@corespecialty.com

IN WITNESS WHEREOF, the **Insurer** has caused this Policy to be signed by its President and Secretary, and, if required by state law, this Policy will not be valid unless countersigned by a duly authorized representative of the **Insurer**.

President

Secretary

**Company:** StarStone Specialty Insurance Company | **Policy No:** DNO00012050P-00

**Insured:** RAD Diversified REIT Inc | **End Effective Date:** 10/24/2022

## PUBLIC COMPANY MANAGEMENT LIABILITY INSURANCE
## Derivative Demand Investigation Costs Limit

It is agreed that:

1. Section II. Extensions A. of the Directors & Officers Coverage (Part 1) of this Policy is deleted in its entirety and replaced with the following:

   A. DERIVATIVE DEMAND INVESTIGATION COSTS COVERAGE

   The **Insurer** shall pay on behalf of the **Company**, **Derivative Demand Investigation Costs** resulting from a **Derivative Demand** first made during the **Policy Period** and reported to the **Insurer** during the Policy Period or within 0 days thereafter.

   Any payment by the **Insurer** pursuant to this section II. A. shall be considered part of **Loss**, shall be excess of the Derivative Demand Investigation Costs Retention as specified in Item 5 of the Declarations, and shall be part of, and not in addition to the **Applicable Limit of Liability**. The maximum amount payable by the **Insurer** pursuant to this section II. A. shall not exceed a maximum aggregate limit of $100,000.

Whenever printed in this Endorsement, the boldface type terms shall have the same meanings as indicated in the Policy Form.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

**Company:** StarStone Specialty Insurance Company
**Insured:** RAD Diversified REIT Inc

**Policy No:** DNO00012050P-00
**End Effective Date:** 10/24/2022

# PUBLIC COMPANY MANAGEMENT LIABILITY INSURANCE
## Absolute Product Liability Exclusion

It is agreed that:

1. Section IV. Exclusions of the Directors & Officers Coverage (Part 1) of this Policy is amended by the addition of the following:

   IV. The **Insurer** shall not be liable under this Directors & Officers Coverage (Part 1) to pay any **Loss** arising from any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged recall, defect, deficiency, inadequacy, malfunction, or dangerous condition of any product, or failure of any product to perform as a result of any defect, deficiency, inadequacy, malfunction, or dangerous condition in such product or its design, manufacture, or implementation;

Whenever printed in this Endorsement, the boldface type terms shall have the same meanings as indicated in the Policy Form.
ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

**Company:** StarStone Specialty Insurance Company
**Insured:** RAD Diversified REIT Inc

**Policy No:** DNO00012050P-00
**End Effective Date:** 10/24/2022

# PUBLIC COMPANY MANAGEMENT LIABILITY INSURANCE
## Professional Services Exclusion

It is agreed that:

1. Section IV. Exclusions of the Directors & Officers Coverage (Part 1) of this Policy is amended by the addition of the following:

   The **Insurer** shall not be liable under this Directors & Officers Coverage (Part 1) to pay any **Loss** arising from any **Claim** made against any **Insured**:

   1. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the **Insured's** performance of, or failure to perform, professional services for others.

Whenever printed in this Endorsement, the boldface type terms shall have the same meanings as indicated in the Policy Form.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

**Company:** StarStone Specialty Insurance Company

**Insured:** RAD Diversified REIT Inc

**Policy No:** DNO00012050P-00

**End Effective Date:** 10/24/2022

## PUBLIC COMPANY LIABILITY INSURANCE
## PRIVACY, COLLECTION AND DISCLOSURE EXCLUSION – INSURING AGREEMENT C

It is agreed that:

1. Section Part 5, Common Exclusions of this Policy is amended by the addition of the following:

   In addition to the Exclusions listed in the **Coverage Parts**, the **Insurer** shall not be liable under this Policy to pay any **Loss** arising from any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

   a. access to or disclosure of,any organization's or person’s confidential or personal information,including but not limited to patents, copyrights, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information;

   b. unauthorized collection of information by any **Insured** or the failure to provide adequate and legal notice that such information is being collected;

   c. violation of any federal, state, local or foreign regulation, statute, rule or law:

      1. that requires commercial entities that collect personal information to post privacy policies, adopt specific privacy or security controls, or provide notification to individuals in the event personal information has been compromised or potentially compromised; or

      2. limiting or prohibiting facsimile, electronic mail or any other means of communication, including but not limited to, the Telephone Consumer Protection Act 47 U.S.C. Section 227, CAN-SPAM Act of 2003, or any similar Federal Communications Commission regulation or similar provision of any federal, state, local or foreign regulation, statute, rule or law;

   d. access to, theft of, or use of an **Insured's** computer hardware, software, web site, electronic systems, network or programs by an unauthorized person or entity, or access by an authorized person in an unauthorized manner, or the transmission or receipt of unauthorized, corrupting, or harmful computer code,including but not limited to adware, cookies, viruses, spyware, Trojan horses, logic bombs or worms;

   Provided however, this exclusion shall only apply to **Loss** arising from a **Claim** made against the **Company** under Insuring Agreement C.

Whenever printed in this Endorsement, the boldface type terms shall have the same meanings as indicated in the Policy Form.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

**Company:** StarStone Specialty Insurance Company
**Insured:** RAD Diversified REIT Inc

**Policy No:** DNO00012050P-00
**End Effective Date:** 10/24/2022

# FLORIDA STATE AMENDATORY ENDORSEMENT

In compliance with state law, it is agreed that:

1. The Conditions section of this Policy is amended by the addition of the following:

   CONTACT INFORMATION

   If any **Insured**, or any holder of a certificate of insurance for this Policy has any question or desires or needs to obtain any information about this Policy, or needs any assistance resolving a complaint arising out of or relating to this Policy, such person or entity may call the **Insurer** at (855) 275-6041.

Whenever printed in this Endorsement, the boldface type terms shall have the same meanings as indicated in the Policy Form.
ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

# POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE

You are hereby notified that, under the Terrorism Risk Insurance Act, as amended (the "Act"), this Policy provides coverage for losses arising out of acts of terrorism. An "act of terrorism" is defined as any act certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

You should know that the coverage provided by this Policy for losses caused by acts of terrorism may be partially reimbursed by the United States Government under the formula set forth in the Act. Under this formula, the United States generally reimburses 85% of covered terrorism losses that exceed the statutorily established deductible to be paid by the insurance company providing the coverage.

You should also know that the Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses in any one calendar year exceeds $100 billion. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

Your policy includes the terrorism coverage required to be offered by the Act. Coverage for certified acts of terrorism is still subject to, and may be limited by, all other terms, conditions and exclusions in your policy. The premium charged for this coverage for the policy period is $0.

# Extended Declarations Page

**ISSUED BY:** . Starstone Specialty Insurance Company
**NAMED INSURED:** RAD Diversified REIT Inc
**POLICY NUMBER:** DNO00012050P-01
**POLICY PERIOD:** 01/22/2024 To 01/22/2025

**STATE SURPLUS LINES REQUIRED WORDING:**

Surplus Lines Agent's Name: Craig E. Dunn
Surplus Lines Agent's Address: 5910 N. Central Expwy., Ste 500
Dallas, TX 75206
Surplus Lines Agent's License #: W303294
Producing Agent's Name: Michael R Snelling
Producing Agent's Address: 701 University Ave Suite 100
Sacramento CA 95825

This insurance is issued pursuant to the Florida Surplus Lines Law. Persons insured by surplus lines carriers do not have the protection of the Florida Insurance Guaranty Act to the extent of any right of recovery for the obligation of an insolvent unlicensed insurer.

Premium: $50,000.00 Tax: $2,470.00 Service Fee: $30.00
EMPA Surcharge:__________ Broker Fee:________
Inspection Fee:__________ Policy Fee:________

Surplus Lines Agent's Countersignature: [signature]

Rev. 8/22

# FACTS WHAT DOES **STARSTONE SPECIALTY INSURANCE COMPANY** DO WITH YOUR PERSONAL INFORMATION?

| | |
|---|---|
| **Why?** | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |

| | |
|---|---|
| **What?** | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>▪ Social Security number, name, address, property description, date of birth, driver's license number, phone number, e-mail address, and employment information;<br>▪ Policy coverages, premiums, payment history, and loss and/or claim history;<br>▪ Income, asset, and credit history;<br>▪ Motor vehicle reports, claim reports, demographic data, and medical information and history.<br>When you are *no longer* our customer, we continue to share your information as described in this notice. |

| | |
|---|---|
| **How?** | All financial companies need to share customer personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customer's personal information; the reasons StarStone Specialty Insurance Company chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does StarStone Specialty Insurance Company share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes—** such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| **For our marketing purposes—** to offer our products and services to you | Yes | No |
| **For joint marketing with other financial companies** | Yes | No |
| **For our affiliates' everyday business purposes—** information about your transactions and experiences | Yes | No |
| **For our affiliates' everyday business purposes—** information about your creditworthiness | No | We don't share |
| **For our affiliates to market to you** | No | We don't share |
| **For nonaffiliates to market to you** | No | We don't share |

| | |
|---|---|
| **Questions?** | Call 844-722-7827 |

| Who we are | |
|---|---|
| **Who is providing this notice?** | StarStone Specialty Insurance Company |

| What we do | |
|---|---|
| **How does StarStone Specialty Insurance Company protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal and state laws. These measures include computer safeguards and secured files and buildings.<br><br>Also, we only allow employees, authorized service providers and other parties as required or permitted by law to access your information. |
| **How does StarStone Specialty Insurance Company collect my personal information?** | We collect your personal information, for example, when you:<br>▪ Apply for insurance, pay insurance premiums or file an insurance claim;<br>▪ Give us your income information or provide employment information;<br>▪ Provide your mortgage information;<br>▪ Pay us by check; or<br>▪ Provide account information or give us your contact information.<br><br>We also may collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| **Why can't I limit all sharing?** | Federal law only gives you the right to limit sharing:<br>▪ between affiliates' for everyday business purposes—(e.g. information about your creditworthiness);<br>▪ Between affiliates to market to you; or<br>▪ With nonaffiliates to market to you.<br><br>State laws and individual companies may give you additional rights to limit sharing. |

| Definitions | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br>▪ *Please visit www.corespecialty.com for information regarding StarStone Specialty Insurance Company's affiliates.* |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br>▪ *StarStone Specialty Insurance Company does not share with nonaffiliates.* |
| **Joint marketing** | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br>▪ *Our joint marketing partners include managing general agents.* |

| Other important information |
|---|
| |

You have a right to see personal information collected about you and the right to correct any information, which may be wrong, by writing to us at the following address: StarStone Specialty Insurance Company, 201 E. Fifth Street, Suite 1200, Cincinnati, OH 45202

**Nevada Residents:** You may request a copy of our telemarketing practices. For more on this Nevada law, contact Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; phone number: 1-702-486-3132; email: BCPINFO@ag.state.nv.us.

**For Vermont Customers:** We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

**For insurance customers in AZ, CT, GA, IL, ME, MA, MT, NV, NJ, NM, NC, ND, OH, OR, and VA only:** The term “Information” means information we collect during an insurance transaction. We will not use your medical information for marketing purposes without your consent. We may share your Information with nonaffiliates without your prior authorization as permitted or required by law. We may share your Information with insurance regulatory authorities, law enforcement, and consumer reporting agencies. Information we obtain from a report prepared by an insurance-support organization may be retained by that insurance-support organization and disclosed to others.

**Residents of California**: We may collect customer information from persons other than the individual or individuals applying for coverage. Such customer information as well as other personal or privileged information subsequently collected may, in certain circumstances, be disclosed to third parties without your authorization as permitted by law. If you would like additional information about the collection and disclosure of customer information, please contact your agent. You may also act upon your right to see and correct any customer information in your files by writing your agent to request this access.

# SURPLUS LINES NOTICE

THIS INSURANCE IS ISSUED PURSUANT TO THE FLORIDA SURPLUS LINES LAW. PERSONS INSURED BY SURPLUS LINES CARRIERS DO NOT HAVE THE PROTECTION OF THE FLORIDA INSURANCE GUARANTY ACT TO THE EXTENT OF ANY RIGHT OF RECOVERY FOR THE OBLIGATION OF AN INSOLVENT UNLICENSED INSURER. SURPLUS LINES INSURERS' POLICY RATES AND FORMS ARE NOT APPROVED BY ANY FLORIDA REGULATORY AGENCY.

