# EXHIBIT "D"

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

**CASE NO.**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

RAD DIVERSIFIED REIT, INC.,
BRANDON "DUTCH" MENDENHALL, and
AMY VAUGHN,

Defendants; and

THE SEMINAR SOLUTION, LLC,

Relief Defendant.
______________________________________/

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**
**AND DEMAND FOR JURY TRIAL**

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges:

## I. INTRODUCTION

1. The Commission brings this action to enjoin RAD Diversified REIT, Inc. ("RADD"), headquartered in Tampa, Florida, and its founders Brandon "Dutch" Mendenhall and Amy Vaughn (collectively, "Defendants") from

committing further violations of the anti-fraud and securities registration provisions of the federal securities laws.

2. From November 2019 through March 2024 ("Relevant Period"), Defendants raised at least $152 million from more than 5,500 retail investors nationwide through an unregistered fraudulent securities offering. During the Relevant Period, RADD raised investor funds through both its stock offerings and investments offered through its "Inner Circle" program, all while systematically deceiving investors about RADD's profitability, the valuation of its stock, and its liquidity. Defendants' conduct has caused financial hardship to thousands of investors nationwide and has jeopardized many of their retirement savings. Many investors were not accredited. Defendants, directly and through RADD's sales agents, encouraged investors to invest by withdrawing funds from their self-directed IRAs, using credit cards, taking out home equity loans, or using life insurance proceeds.

3. Defendants led investors to believe that RADD was a profitable real estate investment trust ("REIT") that generated substantial revenue from rental income and sales of refurbished properties, and that it paid cash dividends from those profits. Defendants ran an extensive marketing campaign across social media, in-person meetings, and through unregistered sales agents using high-pressure sales tactics. Defendants invoked themes of Christian values and

patriotism to create a sense of trust and security for investors. In prolific social media promotions and sales scripts prepared by Defendants and used by their agents, Defendants repeatedly claimed that "zero investors have ever lost money on their investment" and "none of our Inner Circle partners have ever lost money."

4. Contrary to their representations, however, Defendants knew that RADD's financial picture was bleak, with millions of dollars in annual losses reflected in internal profit-and-loss statements.

5. Defendants also touted RADD's ever-increasing stock price, which purportedly increased 150% from 2019 to 2023. Defendants gained investors' confidence by routinely and repeatedly asserting that RADD's stock price was based on objective, independent valuations of the REIT's properties, calculated by external accountants, and would be regularly updated. These assertions were false. RADD used Mendenhall's brother, who was RADD's Vice President of Real Estate Operations yet had no meaningful property valuation experience, to perform the valuations. And no third-party appraiser, evaluator, or accountant, participated in the determination of RADD's stock price.

6. Defendants boasted about RADD's liquidity and gained investors' confidence by assuring them that if they were not satisfied, they could redeem their investments through an established process. In truth, Defendants routinely

denied or ignored investors' redemption requests because RADD lacked sufficient liquidity to honor them. In February 2024, RADD froze stock redemptions.

7. Together with RADD's stock offerings, Defendants promoted access to an "exclusive" investment group, RADD Inner Circle, which purportedly provided members access to invest in Hard Money Loan notes ("HML Notes") promising 20% returns and joint venture real estate deals ("JV Agreements"), each not otherwise available to non-members. In truth, these opportunities were neither exclusive nor capable of producing the returns Defendants claimed.

8. On top of their misrepresentations to investors, Defendants diverted approximately $54 million of RADD investor funds into the bank accounts of an affiliated entity owned and managed by them, The Seminar Solution ("TSS"). Through this scheme, Mendenhall misappropriated approximately $2.3 million and Vaughn misappropriated approximately $2.5 million in investor funds. They used these misappropriated investor funds to pay for personal expenses, such as IRS tax obligations, private jet charters, high end jewelry and clothing, and various recreational and personal expenses.

9. By engaging in the conduct alleged in this Complaint, Defendants have violated, and unless enjoined, are reasonably likely to continue violating, Sections 5(a), 5(c), and Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c); § 77q(a)], and Section 10(b) of the Securities Exchange

Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## II. DEFENDANTS AND RELIEF DEFENDANT

### A. Defendants

10. **RADD** is a Maryland corporation formed in 2017, and its principal place of business during the Relevant Period was in Tampa, Florida. RADD is a REIT that raised at least $152 million from over 5,500 investors. RADD has never been registered with the Commission. On March 1, 2026, RADD filed a Voluntary Petition for Bankruptcy under Chapter 11 of the U.S. Bankruptcy Code in the Middle District of Florida, *In re RAD Diversified REIT, Inc.*, 8:26-bk-01636 (Bankr. M.D. Fla. Mar. 1, 2026) (jointly administered with associated cases 8:26-bk-01637 through 8:26-bk-01640) ("Voluntary Petition for Bankruptcy").

11. **Mendenhall,** 47, is a resident of Tampa, Florida, and is RADD's Chief Executive Officer, President, Director, co-owner, and co-founder. Mendenhall also is an owner of TSS and RADD's investment manager, RAD Management, LLC ("RAD Management"). Mendenhall has never held any securities licenses and has never been registered with the Commission in any capacity, nor associated with a registered entity.

12. **Vaughn**, 48, is a resident of Tampa, Florida, and a Director, co-founder, and co-owner of RADD. Vaughn also is an owner of TSS and RAD

Management. Vaughn has never held any securities licenses and has never been registered with the Commission in any capacity, nor associated with a registered entity.

**B. Relief Defendant**

13. **TSS**, a Nevada limited liability company, with its principal place of business in Tampa, Florida, operated out of the same office space as RADD during the Relevant Period. It is owned by Vaughn and Mendenhall and employed sales agents selling investments in RADD. Since 2020, TSS has received approximately $34 million in direct deposits of RADD investor proceeds, in addition to a net of approximately $20 million of commingled investor funds transferred from RADD.

## III. <u>JURISDICTION AND VENUE</u>

14. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)]; and Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)].

15. This Court has personal jurisdiction over Defendants and the Relief Defendant and venue is proper in the Middle District of Florida because: (a) Mendenhall and Vaughn reside in this District; (b) RADD's principal place of business was in this District; (c) a portion of RADD's real estate, purchased with investor funds, is located in this District; (d) a substantial part of the events or

omissions giving rise to the violations of the Securities Act and the Exchange Act occurred in the District; and (e) TSS was located in this District and received funds directly from RADD.