# FLORIDA POLICYHOLDER NOTICE

CONTACT INFORMATION

If any Insured, or any holder of a certificate of insurance for this Policy has any question or desires or needs to obtain any information about this Policy or needs any assistance resolving a complaint arising out of or relating to this Policy, such person or entity may call the Insurer at (844)-722-7827.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844-722-7827
Fax: 513-599-7501
www.corespecialty.com
Report claims to:
claims@corespecialty.com

# PUBLIC COMPANY MANAGEMENT LIABILITY INSURANCE

**NOTICE: THIS POLICY PROVIDES COVERAGE ON A CLAIMS-MADE AND REPORTED BASIS SUBJECT TO ITS TERMS. THE COVERAGE PROVIDED BY THIS POLICY IS LIMITED TO ONLY THOSE CLAIMS FIRST MADE AGAINST THE INSURED AND REPORTED IN WRITING TO THE INSURER DURING THE POLICY PERIOD OR AN EXTENDED REPORTING PERIOD, IF APPLICABLE. THE LIMIT OF INSURANCE WILL BE REDUCED BY PAYMENT OF DEFENSE COSTS AND DAMAGES. PLEASE READ THE ENTIRE POLICY CAREFULLY.**

**NOTICE: THIS INSURANCE CONTRACT IS WITH AN INSURER NOT LICENSED TO TRANSACT INSURANCE IN THE NAMED INSURED'S STATE OF DOMICILE AND IS ISSUED AND DELIVERED AS A SURPLUS LINES COVERAGE PURSUANT TO THE INSURANCE STATUTES.**

POLICY NO: DNO00012050P-01

ITEM 1. NAMED INSURED: RAD Diversified REIT Inc

ADDRESS: 4115 W Spruce St
Tampa, FL 33607-2485

MAILING ADDRESS: 4115 W Spruce St
Tampa, FL 33607-2485

ITEM 2. POLICY PERIOD: From: 01/22/2024 To: 01/22/2025
(12:01 A.M. local time at the address stated in Item 1.a.)

ITEM 3. POLICY PREMIUM: $50,000.00

ITEM 4. TOTAL AGGREGATE LIMIT OF LIABILITY: $1,000,000

ITEM 5. COVERAGE PART LIMITS OF LIABILITY, RETENTIONS, PENDING & PRIOR LITIGATION DATES:

**Only those Coverage Parts designated with an "X" are included under this Policy. If there is no "X" inserted next to any specified Coverage Part, such Coverage Part and any other reference to it in the Policy shall be deemed to be deleted.**

PUBLIC COMPANY MANAGEMENT LIABILITY COVERAGE PARTS

| Coverage Parts Noted With An "X" | Limit of Liability | Share "X" | Retro Date | Retention | Pending & Prior Litigation Date |
|---|---|---|---|---|---|
| X **Directors & Officers** | $1,000,000 | | | | |
| A. Insuring Agreement A-Insured Person Liability | | | | $0 each **Claim** | 10/24/2022 |
| B. Insuring Agreement B-Company Indemnification | | | | | 10/24/2022 |
| 1. **Claims** except **Securities Claims** | | | | $500,000 each **Claim** | |
| 2. **Securities Claims** | | | | $500,000 each **Claim** | |
| C. Insuring Agreement C-Company Securities | | | | $500,000 each **Claim** | 10/24/2022 |
| D. Extension A-Derivative Demand Investigation Costs | | | | $0 | |
| E. Extension B-Investigative Inquiry | | | | $0 | |
| | | | | | |
| ☐ **Employment Practices** | | | | | |
| A. Insuring Agreement A-Employment Practices Liability | | | | each **Claim** | |
| B. Insuring Agreement B-Third Party Liability | | | | each **Claim** | |
| | | | | | |
| ☐ **Fiduciary** | | | | each **Claim** | |

Whenever printed in this Declarations, the boldface type terms shall have the same meanings as indicated in the Policy Form.

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844-722-7827
Fax: 513-599-7501
www.corespecialty.com
Report claims to:
claims@corespecialty.com

| | | |
|---|---|---|
| A. Extension A-HIPAA and PPACA | | |
| B. Extension B-Settlement Program | | |

ITEM 6. SUPPLEMENTAL EXTENDED REPORTING PERIOD PREMIUM:

150% of the Annual Policy Premium for a 1 year Supplemental Extended Reporting Period;

ITEM 7. FORMS & ENDORSEMENTS:

These Declarations, together with the attached Policy Form and Endorsements as stated in the SSS-MPL-DO-END-CW-001 (03-21) Policy Form Schedule and the **Application** (including all information furnished by the **Insured's** in the underwriting of this Policy), shall constitute the contract between the **Insureds** and the **Insurer** ("Policy").

ITEM 8. NOTICE TO THE INSURER:

| A. Address for Notice of Claim or Potential Claim: | B. Address for all other Notices: |
|---|---|
| Attn: StarStone US Services Claims Office<br>201 E. Fifth Street, Suite 1200<br>Cincinnati, OH 45202<br>Tel: 844-722-7827<br>Fax: 513-599-7501<br>Email: claims@corespecialty.com | Attn: StarStone US Services<br>Specialty Underwriting Department<br>201 E. Fifth Street, Suite 1200<br>Cincinnati, OH 45202<br>Tel: 844-722-7827<br>Fax: 513-599-7501 |

The **Insurer** hereby causes this Policy to be signed by a duly authorized representative of the **Insurer**.

03/05/2024
DATE ISSUED

Authorized Representative

Whenever printed in this Declarations, the boldface type terms shall have the same meanings as indicated in the Policy Form.

StarStone
Part of the Core Specialty Group

**Company:** StarStone Specialty Insurance Company
**Insured:** RAD Diversified REIT Inc

**Policy Number:** DNO00012050P-01
**Endorsement Effective Date:** 01/22/2024

# PUBLIC COMPANY MANAGEMENT LIABILITY INSURANCE
## Policy Form Schedule

It is agreed that:

1. Item 7. Forms and Endorsements of the Declarations of this Policy is amended by the addition of the following:

   Item 7. Forms and Endorsements:

| Form | Form Title |
|---|---|
| SSICPRI (08 22) | SSIC Privacy Notice |
| SSS-SLN-FL (04-21) | FL Surplus Lines Notice |
| SSC-ML-PHN-0007-FL (03-23) | Florida Policyholder Notice |
| SSS-MPL-DO-DEC (03-21) | Public Company Management Liability Insurance Declarations |
| SSS-MPL-DO-GTC (03-21) | Public Company Management Liability Insurance |
| SSS-MPL-DO-END-CW-121 (10-16) | Derivative Demand Investigation Costs Limit |
| SSS-MPL-DO-END-CW-145 (10-16) | Absolute Product Liability Exclusion |
| SSS-MPL-DO-END-CW-524 (10-16) | Professional Services Exclusion |
| SSS-MPL-DO-END-CW-567 (10-16) | Privacy Collection and Disclosure Exclusion - Insuring Agreement C |
| SSS-MPL-STATE AMENDATORY-FL (04-16) | Florida State Amendatory Endorsement |
| SSS-NOT-CW-01 (10-16) | Policyholder Disclosure Notice Of Terrorism Insurance Coverage |

Whenever printed in this Endorsement, the boldface type terms shall have the same meanings as indicated in the Policy Form.
ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844-722-7827
Fax: 513-599-7501
www.corespecialty.com
Report claims to:
claims@corespecialty.com

# STARSTONE SPECIALTY INSURANCE COMPANY

## PUBLIC COMPANY LIABILITY INSURANCE

**NOTICE: THIS POLICY PROVIDES COVERAGE ON A CLAIMS-MADE AND REPORTED BASIS SUBJECT TO ITS TERMS. THE COVERAGE PROVIDED BY THIS POLICY IS LIMITED TO ONLY THOSE CLAIMS FIRST MADE AGAINST THE INSURED AND REPORTED IN WRITING TO THE INSURER DURING THE POLICY PERIOD OR AN EXTENDED REPORTING PERIOD, IF APPLICABLE. THE LIMIT OF INSURANCE WILL BE REDUCED BY PAYMENT OF DEFENSE COSTS AND DAMAGES. PLEASE READ THE ENTIRE POLICY CAREFULLY.**

In consideration of the payment of the premium and in reliance upon the statements in the **Application** and subject to all terms and conditions of this Policy, the **Insureds** agree with the **Insurer** as follows:

This Policy is comprised of the Declarations, one or more **Coverage Parts**, Common Definitions, Common Exclusions, Common Conditions, any and all attached endorsements and the **Application**. Although various **Coverage Parts** may be referenced in this Policy, the only **Coverage Parts** that provide coverage under this Policy are the **Coverage Parts** designated as being purchased in Item 5 of the Declarations.

The Common Definitions, Common Exclusions and Common Conditions apply to all **Coverage Parts**. Unless stated to the contrary in any **Coverage Part** or endorsement, the terms and conditions of each **Coverage Part** of this Policy apply only to that **Coverage Part** and shall not apply to any other **Coverage Part**. Any defined term referenced in the Common Definitions but defined in a **Coverage Part** shall, for the purpose of coverage under that **Coverage Part**, have the meaning set forth in that **Coverage Part**. If any provision in the Common Definitions, Common Exclusions or Common Conditions is inconsistent with, or in conflict with, any term, definition, exclusion or condition of an applicable **Coverage Part**, the respective term, definition, exclusion or condition of such **Coverage Part** shall control for the purpose of that **Coverage Part**.

### PUBLIC COMPANY LIABILITY - PART 1
### DIRECTORS & OFFICERS COVERAGE

**I. INSURING AGREEMENTS**

Subject to the terms, conditions and exclusions of this Policy:

A. INSURED PERSON LIABILITY INSURANCE

The **Insurer** shall pay on behalf of the **Insured Person**, **Loss** arising from any **Claim** first made against the **Insured Person** during the **Policy Period** and reported to the **Insurer** in the time and manner required by this Policy, except to the extent that such **Loss** has been paid or indemnified.

B. COMPANY INDEMNIFICATION INSURANCE

The **Insurer** shall pay on behalf of the **Company**, **Loss** arising from any **Claim** first made against an **Insured Person** during the **Policy Period** and reported to the **Insurer** in the time and manner required by this Policy, but only to the extent the **Company** has paid or indemnified such **Loss**.

C. COMPANY SECURITIES INSURANCE

The **Insurer** shall pay on behalf of the **Company**, **Loss** arising from a **Securities Claim** first made against the **Company** during the **Policy Period** and reported to the **Insurer** in the time and manner required by this Policy.

**II. EXTENSIONS**

A. DERIVATIVE DEMAND INVESTIGATION COSTS COVERAGE

The **Insurer** shall pay on behalf of the **Company**, **Derivative Demand Investigation Costs** resulting from a **Derivative Demand** first made during the **Policy Period** and reported to the **Insurer** during the Policy Period or within 60 days thereafter.

Any payment by the **Insurer** pursuant to this section II. A. shall be considered part of **Loss**, shall be excess of the applicable Retention under the Directors & Officers Coverage Part as specified in Item 5 of the Declarations, and shall be part of, and not in addition to the **Applicable Limit of Liability**. The amount payable by the **Insurer** pursuant to this section II. A. shall not exceed a maximum aggregate limit of $500,000.

B. INVESTIGATIVE INQUIRY COVERAGE

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844-722-7827
Fax: 513-599-7501
www.corespecialty.com
Report claims to:
claims@corespecialty.com

1. The **Insurer** shall pay on behalf of an **Insured Person**, **Defense Costs** incurred by such **Insured Person**, resulting from an **Investigative Inquiry** first made during the **Policy Period** and reported to the **Insurer** during the **Policy Period** or within 60 days thereafter, except to the extent such **Defense Costs** have been paid or indemnified.
2. The **Insurer** shall pay on behalf of the **Company**, **Defense Costs**, in excess of the applicable Retention under the Directors & Officers Coverage Part as specified in Item 5 of the Declarations, incurred solely by an **Insured Person** resulting from an **Investigative Inquiry** first made during the **Policy Period** and reported to the **Insurer** during the **Policy Period** or within 60 days thereafter, but only to the extent the **Company** has paid or indemnified such **Defense Costs**.

Any payment by the **Insurer** pursuant to this section II. B. shall not exceed a maximum aggregate limit of $500,000 and shall be part of, and not in addition to the **Applicable Limit of Liability**.