16. In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

## IV. FACTUAL ALLEGATIONS

### A. RADD's Business and Securities Offerings

#### *1. RADD's REIT and Stock Offerings*

17. Defendants marketed RADD as a REIT that purchased, renovated, and leased income-producing residential properties across the United States. A REIT is a company that owns or finances real estate that generates income. Investors buy shares and can earn dividends and overall returns without having to purchase, renovate, manage, or finance properties themselves. RADD's REIT was a non-traded REIT, thus its shares were unavailable on a public stock exchange for purchase or sale.

18. RADD's website prominently illustrated its business model under the banner "How it Works":




Thus, RADD purportedly would use investor funds to purchase and refurbish distressed properties, collect rents from tenants in those properties, and pay investors cash dividends from rental proceeds.

19. Mendenhall described RADD as "real estate done for you." Defendants exercised exclusive control over RADD's daily operations and in selecting properties to acquire and develop. The properties RADD purchased for the REIT were located primarily in Pennsylvania and Florida, with additional properties in Texas, California, New Jersey, Idaho, and Delaware, totaling more than 550 properties at the REIT's peak. As reflected in this 2022 investor presentation, Defendants assured investors, "We handle everything.":




20. During the Relevant Period, RADD raised approximately $104 million from investors through stock offerings in the REIT. RADD provided investors and prospective investors with (1) offering circulars signed by Mendenhall, Vaughn, and others; (2) Private Placement Memorandums ("PPMs"); and (3) subscriptions agreements (collectively, "Offering Materials"). RADD stock investors deposited their funds into RADD's operating accounts. RADD's stock are securities under the Securities Act and Exchange Act and are described as such in RADD's Offering Materials.

**2. *RADD Inner Circle's Program, and Defendants' Offer and Sale of Investments in HML Notes and JV Agreements***

a. <u>RADD Inner Circle</u>

21. RADD promoted its "RADD Inner Circle" membership as a $50,000 "exclusive" entry into RADD's top investment opportunities, including high interest HML Notes and JV Agreements. In practice, however, Defendants often

accepted far less and encouraged investors to pay the membership fee via credit card.

22. Mendenhall stated that there was a "marriage" between the REIT and RADD Inner Circle and touted its purported "elite" status, as shown here:




23. To join, investors executed a Memorandum of Understanding ("MOU") with a fictitious entity Defendants called "RADD Inner Circle" and signed by Mendenhall or another RADD executive. The MOUs did not have investor qualification questions. The MOUs directed investors to wire their funds to RADD Inner Circle's bank account. However, the bank account was in the name of Mendenhall and Vaughn's other company—TSS. Investors believed they were remitting fees to invest in RADD's top investment opportunities and were not familiar with TSS.

24. Just as with RADD's stock offerings, Defendants marketed RADD's Inner Circle program, including HML Notes and JV Agreements, as "Real Estate Done For You," and portrayed Inner Circle as a path to wealth, as demonstrated here:







b. HML Notes

25. From March 2022 through March 2024, RADD raised approximately $23 million from selling the HML Notes to over 200 investors nationwide. Defendants promoted the HML Notes, signed by Mendenhall or another representative on behalf of RADD, as an investment opportunity for RADD Inner Circle members to earn high interest returns. Defendants sold the HML Notes to raise capital for RADD's general business use and to finance substantial investments. In turn, the investors purchased the HML Notes to make a profit generated by RADD's business and in the form of higher than market-rate interest.

The HML Notes were offered and sold to the public through RADD's website and online social media marketing campaigns directed toward the public at large.

26. With RADD as the loan beneficiary, HML Notes typically were an 18-month term, and on the seventh month, investors were supposed to begin receiving their principal back monthly on an annualized basis, along with 20% interest per month for the remainder of the unpaid principal. If not timely repaid, RADD was required to pay investors an additional 1% of the outstanding balance per month until the HML note was repaid in full. Investors were instructed to wire their funds into bank accounts in the name of RADD and RADD Inner Circle, but which were actually designated for wiring to TSS's accounts.

27. The HML Notes are securities in the form of notes under the Securities Act and Exchange Act. Investors in HML Notes, whose role was limited to investing in them, depended on Defendants to successfully operate and manage RADD to enable investors to achieve the promised returns. Investors understood that RADD would use the HML Notes to further its real estate ventures, over which investors exercised no control. No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the HML Notes' securities and transactions described in this Complaint and no exemption from registration existed with respect to these securities and transactions.

c. JV Agreements

28. From at least November 2019 through March 2024, RADD raised approximately $16.5 million from selling the JV Agreements, signed by Mendenhall or other RADD representatives. RADD received investor funds from the JV Agreements into its main operating account. Defendants promoted the JV Agreements as an opportunity for RADD Inner Circle members to partner with RADD in real estate investment deals. Under the JV Agreements, RADD and the investors were to equally split the cost to acquire and renovate the properties and equally split rental payments and sales profits.

29. The JV Agreements are securities in the form of investment contracts under the Securities Act and Exchange Act. RADD provided investors with pre-selected lists of properties to invest in that were located exclusively through the efforts of RADD. Mendenhall described JV Agreements as "hands-off," and said RADD would do all renovations and handle all aspects of rentals and sales. The JV Agreements stated that RADD would act as agent to operate the business venture and "solely make all decisions" on the properties and joint venture. The investors' roles were limited to investing money in the JV Agreements, and they had no actual or legal authority to exercise entrepreneurial or managerial control over the investments to generate profits. Defendants pooled investors' funds into

bank accounts they controlled. Investors' returns depended entirely on Defendants' performance and management.

**B. Defendants' Solicitation of Investors**

30. Defendants prolifically marketed RADD investments in its stock, HML Notes, and JV Agreements using RADD's website, YouTube videos, podcasts, social media posts, in-person seminars, its Offering Materials, and through its team of sales agents. Advertisements for RADD investments appeared on investors' Facebook feeds, their IRA account platforms, and online investing newsletters. When investors clicked on the links, they were directed to RADD's website, which described how investors could make money by buying shares of RADD stock and investing in HML Notes and JV Agreements available exclusively through the RADD Inner Circle.