C. SUBPOENA COVERAGE

In the event the **Insureds** fully comply with the reporting requirements of Common Conditions (Part 6), D. Reporting and Notice Requirements, subsection 2., and to the extent that coverage is not otherwise available under this Policy, the **Insurer** shall pay on behalf of an **Insured Person** reasonable fees and expenses, incurred with the **Insurer's** prior written consent, resulting from a **Subpoena** first received by the **Insured Person** during the **Policy Period** and reported to the **Insurer** during the **Policy Period** or within 60 days thereafter.

Any payment by the **Insurer** pursuant to this section II. C. shall be considered part of **Loss**, shall be part of, and not in addition to the **Applicable Limit of Liability** and no Retention shall apply. The amount payable by the **Insurer** pursuant to this section II. C. shall not exceed a maximum aggregate limit of $100,000 per **Policy Period**, regardless of the number of **Subpoenas** received during the **Policy Period**.

D. INDEPENDENT DIRECTOR LIABILITY COVERAGE

If the **Applicable Limit of Liability** and any other insurance and indemnification available to an **Insured Person** who is a "Non-Employee Director" of the **Company** are completely exhausted, the **Insurer** shall pay on behalf of such **Insured Person**, **Loss**, in excess of the **Applicable Limit of Liability**, arising from a **Claim** covered under Insuring Agreement A. of this **Coverage Part**.

The amount payable by the **Insurer** pursuant to this section II. D. shall not exceed a maximum aggregate limit of $1,000,000 and no Retention shall apply. Notwithstanding Common Conditions (Part 6), H. Other Insurance, coverage pursuant to this section II. D. shall be specifically excess over, and shall not contribute with, any other valid and collectible insurance, including insurance specifically excess of this Policy.

"Non-Employee Director" shall have the meaning ascribed to that term in Rule 16b-3 promulgated under the Securities Exchange Act of 1934; provided however, that the term "issuer" as referenced in such rule shall be deemed to refer to the **Company**.

E. RETIREE COVERAGE

If, after the inception date of this Policy or the first policy issued by the **Insurer** in an uninterrupted series of policies of which this Policy is a renewal or replacement, and before the end of the **Policy Period**, an **Insured Person** retires and no longer serves in his or her capacity as an **Insured Person** and:

1. this Policy is cancelled or non-renewed for reasons other than nonpayment of premium; and
2. this Policy is not replaced by any other directors and officers liability coverage;

then coverage provided under Insuring Agreement A. of this **Coverage Part** for such **Insured Person** shall be extended for a period of six years from such **Insured Person's** official date of retirement, but only with respect to **Claims** for **Wrongful Acts** fully occurring prior to such official date of retirement.

Any matter reported pursuant to section II. A. or B. above shall be deemed to be a notice of fact, circumstance, or situation, which may reasonably be expected to give rise to a **Claim**, as provided for in Common Conditions (Part 6), D. Reporting and Notice Requirements, subsection 2, of this Policy.

## III. DEFINITIONS

Whenever printed in boldface type, and whether in singular or plural form, the following terms shall have the meanings indicated below for purposes of this **Coverage Part**.

A. **Claim** means:

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844-722-7827
Fax: 513-599-7501
www.corespecialty.com
Report claims to:
claims@corespecialty.com

1. a written demand for monetary, non-monetary or injunctive relief against an **Insured**, by reason of a **Wrongful Act**;
2. a civil, administrative, regulatory, arbitration or mediation proceeding or any other alternative dispute resolution proceeding against an **Insured**, by reason of a **Wrongful Act**, which is commenced by service of a complaint or similar document or the filing of a notice of charges;
3. an official request for **Extradition** of an **Insured Person** or a criminal proceeding which is commenced by an arrest of, or return of an indictment against an **Insured Person**, by reason of a **Wrongful Act**;
4. a civil, criminal, administrative, or regulatory investigation of an **Insured Person**, by reason of a **Wrongful Act**, commenced by the service upon, or other receipt by, an **Insured Person**, of a written notice, including a Wells Notice or target letter, from an **Investigating Authority** identifying the **Insured Person** as an individual against whom a formal proceeding may be commenced; or
5. a written request that an **Insured** sign an agreement to toll or waive any statute of limitations, by reason of a **Wrongful Act**.

**Claim** shall not include a **Derivative Demand**, **Investigative Inquiry**, **Subpoena** or any labor or grievance proceeding or investigation which is subject to a collective bargaining agreement. A **Claim** shall be deemed to have been first made at the time written notice of the **Claim** is first received by any **Insured**. All **Claims** arising out of the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to be a single **Claim** first made on the date on which the earliest such **Claim** was first made.

B. **Derivative Demand** means any written demand by a security holder of the **Company**, upon the **Company** or an **Insured Person** of such **Company**, to bring a civil proceeding in a court of law against an **Insured Person** for a **Wrongful Act**, provided such **Derivative Demand** is brought and maintained without the solicitation, assistance or participation of any **Insured Person**, other than assistance that is protected pursuant to any federal or state whistleblower statute or any regulation promulgated thereunder.

C. **Derivative Demand Investigation Costs** means reasonable costs, fees and expenses incurred by a **Company**, with the **Insurer's** prior written consent, solely with respect to an investigation or evaluation required to determine whether it is in the best interest of the **Company** to commence a civil proceeding as demanded by a **Derivative Demand**. **Derivative Demand Investigation Costs** shall not include salaries, wages, fees, costs or expenses of any **Insured Person** or **Employee**.

D. **D&O Wrongful Act** means:

1. with respect to any **Insured Person**, any actual or alleged act, error or omission, misstatement, misleading statement, neglect, or breach of duty by such **Insured Person** in his or her capacity as such or in an **Outside Capacity**, or any matter claimed against them by reason of their status as an **Insured Person**;
2. with respect to a **Securities Claim**, a **D&O Wrongful Act** shall include any actual or alleged act, error or omission, misstatement, misleading statement, neglect, or breach of duty by the **Company** arising from the purchase or sale or offer to purchase or sell securities issued by the **Company** in the open market or in a direct transaction with the **Company**.

E. **Extradition** means a process by which one country surrenders a person to another country to face prosecution, incarceration or to answer any criminal accusation.

F. **Financially Impaired** means the status of an entity resulting from such entity becoming a debtor in possession under United States bankruptcy law, or its foreign equivalent, or from the appointment by a state or federal official, agency or court of a bankruptcy or insolvency examiner, receiver, trustee, or similar official to take control of, supervise, manage or liquidate such entity.

G. **Investigating Authority** means any federal, state, or local law enforcement or governmental regulatory authority worldwide (including any attorney general, the U.S. Department of Justice, and the U.S. Securities and Exchange Commission) or the enforcement unit of any securities exchange or similar self-regulatory organization.

H. **Investigative Inquiry** means a request for the production of documents or sworn statement from, or an interview with, an **Insured Person** by an **Investigating Authority** in connection with such **Insured Person** acting in his or her capacity as such or in connection with the **Company's** business activities. In no event

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844-722-7827
Fax: 513-599-7501
www.corespecialty.com
Report claims to:
claims@corespecialty.com

shall an **Investigative Inquiry** include any routine or regularly scheduled oversight, compliance, audit, examination, or inspection.

I. **Outside Capacity** means service by an **Insured Person** as a director, trustee, or equivalent executive position with an **Outside Entity**, but only if such service is or was at the specific request or direction of the **Company**.

J. **Outside Entity** means any not-for-profit entity.

K. **Securities Claim** means a **Claim**:

1. against an **Insured** for violation of any United States securities law or foreign securities law arising from the purchase or sale of, or offer or solicitation of an offer to purchase or sell, any securities of a **Company**;
2. brought by a security holder of a **Company** in his or her capacity as such, whether individually or by class action, against an **Insured** for a common law cause of action pled in connection with any securities law violation described in K.1. above; or
3. brought by a security holder as a derivative action on behalf of a **Company** solely against an **Insured Person**;

Provided, however, **Securities Claim** shall not include any **Claim** based upon, arising out of, directly or indirectly resulting from, or in any way involving an **Insured Person's** failure to receive or obtain any stock, stock options, stock warrants, or other securities of the **Company.**

L. **Subpoena** means a subpoena or written request compelling witness testimony or document production from an **Insured Person.**

M. **Wrongful Act** means a **D&O Wrongful Act**.

## IV. EXCLUSIONS

The **Insurer** shall not be liable under this Directors & Officers Coverage (Part 1) to pay any **Loss** arising from any **Claim** made against any **Insured**:

A. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Wrongful Act** as defined in any other **Coverage Part**;

B. which is brought or maintained by, on behalf of, or in the right of any **Insured** or any **Outside Entity** on behalf of which an **Insured Person** is or was serving in an **Outside Capacity** or which is brought or maintained by any security holder of the **Company**, whether directly or derivatively; provided, however, this exclusion shall not apply to any **Claim**:

1. that is a derivative action brought and maintained on behalf of the **Company** by one or more persons who are not **Insured Persons**, but only if such **Claim** is instigated and maintained without the solicitation, assistance or participation of any **Insured**, other than assistance that is protected pursuant to any federal or state whistleblower statute or any regulation promulgated thereunder;
2. brought and maintained by any security holder of the **Company**, including any **Employee** in his or her capacity as a security holder of the **Company**, but only if such security holder's **Claim** is instigated and continued independent of, and without the solicitation, assistance, participation or intervention of any **Executive Officer** or the **Company**;
3. by any former **Insured Person** who has not served with, been employed by, or provided consultation to the **Company** in any capacity for at least 2 years prior to such **Claim** being first made, but only if such **Claim** is instigated and maintained without the solicitation, assistance or participation of the **Company** or any **Insured Person** who is or has served with, been employed by, or provided consultation to the **Company** in any capacity in the last 2 years;
4. by any **Insured Person** for contribution or indemnity, where such contribution or indemnity **Claim** results solely from another **Claim** covered by this **Coverage Part**;
5. brought and maintained by or on behalf of a court-appointed bankruptcy or insolvency examiner, receiver, trustee, similar official or creditors committee for such:
   a. **Company** while such **Company** is **Financially Impaired**; or

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844-722-7827
Fax: 513-599-7501
www.corespecialty.com
Report claims to:
claims@corespecialty.com

b. **Outside Entity** while such **Outside Entity** is **Financially Impaired**; or

6. brought and maintained outside the United States of America and Canada, by or on behalf of the **Company** or any **Outside Entity** against an **Insured Person**, but only if the laws where such **Claim** is brought and maintained require that such **Claim** be brought by or on behalf of such entity;

C. for any actual or alleged violation of any of the responsibilities, obligations or duties imposed by **ERISA**;

D. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of any of the duties, obligations or responsibilities imposed by the Fair Labor Standards Act, including amendments thereto or any similar provision of any federal, state, local or foreign regulation, statute, rule or law governing the classification of employees to determine their eligibility for compensation or the payment of wages, overtime, on-call time, rest periods, expense reimbursement, or minimum wages;

E. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of any of the duties, obligations or responsibilities imposed by the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, or the Occupational Safety and Health Act, including amendments thereto or any similar provision of any federal, state, local or foreign regulation, statute, rule or law;

F. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged act, error, or omission, misstatement, misleading statement, neglect, or breach of duty of an **Insured Person** serving in a capacity, or by reason of his or her status, as a director, officer, trustee, regent, governor, manager or member of the board of managers of any entity other than the **Company**; provided, however, this exclusion shall not apply to any **Outside Capacity**.

## V. PRESUMPTION OF INDEMNIFICATION

If the **Company** is permitted or required by common or statutory law to indemnify an **Insured Person** for **Loss**, but fails or refuses to do so for reasons other than financial insolvency, then any payment by the **Insurer** of such **Loss** shall be subject to the applicable Retention that correlates with Insuring Agreement B. of this Directors & Officers Coverage Part as specified in Item 5 of the Declarations. To determine if the **Insured Person** is entitled to indemnification from the **Company**, the articles of association, bylaws, charter, resolutions and other organizational documents of the **Company** shall be deemed to have been adopted or amended to provide indemnification to such **Insured Person** to the fullest extent permitted by law.

## VI. PRIORITY OF PAYMENTS

If **Loss** covered under Insuring Agreement A. or section II. Extensions, B.1. and any other **Loss** are concurrently due under this Policy, the **Insurer** shall first pay **Loss** covered under Insuring Agreement A. or section II. Extensions, B.1.