31. Defendants talked about Christian values and Mendenhall made comments about his deep faith which gave investors comfort and encouraged them to trust RADD. Defendants also emphasized patriotism, routinely included references to America and images of the American flag in RADD's social media content, and talked about the importance of helping military veterans, which resonated with investors. RADD's Instagram handle was "@redefineamericandream," with a tagline, "We're a cultural and financial

shifting of consciousness for Americans. If you don't love this country, go somewhere else." RADD's Instagram invoked all these themes, as seen here:




32. In publicly available videos and podcasts, Mendenhall touted RADD's positive returns, the money RADD purportedly made for investors, and RADD's cash flow from rental income. He described RADD as a "cash company" that "makes money." He also emphasized RADD's ever-increasing stock price. In a June 2022 email to investors, Mendenhall wrote, "As of today, our REIT has reached a value of $20.03 per share! Let that sink in… we have doubled the equity of our REIT investors' shares in less than 3 years. Since its inception in September 2019, that marks an increase of 100.3%." A large button at the end of the email above Mendenhall's picture invited recipients to the email to "Invest Now!"

33. RADD employed approximately 60 internal sales agents to solicit investors to invest in RADD's stock, HML Notes, and JV Agreements. The sales agents used RADD's sales materials, approved by Vaughn, whom Mendenhall nicknamed "Sales Goddess," and likewise characterized RADD as a thriving company. Sales scripts instructed sales agents to leave investors and prospective investors repeated voicemails, text messages, and emails. Defendants repeatedly stressed that salespersons should emphasize the returns on investment that RADD purportedly provided and that time was of the essence to invest.

34. In a publicly available sales meeting video posted on LinkedIn during the Relevant Period, Mendenhall and Vaughn sat side-by-side at the head of the table talking to sales agents, as seen here:




Mendenhall, with Vaughn nodding along in acknowledgment, directed the sales agents in soliciting investors to take the following approach:

> I think when you're on the phone and you're selling the REIT or you're selling our Inner Circle you have to make—have that same kind of commitment level towards the sale. Right? And—and you also have to have an attitude like—like, if you don't get it, you're a f**king idiot. Right?
>
> . . .
>
> And our[]—thing is so much better than anything else that is out there. There's nothing even close to it from a comparative standpoint. Right? Nobody has the kind of returns we have.

35. Defendants also conducted "Investor Wealth Summits" during which they promoted RADD's investments and provided financial education. Mendenhall and Vaughn directly solicited investors at these summits.

36. Defendants' marketing campaign worked—they convinced more than five thousand retail investors to invest more than one hundred million dollars in RADD in less than five years. As detailed below, however, Defendants painted a false picture of RADD's business, all while Mendenhall and Vaughn helped themselves to nearly five million dollars in investor funds.

## C. Defendants' Violations of the Anti-Fraud Provisions of the Federal Securities Laws

### 1. *Material Misrepresentations*

#### a. <u>RADD Was Not a Profitable Business Sustained By Its Real Estate Operations</u>

37. Defendants repeatedly and consistently represented during the Relevant Period that RADD was profitable and had a net positive cash flow. These

statements were false and omitted material facts about RADD's deteriorating financial condition and inability to secure credit.

38. Mendenhall emphasized that RADD was a thriving, profitable, and cash-flowing business. For example, in a March 2022 video entitled, "Being Burned," Mendenhall stated, "The bottom line is our real estate investment trust is one that invests and makes money. It's been proven year after year after year as a company doing business in the marketplace." In a January 2023 video entitled, "Power of RAD," Mendenhall stated that RADD would "thrive during the worst of economic times" and was not affected by the stock market. In a September 2023 podcast, he stated, "We are a cash company. We build up our cash. We have more, you know, money coming in monthly than most people can imagine."

39. Sales agent scripts approved by Vaughan touted that RADD invested in assets "that rent, that [produce] cashflow and make money," and emphasized investors receiving monthly income and retirement funding.

40. RADD's sales manual instructed sales agents to repeat representations to investors such as "[W]e have cash flow, we appreciate it, we make money and we do it again and again." RADD's sales manual, sales scripts, and social media stated that "zero investors have ever lost money on their investment." Defendants sent mailers to investors that boasted, "Since inception, [RADD has] had a return of 140.80%."

41. Yet, since at least 2022, RADD was in dire financial condition, which Defendants knew.

42. At the time that Mendenhall painted a rosy picture of RADD to investors, Mendenhall knew that RADD's rental income and real estate sales did not cover RADD's operating expenses from 2022 through 2024; he knew that RADD relied on financing and raising new investor funds to operate; and he knew that RADD had net operating losses from 2021 through 2024. But he did not disclose these facts to investors while mispresenting RADD's financial condition.

43. Indeed, Mendenhall received financial and cash flow reports in 2022 and 2023 showing RADD was receiving little to no rental income in 2022 and 2023. Mendenhall also received several text messages from RADD's accounting department on a periodic basis containing a dashboard of current balances in RADD's bank accounts and current and projected expenses, which revealed RADD was receiving little to no rental income.

44. In late 2022, Mendenhall met directly with representatives of a bank to apply for a $15 million line of credit. RADD provided the bank with copies of its internal financial statements for the loan application. In response, on February 1, 2023, Mendenhall and others at RADD received an email notifying them that the bank declined to provide a line of credit because:

> **The company looks to be losing $20 million repeatedly and covers the cost of operational expenses which are abnormally high through equity raises in the public market.** With that[,] our concerns with the latest financials is the trend continues and if [your] access to raise public or private funds dries up, the operational cost of the company is too great to support the current balance sheet. We took a deep analysis and wanted this to work, but with annual losses this large and consistent-it is just not possible. (emphasis added)

45. Vaughn also knew about RADD's grim financial condition. She was the ultimate supervisor for payroll across RADD, TSS, and related entities, and knew about the need to move money between entities under Mendenhall and Vaughn's control to cover expenses and delinquent obligations.

46. Moreover, RADD's own internal financial records show that its annual rental income never exceeded $5 million annually. They also reveal that RADD continuously generated losses and recorded net losses from 2020 through 2024—with annual losses of at least $31 million in 2022 and $22 million in 2023.

47. Despite RADD's perilous financial condition, Defendants continued soliciting investors in RADD stock, HML Notes, and JV Agreements while misrepresenting that RADD was profitable and had a net positive cash flow.