# PUBLIC COMPANY LIABILITY - PART 2
# EMPLOYMENT PRACTICES COVERAGE

## I. INSURING AGREEMENTS

Subject to the terms, conditions and exclusions of this Policy:

A. EMPLOYMENT PRACTICES LIABILITY INSURANCE

The **Insurer** shall pay on behalf of the **Insured**, **Loss** arising from any **Claim** first made against the **Insured** during the **Policy Period** and reported to the **Insurer** in the time and manner required by this Policy.

B. THIRD PARTY LIABILITY INSURANCE

The **Insurer** shall pay on behalf of the **Insured**, **Loss** arising from any **Third Party Claim** first made against the **Insured** during the **Policy Period** and reported to the **Insurer** in the time and manner required by this Policy.

## II. DEFINITIONS

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844-722-7827
Fax: 513-599-7501
www.corespecialty.com
Report claims to:
claims@corespecialty.com

Whenever printed in boldface type, and whether in singular or plural form, the following terms shall have the meanings indicated below for purposes of this **Coverage Part**.

A. **Claim** means:

1. a written demand for monetary, non-monetary or injunctive relief against an **Insured**, by reason of a **Wrongful Act**;
2. a civil, administrative, regulatory, arbitration or mediation proceeding or any other alternative dispute resolution proceeding against an **Insured**, by reason of a **Wrongful Act**, which is commenced by service of a complaint or similar document or the filing of a notice of charges;
3. a formal administrative or regulatory investigation of an **Insured**, by reason of a **Wrongful Act**, which is commenced by written notice or subpoena from the Equal Employment Opportunity Commission or any similar federal, state, local or foreign government agency; or
4. a written request that an **Insured** sign an agreement to toll or waive any statute of limitations, by reason of a **Wrongful Act**.

**Claim** shall not include a criminal proceeding, labor or grievance proceeding or investigation which is subject to a collective bargaining agreement, or an audit by the Office of Federal Contract Compliance Programs. A **Claim** shall be deemed to have been first made at the time written notice of the **Claim** is first received by any **Insured**. All **Claims** arising out of the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to be a single **Claim** first made on the date on which the earliest such **Claim** was first made.

B. **Employment Wrongful Act** means any actual or alleged employment-related:

1. discrimination based upon race, color, religion, age, gender, national origin, sexual orientation, pregnancy, disability, military status, or any other basis prohibited by federal, state, or local statute, rule or common law;
2. wrongful dismissal, discharge, or termination of employment, whether actual or constructive;
3. sexual or workplace harassment, including workplace bullying;
4. violation of employment discrimination laws including any actual or alleged wrongful: deprivation of career opportunity, failure to promote, discipline, evaluation, demotion, denial of tenure, modification of any term or condition of employment; or limitation, segregation or classification of any employee;
5. violation of the Family and Medical Leave Act;
6. retaliation in response to any **Employee** exercising his or her rights under any law;
7. failure to enforce existing employment-related corporate policies and procedures relating to retention, supervision, hiring or training;
8. misrepresentation, defamation, humiliation, or invasion of privacy;
9. breach of any verbal, written or implied contract of employment including any contractual obligation arising out of any employee handbook, personnel manual, or policy statement;

by any **Insured** against an **Employee**; provided, however, **Employment Wrongful Act** shall not include breach of an express contract or agreement between an independent contractor or any entity on behalf of such independent contractor and the **Company**.

C. **Third Party** means any natural person who is not an **Insured** and who is or was a customer, vendor, supplier, applicant or business invitee of the **Company**.

D. **Third Party Claim** means any **Claim** brought by, on behalf of, or in the right of a **Third Party**.

E. **Third Party Wrongful Act** means any actual or alleged:

1. discrimination based upon race, color, religion, age, gender, national origin, sexual orientation, pregnancy, disability, military status or any other basis prohibited by federal, state, or local statute, rule or common law; or
2. harassment, including sexual harassment, any unwelcome sexual advance, or other conduct of a sexual nature;

by an **Insured** against a **Third Party**.

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844-722-7827
Fax: 513-599-7501
www.corespecialty.com
Report claims to:
claims@corespecialty.com

F. **Wrongful Act** means:

1. with respect to I. Insuring Agreement A. of this **Coverage Part**, any **Employment Wrongful Act**.
2. with respect to I. Insuring Agreement B. of this **Coverage Part**, any **Third Party Wrongful Act**.

## III. EXCLUSIONS

The **Insurer** shall not be liable under this Employment Practices Coverage (Part 2) to pay any **Loss** arising from any **Claim** made against any **Insured**:

A. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Wrongful Act** as defined in any other **Coverage Part**;

B. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of any of the duties, obligations or responsibilities imposed by the Fair Labor Standards Act, including amendments thereto or any similar provision of any federal, state, local or foreign regulation, statute, rule or law governing the classification of employees to determine their eligibility for compensation or the payment of wages, overtime, on-call time, rest periods, expense reimbursement, or minimum wages; provided, however, this exclusion shall not apply to the extent a **Claim** is for amounts owed under the Equal Pay Act of 1963 or for retaliation in response to any **Employee** exercising his or her rights under any such law;

C. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of any of the duties, obligations or responsibilities imposed by the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, or the Occupational Safety and Health Act, including amendments thereto or any similar provision of any federal, state, local or foreign regulation, statute, rule or law; provided, however, this exclusion shall not apply to any **Claim** for retaliation in response to any **Employee** exercising his or her rights under any such law;

D. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged failure to comply with any law concerning disability benefits, unemployment insurance, social security or workers compensation, including amendments thereto or any similar provision of any federal, state, local or foreign regulation, statute, rule or law; provided, however, this exclusion shall not apply to any **Claim** for retaliation in response to any **Employee** exercising his or her rights under any such law;

E. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of any of the responsibilities, obligations or duties imposed by **ERISA**; provided, however, this exclusion shall not apply to any **Claim** for retaliation in response to any **Employee** exercising his or her rights under any such law;

F. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any lockout, strike, picket line, hiring of any replacement workers or other similar action in connection with any labor dispute, labor negotiation or collective bargaining agreement; provided, however, this exclusion shall not apply to any **Claim** for retaliation in response to any **Employee** exercising his or her rights under any such law;

G. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving liability under any written or verbal contract of employment; provided, however, this exclusion shall not apply to **Defense Costs** or liability that would have attached in the absence of such contract or agreement;

H. to the extent such **Loss**, other than **Defense Costs**, constitutes employment related benefits, bonuses, commissions, profit sharing, perquisites, deferred compensation, stock options, or any other type of compensation earned by the claimant in the course of employment; provided, however, this exclusion shall not apply to front pay or back pay.

# PUBLIC COMPANY LIABILITY - PART 3
# FIDUCIARY COVERAGE

## I. INSURING AGREEMENT

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844-722-7827
Fax: 513-599-7501
www.corespecialty.com
Report claims to:
claims@corespecialty.com

Subject to the terms, conditions and exclusions of this Policy, the **Insurer** shall pay on behalf of the **Insured**, **Loss** arising from any **Claim** first made against the **Insured** during the **Policy Period** and reported to the **Insurer** in the time and manner required by this Policy.

## II. EXTENSIONS

A. HIPAA AND PPACA COVERAGE

The **Insurer** shall pay on behalf of the **Insured**, any **Health Act Penalty** arising from a **Health Act Notice** first received by the **Insured** during the **Policy Period** and reported to the **Insurer** during the **Policy Period** or within 60 days thereafter; provided, however, the **Insured** shall not make any payment, admit liability or stipulate to any **Health Act Penalty** without the **Insurer's** prior written consent.

Any payment by the **Insurer** pursuant to this section II. A. shall be considered part of **Damages**, shall be excess of the applicable Retention under the Fiduciary Coverage Part as specified in Item 5 of the Declarations, and shall be part of, and not in addition to the **Applicable Limit of Liability**. The amount payable by the **Insurer** pursuant to this section II. A. shall not exceed a maximum aggregate limit of $250,000.

B. SETTLEMENT PROGRAM COVERAGE

The **Insurer** shall pay on behalf of the **Insured**, **Settlement Fees** arising from a **Settlement Program Notice** first received by the **Insured** during the **Policy Period** and reported to the **Insurer** during the **Policy Period** or within 60 days thereafter; provided, however, the **Insured** shall not make any payment, admit liability or stipulate to any **Settlement Fees** without the **Insurer's** prior written consent.

Any payment by the **Insurer** pursuant to this section II. B. shall be considered part of **Damages**, shall be excess of the applicable Retention under the Fiduciary Coverage Part as specified in Item 5 of the Declarations, and shall be part of, and not in addition to the **Applicable Limit of Liability**. The amount payable by the **Insurer** pursuant to this section II. B. shall not exceed a maximum aggregate limit of $250,000.

Any matter reported pursuant to this section II. shall be deemed to be a notice of fact, circumstance, or situation, which may reasonably be expected to give rise to a **Claim**, as provided for in Part 6, Common Conditions, D. 2. of this Policy.

## III. DEFINITIONS

Whenever printed in boldface type, and whether in singular or plural form, the following terms shall have the meanings indicated below for purposes of this **Coverage Part**.

A. **Administration** means the rendering of advice to any **Employee** with regard to any **Plan**, providing any explanation to any **Employee** with regard to any **Plan**, or handling any record or effecting any enrollment, termination or cancellation of any **Employee** under any **Plan**.

B. **Claim** means:

1. a written demand for monetary or non-monetary relief against an **Insured**, by reason of a **Wrongful Act**;
2. a civil, criminal, administrative, regulatory, arbitration or mediation proceeding or any other alternative dispute resolution proceeding against an **Insured**, by reason of a **Wrongful Act**, which is commenced by service of a complaint or similar document or the filing of a notice of charges;
3. a formal investigation of an **Insured**, by reason of a **Wrongful Act**, which is commenced by written notice from the Department of Labor or the Pension Benefit Guaranty Corporation; or
4. a written request that an **Insured** sign an agreement to toll or waive the statute of limitations, by reason of a **Wrongful Act**.

**Claim** shall not include a **Health Act Notice**, **Settlement Program Notice** or any labor or grievance proceeding or investigation which is subject to a collective bargaining agreement. A **Claim** shall be deemed to have been first made at the time written notice of the **Claim** is first received by any **Insured**. All **Claims** arising out of the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to be a single **Claim** first made on the date on which the earliest such **Claim** was first made.

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844-722-7827
Fax: 513-599-7501
www.corespecialty.com
Report claims to:
claims@corespecialty.com

C. **Fiduciary Wrongful Act** means any actual or alleged breach of any of the duties, responsibilities, or obligations imposed upon **Plan** fiduciaries by **ERISA**; any actual or alleged negligent act, error or omission in the **Administration** of any **Plan** committed or attempted by any **Insured**; or any other matter alleged against such **Insured** solely by reason of such **Insured's** service as a **Plan** fiduciary.

D. **Health Act Notice** means written notice from a governmental agency in connection with an actual or alleged violation, by an **Insured**, of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) or the Patient Protection and Affordable Care Act (PPACA).

E. **Health Act Penalty** means a fine or penalty assessed against the **Company** or any **Insured Person**, in his or her capacity as such, pursuant a violation of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) or the Patient Protection and Affordable Care Act (PPACA).

F. **Plan** means:

1. any Welfare Benefit Plan as defined in **ERISA**, which was, is now, or becomes sponsored by the **Company** exclusively for the benefit of the **Employees** of the **Company**;
2. any Pension Benefit Plan as defined in **ERISA**, which is sponsored by the **Company** exclusively for the benefit of the **Employees** of the **Company**, provided, such plan existed on or before the inception date of this Policy as specified in Item 2 of the Declarations and has been reported in writing to the **Insurer** as part of the **Application**;
3. any employee benefit plan, including an excess benefit plan, not subject to Title 1 of **ERISA**, which is sponsored by the **Company** exclusively for the benefit of the **Employees** of the **Company**, provided, such plan existed on or before the inception date of this Policy as specified in Item 2 of the Declarations; and
4. any government mandated benefit program for disability benefits, unemployment insurance, social security, or workers compensation for **Employees** of the **Company**.

**Plan** does not include any employee stock ownership plan or any multi-employer plan unless such plan is specifically included as a **Plan** in a written endorsement applied to this Policy by the **Insurer**.