48. By 2024, RADD faced widespread mortgage defaults and before its filing for bankruptcy, faced at least 166 foreclosure actions totaling approximately $47 million.

b. RADD's Cashflow Could Not Support Defendants' Promises on the HML Notes and JV Agreements

49. From at least 2022 to 2024, Defendants misrepresented to HML Notes and JV Agreement investors into believing that RADD had more than enough cash flow to pay the HML Notes and operate the JV properties to generate returns. Mendenhall touted RADD's outstanding financial condition, and both he and Vaughn stated that no RADD Inner Circle investors had ever lost money. Defendants' statements were misleading because RADD was relying on financing and raising new investor funds to operate and could not make interest or principal payments to HML Notes investors. Defendants also commingled investor proceeds from HML Notes and JV Agreements in RADD and TSS's operating accounts, used investor proceeds to cover RADD's operating costs, and failed to make property payments which resulted in the foreclosures.

c. RADD's Stock Price Was Illusory: It Was Not Independently Valued, It Was Derived From Understated Mortgage Obligations, and It Was Not Updated

50. Central to RADD's marketing was the purported upward trajectory of its stock price. RADD prominently featured its stock price on its website as evidence of its profitability, as seen here:




51. RADD's steadily rising stock price—from $10 to $25.04—was an illusion intended to deceive current and prospective investors. The price was based on unsupported real estate valuations that did not come from objective third-party appraisals, independent valuations, or external accountants' calculations—contrary to Defendants' representations—and utilized dramatically understated mortgage liabilities. For example, RADD's internal balance sheet for December 31, 2022, which RADD used to calculate its stock price, listed $41.4 million in mortgage debt, even though RADD's contemporaneous property finance records reflected $66 million in mortgage debt. Further, Defendants failed to update the stock price as promised to investors.

52. RADD's Offering Materials specified how and when RADD's stock price would be determined. As explained in RADD's Offering Materials, RADD's stock price was rooted in the valuation of its net asset value ("NAV"). RADD calculated its NAV by adding up the fair value of all its properties, subtracting the

debt on those properties, and then adding any other assets and liabilities. The stock price was simply the NAV divided by the number of outstanding shares. Per the Offering Materials, to calculate its NAV, RADD was supposed to value each property in its portfolio quarterly by either an "objective independent third party appraiser" or "objective independent third party evaluator" to determine its fair value. Then, "external accountants" were supposed to work with RADD to calculate its stock price. RADD was also supposed to update its stock price and NAV every quarter, and sooner if a material event caused RADD's stock price to change by 5% or more.

53. In a March 2022 video entitled "Being Burned," Mendenhall, to engender investor trust, stated, "We have a third party that also does the assessment of all our assets, of all our values, of all our properties." This independent third-party appraiser assertion was repeated at presentations to investors during investor retreats.

54. In a May 2024 video focusing on whether RADD was profitable, Mendenhall, after touting RADD's ever-increasing stock price being up to $25.04, stated, "That's what the numbers are. That's what the math is. And if I ever found that there was anything different in the math, then we would change the math. That's why there are CFOs, that's why there are accountants, that's why there's third-party, that's why there's auditors."

55. Sales scripts approved by Vaughn for use by RADD's sales agents touted RADD's stock price and included statements about RADD's use of third-party appraisers or evaluators to calculate RADD's NAV each quarter.

56. RADD also sent investors "Shareholder's Periodic Statement[s]" reflecting the purported current value and their investments' alleged growth based on the purported increase in RADD's stock price.

57. Defendants' representations about determining, calculating, and updating RADD's stock price were false. RADD did not obtain independent property appraisals or valuations for its properties. Instead, Mendenhall's brother, who was employed by RADD as its Vice President of Real Estate Operations, determined the value of RADD's real estate assets. Prior to joining RADD, Mendenhall's brother's work experience was largely working at two prominent chain restaurants. Mendenhall's brother and his team relied on superficial online estimates rather than accepted appraisal standards. Mendenhall's brother and his team did not maintain any records of how they determined property values sent to RADD's internal accountants. RADD's internal accountants just accepted those valuations at face value. And RADD also did not use external accountants to determine its stock price.

58. Indeed, RADD was suffering from a foreclosure epidemic which began in earnest in 2024. And despite widespread foreclosures—internal findings

showing the stock price was significantly overstated—Defendants failed to update the $25.04 stock price after July 2023 which was contrary to representations in the Offering Materials about quarterly and event-driven updates. Defendants never updated RADD's stock price beyond July 2023.

59. The inflated stock price inured to the benefit of Mendenhall and Vaughn as co-owners of RAD Management, which was entitled to a performance fee equal to 20% of the increase in the NAV. The higher the NAV, the more fees paid to RAD Management, enriching Mendenhall and Vaughn. For example, Mendenhall and Vaughn, through RAD Management, used a purported increase in NAV and equity for the quarter ending December 2022 to charge RADD approximately $2.9 million in performance fees. RAD Management—Mendenhall and Vaughn—also calculated asset management fees equal to 2% of the NAV every year based on the inaccurate NAV amount.

d. <u>RADD Was Not Liquid as Defendants Repeatedly Touted</u>

60. Defendants told investors they could withdraw at least a portion of their investment if they followed the procedures laid out in the Offering Materials—filling out the requisite form and waiting the allotted six months—permitting redemption requests every January and June.

61. In a January 2023 video, Mendenhall stated, "It's their money. They should have access to it when they want to have it." In or around 2022, Vaughn

told at least one investor that he would have access to his money after the six-month holding period.

62. Still, many investors were not paid even after complying with RADD's redemption requirements. After investors submitted redemption requests, Mendenhall, Vaughn, or both, determined whether and when those requests would be honored. Preference was given to large investors, investors planning to attend upcoming RADD events and those who repeatedly complained. Meanwhile, numerous investors either received no payment or were met with shifting explanations—such as supposed delays in the accounting department—or were given false assurances that funds were forthcoming. In reality, RADD lacked the financial capacity to honor redemption requests because of its deteriorating financial condition and Mendenhall's and Vaughn's misappropriation of investor funds.

63. On February 2, 2024, RADD froze redemptions. Despite Defendants' representations that RADD would revisit its decision to freeze redemptions, RADD has not unfrozen redemptions. In January 2025, Mendenhall in fact berated investors for seeking redemptions, saying they were "attacking" RADD.

64. At the time of the redemption freeze in February 2024, there were at least $3 million in redemption requests outstanding.

**2. *Scheme To Defraud***

a. <u>Mendenhall and Vaughn Diverted RADD Investor Funds to TSS</u>

65. Mendenhall and Vaughn controlled RADD, TSS, and their bank accounts, and they commingled investor funds within and across these accounts. From January 2020 through at least March 2024, RADD received approximately $118 million of investor funds into its bank accounts. Defendants diverted a net of approximately $20 million of commingled investor funds from RADD's bank accounts to TSS's bank accounts. TSS also received about $34 million of investor funds that Mendenhall and Vaughn, unbeknownst to investors, diverted and commingled directly into TSS's bank accounts from investments in HML Notes and JV Agreements, together with fees to join the RADD Inner Circle program. While TSS had some legitimate income from education revenue, the vast majority of funds in TSS's bank accounts were commingled and diverted RADD investor funds.