G. **Settlement Fees** mean fees, fines or penalties assessed against an **Insured** by a governmental authority, pursuant to a **Settlement Program**, for the actual or alleged inadvertent failure of any **Plan** to comply with any statute, rule or regulation; provided, however, that **Settlement Fees** shall not include:

1. any benefits, costs to correct the non-compliance or any other charges, expenses, or taxes; or
2. any fees, fines or penalties relating to a **Plan** that any **Insured Person** knew to be actually or allegedly non-compliant prior to the earlier of:
   a. this Policy's inception date as specified in Item 2 of the Declarations; or
   b. the inception date of the first policy, in an uninterrupted series of policies of which this Policy is a direct or indirect renewal or replacement, which the **Insurer** issued to the **Company**.

H. **Settlement Program** means any voluntary compliance resolution program or similar settlement program administered by the United States Internal Revenue Service, United States Department of Labor, or any other domestic or foreign authority, including, but not limited to, the Employee Plans Compliance Resolution System, Audit Closing Agreement Program, Voluntary Compliance Resolution Program, Walk-in Closing Agreement Program, Administrative Policy Regarding Self-Correction, Tax Sheltered Annuity Voluntary Correction Program, Delinquent Filer Voluntary Compliance Program, and Voluntary Fiduciary Correction Program, or any similar program administered by a governmental authority located outside of the United States.

I. **Settlement Program Notice** means written notice in connection with a **Settlement Program**.

J. **Wrongful Act** means any **Fiduciary Wrongful Act**.

## IV. EXCLUSIONS

The **Insurer** shall not be liable under this Fiduciary Coverage (Part 3) to pay any **Loss** arising from any **Claim** made against any **Insured**:

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844-722-7827
Fax: 513-599-7501
www.corespecialty.com
Report claims to:
claims@corespecialty.com

A. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Wrongful Act** as defined in any other **Coverage Part**;

B. to the extent such **Loss**, other than **Defense Costs**, constitutes:
   1. the return or reversion to an employer of any contribution or asset of a **Plan**, or
   2. benefits due or to become due under the terms of any **Plan**, or benefits which would be due under the terms of any **Plan** if such terms complied with all applicable law;

C. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged failure to collect or fund contributions owed to any **Plan**;

D. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged liability under any contract or agreement; provided, however, this exclusion shall not apply to any contract or agreement to which the **Plan** was established;

E. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged employment-related practices including but not limited to any workplace discrimination or harassment, abusive or hostile work environment, wrongful discharge or termination, wrongful demotion or discipline, retaliation, employment-related misrepresentation, negligent hiring, supervision, evaluation, retention or performance evaluation, wrongful reference or any violation of the Family and Medical Leave Act or any similar provision of any federal, state, local or foreign regulation, statute, rule or law; provided, however this exclusion shall not apply to **Claims** asserted under **ERISA**;

F. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of any of the duties, obligations or responsibilities imposed by the Fair Labor Standards Act, including amendments thereto or any similar provision of any federal, state, local or foreign regulation, statute, rule or law governing the classification of employees to determine their eligibility for compensation or the payment of wages, overtime, on-call time, rest periods, expense reimbursement or minimum wages;

G. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any failure to comply with any law concerning disability benefits, unemployment insurance, social security or workers compensation, including amendments thereto or any similar provision of any federal, state, local or foreign regulation, statute, rule or law; except the Consolidated Omnibus Budget Reconciliation Act of 1985 and the Health Insurance Portability and Accountability Act of 1996, or any amendments thereto or any rules or regulations promulgated thereunder;

H. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of any of the duties, obligations or responsibilities imposed by the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act or the Occupational Safety and Health Act, including amendments thereto or any similar provision of any federal, state, local or foreign regulation, statute, rule or law;

I. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any lockout, strike, picket line, hiring of any replacement workers or other similar action in connection with any labor dispute, labor negotiation or collective bargaining agreement.

## PUBLIC COMPANY LIABILITY - PART 4
## COMMON DEFINITIONS

Whenever printed in boldface type, and whether in singular or plural form, the following terms shall have the meanings indicated below.

A. **Applicable Limit of Liability** means:
   1. the Total Aggregate Limit of Liability as specified in Item 4 of the Declarations, unless one or more of the Coverage Part Limits of Liability as specified in Item 5 of the Declarations is purchased;
   2. if one or more Coverage Part Limits of Liability as specified in Item 5 of the Declarations is purchased, then, **Applicable Limit of Liability** means:
      a. with respect to the Directors & Officers Coverage (Part 1), the Directors & Officers Coverage Part Limit of Liability as specified in Item 5 of the Declarations, if purchased;

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844-722-7827
Fax: 513-599-7501
www.corespecialty.com
Report claims to:
claims@corespecialty.com

b. with respect to the Employment Practices Coverage (Part 2), the Employment Practices Coverage Part Limit of Liability as specified in Item 5 of the Declarations, if purchased;

c. with respect to the Fiduciary Coverage (Part 3), the Fiduciary Coverage Part Limit of Liability as specified in Item 5 of the Declarations, if purchased.

B. **Application** means:

1. the application for insurance and any material submitted therewith or incorporated therein, and any other documents submitted in connection with the underwriting of this Policy; and
2. all publicly available documents filed by a **Company** with the Securities and Exchange Commission or similar federal, state, local or foreign authority during the 12 month period preceding the inception date of this Policy as specified in Item 2 of the Declarations.

C. **Change In Control** means:

1. the acquisition by another entity or person, or group of entities or persons acting in concert, resulting in the ownership or control of more than fifty percent (50%) of:
   a. the **Named Insured's** voting stock or voting rights; or
   b. the **Named Insured's** total consolidated assets as of the date of the **Named Insured's** most recent audited consolidated financial statement prior to such acquisition;
2. the merger of the **Named Insured** into another entity such that the **Named Insured** is not the surviving entity; or
3. the consolidation of the **Named Insured** with another entity.

D. **Claim** shall have the meaning set forth in the applicable **Coverage Part.**

E. **Company** means the **Named Insured** and any **Subsidiary**. In the event of a bankruptcy proceeding by or against a **Company**, **Company** shall also mean the resulting entity named as a debtor in possession within the United States Bankruptcy Code, or an equivalent legal status under foreign law.

F. **Coverage Part** means, individually or collectively, the following coverage parts, if purchased, as specified in Item 5 of the Declarations:

1. Directors & Officers Coverage (Part 1)
2. Employment Practices Coverage (Part 2)
3. Fiduciary Coverage (Part 3)

G. **Damages** means the monetary portion of any award, settlement or judgment, including pre-judgment and post-judgment interest, provided always that **Damages** shall not include:

1. taxes, civil fines, criminal fines, sanctions, fees, restitution or penalties imposed by law, statute, regulation or court rule, except;
   a. a tax, if insurable under the law pursuant to which this Policy is construed, imposed upon an **Insured Person** in connection with any bankruptcy, receivership, or liquidation of a **Company**;
   b. civil fines or penalties, if insurable under the law pursuant to which this Policy is construed, assessed against an **Insured Person** for an unintentional and non-willful violation of the Foreign Corrupt Practices Act of 1977 § 15 U.S.C. §78dd-2(g)(2)(B), the United Kingdom Bribery Act of 2010 (Eng.) § 11(1)(a), or fines or penalties described in Section 308 of the Sarbanes-Oxley Act of 2002;
   c. the 5% or less, or the 20% or less, civil penalties imposed upon an **Insured** as a fiduciary under Section 502 (i) or (l) of **ERISA**; or
   d. costs or attorney fees awarded pursuant to a covered judgment in favor of the claimant;
2. punitive, exemplary or multiplied damages, except to the extent such damage is insurable under the law of any jurisdiction which has a substantial relationship to the **Insured** or the **Claim** seeking such damage, and which is most favorable to the insurability of such damage;
3. any amount that represents an increase in the consideration paid or proposed to be paid by a **Company** in connection with its purchase of any securities or assets as a result of any allegation that the consideration for such securities or assets was inadequate; provided however, this subsection 3 shall only apply with respect to Insuring Agreement C of the Directors & Officers Coverage (Part 1);

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844-722-7827
Fax: 513-599-7501
www.corespecialty.com
Report claims to:
claims@corespecialty.com

4. any amount not insurable under the law pursuant to which this Policy is construed; provided, however, the **Insurer** shall not contend that any amount attributable to violation of Sections 11, 12 or 15 of the Securities Act of 1933, or any amendments thereto, is uninsurable as a matter of law;
5. amounts that represent the return of any fee, charge, commission, gain or other compensation paid to an **Insured**;
6. costs associated with any accommodation, including the cost to make any building or property more accessible or accommodating to any person;
7. any amounts awarded for actual or alleged violations of the Fair Labor Standards Act including amendments thereto or any similar provision of any federal, state, local or foreign regulation, statute, rule or law relating to the classification of employees to determine the payment of wages, overtime, on-call time, rest periods, expense reimbursement or minimum wages;
8. severance pay or amounts owed under an express written contract of employment, leased worker agreement or independent contractor services agreement, or a written agreement to make payment in the event of termination of employment;
9. liquidated damages, except liquidated damages awarded pursuant to the Age Discrimination in Employment Act, Equal Pay Act, or Family and Medical Leave Act; or
10. cost of compliance with any form of injunctive or other non-monetary or declaratory relief.

H. **Defense Costs** means reasonable and necessary fees and expenses incurred with the **Insurer's** prior written consent to defend the **Insured**, and if authorized by the **Insurer**, all other fees and expenses resulting from: (1) the investigation, adjustment, defense or appeal of any **Claim** including the cost of appeal bonds; however, the **Insurer** shall have no obligation to apply for or furnish appeal bonds on behalf of any **Insured**; or (2) an **Investigative Inquiry**. **Defense Costs** shall also include **Sox 304/Dodd-Frank 954(b) Costs**.

   **Defense Costs** shall not include salaries and expenses of regular employees or officers of the **Insurer** or any salaries, wages, fees, costs or expenses of any **Insured**. **Defense Costs** shall be part of, and not in addition to, the **Applicable Limit of Liability**.

I. **Employee** means any natural person whose labor or service is engaged by and directed by the **Company** and is on the payroll of the **Company**, including any full-time, part-time, and seasonal worker. **Employee** shall also mean a temporary worker, leased worker, intern, independent contractor or volunteer for the **Company** solely with respect to conduct within the scope of his or her duties on behalf of the **Company.**

J. **ERISA** means the Employee Retirement Income Security Act of 1974, including amendments thereto or any similar federal, state, local or foreign law, whether statutory or common law.

K. **Executive Officer** means any natural person who was, or now is, a duly elected or appointed director, officer, trustee, governor, risk manager, in-house general counsel or **Manager** of any **Company**, or any member of any **Company** advisory or scientific board or internal committee, including the audit committee. **Executive Officer** shall include a shadow director of the **Company** as defined under the United Kingdom's Companies Act 2006, including amendments thereto. **Executive Officer** also means the equivalent status of any of the foregoing under the law of any other country.

L. **Insured** means the **Company** and any **Insured Person.**

M. **Insured Person** means:
   1. Solely with respect to the Directors & Officers Coverage (Part 1); any past or present **Executive Officer**. Solely with respect to a **Securities Claim**, an **Insured Person** also means an **Employee**;
   2. Solely with respect to the Employment Practices Coverage (Part 2); any past or present **Executive Officer**, in his or her capacity as such, or **Employee** but solely while acting within the scope of employment with the **Named Insured** or a **Subsidiary**;
   3. Solely with respect to the Fiduciary Coverage (Part 3); any past or present **Executive Officer** or director, officer, governor, or trustee of any **Plan.**

N. **Insurer** means the Insurance Company shown in the Declarations.

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844-722-7827
Fax: 513-599-7501
www.corespecialty.com
Report claims to:
claims@corespecialty.com

O. **Interrelated Wrongful Acts** means **Wrongful Acts** that have in common any fact, circumstance, situation, event, transaction, cause, or series of causally or logically connected facts, circumstances, situations, events, transactions or causes.

P. **Loss** means **Damages** and **Defense Costs**.

Q. **Manager** means any natural person who was or now is a manager or member of the board of managers of a company that is a limited liability company.

R. **Named Insured** means the entity as specified in Item 1 of the Declarations.

S. **Pending & Prior Litigation Date** means the applicable date, if any, specified in Item 5 of the Declarations under the heading "Pending & Prior Litigation Date".

T. **Policy Period** means the period of time from the inception date of this Policy as set forth in Item 2 of the Declarations to the earlier of the expiration date shown in Item 2 of the Declarations or the effective date of cancellation of this Policy.