66. Mendenhall and Vaughn knew that RADD Inner Circle funds were directed to TSS's bank accounts, that RADD funds were commingled in TSS's accounts, and that investors were not told their money would be used for payroll or personal expenses.

b. <u>Mendenhall and Vaughn Misappropriated Millions of Dollars of Investor Funds</u>

67. Mendenhall and Vaughn diverted millions of dollars from RADD's bank accounts and investor-funded TSS accounts for personal use, including private jets, luxury goods, jewelry, IRS tax payments, nanny services, and other personal expenditures. All of RADD's and TSS's bank accounts were jointly controlled by Mendenhall and Vaughn.

68. During the Relevant Period, Mendenhall misappropriated at least $2.3 million in investor funds. He transferred at least $1.4 million from TSS's bank accounts to his personal accounts, paid from RADD's and TSS's accounts $691,000 to the IRS on his behalf, paid from TSS's accounts $75,000 to his nanny, and paid from TSS's account $197,000 in American Express ("AmEx") charges.

69. Mendenhall's AmEx charges included more than $50,000 from a high-end custom clothier, more than $25,000 for AmEx gift cards, nearly $50,000 from high-end jewelers, and thousands of dollars in various expenses, including orthodontic charges, adult nightclub expenses, firearms ranges, outdoor sporting goods stores, and recreation such as golf and bowling, among others.

70. Vaughn misappropriated at least $2.5 million in investor funds. She transferred $1.5 million from TSS's accounts to her personal accounts, paid from TSS's accounts $299,000 to the IRS on her behalf, and paid from TSS's account at least $747,000 in AmEx charges.

71. Vaughn's AmEx charges included more than $214,000 in private jet charters, approximately $173,000 from high-end fashion clothing and accessories stores, approximately $80,000 from jewelry stores, approximately $40,000 from adult nightclubs, approximately $15,000 in AmEx gift cards, approximately $15,000 in Ticketmaster charges, and thousands of dollars for various other expenses, including to a luxury car dealership, private school, orthodontics, pet supplies and spa, exercise equipment, and a pawn shop, among others.

72. While RADD's offering circular and PPMs stated that Mendenhall and Vaughn were entitled to salaries as well as management fees upon RADD meeting certain financial benchmarks, these payments for the benefit of Mendenhall and Vaughn from RADD and TSS using commingled investor funds were not designated as salary or management fee payments. And, as described below, Mendenhall himself publicly stated several times that neither he nor Vaughn received salary or management fees in 2023 or 2024, and Vaughn emphasized to investors the sacrifices she had purportedly made for them.

73. During a December 28, 2024, video question-and-answer session with investors, Mendenhall stated, "So [RADD] is focused on taking steps we believe will improve our financial condition and protect our assets. Amy Vaughn and Dutch Mendenhall as leaders have deferred their personal offer (*sic*) salaries for the company for all of 2023 and 2024 calendar year."

74. In a January 2025 update video call to investors, Mendenhall stated that he and Vaughn had deferred all management fees until the redemption freeze would be lifted, and reiterated it by later stating:

> Ladies and gentlemen, I have deferred all salary for all of 2023 and 2024. Right? Because at the end of the day, my true wealth is built up in this. And if this survives and succeeds, then I'm a very, very wealthy man. If it doesn't, then I'm an entrepreneur who's building my business and building my wealth. And so that's—thus is life. Right? Cool.

***3. RADD's Status***

75. In April 2025, Mendenhall and Vaughn finally told investors via video that the company was preparing to file for Chapter 11 bankruptcy. In the same video, they asked investors to provide $20,000 to keep RADD operational.

76. On March 1, 2026, RADD, along with four affiliated entities, filed its Voluntary Petition for Bankruptcy. The filing placed over 300 properties—single family homes and vacant lots—under court supervision. Thereafter, the U.S. Trustee's Office moved for the appointment of an Examiner, which was granted.

## V. CLAIMS FOR RELIEF

### COUNT I

### Violations of Section 17(a)(1) of the Securities Act
### (Against All Defendants)

77. The Commission repeats and realleges Paragraphs 1 through 76 of this Complaint.

78. By engaging in the conduct described herein, and as alleged in Paragraphs 65 through 76 above, from approximately November 2019 through March 2024, Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes or artifices to defraud.

79. By reason of the foregoing, Defendants, directly or indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

**COUNT II**

**Violations of Section 17(a)(2) of the Securities Act**
**(Against All Defendants)**

80. The Commission repeats and realleges Paragraphs 1 through 76 of this Complaint.

81. By engaging in the conduct described herein, and as alleged in Paragraphs 37 through 64 above, from approximately November 2019 through March 2024, Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts

necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

82. By reason of the foregoing, Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT III

**Violations of Section 17(a)(3) of the Securities Act**
**(Against All Defendants)**

83. The Commission repeats and realleges Paragraphs 1 through 76 of this Complaint.

84. By engaging in the conduct described herein, and as alleged in Paragraphs 65 through 76 above, from approximately November 2019 through March 2024, Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices and courses of business which have operated, are now operating or will operate as a fraud or deceit upon the purchasers.

85. By reason of the foregoing, Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

**COUNT IV**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a)**
**(Against All Defendants)**

86. The Commission repeats and realleges Paragraphs 1 through 76 of this Complaint.

87. By engaging in the conduct described herein, and as alleged in Paragraphs 65 through 76 above, from approximately November 2019 through March 2024, Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

88. By reason of the foregoing, Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) [17 C.F.R. § 240.10b-5(a)] thereunder.

**COUNT V**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**
**(Against All Defendants)**

89. The Commission repeats and realleges Paragraphs 1 through 76 of this Complaint.

90. By engaging in the conduct described herein, and as alleged in Paragraphs 37 through 64 above, from approximately November 2019 through March 2024, Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

91. By reason of the foregoing, Defendants, directly and indirectly, violated and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

**COUNT VI**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(c)**
**(Against All Defendants)**

92. The Commission repeats and realleges Paragraphs 1 through 76 of this Complaint.

93. By engaging in the conduct described herein, and as alleged in Paragraphs 65 through 76 above, from approximately November 2019 through March 2024, Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the

purchase or sale of securities, knowingly or recklessly engaged in acts, practices and courses of business which have operated, are now operating, and will operate as a fraud upon the purchasers of such securities.