U. **Pollutant** means any substance, located anywhere in the world, exhibiting any hazardous characteristic as defined by, or identified on a list of hazardous substances issued by, the U.S. Environmental Protection Agency or a state, county, municipality or locality counterpart thereof. **Pollutant** also means any air emission, odor, waste water, oil, oil product, infectious waste, medical waste, asbestos, asbestos product, silica, noise, fungus, bacteria, mold, mildew, mycotoxin, spore, scent or byproduct produced or released by fungi, (other than any fungi intended by the **Insured**) and any electric or magnetic or electromagnetic field. **Pollutant** also includes, but is not limited to, any solid, liquid, gaseous, thermal, biological, nuclear irritant, radiological, contaminant, smoke, soot, fume, acid, alkali, chemical or waste material.

V. **Side A Excess DIC Policy** means an insurance policy, written specifically as excess over this Policy, that provides "Side A" (non-indemnifiable or non-indemnified loss) coverage with difference-in-conditions features.

W. **Sox 304/Dodd-Frank 954(b) Costs** means the reasonable and necessary fees, costs and expenses (including the premium or origination fee for a loan or bond), incurred by an **Insured Person** with the **Insurer's** prior written consent, to facilitate the return of amounts required to be repaid by such **Insured Person** pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002 or Section 954(b) of the Dodd-Frank Act of 2010 or any rules, regulations or policies pursuant to such sections; provided, however, **SOX 304/Dodd-Frank 954(b) Costs** do not include the payment, return, reimbursement, disgorgement or restitution of any such amounts.

X. **Subsidiary** means any corporation or limited liability company of which the **Named Insured** owns more than fifty percent (50%) of the outstanding stock or other interest representing the present right to vote, designate or select a majority of the **Managers** or board of directors (or foreign equivalent thereof) of a corporation; but only during such time as the **Named Insured** owns such stock or other interest representing the right to vote, designate or select a majority of the **Managers** or board of directors (or foreign equivalent thereof) of such corporation.

Y. **Wrongful Act** shall have the meaning set forth in the applicable **Coverage Part**.

## PUBLIC COMPANY LIABILITY - PART 5
## COMMON EXCLUSIONS

In addition to the Exclusions listed in the **Coverage Parts**, the **Insurer** shall not be liable under this Policy to pay any **Loss** arising from any **Claim** made against any **Insured**:

A. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

1. Solely with respect to Directors & Officers Coverage (Part 1) and Fiduciary Coverage (Part 3), any criminal, dishonest, fraudulent, deliberate, intentional or willful act or omission or any deliberate, intentional or willful violation of any statute or regulation committed by any **Insured**; however, this exclusion shall only apply if a final and non-appealable judgment in any underlying action establishes the **Insured** committed such act, omission or violation;
2. Solely with respect to Employment Practices Coverage (Part 2), any criminal or fraudulent act or omission committed by any **Insured**; however, this exclusion shall only apply if a final and non-appealable judgment in any underlying action establishes the **Insured** committed such act or omission;

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844-722-7827
Fax: 513-599-7501
www.corespecialty.com
Report claims to:
claims@corespecialty.com

B. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any **Insured** gaining any personal profit, remuneration or other financial advantage to which such **Insured** was not legally entitled; however, this exclusion shall only apply if a final and non-appealable judgment in any underlying action establishes the **Insured** gained such personal profit, remuneration or other financial advantage;

Provided however Exclusions A. and B. shall not apply to any actual or alleged violation of Sections 11, 12 or 15 of the Securities Act of 1933, or any amendments thereto.

Severability of Exclusions: For purposes of determining the applicability of Exclusions A. and B. above, the **Wrongful Act** or knowledge of any **Insured Person** shall not be imputed to any other **Insured Person**; provided, however, that the **Wrongful Act** or knowledge of the Chief Executive Officer, Chief Financial Officer or Chief Operating Officer (or the foreign or domestic equivalent of such positions) shall be imputed to the **Company**.

C. for any actual or alleged bodily injury, or emotional distress or mental anguish arising from such bodily injury, or any actual or alleged damage to, or destruction of any tangible property, including loss of use thereof; provided, however, this exclusion shall not apply to:

1. **Defense Costs** incurred by an **Insured Person** that result solely from the investigation, adjustment, defense or appeal of a **Claim** against the **Company** for violation of the United Kingdom's Corporate Manslaughter and Corporate Homicide Act 2007; or
2. any **Claim** for emotional distress or mental anguish under the Employment Practices Coverage (Part 2);

D. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any industrial, non-industrial or environmental actual, alleged or threatened discharge, release, escape, seepage, migration or disposal of any **Pollutant** into or on real or personal property, water or the atmosphere or any regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any **Pollutant**, or any voluntary decision to do so, including but not limited to any **Claim** alleging damage to the **Company**, its security holders or its creditors; provided, however, this exclusion shall not apply to **Loss** arising from a **Claim** under Insuring Agreement A. of the Directors & Officers Coverage (Part 1);

E. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

1. any fact, circumstance, situation, transaction, event or **Wrongful Act** that was the subject of any written notice given under any policy of insurance prior to inception of this Policy; or any other **Wrongful Act** whenever occurring, that, together with a **Wrongful Act** described previously in this paragraph would constitute **Interrelated Wrongful Acts**; or
2. any prior or pending written demand, suit, complaint, proceeding, investigation, order, judgment, or notice of violation, that is against any **Insured**, and received by any **Insured**, prior to the applicable **Pending & Prior Litigation Date**;

F. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, any actual or alleged **Wrongful Act**, by a **Subsidiary** or any **Insured Person** of such **Subsidiary**, occurring prior to the date such entity became a **Subsidiary** or subsequent to the date such entity ceased to be a **Subsidiary**; or while such entity was a **Subsidiary** and that, together with a **Wrongful Act** occurring prior to the date such entity became a **Subsidiary**, would constitute **Interrelated Wrongful Acts**.

## PUBLIC COMPANY LIABILITY - PART 6
## COMMON CONDITIONS

A. LIMITS OF LIABILITY

Regardless of the number of **Insureds** involved or **Claims** made, the **Insurer's** liability under this Policy is limited as follows:

1. TOTAL AGGREGATE LIMIT OF LIABILITY

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844-722-7827
Fax: 513-599-7501
www.corespecialty.com
Report claims to:
claims@corespecialty.com

The amount as specified in Item 4 of the Declarations shall be the **Insurer's** maximum aggregate liability for all **Loss**, covered under all **Coverage Parts** combined.

2. COVERAGE PART LIMIT OF LIABILITY
   a. The respective Limit of Liability for each **Coverage Part** as specified in Item 5 of the Declarations, shall be the **Insurer's** maximum aggregate liability for all **Loss** covered under such **Coverage Part**.
   b. In the event coverage is available for a **Claim** under the Employment Practices Coverage (Part 2) and any other **Coverage Part**, then any **Loss** for such **Claim** shall first be paid under the Employment Practices Coverage (Part 2). Any remaining **Loss** for such **Claim** that is not paid under the Employment Practices Coverage (Part 2) shall be paid under such other applicable **Coverage Part**; provided however, the remaining Limit of Liability of such other applicable **Coverage Part** shall be reduced by the amount of **Loss** paid under the Employment Practices Coverage (Part 2).

      In the event coverage is available for a **Claim** under more than one **Coverage Part** and the Employment Practices Liability Coverage (Part 2) does not apply, then the largest applicable remaining Limit of Liability under only one of the applicable **Coverage Parts**, at the time the **Claim** is first made, shall apply.
   c. The Limit of Liability for each **Coverage Part** shall be part of, and not in addition to, the Total Aggregate Limit of Liability as specified in Item 4 of the Declarations.
3. DEFENSE COSTS WITHIN LIMIT OF LIABILITY

   **Defense Costs** are part of, and not in addition to, the **Applicable Limit of Liability** and the payment by the **Insurer** of **Defense Costs** reduces the **Applicable Limit of Liability**.

If the Total Aggregate Limit of Liability set forth in Item 4 of the Declarations or the applicable Coverage Part Limit of Liability set forth in Item 5 of the Declarations is exhausted by payment of **Loss**, the **Insurer's** obligation to pay **Loss** will be completely fulfilled and extinguished. Except as provided for in section VI. Priority of Payments of the Directors & Officers Coverage (Part 1), the **Insurer** is entitled to pay **Loss** as it becomes due and payable, without consideration of other future payment obligations.

B. DEFENSE AND SETTLEMENT

1. The **Insureds** and not the **Insurer** have the duty to defend any **Claim** made against the **Insureds**. At the written request of the **Insured**, the **Insurer** shall advance covered **Defense Costs** in excess of the applicable Retention within 90 days after receipt by the **Insurer** of detailed invoices and any other information requested by the **Insurer**. Such advance payments by the **Insurer** shall be repaid by the **Insureds**, severally according to their respective interests, to the extent it is determined that the **Insureds** are not entitled to payment of such **Defense Costs** under the terms of this Policy. The **Insurer** shall have no obligation to pay **Defense Costs** for any **Claim** for damages not covered by this Policy.
2. The **Insurer** shall have the right and opportunity to associate with the **Insured** regarding the investigation, defense and settlement of any **Claim** to which this Policy applies, including selecting appropriate defense counsel. The **Insured** agrees not to offer to settle, incur any expense or **Defense Costs**, or otherwise assume any contractual obligation, admit any liability or stipulate to any judgment with regard to any **Claim** without the **Insurer's** prior written consent, which will not be unreasonably withheld. The **Insurer** shall not be liable for any offer to settle, settlement, expense, **Defense Costs**, assumed obligation, admission, judgment or stipulated judgment to which it has not given its prior consent. However, the **Insured** may settle a **Claim** without the **Insurer's** consent if the **Claim** is reported in the time and manner required by this Policy, settled in its entirety, and the amount of such settlement, including **Defense Costs**, does not exceed the applicable Retention as specified in Item 5 of the Declarations.
3. Each **Insured** agrees to cooperate with the **Insurer** in the defense, investigation and settlement of any **Claim**. Upon the **Insurer's** request, the **Insured** shall submit to examination or questioning, attend hearings, depositions, and trials and assist in effecting settlement, securing and giving evidence and obtaining the attendance of witnesses in the conduct of suits, mediations or similar proceedings. Each **Insured** shall assist the **Insurer** in effecting any rights of indemnity, contribution or apportionment available to any **Insured** or the **Insurer**. The **Insured** shall do nothing to prejudice the **Insurer's** position or its potential or actual rights of recovery.

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844-722-7827
Fax: 513-599-7501
www.corespecialty.com
Report claims to:
claims@corespecialty.com

4. The **Insurer** may, with the consent of the **Insured** which will not be unreasonably withheld, make any settlement of any **Claim** covered under this Policy that the **Insurer** deems expedient. Solely with respect to **Claims** made under the Employment Practices Coverage (Part 2) and Fiduciary Coverage (Part 3), if any **Insureds** refuse to consent to the settlement of a **Claim** recommended by the **Insurer** and acceptable to the claimant, then the **Insurer** shall not pay **Loss** for such claim in excess of the sum of:
   a. The amount of the proposed settlement plus **Defense Costs** incurred prior to such refusal; and
   b. Seventy percent (70%) of the **Loss** incurred for such **Claim** in excess of the amount specified in 4 a. above.