94. By reason of the foregoing, Defendants, directly and indirectly, violated and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(c) [17 C.F.R. § 240.10b-5(c)] thereunder.

## COUNT VII

**Violations of Sections 5(a) and 5(c) of the Securities Act**
**in the HML Notes Offering**
**(Against All Defendants)**

95. The Commission repeats and realleges Paragraphs 1 through 76 of this Complaint.

96. No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the HML Notes' securities and transactions described in this Complaint and no exemption from registration existed with respect to these securities and transactions.

97. Starting no later than November 2019 and continuing through at least March 2024, Defendants, directly and indirectly, (a) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities as described herein, through the use or medium of a

prospectus or otherwise; (b) carried or caused such securities, as described herein, to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or (c) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise, as described herein, without a registration statement having been filed or being in effect with the Commission as to such securities.

98. By reason of the foregoing, Defendants violated and, unless enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

**COUNT VIII**

**Unjust Enrichment**
**(Against Relief Defendant)**

99. The Commission repeats and realleges Paragraphs 1 through 76 of this Complaint.

100. As a result of Defendants' fraudulent conduct described herein, and as alleged in Paragraphs 23, 26, 49, and 65 through 76 above, TSS obtained investor funds without a legitimate claim to those funds. Under those circumstances, it is not just, equitable, or considerable for TSS to retain the funds. TSS was unjustly enriched.

Case 8:26-cv-02186 Document 1 Filed 07/29/26 Page 37 of 39 PageID 37

## VI. RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests the Court find Defendants committed the violations alleged, and

### A. Permanent Injunction Against Defendants

Issue Permanent Injunctions enjoining Defendants from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77(e)(a) and (c); § 77q(a)]; and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

### B. Conduct-Based Injunction Against Mendenhall and Vaughn

Issue Conduct-Based Injunctions enjoining Mendenhall and Vaughn from directly or indirectly, including, but not limited to, through any entity owned or controlled by Mendenhall or Vaughn, respectively, from participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Mendenhall or Vaughn from purchasing or selling securities for each of their respective own personal accounts.

### C. Disgorgement and Prejudgment Interest Against Defendants and Relief Defendant

Issue an order directing Defendants and Relief Defendant to disgorge all ill-gotten gains or proceeds received with prejudgment interest thereon, resulting from the acts and/or courses of conduct alleged in this Complaint, pursuant to

Sections 21(d)(3), (d)(5), and (d)(7) of the Exchange Act [15 U.S.C. § 78(d)(3), (5), and (7)].

**D. Civil Monetary Penalties Against Mendenhall and Vaughn**

Issue an order directing Mendenhall and Vaughn to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

**E. Officer and Director Bar Against Mendenhall and Vaughn**

Issue an order pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], permanently prohibiting Mendenhall and Vaughn from acting as an officer or director of any issuer whose securities are registered with the Commission pursuant to Section 12 of the Exchange Act or which is required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act.

**F. Further Relief Against Defendants and Relief Defendant**

Grant such other and further relief as may be necessary and appropriate.

## VII. DEMAND FOR JURY TRIAL

The Commission hereby demands a trial by jury on any and all issues in this action so triable.

Dated: July 29, 2026

Respectfully submitted:

By: /s/ *Russell Koonin*
Russell Koonin
Acting Supervisory Trial Counsel
Fla. Bar No. 474479
Direct: (305) 982-6390
Kooninr@sec.gov
*Lead Counsel*

Michael Mikulic
Trial Counsel
Fla. Bar No. 125073
Direct: (305) 982-6353
Mikulicm@sec.gov

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, FL 33131
Telephone: (305) 982-6300

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

SECURITIES AND EXCHANGE COMMISSION

**(b)** County of Residence of First Listed Plaintiff ______
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Russell Koonin, Esq. SEC, 801 Brickell Ave. #1950, Miami FL 33131 Ph: 305-982-6390

## DEFENDANTS

RAD DIVERSIFIED REIT, INC., et al.

County of Residence of First Listed Defendant Hillsborough
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [x] 1 U.S. Government Plaintiff
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

Other:
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [x] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
15 U.S.C. §§ 77(e)(a) and (c); 15 U.S.C. § 77q(a);15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5

Brief description of cause:
Violations of Anti-fraud and Securities Registration Provisions of the Federal Securities Laws

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ______ DOCKET NUMBER ______

DATE: July 29, 2026

SIGNATURE OF ATTORNEY OF RECORD: s/Russell Koonin, Esq.

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II. Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III. Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV. Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V. Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII. Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS 44 is used to reference related cases, if any. If there are related cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

Case 8:26-cr-00192-JLB-NHA Document 1 Filed 05/27/26 Page 1 of 8 PageID 1

MAY 27 2026 PM3:59
FILED - USDC - FLMD - TPA

SEALED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v. CASE NO. 8:26-CR-192-JLB-NHA
18 U.S.C. § 1341

BRANDON DUTCH MENDENHALL

# INDICTMENT

The Grand Jury charges:

## COUNT ONE
(Mail Fraud)

### A. Introduction

At times relevant to this Indictment:

1. BRANDON DUTCH MENDENHALL, was a resident of the Middle District of Florida, and along with other members known and unknown to the Grand Jury, was the registered agent, director, or officer of several entities, including RAD DIVERSIFIED REIT, INC.; RAD DIVERSIFIED OZ FUND, LP; DDH FUND, LP; and DHI HOLDINGS, LP. MENDENHALL solicited individuals to invest in real estate properties through these entities by falsely and fraudulently promising high investment returns.

SEALED

2. RAD DIVERSIFIED REIT, INC. was a Maryland corporation with its principal address in Port Richey, Florida. MENDENHALL was one of the entity's registered agents, and signatory on its Financial Institution 1 account ending in 9802.

3. RAD DIVERSIFIED OZ FUND, LP was a Delaware limited partnership with its principal address in Tampa, Florida. MENDENHALL was one of the entity's registered agents and had access to its Financial Institution 1 account ending in 8379.

4. DDH FUND, LP was a Delaware limited partnership with its principal address in Tampa, Florida. MENDENHALL was one of the entity's registered agents and was a signatory on its Financial Institution 1 account ending in 5516.

5. DHI HOLDINGS LP. was a Delaware limited partnership with its principal place of business in St. Petersburg, Forida. MENDENHALL was one of the entity's registered agents and a signatory on its Financial Institution 1 account ending in 5376.