C. RETENTION

1. The **Insurer** shall only be liable for those amounts payable as **Loss** which are in excess of the applicable Retention as specified in Item 5 of the Declarations. The Retention shall apply separately to each **Claim** and shall be paid by the **Insured**.
2. The **Insured** shall promptly make direct payments within the Retention to the appropriate parties as designated by the **Insurer**. The **Insurer** shall have no obligation to make payments within the Retention. If the **Insured** fails to pay the Retention and the **Insurer** brings suit to collect such amounts, then the **Insureds** responsible to pay such amounts shall pay the legal fees, costs, and expenses incurred by the **Insurer** to collect such amounts.
3. If a single **Claim** is covered in whole or in part under more than one **Coverage Part**, the applicable Retention under each such **Coverage Part** shall be applied with regard to coverage for such **Claim**; provided, however, that the sum of all applicable Retentions under all such applicable **Coverage Parts** shall not exceed the largest applicable Retention.
4. Any payment of a Retention by the **Company** as a result of an **Investigative Inquiry** shall reduce any Retention due from the **Company** on account of a **Claim** subsequently afforded coverage under Insuring Agreement B. of the Directors & Officers Coverage (Part 1) that is based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact or circumstance that was the subject of such **Investigative Inquiry**.
5. If the **Company** fails or refuses to pay covered indemnifiable **Loss** of an **Insured Person** within the applicable Retention specified in Item 5 of the Declarations, then:
   a. to the extent such **Loss** is paid pursuant to the terms and conditions of a **Side A Excess DIC Policy**, the **Insurer** agrees such **Side A Excess DIC Policy** payments contribute to and reduce the applicable Retention specified in Item 5 of the Declarations; provided however, as a condition to recognition of the reduction of the applicable Retention amount, the **Insured** shall provide the **Insurer** with written evidence of the payment of such **Loss** under the **Side A Excess DIC Policy**. Such written evidence shall be in a form satisfactory to the **Insurer**;
   b. to the extent such **Loss** is not paid pursuant to the terms and conditions of a **Side A Excess DIC Policy**, the **Insurer** shall advance such amounts on behalf of the **Insured Person** until the **Company** agrees to make such payments or the Retention has been satisfied. Such advancement of **Loss** is subject to the following:
      1. Advancement of **Loss** shall be part of and not in addition to the **Applicable Limit of Liability**; and
      2. In no event shall any such advancement of **Loss** by the **Insurer** relieve the **Company** of any duty it may have to provide advancement, payment or indemnification to any **Insured Person**, and the **Company** agrees to provide such advancement, payment or indemnification to the fullest extent permitted by law.

   Indemnification shall be deemed "failed" if it has been requested by an **Insured Person** in writing and the **Company** has not provided, agreed to provide or acknowledged such indemnification as an obligation of the **Company** within 60 days of the **Insured Person's** request. Indemnification shall be deemed "refused" if the **Company** gives a written notice of the refusal to the **Insured Person**. In all events, indemnification shall only be deemed "failed" or "refused" to the extent such indemnification is not provided by, or agreed to be provided by, or acknowledged by and collectible from the **Company** or other source.

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844-722-7827
Fax: 513-599-7501
www.corespecialty.com
Report claims to:
claims@corespecialty.com

D. REPORTING AND NOTICE REQUIREMENTS

As a condition precedent to coverage under this Policy, the **Insured's** duties in the event of a **Claim** are as follows:

1. If a **Claim** is made against an **Insured**, the **Insured** must give written notice to the **Insurer** as soon as practicable after the Chief Executive Officer, Chief Financial Officer or Risk Manager (or the foreign or domestic equivalent of such positions) becomes aware of such **Claim**, but in no event later than:
   a. 180 days after this Policy expires, with the stipulation that this Policy is renewed with the **Insurer**;
   b. 60 days after this Policy expires or terminates if this Policy is not renewed with the **Insurer**; or
   c. the expiration date of the Supplemental Extended Reporting Period, if applicable.

   The **Insured** shall immediately forward to the **Insurer** every demand, notice, summons, or other process received by any **Insured**.
2. If, during the **Policy Period**, or an Extended Reporting Period if applicable, an **Insured** becomes aware of any fact, circumstance, or situation, which may reasonably be expected to give rise to a **Claim** against any **Insured**, and gives written notice to the **Insurer** during the **Policy Period,** or an Extended Reporting Period if applicable, then any **Claim** subsequently made against an **Insured** arising out of such fact, circumstance or situation shall be deemed to have been made when written notice was first received by the **Insurer**. Written notice under this paragraph shall include the specific fact, circumstance or situation with full particulars as to dates, injury or damage that may result, and persons and entities involved.

E. CANCELLATION

This Policy may be canceled by the **Named Insured** by providing advance written notice to the **Insurer** stating when thereafter such cancellation shall be effective. If this Policy is canceled by the **Named Insured**, earned premium shall be computed pro rata.

This Policy may be canceled by the **Insurer** only for non-payment of any premium when due. The **Insurer** shall provide written notice to the **Named Insured** at least 10 days prior to the effective date of cancellation. The notice as aforementioned shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the **Policy Period**. If the **Insurer** cancels, earned premium shall be computed pro rata.

F. NON-RENEWAL

The **Insurer** shall not be required to renew this Policy; however, the **Insurer** shall send notice of the **Insurer's** intent not to renew this Policy, to the **Named Insured**, at least 60 days prior to expiration of the **Policy Period**.

G. EXTENDED REPORTING PERIOD COVERAGE

In the event of cancellation or non-renewal of this Policy by either the **Named Insured** or the **Insurer** for reasons other than nonpayment of premium, the **Named Insured** shall have the right to purchase an optional Supplemental Extended Reporting Period upon payment of the additional premium as specified in Item 6 of the Declarations.

If the **Named Insured** purchases the Supplemental Extended Reporting Period, the coverage shall apply only to **Claims** for **Wrongful Acts** fully occurring prior to the date of cancellation or non-renewal and otherwise covered by this Policy and which are first made against any **Insured** and reported to the **Insurer** during the Supplemental Extended Reporting Period.

1. The right to purchase the Supplemental Extended Reporting Period is subject to the following conditions:
   a. any Retention or other amounts owed the **Insurer** have been paid;
   b. the **Insureds** have complied with all terms and conditions of the Policy;
   c. the **Named Insured** must send written notice to the **Insurer** of the intention to purchase the Supplemental Extended Reporting Period accompanied by the additional premium. Written notice and premium payment must be received by the **Insurer** within 60 days of cancellation or nonrenewal or the right to purchase the Supplemental Extended Reporting Period shall terminate; and
   d. the Supplemental Extended Reporting Period does not increase or reinstate the limits of liability or extend the **Policy Period**.
2. Any **Claim** made during the Supplemental Extended Reporting Period shall be deemed to have been made during the **Policy Period**. The entire premium for the Supplemental Extended Reporting Period shall be deemed to be fully earned at the inception of the Supplemental Extended Reporting Period.

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844-722-7827
Fax: 513-599-7501
www.corespecialty.com
Report claims to:
claims@corespecialty.com

H. OTHER INSURANCE

This Policy shall be specifically excess over any applicable Retention. This Policy shall also be specifically excess over, and shall not contribute with, any other valid and collectible insurance, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is a personal umbrella policy, personal directors and officers liability policy purchased by an **Insured Person**, or insurance specifically excess of this Policy.

If two or more policies of insurance issued by the **Insurer** or any of its affiliated companies apply to the same claim, the **Insurer** shall not be liable for any amount greater than the Limit of Liability of the policy which has the highest applicable Limit of Liability. If the Limit of Liability on each policy is the same, only one limit will apply.

With specific respect to any **Employee** that is a temporary or leased worker, or independent contractor, this Policy shall be specifically excess of any indemnification or insurance, otherwise available to such temporary or leased worker or independent contractor, from any source.

If any **Loss** arising out of any covered **Claim** made against any **Insured Person** in an **Outside Capacity** is indemnified by an **Outside Entity** or any other entity other than the **Company**, then, subject to this Policy's terms, conditions and exclusions, this Policy shall cover such **Loss**, but only to the extent that the amount of such **Loss** is in excess of the amount of any insurance from such **Outside Entity** or any entity other than the **Company**.

The **Insured** agrees that it will use its best effort to promptly enforce any and all rights any **Insured Person** has to indemnification by any entity other than the **Company**.

I. SUBROGATION

In the event of any payment under this Policy, the **Insurer** shall be subrogated to the extent of such payment to all of the **Insured's** rights of recovery, including without limitation, any right of recovery from the **Company** for **Loss** incurred by an **Insured Person** that is indemnifiable by the **Company**. The **Insured** shall execute all papers required and do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable the **Insurer** effectively to bring suit in the name of the **Insured**.

In any subrogation claim against the **Company** to enforce an **Insured Person's** right of indemnification, the articles of association, bylaws, charter, resolutions and other organizational documents of the **Company** shall be deemed to provide indemnification to the fullest extent permitted by law and the **Insurer's** recovery from the **Company** for such **Loss** shall not exceed the Retention applicable to the **Company** for such **Loss**.

The **Insurer** shall have no right of recourse against any **Insured Person** with respect to any amounts paid under the Fiduciary Coverage (Part 3), if the premium for this Policy, or any portion thereof, was purchased by or on behalf of any **Insured Person** who is serving as a past, present, or future trustee of a **Plan**.

The **Insurer** shall not exercise its right of subrogation against any **Insured Person** unless it has been established by a final and non-appealable judgment in any underlying action that such **Insured Person** committed conduct that is uninsured pursuant to Common Exclusions (Part 5), A. or B.

Any amounts recovered by the **Insurer** pursuant to the exercise of such rights of subrogation shall be applied to reinstate the **Applicable Limit of Liability** to the extent of such recovery, less the **Insurer's** costs incurred in obtaining such recovery, except as otherwise required by law. It is understood and agreed that the **Insurer** shall have no duty to seek such a recovery.

J. ALLOCATION

If both **Loss** covered by this Policy and loss not covered by this Policy are incurred as a result of a **Claim**, the **Insured** and the **Insurer** shall use their best efforts to allocate such amount between covered **Loss** and uncovered loss based upon the relative legal and financial exposures of the parties to covered and uncovered matters. If the **Insured** and the **Insurer** are unable to agree on the amount of the allocation, then the **Insurer** shall pay only those amounts (excess of the Retention amount) which the **Insurer** deems to be fair and equitable until a different amount shall be agreed upon or determined pursuant to the terms of this Policy and the above stated standards.

K. ASSIGNMENT

Assignment of interest under this Policy shall not bind the **Insurer** unless its consent is endorsed hereon.

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844-722-7827
Fax: 513-599-7501
www.corespecialty.com
Report claims to:
claims@corespecialty.com

L. AUTHORIZATION

It is agreed the **Named Insured** shall act on behalf of all **Insureds** with respect to giving or receiving notice of cancellation or non-renewal, payment of premiums, receiving of any return premiums, exercising or declining the right to purchase Supplemental Extended Reporting Period Coverage and agreeing to any changes in this Policy.

M. ACTION AGAINST THE INSURER

1. No action shall lie against the **Insurer** unless, as a condition precedent thereto, the **Insureds** have fully complied with all terms of this Policy and until the amount of the **Insureds'** obligations to pay shall have been finally determined either by judgment against the **Insured** after actual trial or by written agreement of the **Named Insured**, all claimants and the **Insurer**.
2. Nothing contained in this Policy shall give any person or organization any right to join the **Insurer** as a party in any action against any **Insured** to determine any **Insured's** liability.

N. BANKRUPTCY

Bankruptcy or insolvency of any **Insured** shall not relieve the **Insurer** of any of its obligations hereunder. In the event that a bankruptcy proceeding is commenced by or against the **Company**, the **Company** and the **Insured Persons** shall not oppose efforts by the **Insureds** or the **Insurer** to obtain relief from any stay or injunction.

O. CHANGES IN STATUS OF ENTITY

1. CHANGE IN CONTROL

   If there is a **Change In Control**, coverage will continue until the end of the **Policy Period**, but only with regard to **Claims** first made against the **Insured** during the **Policy Period**, and reported to the **Insurer** in the time and manner required by this Policy, for **Wrongful Acts** occurring prior to the effective date of the **Change In Control**. If and when there has been a **Change In Control**, the premium shall be deemed to be fully earned and the **Policy Period** shall remain unaltered.

2. NEW ENTITY

   a. If during the **Policy Period** the **Company** acquires an entity such that it owns, directly or indirectly, more than fifty percent (50%) of the voting stock or voting rights thereof, coverage under this Policy shall automatically apply to: (i) such new entity; (ii) such new entity's subsidiaries; and (iii) such new entity's subsidiaries' directors, officers, trustees and employees; but only with regard to **Claims** that allege **Wrongful Acts** committed after such acquisition.

   b. However, if the total assets of such newly acquired entity exceed thirty five percent (35%) of the total assets of the **Named Insured** as reflected in the **Named Insured's** most recent audited consolidated financial statements; or the combined total number of all **Company** employees increases by more than thirty five percent (35%) as an immediate result of such acquisition; then coverage under this Policy shall apply only if the **Insurer** agrees to afford such coverage pursuant to paragraph 2.c. below.

   c. The **Insurer** may agree to extend the coverage described in paragraph 2.b. above to the new entities and persons described in paragraph 2.a. above if, within 60 days after the acquisition, the **Named Insured** provides any additional information, pays any additional premium and agrees to any additional terms, conditions and/or exclusions reasonably required by the **Insurer** for such extension of coverage. If the **Named Insured** fails to provide such notice or information, or otherwise fails to comply as required by this paragraph, then coverage as described in paragraph 2.a. above shall terminate with respect to **Claims** first made more than 60 days after such acquisition.

   d. There will be no coverage under this Policy for any **Wrongful Act** by any **Insured** considered to be a covered **Insured** pursuant to paragraph 2.a. above where such **Wrongful Act** occurred, in whole or in part before the effective date of such acquisition, or for any **Wrongful Act** occurring on or after such date which, together with any **Wrongful Act** occurring before such date, would constitute **Interrelated Wrongful Acts**.