6. Lender 1 was a wholesale, non-qualified mortgage lending business, and was a financial institution as that term is defined in 18 U.S.C. § 20.

7. Title Company 1 was a title company whose principal place of business was in the Middle District of Florida.

**B. <u>The Scheme and Artifice</u>**

8. Beginning on an unknown date, but no later than in or around November 2021, and continuing through in or around March 2022, in the Middle District of Florida and elsewhere, the defendant,

BRANDON DUTCH MENDENHALL,

did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises about a material fact.

### C. Manner and Means of the Scheme and Artifice

9. The manner and means by which the defendant sought to accomplish the scheme and artifice included, among others, the following:

a. It was part of the scheme and artifice that the defendant would and did create, and caused to be created, multiple investment funds.

b. It was further a part of the scheme and artifice that the defendant would and did open, and caused to be open, multiple bank accounts at Financial Institution 1 for his investment funds, including the accounts ending in 5516, 5376, 8379, and 9802.

c. It was further a part of the scheme and artifice that the defendant would and did solicit, and caused to be solicited, money from investors for various real estate opportunities, and caused those investments to be deposited into accounts at Financial Institution 1.

d. It was further a part of the scheme and artifice that the defendant would and did arrange, and caused to be arranged, the rental income from real estate investments to be deposited into the accounts at Financial Institution 1.

e. It was further a part of the scheme and artifice that once the defendant established significant deposits into the accounts at Financial Institution 1, the defendant engaged, and caused to be engaged, the services of Lender 1.

f. It was further a part of the scheme and artifice that in order to induce Lender 1 to finance a loan for his personal residence the defendant would and did prepare and submit, and caused to be prepared and submitted, a false and fraudulent mortgage application that included multiple material false and fraudulent representations, and pretenses, such as:

i. Overinflating the defendant's personal income; and

ii. Representing that the deposits in the past 24 months of bank statements provided from the operating accounts of DDH FUND, LP and DHI HOLDINGS, LP were the defendant's personal income because he was the owner of those entities.

g. It was further a part of the scheme and artifice that the defendant would and did cause Lender 1 to mail closing documents to Title Company 1.

h. It was further a part of the scheme and artifice that the defendant would and did cause Lender 1 to approve the mortgage application and caused to be transmitted funds to purchase the residence.

i. It was a further part of the scheme and artifice that the defendant would and did perform acts and make statements to promote and achieve the scheme and artifice and to misrepresent, hide, and conceal the scheme and artifice and the acts committed in furtherance thereof.

## D. Execution of the Scheme and Artifice

10. On or about the date set forth below, in the Middle District of Florida and elsewhere, the defendant,

BRANDON DUTCH MENDENHALL,

for the purpose of executing and attempting to execute the aforesaid scheme and artifice, did knowingly and willfully deposited and caused to be deposited a matter and thing to be sent and delivered by any private or commercial interstate carrier, and knowingly caused to be delivered by mail and such carrier according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, a matter and thing, as described below:

| COUNT | DATE OF MAILING | NATURE OF MAILING |
|---|---|---|
| **One** | March 1, 2022 | Closing documents for the purchase of the defendant's personal residence mailed to Title Company 1 located in the Middle District of Florida. |

All in violation of 18 U.S.C. §§ 1341 and 2.

**FORFEITURE**

1. The allegations contained in Count One are incorporated by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

2. Upon conviction of a violation of 18 U.S.C. § 1341, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

3. The property to be forfeited includes, but is not limited to, the real property located at 4604 Clarksdale Lane, Brandon, Florida 33511; Lot 25, Block 2,

BLOOMINGDALE SECTION "F" UNIT 1, according to the map of plat thereof, as recorded in Plat Book 51, Page(s) 74, of the Public Records of Hillsborough County, Florida, which represents the real property the defendant obtained from the offense.

4. If any of the property described above, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

[redacted]

GREGORY W. KEHOE
United States Attorney

By: ______________________________
Merrilyn E. Hoenemeyer
Assistant United States Attorney

By: ______________________________
Gregory D. Pizzo
Assistant United States Attorney
Chief, Economic Crimes Section

FORM OBD-34
May 26

No.

UNITED STATES DISTRICT COURT
Middle District of Florida
Tampa Division

THE UNITED STATES OF AMERICA

vs.

BRANDON DUTCH MENDENHALL

INDICTMENT

Violations: 18 U.S.C. § 1341

[redacted]

Filed in open court this 27th day

of May, 2026.

K. Nieves KARINA NIEVES
Clerk

Bail $____________________

GPO 863 525

FILED
AUG 19 2026
CLERK, U. S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA FLORIDA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v. CASE NO. 8:26-cr-267-WFJ-LSG

BRANDON DUTCH MENDENHALL
and
AMY MARIE SMITH VAUGHN

SEALED

18 U.S.C. § 664 (Theft or Embezzlement from Employee Benefit Plan)
18 U.S.C. § 669 (Theft or Embezzlement in Connection with Health Care)

## INDICTMENT

The Grand Jury charges:

### COUNTS ONE THROUGH TEN
(Theft or Embezzlement from Employee Benefit Plan)

### A. Introduction

At times relevant to this Indictment:

1. BRANDON DUTCH MENDENHALL and AMY MARIE SMITH VAUGHN were residents of the Middle District of Florida and, along with other members known and unknown to the Grand Jury, were the founders, registered agents, directors, or officers of several entities, including RAD DIVERSIFIED REIT, INC.; RADD CAPITAL LLC; THE SEMINAR SOLUTION, LLC; and DHI HOLDINGS, INC.

2. RAD DIVERSIFIED REIT, INC. was a Maryland corporation with its principal address in Port Richey, Florida. MENDENHALL and VAUGHN were the entity's registered officers.

3. RADD CAPITAL, LLC was a Florida limited liability company with its principal address in Tampa, Florida. MENDENHALL was one of the entity's registered officers and had access to its Financial Institution 1 account ending in 6416. MENDENHALL and VAUGHN both were signers on RADD CAPITAL'S Financial Institution 2 account ending in 5471.

4. THE SEMINAR SOLUTION, LLC was a limited liability company registered in Nevada. MENDENHALL and VAUGHN were listed as the entity's managers and were signers on its Financial Institution 3 account ending in 0790.

5. DHI HOLDINGS, INC. was a Florida corporation with its principal place of business in Tampa, Forida. MENDENHALL was the entity's registered agent and managing member.