P. ECONOMIC OR TRADE SANCTION

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844-722-7827
Fax: 513-599-7501
www.corespecialty.com
Report claims to:
claims@corespecialty.com

If coverage for a **Claim** under this Policy is in violation of any economic or trade sanction, including, but not limited to, any sanction administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control (OFAC), then coverage for such **Claim** shall be deemed null and void.

Q. HEADINGS

The titles and headings to the **Coverage Parts**, Common Definitions, Common Exclusions, Common Conditions, Clauses, Sub-Clauses, endorsements of this Policy, and the schedule of endorsements attached to this Policy, are included solely for ease of reference and do not in any way limit, expand or otherwise affect coverage available under this Policy.

R. APPLICATION REPRESENTATIONS

The **Application** is the basis of this Policy and is incorporated in and constitutes a part of this Policy. The **Application** shall be deemed to be attached to this Policy as if physically attached. The **Insureds** agree that the statements and representations within the **Application** are true and accurate and that this Policy is issued in reliance upon the truth and accuracy of such statements and representations.

With respect to such statements and representations, no knowledge possessed by any **Insured Person** shall be imputed to any other **Insured Person** for purposes of determining the availability of coverage under this Policy; provided however, the **Insureds** agree that in the event of any material misstatement, misrepresentation or omission in the **Application**, no coverage will be afforded under this Policy for any **Claim** based upon or arising out of the information that was not truthfully or accurately disclosed with respect to:

1. any **Insured Person** who knew, as of the inception date of this Policy, the information that was not truthfully or accurately disclosed;
2. the **Company** under Insuring Agreement B. of the Directors & Officers Coverage (Part 1) for the indemnification of any **Insured Person** who knew, as of the inception date of this Policy, the information that was not truthfully or accurately disclosed;
3. the **Company** if any **Insured Person** who is or was Chief Executive Officer or Chief Financial Officer (or the foreign or domestic equivalent of such positions) of the **Company** knew, as of the inception date of this Policy, the information that was not truthfully or accurately disclosed.

S. NON-RESCISSION

This Policy shall not be rescinded by the **Insurer**; provided that nothing herein shall limit or waive any other rights or remedies available under the Policy or applicable law.

T. GLOBAL LIBERALIZATION

If a **Claim**, or a portion of a **Claim**, is subject to a jurisdiction other than the jurisdiction of the United States of America its territories or possessions, and the application of such jurisdictional law would result in a coverage determination under this Policy that is less favorable to the **Insured** than the **Insured** would receive had the issue been subject to the U.S. Jurisdiction, to the greatest extent legally permissible, the **Insurer** shall apply the U.S. Jurisdictional law that would otherwise apply to such coverage determination.

U. REPRESENTATIVES

Coverage under each **Coverage Part**, subject to its terms, shall be extended to apply to **Loss** resulting from a **Claim** for a **Wrongful Act** of an **Insured Person** made against:

1. a natural person who, at the time the **Claim** is made, is the lawful spouse or domestic partner of such **Insured Person**, provided that such **Claim** arises solely out of such person's status as the spouse or domestic partner of such **Insured Person**; or seeks recovery from marital community property, other property jointly held by the spouse or domestic partner and such **Insured Person**, or property transferred from such **Insured Person** to the spouse or domestic partner; or
2. the estate, heir, legal representative or assigns of an **Insured Person**, in the event of such **Insured Person's** death, incompetency, insolvency or bankruptcy; but solely with respect to a **Wrongful Act** fully occurring prior to such **Insured Person's** death, incapacity or bankruptcy and only to the extent that such **Insured Person** would otherwise be covered by this Policy.

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844-722-7827
Fax: 513-599-7501
www.corespecialty.com
Report claims to:
claims@corespecialty.com

There shall be no coverage extended under this Policy for **Loss** resulting from any **Claim** arising from any act, error, or omission of any spouse, domestic partner, estate, heir, legal representative or assigns of any **Insured Person**.

V. VALUATION

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the U.S. If a judgment is rendered, a settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than U.S. dollars, payment under this Policy will be made in U.S. dollars at the rate of exchange as published in *The Wall Street Journal* on the date the final judgment is reached, the amount of the settlement is agreed upon, or the other element of **Loss** is due, respectively.

W. TERRITORY

Coverage under this Policy shall, to the extent legally permitted, extend to **Wrongful Acts** taking place, **Loss** incurred, or **Claims** made anywhere in the world.

X. SERVICE OF SUIT CLAUSE

The **Insurer** appoints the highest state official in charge of insurance affairs (Commissioner of Insurance, Director of Insurance, Insurance Commissioner, Executive Secretary, Superintendent of Insurance, or such other official title as designated by the state) of the **Insured's** domiciliary state and his/her successor or successors in office as his/her and their duly authorized deputies, as the **Insurer's** true and lawful attorney in and for the aforesaid state, upon whom all lawful process may be served in any action, suit or proceeding instituted in the **Insured's** domiciliary state by or on behalf of any **Insured** or beneficiary against the **Insurer** arising out of this Policy, provided a copy of any process, suit, complaint or summons is sent by certified or registered mail to:

Robert Kuzloski
Legal Department
StarStone US Companies
412 Mt. Kemble Avenue, Suite G-60,
Morristown, New Jersey 07960
Tel: (917) 704-6008
Email: Robert.Kuzloski@corespecialty.com

IN WITNESS WHEREOF, the **Insurer** has caused this Policy to be signed by its President and Secretary, and, if required by state law, this Policy will not be valid unless countersigned by a duly authorized representative of the **Insurer**.

Joseph E (Jeff) Consolino
President

Secretary

**Company:** StarStone Specialty Insurance Company
**Policy Number:** DNO00012050P-01
**Insured:** RAD Diversified REIT Inc
**Endorsement Effective Date:** 01/22/2024

# PUBLIC COMPANY MANAGEMENT LIABILITY INSURANCE
## Derivative Demand Investigation Costs Limit

It is agreed that:

1. Section II. Extensions A. of the Directors & Officers Coverage (Part 1) of this Policy is deleted in its entirety and replaced with the following:

   A. DERIVATIVE DEMAND INVESTIGATION COSTS COVERAGE

   The **Insurer** shall pay on behalf of the **Company**, **Derivative Demand Investigation Costs** resulting from a **Derivative Demand** first made during the **Policy Period** and reported to the **Insurer** during the Policy Period or within 0 days thereafter.

   Any payment by the **Insurer** pursuant to this section II. A. shall be considered part of **Loss**, shall be excess of the Derivative Demand Investigation Costs Retention as specified in Item 5 of the Declarations, and shall be part of, and not in addition to the **Applicable Limit of Liability**. The maximum amount payable by the **Insurer** pursuant to this section II. A. shall not exceed a maximum aggregate limit of $100,000.

Whenever printed in this Endorsement, the boldface type terms shall have the same meanings as indicated in the Policy Form.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

**Company:** StarStone Specialty Insurance Company
**Insured:** RAD Diversified REIT Inc
**Policy Number:** DNO00012050P-01
**Endorsement Effective Date:** 01/22/2024

# PUBLIC COMPANY MANAGEMENT LIABILITY INSURANCE
## Absolute Product Liability Exclusion

It is agreed that:

1. Section IV. Exclusions of the Directors & Officers Coverage (Part 1) of this Policy is amended by the addition of the following:

   IV. The **Insurer** shall not be liable under this Directors & Officers Coverage (Part 1) to pay any **Loss** arising from any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged recall, defect, deficiency, inadequacy, malfunction, or dangerous condition of any product, or failure of any product to perform as a result of any defect, deficiency, inadequacy, malfunction, or dangerous condition in such product or its design, manufacture, or implementation;

Whenever printed in this Endorsement, the boldface type terms shall have the same meanings as indicated in the Policy Form.
ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

**Company:** StarStone Specialty Insurance Company
**Insured:** RAD Diversified REIT Inc
**Policy Number:** DNO00012050P-01
**Endorsement Effective Date:** 01/22/2024

# PUBLIC COMPANY MANAGEMENT LIABILITY INSURANCE
## Professional Services Exclusion

It is agreed that:

1. Section IV. Exclusions of the Directors & Officers Coverage (Part 1) of this Policy is amended by the addition of the following:

   The **Insurer** shall not be liable under this Directors & Officers Coverage (Part 1) to pay any **Loss** arising from any **Claim** made against any **Insured**:

   1. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the **Insured's** performance of, or failure to perform, professional services for others.

Whenever printed in this Endorsement, the boldface type terms shall have the same meanings as indicated in the Policy Form.
ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

**Company:** StarStone Specialty Insurance Company
**Policy Number:** DNO00012050P-01
**Insured:** RAD Diversified REIT Inc
**Endorsement Effective Date:** 01/22/2024

# PUBLIC COMPANY LIABILITY INSURANCE
# PRIVACY, COLLECTION AND DISCLOSURE EXCLUSION – INSURING AGREEMENT C

It is agreed that:

1. Section Part 5, Common Exclusions of this Policy is amended by the addition of the following:

   In addition to the Exclusions listed in the **Coverage Parts**, the **Insurer** shall not be liable under this Policy to pay any **Loss** arising from any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

   a. access to or disclosure of,any organization's or person's confidential or personal information,including but not limited to patents, copyrights, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information;

   b. unauthorized collection of information by any **Insured** or the failure to provide adequate and legal notice that such information is being collected;

   c. violation of any federal, state, local or foreign regulation, statute, rule or law:

      1. that requires commercial entities that collect personal information to post privacy policies, adopt specific privacy or security controls, or provide notification to individuals in the event personal information has been compromised or potentially compromised; or

      2. limiting or prohibiting facsimile, electronic mail or any other means of communication, including but not limited to, the Telephone Consumer Protection Act 47 U.S.C. Section 227, CAN-SPAM Act of 2003, or any similar Federal Communications Commission regulation or similar provision of any federal, state, local or foreign regulation, statute, rule or law;

   d. access to, theft of, or use of an **Insured's** computer hardware, software, web site, electronic systems, network or programs by an unauthorized person or entity, or access by an authorized person in an unauthorized manner, or the transmission or receipt of unauthorized, corrupting, or harmful computer code,including but not limited to adware, cookies, viruses, spyware, Trojan horses, logic bombs or worms;

   Provided however, this exclusion shall only apply to **Loss** arising from a **Claim** made against the **Company** under Insuring Agreement C.

Whenever printed in this Endorsement, the boldface type terms shall have the same meanings as indicated in the Policy Form.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

**Company:** StarStone Specialty Insurance Company
**Insured:** RAD Diversified REIT Inc

**Policy Number:** DNO00012050P-01
**Endorsement Effective Date:** 01/22/2024

# FLORIDA STATE AMENDATORY ENDORSEMENT

In compliance with state law, it is agreed that:

1. The Conditions section of this Policy is amended by the addition of the following:

   CONTACT INFORMATION

   If any **Insured**, or any holder of a certificate of insurance for this Policy has any question or desires or needs to obtain any information about this Policy, or needs any assistance resolving a complaint arising out of or relating to this Policy, such person or entity may call the **Insurer** at (855) 275-6041.

Whenever printed in this Endorsement, the boldface type terms shall have the same meanings as indicated in the Policy Form.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

# POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE

You are hereby notified that, under the Terrorism Risk Insurance Act, as amended (the "Act"), this Policy provides coverage for losses arising out of acts of terrorism. An "act of terrorism" is defined as any act certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

You should know that the coverage provided by this Policy for losses caused by acts of terrorism may be partially reimbursed by the United States Government under the formula set forth in the Act. Under this formula, the United States generally reimburses 85% of covered terrorism losses that exceed the statutorily established deductible to be paid by the insurance company providing the coverage.

You should also know that the Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses in any one calendar year exceeds $100 billion. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

Your policy includes the terrorism coverage required to be offered by the Act. Coverage for certified acts of terrorism is still subject to, and may be limited by, all other terms, conditions and exclusions in your policy. The premium charged for this coverage for the policy period is $0.