6. The Employee Retirement Income Security Act of 1974 ("ERISA") is a federal law that sets minimum standards for most voluntarily established retirement and health plans in private industry to provide protection for individuals in these plans. The provisions of Title I of ERISA, were enacted to address public concern that funds of private pension plans

were being mismanaged and abused. ERISA is applicable to most private employer sponsored employee benefit plans, including retirement plans and health benefit plans.

7. Company 1 was a business that offered 401(k) retirement plans to employers for the benefit of their employees. These plans were employee benefit plans subject to Title 1 of ERISA. RAD DIVERSIFIED REIT and RADD CAPTIAL contracted with Company 1 for its employees' retirement plan.

8. Company 2 was a health insurance company that offered health insurance plans to employers for the benefit of its employees. These plans were also subject to Title I of ERISA and were health care benefit programs as defined in 18 U.S.C. § 24(b). DHI HOLDINGS and THE SEMINAR SOLUTION contracted with Company 2 for its employees' health insurance plan.

9. MENDENHALL and VAUGHN were responsible and oversaw the financial activities of the entities, such as paying salaries, deciding when to pay bills, deciding which bills to pay, and forwarding employee contributions to its employees' retirement plans and health insurance plans. The employee contributions were withheld from employees' pay checks to pay the premiums to the health insurer or transferred directly to the retirement program.

**B. The Charges**

10. On or about the dates set forth below, in the Middle District of Florida and elsewhere, the defendants,

BRANDON DUTCH MENDENHALL and
AMY MARIE SMITH VAUGHN

did embezzle, steal, and unlawfully and willfully abstract and convert to their own use and the use of another, in the amounts set for below, the moneys, funds, securities, premiums, credits, property and other assets of a 401(k) Plan, an employee benefit plan, subject to Title 1 of ERISA, and of a fund connected with such plan, each instance constituting a separate count:

| COUNT | APPROXIMATE DATE | DESCRIPTION OF THE FUNDS |
|---|---|---|
| 1 | May 22, 2024 | $2,067.93 withheld from employees' pay for the exclusive purpose of being transmitted to employees' retirement accounts with Company 1. |
| 2 | June 25, 2024 | $1,402.63 withheld from employees' pay for the exclusive purpose of being transmitted to employees' retirement accounts with Company 1. |
| 3 | July 23, 2024 | $2,360.75 withheld from employees' pay for the exclusive purpose of being transmitted to employees' retirement accounts with Company 1. |
| 4 | August 22, 2024 | $3,317.11 withheld from employees' pay for the exclusive purpose of being transmitted to employees' retirement accounts with Company 1. |
| 5 | September 24, 2024 | $2,625.82 withheld from employees' pay for the exclusive purpose of being transmitted to employees' retirement accounts with Company 1. |

| COUNT | APPROXIMATE DATE | DESCRIPTION OF THE FUNDS |
|---|---|---|
| **6** | October 23, 2024 | $1,191.00 withheld from employees' pay for the exclusive purpose of being transmitted to employees' retirement accounts with Company 1. |
| **7** | November 25, 2024 | $1,596.87 withheld from employees' pay for the exclusive purpose of being transmitted to employees' retirement accounts with Company 1. |
| **8** | December 23, 2024 | $901.07 withheld from employees' pay for the exclusive purpose of being transmitted to employees' retirement accounts with Company 1. |
| **9** | January 27, 2025 | $535.81 withheld from employees' pay for the exclusive purpose of being transmitted to employees' retirement accounts with Company 1. |
| **10** | February 25, 2025 | $60.39 withheld from employees' pay for the exclusive purpose of being transmitted to employees' retirement accounts with Company 1. |

All in violation of 18 U.S.C. § 664.

**COUNTS ELEVEN THROUGH FIFTEEN**
(Theft or Embezzlement in Connection with Health Care)

11. The Grand Jury realleges and incorporates by reference Paragraph 1 through 9 of Part A of this Indictment as if fully set forth herein.

12. On or about the dates set forth below, in the Middle District of Florida and elsewhere, the defendants,

BRANDON DUTCH MENDENHALL and
AMY MARIE SMITH VAUGHN

did knowingly and willfully embezzle, steal, and without authority convert to their own use and the use of any person other than the rightful owner, and intentionally misapplied any of the moneys, funds, securities, premiums, credits, property, and other assets of the health insurance plan, a health care benefit programs as defined in 18 U.S.C. § 24(b), each instance constituting a separate count:

| COUNT | APPROXIMATE DATE | DESCRIPTION OF THE FUNDS |
|---|---|---|
| **11** | September 2024 | $5,401.35 withheld from employees' pay for insurance premium payments which were not remitted to Company 2. |
| **12** | October 2024 | $8,394.81 withheld from employees' pay for insurance premium payments which were not remitted to Company 2. |
| **13** | November 2024 | $6,343.27 withheld from employees' pay for insurance premium payments which were not remitted to Company 2. |
| **14** | December 2024 | $3,855.01 withheld from employees' pay for insurance premium payments which were not remitted to Company 2. |
| **15** | January 2025 | $302.47 withheld from employees' pay for insurance premium payments which were not remitted to Company 2. |

All in violation of 18 U.S.C. § 669.

## FORFEITURE

1. The allegations contained in Counts One through Fifteen are incorporated by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a)(7), and 28 U.S.C. § 2461(c).

2. Upon conviction of a violation of 18 U.S.C. § 664, the defendants shall forfeit to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the violation.

3. Upon conviction of a violation of 18 U.S.C. § 669, the defendants shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7) any property, real or personal, that constitutes or is derived directly or indirectly, from gross proceeds traceable to the commission of the offense.

4. The property to be forfeited includes, but is not limited to, an order of forfeiture in the amount of the proceeds the defendant obtained from the offense.

5. If any of the property described above, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

A TRUE BILL,

Foreperson

GREGORY W. KEHOE
United States Attorney

By: Merrilyn E. Hoenemeyer
Assistant United States Attorney

By: Michael R. Kenneth
Assistant United States Attorney
Chief, Economic Crimes Section

FORM OBD-34
August 26

No.

UNITED STATES DISTRICT COURT
Middle District of Florida
Tampa Division

THE UNITED STATES OF AMERICA

vs.

BRANDON DUTCH MENDENHALL
and
AMY MARIE SMITH VAUGHN

INDICTMENT

Violations: 18 U.S.C. §§ 664, 669

A true bill,

Foreperson

Filed in open court this 19th day

of August 2026.

Ashley Sanden
Clerk

Bail $____________________

GPO 863 525